**EXHIBIT 1**

**TO**

**DECLARATION OF ALYSON A. FOSTER**

ORIGINAL

1   TODD M LANDER (BAR NO. 173031)
    todd.lander@ffslaw.com
2   TRACY R. DAUB (BAR NO. 239013)
    tracy.daub@ffslaw.com
3   FREEMAN, FREEMAN & SMILEY, LLP
    1888 Century Park East, Suite 1900
4   Los Angeles, California 90067
    Telephone: (310) 255-6100
5   Facsimile: (310) 255-6200

6   SANFORD L. MICHELMAN,
    (BAR NO. 179702)
7   (smichelman@mrllp.com)
    MONA Z. HANNA (BAR NO. 131439)
8   (mhanna@mrllp.com)
    MICHELMAN & ROBINSON, LLP
9   15760 Ventura Boulevard, 5th Floor
    Encino, CA 91436
10   Telephone: (818) 783-5530
    Facsimile: (818) 783-5507

11

12   Attorneys for GEMCAP LENDING I, LLC



FILED
CLERK, U.S. DISTRICT COURT

JUL 30 2013

CENTRAL DISTRICT OF CALIFORNIA
BY         DEPUTY

13

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

16

GEMCAP LENDING I, LLC, a
Delaware limited liability company,

    Plaintiff,

    vs.

CROP USA INSURANCE AGENCY,
INC., an Idaho corporation; CROPUSA
INSURANCE SERVICES, LLC, an
Idaho limited liability company; CROP
USA, LLC, a limited liability company
of unknown origin; AIA INSURANCE,
INC., an Idaho corporation; AIA
SERVICES CORPORATION, an Idaho
corporation; R. JOHN TAYLOR a/k/a
RAY JOHNSON TAYLOR a/k/a R.
JOHNSON TAYLOR a/k/a
RAYMOND J. TAYLOR, an
individual; REINSURANCE
PARTNERS, LLC, an Idaho limited
liability company; GREEN LEAF
REINSURANCE PARTNERS, LLC, a
Delaware limited liability company;

CV13- 5504 Case No. STD (MANx)

COMPLAINT FOR:
(1)   BREACH OF LOAN
      AGREEMENT;
(2)   BREACH OF IMPLIED
      COVENANT OF GOOD FAITH
      AND FAIR DEALING;
(3)   FRAUD;
(4)   MONEY HAD AND
RECEIVED; AND
(5)   BREACH OF CONTRACT;
(6)   FRAUD;
(7)   CONVERSION;
(8)   DECLARATORY RELIEF;
(9)   UNFAIR BUSINESS
PRACTICES



Clerk, US District Court
COURT 4612

1999446.1 24093-800

1
COMPLAINT

FOSTER DEC. EX. 1 pg. 1

1 WESKAN AGENCY, LLC, a Kansas
limited liability company; SOUND
2 INSURANCE AGENCY, an Idaho
assumed business name; PACIFIC
3 EMPIRE RADIO CORPORATION, an
Idaho corporation; RANDOLPH
4 LAMBERJACK, an individual; JOLEE
DUCLOS, an individual; BRYAN
5 FREEMAN, an individual; and
HILLCREST AIRCRAFT COMPANY,
6 an Idaho corporation; CGB
DIVERSIFIED SERVICES, INC. dba
7 DIVERSIFIED CROP INSURANCE
SERVICES, a Louisiana Corporation,
8
9            Defendants.

10

11

        Plaintiff GEMCAP LENDING I, LLC, complains of Defendants 17TH STATE
12
STREET PARTNERS, LLC, CROP USA INSURANCE AGENCY, INC.,
13
CROPUSA INSURANCE SERVICES, LLC, AIA INSURANCE, INC., AIA
14
SERVICES CORPORATION, R. JOHN TAYLOR a/k/a RAY JOHNSON
15
TAYLOR a/k/a R. JOHNSON TAYLOR a/k/a Raymond J. Taylor,
16
REINSURANCE PARTNERS, LLC, GREEN LEAF REINSURANCE
17
PARTNERS, LLC, GREEN LEAF RE INSURANCE COMPANY, WESKAN
18
AGENCY, LLC, SOUND INSURANCE AGENCY, PACIFIC EMPIRE RADIO
19
CORPORATION, RANDOLPH LAMBERJACK, JOLEE DUCLOS, BRYAN
20
FREEMAN, HILLCREST AIRCRAFT COMPANY, LINDA JONES, FRANCIS
21
WILSON, and CGB DIVERSIFIED SERVICES, INC. dba DIVERSIFIED CROP
22
INSURANCE SERVICES as follows:
23
                    **THE PARTIES**
24
        1.    Plaintiff Gemcap Lending I, LLC ("GemCap"), is, and at all times
25
relevant was, a Delaware limited liability company with its principle place of
26
business in Malibu, California. All members of GemCap are domiciled in
27
California. GemCap, therefore, is a citizen of California.
28

1999446.1 24093-800                    2
                              COMPLAINT

**FOSTER DEC. EX. 1 pg. 2**

2.     Defendant R. John Taylor a/k/a Ray Johnson Taylor a/k/a R. Johnson Taylor a/k/a/ Raymond J. Taylor ("Taylor") is an individual domiciled in Idaho. Taylor, therefore, is a citizen of Idaho.

3.     Defendant Randolph Lamberjack ("Lamberjack") is an individual domiciled in Indiana. Lamberjack, therefore is a citizen of Indiana.

4.     Defendant JoLee Duclos ("Duclos") is an individual domiciled in Washington. Duclos, therefore, is a citizen of Washington.

5.     Defendant Bryan Freeman ("Freeman") is an individual domiciled in Idaho. Freeman, therefore, is a citizen of Idaho.

6.     Defendant Hillcrest Aircraft Company ("Hillcrest") is an Idaho corporation with its principal place of business in Lewiston, Idaho. Hillcrest, therefore, is a citizen of Idaho and GemCap is informed and believes that it has conducted and is conducting business in the state of California and within this judicial district.

7.     Defendants Linda Jones ("Jones") and Francis Wilson ("Wilson") are officers and agents of Hillcrest, and are citizens of Idaho.

8.     Defendant Crop USA Insurance Agency, Inc. ("Crop"), is, and at all relevant times was, an Idaho corporation with its principal place of business in Idaho and is, therefore, a citizen of Idaho. GemCap is informed and believes that Crop has done, and is doing, business in the state of California and within this judicial district.

9.     Defendant CropUSA Insurance Services, LLC ("Crop Services"), is and at all relevant times was, an Idaho limited liability company. Taylor and Lamberjack are the sole members of Crop Services. Crop Services is, therefore, a citizen of Idaho and Indiana. GemCap is informed and believes that Crop Services has done, and is doing, business in the state of California and within this judicial district. Crop and Crop Services are occasionally referred to collectively as "Crop."

10.     Defendant AIA Insurance, Inc. ("AIA Insurance"), is and at all relevant times was, an Idaho corporation with its principal place of business in Idaho and is,

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**FOSTER DEC. EX. 1 pg. 3**

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1 therefore, a citizen of Idaho. GemCap is informed and believes that AIA Insurance
2 has done, and is doing, business in the state of California and within this judicial
3 district.

4       11. Defendant AIA Services Corporation ("AIA") is the assumed name of
5 AIA Insurance, a citizen of Idaho. AIA is, therefore, a citizen of Idaho. GemCap is
6 informed and believes that AIA has done, and is doing, business in the state of
7 California and within this judicial district.

8       12. Defendant Reinsurance Partners, LLC ("Reinsurance Partners"), is an
9 Idaho limited liability company. GemCap alleges on information and belief that all
10 members of Reinsurance Partners are domiciled in Idaho and, therefore,
11 Reinsurance Partners is a citizen of Idaho. GemCap is informed and believes that
12 Reinsurance Partners has done, and is doing, business in the state of California and
13 within this judicial district.

14       13. Defendant Green Leaf Reinsurance Partners, LLC ("Green Leaf"), is a
15 Delaware limited liability company. GemCap alleges on information and belief that
16 all members of Green Leaf are domiciled in Idaho and, therefore, Green Leaf is a
17 citizen of Idaho and Delaware. GemCap is informed and believes that Green Leaf
18 has done, and is doing, business in the state of California and within this judicial
19 district.

20       14. Defendant Green Leaf Re Insurance Company ("Green Leaf
21 Insurance") is, on information and belief, a corporation domiciled in the state of
22 Idaho. GemCap is informed and believes that Green Leaf Insurance has done, and is
23 doing, business in the state of California and within this judicial district.

24       15. Defendant Weskan Agency, LLC ("Weskan"), a/k/a 17th State Street
25 Partners, LLC, is a Kansas limited liability company. GemCap alleges on
26 information and belief that all members of Weskan are domiciled in Idaho or Kansas
27 and, therefore, Weskan is a citizen of Idaho and Kansas. GemCap is informed and

28

**FOSTER DEC. EX. 1 pg. 4**

1 || believes that Weskan has done, and is doing, business in the state of California and

2 || within this judicial district.

3      16.    Defendant Sound Insurance Agency ("Sound") is, on information and

4 || believe, a corporation organized and existing under the laws of the state of Idaho,

5 || and is owned by Taylor. Sound, therefore, is a citizen of Idaho. GemCap is

6 || informed and believes that Sound has done, and is doing, business in the state of

7 || California and within this judicial district.

8      17.    Defendant Pacific Empire Radio Corporation ("PERC") is an Idaho

9 || corporation with its principal place of business in Idaho and, therefore, is a citizen of

10 || Idaho. GemCap is informed and believes that PERC has done, and is doing,

11 || business in the state of California and within this judicial district.

12      18.    Defendant CGB Diversified Services, Inc. dba Diversified Crop

13 || Insurance Services ("Diversified") is a Louisiana Corporation with its principal

14 || place of business on Illinois and, therefore, is a citizen of both states. Diversified is

15 || registered to do business in the State of California and has a designated agent for

16 || service located in the State of California and within this judicial district. GemCap is

17 || informed and believes that Diversified has regularly conducted, and is regularly

18 || conducting, business in the State of California and within this judicial district.

19      19.    GemCap is informed and believes, and based thereon alleges, that each

20 || of the Defendants named herein was the agent, servant or employee of each of the

21 || other Defendants, and was acting within and pursuant to such agency, authority and

22 || employment. Each of the Defendants is responsible for the losses, damage, and

23 || harm suffered by GemCap alleged herein.

24      20.    GemCap is informed and believes, and based thereon alleges, that each

25 || of the Defendants named herein conspired and agreed among themselves to do the

26 || acts complained of herein and were, in doing the acts complained of herein, acting

27 || pursuant to said conspiracy, and that each Defendant sued herein is jointly and

28 || severally responsible and liable to GemCap for the damages alleged herein.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800

5

COMPLAINT

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

## JURISDICTION AND VENUE

21.     GemCap is a citizen of Delaware and California.  Each of the Defendants is a citizen of Idaho, Kansas, Delaware, Washington, Indiana, Illinois or Louisiana.

22.     The matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

23.     The transaction giving rise to this action was negotiated and consummated in Santa Monica and Malibu, California.

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) and (c)(1) because there is complete diversity between plaintiff and defendant, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests or costs.

## GENERAL ALLEGATIONS

### GemCap's Business

25.     GemCap is a family-run asset based commercial lender that has established a thriving niche serving small and mid-size businesses in need of funding unavailable from larger and traditional lending institutions.  Formed in 2008, GemCap has built a reputation for integrity, diligence, and fair play among borrowers, and has consequently seen dramatic growth in its loan portfolio in the past five years.

26.     The basic business blueprint is straightforward.  GemCap receives over $1 billion in loan requests annually, many from distressed companies that cannot turn to or rely upon conventional funding.  The company then assesses the asset base of each prospective borrower to determine if sufficient tangible and recoverable assets – typically taking the form of equipment, inventory and accounts receivable – exist to secure the requested loan and make GemCap whole in the event of a default.  If so, and the borrower otherwise qualifies, appropriate funding and security terms are negotiated.

FOSTER DEC. EX. 1 pg. 6

27. Once a loan is approved, GemCap typically funds on a revolving basis subject to a specified limit, a structure under which the borrower must demonstrate that its asset base and liquidity warrant continued lending. More specifically, borrowers must accompany each request for funding with a borrowing base certificate delineating the available inventory, accounts receivable and other loan security, and establishing that the borrower is entitled to receive funding in the requested amount. These certificates are essential for GemCap, given that they are the central instrument in the funding process and are relied upon in making lending decisions. Where GemCap funds a request based on a certificate exaggerating the borrower's attachable asset base and/or otherwise misrepresenting the financial picture such that the borrower is not eligible to receive the funding it has requested, the result is an over-advance – i.e., the borrower has been funded in an amount exceeding its eligibility. GemCap engages in ongoing due diligence concerning certificates and the borrower's representations in them – by, among other things, routinely auditing the borrower's certificates and financial circumstances – in order to avoid over-advances. But some inevitably occur, and GemCap's loan documents invariably require that they be re-paid immediately. Where they are not, GemCap then pursues its rights against the pledged security or, when necessary, initiates litigation. By virtue of the transparency of its business practices, the comprehensiveness of the security it obtains as part of its loan agreements, and its willingness to work with borrowers toward constructive resolutions of disputes, litigation has been rare for GemCap. As explained below, however, it is necessary in this case.

**Crop USA, And The Federal Crop Insurance Program**

28. Crop is a Lewiston, Idaho based managing general insurance agency specializing in crop insurance marketed to established independent insurance agents in twelve western states. Crop insurance in the United States is federally subsidized, and subject to a byzantine regulatory regime regulating premiums and available

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FOSTER DEC. EX. 1 pg. 7

1 commissions based on a series of risk factors. The federal Risk Management
2 Agency ("RMA") administers the program as authorized by the Federal Crop
3 Insurance Corporation ("FCIC"), and RMA is responsible for determining premium
4 rates and capping commissions. The Government does not issue insurance itself,
5 which is instead sold and serviced by private insurance companies. But the
6 Government subsidizes a portion of the premium, and a segment of the
7 administrative and operating costs (called "A&O") of the insurers. It likewise
8 reinsurers the carriers by absorbing losses occurring when policy payments exceed
9 collected premiums. The result is a system where the Government partially
10 underwrites a private insurance market, ensuring that farms throughout the country
11 can obtain comprehensive insurance for the crops.

12    29.    Crop is not an insurance company, but acts as a general agent for
13 Diversified concerning the sale of Diversified policies in accordance with the terms
14 of a July 2011 Sales-Agent-Company Agreement between the two companies. That
15 agreement provided for Crop to facilitate the sale of Diversified crop insurance
16 policies, a responsibility it undertook by contracting with other third party insurance
17 agents to solicit and sell the policies to the insureds. Crop was, under the resulting
18 structure, entitled as the general agent to receive commissions on the issued policies,
19 though a percentage of those commissions were ultimately distributed to the selling
20 agents with whom Crop contracted. Thus, Crop's role in the system is to collect
21 premiums and to ensure Crop's agents confirm policyholders make the premium
22 payments from the sale of policies and distribute appropriate commissions to the
23 selling agents, charging a fee for doing so. The transaction of business through
24 Crop serves to pool the premiums of high volumes of independent agents, creating a
25 larger block of policies that increases leverage on the carriers and gives rise to more
26 favorable rates.

27    30.    Taylor, Crop's president and principal, approached GemCap in 2011
28 seeking funding. He explained the nature of Crop's business, the premiums it held

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**FOSTER DEC. EX. 1 pg. 8**

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1 under management, and why it needed funding. More particularly, he represented in

2 September 2011 to Richard Ellis – GemCap's co-president – and Ramsey Naber – a

3 GemCap employee – that, because of the peculiarities of the crop insurance system,

4 premiums and commissions were paid in intervals over the course of the year and

5 not on an ongoing basis. As a result, Crop's primary source of revenue was paid

6 intermittently, and the business needed loan funds to operate its daily operations

7 during the period between those intermittent payments – in other words, for working

8 capital. GemCap is informed and believes, and on that basis alleges, that Taylor's

9 representations were false. The true facts were that Taylor was overstretched

10 financially and needed money largely to fund several other entities, both related and

11 unrelated to Crop, and to service his personal obligations. These included without

12 limitation Weskan, AIA Insurance, AIA and PERC. Indeed, and as alleged before,

13 GemCap has recently become aware that Taylor and Crop transferred GemCap loan

14 proceeds – advanced under the terms of the loan agreement among the parties and

15 subject to specific use restrictions within those documents – to each and all of these

16 entities for purposes having nothing whatever to do with the crop insurance business

17 that was the pretext Taylor and Crop offered to induce GemCap into agreeing to the

18 loan arrangement. When coupled with Taylor's misappropriation of loan funds to

19 pay purely personal expenses, as alleged below, it's clear that Taylor defrauded

20 GemCap from the outset.

21 **The Crop USA Loan**

22      31.    GemCap was unaware of Taylor's fraudulent intent in 2011, of course,

23 having instead received representations and assurances that any loan proceeds would

24 be used for permissible purposes related to Crop's business. On the strength of

25 those representations, and independent due diligence, GemCap agreed to provide a

26 revolving loan facility to Crop and Crop Services, with an initial credit limit of

27 $5,000,000. That limit was later increased incrementally – prior to GemCap

28

**FOSTER DEC. EX. 1 pg. 9**

1   becoming aware of the misrepresentations and breaches of agreement set forth in

2   this Complaint – to the present credit limit of $10,000,000.

3      **The Loan Agreement**

4      32.    The parties entered into a loan agreement dated November 23, 2011, by

5   and between GemCap, as lender, and Crop and Crop Services, joint and severally, as

6   borrowers. The parties later executed, on February 4, 2013, an Amended and

7   Restated Loan and Security Agreement Amending and Restating the Loan and

8   Security Agreement Originally Dated November 23, 2011, and the original and

9   amended agreements are collectively referred to as the "Loan Agreement". A true

10   and correct copy of the Loan Agreement is attached to this Complaint as Exhibit "1"

11   and is incorporated herein as though set forth in full.

12      33.    The Loan Agreement provides for a revolving credit facility to Crop

13   and Crop Services in the maximum principal amount of $10,000,000.00, and

14   contains several provisions relevant to this Complaint: (1) Section 14.9 provides that

15   the laws of the State of California shall govern the Loan Agreement; (2) Section 2.3

16   provides that "Borrower shall use the proceeds of the Loans solely for the purposes

17   set forth in <u>Section 1(d) the Loan Agreement Schedule</u>."; (3) Section 11 of the Loan

18   Agreement specifies the events constituting a default, including the specification in

19   Section 11.3 that a default occurs upon "Borrower's failure to perform or observe

20   any covenant, term or condition of this Agreement or in any other Loan Document";

21   and (4) Section 12.5 of the Loan Agreement provides for attorneys' fees in the event

22   of the Borrower's default as follows: "Borrower shall be liable for all costs, charges,

23   and expenses, including attorney's fees and disbursements, incurred by Lender by

24   reason of the occurrence of any Event of Default or the exercise of Lender's

25   remedies with respect thereto, each of which shall be repayable by Borrower on

26   demand with interest at the Default Interest Rate, and added to the Obligations."

27      34.    The Loan Agreement also provides that, as collateral for the loan,

28   GemCap maintains a first priority security interest in and lien upon "all now owned

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**FOSTER DEC. EX. 1 pg. 10**

25

1 and hereafter acquired property and assets of Borrower and the Proceeds and

2 Products thereof." That pledge of security, at Section 5.1 of the Loan Agreement,

3 delineates the full scope of assets and property comprising the collateral and, for

4 purposes of this action, indisputably includes all commissions, premiums and other

5 amounts Crop and Crop Services are paid as part of their insurance business and

6 which they hold for themselves or for distribution to agents or other third parties.

7    35.    To ensure against any uncertainty or ambiguity concerning its right to

8 attach the pledged collateral, GemCap required Crop to notify Diversified , the

9 insurance company issuing the policies Crop managed, of the funding arrangement

10 with GemCap and of GemCap's security interest in all of Crop's property, including

11 commissions. That notice, provided by way of a November 21, 2011 letter that

12 Diversified countersigned, noted that in "connection with the Financing, CropUSA

13 has, among other things, granted GemCap a security interest in and to any and all

14 property of CropUSA, including, without limitation, all payments, proceeds and

15 other sums to which CropUSA is entitled under the Agreement [i.e., the sales

16 agency agreement between Diversified and Crop under which the latter manage

17 policy premiums and commissions derived from policies the former underwrites],

18 such grant of security interest in the payments under the Agreement is referred to

19 herein as the 'Pledge of Commissions.' The letter went on to request that

20 "Diversified acknowledge the Pledge of Commissions and agree that such Pledge of

21 Commissions does not constitute a default by CropUSA under the Agreement, and

22 acknowledge its receipt of the notice directing payments under the Agreement in the

23 attached letter." A true and correct copy of the November 21, 2011 letter is attached

24 to this Complaint as Exhibit "2." There was, in other words, no uncertainty as to the

25 scope of GemCap's security rights or whether those rights impaired any obligations

26 Crop held to Diversified. They did not.

27    36.    GemCap is an express and acknowledged third-party beneficiary to

28 CropUSA's pledge of commissions.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800

11

COMPLAINT

37.     To further ensure GemCap's rights to the pledged collateral, Crop irrevocably appointed GemCap as attorney-in-fact.  That appointment, at Section 13.3 of the Loan Agreement, provides that, *inter alia*, "as its true and lawful attorney-in-fact, with full irrevocable power and authority in its [Crop] place and stead and in its name or otherwise, from time to time in Lender's [GemCap] discretion, at Borrowers sole [Crop] cost and expense, to take any and all appropriate action . . . which the Lender may deem reasonably necessary or advisable to accomplish the purposes of this Agreement, including without limiting the generality of the foregoing . . . after or during the continuation of an Event of Default . . . take or bring, in the name of the Lender or Borrower, all steps, actions suits or proceedings deemed by Lender necessary or desirable to effect collection of or other realization upon the Collateral . . . ."  (*Id.*, ¶ 13.3(a)(C)(ii)(D)).

38.     In addition, Crop appointed GemCap additional limited powers at its attorney-in-fact, as set forth in the special power of attorney the parties entered into on November 22, 2011 (the "Special POA").  Among other things, the Special POA provides "upon the occurrence of an Event of Default, to file any claims or take any action or institute any proceeding that GemCap may in its good faith sole discretion deem necessary or desirable for the collection of any of the Collateral or otherwise enforce the rights of GemCap with respect to any of the Collateral."  (*Id.*, ¶ (c)).  A true and correct copy of the Special POA is attached to this Complaint as Exhibit "3" and is incorporated herein as though set forth in full.

**The Loan Agreement Schedule**

39.     The Loan Agreement was accompanied by a Loan Schedule, initially executed November 23, 2011 with a later Amended and Restated Loan Agreement Schedule being entered into in conjunction with the Amended and Restated Loan Agreement  (the "Schedule").  A true and correct copy of the Loan Agreement Schedule is attached to this Complaint as Exhibit "4" and is incorporated herein as though set forth in full.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FOSTER DEC. EX. 1 pg. 12

40. The Schedule, at Section 1(c)(v), prescribes the specific manner in which Crop and/or Crop Services could request funding and requires the submission of a borrowing base certificate (the "Borrowing Certificate") substantiating the request and demonstrating Crop's entitlement to the amount:

> "(v) **Borrowing Procedures.** Whenever Borrower desires an Advance, Borrower will notify Lender by delivery of a borrowing certificate certified by a Responsible Officer ("Borrowing Certificate") no later than two (2) Business Days prior to the date of the proposed Advance, setting forth in reasonable detail, as of the date set forth on the Borrowing Certificate, (A) a schedule of Eligible Crop Insurance Contract Receivables setting forth the calculation of the Eligible Crop Insurance Contract Receivables on which such Advance is to be based and a calculation of the Advance requested in connection therewith; and (B) a schedule of the aggregate amount of funds in the Crop account on which such Advance is based, which Borrowing Certificate shall in all respects be subject to the Lender's review and approval."

41. This requirement stands at the core of the Loan Agreement and Crop and Crop Services' contractual obligations. Simply put, GemCap loans on the basis of the Borrowing Certificates, and where an inaccurate Borrowing Certificate is submitted it runs the risk of advancing funds that a borrower is not entitled to receive, creating an overadvance. And where an over-advance occurs, paragraph 1(c)(iv) of the Schedule requires that it be repaid immediately.

42. Beyond that, the Schedule restricts the permissible use of proceeds to a small set of activities related to the crop insurance business:

> (i) payment of funds to Reinsurance Partners, LLC for the purpose of funding its investment in Green Leaf Reinsurance Partners, LLC, (ii) working capital purposes of Weskan Agency, LLC, (iii) payment of the Annual Line Fee (as set forth in Section 3(c) of this Loan Agreement Schedule, (iv) payment of an investment bank fee to GVC Financial Services, LLC, (v) payment of any other out-of-

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FOSTER DEC. EX. 1 pg. 13

Case 2:18-cv-00350-RMN - FGS No. 9-1 filed 08/18/18 PageID 287   Page 15
Case 2:18-cv-00350-RMN - Document 9-1 filed 08/18/18 PageID 287   Page 15   Page 15 of 14
of 81

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   pocket costs, fees and expenses incurred by Borrower in
connection with the Revolving Loans and (vi) working
2   capital purposes of Borrower."[1]

3   43.   The Schedule additionally required, at Section 7(b)(iii), Crop to provide

4   monthly financial statements to GemCap – certified by the Chief Financial Officer –

5   within thirty days after the close of each month.  That, coupled with a similar

6   obligation to furnish quarterly financial statements and other books and records on a

7   continuing basis, was intended to allow GemCap to monitor the company's financial

8   progress.  As alleged below, Crop and Crop Services have breached all these cited

9   provisions, and have did so repeatedly.[2]

10   **The Loan Agreement Guarantors**

11   44.   The Loan Agreement, and Crop and Crop Services' obligations under

12   it, is subject to several personal guarantees.  To start, Taylor personally guaranteed

13   the loan from GemCap to Crop and Crop Services in a Secured Continuing

14   Guarantee dated November 23, 2011, as Amended and Restated Secured Continuing

15   Guarantee dated February 4, 2013 (the "Taylor Guarantee").  The Taylor Guarantee,

16   a true and correct copy of the Taylor Guarantee is attached to this Complaint as

17   Exhibit "5" and incorporated herein as though set forth in full, provides that:

18   "Whether or not suit be instituted, Guarantor agrees to
reimburse Lender on demand for all attorneys' fees and all
19   other costs and expenses incurred by Lender in enforcing
this Guarantee, or arising out of or relating in any way to
20   this Guarantee, or in enforcing any of the Indebtedness
against Borrower, Guarantor, or any other person, or in
21   connection with any property of any kind securing all or
any part of the Indebtedness.  Without limiting the

22

23   [1]   Green Leaf is a "reinsurance" company that Crop created in 2012 and of which
Gemcap was aware.  Given that Green Leaf was related to Crop's insurance
24   business, the funding of it was permissible under the Schedule but strictly limited to
$125,000 capitalization which was to remain, unspent, in a capital account.
25

26   [2]   The Loan Agreement package also included a Secured Revolving Note dated
November 23, 2011, and Amended and Restated on April 1, 2012, July 18, 2012 and
27   February 4, 2013 (the "Note").  A true and correct copy of the Note is attached as
Exhibit "7" to this Complaint.

28

**FOSTER DEC. EX. 1 pg. 14**

generality of the foregoing, and in addition thereto, Guarantor shall reimburse Lender on demand for all attorneys' fees and costs Lender incurs in any way relating to Guarantor, Borrower or the Indebtedness, in order to: (i) obtain legal advice; (ii) enforce or seek to enforce any of its rights; (iii) commence, intervene in, respond to, or defend any action or proceeding, (iv) file, prosecute or defend any claim or cause of action in any action or proceeding (including without limitation any probate claim, bankruptcy claim, third-party claim, secured creditor claim, reclamation complaint, and complaint for relief from any stay under the Bankruptcy Code (Title 11, United States Code) or otherwise; (v) protect, obtain possession of, sell, lease, dispose of or otherwise enforce any security interest in or lien on any property of any kind securing any or all of the Borrower's or Guarantor's affairs. In the event either Lender or Guarantor files any lawsuit against the other predicated on a breach of this Guarantee, the prevailing party in such action shall be entitled to recover it attorneys' fees and costs of suit from the non-prevailing party."

45.     AIA and AIA Insurance likewise entered into a guarantee, this one a Secured Continuing Guarantee in favor of GemCap with respect to the Loan Agreement (the "AIA Guarantee"). The AIA Guarantee rendered AIA and AIA Insurance liable for the joint and several obligations of Crop at the time payment is demanded by GemCap, including any and all attorneys' fees, court costs, and collection charges incurred in endeavoring to collect or enforce any of the AIA Guarantee and any other expense of, for or incidental to collection thereof. A true and correct copy of the AIA Guarantee is attached as Exhibit "6" to this Complaint.

**GemCap Discovers Misleading Erroneous Borrowing Certificates, Resulting Overadvances, And The Rampant And Fraudulent Misuse Of Loan Funds**

46.     GemCap, as alleged above, routinely examines borrower asset and inventory bases, and part of its continuing due diligence on all revolving loan facilities. It did so in April of this year retaining a field examiner to audit Crop's collateral's flow, including reviewing documentation Crop provided in its Borrowing Certificates, scheduling its bank accounts and examining other financial data. GemCap was, at the time, sensitive to the potential misuse of loan funds because that Taylor had acknowledged doing just that in 2012. Specifically,

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**FOSTER DEC. EX. 1 pg. 15**

1   GemCap became aware in September 2012 that Taylor had diverted loan proceeds

2   to PERC the previous month – on August 7, 15 and 31, respectively – in

3   contravention of the use restrictions in the Schedule. GemCap immediately

4   informed Taylor of the discovery and that this use of funds was impermissible and

5   would not be tolerated, at which point Taylor conceded that the transfers constituted

6   an event of default and were prohibited under the Loan Agreement and Schedule.

7   As a consequence, GemCap and Crop/Crop Services entered into an amendment to

8   the Loan Agreement dated October 1, 2012, which required Crop and Crop Services

9   to pay GemCap a $10,000 fee in connection with the admitted misuse of funds.

10       47.    The April 2013 examination proceeded against that contextual

11   backdrop, and it revealed inaccuracies in Borrowing Certificates Crop had submitted

12   to GemCap – and on which funds were advanced – the seriousness of which far

13   exceeded the misuse of funds uncovered the prior August. In fact, these erroneous

14   Borrowing Certificates resulted in a massive overadvance which has yet to be

15   resolved. Specifically, the field examiner found that while available commissions

16   were capped by the RMA at 62% of the "A&O" expenses – that term is identified at

17   paragraph 26, above – Crop's Borrowing Certificates represented commission

18   payments on the basis of an 80% cap rate. The result was an overadvance of

19   roughly $2 million. Beyond that, the inspector concluded that Crop did not exercise

20   cash dominion over its book, an equally disturbing finding that resulted in an

21   additional and substantial overadvance.

22       48.    In all, Crop submitted multiple false Borrowing Certificates, some

23   which Taylor signed personally, and all of which contributed to the overadvance,

24   which presently total in excess of $5.7 million (the "Overadvance"). These are

25   funds to which Crop was not entitled under the Loan Agreement, and is a direct

26   result of the inaccurate information and representations in its Borrowing

27   Certificates.

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FOSTER DEC. EX. 1 pg. 16

49. The Overadvance is, as already alleged, due and owing immediately under the terms of the Schedule, and GemCap has repeatedly demanded that immediate repayment. Those demands have proven to be fool's errands, despite GemCap exercising extraordinary patience with Taylor, Crop and the litany of incestuous entities that improperly received loan funds. GemCap initially confronted Taylor and Crop with the auditor's findings during a meeting in Lewiston at the end of April. Taylor did not deny the accuracy of the information, but sought GemCap's indulgence while he purportedly attempted to raise the funds necessary to repay the outstanding amounts. GemCap was, for its part, mystified as to where all the money went – approximately $12.7 million has been funded to date under the Loan Agreement – and, in a telephone conversation at the end of April, co-founders Richard Ellis and David Ellis asked Taylor how the loan proceeds had been spent. Taylor responded that he had used the money to "fund our business."

50. GemCap found that claim difficult to understand, and promptly began inspecting additional material concerning Taylor's and Crop's business, and the use of the loan funds. What it discovered was breathtaking in its scope. Taylor has used GemCap's loan funds for a slew of personal expenses and indulgences, none of which relate in any way to Crop's business. For example, and based on the results of GemCap's preliminary and ongoing investigation, Taylor and Crop – the two are legally indistinguishable at this point – have misappropriated loan funds to: (1) pay Taylor's personal mortgages and other loans; (2) fund PERC, a radio station in which Taylor and defendants Hillcrest and Lamberjack maintain an ownership interest; (3) fund various other businesses that Taylor and other defendants maintain ownership interest in whole or in part, but which have nothing to do with Crop's business; (4) pay other personal expenses of Taylors; and (5) cover legal and other expenses that are either personal to Taylor or were incurred by entities owned by Taylor and other defendants by unrelated to Crop's insurance activities. These activities are contrary to the terms of the Loan Agreement and the Schedule, and

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FOSTER DEC. EX. 1 pg. 17

1   constitute breaches of the Crop and Crop Services' obligations under both

2   documents. More ominously, the recent discovery of Taylor's rampant misuse of

3   the loan proceeds confirms that his representations to GemCap in inducing the loan

4   were knowingly false, and that his intent was to take the proceeds to pay his

5   personal debts and otherwise operate his various other businesses in Idaho having no

6   connection to Crop or Crop Services.

7        51.   GemCap has made repeated demands for payment of the Overadvance,

8   and for all other amounts due under the Loan Agreement. The Defendants have

9   failed and refused to do so, however, despite GemCap's demands and extensive

10   attempts to resolve the issue informally. Facing the Defendants' intransigence and

11   refusal to comply with their contractual obligations, GemCap had no choice but to

12   issue, on July 16, 2013, a Notice of Default under the Loan Agreement and related

13   documents. On July 29, 2013, after Crop failed to cure the defaults, GemCap issued

14   a Notice of Acceleration, exercising its right to demand immediate payment of all

15   outstanding obligation to GemCap. Crop has refused to make the demanded

16   payment. As a result, GemCap is left with no option but to initiate this litigation. A

17   true and correct copy of the July 16, 2013 Notice of Default and the July 29 Notice

18   of Acceleration are attached to this Complaint as Exhibit "8" and Exhibit "9,"

19   respectively.

20   **All Of The Business Entity Defendants Are Alter Egos Of The Individual**

21   **Defendants**

22        52.   As alleged above, many companies and individuals received proceeds

23   of the GemCap loan to Crop, which was unauthorized by the Loan Agreement.

24   Each of those entities and the individuals who own and/or operate those entities are

25   liable for the damages incurred by Crop.

26        53.   The facts are such that an adherence to the fiction of the separate

27   existence of each of the defendant corporate entities would, under the particular

28   circumstances, sanction a fraud or promote injustice.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**FOSTER DEC. EX. 1 pg. 18**

## Crop USA Insurance Agency, Inc.

54. Crop Agency is owned by Taylor, Crop LLC, Lamberjack, Duclos, and Freeman.

55. Taylor and Duclos are officers of Crop Agency.

56. Crop Agency is not only influenced by Taylor, Crop LLC, Lamberjack, Duclos, and Freeman, but there is such a unity of interest and ownership that the individuality, or separateness, of those individuals and Crop Agency has ceased.

## CropUSA Insurance Services, LLC

57. Taylor and Lamberjack are the sole members of Crop Services.

58. Taylor is the managing member of Crop Services.

59. Crop Services is not only influenced by Taylor and Lamberjack, but there is such a unity of interest and ownership that the individuality, or separateness, of those individuals and Crop Services has ceased.

## Crop USA, LLC

60. On information and belief, GemCap alleges that Taylor is the managing member of Crop LLC.

61. Crop LLC is not only influenced by Taylor, but there is such a unity of interest and ownership that the individuality, or separateness, of those individuals and Crop LLC has ceased.

## 17 State Street Partners, LLC

62. Taylor and his son are the sole members of 17 State.

63. 17 State is not only influenced by Taylor, but there is such a unity of interest and ownership that the individuality, or separateness, of Taylor and 17 State has ceased.

## AIA Services Corporation

64. AIA is owned by Taylor and Duclos, who also serve as officers.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FOSTER DEC. EX. 1 pg. 19

65.     AIA is not only influenced by Taylor and Duclos, but there is such a unity of interest and ownership that the individuality, or separateness, of those individuals and AIA Services has ceased.

**AIA Insurance, Inc.**

66.     AIA Insurance is owned by Taylor, Duclos, and Freeman, who also serve as officers.

67.     AIA Insurance is not only influenced by Taylor, Duclos, and Freeman, but there is such a unity of interest and ownership that the individuality, or separateness, of those individuals and AIA Insurance has ceased.

**Pacific Empire Radio Corp.**

68.     PERC is owned by Taylor, Hillcrest. and Lamberjack.

69.     PERC is not only influenced by Taylor, Hillcrest and Lamberjack, but there is such a unity of interest and ownership that the individuality, or separateness, of those individuals and PERC has ceased.

**Weskan Agency, LLC**

70.     Taylor and Lamberjack are the sole members of Weskan.

71.     Weskan is not only influenced by Taylor and Lamberjack, but there is such a unity of interest and ownership that the individuality, or separateness, of those individuals and Weskan has ceased.

**Sound Insurance Agency**

72.     Sound is an assumed business name used by its sole owner, Taylor.

73.     Sound is not only influenced by Taylor, but there is such a unity of interest and ownership that the individuality, or separateness, of Taylor and Sound has ceased.

**Green Leaf RE Insurance Partners, LLC**

74.     Crop Agency is the managing member of Green Leaf.

75.     Green Leaf is not only influenced by Crop Agency and Crop Agency's owners Taylor, Crop LLC, Lamberjack, Duclos, but there is such a unity of interest

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FOSTER DEC. EX. 1 pg. 20

1  and ownership that the individuality, or separateness, of Crop Agency and its

2  owners and Green Leaf has ceased.

3  **Green Leaf RE Insurance Company**

4      76.    Taylor sits on the board of directors for Green Leaf Company.

5      77.    Green Leaf Company is not only influenced by Taylor, but there is such

6  a unity of interest and ownership that the individuality, or separateness, of Taylor

7  and Green Leaf Company has ceased.

8  **Reinsurance Partners, LLC**

9      78.    Taylor is the sole member of Reinsurance.

10      79.    Reinsurance is not only influenced by Taylor, but there is such a unity

11  of interest and ownership that the individuality, or separateness, of Taylor and

12  Reinsurance has ceased.

13  **Hillcrest Aircraft Company**

14      80.    Jones and Wilson are executive officers of Hillcrest.

15      81.    Hillcrest is not only influenced by Jones and Wilson, but there is such a

16  unity of interest and ownership that the individuality, or separateness, of Jones,

17  Wilson and Hillcrest has ceased.

18  **FIRST CLAIM FOR RELIEF**

19  **(Breach of Loan Agreement Against All Defendants, Except Diversified)**

20      82.    GemCap restates and realleges paragraphs 1 through 82 herein.

21      83.    GemCap entered into the Loan Agreement with Crop (Exhibit 1).

22      84.    GemCap discharged all of its obligations, or substantially all of its

23  obligations, that the Loan Agreement required of GemCap to do except for those

24  obligations GemCap was excused from having to discharge.

25      85.    Crop breached the Loan Agreement by, among other things and without

26  limitation:

27      a.    Failing to maintain the amount of certified cash on hand

28      as required by the Loan Agreement and Schedule;

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**FOSTER DEC. EX. 1 pg. 21**

b. Failing to provide accurate Borrowing Certificates resulting in the Overadvance of approximately $5,700,000.00;

c. Using loan proceeds for unauthorized purposes, including funding Taylor's other companies and business interests, including paying down Taylor's personal mortgage; and

d. Otherwise failing to repay amounts due under the Loan Agreement and the Note, despite demand from GemCap.

86. As a direct and proximate result of Crop's breach of the Loan Agreement and Schedule, GemCap has incurred not less than $8.7 million in damages and will continue to incur damages in an amount to be proven at trial, in addition to incidental and consequential damages and attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

### (Breach of Implied Covenant of Good Faith and Fair Dealing Against All Defendants, Except Diversified)

87. GemCap restates and realleges paragraphs 1 through 87 herein.

88. In every contract or agreement there is an implied promise of good faith and fair dealing. This means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. Crop violated the duty to act fairly and in good faith.

89. All conditions required for Crop's performance of the Loan Agreement have occurred.

90. Crop unfairly interfered with GemCap's right to receive the benefits of the Loan Agreement and Schedule by breaching the terms of the Loan Agreement as alleged above, such that the Overadvance has occurred.

91. GemCap was harmed by Crop's conduct and has incurred and will continue to incur damages in an amount to be proven at trial, but at least $9.6 million, in addition to attorneys' fees and costs.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FOSTER DEC. EX. 1 pg. 22

# THIRD CLAIM FOR RELIEF

## (Fraud Against All Defendants, Except Diversified)

92.   GemCap restates and realleges paragraphs 1 through 96 herein.

93.   Crop and Taylor represented to GemCap, both in negotiating the Loan Agreement and in subsequent Borrowing Certificates, that all of GemCap's requirements to lend had been met. Specifically, Taylor represented to Richard Ellis and Ramsey Naber of GemCap, in September 2011, that Crop needed the prospective funds, and would use those funds, as working capital for Crop's insurance business.

94.   Those representations were false, however. The true facts were that Taylor was overstretched financially and needed money largely to fund several other entities, both related and unrelated to Crop, and to service his personal obligations. These included without limitation Weskan, AIA Insurance, AIA and PERC. Indeed, and as alleged before, GemCap has recently become aware that Taylor and Crop transferred GemCap loan proceeds – advanced under the terms of the loan agreement among the parties and subject to specific use restrictions within those documents – to each and all of these entities for purposes having nothing whatever to do with the crop insurance business that was the pretext Taylor and Crop offered to induce GemCap into agreeing to the loan arrangement.

95.   Crop and Taylor knew those representations to GemCap were false, and nevertheless made them for the purpose of inducing GemCap to keep lending Crop funds. It worked. GemCap relied upon the statements and the contents of financial documents and Borrowing Certificates provided by Crop and Taylor to determine whether or not to loan Crop addition money.

96.   As a direct and proximate result of Crop's and Taylor's fraudulent actions, GemCap was damaged in that it advanced funds to Crop and Taylor in an amount of approximately $12,700,000.00, and otherwise funded under the Loan Agreement despite the fact that defendants were ineligible to receive further

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FOSTER DEC. EX. 1 pg. 23

1 advances. Had GemCap known the true facts at the time of the misrepresentations

2 alleged above, it would not have entered into the Loan Agreement, nor would it

3 have funded any amounts to the Defendants.

4       97.    As a direct and proximate result of Crop's and Taylor's fraudulent

5 actions, GemCap has suffered general damages in an amount to be proven at trial,

6 but not less than $8,700,000.

7       98.    In performing the acts alleged herein, Crop and Taylor acted

8 fraudulently, despicably and in willful and conscious disregard of GemCap's rights,

9 thereby justifying an award of punitive and exemplary damages against Crop and

10 Taylor.

### FOURTH CLAIM FOR RELIEF

### (Money Had And Received Against All Defendants, Except Diversified)

13       99.    GemCap restates and realleges paragraphs 1 through 103 herein.

14      100.   GemCap has overadvanced the defendants, and each of them, not less

15 than $8,700,000.00 as a result of the defendants' actions and misrepresentations.

16      101.   Defendants, and each of them, are therefore indebted to GemCap in the

17 sum of not less than $8,700,000.00 for money had and received by each of the

18 defendants for the use of GemCap.

19

### FIFTH CLAIM FOR RELIEF

### (Breach of Contract Against Diversified)

22      102.   GemCap restates and realleges paragraphs 1 through 103 herein.

23      103.   GemCap entered into the Loan Agreement with Crop (Exhibit 1).

24      104.   As a condition precedent to the loan, Crop notified Diversified that it

25 pledged as security to GemCap all payments and proceeds payable to Crop by

26 Diversified and directed Diversified to pay or deposit such monies into a specified

27 bank account.

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**FOSTER DEC. EX. 1 pg. 24**

1   105.   Diversified countersigned Crop's notice to Diversified, agreeing to be

2   bound by its terms, including depositing said monies into the specified account,

3   constituting a valid and binding contract (the "Payments Contract").

4   106.   Crop discharged all of its obligations, or substantially all of its

5   obligations, in connection with the agreement between Crop and Diversified

6   underlying the Payments Contract, except for those obligations that Crop was

7   excused from having to discharge.

8   107.   Diversified breached the Payments Contract by refusing to direct

9   payments owed to Crop to the specified bank account.

10   108.   As a direct and proximate result of Diversfied's breach of the Payments

11   Contract, GemCap has incurred damages and will continue to incur damages in an

12   amount to be proven at trial, but in excess of the jurisdictional minimum.

13   109.   GemCap was an express and acknowledged third-party beneficiary to

14   the Payments Contract, according GemCap the power and authority to enforce the

15   Payments Contract.  GemCap also has the power and authority to enforce the

16   Payments Contract as Crop's general and special attorney-in-fact because that

17   contract directly relates to and involves the collateral for the Loan Agreement and

18   there has been a event of default.

19   ### SIXTH  CLAIM FOR RELIEF

20   ### (Fraud Against Diversified)

21   110.   GemCap restates and realleges paragraphs 1 through 111 herein.

22   111.   By acknowledging, agreeing to, and countersigning Crop's notice to

23   Diversified regarding Crop's pledge as security to GemCap all payments and

24   proceeds payable to Crop by Diversified and agreeing to direct such payments

25   and/or proceeds into a specified bank account, which notice expressly referred to

26   GemCap and which countersigned notice Diversified knew would be presented to

27   GemCap, Diversified represented to GemCap that it would direct the specified

28   payments and/or proceeds to the specified account.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FOSTER DEC. EX. 1 pg. 25

1    112.  Those representations were false, however.  The true facts were that

2 Diversified would circumvent Crop by making payments and/or proceeds owed to

3 Crop directly to Crop's subagents, rather than to the specified account.  Indeed, that

4 is precisely what Diversified has done and continues to do.

5    113.  Diversified knew its representations to GemCap were false, and

6 nevertheless made them for the purpose of inducing GemCap to keep lending Crop

7 funds.  It worked.  GemCap relied upon Diversified's statements and loaned Crop

8 money.

9    114.  As a direct and proximate result of Diversified's fraudulent actions,

10 GemCap was damaged in that it advanced Crop approximately $12,700,000.00, and

11 otherwise funded under the Loan Agreement despite the fact that Diversified never

12 intended to direct payments to the account specified by Crop.  Had GemCap known

13 the true facts at the time of the misrepresentations alleged above, it would not have

14 entered into the Loan Agreement, nor would it have funded any amounts to the

15 Defendants.

16    115.  As a direct and proximate result of Diversified's fraudulent actions,

17 GemCap has suffered general damages in an amount to be proven at trial, but not

18 less than $8,700,000.

19    116.  In performing the acts alleged herein, Diversified acted fraudulently,

20 despicably and in willful and conscious disregard of GemCap's rights, thereby

21 justifying an award of punitive and exemplary damages against Diversified.

### SEVENTH CLAIM FOR RELIEF

#### (Conversion Against Diversified)

24    117.  GemCap restates and realleges paragraphs 1 through 118 herein.

25    118.  By the terms of the Loan Agreement, GemCap had a right to possess

26 the payments and/or proceeds that Diversified was obligated to deposit in the above-

27 specified back account.

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   119.   Diversified wrongfully disposed of those payments and/or proceeds by

2   refusing to deposit them in the specified bank account and, instead, paying those

3   payments and/or proceeds directly to Crop's subagents.

4   120.   As a direct and proximate of Diversified's actions, GemCap has been

5   damaged in amount to be proven at trial, but in excess of the jurisdictional

6   minimum.

7   121.   In performing the acts alleged herein, Diversified acted fraudulently,

8   despicably and in willful and conscious disregard of GemCap's rights, thereby

9   justifying an award of punitive and exemplary damages against Diversified.

10   ### EIGHTH CLAIM FOR RELIEF

11   ### (Declaratory Relief Against Diversified)

12   122.   GemCap restates and realleges paragraphs 1 through 123 herein.

13   123.   Under the Payments Contract, Diversified is required to deposit into the

14   above-specified account certain payments and/or proceeds owed to Crop, which

15   payments or proceeds GemCap has a security interest it under the Loan Agreement.

16   124.   Diversified has refused to comply with the terms of the Payments

17   Contract and contends that it is not obligated to deposit said payments and/or

18   proceeds into the specified account.

19   125.   Accordingly, an actual controversy exists between Diversified and

20   GemCap.

21   126.   GemCap accordingly desires a judicial determination that Diversified is

22   required to deposit any and all payments and/or proceeds owed to Crop into the

23   above-specified account.

24   127.   A judicial declaration is necessary and appropriate at this time so that

25   the GemCap may be certain of its security interest in those payments and/or

26   proceeds and so that any required deposits are made in accordance with the

27   Payments Contract.

28

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

## NINTH CLAIM FOR RELIEF

### (Unfair Business Practices Against All Defendants)

128.   GemCap restates and realleges paragraphs 1 through 129 herein.

129.   California Business and Professions Code § 17200 provides:

> As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

130.   Defendants have engaged in unfair business acts and practices within the meaning of California Business and Professional Code § 17200.  As alleged above, these unfair business acts and practices include, but are not limited to: (1) Crop's, Taylor's, and Diversified's misrepresentations to GemCap; (2) Crop's and Taylor's misuse and misappropriation of loan funds; and (3) Diversified's wrongful refusal to deposit certain payments and/or proceeds owed to Crop, an in which GemCap has a security interest, into Crop's bank account.

131.   As a direct, proximate and foreseeable result of Defendants' wrongful conduct, including the misrepresentations, misuse of loan funds and refusal to comply with certain obligations, GemCap has been damaged in an amount to be proven at trial.  GemCap is entitled to relief, including full restitution and/or disgorgement of any funds and benefits that may be obtained by Defendants as a result of such unfair business acts and practices.

132.   California Business and Professions Code § 17203 provides in pertinent part:

> Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FOSTER DEC. EX. 1 pg. 28

133.   Pursuant to California Business and Professions Code § 17203, GemCap also seeks an order of this Court for a temporary restraining order, preliminary injunction and permanent injunction: (1) freezing all accounts in the name of Crop, Crop Services, and Taylor; (2) enjoining and prohibiting Diversified from circumventing Crop and making payments directly to Crop's subagents; (3) directing Diversified to deposit any and all payments and/or proceeds owed to Crop into the Crop's bank account specified in the Payments Contract; (4) enjoining and prohibiting Crop, Crop Services and Taylor from withdrawing, transferring, or otherwise dissipating any amounts in any of the subject accounts; (5) freezing all accounts in the name of AIA, AIA Insurance, Reinsurance Partners, Green Leaf, Green Leaf Insurance, Weskan, Sound, PERC and Hillcrest, and enjoining and prohibiting any of the Defendants from withdrawing, transferring, or otherwise dissipating any amounts in any of the subject accounts; (6) enjoining and prohibiting the transfer of any funds or other assets by and between any of the Defendants; (7) enjoining and prohibiting any of the Defendants from taking any steps to frustrate, impair or prevent GemCap from attaching or sizing any of the pledged security under the Loan Agreement and its related documents, including without limitation any steps that could prevent the payment of commissions under the crop insurance program that Crop and Crop Services pledged and which GemCap is entitled to seize in partial satisfaction of the Defendants' obligations under the Loan Agreement and related documents; and (8) enjoining and prohibiting any of the Defendants from taking any steps that could or will impair GemCap's rights under the Loan Agreement and related documents, including without limitation its right to the pledged security.

# PRAYER FOR RELIEF

WHEREFORE, GemCap prays for judgment as follows:

**On the First Claim For Breach of Contract:**

1. For general, incidental and consequential damages according to proof, but at least $8,700,000;

2. For attorneys' fees and costs as allowed by law;

**On the Second Claim For Breach of Covenant of Good Faith And Fair Dealing:**

3. For damages according to proof, but at least $8,700,000;

4. For attorneys' fees and costs as allowed by law;

**On the Third Claim for Fraud:**

6. For damages according to proof, but at least $8,700,000;

7. For punitive and exemplary damages according to proof;

**On the Fourth Claim for Money Had and Received:**

8. For damages in the amount of at least $8,700,000;

**On the Fifth Claim for Breach of Contract:**

9. For damages according to proof;

**On the Sixth Claim for Fraud:**

10. For damages according to proof, but at least $8,700,000;

11. For punitive and exemplary damages according to proof;

**On the Seventh Claim for Conversion:**

12. For damages according to proof;

13. For punitive and exemplary damages according to proof;

**On the Eighth Claim for Declaratory Relief:**

14. For a judicial declaration that Diversified is required to deposit any and all payments and/or proceeds owed to Crop under the Payments Contract into the bank account specified in that contract.

**On the Ninth Claim for Unfair Business Practices:**

15. For restitution and disgorgement of any funds and benefits that may be

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**FOSTER DEC. EX. 1 pg. 30**

1 obtained by Defendants as a result of such unfair business acts and practices;

2    16.    For a temporary restraining order, preliminary injunction and

3 permanent injunction: (1) freezing all accounts in the name of Crop, Crop Services,

4 and Taylor; (2) enjoining and prohibiting Diversified from circumventing Crop and

5 making payments directly to Crop's subagents; (3) directing Diversified to deposit

6 any and all payments and/or proceeds owed to Crop into the Crop's bank account

7 specified in the Payments Contract; (4) enjoining and prohibiting Crop, Crop

8 Services and Taylor from withdrawing, transferring, or otherwise dissipating any

9 amounts in any of the subject accounts; (5) freezing all accounts in the name of

10 AIA, AIA Insurance, Reinsurance Partners, Green Leaf, Green Leaf Insurance,

11 Weskan, Sound, PERC and Hillcrest, and enjoining and prohibiting any of the

12 Defendants from withdrawing, transferring, or otherwise dissipating any amounts in

13 any of the subject accounts; (6) enjoining and prohibiting the transfer of any funds

14 or other assets by and between any of the Defendants; (7) enjoining and prohibiting

15 any of the Defendants from taking any steps to frustrate, impair or prevent GemCap

16 from attaching or sizing any of the pledged security under the Loan Agreement and

17 its related documents, including without limitation any steps that could prevent the

18 payment of commissions under the crop insurance program that Crop and Crop

19 Services pledged and which GemCap is entitled to seize in partial satisfaction of the

20 Defendants' obligations under the Loan Agreement and related documents; and (8)

21 enjoining and prohibiting any of the Defendants from taking any steps that could or

22 will impair GemCap's rights under the Loan Agreement and related documents,

23 including without limitation its right to the pledged security.

24

25 **On All Causes of Action:**

26    17.    For a temporary restraining order, preliminary injunction and

27 permanent injunction;

28    18.    For prejudgment and postjudgment interest as allowed by law;

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

FOSTER DEC. EX. 1 pg. 31

19. For costs of suit incurred herein; and

20. For such other relief as the Court may deem just and proper.

DATED: July 30, 2013
FREEMAN, FREEMAN & SMILEY, LLP

By: _____
TODD M LANDER
TRACY R. DAUB
Attorneys for GEMCAP LENDING I, LLC

## JURY TRIAL DEMAND

Plaintiff GemCap Lending, I, LLC hereby demands trial by jury.

DATED: July 30, 2013
FREEMAN, FREEMAN & SMILEY, LLP

By: _____
TODD M LANDER
TRACY R. DAUB
Attorneys for GEMCAP LENDING I, LLC

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1900
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1999446.1 24093-800

COMPLAINT

**FOSTER DEC. EX. 1 pg. 32**

**EXHIBIT 1**

## AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT

**AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT**, dated as of February 4, 2013, by and among CROP USA INSURANCE AGENCY, INC., an Idaho corporation ("**Crop USA**") and CROPUSA INSURANCE SERVICES, LLC, an Idaho limited liability company ("**Crop Services**"), jointly and severally, on the one hand (each, individually, and collectively, "**Borrower**"), and GEMCAP LENDING I, LLC, a Delaware limited liability company with offices at 1401 Ocean Avenue, Suite 305, Santa Monica, CA 90401, on the other hand (together with its successors and assigns, the "**Lender**").

## R E C I T A L S :

**WHEREAS**, on November 23, 2011, Crop USA, Crop Services and Lender entered into that certain Loan and Security Agreement and the documents made in connection therewith, pursuant to which Lender established a credit facility for Crop USA and Crop Services, and Crop USA and Crop Services pledged certain assets to Lender as security for the obligations of Crop USA and Crop Services;

**WHEREAS**, Borrower and Lender desire to amend and restate the Original Loan Agreement as set forth herein, so that the parties will, among other modifications, provide for a revolving credit facility to Borrower in the maximum principal amount of Ten Million Dollars ($10,000,000), and provide for a pledge by Borrower and certain affiliates of Borrower of additional security for such credit facility;

**NOW, THEREFORE**, in consideration of the foregoing, the mutual covenants and agreements herein contained and other good and valuable consideration, Lender and Borrower mutually covenant, warrant and agree as follows:

## SECTION 1. DEFINITIONS AND RULES OF INTERPRETATION AND CONSTRUCTION

**Specific Terms Defined.** Capitalized terms used herein and not otherwise defined have the following meanings:

**1.1** "**A&O Subsidy Payments**" means the administrative and operations subsidy amounts owing to DCIS as described in the DCIS Agreement that are owing to Borrower by DCIS pursuant to the terms of the DCIS Agreement.

**1.2** "**Account Debtor**" or "**account debtor**" has the meaning ascribed to such term in the UCC.

**1.3** "**Accounts**" or "**accounts**" means "**accounts**" as defined in the UCC, and, in addition, any and all obligations of any kind at any time due and/or owing to Borrower, whether now existing or hereafter arising, and all rights of Borrower to receive payment or any other consideration including, without limitation, Crop Insurance Contract Receivables, invoices, contract rights, accounts receivable, general intangibles, choses-in-action, notes, drafts, acceptances, instruments and all other debts, obligations and liabilities in whatever form owing to Borrower from any Person, Governmental Authority or any other entity, all security therefor, and all of Borrower's rights to receive payments for

{00171621.DOC; 1}

goods sold (whether delivered, undelivered, in transit or returned) or services rendered, which may be represented thereby, or with respect thereto, including, but not limited to, all rights as an unpaid vendor (including stoppage in transit, replevin or reclamation), and all additional amounts due from any Account Debtor, whether or not invoiced, together with all Proceeds and products of any and all of the foregoing.

      **1.4**    **"ACH"** has the meaning set forth in Section 2.5 hereof.

      **1.5**    [RESERVED]

      **1.6**    [RESERVED]

      **1.7**    **"Advance"** has the meaning as set forth in <u>Section 1(c)(ii) of the Loan Agreement Schedule</u>.

      **1.8**    **"Advance Commissions"** means the advance commission amounts owing to Borrower as set forth in the DCIS Agreement pursuant to the terms of the DCIS Agreement.

      **1.9**    [RESERVED]

      **1.10**    **"Affiliate"** means, with respect to any Person, (a) any other Person that, directly or indirectly, controls, is controlled by, or is under common control with such Person, including any Subsidiary, or (b) any other Person who is a director, manager or officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above. For the purposes of this definition, control of a Person shall mean the power (direct or indirect) to direct or cause the direction of the management or the policies of such Person, whether through the ownership of any voting securities, by contract or otherwise.

      **1.11**    **"Agreement"** means this Amended and Restated Loan and Security Agreement (including the Amended and Restated Loan Agreement Schedule, all Exhibits annexed hereto and the Borrower's Disclosure Schedule) as originally executed or, if amended, modified, supplemented, renewed or extended from time to time, as so amended, modified, supplemented, renewed or extended.

      **1.12**    Availability" means, as of any date of determination, the lesser of (i) the Borrowing Base (as set forth in the most recently delivered Borrowing Certificate), and (ii) the Maximum Credit.

      **1.13**    **"Balance Sheet"** means the balance sheets of Borrower dated as of the Balance Sheet Date.

      **1.14**    **"Balance Sheet Date"** means September 30, 2011.

      **1.15**    **"Bankruptcy Code"** means the United States Bankruptcy Code, as now existing or hereafter amended.

      **1.16**    **"Borrower"** has the meaning set forth in the introductory paragraph hereof.

{00171621.DOC; 1}

EX 1 PG 34

FOSTER DEC. EX. 1 pg. 35

**1.17** **"Borrower's Disclosure Schedule"** means the disclosure schedule prepared by Borrower that is being delivered to Lender concurrently herewith.

**1.18** **"Borrower's Premises"** means the property leased by the Borrower located at 111 Main Street, Lewiston, Idaho 83051.

**1.19** **"Borrowing Base"** shall be calculated at any time as the sum of (A) the product obtained by multiplying the outstanding amount of all Eligible Crop Insurance Contract Receivables by eighty percent (80%), provided that such percentage is subject to adjustment by Lender as Lender deems necessary, plus (B) the product obtained by multiplying the Crop USA Savings Account amount by one hundred percent (100%).

**1.20** **"Borrowing Certificate"** has the meaning as set forth in Section 1(c)(v) of the Loan Agreement Schedule.

**1.21** **"Business"** means the selling of Crop Insurance.

**1.22** **"Business Day"** means any day other than a Saturday, Sunday or any other day on which banks located in the State of California are authorized or required to close under applicable banking laws.

**1.23** **"Capital Assets"** means, in accordance with GAAP, fixed assets, both tangible (such as land, buildings, fixtures, machinery and equipment) and intangible (such as patents, copyrights, trademarks, franchises and goodwill).

**1.24** **"Change of Control"** has the meaning as set forth in Section 10.1 hereof.

**1.25** **"Chattel Paper"** has the meaning ascribed to such term in the UCC.

**1.26** **"Closing Date"** means the date of this Agreement.

**1.27** **"Collateral"** has the meaning as set forth in Section 5.1 hereof.

**1.28** **Intentionally omitted**

**1.29** **"Collection Account"** has the meaning set forth in Section 1(c)(vi) of the Loan Agreement Schedule.

**1.30** **"Collection Days"** means a period equal to the greater of (i) two (2) Business Days after the deposit of Collections into the Collection Account, or (ii) such longer period as may be required by the financial institution with whom the Collection Account is maintained, in either event for which interest may be charged on the aggregate amount of such deposits at the Interest Rate or, if applicable, the Default Interest Rate.

**1.31** **"Collections"** means all amounts received in connection with Crop Insurance Contract Receivables, all other amounts owing to Borrower under or pursuant to any Sales Agent Agreement and all other amounts remitted by an Account Debtor of Borrower or any Person in respect of the Collateral, or amounts otherwise owing to Borrower by any Person in respect of the Collateral.

{00171621.DOC; 1}

3

**1.32** "**Commercial Tort Claims**" has the meaning ascribed to such term in the UCC.

**1.33** "**Crop Insurance**" means federal crop insurance for an agricultural commodity authorized by the Federal Crop Insurance Act and approved by the FCIC that is sold and serviced consistent with the Federal Crop Insurance Act or FCIC regulations.

**1.34** "**Crop Insurance Contract Receivables**" means, all of the right, title and interest of Borrower in and to, collectively, (i) any and all amounts, whether administrative and operations subsidy amounts, commissions, advances, advance commissions or otherwise, whether payable now or in the future, under the DCIS Agreement (as reported on the DCIS System), and/or any other Sales Agent Agreement and (ii) any indemnity or other compensatory or punitive payments or damage awards made in lieu of or with respect to lost amounts or commissions otherwise payable under a Sales Agent Agreement.

**1.35** "**Crop Insurance Contractor Waivers**" means the agreements executed by DCIS and delivered to Lender, containing, among other things, consents by DCIS to the transactions contemplated herein and the exercise by Lender of its rights and remedies with respect to the Crop Insurance Contract Receivables as contemplated herein.

**1.36** "**Crop Services**" has the meaning set forth in the introductory paragraph hereof.

**1.37** "**Crop USA**" has the meaning set forth in the introductory paragraph hereof.

**1.38** "**Crop USA Savings Account**" means that certain U.S. Bank, National Association account no. 553000116, holding an original principal amount of no less than One Million Fifteen Thousand Two Hundred Sixty-Two Dollars ($1,015,262) ("**Account**"), in the name of Crop USA, together with all substitutions or replacements thereof, all additions to, income, interest and dividends thereon and all Proceeds thereof, which account is subject to the Deposit Account Control Agreement – Crop USA Savings Account and the Pledge Agreement as security for the Obligations.

**1.39** "**DCIS**" means Diversified Crop Insurance Services.

**1.40** "**DCIS Agreement**" means the Diversified Crop Insurance Services Sales Agent – Company Agreement dated July 21, 2011 between Crop USA and DCIS, as the same may be amended, restated, modified or supplemented from time to time.

**1.41** "**DCIS System**" means software package for the electronic processing system used by DCIS. All Multiple Peril and hail insurance policy information is input and maintained using this system. Policy information is transmitted to the FCIC by DCIS on a daily basis. The processing system also integrates the functions of claims, mapping and document management.

**1.42** "**Default Interest Rate**" has the meaning set forth in Section 3(b) of the Loan Agreement Schedule.

**1.43** "**Deposit Account Control Agreement – Crop USA Savings Account**" means the Deposit Account Control Agreement in the form of **Exhibit 1.43(a)** annexed hereto.

{00171621.DOC; 1}

4

EX 1 PG 36

FOSTER DEC. EX. 1 pg. 37

**1.44** "**Deposit Account Control Agreement – Operating Account**" means the Blocked Account Control Agreement in the form of **Exhibit 1.43(b)** annexed hereto.

**1.45** "**Deposit Account Control Agreement – Receivables Collection Account**" means the Blocked Account Control Agreements in the form of **Exhibit 1.43(c)** annexed hereto.

**1.46** "**Deposit Accounts**" has the meaning ascribed to such term in the UCC.

**1.47** "**Document**" or "document" has the meaning ascribed to such term in the UCC.

**1.48** "**Eligible Crop Insurance Contract Receivables**" means Crop Insurance Contract Receivables consisting of A&O Subsidy Payments and Advance Commissions that are due and payable to Borrower within twelve (12) months of the date of any calculation (as reported by the DCIS System or any similar reporting system approved by Lender), net of any returns, discounts, claims, credits and allowances given or claimed, and otherwise satisfactory to Lender in its sole discretion.

**1.49** "**Environment**" means all air, surface water, groundwater or land, including, without limitation, land surface or subsurface, including, without limitation, all fish, wildlife, biota and all other natural resources.

**1.50** "**Environmental Law**" or "**Environmental Laws**" means all federal, state and local laws, statutes, ordinances and regulations now or hereafter in effect, and in each case as amended or supplemented from time to time, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment relating to the regulation and protection of human health, safety, the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation).

**1.51** "**Environmental Liabilities and Costs**" means, as to any Person, all liabilities, obligations, responsibilities, remedial actions, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all fees, disbursements and expenses of counsel, experts and consultants and costs of investigation and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any other Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute, including any Environmental Law, permit, order or agreement with any Governmental Authority or other Person, and which arise from any environmental, health or safety conditions, or a Release or conditions that are reasonably likely to result in a Release, and result from the past, present or future operations of such Person or any of its Affiliates.

**1.52** "**Environmental Lien**" means any Lien in favor of any Governmental Authority for Environmental Liabilities and Costs.

**1.53** "**ERISA**" means the Employee Retirement Income Security Act of 1974, as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

**1.54** "**Equipment**" means "equipment", as such term is defined in the UCC, now owned or hereafter acquired by Borrower, wherever located, and shall include, without limitation, the machinery and equipment set forth on <u>Section 1.54 to the Borrower's Disclosure Schedule</u> annexed hereto, and all

{00171621.DOC; 1}

5

other equipment, machinery, furniture, Fixtures, computer equipment, telephone equipment, molds, tools, dies, partitions, tooling, transportation equipment, all other tangible assets used in connection with the manufacture, sale or lease of goods or rendition of services, and Borrower's interests in any leased equipment, and all repairs, modifications, alterations, additions, controls and operating accessories thereof or thereto, and all substitutions and replacements therefor.

**1.55** **"Equity Interests"** means, with respect to any Person, any and all shares, rights to purchase, options, warrants, general, limited or limited liability partnership interests, membership interests, units, participations or other equivalents of or interest in (regardless of how designated) equity of such Person, whether voting or nonvoting, including common stock, preferred stock, convertible securities or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC (or any successor thereto) under the 1934 Act).

**1.56** **"Event of Default"** means the occurrence or existence of any event or condition described in Section 11 of this Agreement.

**1.57** **"FCIC"** means the Federal Crop Insurance Corporation, a wholly-owned government corporation of the United States Department of Agriculture.

**1.58** **"Federal Crop Insurance Act"** means the Federal Crop Insurance Act, as amended, and Section 536 of the Agricultural Research, Extension and Education Reform Act of 1998, as amended.

**1.59** **"Financial Statements"** has the meaning as set forth in Section 8.9 hereof.

**1.60** **"Financing Statements"** means the Uniform Commercial Code UCC-1 Financing Statements to be filed with applicable Governmental Authorities of each State or Commonwealth or political subdivisions thereof pursuant to which Lender shall perfect its security interest in the Collateral.

**1.61** **"Full Minimum Draw Period"** means the period commencing on the Closing Date and ending on November 23, 2014.

**1.62** **"Fiscal Year"** means that twelve (12) month period commencing on January 1 and ending on December 31.

**1.63** **"Fixtures"** has the meaning ascribed to such term in the UCC.

**1.64** **"GAAP"** means generally accepted accounting principles in effect in the United States of America at the time of any determination, and which are applied on a consistent basis. All accounting terms used in this Agreement which are not expressly defined in this Agreement shall have the meanings given to those terms by GAAP, unless the context of this Agreement otherwise requires.

**1.65** **"General Intangibles"** has the meaning ascribed to such term in the UCC.

**1.66** [RESERVED]

**1.67** **"Goods"** has the meaning ascribed to such term in the UCC.

{00171621.DOC; 1}

6

**1.68** "**Governmental Authority**" or "**Governmental Authorities**" means any federal, state, county or municipal governmental agency, board, commission, officer, official or entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

**1.69** "**Guarantees**" means (i) the Amended and Restated Secured Continuing Guarantee of the Guarantor (Individual) dated February 4, 2013, made by Guarantor (Individual) for the benefit of Lender and the Membership Interest Pledge Agreement dated February 4, 2012, made by Guarantor (Individual) to the Lender and (ii) the Amended and Restated Secured Continuing Guarantee dated October 5, 2012, made by Guarantors (Corporate) for the benefit of Lender and the Security Agreement dated October 1, 2012, made by Guarantors (Corporate) to the Lender.

**1.70** "**Guarantors (Corporate)**" means AIA Insurance, Inc., an Idaho corporation and an Affiliate of Borrower, and AIA Services Corporation, an Idaho corporation and an Affiliate of Borrower.

**1.71** "**Guarantor (Individual)**" means R. John Taylor a/k/a Ray Johnson Taylor a/k/a R. Johnson Taylor.

**1.72** "**Indebtedness**" means, with respect to any Person, all of the obligations of such Person which, in accordance with GAAP, should be classified upon such Person's balance sheet as liabilities, or to which reference should be made by footnotes thereto, including without limitation, with respect to Borrower, in any event and whether or not so classified:

        (a)    all debt and similar monetary obligations of Borrower, whether direct or indirect;

        (b)    all obligations of Borrower arising or incurred under or in respect of any guaranties (whether direct or indirect) by Borrower of the Indebtedness of any other Person; and

        (c)    all obligations of Borrower arising or incurred under or in respect of any Lien upon or in any property owned by Borrower that secured Indebtedness of another Person, even though Borrower has not assumed or become liable for the payment of such Indebtedness.

**1.73** "**Intellectual Property**" means all of the following intellectual property used in the conduct of the business of Borrower: (a) inventions, processes, techniques, discoveries, developments and related improvements, whether or not patentable; (b) United States patents, patent applications, divisionals, continuations, reissues, renewals, registrations, confirmations, re-examinations, extensions and any provisional applications, of any such patents or patent applications, and any foreign or international equivalent of any of the foregoing; (c) unregistered, United States registered or pending trademark, trade dress, service mark, service name, trade name, brand name, logo, domain name, or business symbol and any foreign or international equivalent of any of the foregoing and all goodwill associated therewith; (d) work specifications, software (including object and source code listing) and artwork; (e) technical, scientific and other know-how and information, trade secrets, methods, processes, practices, formulas, designs, assembly procedures, specifications owned or used by Borrower; (f) copyrights; (g) work for hire; (h) customer and mailing lists; and (i) any and all rights of the Borrower to the name "CROP USA" or CROPUSA," or any derivation thereof; and Borrower's entire customer list and database and all assets used or useful by Borrower in the conduct of its business over the internet or in any electronic medium, including any websites or domain names owned by Borrower.

{00171621.DOC; 1}

7

**1.74** **"Interest Rate"** means the Revolving Loan Interest Rate set forth in <u>Section 3(a) of the Loan Agreement Schedule</u>.

**1.75** **"Instruments"** has the meaning ascribed to such term in the UCC

**1.76** **"Inventory"** means "inventory," as such term is defined in the UCC, now owned or hereafter acquired by Borrower, wherever located, and, in any event, shall include, without limitation, all raw materials, work-in-process, finished and semi-finished Inventory including, without limitation, all materials, parts, components and supplies relating to the manufacture or assembly thereof, packaging and shipping supplies relating thereto, and all other inventory, merchandise, goods and other personal property now or hereafter owned by Borrower, which are held for sale, exchange or lease or are furnished or are to be furnished under a contract of service or an exchange arrangement or which constitute raw materials, work-in-process or materials used or consumed in Borrower's business, or the processing, packaging, delivery or shipping of the same, and all finished goods and the products of the foregoing, whatever form and wherever located; and all names or marks affixed to or to be affixed thereto for purposes of selling same by the seller, manufacturer, lessor or licensor thereof and all right, title and interest of Borrower therein and thereto.

**1.77** **"Investment Property"** has the meaning ascribed to such term in the UCC.

**1.78** **"Lender"** has the meaning set forth in the introductory paragraph hereof.

**1.79** **"Letter-of-Credit Rights"** means "letter-of-credit rights" as such term is defined in the UCC, including rights to payment or performance under a letter of credit, whether or not the beneficiary thereof has demanded or is entitled to demand payment or performance.

**1.80** **"Lien"** or **"lien"** means any mortgage, deed of trust, pledge, security interest, hypothecation, assignment, lien (statutory or other, including, without limitation, liens imposed by any Governmental Authority, whether arising under PACA, if applicable, or otherwise), charge or other encumbrance of any kind or nature whatsoever (including, without limitation, pursuant to any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the UCC or comparable law of any jurisdiction to evidence any of the foregoing) on personal or real property or fixtures.

**1.81** **"Loans"** or **"Revolving Loans"** means the principal amount(s) advanced to the Borrower as set forth in this Agreement and the Note(s).

**1.81A** **"Loan Agreement Schedule"** means the Amended and Restated Loan Agreement Schedule, dated of even date herewith, signed by Borrower and delivered together with this Agreement, which Loan Agreement Schedule is incorporated herein by reference.

**1.82** **"Loan Documents"** means this Agreement and any and all other agreements, notes, documents, mortgages, financing statements, guaranties, intercreditor agreements, subordination agreements, certificates and instruments executed and/or delivered by Borrower or any other Person to Lender pursuant to and in connection with the Loans and this Agreement, as the same may be amended, restated, modified, supplemented, renewed or extended from time to time, including, without limitation, the Note, the Guarantees, the Membership Interest Pledge Agreement, the

{00171621.DOC; 1}

8

Deposit Account Control Agreement – Crop USA Savings Account, the Deposit Account Control Agreements – Operating Accounts, the Deposit Account Control Agreement – Receivables Collection Account, the Crop Insurance Contractor Waivers, the Deposit Account Control Agreement, the Power of Attorney and the Pledge Agreement.

**1.83** "**Material Adverse Effect**" means a material adverse effect on (a) the Business, assets, liabilities, financial condition, results of operations or business prospects of Borrower, (b) the Borrower's rights under the DCIS Agreement, (c) the Crop Insurance Contract Receivables or Borrower's right to receive A&O Subsidy Payments, Advance Commissions or other commissions payments in connection therewith (d) the ability of Borrower or any Guarantor to perform its obligations under any Loan Document to which it is a party, (e) the value of the Collateral or the rights of Lender therein, (f) the validity or enforceability of any of the Loan Documents, (g) the rights and remedies of Lender under any of such Loan Documents, or (h) the timely payment of the principal of or interest on the Loans or other amounts payable in connection therewith. All determinations of materiality shall be made by the Lender in its reasonable judgment.

**1.84** "**Material Contract**" means any contract or other arrangement (other than Loan Documents), whether written or oral, to which Borrower is a party as to which the breach, nonperformance, cancellation or failure to renew by any party thereto could have a Material Adverse Effect, including the DCIS Agreement, any other Sales Agent Agreement and the other agreements set forth in Section 1.84 of the Borrower's Disclosure Schedule.

**1.85** "**Maturity Date**" means the earlier of (i) November 23, 2014, or (ii) the date Lender may exercise any of its remedies pursuant to the terms hereof.

**1.86** "**Maximum Credit**" means, subject to Availability, Ten Million Dollars ($10,000,000).

**1.87** "**Membership Interest Pledge Agreement**" means the Membership Interest Pledge Agreement, of even date herewith, between Guarantor (Individual) and Lender.

**1.88** "**Minimum Draw Fee**" means the difference between (a) the amount of interest Lender would have received on Five Million Dollars ($5,000,000) of Revolving Loans outstanding for one year minus (b) the amount of interest actually received by Lender during the Full Minimum Draw Period.

**1.89** "**1934 Act**" means the Securities Exchange Act of 1934, as amended.

**1.90** "**Note**" or "**Revolving Loan Note**" means the Third Amended and Restated Secured Revolving Note annexed hereto as **Exhibit 1.89**.

**1.91** "**Obligations**" means all obligations, liabilities and indebtedness of every kind, nature and description owing by Borrower to Lender pursuant to the Loan Documents, including, without limitation, principal, interest, repurchase obligations, charges, fees, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, whether now existing or hereafter arising, whether arising before, during or after the Term or after the commencement of any case with respect to Borrower under the United States Bankruptcy Code or any similar statute (including, without limitation, the payment of interest and other amounts which would accrue and become due but for the commencement of such case), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured.

{00171621.DOC; 1}

9

**1.92** "**Organizational Documents**" means, in the case of a corporation, its Articles of Incorporation, Certificate of Incorporation and By-Laws; in the case of a general partnership, its Articles of Partnership and any partnership agreement; in the case of a limited partnership, its Articles of Limited Partnership and any partnership agreement; in the case of a limited liability company, its Articles of Organization and Operating Agreement or Regulations, if any; in the case of a limited liability partnership, its Articles of Limited Liability Partnership; or alternatively, in each case, the legal equivalent thereof in the jurisdiction of its organization, together with all other formation or governing documents, schedules, exhibits, amendments, addendums, modifications, replacements, additions, or restatements of the foregoing, which are in effect.

**1.93** "**Original Loan Agreement**" means the Loan and Security Agreement dated November 23, 2011, as amended prior to the date hereof, between Crop Services and CROPUSA, jointly and severally, as Borrower, and Lender.

**1.94** "**Overadvance**" has the meaning as set forth in <u>Section 1(c)(iv) of the Loan Agreement Schedule</u>.

**1.95** "**Payment Intangibles**" has the meaning ascribed to such term in the UCC.

**1.96** "**Permitted Encumbrances**" means the following: (a) Liens granted to Lender or its Affiliates; (b) purchase money security interests in favor of equipment vendors upon any Capital Assets hereafter acquired (including, without limitation, capitalized or finance leases); provided, that, (i) no such purchase money security interest or other Lien (or capitalized or finance lease, as the case may be) with respect to specific future Capital Assets shall extend to or cover any other property, other than the specific Capital Assets so acquired, and the proceeds thereof, (ii) such mortgage, Lien or security interest secures only the cost or obligation to pay the purchase price of such specific Capital Assets only (or the obligations under the capitalized or finance lease), (iii) the principal amount secured thereby shall not exceed one hundred (100%) percent of the cost or the fair market value (at the time of the acquisition of the Capital Assets) of the Capital Assets so acquired, and (iv) such purchase money security interest is preapproved in writing by Lender; (c) Liens incurred in the ordinary course of business in connection with worker's compensation, unemployment insurance or other forms of governmental insurance or benefits, relating to employees, securing sums (i) not overdue or (ii) being diligently contested in good faith provided that adequate reserves with respect thereto are maintained on the books of Borrower in conformity with GAAP; and (d) Liens for taxes (i) not yet due or (ii) being diligently contested in good faith by appropriate proceedings, provided that adequate reserves with respect thereto are maintained on the books of Borrower in conformity with GAAP, and which have no effect on the priority of Liens in favor of Lender or the value of the assets in which Lender has a Lien.

**1.97** "**Person**" or "**person**" means, as applicable, any individual, sole proprietorship, partnership, corporation, limited liability company, limited liability partnership, business trust, unincorporated association, joint stock corporation, trust, joint venture or other entity or any government or any agency or instrumentality or political subdivision thereof.

**1.98** "**Pledge Agreement**" means the Pledge Agreement in the form of **Exhibit 1.96** annexed hereto.

{00171621.DOC; 1}

10

EX 1 PG 42

**FOSTER DEC. EX. 1 pg. 43**

**1.99 "Power of Attorney"** means the Special Power of Attorney in the form of **Exhibit 1.97** annexed hereto.

**1.100 "Proceeds"** has the meaning ascribed to such term in the UCC and shall also include, but not be limited to, (a) any and all proceeds of any and all insurance policies (including, without limitation, life insurance, casualty insurance, business interruption insurance and credit insurance), indemnity, warranty or guaranty payable to Borrower from time to time with respect to any of the Collateral or otherwise, (b) any and all payments (in any form whatsoever) made or due and payable to Borrower from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental body, authority, bureau or agency or any other Person (whether or not acting under color of Governmental Authority) and (c) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

**1.101 "Promissory Note"** has the meaning ascribed to such term in the UCC.

**1.102 "Release"** means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing of a Hazardous Substance into the Environment.

**1.103 "Reserves"** means, as of any date of determination, such amounts as Lender may from time to time establish and revise in good faith reducing the amount of the Revolving Loan Commitment (a) to reflect events, conditions, contingencies or risks which, as determined by Lender in good faith, do or may adversely affect either (i) the Collateral or any other property which is security for the Obligations or its value, (ii) the assets, Business or prospects of Borrower, (iii) the security interests and other rights of Lender in the Collateral (including the enforceability, perfection and priority thereof), or (iv) Borrower's ability to perform its Obligations under the Loan Documents; or (b) in respect of any state of facts which Lender determines in good faith constitutes an Event of Default or may, with notice or passage of time or both, constitute an Event of Default.

**1.104 "Responsible Officer"** means the Chief Executive Officer of Borrower.

**1.105 "Revolving Loan Commitment"** means the difference between (i) Availability and (ii) the sum of the Reserves plus outstanding Obligations.

**1.106 "Revolving Loan Prepayment Fee"** has the meaning set forth in Section 4(b) of the Loan Agreement Schedule.

**1.107 "Revolving Loans"** has the meaning as set forth in Section 1(c)(i) of the Loan Agreement Schedule.

**1.108 "Sales Agent Agreement"** means the DCIS Agreement and any other agreement pursuant to which Borrower sells Crop Insurance.

**1.109 "Sales Agent Agreement Counterparty"** has the meaning as set forth in Section 5.4(i).

**1.110 "SEC"** means the United States Securities and Exchange Commission.

**1.111 "Securities"** has the meaning ascribed to such term in the UCC.

{00171621.DOC; 1}

11

EX 1 PG 43

1.112  **"Software"** has the meaning ascribed to such term in the UCC.

1.113  **"Subsidiary"** means, as to any Person, a corporation, limited liability company or other entity with respect to which more than fifty (50%) percent of the outstanding Equity Interests of each class having voting power is at the time owned by such Person or by one or more Subsidiaries of such Person or by such Person.

1.114  **"Tangible Chattel Paper"** has the meaning ascribed to such term in the UCC.

1.115  **"Tax"** has the meaning set forth in Section 8.12(c).

1.116  **"Tax Deduction"** has the meaning set forth in Section 8.12(c).

1.117  **"Term"** has the meaning set forth in Section 4.1.

1.118  **"UCC"** means the Uniform Commercial Code as presently enacted in California (or any successor legislation thereto), and as the same may be amended from time to time, and the state counterparts thereof as may be enacted in such states or jurisdictions where any of the Collateral is located or held.

1.119  **Rules of Interpretation and Construction.**  In this Agreement unless the context otherwise requires:

(a)  All terms used herein which are defined in the UCC shall have the meanings given therein unless otherwise defined in this Agreement;

(b)  Sections mentioned by number only are the respective Sections of this Agreement as so numbered;

(c)  Words importing a particular gender shall mean and include the other gender and words importing the singular number mean and include the plural number and vice versa;

(d)  Words importing persons shall mean and include firms, associations, partnerships (including limited partnerships), societies, trusts, corporations, limited liability companies or other legal entities, including public or governmental bodies, as well as natural persons;

(e)  Each reference in this Agreement to a particular person shall be deemed to include a reference to such person's successors and permitted assigns;

(f)  Any headings preceding the texts of any Section of this Agreement, and any table of contents or marginal notes appended to copies hereof are intended, solely for convenience of reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect;

(g)  If any clause, provision or section of this Agreement shall be ruled invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any of the remaining provisions thereof;

{00171621.DOC; 1}

12

(h)     The terms "herein", "hereunder", "hereby", "hereto", and any similar terms as used in this Agreement refer to this Agreement; the term "heretofore" means before the date of execution of this Agreement; and the term "hereafter" shall mean after the date of execution of this Agreement;

(i)     If any clause, provision or section of this Agreement shall be determined to be apparently contrary to or conflicting with any other clause, provision or section of this Agreement, then the clause, provision or section containing the more specific provisions shall control and govern with respect to such apparent conflict;

(j)     Unless otherwise specified, (i) all accounting terms used herein or in any Loan Document shall be interpreted in accordance with GAAP, (ii) all accounting determinations and computations hereunder or thereunder shall be made in accordance with GAAP and (iii) all financial statements required to be delivered hereunder or thereunder shall be prepared in accordance with GAAP;

(k)     An Event of Default that occurs shall exist or continue or be continuing unless such Event of Default is waived by Lender in accordance with the terms of this Agreement;

(l)     The word "and" when used from time to time herein shall mean "or" or "and/or" if such meaning is expansive of the rights or interests of Lender in the given context;

(m)     All references herein and in the other Loan Documents to times of day shall refer to Los Angeles, California time, unless otherwise specified to the contrary; and

(n)     No provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by reason of such party or his or its counsel having, or being deemed to have, structured or drafted such provision.

## SECTION 2. LOANS

**2.1     Loans.** The terms and provisions of Section 1(c) of the Loan Agreement Schedule are incorporated herein by reference and made a part hereof.

**2.2     Maximum Credit.** The aggregate principal amount of the Loans shall not exceed the amount of the Maximum Credit.

**2.3     Use of Proceeds.** Borrower shall use the proceeds of the Loans solely for the purposes set forth in Section 1(d) the Loan Agreement Schedule.

**2.4     Repayment.** Borrower shall repay the Loans and other Obligations in accordance with this Agreement and the Note(s).

**2.5     ACH.** In order to satisfy Borrower's payment of amounts due under the Loans and all fees, expenses and charges with respect thereto that are due and payable under this Agreement or any other Loan Document, Borrower hereby irrevocably authorizes the Lender to initiate manual and automatic electronic (debit and credit) entries through the Automated Clearing House or other appropriate electronic payment system ("ACH") to all deposit accounts maintained by Borrower,

{00171621.DOC; 1}

13

FOSTER DEC. EX. 1 pg. 46

wherever located. At the request of the Lender, Borrower shall complete, execute and deliver to the institution set forth below (with a copy to the Lender) any ACH agreement, voided check, information and/or direction letter reasonably necessary to so instruct Borrower's depository institution. Borrower (i) shall maintain in all respects this ACH arrangement; (ii) shall not change depository institutions without Lender's prior written consent, and if consent is received, shall immediately execute similar ACH instruction(s), and (iii) waives any and all claims for loss or damage arising out of debits or credits to/from the depository institution, whether made properly or in error. Borrower has so communicated with and instructed the institution(s) set forth in <u>Section 1(e) of the Loan Agreement Schedule</u>.

## SECTION 3. INTEREST, FEES AND CHARGES

**3.1 Interest.** Interest on the Loans shall accrue as set forth in <u>Sections 3(a) and 3(b) of the Loan Agreement Schedule</u>.

**3.2 Fees.** Borrower shall pay Lender, or Lender's designee, the fees set forth in <u>Section 3(c) of the Loan Agreement Schedule</u>. Such fees, other than the audit fees referenced therein, shall be deemed fully earned on the date hereof, shall be paid from Loan proceeds, and not be subject to rebate or proration for any reason.

**3.3 Fees and Expenses.** Borrower shall pay, on Lender's demand, all costs, expenses, filing fees and taxes payable in connection with the preparation, execution, delivery, recording, administration, collection, liquidation, defense and enforcement of the Loan Documents, Lender's rights in the Collateral, and all other existing and future agreements or documents contemplated herein or related hereto, including any amendments, waivers, supplements or consents which may now or hereafter be made or entered into in respect hereof, or in any way involving claims or defenses asserted by Lender or claims or defenses against Lender asserted by Borrower or any third party directly or indirectly arising out of or related to the relationship between Borrower and Lender, including, but not limited to the following, whether incurred before, during or after the Term or after the commencement of any case with respect to Borrower under the United States Bankruptcy Code or any similar or successor statute: (a) all costs and expenses of filing or recording (including UCC Financing Statement and mortgage filing fees); (b) all title insurance and other insurance premiums, appraisal fees, fees incurred in connection with any environmental report and audit, survey and search fees and charges; (c) all fees relating to the wire transfer of loan proceeds and other funds and fees for returned checks; and (d) all costs, fees and disbursements of counsel to Lender. If any fees, costs or charges payable to Lender hereunder are not paid when due, such amounts shall be added to the principal amount of the Revolving Loans and accrue interest at the Default Interest Rate until paid.

**3.4 Savings Clause.** It is intended that the Interest Rate and the Default Interest Rate shall never exceed the maximum rate, if any, which may be legally charged in the State of California for loans made to corporations (the "**Maximum Rate**"). If the provisions for interest contained in the Note(s) would result in a rate higher than the Maximum Rate, the interest shall nevertheless be limited to the Maximum Rate and any amounts which may be paid toward interest in excess of the Maximum Rate shall be applied to the reduction of principal, or, at the option of Lender, returned to the Borrower.

{00171621.DOC; 1}

14

## SECTION 4. TERM.

**4.1 Term.** This Agreement shall continue until all Obligations shall have been indefeasibly paid in full (the "**Term**").

**4.2 Early Termination; Loan Prepayment Fees.**

(a) Lender shall have the right to terminate this Agreement at any time upon or after the occurrence of an Event of Default.

(b) Borrower may prepay the Loans as set forth in <u>Section 4 of the Loan Agreement Schedule</u>.

## SECTION 5. COLLATERAL.

**5.1 Security Interests in Borrower's Assets.** As collateral security for the payment and performance of the Obligations, Borrower hereby grants and conveys to Lender a first priority continuing security interest in and Lien upon all now owned and hereafter acquired property and assets of Borrower and the Proceeds and products thereof (which property, assets and Proceeds, together with all other collateral security for the Obligations now or hereafter granted to or otherwise acquired by Lender, are referred to herein collectively as the "**Collateral**"), including, without limitation, all property of Borrower now or hereafter held or possessed by Lender, and including the following:

(a) Accounts;

(b) Chattel Paper;

(c) Commercial Tort Claims;

(d) Deposit Accounts;

(e) Documents;

(f) Electronic Chattel Paper;

(g) Equipment;

(h) Fixtures;

(i) General Intangibles (including, without limitation the website domain names set forth on <u>Section 8.21 to the Borrower's Disclosure Schedule</u>;

(j) Goods;

(k) Instruments;

(l) Inventory;

(m) Investment Property;

{00171621.DOC; 1}

15

(n)    Letter-of-Credit Rights;

(o)    Payment Intangibles;

(p)    Promissory Notes;

(q)    Software;

(r)    Tangible Chattel Paper;

(s)    Securities (whether certificated or uncertificated);

(t)    warehouse receipts;

(u)    cash monies;

(v)    tax and duty refunds;

(w)    Intellectual Property;

(x)    All present and future books and records relating to any of the above including, without limitation, all present and future books of account of every kind or nature, purchase and sale agreements, invoices, ledger cards, bills of lading and other shipping evidence, statements, correspondence, memoranda, credit files and other data relating to the Collateral or any Account Debtor, together with the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of Borrower with respect to any of the foregoing maintained with or by any other Person);

(y)    The Additional Collateral set forth in <u>Section 5(a) of the Loan Agreement Schedule</u>; and

(z)    Any and all products and Proceeds of the foregoing in any form including, without limitation, all insurance claims, warranty claims and proceeds and claims against third parties for loss or destruction of or damage to any or the foregoing.

**5.2    Financing Statements.**  Borrower hereby authorizes Lender to file Financing Statements with respect to the Collateral in form acceptable to Lender and its counsel, and hereby ratify any actions taken by Lender prior to the date hereof to file such Financing Statements. Borrower shall, at all times, do, make, execute, deliver and record, register or file all Financing Statements and other instruments, acts, pledges, leasehold or other mortgages, amendments, modifications, assignments and transfers (or cause the same to be done), and will deliver to Lender such instruments and/or documentation evidencing items of Collateral, as may be requested by Lender to better secure or perfect Lender's security interest in the Collateral or any Lien with respect thereto. Borrower acknowledges that it is not authorized to file any Financing Statement or amendment or termination statement with respect to any Financing Statement without the prior written consent of Lender and agrees that it will not do so without the prior written consent of Lender. In addition, Borrower hereby authorizes Lender to record the Liens in favor of the Lender in the U.S. Patent and Trademark Office and the U.S. Copyright Office,

{00171621.DOC; 1}

16

EX 1 PG 48

FOSTER DEC. EX. 1 pg. 49

as applicable, and the taking of any actions required under the laws of jurisdictions outside the United States with respect to Intellectual Property included in the Collateral.

**5.3 License Grant.** The terms of <u>Section 5(b) of the Loan Agreement Schedule</u> are incorporated herein by reference and made a part hereof.

**·5.4 Representations, Warranties and Covenants Concerning the Collateral.** Borrower covenants, represents and warrants (each of which such representations and warranties shall survive execution and delivery of this Agreement and shall be deemed repeated upon the making of each request for a Revolving Loan and made as of the time of each and every Revolving Loan hereunder) and covenants as follows:

(a) (i) All of the Collateral owned by it is owned by it free and clear of all Liens (including any claim of infringement) except those in Lender's favor and Permitted Encumbrances and (ii) none of the Collateral is subject to any agreement prohibiting the granting of a Lien or requiring notice of or consent to the granting of a Lien.

(b) It shall not encumber, mortgage, pledge, assign or grant any Lien upon any Collateral or any other assets to anyone other than the Lender and except for Permitted Encumbrances.

(c) The Liens granted pursuant to this Agreement, upon the filing of Financing Statements in respect of Borrower in favor of the Lender in the applicable filing office of the state of organization of Borrower, the recording of the Liens in favor of the Lender in the U.S. Patent and Trademark Office and the U.S. Copyright Office, as applicable, and the taking of any actions required under the laws of jurisdictions outside the United States with respect to Intellectual Property included in the Collateral which is created under such laws, constitute valid perfected first priority security interests in all of the Collateral in favor of the Lender, as security for the prompt and complete payment and performance of the Obligations, enforceable in accordance with the terms hereof.

(d) No security agreement, mortgage, deed of trust, financing statement, equivalent security or Lien instrument or continuation statement covering all or any part of the Collateral is or will be on file or of record in any public office, except those relating to Permitted Encumbrances.

(e) It shall not dispose of any of the Collateral whether by sale, lease or otherwise.

(f) It shall defend the right, title and interest of the Lender in and to the Collateral against the claims and demands of all Persons whomsoever, and take such actions, including (i) all actions necessary to grant the Lender "control" of any Investment Property, Deposit Accounts, Letter-of-Credit Rights or Electronic Chattel Paper owned by it, with any agreements establishing control to be in form and substance satisfactory to the Lender, (ii) the prompt (but in no event later than three (3) Business Days following the Lender's request therefor) delivery to the Lender of all original Instruments, Chattel Paper, negotiable Documents and certificated Securities owned by it (in each case, accompanied by stock powers, allonges or other instruments of transfer executed in blank), (iii) notification to third parties of the Lender's interest in Collateral at the Lender's request, and (iv) the institution of litigation against third parties as shall be prudent in order to protect and preserve its and/or the Lender's interests in the Collateral.

{00171621.DOC; 1}

17

(g)     It shall promptly, and in any event within three (3) Business Days after the same is acquired by it, notify the Lender of any Commercial Tort Claim acquired by it and, unless otherwise consented to by the Lender, it shall enter into a supplement to this Agreement granting to the Lender a Lien in such Commercial Tort Claim for the benefit of Lender.

(h)     It shall perform in a reasonable time all other steps requested by the Lender to create and maintain in the Lender's favor a valid perfected first Lien in all Collateral.

(i)     It shall notify the Lender promptly, and in any event within three (3) Business Days after obtaining knowledge thereof (i) of any material delay in its performance of any of its obligations to DCIS or any other counterparty to a Sales Agent Agreement (a "**Sales Agent Agreement Counterparty**"); (ii) of any assertion by any Sales Agent Agreement Counterparty of any material claims, offsets or counterclaims; (iii) of any allowances, credits and/or monies granted by it to any Sales Agent Agreement Counterparty; (iv) of all material adverse information relating to the financial condition of any Sales Agent Agreement Counterparty; and (v) of any loss, damage or destruction of any of the Collateral .

(j)     Section 5.4(j) of the Borrower's Disclosure Schedule contains a true and complete list of all Equipment owned by Borrower. Borrower owns no Equipment other than as set forth in such Section 5.4(j). It shall keep and maintain its Equipment in good operating condition, except for ordinary wear and tear. It shall not permit any such items to become a fixture to real estate or accessions to other personal property.

(k)     Section 5.4(k) of the Borrower's Disclosure Schedule lists all banks and other financial institutions at which it maintains deposits and/or other accounts, and such Schedule correctly identifies the name, address and telephone number of each such depository, the name in which the account is held, a description of the purpose of the account, and the complete account number. It shall not establish any depository or other bank account with any financial institution (other than the accounts set forth on Section 5.4(k) of the Borrower's Disclosure Schedule) without providing Lender with written notification thereof and providing similar information related thereto.

(l)     On the date hereof, its exact legal name (as indicated in the public record of its jurisdiction of organization), jurisdiction of organization, organizational identification number, if any, from the jurisdiction of organization, and the location of its chief executive office and all other offices or locations out of which it conducts business or operations, are specified on Section 5.4(l) of the Borrower's Disclosure Schedule. It has furnished to the Lender its Organizational Documents and long-form good standing certificate as of a date which is within thirty (30) days of the date hereof. It is organized solely under the law of the jurisdiction so specified and has not filed any certificates of domestication, transfer or continuance in any other jurisdiction. Except as otherwise indicated on Section 5.4(l) of the Borrower's Disclosure Schedule, the jurisdiction of its organization of formation is required to maintain a public record showing it to have been organized or formed. Except as specified on Section 5.4(l) of the Borrower's Disclosure Schedule, it has not changed its name, jurisdiction of organization, chief executive office or sole place of business or its corporate or company structure in any way (e.g., by merger, consolidation, change in form or otherwise) within the last five years and has not within the last five years become bound (whether as a result of merger or otherwise) as a grantor under a security agreement entered into by another Person, which has not heretofore been terminated.

EX 1 PG 50

FOSTER DEC. EX. 1 pg. 51

(m)    Borrower shall maintain and keep all of its books and records concerning the Collateral at its executive offices listed in <u>Section 5.4(l) of the Borrower's Disclosure Schedule.</u>

(n)    It will not, except with Lender's prior written consent and delivery to the Lender of all additional financing statements and other documents requested by the Lender to maintain the validity, perfection and priority of the security interests provided for herein: (i) change its jurisdiction of organization or the location of its chief executive office from that referred to in <u>Section 5.4(l) of the Borrower's Disclosure Schedule;</u> or (ii) change its name, identity or organizational structure.

(o)    Except pursuant to the terms hereof, none of the Collateral is subject to any prohibition against encumbering, pledging, hypothecating or assigning the same or requires notice or consent to Borrower's doing of the same.

(p)    (i) all Accounts represent complete bona fide transactions which,  except for adjustments to allowances and operating commissions under Sales Agent Agreements with respect to A&O Subsidy Payments and Advance Commissions, require no further act under any circumstances on its part to make such Accounts payable by any Sales Agent Agreement Counterparty, and (ii) except for adjustments to allowances and operating commissions under Sales Agent Agreements with respect to A&O Subsidy Payments and Advance Commissions, no Account is subject to any present, future contingent offsets or counterclaims.. It has not made, nor will it make, any agreement with any Sales Agent Agreement Counterparty for any extension of time for the payment of any Account, any compromise or settlement for less than the full amount thereof, any release of any  Sales Agent Agreement Counterparty from liability therefor, or any deduction therefrom except a discount or allowance for prompt or early payment allowed by it in the ordinary course of its business consistent with historical practice and as previously disclosed to the Lender in writing.

(q)    The additional representations, warranties and covenants set forth in <u>Section 5(c) of the Loan Agreement Schedule</u> are incorporated herein by reference and made a part hereof.

## SECTION 6. CONDITIONS TO LOANS.

The obligation of Lender to make the Loans shall be subject to the satisfaction or waiver by Lender, prior thereto or concurrently therewith, of each of the following conditions precedent:

**6.1    Loan Documents.** Each of the Loan Documents shall have been duly and properly authorized, executed and delivered by Borrower and the other parties thereto and shall be in full force and effect as of the date hereof.

**6.2    Representations and Warranties.** Each of the representations and warranties made by or on behalf of Borrower to Lender in this Agreement and in other Loan Documents shall be true and correct in all material respects as of the date hereof, provided that any such representation or warranty that is qualified by materiality shall be true and correct in all respects as of the date hereof.

**6.3    Certified Copies of Formation Documents.** Lender shall have received from Borrower, certified by a duly authorized officer to be true and complete on and as of a date which is not more than ten (10) Business Days prior to the date hereof, a copy of each of the Organizational Documents of Borrower in effect on such date of certification.

{00171621.DOC; 1}

19

**6.4    Proof of Action.** Lender shall have received from Borrower a copy, certified by a duly authorized officer to be true and complete on and as of the date which is not more than ten (10) Business Days prior to the date hereof, of the records of all corporate or company action taken by Borrower to authorize (a) its execution and delivery of each of the Loan Documents to which it is or is to become a party as contemplated or required by this Agreement, (b) its performance of all of its agreements and obligations under each of such documents, and (c) the incurring of the Obligations contemplated by this Agreement.

**6.5    Legal Opinion.** Lender shall have received a written legal opinion, addressed to Lender, dated the date hereof, from counsel for Borrower. Such legal opinion shall be acceptable to Lender and its counsel.

**6.6    Collateral.** Lender shall have obtained a first priority, perfected security interest in the Collateral of Borrower.

**6.7    Insurance.** Lender shall have received evidence of insurance, additional insured and loss payee endorsements required hereunder and under the other Loan Documents, in form and substance satisfactory to Lender, and certificates of insurance policies and/or endorsements naming Lender as additional insured and loss payee.

**6.8    Validity of Collateral Representation.** Lender shall have received a statement by the appropriate officers of Borrower which shall represent and certify the validity of the Collateral.

**6.9    ACH Agreement.** Lender shall have received from Borrower an agreement executed by Borrower which irrevocably authorizes Lender to initiate manual and automatic electronic (debit and credit) entries through the Automated Clearing House or other appropriate electronic payment system to all deposit accounts maintained by Borrower, wherever located.

**6.10    IRS Form 4506.** Lender shall have received from Borrower an executed Form 4506 to be submitted to the Internal Revenue Service which shall grant Lender access to Borrower's tax returns.

**6.11    IRS Form W-9.** Lender shall have received from Borrower an executed Form W-9 to be submitted to the Internal Revenue Service which shall allow Lender to verify Borrower's tax identification number(s).

**6.12    Pay Proceeds Letter.** Borrower shall have delivered to Lender a pay proceeds letter with respect to the disbursement of the proceeds of the initial Loans in form and substance satisfactory to Lender, which letter shall provide for, among other things, the payment or reimbursement of all costs and expenses incurred by Lender in connection with this Agreement and the other Loan Documents.

**6.13    No Event of Default.** No event shall have occurred on or prior to the date of each Loan by Lender hereunder and be continuing on the date of each such Loan by Lender hereunder, and no condition shall exist on the date of each Loan by Lender hereunder, which constitutes an Event of Default or which would, with notice or the lapse of time, or both, constitute an Event of Default under this Agreement or any other Loan Document; and, Lender shall have received a certification from a Responsible Officer with respect to the foregoing in form and substance satisfactory to Lender.

{00171621.DOC; 1}

EX 1 PG 52

FOSTER DEC. EX. 1 pg. 53

**6.14** **Additional Deliveries.** Borrower shall have delivered to Lender such other documents and instruments reasonably requested by Lender, including, without limitation, the documents set forth on Section 6 of the Loan Agreement Schedule.

## SECTION 7. CONDITIONS TO MAKING ALL LOANS.

If it is contemplated in this Agreement that more than one advance will be made by Lender under Section 2.1 hereof, the obligations of Lender to make all Loans hereunder shall be subject to the satisfaction or waiver by Lender, prior thereto or concurrently therewith, of each of the conditions set forth in Section 6, and, in addition, the following conditions precedent:

**7.1** **Applications and Compliance.** The application for such Loans shall have been made by Borrower to Lender in accordance with the applicable provisions of this Agreement and in compliance with all provisions of this Agreement.

**7.2** **Representations and Warranties.** Each of the representations and warranties made by or on behalf of Borrower to Lender in this Agreement or in other Loan Documents shall have been true and correct in all material respects when made (provided that any such representation or warranty that is qualified as to materiality shall be true and correct in all respects), shall, for all purposes of this Agreement, be deemed to be repeated on and as of the date of each Loan by Lender hereunder and shall be true and correct in all respects on and as of each such date, except to the extent that any of such representations and warranties relate, by the express terms thereof, solely to a date prior to the date of each Loan by Lender hereunder, and Lender shall have received a certification from a Responsible Officer of Borrower with respect to the foregoing in form and substance satisfactory to Lender.

**7.3** **Performance, etc.** Borrower shall have duly and properly performed, complied with and observed each of its covenants, agreements and obligations contained in this Agreement and in any other Loan Documents on the date of each Loan by Lender hereunder, and Lender shall have received a certification from a Responsible Officer with respect to the foregoing in form and substance satisfactory to Lender. No event shall have occurred on or prior to the date of each Loan by Lender hereunder and be continuing on the date of each Loan by Lender hereunder, and no condition shall exist on the date of each Loan by Lender hereunder, which constitutes an Event of Default or which would, with notice or the lapse of time, or both, constitute an Event of Default under this Agreement or any other Loan Document, and Lender shall have received a certification from a Responsible Officer with respect to the foregoing in form and substance satisfactory to Lender.

## SECTION 8. REPRESENTATIONS AND WARRANTIES.

Each Borrower hereby represents and warrants to Lender, knowing and intending that Lender shall rely thereon in making the Loans contemplated hereby (each of which representations and warranties shall be continuing unless expressly made in relation only to a specific date), that:

**8.1** **Existence:**

(a) Borrower (i) is a corporation or limited liability company duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization or formation, (ii) is in good standing in all other jurisdictions in which it is required to be qualified to do

{00171621.DOC; 1}

21

business as a foreign corporation or limited liability company, (iii) has all requisite corporate power and authority and full legal right to own or to hold under lease its properties and to carry on the business as presently engaged and (iv) Borrower has been issued all required federal, state and local licenses, certificates or permits necessary, required or appropriate to the operation of its business.

    (b)  Borrower has corporate power and authority and has full legal rights to enter into each of the Loan Documents to which it is a party, and to perform, observe and comply with all of its agreements and obligations under each of such documents.

   **8.2**  **No Violation, etc.** The execution and delivery by Borrower of the Loan Documents to which Borrower is a party, the performance by Borrower of all of its agreements and obligations under each of such documents, and the incurring by Borrower of all of the Obligations contemplated by this Agreement, have been duly authorized by all necessary corporate or company actions on the part of Borrower and, if required, its shareholders, and do not and will not (a) contravene any provision of Borrower's charter, organizational documents, bylaws, operating agreement, or other governing documents or this Agreement (each as from time to time in effect), (b) conflict with, or result in a breach of the terms, conditions, or provisions of, or constitute a default under, or result in the creation of any Lien upon any of the property of Borrower under, any agreement, mortgage or other instrument to which Borrower is or may become a party, (c) violate or contravene any provision of any law, regulation, order, ruling or interpretation thereunder or any decree, order or judgment or any court or governmental or regulatory authority, bureau, agency or official (all as from time to time in effect and applicable to such entity), (d) other than waivers required from Borrower's landlords, require any waivers, consents or approvals by any third party, including any creditors or trustees for creditors of Borrower, or (e) require any approval, consent, order, authorization, or license by, or giving notice to, or taking any other action with respect to, any Governmental Authority.

   **8.3**  **Binding Effect of Documents, etc.** Borrower has duly executed and delivered each of the Loan Documents to which Borrower is a party, and each of the Loan Documents is valid, binding and in full force and effect. The agreements and obligations of Borrower as contained in each of the Loan Documents constitute, or upon execution and delivery thereof will constitute, legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, subject, as to the enforcement of remedies only, to limitations imposed by federal and state laws regarding bankruptcy, insolvency, reorganization, moratorium and other laws affecting creditors' rights and remedies generally, and by general principles of law and equity.

   **8.4**  **No Events of Default.**

    (a)  No Event of Default has occurred and is continuing and no event has occurred and is continuing and no condition exists that would, with notice or the lapse of time, or both, constitute an Event of Default.

    (b)  Borrower is not in default under any Material Contract to which Borrower is a party or by which Borrower or any property of Borrower is bound.

    (c)  Borrower's execution, delivery and performance of and compliance with this Agreement and the other Loan Documents will not, with or without the passage of time or giving of notice, result in any material violation of law, or be in conflict with or constitute a default under any

{00171621.DOC; 1}

22

term or provision, or result in the creation of any Lien upon any of Borrower's properties or assets or the suspension, revocation, impairment, forfeiture or nonrenewal, of any permit, license, authorization or approval applicable to Borrower, or any of its businesses or operations or any of its assets or properties.

**8.5     No Governmental Consent Necessary.** No consent or approval of, giving of notice to, registration with or taking of any other action in respect of, any Governmental Authority is required with respect to the execution, delivery and performance by Borrower of this Agreement and the other Loan Documents to which it is a party.

**8.6     No Proceedings.** There are no actions, suits, or proceedings pending or, to the best of Borrower's knowledge, threatened against or affecting Borrower in any court or before any Governmental Authority which, if adversely determined, would have an adverse effect on the ability of Borrower to perform its obligations under this Agreement or the other Loan Documents to which it is a party.

**8.7     No Violations of Laws.** Borrower has conducted, and is conducting, its Business, so as to comply in all material respects with all applicable federal, state, county and municipal statutes and regulations. Neither Borrower nor any officer, director, manager, member or shareholder of Borrower is charged with, or so far as is known by Borrower, is under investigation with respect to, any violation of any such statutes, regulations or orders, which could have a Material Adverse Effect.

**8.8     Use of Proceeds of the Loans.** Proceeds from the Loans shall be used only for those purposes set forth in this Agreement. No part of the proceeds of the Loans shall be used, directly or indirectly, for the purpose of purchasing or carrying any margin stock or for the purpose of purchasing or carrying or trading in any stock under such circumstances as to involve Borrower in a violation of any statute or regulation. In particular, without limitation of the foregoing, no part of the proceeds from the Loans is intended to be used to acquire any publicly-held stock of any kind.

**8.9     Financial Statements; Indebtedness.**

(a)     The balance sheet of Borrower as of December 31, 2011, and the related statement of operations, stockholders' equity and cash flows (together with the related notes) for the year ended December 31, 2011, and the balance sheet of each Borrower and the related statement of operations, stockholders' or members' equity and cash flows (together with the related notes) for the month ended November 30, 2012 (collectively, the **"Financial Statements"**) fairly present, as of the date thereof, the financial position of Borrower, and the results of its operations, cash flows and stockholders' equity in all material aspects.

(b)     Except as shown on the most recent Financial Statements, (i) neither Borrower has any Indebtedness as of the date hereof which would adversely affect the financial condition of either Borrower or the Collateral, and (ii) neither Borrower has any liabilities, contingent or otherwise, except those which, individually or in the aggregate, are not material to the financial condition or operating results of Borrower.

**8.10     Changes in Financial Condition.** Since the Balance Sheet Date, there has been no material adverse change and no material adverse development in the business, properties, operations,

EX 1 PG 55

FOSTER DEC. EX. 1 pg. 56

condition (financial or otherwise), results of operations or prospects of either Borrower. Since the Balance Sheet Date, Borrower has not (i) declared or paid any dividends, (ii) sold any assets, individually or in the aggregate, outside of the ordinary course of business, (iii) had capital expenditures outside of the ordinary course of business, (iv) engaged in any transaction with any Affiliate or (v) engaged in any other transaction outside of the ordinary course of business.

**8.11   Equipment.**   Borrower shall keep its Equipment in good order and repair, and in running and marketable condition, ordinary wear and tear excepted.

**8.12   Taxes and Assessments.**

      (a)   Borrower has paid and discharged when due all taxes, assessments and other governmental charges which may lawfully be levied or assessed upon its income and profits, or upon all or any portion of any property belonging to it, whether real, personal or mixed, to the extent that such taxes, assessment and other charges have become due. Borrower has filed all tax returns, federal, state and local, and all related information, required to be filed by it.

      (b)   Borrower shall make all payments to be made by it hereunder without any Tax Deduction (as defined below), unless a Tax Deduction is required by law. If Borrower is aware that it must make a Tax Deduction (or that there is a change in the rate or the basis of a Tax Deduction), it shall promptly notify Lender. If a Tax Deduction is required by law to be made by Borrower, the amount of the payment due from Borrower shall be increased to an amount which (after making the Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required. If Borrower is required to make a Tax Deduction, Borrower shall make the minimum Tax Deduction allowed by law and shall make any payment required in connection with that Tax Deduction within the time allowed by law. Within thirty (30) days of making either a Tax Deduction or a payment required in connection with a Tax Deduction, Borrower shall deliver to Lender evidence satisfactory to Lender that the Tax Deduction has been made or (as applicable) the appropriate payment has been paid to the relevant taxing authority.

      (c).   **"Tax Deduction"** means a deduction or withholding for or on account of Tax from a payment under a Loan Document. **"Tax"** means any tax, levy, impost, duty or other charge or withholding of a similar nature, including any income, franchise, stamp, documentary, excise or property tax, charge or levy (in each case, including any related penalty or interest).

**8.13   ERISA.**   Borrower is in compliance in all material respects with the applicable provisions of ERISA and all regulations issued thereunder by the United States Treasury Department, the Department of Labor and the Pension Benefit Guaranty Corporation.

**8.14   Environmental Matters.**

      (a)   Borrower has duly complied with, and its facilities, business assets, property, leaseholds and equipment are in compliance in all respects with, the provisions of all Environmental Laws.

      (b)   Borrower has been issued all required federal, state and local licenses, certificates or permits required under Environmental Laws for the operation of its business.

{00171621.DOC; 1}

24

**8.15    United States Anti-Terrorism Laws; Holding Company Status.**

(a)    In this Section 8.15:

**"Anti-Terrorism Law"** means each of: (i) Executive Order No. 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism (the **"Executive Order"**); (ii) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (commonly known as the USA Patriot Act); (iii) the Money Laundering Control Act of 1986, Public Law 99-570; and (iv) any similar law enacted in the United States of America subsequent to December 31, 2004.

**"holding company"** has the meaning given to it in the United States Public Utility Holding Company Act of 1935, and any successor legislation and rules and regulations promulgated thereunder.

**"investment company"** has the meaning given to it in the United States Investment Company Act of 1940.

**"public utility"** has the meaning given to it in the United States Federal Power Act of 1920.

**"Restricted Party"** means any person listed: (i) in the Annex to the Executive Order; (ii) on the Specially Designated Nationals and Blocked Persons list maintained by the Office of Foreign Assets Control of the United States Department of the Treasury; or (iii) in any successor list to either of the foregoing.

(b)    Borrower is not (i) a holding company or subject to regulation under the United States Public Utility Holding Company Act of 1935; (ii) a public utility or subject to regulation under the United States Federal Power Act of 1920; (iii) required to be registered as an investment company or subject to regulation under the United States Investment Company Act of 1940; or (iv) subject to regulation under any United States Federal or State law or regulation that limits its ability to incur or guarantee indebtedness.

(c)    To the best of Borrower's knowledge, Borrower (i) is not, and is not controlled by, a Restricted Party; (ii) has not received funds or other property from a Restricted Party; and (iii) is not in breach of and is not the subject of any action or investigation under any Anti-Terrorism Law.

(d)    Borrower has taken reasonable measures to ensure compliance with the Anti-Terrorism Laws.

**8.16    Customers and Vendors.**   There are no disputes with any customers, suppliers, manufacturers, vendors and independent contractors of Borrower in excess of $5,000 in the aggregate with any such party.

{00171621.DOC; 1}

25

**8.17   Representations, Warranties and Covenants Concerning the Collateral.** The representations and warranties of Borrower set forth in Section 5.4 hereof are incorporated in this Section 8.17 by reference.

**8.18   Books and Records.** Borrower maintains its chief executive office and its books and records related to its Accounts, Inventory and all other Collateral at its address set forth in <u>Section 5.4(l) of Borrower's Disclosure Schedule</u>.

**8.19   Ownership and Control.** All of the issued and outstanding Equity Interests of Borrower are duly authorized and validly issued, fully paid, non-assessable, and free and clear of all Liens, and such Equity Interests were issued in compliance with all applicable state and federal laws concerning the issuance of securities. As of the date hereof, there are no pre-emptive or other outstanding rights, options, warrants, conversion rights or other similar agreements or understandings for the purchase or acquisition of any Equity Interests of Borrower. All of the issued and outstanding Equity Interests of Borrower are owned beneficially and of record according to the percentages set forth in <u>Section 8.19 of the Borrower's Disclosure Schedule</u>.

**8.20   Changes.** Since the date of the Balance Sheet, except as disclosed in <u>Section 8.20 of Borrower's Disclosure Schedule</u>, with respect to Borrower, there has not been:

(a)      any change in its business, assets, liabilities, condition (financial or otherwise), properties, operations or prospects, which, individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect;

(b)      any resignation or termination of any of its officers, key employees or groups of employees;

(c)      any material change, except in the ordinary course of business, in its contingent obligations by way of guaranty, endorsement, indemnity, warranty or otherwise;

(d)      any damage, destruction or loss, whether or not covered by insurance, which has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(e)      any waiver by it of a valuable right or of a material debt owed to it;

(f)      any direct or indirect material loans made by it to any of its stockholders, managers, employees, officers or directors, other than advances made in the ordinary course of business;

(g)      any material change in any compensation arrangement or agreement with any employee, manager, officer, director or equity holder;

(h)      any declaration or payment of any dividend or other distribution of its assets;

(i)      any labor organization activity related to it;

{00171621.DOC; 1}

26

(j)    any debt, obligation or liability incurred, assumed or guaranteed by it, except those for immaterial amounts and for current liabilities incurred in the ordinary course of business;

(k)    any sale, assignment, transfer, abandonment or other disposition of any Collateral other than Inventory in the ordinary course of business;

(l)    any change in any Material Contract to which it is a party or by which it is bound which, either individually or in the aggregate, has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(m)    any other event or condition of any character that, either individually or in the aggregate, has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; or

(n)    any arrangement or commitment by it to do any of the acts described in subsection (a) through (m) of this Section 8.20.

### 8.21    Intellectual Property.

(a)    Except for Permitted Encumbrances, (1) Borrower holds all Intellectual Property that it owns free and clear of all Liens and restrictions on use or transfer, whether or not recorded, and has sole title to and ownership of or has the full, exclusive (subject to the rights of its licensees) right to use in its field of business such Intellectual Property; and Borrower holds all Intellectual Property that it uses but does not own under valid licenses or sub-licenses from others; (2) the use of the Intellectual Property by Borrower does not, to the knowledge of Borrower, violate or infringe on the rights of any other Person; (3) Borrower has not received any notice of any conflict between the asserted rights of others and Borrower with respect to any Intellectual Property; (4) Borrower has used its commercially reasonable best efforts to protect its rights in and to all Intellectual Property; (5) Borrower is in compliance with all material terms and conditions of its agreements relating to the Intellectual Property; (6) Borrower is not, and since the Balance Sheet Date has not been, a defendant in any action, suit, investigation or proceeding relating to infringement or misappropriation by Borrower of any Intellectual Property nor has Borrower been notified of any alleged claim of infringement or misappropriation by Borrower of any Intellectual Property; (7) to the knowledge of Borrower, none of the products or services Borrower is researching, developing, proposes to research and develop, make, have made, use, or sell, infringes or misappropriates any Intellectual Property right of any third party; (8) none of the trademarks and service marks used by Borrower, to the knowledge of Borrower, infringes the trademark or service mark rights of any third party; and (9) to Borrower's knowledge, none of the material processes and formulae, research and development results and other know-how relating to Borrower's business, the value of which to Borrower is contingent upon maintenance of the confidentiality thereof, has been disclosed to any Person other than Persons bound by written confidentiality agreements.

(b)    Section 8.21 of Borrower's Disclosure Schedule sets forth a true and complete list of (i) all Intellectual Property owned or claimed by Borrower, together with any and all registration or application numbers for any Intellectual Property filed or issued by any Intellectual Property registry (and in the case of any and all domain names registered by or on behalf of Borrower, the name of the registrar(s) thereof) and (ii) all Intellectual Property licenses which are either material to the business of Borrower or relate to any material portion of Borrower's Inventory, including licenses for standard

{00171621.DOC; 1}

software having a replacement value of more than $10,000. None of such Intellectual Property licenses are reasonably likely to be construed as an assignment of the licensed Intellectual Property to Borrower. Borrower shall update such Section 8.21 of the Borrower's Disclosure Schedule upon each new claim, use, registration or application of or for Intellectual Property by Borrower, and upon Borrower becoming the licensee under any license described in the foregoing clause (b)(ii).

**8.22 Employees.** Borrower has no collective bargaining agreements with any of its employees. There is no labor union organizing activity pending or, to Borrower's knowledge, threatened with respect to Borrower. Except as set forth in Section 8.22 of the Borrower's Disclosure Schedule, Borrower is not a party to or bound by any currently effective deferred compensation arrangement, bonus plan, incentive plan, profit sharing plan, retirement agreement or other employee compensation plan or agreement. To Borrower's knowledge, no employee of Borrower, nor any consultant with whom Borrower has contracted, is in violation of any material term of any employment contract or any other contract relating to the right of any such individual to be employed by, or to contract with, Borrower or to receive any benefits; and, to Borrower's knowledge, the continued employment by Borrower of its present employees, and the performance of Borrower's contracts with its independent contractors, will not result in any such violation. Except for employees who have a current effective employment agreement with Borrower, as set forth in Section 8.22 of the Borrower's Disclosure Schedule, no employee of Borrower has been granted the right to continued employment by Borrower or to any material compensation following termination of employment with Borrower. Borrower is not aware that any officer, director, manager, partner, key employee or group of employees intends to terminate his, her or their employment with Borrower, nor does Borrower have a present intention to terminate any of the same.

**8.23 Tax Status.** Borrower (i) has made or filed all federal and state income and all other tax returns, reports and declarations required by any jurisdiction to which it is subject, (ii) has paid all taxes and other governmental assessments and charges that are shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and for which it has set aside on its books a provision in the amount of such taxes being contested in good faith and (iii) has set aside on its books provisions reasonably adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations apply. There are no unpaid taxes payable by Borrower claimed to be due by the taxing authority of any jurisdiction, and the officers of the Borrower know of no basis for any such claim.

**8.24 Representations and Warranties: True, Accurate and Complete.** None of the representations, certificates, reports, warranties or statements now or hereafter made or delivered to Lender pursuant hereto or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary in order to make the statements contained herein and therein, in light of the circumstances in which they are made, not misleading.

**8.25 Fees; Brokers; Finders.** There are no fees, commissions or other compensation due to any third party acting on behalf of or at the direction of Borrower in connection with the Loan Documents, except as set forth on Section 8.25 of the Borrower's Disclosure Schedule. All negotiations relative to the Loan Documents, and the transactions contemplated thereby, have been carried on by the Borrower with the Lender without the intervention of any other person or entity acting on behalf of the Borrower, and in such manner as not to give rise to any claim against the Borrower or the Lender for

{00171621.DOC; 1}

28

any finder's fee, brokerage commission or like payment due to any third party acting on behalf of or at the direction of Borrower, and if any such fee, commission or payment is payable, it shall be the sole responsibility of the Borrower and the Borrower shall pay, and indemnify the Lender for, the same.

## SECTION 9. AFFIRMATIVE COVENANTS.

Until the indefeasible payment and satisfaction in full of all Obligations and the termination of this Agreement, Borrower hereby covenants and agrees as follows:

**9.1     Notify Lender.** Borrower shall promptly, and in any event within three (3) Business Days, inform Lender (a) if any one or more of the representations and warranties made by Borrower in this Agreement or in any document related hereto shall no longer be entirely true, accurate and complete in any respect, (b) of all material adverse information relating to the financial condition of Borrower; (c) of any material return of goods; (d) of any loss, damage or destruction of any of the Collateral; (e) the occurrence of an Event of Default or a Material Adverse Effect; and (f) of any other events or occurrences set forth in Section 7(a) of the Loan Agreement Schedule.

**9.2     Change in Ownership, Directors, Managers or Officers.** Borrower shall promptly notify Lender of any changes in Borrower's managers, directors and/or officers and in the ownership of Borrower.

**9.3     Pay Taxes and Liabilities; Comply with Agreement.** Borrower shall promptly pay, when due, or otherwise discharge, all Indebtedness, sums and liabilities of any kind now or hereafter owing by Borrower to its employees as wages or salaries or to Lender and Governmental Authorities however created, incurred, evidenced, acquired, arising or payable, including, without limitation, the Obligations, income taxes, excise taxes, sales and use taxes, license fees, and all other taxes with respect to any of the Collateral, or any wages or salaries paid by Borrower or otherwise, unless the validity of which are being contested in good faith by Borrower by appropriate proceedings, provided that Borrower shall have maintained reasonably adequate reserves and accrued the estimated liability on Borrower's balance sheet for the payment of same.

**9.4     Observe Covenants, etc.** Borrower shall observe, perform and comply with the covenants, terms and conditions of this Agreement and the other Loan Documents.

**9.5     Maintain Corporate Existence and Qualifications.** Borrower shall maintain and preserve in full force and effect, its corporate existence and rights, franchises, licenses and qualifications necessary to continue its business, and comply with all applicable statutes, rules and regulations pertaining to the operation, conduct and maintenance of its existence and business including, without limitation, all federal, state and local laws relating to benefit plans, environmental safety, or health matters, and hazardous or liquid waste or chemicals or other liquids (including use, sale, transport and disposal thereof).

**9.6     Financial Reports and Other Information.** Borrower shall deliver or cause to be delivered to Lender:

(a)     **Reports.** The financial reports and other information set forth on Section 7(b) of the Loan Agreement Schedule, on the dates set forth therein. The Borrower shall further comply with all its covenants set forth therein.

{00171621.DOC; 1}

29

(b)     **Notice of Litigation; Judgments, Environmental, Health or Safety Complaints**.

(i)     Immediately after commencement thereof, notice in writing of all litigation and of all proceedings before any Governmental Authority affecting the Borrower or any of its assets;

(ii)     Within three (3) Business Days thereafter, written notice to Lender of the entry of any judgment or the institution of any lawsuit or of other legal or equitable proceedings or the assertion of any crossclaim or counterclaim seeking monetary damages from Borrower in an amount exceeding $25,000; and

(iii)     Within three (3) Business Days thereafter, notice or copies if written of all claims, complaints, orders, citations or notices, whether formal or informal, written or oral, from a governmental body or private person or entity, relating to air emissions, water discharge, noise emission, solid or liquid waste disposal, hazardous waste or materials, or any other environmental, health or safety matter, which adversely effect Borrower. Such notices shall include, among other information, the name of the party who filed the claim, the potential amount of the claim, and the nature of the claim.

(c)     **Other Information**. Upon demand,

(i)     Certificates of insurance for all policies of insurance to be maintained by Borrower pursuant hereto;

(ii)     All information received by Borrower affecting the financial status or condition of any Account Debtor or the payment of any Account, including but not limited to, invoices, original orders, shipping and delivery receipts; and

(iii)     An estoppel certificate executed by an authorized officer of Borrower indicating that there then exists no Event of Default and no event which, with the giving of notice or lapse of time, or both, would constitute an Event of Default.

(d)     **Additional Information**. From time to time, such other information as Lender may reasonably request, including financial projections and cash flow analysis.

9.7     **Comply with Laws**.  Borrower shall comply with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority, compliance with which is necessary to maintain its corporate existence or the conduct of its business or non-compliance with which would adversely affect in any respect its ability to perform its obligations or any security given to secure its obligations.

9.8     **Insurance Required**.

(a)     Borrower shall cause to be maintained, in full force and effect on all property of Borrower including, without limitation, all Inventory and Equipment, insurance in such amounts against such risks as is reasonably satisfactory to Lender, including, but without limitation, business interruption, liability, fire, boiler, theft, burglary, pilferage, vandalism, malicious mischief, loss in

{00171621.DOC; 1}

30

transit, and hazard insurance and, if as of the date hereof, any of the leased real property of Borrower is in an area that has been identified by the Secretary of Housing and Urban Development as having special flood or mudslide hazards, and on which the sale of flood insurance has been made available under the National Flood Insurance Act of 1968, then Borrower shall maintain flood insurance. Said policy or policies shall:

           (i)     Be in a form and with insurers which are satisfactory to Lender;

           (ii)    Be for such risks, and for such insured values as Lender or its assigns may reasonably require in order to replace the property in the event of actual or constructive total loss;

           (iii)   Designate Lender as additional insured and loss payee as Lender's interest may from time to time appear;

           (iv)   Contain a "breach of warranty clause" whereby the insurer agrees that a breach of the insuring conditions or any negligence by Borrower or any other person shall not invalidate the insurance as to Lender and its assignee;

           (v)    Provide that they may not be canceled or altered without thirty (30) days prior written notice to Lender; and

           (vi)   Upon demand, be delivered to Lender.

       (b)    Borrower shall obtain such additional insurance as Lender may reasonably require.

       (c)    Borrower shall, in the event of loss or damage, forthwith notify Lender and file proofs of loss with the appropriate insurer. Borrower hereby authorizes Lender to endorse any checks or drafts constituting insurance proceeds.

       (d)    Borrower shall forthwith upon receipt of insurance proceeds endorse and deliver the same to Lender.

       (e)    In no event shall Lender be required either to (i) ascertain the existence of or examine any insurance policy or (ii) advise Borrower in the event such insurance coverage shall not comply with the requirements of this Agreement.

     **9.9**    **Condition of Collateral; No Liens.** Borrower shall maintain all Collateral in good condition and repair at all times, and preserve it against any loss, damage, or destruction of any nature whatsoever relating to said Collateral or its use, and keep said Collateral free and clear of any Liens, except for the Permitted Encumbrances, and shall not permit Collateral to become a fixture to real estate or accessions to other personal property.

     **9.10**    **Payment of Proceeds.** Borrower shall forthwith upon receipt of all proceeds of Collateral, pay such proceeds (insurance or otherwise) up to the amount of the then-outstanding

{00171621.DOC; 1}

31

Obligations over to Lender for application against the Obligations in such order and manner as Lender may elect.

**9.11 Records.** Borrower shall at all times keep accurate and complete records of its operations, of the Collateral and the status of each Account, which records shall be maintained at its executive offices as set forth on Section 5.4(l) of Borrower's Disclosure Schedule.

**9.12 Delivery of Documents.** If any proceeds of Accounts shall include, or any of the Accounts shall be evidenced by, notes, trade acceptances or instruments or documents, or if any Inventory is covered by documents of title or chattel paper, whether or not negotiable, then Borrower waives protest regardless of the form of the endorsement. If Borrower fails to endorse any instrument or document, Lender is authorized to endorse it on Borrower's behalf.

**9.13 United States Contracts.** Section 7(c) of the Loan Agreement Schedule is hereby incorporated by reference and made a part hereof.

**9.14 Name Changes; Location Changes.**

(a)     Borrower shall promptly notify Lender if Borrower is known by or conducting business under any names other than those set forth in this Agreement.

(b)     Borrower shall deliver not less than thirty (30) Business Days prior written notice to Lender if Borrower intends to conduct any of its business or operations at or out of offices or locations other than those set forth in this Agreement, or if it changes the location of its chief executive office or the address at which it maintains its books and records.

**9.15 Further Assurances.** Borrower shall at any time or from time to time upon request of Lender take such steps and execute and deliver such Financing Statements and other documents all in the form of substance satisfactory to Lender relating to the creation, validity or perfection of the security interests provided for herein, under the UCC or which are reasonably necessary to effectuate the purposes and provisions of this Agreement. Borrower shall defend the right, title and interest of Lender in and to the Collateral against the claims and demands of all Persons whomsoever, and take such actions, including (i) all actions necessary to grant Lender "control" of any Investment Property, Deposit Accounts, Letter-of-Credit Rights or Electronic Chattel Paper owned by it, with any agreements establishing control to be in form and substance satisfactory to Lender, (ii) the prompt (but in no event later than three (3) Business Days following Lender's request therefor) delivery to Lender of all original Instruments, Chattel Paper, negotiable Documents and certificated Securities owned by it (in each case, accompanied by stock powers, allonges or other instruments of transfer executed in blank), (iii) notification of Lender's interest in Collateral at Lender's request, and (iv) the institution of litigation against third parties as shall be prudent in order to protect and preserve Borrower's and/or Lender's respective and several interests in the Collateral.

**9.16 Indemnification.** Borrower shall indemnify, protect, defend and save harmless Lender, as well as Lender's directors, officers, trustees, employees, agents, attorneys, members and shareholders (hereinafter referred to collectively as the "**Indemnified Parties**" and individually as an "**Indemnified Party**") from and against (a) any and all losses, damages, expenses or liabilities of any kind or nature and from any suits, claims or demands, by third parties (including, without limitation, claims of brokers and finders), including reasonable counsel fees incurred in investigating or defending such claim,

{00171621.DOC; 1}

32

EX 1 PG 64

FOSTER DEC. EX. 1 pg. 65

suffered by any of them and caused by, relating to, arising out of, resulting from, or in any way connected with the Loans, the transactions contemplated herein and the Loan Documents, and (b) any and all losses, damages, expenses or liabilities sustained by Lender in connection with any Environmental Liabilities and Costs. In case any action shall be brought against an Indemnified Party based upon any of the above and in respect to which indemnity may be sought against Borrower, the Indemnified Party against whom such action was brought shall promptly notify Borrower in writing, and Borrower shall assume the defense thereof, including the employment of counsel selected by Borrower and reasonably satisfactory to the Indemnified Party, the payment of all costs and expenses and the right to negotiate and consent to settlement. Upon reasonable determination made by the Indemnified Party, the Indemnified Party shall have the right to employ separate counsel in any such action and to participate in the defense thereof; provided, however, that the Indemnified Party shall pay the costs and expenses incurred in connection with the employment of separate counsel. Borrower shall not be liable for any settlement of any such action effected without its consent, but if settled with Borrower's consent, or if there be a final judgment for the claimant in any such action, Borrower agrees to indemnify and save harmless said Indemnified Party against whom such action was brought from and against any loss or liability by reason of such settlement or judgment, except as otherwise provided above. The provisions of this Section shall survive the termination of this Agreement and the final repayment of the Obligations.

**9.17    Additional Covenants.** The terms and provisions of <u>Section 7(d) of the Loan Agreement Schedule</u> are incorporated herein by reference and made a part hereof.

## SECTION 10. NEGATIVE COVENANTS.

Until payment and satisfaction in full of all Obligations and the termination of this Agreement, Borrower hereby covenants and agrees as follows:

**10.1    Change of Control; No Creation of Subsidiaries.** Borrower will not consolidate with, merge with, or acquire the stock or a material portion of the assets of any person, firm, joint venture, partnership, corporation, or other entity, whether by merger, consolidation, purchase of stock or otherwise if any such action results in a Change of Control (as defined below). Borrower will not create or permit to exist any Subsidiary unless such new Subsidiary is a wholly-owned Subsidiary and is designated by Lender as either a co-borrower or guarantor hereunder and such Subsidiary shall have entered into all such documentation required by Lender, including, without limitation, to grant to Lender a first priority perfected security interest in substantially all of such Subsidiary's assets to secure the Obligations. In addition, Borrower will not acquire a material portion of the assets of any entity in a manner that is not addressed by the foregoing provisions of this Section 10.1 if such action would impair Lender's rights hereunder or in the Collateral.

A **"Change of Control"** shall be deemed to have occurred if:

(i)    any "Person," which shall mean a "person" as such term is used in Sections 13(d) and 14(d) of the 1934 Act, or group of Persons (other than Persons that are holders of voting securities of the Borrower as of the date of the execution of this Agreement) is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the 1934 Act), directly or indirectly, of securities of Borrower representing 50% or more of the combined voting power of Borrower's then outstanding voting securities;

{00171621.DOC; 1}

33

FOSTER DEC. EX. 1 pg. 66

(ii)    individuals, who at the Closing Date constitute the Board of Directors or the managers of Borrower, and any new director or manager whose election by the Board of Directors or managers of Borrower, or whose nomination for election by Borrower's equity holders, was approved by a vote of at least one-half (1/2) of the directors or managers then in office (other than in connection with a contested election), cease for any reason to constitute at least a majority of the Board of Directors or managers of Borrower;

(iii)    the stockholders or members of Borrower approve (I) a plan of complete liquidation of Borrower or (II) the sale or other disposition by Borrower of all or substantially all of Borrower's assets; or

(iv)    a merger or consolidation of Borrower with any other entity is consummated, other than:

    (A)    a merger or consolidation which results in the voting securities of Borrower outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than 50% of the combined voting power of the surviving entity's outstanding voting securities immediately after such merger or consolidation; or

    (B)    a merger or consolidation which would result in the directors or managers of Borrower (who were directors or managers immediately prior thereto) continuing to constitute more than 50% of all directors or managers of the surviving entity immediately after such merger or consolidation.

In this paragraph (iv), "surviving entity" shall mean only an entity in which all of Borrower's equity holders immediately before such merger or consolidation (determined without taking into account any equity holders properly exercising appraisal or similar rights) become equity holders by the terms of such merger or consolidation, and the phrase "directors or managers of Borrower (who were directors or managers immediately prior thereto)" shall include only individuals who were directors or managers of Borrower at the Closing Date.

**10.2    Disposition of Assets or Collateral.**  Borrower will not sell, lease, transfer, convey, or otherwise dispose of any or all of its assets or Collateral, other than the disposition or transfer in the ordinary course of business.

**10.3    Other Liens.**  Borrower will not incur, create or permit to exist any Lien on any of its property or assets, whether now owned or hereafter acquired, except for (a) those Liens in favor of Lender created by this Agreement and the other Loan Documents; and (b) the Permitted Encumbrances.

**10.4    Other Liabilities.**  Borrower will not incur, create, assume, or permit to exist, any Indebtedness or liability on account of either borrowed money or the deferred purchase price of property, except (i) Obligations to Lender, (ii) debt expressly subordinated to Borrower's

{00171621.DOC; 1}

EX 1 PG 66

FOSTER DEC. EX. 1 pg. 67

Indebtedness to Lender pursuant to a subordination agreement in form and substance satisfactory to Lender or (iii) Indebtedness incurred in connection with any of the Permitted Encumbrances.

**10.5    Intentionally Omitted.**

**10.6    Loans.** Borrower will not make any loans to any Person, other than (a) advances to employees of Borrower in the ordinary course of business, with outstanding advances to any employee not to exceed $1,000 at any time and (b) commission advances made by Borrower to Borrower's sub-agents pursuant to the terms of their contracts and attached commission schedules, provided that such advances shall not at any time exceed, in the aggregate, fifty percent (50%) of final commissions scheduled to be paid to sub-agents.

**10.7    Guaranties.** Borrower will not assume, guaranty, endorse, contingently agree to purchase or otherwise become liable upon the obligation of any Person, except by the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business.

**10.8    Transfers of Notes or Accounts.** Borrower will not sell, assign, transfer, discount or otherwise dispose of any Accounts or any promissory note payable to Borrower, with or without recourse.

**10.9    Dividends.** Borrower will not declare or pay any cash dividend, make any distribution on, redeem, retire or otherwise acquire directly or indirectly, any of its Equity Interests without the prior written consent of Lender. Notwithstanding the foregoing, on not less than thirty (30) days prior written notice to Lender, and provided that no event of Default has occurred and is then continuing, Crop Services may make cash distributions to its members as and when required to enable the members to make estimated tax payments attributable to their respective distributive shares of net profits, if any.

**10.10    Payments to Affiliates.** Except as set forth in Section 10.10 of the Borrower's Disclosure Schedule, or as otherwise approved by Lender in writing in advance, Borrower shall not make any payments of cash or other property to any Affiliate.

**10.11    Modification of Documents.** Borrower will not change, alter or modify, or permit any change, alteration or modification of its Organizational Documents in any manner that might adversely affect Lender's rights hereunder as a secured lender or its Collateral without Lender's prior written consent.

**10.12    Change Business or Name.** Borrower will not engage in any business other than the Business, or change its names as it appears in the official filings of its state of organization.

**10.13    Settlements.** Other than in the ordinary course of its business, Borrower will not compromise, settle or adjust any claims in any amount relating to any of the Collateral, without the prior written consent of Lender.

### SECTION 11. EVENTS OF DEFAULT.

The occurrence of any of the following shall constitute an event of default (hereinafter referred to as an "**Event of Default**"):

{00171621.DOC; 1}

35

**11.1    Failure to Pay.**  The failure by Borrower to pay, when due, (a) any payment of principal, interest or other charges due and owing to Lender pursuant to any obligations of Borrower to Lender including, without limitation, those Obligations arising pursuant to this Agreement or any Loan Document, or under any other agreement for the payment of monies then due and payable to Lender, or (b) any taxes due to any Governmental Authority.

**11.2    Failure of Insurance.**  Failure of one or more of the insurance policies required hereunder to remain in full force and effect; failure on the part of Borrower to pay or cause to be paid all premiums when due on the insurance policies pursuant to this Agreement; failure on the part of Borrower to take such other action as may be requested by Lender in order to keep said policies of insurance in full force and effect until all Obligations have been indefeasibly paid in full; and failure on the part of Borrower to execute any and all documentation required by the insurance companies issuing said policies to effectuate said assignments.

**11.3    Failure to Perform.**  Borrower's failure to perform or observe any covenant, term or condition of this Agreement or in any other Loan Document.

**11.4    Cross Default.**  Borrower's default under any agreement or contract with a third party which default would result in a liability to Borrower in excess of $25,000.

**11.5    False Representation or Warranty.**  Borrower shall have made any statement, representation or warranty in this Agreement or in any other Loan Document to which Borrower is a party or in a certificate executed by Borrower incident to this Agreement, which is at any time found to have been false in any material respect at the time such representation or warranty was made.

**11.6    Liquidation, Voluntary Bankruptcy, Dissolution, Assignment to Creditors.**  Any resolution shall be passed or any action (including a meeting of creditors) shall be taken by Borrower for the termination, winding up, liquidation or dissolution of Borrower, or Borrower shall make an assignment for the benefit of creditors, or Borrower shall file a petition in voluntary liquidation or bankruptcy, or Borrower shall file a petition or answer or consent seeking, or consenting to, the reorganization of Borrower or the readjustment of any of the indebtedness of Borrower under any applicable insolvency or bankruptcy laws now or hereafter existing (including the United States Bankruptcy Code), or Borrower shall consent to the appointment of any receiver, administrator, liquidator, custodian or trustee of all or any part of the property or assets of Borrower or any corporate or company action shall be taken by Borrower for the purposes of effecting any of the foregoing.

**11.7    Involuntary Petition Against Borrower.**  Any petition or application for any relief is filed against Borrower under applicable insolvency or bankruptcy laws now or hereafter existing (including the United States Bankruptcy Code) or under any insolvency, reorganization, receivership, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction now or hereafter in effect (whether at law or in equity), and is not dismissed or stayed within thirty (30) days of the filing thereof.

**11.8    Judgments; Levies.**  Judgments or attachments aggregating in excess of $10,000 at any given time are obtained against Borrower which remain unstayed for a period of ten (10) days or are enforced.

{00171621.DOC; 1}

36

**11.9   Change in Condition.** There occurs any event or a change in the condition or affairs, financial or otherwise, of Borrower which, in the reasonable opinion of Lender, impairs Lender's security or the ability of Borrower to discharge its obligations hereunder or any other Loan Document or which impairs the rights of Lender in Borrower's Collateral.

**11.10   Environmental Claims.** Lender determines that any Environmental Liabilities and Costs or Environmental Lien with respect to Borrower will have a potentially adverse effect on the financial condition of Borrower or on the Collateral.

**11.11   Failure to Notify.** If at any time Borrower fail to provide Lender immediately with notice or copies, if written, of all complaints, orders, citations or notices with respect to environmental, health or safety complaints.

**11.12   Failure to Deliver Documentation.** Borrower shall fail to obtain and deliver to Lender any other documentation required to be signed or obtained as part of this Agreement, or shall have failed to take any reasonable action requested by Lender to perfect, protect, preserve and maintain the security interests and Lien on the Collateral provided for herein.

**11.13   Change of Control.** Borrower undergoes a Change of Control.

**11.14   Dissolution; Maintenance of Existence.** Borrower is dissolved, or either Borrower fails to maintain its corporate existence in good standing, or the usual business of Borrower ceases or is suspended in any respect.

**11.15   Indictment.** The indictment of Borrower or any director or Responsible Officer of either Borrower under any criminal statute, or commencement of criminal or civil proceedings against either Borrower, pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture of any portion of the property of either Borrower.

**11.16   Tax Liens.** The filing of a Lien for any unpaid taxes filed by any Governmental Authority against Borrower or any of its assets.

**11.17   Challenge to Validity of Loan Documents.** Borrower attempts to terminate, or challenges the validity of, or its liability under, this Agreement or any other Loan Document, or any proceeding shall be brought to challenge the validity, binding effect of Loan Document, or any Loan Document ceases to be a valid, binding and enforceable obligation of either Borrower.

**11.18   Claims Against Lender.** The filing of a motion by the Borrower seeking to challenge the Lender's Liens under the Loan Documents or otherwise commencing any cause of action against the Lender.

**11.19   Other Events of Default.** Any events and/or occurrences set forth on Section 9 of the Loan Agreement Schedule.

{00171621.DOC; 1}

37

EX 1 PG 69

FOSTER DEC. EX. 1 pg. 70

## SECTION 12.REMEDIES.

**12.1    Acceleration; Other Remedies.** Upon the occurrence and during the continuation of an Event of Default:

(a)    Lender shall have all rights and remedies provided in this Agreement, any of the other Loan Documents, the UCC or other applicable law, all of which rights and remedies may be exercised without notice to Borrower, all such notices being hereby waived, except such notice as is expressly provided for hereunder or is not waivable under applicable law.  All rights and remedies of Lender are cumulative and not exclusive and are enforceable, in Lender's discretion, alternatively, successively, or concurrently on any one or more occasions and in any order Lender may determine. Without limiting the foregoing, Lender may (i) accelerate the payment of all Obligations and demand immediate payment thereof to Lender, (ii) with or without judicial process or the aid or assistance of others, enter upon any premises on or in which any of the Collateral may be located and take possession of the Collateral or complete processing, manufacturing and repair of all or any portion of the Collateral, (iii) require Borrower, at Borrower's expense, to assemble and make available to Lender any part or all of the Collateral at any place and time designated by Lender, (iv) collect, foreclose, receive, appropriate, setoff and realize upon any and all Collateral, (v) notify Account Debtors or other obligors to make payment directly to Lender, or notify bailees as to the disposition of Collateral, (vi) extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all Accounts or other Collateral which includes a monetary obligation and discharge or release the Account Debtor or other obligor, without affecting any of the Obligations, and (vii) sell, lease, transfer, assign, deliver or otherwise dispose of any and all Collateral (including, without limitation, entering into contracts with respect thereto, by public or private sales at any exchange, broker's board, any office of Lender or elsewhere) at such prices or terms as Lender may deem reasonable, for cash, upon credit or for future delivery, with Lender having the right to purchase the whole or any part of the Collateral at any such public sale, all of the foregoing being free from any right or equity of redemption of Borrower, which right or equity of redemption is hereby expressly waived and released by Borrower. If any of the Collateral or other security for the Obligations is sold or leased by Lender upon credit terms or for future delivery, the Obligations shall not be reduced as a result thereof until payment therefor is finally collected by Lender. If notice of disposition of Collateral is required by law, ten (10) days prior notice by Lender to Borrower designating the time and place of any public sale or the time after which any private sale or other intended disposition of Collateral is to be made, shall be deemed to be reasonable notice thereof and Borrower waives any other notice. In the event Lender institutes an action to recover any Collateral or seeks recovery of any Collateral by way of prejudgment remedy, Borrower waives the posting of any bond which might otherwise be required.

(b)    Lender may apply the proceeds of Collateral actually received by Lender from any sale, lease, foreclosure or other disposition of the Collateral to payment of any of the Obligations, in whole or in part (including attorneys' fees and legal expenses incurred by Lender with respect thereto or otherwise chargeable to Borrower) and in such order as Lender may elect, whether or not then due. Borrower shall remain liable to Lender for the payment on demand of any deficiency together with interest at the Default Interest Rate and all costs and expenses of collection or enforcement, including reasonable attorneys' fees and legal expenses.

{00171621.DOC; 1}

38

(c)     Lender may, at its option, cure any default by Borrower under any agreement with a third party or pay or bond on appeal any judgment entered against Borrower, discharge taxes and Liens at any time levied on or existing with respect to the Collateral, and pay any amount, incur any expense or perform any act which, in Lender's sole judgment, is necessary or appropriate to preserve, protect, insure, maintain, or realize upon the Collateral.  Such amounts paid by Lender shall be repayable by Borrower on demand and added to the Obligations, with interest payable thereon at the Default Interest Rate. Lender shall be under no obligation to effect such cure, payment, bonding or discharge, and shall not, by doing so, be deemed to have assumed any obligation or liability of Borrower.

(d)     Lender and Lender's agents shall have the right to utilize any of Borrower's customer lists, registered names, trade names or trademarks to publicly advertise the sell, lease, transfer, assign, deliver or otherwise dispose of any and all Collateral and Borrower will be deemed to have waived and voided any confidentiality agreements by and between Borrower and Lender.

**12.2    Set-off.**  Lender shall have the right, immediately and without notice of other action, to set-off against any of Borrower's liabilities to Lender any money or other liability owed by Lender or any Affiliate of Lender (and such Affiliate of Lender is hereby authorized to effect such set-off) in any capacity to Borrower, whether or not due, and Lender or such Affiliate shall be deemed to have exercised such right of set-off and to have made a charge against any such money or other liability immediately upon the occurrence of such Event of Default even though the actual book entries may be made at a time subsequent thereto. The right of set-off granted hereunder shall be effective irrespective of whether Lender shall have made demand under or in connection with the Loans. None of the rights of Lender described in this Section are intended to diminish or limit in any way Lender's or Affiliates of Lender's common-law set-off rights.

**12.3    Costs and Expenses.**  Borrower shall be liable for all costs, charges and expenses, including attorney's fees and disbursements, incurred by Lender by reason of the occurrence of any Event of Default or the exercise of Lender's remedies with respect thereto, each of which shall be repayable by Borrower on demand with interest at the Default Interest Rate, and added to the Obligations.

**12.4    No Marshalling.**  Lender shall be under no obligation whatsoever to proceed first against any of the Collateral or other property which is security for the Obligations before proceeding against any other of the Collateral.  It is expressly understood and agreed that all of the Collateral or other property which is security for the Obligations stands as equal security for all Obligations, and that Lender shall have the right to proceed against any or all of the Collateral or other property which is security for the Obligations in any order, or simultaneously, as in its sole and absolute discretion it shall determine.  It is further understood and agreed that Lender shall have the right, as it in its sole and absolute discretion shall determine, to sell any or all of the Collateral or other property which is security for the Obligations in any order or simultaneously, as Lender shall determine in its sole and absolute discretion.

**12.5    No Implied Waivers; Rights Cumulative.**  No delay on the part of Lender in exercising any right, remedy, power or privilege hereunder or under any other Loan Document or provided by statute or at law or in equity or otherwise shall impair, prejudice or constitute a waiver of any such right, remedy, power or privilege or be construed as a waiver of any Event of Default or as an

{00171621.DOC; 1}

39

EX 1 PG 71

FOSTER DEC. EX. 1 pg. 72

acquiescence therein. No right, remedy, power or privilege conferred on or reserved to Lender hereunder or under any other Loan Document or otherwise is intended to be exclusive of any other right, remedy, power or privilege. Each and every right, remedy, power or privilege conferred on or reserved to Lender under this Agreement or under any of the other Loan Documents or otherwise shall be cumulative and in addition to each and every other right, remedy, power or privilege so conferred on or reserved to Lender and may be exercised by Lender at such time or times and in such order and manner as Lender shall (in its sole and complete discretion) deem expedient.

## SECTION 13.OTHER RIGHTS OF LENDER.

**13.1    Collections.** Borrower hereby authorizes Lender to, and Lender shall make such arrangements as it shall deem necessary or appropriate to, collect the Accounts and any other monetary obligations included in, or proceeds of, the Collateral at any time whether or not an Event of Default has occurred. Borrower shall, at Borrower's expense and in the manner requested by Lender from time to time, direct that remittances and all other proceeds of accounts and other Collateral up to the amount of the then-current Obligations shall be (a) remitted in kind to Lender, (b) sent to a post office box designated by and/or in the name of Lender, or in the name of Borrower, but as to which access is limited to Lender and/or (c) deposited into a bank account maintained in the name of Lender and/or a blocked bank account under arrangements with the depository bank under which all funds deposited to such blocked bank account are required to be transferred solely to Lender. In connection therewith, Borrower shall execute such post office box and/or blocked bank account agreements as Lender shall specify.

**13.2    Repayment of Obligations.** All Obligations shall be payable at Lender's office set forth below or at a bank or such other place as Lender may expressly designate from time to time for purposes of this Section. Lender shall apply all proceeds of Accounts or other Collateral received by Lender and all other payments in respect of the Obligations to the Loans whether or not then due or to any other Obligations then due, in whatever order or manner Lender shall determine.

**13.3    Lender Appointed Attorney-in-Fact.**

(a)     Borrower hereby irrevocably constitutes and appoints Lender, with full power of substitution, as its true and lawful attorney-in-fact, with full irrevocable power and authority in its place and stead and in its name or otherwise, from time to time in Lender's discretion, at Borrower's sole cost and expense, to take any and all appropriate action and to execute and deliver any and all documents and instruments which Lender may deem reasonably necessary or advisable to accomplish the purposes of this Agreement, including, without limiting the generality of the foregoing, (i) at any time any of the Obligations are outstanding, (A) to transmit to Account Debtors, other obligors or any bailees notice of the interest of Lender in the Collateral or request from Account Debtors or such other obligors or bailees at any time, in the name of Borrower or Lender or any designee of Lender, information concerning the Collateral and any amounts owing with respect thereto; (B) to execute in the name of Borrower and file against Borrower in favor of Lender Financing Statements or amendments with respect to the Collateral, or record a copy or an excerpt hereof in the United States Copyright Office or the United States Patent and Trademark Office and to take all other steps as are necessary in the reasonable opinion of Lender under applicable law to perfect the security interests granted herein; and (C) to pay or discharge taxes, Liens, security interests or other encumbrances levied or placed on or threatened against the Collateral; and (ii) after and during the continuation of an Event of Default, (A) to

receive, take, endorse, assign, deliver, accept and deposit, in the name of Lender or Borrower, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the Collateral or the proceeds thereof, (B) to notify Account Debtors or other obligors to make payment directly to Lender, or notify bailees as to the disposition of Collateral, (C) to change the address for delivery of mail to Borrower and to receive and open mail addressed to Borrower, (D) take or bring, in the name of Lender or Borrower, all steps, actions, suits or proceedings deemed by Lender necessary or desirable to effect collection of or other realization upon the Collateral; (E) to obtain and adjust insurance required pursuant to this Agreement and to pay all or any part of the premiums therefor and the costs thereof, and (F) to extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all Accounts or other Collateral which includes a monetary obligation and discharge or release the Account Debtor or other obligor, without affecting any of the Obligations.

(b)     Borrower hereby ratifies, to the extent permitted by law, all that Lender shall lawfully and in good faith do or cause to be done by virtue of and in compliance with this Agreement. The powers of attorney granted pursuant to this Agreement are each a power coupled with an interest and shall be irrevocable until the Obligations are paid indefeasibly in full.

**13.4     Release of Lender.** Borrower hereby releases and exculpates Lender, its officers, partners, members, directors, employees, agents, representatives and designees, from any liability arising from any acts or occurrence under this Agreement or in furtherance thereof, whether as attorney-in-fact or otherwise, whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for gross negligence or willful misconduct as determined by a final and non-appealable order from a court of competent jurisdiction. In no event will Lender have any liability to Borrower for lost profits or other special or consequential damages.

**13.5     Uniform Commercial Code.** At all times prior and subsequent to an Event of Default hereinafter, Lender shall be entitled to all the rights and remedies of a secured party under the UCC with respect to all Collateral.

**13.6     Preservation of Collateral.** At all times prior and subsequent to an Event of Default hereinafter, Lender may (but without any obligation to do so) take any and all action which in its sole and absolute discretion is necessary and proper to preserve its interest in the Collateral consisting of Accounts, including without limitation the payment of debts of Borrower which might, in Lender's sole and absolute discretion, impair the Collateral or Lender's security interest therein, and the sums so expended by Lender shall be secured by the Collateral, shall be added to the amount of the Obligations due Lender and shall be payable on demand with interest at the rate applicable to the Loans set forth in Section 3.1 hereof from the date expended by Lender until repaid by Borrower. After written notice by Lender to Borrower and automatically, without notice, after an Event of Default, Borrower shall not, without the prior written consent of Lender in each instance, (a) grant any extension of time of payment of any Accounts, (b) compromise or settle any Accounts for less than the full amount thereof, (c) release in whole or in part any Account Debtor or other person liable for the payment of any of the Accounts or any such other Collateral, or (d) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any of the Accounts.

**13.7     Lender's Right to Cure.** In the event Borrower shall fail to perform any of its Obligations hereunder or under any other Loan Document, then Lender, in addition to all of its rights

{00171621.DOC; 1}

41

FOSTER DEC. EX. 1 pg. 74

and remedies hereunder, may perform the same, but shall not be obligated to do so, at the cost and expense of Borrower. Such costs and expenses shall be added to the amount of the Obligations due Lender, and Borrower shall promptly reimburse Lender for such amounts together with interest at the Default Interest Rate from the date such sums are expended until repaid by Borrower.

**13.8    Inspection of Collateral.** From time to time as requested by Lender, Lender or its designee shall have access, (a) prior to an Event of Default, at the sole expense of Borrower, during reasonable business hours to all of the premises where Collateral is located for the purpose of inspecting the Collateral and to all of Borrower's Collateral, inclusive of books and records, and Borrower shall permit Lender or Lender's designees to make copies of such books and records or extracts therefrom as Lender may request, and (b) on or after an Event of Default, at the sole expense of Borrower, at any time, to all of the premises where Collateral is located for the purposes of inspecting, disposing and realizing upon the Collateral, and all Borrower's books and records, and Borrower shall permit Lender or its designee to make such copies of such books and records or extracts therefrom as Lender may request. Without expense to Lender, Lender may use such of Borrower's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises for the collection of Accounts and realization on other Collateral as Lender, in its sole discretion, deems appropriate. Borrower hereby irrevocably authorizes all accountants and third parties to disclose and deliver to Lender at Borrower's expense all financial information, books and records, work papers, management reports and other information in its possession regarding Borrower.

## SECTION 14. PROVISIONS OF GENERAL APPLICATION.

**14.1    Waivers.** Borrower waives demand, presentment, notice of dishonor protest and notice of protest of any instrument of Borrower or others which may be included in the Collateral.

**14.2    Survival.** All covenants, agreements, representations and warranties made by Borrower herein or in any other Loan Document or in any certificate, report or instrument contemplated hereby shall survive any independent investigation made by Lender and the execution and delivery of this Agreement, and such certificates, reports or instruments and shall continue so long as any Obligations are outstanding and unsatisfied, applicable statutes of limitations to the contrary notwithstanding.

**14.3    Notices.** All notices, requests and demands to or upon the respective parties hereto shall be in writing and either (a) delivered by registered or certified mail, (b) delivered by hand, or (c) delivered by national overnight courier service with next Business Day delivery, and shall be deemed to have been duly given or made (i) upon the earlier of actual receipt and three (3) Business Days after deposit in the United States Mail, registered or certified mail, return receipt requested, with proper postage prepaid, (ii) one (1) Business Day after deposit with a national overnight courier with all charges prepaid, or (iii) when hand-delivered upon receipt by the receiving party. All notices, requests and demands are to be given or made to the respective parties at the addresses set forth on Section 11 of the Loan Agreement Schedule (or to such other addresses as either party may designate by notice in accordance with the provisions of Section 11 of the Loan Agreement Schedule).

**14.4    Amendments; Waiver of Defaults.** The terms of this Agreement shall not be amended, waived, altered, modified, supplemented or terminated in any manner whatsoever except by a written instrument signed by Lender and Borrower. Any default or Event of Default by Borrower may only be

{00171621.DOC; 1}

42

waived by a written instrument specifically describing such default or Event of Default and signed by the Lender.

**14.5    Binding on Successors.**

(a)    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, provided, however, that Borrower may not assign any of its rights or obligations under this Agreement or the other Loan Documents to any Person without the prior written consent of Lender.

(b)    Lender may assign any or all of the Obligations together with any or all of the security therefor to any Person and any such assignee shall succeed to all of Lender's rights with respect thereto. Lender shall notify Borrower of any such assignment. Upon such assignment, Lender shall have no further obligations under the Loan Documents. Lender may from time to time sell or otherwise grant participations in any of the Obligations and the holder of any such participation shall, subject to the terms of any agreement between Lender and such holder, be entitled to the same benefits as Lender with respect to any security for the Obligations in which such holder is a participant.

**14.6    Invalidity.** Any provision of this Agreement which may be determined by competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**14.7    Publicity.** Borrower hereby authorizes Lender to make appropriate announcements of the financial arrangement entered into by and between Borrower and Lender, including, without limitation, announcements which are commonly known as tombstones, in such publications and to such selected parties as Lender shall in its sole and absolute discretion deem appropriate, or as required by applicable law.

**14.8    Section or Paragraph Headings.** Section and paragraph headings are for convenience only and shall not be construed as part of this Agreement.

**14.9    APPLICABLE LAW.** THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, THE LAWS OF WHICH THE BORROWER HEREBY EXPRESSLY ELECTS TO APPLY TO THIS AGREEMENT, WITHOUT GIVING EFFECT TO PROVISIONS FOR CHOICE OF LAW THEREUNDER. THE BORROWER AGREES THAT ANY ACTION OR PROCEEDING BROUGHT TO ENFORCE OR ARISING OUT OF THIS AGREEMENT SHALL BE COMMENCED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT.

**14.10    WAIVER OF JURY TRIAL.**    TO THE EXTENT PERMITTED BY APPLICABLE LAW, BORROWER HEREBY WAIVES ANY AND ALL RIGHTS THAT IT MAY NOW OR HEREAFTER HAVE UNDER THE LAWS OF THE UNITED STATES OF AMERICA OR ANY STATE TO A TRIAL BY JURY OF ANY AND ALL ISSUES ARISING EITHER DIRECTLY OR INDIRECTLY IN ANY ACTION OR PROCEEDING BETWEEN BORROWER, LENDER OR ITS SUCCESSORS AND ASSIGNS, OUT OF OR IN ANY WAY

{00171621.DOC; 1}

43

CONNECTED WITH THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, THE OBLIGATIONS AND/OR THE COLLATERAL. IT IS INTENDED THAT SAID WAIVER SHALL APPLY TO ANY AND ALL DEFENSES, RIGHTS, AND/OR COUNTERCLAIMS IN ANY ACTION OR PROCEEDINGS BETWEEN BORROWER AND LENDER. BORROWER WAIVES ALL RIGHTS TO INTERPOSE ANY CLAIMS, DEDUCTIONS, SETOFFS OR COUNTERCLAIMS OF ANY KIND, NATURE OR DESCRIPTION IN ANY ACTION OR PROCEEDING INSTITUTED BY LENDER WITH RESPECT TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, THE OBLIGATIONS, THE COLLATERAL OR ANY MATTER ARISING THEREFROM OR RELATING THERETO, EXCEPT COMPULSORY COUNTERCLAIMS.

14.11   CONSENT TO JURISDICTION. BORROWER HEREBY (a) IRREVOCABLY SUBMITS AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF CALIFORNIA, LOS ANGELES COUNTY WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, THE OBLIGATIONS AND/OR THE COLLATERAL OR ANY MATTER ARISING THEREFROM OR RELATING THERETO, AND (b) WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE OR FORUM NON CONVENIENS WITH RESPECT THERETO. IN ANY SUCH ACTION OR PROCEEDING, BORROWER WAIVES PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT OR OTHER PROCESS AND PAPERS THEREIN AND AGREES THAT THE SERVICE THEREOF MAY BE MADE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO BORROWER AT ITS OFFICES SET FORTH HEREIN OR OTHER ADDRESS THEREOF OF WHICH LENDER HAS RECEIVED NOTICE AS PROVIDED IN THIS AGREEMENT.   NOTWITHSTANDING THE FOREGOING, BORROWER CONSENTS TO THE COMMENCEMENT BY LENDER OF ANY SUIT, ACTION OR PROCEEDING IN ANY OTHER JURISDICTION TO ENFORCE LENDER'S RIGHTS AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING.

14.12   **Entire Agreement.** This Agreement, the other Loan Documents, any supplements or amendments hereto or thereto, and any instruments or documents delivered or to be delivered in connection herewith or therewith contains the entire agreement and understanding concerning the subject matter hereof and thereof between the parties hereto, and supersede all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written. In the event of any inconsistency between the terms of this Agreement and any schedule or exhibit hereto, the terms of this Agreement shall govern.

14.13   **Counterparts.** This Agreement may be executed in counterparts and by facsimile or other electronic signatures, each of which when so executed, shall be deemed an original, but all of which shall constitute but one and the same instrument.

14.14   **Joint and Several Obligations.** If more than one Person is a Borrower hereunder, the provisions of <u>Section 12  of the Loan Agreement Schedule</u> shall apply.

{00171621.DOC; 1}

44

EX 1 PG 76

FOSTER DEC. EX. 1 pg. 77

**14.15   Amendment and Restatement.**   This Agreement is given in substitution for, and amends and restates in its entirety, and as so amended and restated supersedes, the Original Loan Agreement. This Agreement is not in payment, novation, satisfaction or cancellation of the Original Loan Agreement, or of the indebtedness evidenced and secured thereby, and such indebtedness is hereby ratified and confirmed by Borrower, as amended hereby.

Borrower acknowledges and agrees that each of the Loan Documents shall remain in full force and effect and Borrower hereby ratifies and confirms the terms and provisions set forth therein. No novation of any Loan Document is intended or shall occur by or as a result of this Agreement.

The execution and delivery of this Agreement shall not impair the Liens of Lender under the Original Loan Agreement, and no part of such Liens shall be disturbed, impaired, extinguished, cancelled, rejected, surrendered, terminated, or discharged by the execution and delivery of this Agreement or any further instruments securing any other Indebtedness of Borrower to Lender.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

{00171621.DOC; 1}

EX 1 PG 77

FOSTER DEC. EX. 1 pg. 78

**IN WITNESS WHEREOF**, this Amended and Restated Loan and Security Agreement has been duly executed as of the day and year first above written.

**BORROWER:**

**CROP USA INSURANCE AGENCY, INC.**

By:
Name:
Title:

**CROPUSA INSURANCE SERVICES, LLC**

By:
Name:
Title:

**LENDER:**

**GEMCAP LENDING I, LLC**

By:
Name:
Title:

[SIGNATURE PAGE OF AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT]

{00171621.DOC, 1}

**EXHIBIT 2**