

**CropUSA**
**Insurance**

111 Main Street • P.O. Box 538
Lewiston, ID 83501
800-635-1519
208-799-9000
208-746-8159 fax
www.CropUSAinsurance.com

November 21, 2011

Diversified Crop Insurance Services
1608 B West Lafayette
Jacksonville, IL 62650

Re:    Pledge of commissions payable to CropUSA Insurance Agency, Inc. ("CropUSA") under the Sales Agency – Company Agreement between CropUSA and Diversified Crop Insurance Services ("Diversified") effective as of July 21, 2011 ("the Agreement").

Gentlemen:

This letter confirms that CropUSA has entered into a financing arrangement (the "Financing") on or about November 22, 2011, between CropUSA and GemCap Lending I, LLC ("GemCap"). In connection with the Financing, CropUSA has, among other things, granted GemCap a security interest in and to any and all property of CropUSA, including, without limitation, all payments, proceeds and other sums to which CropUSA is entitled under the Agreement, such grant of security interest in the payments under the Agreement is referred to herein as the "Pledge of Commissions".

We request that Diversified acknowledge the Pledge of Commissions and agree that such Pledge of Commissions does not constitute a default by CropUSA under the Agreement, and acknowledge its receipt of the notice directing payments under the Agreement in the attached letter.

If Diversified agrees with the understandings and agreements contained in this letter, please sign below and return this letter to CropUSA, Attn: John Taylor. This letter may be executed in counterparts, and signatures transmitted via facsimile or electronic mail shall be deemed original signatures. Thank you.

Very truly yours,

CropUSA Insurance Agency, Inc.

By: _____
    R. John Taylor
Its: President

Acknowledged and agreed to:

Diversified Crop Insurance Services

By: _Deborah J Scott_
Its: _Accounting Manager_

**EXHIBIT 3**

## SPECIAL POWER OF ATTORNEY

STATE OF _Idaho_        )
                              )   ss.:
COUNTY OF _Nez Perce_   )

         KNOW ALL MEN BY THESE PRESENTS, that each of **CROP USA INSURANCE AGENCY, INC.**, an Idaho corporation, and **CROPUSA INSURANCE SERVICES, LLC**, an Idaho limited liability company (each, individually, a "**CROP USA ENTITY**" and collectively, the "**CROP USA ENTITIES**"), hereby appoints and constitutes **GEMCAP LENDING I, LLC** ("**GEMCAP**") and each of its affiliates, its true and lawful attorney, with full power of substitution and with full power and authority to perform the following acts on behalf of such CROP USA ENTITY:

         (a)    upon the occurrence and during the continuation of an Event of Default, to exercise any and all rights of such CROP USA ENTITY in, to and under any and all Collateral, including, without limitation, any and all agreements included in Collateral, and to ask for, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

         (b)    upon the occurrence and during the continuation of an Event of Default, to receive, endorse and collect any drafts or other instruments, documents and chattel paper in connection with clause (a) above;

         (c)    upon the occurrence and during the continuation of an Event of Default, to file any claims or take any action or institute any proceedings that GEMCAP may in its good faith sole discretion deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of GEMCAP with respect to any of the Collateral;

         (d)    to pay or discharge taxes or liens levied or placed upon or threatened against the Collateral, the legality or validity thereof and the amounts necessary to discharge the same to be determined by GEMCAP in its reasonable commercial judgment, any such payments made by GEMCAP to become joint and several obligations of the CROP USA ENTITIES to GEMCAP, due and payable immediately without demand;

         (e)    upon the occurrence and during the continuation of an Event of Default, to sign and endorse any invoices, drafts against such CROP USA ENTITY, assignments, verifications, notices and other documents relating to the Collateral; and

         (f)    upon the occurrence and during the continuation of an Event of Default, to prepare, file and sign such CROP USA ENTITY's name on an assignment document in form acceptable to GEMCAP in its sole discretion necessary or desirable to transfer ownership of the Collateral to GEMCAP or an assignee or transferee of GEMCAP.

1

**EX 3 PG 80**

**FOSTER DEC. EX. 1 pg. 83**

This Power of Attorney is made pursuant to a Loan and Security Agreement, dated as of November ~~~, 2011 (the "**Loan Agreement**") between GEMCAP as lender and the CROP USA ENTITIES, jointly and severally, as borrower, and is subject to the terms and provisions thereof. Capitalized terms used and not defined herein have the meanings given to them in the Loan Agreement. This Special Power of Attorney, being coupled with an interest, is irrevocable until GEMCAP confirms in writing that all Obligations are indefeasibly paid in full.

Date: November ~~~ 2011

> **CROP USA INSURANCE AGENCY, INC.**
>
> By: _____
> Name: R John Taylor
> Title: Pres
>
>
> **CROPUSA INSURANCE SERVICES, LLC.**
>
> By: _____
> Name: R John Taylor
> Title: Manager

[SIGNATURE PAGE TO SPECIAL POWER OF ATTORNEY]

2

**EX 3 PG 81**

**FOSTER DEC. EX. 1 pg. 84**

# ACKNOWLEDGMENT

STATE OF IDAHO

COUNTY OF _Nez Perce_

On this _22nd_ day of _November_, in the year _2011_, before me,
_Diane R Whisner_, a Notary Public, personally appeared
_R. John Taylor_, known or identified to me (or proved to me on the oath
of) to be the president, or vice president, or secretary or assistant secretary of the corporation that
executed the above instrument or the person who executed the instrument on behalf of said
corporation and acknowledged to me that such corporation executed the same.

(Seal)

_Diane R. Whisner_

Notary Public

Printed Name: _Diane R Whisner_

Commission Expires:

_10-4-2013_

--------------------------------------------------------------------------

STATE OF IDAHO

COUNTY OF _Nez Perce_

On this _22nd_ day of _November_, in the year _2011_, before me,
_Diane R Whisner_, a Notary Public, personally appeared
_R. John Taylor_, known or identified to me (or proved to me on the oath
of) to be the president, or vice president, or secretary or assistant secretary of the corporation that
executed the above instrument or the person who executed the instrument on behalf of said
corporation and acknowledged to me that such corporation executed the same.

(Seal)

_Diane R. Whisner_

Notary Public

Printed Name: _Diane R Whisner_

Commission Expires:

_10-4-2013_

3

**EX 3 PG 82**

**FOSTER DEC. EX. 1 pg. 85**

**EXHIBIT 4**

**AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT DATED FEBRUARY 4, 2013 ("LOAN AGREEMENT"), AMONG CROP USA INSURANCE AGENCY, INC. AND CROPUSA INSURANCE SERVICES, LLC, JOINTLY AND SEVERALLY, AS BORROWER AND GEMCAP LENDING I, LLC AS LENDER**

**AMENDED AND RESTATED LOAN AGREEMENT SCHEDULE**

## 1. LOAN DETAILS

**(a) Borrower:** CROP USA INSURANCE AGENCY, INC. and CROPUSA INSURANCE SERVICES, LLC, jointly and severally, each with a principal place of business located at 111 Main Street, Lewiston, Idaho 83501.

**(b) Intentionally Omitted.**

**(c) Revolving Loans.**

    (i)    **Revolving Loan Amount.** Lender may, subject to the terms and conditions contained herein and the satisfaction of the closing and funding conditions set forth herein, make revolving loans to Borrower ("**Revolving Loans**") prior to the Maturity Date in amounts requested by Borrower from time to time, but not more than twelve (12) times each month, provided that the requested Revolving Loan would not cause the outstanding Revolving Loans to exceed the Revolving Loan Commitment existing immediately prior to the making of the requested Revolving Loan. Subject to the terms and conditions hereof, Borrower may borrow, repay and reborrow Revolving Loans, as set forth in this Agreement.

    (ii)    **Advances.** Revolving Loans may be drawn in tranches of not less than Twenty Five Thousand Dollars ($25,000) (each drawing, an "**Advance**" and collectively, the "**Advances**"). The obligation of Borrower to repay the Revolving Loans shall be evidenced by the Revolving Loan Note.

    (iii)    **Repayment of Principal.** The principal amount of the Revolving Loans shall be payable on the Maturity Date.

    (iv)    **Overadvances.** Notwithstanding any provision herein to the contrary, Borrower shall repay the Revolving Loans immediately at any time and from time to time in an amount by which the outstanding balance of the Revolving Loans exceeds the Revolving Loan Commitment, as determined by Lender (an "**Overadvance**").

    (v)    **Borrowing Procedures.** Whenever Borrower desires an Advance, Borrower will notify Lender by delivery of a borrowing certificate certified by a Responsible Officer ("**Borrowing Certificate**") no later than two (2) Business Days prior to the date of the proposed Advance, setting forth in reasonable detail, as of the date set forth on the Borrowing Certificate, (A) a schedule of Eligible Crop Insurance Contract Receivables setting forth the calculation of the Eligible Crop Insurance Contract Receivables on which such Advance is to be based and a calculation of the Advance

{00171999.DOC; 1}

EX 4 PG 83

FOSTER DEC. EX. 1 pg. 87

requested in connection therewith and (B) a schedule of the aggregate amount of funds in the Crop USA Savings Account on which such Advance is to be based, which Borrowing Certificate shall in all respects be subject to Lender's review and approval. In addition, Borrower shall furnish Lender with a Borrowing Certificate weekly on each Tuesday during the Term setting forth such information, irrespective of whether Borrower has then requested an Advance. Lender shall be entitled to rely on any facsimile or electronic transmission of a Borrowing Certificate given by a person who Lender reasonably believes to be a Responsible Officer, and Borrower shall indemnify and hold Lender harmless for any damages or loss suffered by Lender as a result of such reliance. The funding of each Advance shall be made in accordance with the applicable Borrowing Certificate as approved by Lender.

(vi)     **Collections.** All Collections shall be directed to Lender and deposited in an account at a financial institution selected by Lender (the "**Collection Account**"). Borrower shall cause all Collections to be sent directly to Lender's address set forth in this Agreement or in accordance with wire instructions as provided by Lender pursuant to a written instruction approved by Lender and delivered to all Account Debtors, which instruction may not be modified or terminated without Lender's prior written consent in each case. Once instituted, such payment system shall remain in effect unless Lender directs otherwise. Borrower shall bear all risk of loss of any funds deposited into such account except to the extent such loss is caused by the gross negligence or the willful misconduct of Lender. In connection therewith, Borrower shall execute such lockbox and/or bank account agreements as Lender shall specify from time to time. Any Collections or other Collateral proceeds received by Borrower from any source whatsoever shall be held in trust for the benefit of Lender and immediately remitted to Lender in kind. In the event that Borrower receives any Collections that should have been sent to the Collection Account, Borrower shall, promptly upon receipt and in any event within one Business Day of receipt, forward such Collections directly to Lender, in the form received, and promptly notify Lender of such event. Until so forwarded, such Collections shall be held in trust for the benefit of Lender.

(vii)     **Intentionally Omitted.**

(viii)     **Application of Collections.** Subject to charges for Collections Days, all amounts deposited into the Collection Account will, for the purposes of calculating the Borrowing Base and interest, be credited to the aggregate outstanding amount of the Revolving Loans on the date of deposit in the Collection Account. No checks, drafts or other instruments received by Lender shall constitute final payment to Lender unless and until such instruments have actually been collected.

(ix)     **Revolving Loan Fees and Expenses.** All payments of interest, fees, costs, expenses and other charges provided for in this Agreement or any other Loan Document that have not been paid to Lender on the due dates thereof, and any chargeback on an Eligible Crop Insurance Contract Receivable against which an Advance was made, shall be added to the principal amount of the Revolving Loans, and shall bear interest at the Default Interest Rate.

(x)     **Application of Collections and Proceeds of Collateral:**

{00171999.DOC; 1}                                                                                              2

EX 4 PG 84

FOSTER DEC. EX. 1 pg. 88

A.    So long as no Event of Default shall have occurred and remain outstanding, Lender agrees to apply all Collections as follows: first, to Overadvances; second, to all fees, costs and expenses; third, to accrued and unpaid interest; fourth, to matured and unpaid Obligations; and fifth, the principal amount of the Revolving Loans.

B.    If an Event of Default shall have occurred and be continuing, Lender may apply Collections, any other proceeds of Collateral and all other payments received by Lender to the payment of the Obligations in such manner and in such order as Lender may elect in its sole discretion.

C.    In addition to the foregoing application of Collections, in order to satisfy Borrower's payment of amounts due under the Revolving Loans and all fees, expenses and charges with respect thereto that are due and payable under this Agreement or any other Loan Document, Borrower hereby irrevocably authorizes the Lender to initiate manual and automatic electronic (debit and credit) entries through ACH to all deposit accounts maintained by Borrower, wherever located, in accordance with Section 2.5 of the Loan Agreement.

(xi)    **Reserves.**    Without limiting any other rights and remedies of Lender hereunder or under the other Loan Documents, the Revolving Loan Commitment shall be subject to Lender's continuing right, in its sole discretion in good faith, from time to time, to withhold a Reserve from the Revolving Loan Commitment to reflect, among other things, conditions, contingencies or risks that may affect the Collateral or the financial condition of the Company.

(xii)    **Minimum Draw.**    During the Full Minimum Draw Period, Borrower shall maintain an outstanding amount of at least Five Million Dollars ($5,000,000) of Revolving Loans at all times, provided, however, that if the outstanding Revolving Loans at any time during the Full Minimum Draw Period do not equal or exceed Five Million Dollars ($5,000,000), Borrower shall pay to Lender the Minimum Draw Fee. The Minimum Draw Fee is intended to compensate Lender for committing and deploying funds for Borrower's Loans pursuant to the Agreement and for Lender's loss of investment of such funds in connection with Borrower's failure to borrow such funds, and is not intended as a penalty.

**(d)    Use of Proceeds**: (i) payment of funds to Reinsurance Partners, LLC for the purpose of funding its investment in Green Leaf Reinsurance Partners LLC, (ii) working capital purposes of Weskan Agency, LLC, (iii) payment of the Annual Line Fee (as set forth in Section 3(c) of this Loan Agreement Schedule), (iv) payment of an investment bank fee to GVC Financial Services, LLC, (v) payment of any other out-of-pocket costs, fees and expenses incurred by Borrower in connection with the Revolving Loans and (vi) working capital purposes of Borrower.

**(e)    Financial Institution(s):**

Bank Name: US Bank
Address: 615 6th Street

EX 4 PG 85

FOSTER DEC. EX. 1 pg. 89

Clarkston, WA 99403
ABA#: 125000105
Account # 1535 9134 9136
Phone: 208 762 0247
Fax: _____
Reference: _____
Contact Person: Marian Pelsma

**2. Intentionally Omitted.**

## 3. INTEREST, FEES AND CHARGES

**(a) Interest.** Interest on the unpaid principal balance of Revolving Loans, including interest charges for Collection Days, shall be computed on the basis of the actual number of days elapsed and a year of 360 days and shall accrue on the unpaid principal balance of Advances at the rate of Eighteen and One Half Percent (18.5%) per annum (the **"Revolving Loan Interest Rate"**). All accrued interest on the Revolving Loans, including interest charges for Collection Days, shall be due and payable in arrears monthly on the first Business Day of each month.

**(b)    Default Interest.** Following and during the continuation of an Event of Default, interest on the unpaid principal balance of the Term Loan and the Revolving Loans shall accrue at a rate equal to Twenty Four Percent (24%) per annum (the **"Default Interest Rate"**).

**(c) Fees and Expenses.** Borrower shall pay to Lender the following fees:

**Annual Line Fee:**

A fee equal to one percent (1%) of the Maximum Credit shall be due and payable on each of the Closing Date and on each anniversary thereof.

**Loan Administration Fee and Funding Fee:**

Five Hundred Dollars ($500) per month, payable in arrears on the first Business Day of each month.

**Audit Fees:**

Eight Hundred Fifty Dollars ($850) per person, per day, plus out-of-pocket expenses.

## 4. PREPAYMENT TERMS

**(a)    Intentionally Omitted.**

{00171999.DOC; 1}

4

EX 4 PG 86

FOSTER DEC. EX. 1 pg. 90

**(b)** **Revolving Loan Prepayment.** Borrower may voluntarily prepay the entire unpaid principal sum of the Revolving Loans without premium or penalty, provided, however, that, (i) such prepayment is no less than the amount of the then-outstanding aggregate principal sum of all Revolving Loans and all accrued and unpaid interest thereon, (ii) as part of such prepayment, Borrower shall pay Lender all other amounts due to Lender pursuant to the Note, this Agreement and other Loan Documents, including, without limitation, any Minimum Draw Fee and (iii) in the event Borrower makes such prepayment on or before November 23, 2014, then Borrower shall pay to Lender an amount equal to (1) the product of (A) the average daily principal balance of all Revolving Loans from January 1, 2013 through the date of prepayment, multiplied by (B) the daily Interest Rate, multiplied by (C) one thousand eighty (1,080), minus (2) the amount of interest indefeasibly received by Lender on account of all Revolving Loans through the date of prepayment (the **"Revolving Loan Prepayment Fee"**). The Revolving Loan Prepayment Fee is intended to compensate Lender for committing and deploying funds for Borrower's Loans pursuant to the Agreement and for Lender's loss of investment of such funds in connection with such early termination, and is not intended as a penalty.

**(c)** **Fees and Acceleration.** The Revolving Loan Prepayment Fee and the Minimum Draw Fee also shall be due and payable by Borrower to Lender if Lender accelerates the payment of the Obligations on or before November 23, 2014 due to the occurrence of an Event of Default.

## 5. ADDITIONAL TERMS CONCERNING COLLATERAL

**(a) Additional Collateral.** The "Account Collateral" set forth in the Pledge Agreement shall be a part of the "Collateral" under the Loan Agreement.

**(b) Intellectual Property.**

Borrower hereby grants to Lender an irrevocable, exclusive, worldwide license without payment of royalty or other compensation to Borrower, upon the occurrence and during the continuance of an Event of Default, to use or otherwise exploit in any manner as to which authorization of the holder of such Intellectual Property would be required, and to license or sublicense such rights in to and under, any Intellectual Property now or hereafter owned by or licensed to Borrower, and wherever the same may be located, including in such license access to all media in which any of such Intellectual Property may be recorded or stored and to all software and hardware used for the compilation or printout thereof, and represents, promises and agrees that any such license or sublicense is not and will not be in conflict with the contractual, proprietary or commercial rights of any third Person and subject, in the case of trademarks and service marks, to sufficient rights to quality control and inspection in favor of Borrower to avoid the risk of invalidation of said trademarks and service marks. The foregoing license will terminate on the indefeasible payment in full of all Obligations; provided, however, that any license, sublicense, or other rights granted by Lender pursuant to such license during its term shall remain in effect in accordance with its terms. Notwithstanding the foregoing, the foregoing grant of license shall not apply to use or exploitation of Borrower's risk

EX 4 PG 87

FOSTER DEC. EX. 1 pg. 91

assessment software, to the extent that such grant is expressly prohibited under the terms of that software's license.

(c)    **Representations, Warranties and Covenants.**  In addition to the representations, warranties and covenants set forth in the Loan Agreement, the Borrower represents, warrant and covenants to Lender that:

(i)    Borrower has been represented by the law firm of Quarles & Brady LLP in connection with the negotiation, execution and delivery of the Loan Documents and the consummation of the financing contemplated herein on the Closing Date.

(ii)    Borrower shall take the following protective actions to prevent destruction of the Collateral and records pertaining to the Collateral: (i) if Borrower maintains its Collateral records on a manual system such records shall be kept in a fire proof cabinet or on no less than a monthly basis, a record of all Crop Insurance Contract Receivables, Sales Agent Agreements and all other matters relating to the Collateral shall be placed in an offsite safety deposit box (and Lender shall have access to such safety deposit box at all times); or (ii) if the Collateral records are computerized, Borrower shall create a "back-up" of the computerized information and upon the request of Lender, provide Lender with a copy of such "back-up" information.

(iii)    Any of Lender's officers, employees or agents shall have the right, at any time or times hereafter, in Lender's name or in the name of a nominee of Lender, to verify the validity, amount or any other matter relating to Collections by mail, telephone, facsimile or otherwise and to sign Borrower's name on any verification of Collections and notices thereof to ADM, DCIS or other Persons.

(iv)    Borrower is not a party to any other Sales Agent Agreement other than the ADM Agreement and the DCIS Agreement.  Borrower will inform Lender within three (3) days' of its entry into any other Sales Agent Agreement.  Borrower shall do all acts and execute all documents and instruments required by Lender to grant a security interest to Lender in, and to collaterally assign to Lender, all of Borrower's rights to receive payment under any such Sales Agent Agreement.

(v)    There are no Material Contacts other than those set forth on Section 1.84 of the Borrower's Disclosure Schedule.  Neither Borrower nor any of its Affiliates is in breach of or in default under any Material Contract, which default, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.  Nothing has occurred and no condition exists that would permit any other party thereto to terminate any Material Contract.  Borrower has not received any notice or, to the knowledge of Borrower, any threat of termination of any Material Contract.  No other party to a Material Contract is in material of or in material default under a Material Contract.  All Material Contracts are valid and binding on Borrower, and on each other party thereto, and are in full force and effect.

EX 4 PG 88

FOSTER DEC. EX. 1 pg. 92

(vi)    Borrower shall use commercially reasonable efforts to comply with all terms and conditions of and fulfill all of its obligations under all Material Contracts. Borrower shall not amend or terminate any such Material Contract or issue any consents or other approvals under any such Material Contract in a manner which would materially adversely affect Lender's rights hereunder without the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed, and Borrower shall give immediate notice to Lender of any Person's breach, termination and threatened or pending breach or termination of any Material Contract. Borrower shall use commercially reasonable efforts to take all actions necessary to enforce its rights under any such Material Contract (subject to consultation with and reasonable direction and approval of Lender, which approval shall not be unreasonable withheld, conditioned or delayed) and perform all of its obligations under any such Material Contract. In the event Borrower fails to take such action, Borrower hereby appoints Lender and any officer thereof, its agent-in-fact to take such actions and exercise and enforce all such rights. Borrower will amend Section 1. 84 of the Borrower's Disclosure Schedule upon any termination or addition of a Material Contract.

(vii)    Unless Lender notifies Borrower in writing that Lender suspends any one or more of the following requirements, Borrower shall (A) promptly upon Borrower's learning thereof, inform Lender, in writing, of any material delay in Borrower's performance of any of its obligations to ADM and/or DCIS pursuant to the ADM Agreement or the DCIS Agreement, as applicable, and of any assertion of any material claims, offsets or counterclaims by ADM or DCIS pursuant to the ADM Agreement or the DCIS Agreement, as applicable, and of any allowances, credits and/or other monies granted by Borrower to ADM or DCIS pursuant to the ADM Agreement or the DCIS Agreement, as applicable, outside of the ordinary course of Borrower's business, and (B) not permit or agree to any extension, compromise or settlement with respect to Collections which constitute, in the aggregate, more than five percent (5%) of all Collections then owing to Borrower.

(viii)    Lender shall have the right, now and at any time or times hereafter, at its option, without notice thereof to Borrower (A) to notify ADM and DCIS that the Crop Insurance Contract Receivables have been assigned to Lender and the Lender has a security interest therein; (B) to direct ADM and DCIS to make all Collections due from it to Borrower directly to Lender; and (C) from and after the occurrence of any Event of Default, without notice to Borrower, to enforce payment of and collect, by legal proceedings or otherwise, the Crop Insurance Contract Receivables in the name of the Lender and Borrower.

(ix)    As of the date hereof, and immediately prior to and after giving effect to the issuance of each Revolving Loan hereunder and the use of the proceeds thereof, (A) the fair value of the Borrower's assets is greater than the amount of its liabilities (including disputed, contingent and unliquidated liabilities) as such value is established and liabilities evaluated as required under the Section 548 of the Bankruptcy Code, (B) the present fair saleable value of the Borrower's assets is not less than the amount that will be required to pay the probable liability on its debts as they become absolute and matured, (C) the Borrower is able to realize upon its assets and pay its debts and

EX 4 PG 89

FOSTER DEC. EX. 1 pg. 93

other liabilities (including disputed, contingent and unliquidated liabilities) as they mature in the normal course of business, (D) the Borrower does not intend to, and does not believe that it will, incur debts or liabilities beyond its ability to pay as such debts and liabilities mature, and (E) the Borrower is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which its property would constitute unreasonably small capital.

## 6. ADDITIONAL CLOSING CONDITIONS

The effectiveness of the Loan Agreement shall be subject to the receipt by the Lender of each of the following:

(a)    an original of the Third Amended and Restated Secured Revolving Note in the form annexed hereto as Exhibit 6(a), duly authorized, executed and delivered by Borrower;

(b)    a reaffirmation of the Guarantee made by Guarantors (Corporate), in the form annexed hereto as Exhibit 6(b), duly executed and delivered by Guarantors (Corporate);

(c)    an original of the Amended and Restated Secured Continuing Guarantee and Security Agreement in the form of Exhibit 6(c) annexed hereto duly authorized, executed and delivered by the Guarantor (Individual);

(d)    an original of the Membership Interest Pledge Agreement in the form of Exhibit 6(d) annexed hereto duly authorized, executed and delivered by the Guarantor (Individual);

(e)    an officer's certificate of the Guarantors (Corporate) in the form of Exhibit 6(e) annexed hereto duly executed and delivered by an officer of the Guarantors (Corporate); and

(f)    payment by wire transfer of an amount equal to one percent of Two Million Dollars ($2,000,000), prorated for the portion of the year commencing on the date hereof and ending on November 23, 2013, for payment of the Annual Line Fee due on account of the increase in Maximum Credit as of the date hereof.

## 7. ADDITIONAL AFFIRMATIVE COVENANTS

(a) Notify Lender. In addition to the events and occurrences set forth in Section 9.1 of the Loan Agreement, Borrower shall inform Lender within three (3) Business Days of any event or circumstance that, to its knowledge, would cause Lender to consider any then existing Eligible Crop Insurance Contract Receivable as no longer constituting an Eligible Crop Insurance Contract Receivable.

(b) Financial Reports and Other Information.

EX 4 PG 90

FOSTER DEC. EX. 1 pg. 94

(i) Annual Financial Statements. Annual financial statements of Borrower, certified by its Chief Financial Officer and reviewed by an outside accounting firm acceptable to Lender, as soon as available, but in any event within ninety (90) days after the end of Borrower's Fiscal Year during the Term. Such financial statements shall (A) fairly present the financial position of each Borrower as of the dates thereof and the results of its operations, cash flows and stockholders' equity for each of the periods then ended in all material aspects; and (B) be prepared in accordance with GAAP.

(ii) Quarterly Financial Statements. Quarterly financial statements of the Borrower, as soon as available but in any event no later than forty-five (45) days after the close of each calendar quarter, the unaudited balance sheet and the related statement of income of the Borrower, prepared in accordance with GAAP, subject to year-end review adjustments, together with such other information with respect to the business of Borrower as Lender may request.

(iii) Monthly Financial Statements. Not later than thirty (30) days after the end of each calendar month, the unaudited balance sheets and the related statements of income of Borrower, certified by its Chief Financial Officer, subject to year-end review adjustments, with an aging schedule for all accounts receivable and accounts payable, together with such other information with respect to the business of Borrower as Lender may request.

(iv) Monthly Crop Insurance Reports. As soon as available, and in any event within ten (10) days after the end of each month, (A) a monthly policy report, with reporting segregated by policy, crop year, state and insured in a form acceptable to Lender; (B) a nonrenewal report in a form acceptable to Lender; (C) a report which sets forth an analysis of the due dates for Crop Insurance Contracts Receivables in a form acceptable to Lender and (D) a report which sets forth the monthly insurance loss claims in a form acceptable to Lender.

(v) Semi-Annual Crop Insurance Reports. Borrower shall deliver to Lender projections for spring and fall, Crop Insurance sales, a projected operating budget, cash projections for Crop Insurance sales by state and projected Crop Insurance Contract Receivables and payments due, together with such other schedules and reports as the lender may required, such projections and reports to be provided on March 1 and August 1 of each year during the Term.

(vi) Borrowing Certificates. Weekly, and more frequently if so requested by Lender, a Borrowing Certificate in accordance with <u>Section 1(c)(v) of the Loan Agreement Schedule</u>. Simultaneously with delivery of the Borrowing Certificates, a weekly report which details FCIC premium submissions, rejections and resolutions for the immediately preceding week, in a form acceptable to Lender.

(vii) Other Weekly Reports. Weekly aging schedule for all accounts receivable and accounts payable, and inventory schedules, in such form as Lender may request.

(viii) Items Upon Demand. Upon demand, assignments, in form acceptable to Lender, of all Accounts, and of the monies due or to become due on specific contracts relating to the same.

(ix) Processing Systems. Borrower shall permit Lender to access, on a daily basis, the processing systems maintained by ADM, DCIS or Affiliates of the foregoing in order for Lender to monitor Crop Insurance sales and Crop Insurance Contract Receivables. Borrower shall cooperate with Lender to establish this access, which shall also include Borrower's internal computer system. The processing system for ADM is referred to as "Aeros" and the processing system for DCIS is referred to as Crop Insurance Advantage ("CIA").

(c)     United States Contracts. If any of the Accounts arise out of contracts with the United States or any of its departments, agencies or instrumentalities, Borrower will notify Lender and, if requested by Lender, execute any necessary instruments in order that all monies due or to become due under such contract shall be assigned to Lender and proper notice of the assignment given under the Federal Assignment of Claims Act.

(d)     Intentionally Omitted.

9.     ADDITIONAL EVENTS OF DEFAULT

The occurrence of any of the following shall also constitute an "Event of Default":

(a)     Reduction in Equity Ownership Interests. R. John Taylor ceases to own of record and beneficially not less than (i) Fifty-one Percent (51%) of the issued and outstanding voting equity interests of each of Crop USA and Crop Services and (ii) one hundred percent (100%) of the issued and outstanding voting equity interests of Partners.

(b)     Default under Material Contract. Any default by Borrower under a Material Contract.

(c)     Death of Guarantor. The death or incompetency of Guarantor.

10.     Intentionally Omitted.

11.     NOTICES

Notices under the Loan Agreement shall be given to each party at the following addresses in accordance with Section 14.3 thereof:

{00171999.DOC; 1}                                                                 10

EX 4 PG 92

FOSTER DEC. EX. 1 pg. 96

If to Borrower:

Crop USA Insurance Agency, Inc.
111 Main Street
Lewiston, Idaho 83501
Attn: R. John Taylor, Chief Executive Officer

With a copy to:

Quarles & Brady LLP
300 North LaSalle Street
Suite 4000
Chicago, IL 60654
Attn: James Gatziolis

If to Lender:

GemCap Lending I, LLC
24955 Coast Highway
Suite A202
Malibu, CA 90265
Attention: Richard Ellis

With a copy to:

Cohen Tauber Spievack & Wagner P.C.
420 Lexington Avenue, Suite 2400
New York, NY 10170
Attention: Robert A. Boghosian

Notwithstanding the foregoing, that parties expressly acknowledge and agree that foregoing provisions of notice by Lender to Borrower's counsel is an accommodation only, and that Lender shall have fulfilled its notice obligation hereunder if notice shall have been received by Borrower at the address set forth above, irrespective of whether such notice is received by Borrower's counsel.

## 12.   JOINT AND SEVERAL OBLIGATIONS

If more than one Person is a Borrower hereunder, the following shall apply:

(a)     All Obligations, covenants and liabilities of Borrower hereunder shall be the joint and several Obligations, covenants and liabilities of each Borrower. All representations and warranties of Borrower hereunder shall be deemed made by each Borrower with respect to such Borrower. The Borrower shall make payment upon the maturity of the Obligations by acceleration or otherwise, and such obligation and liability

{00171999.DOC; 1}

11

EX 4 PG 93

FOSTER DEC. EX. 1 pg. 97

on the part of the Borrower shall in no way be affected by the failure of Lender to pursue or preserve its rights against any Borrower or the release by Lender of any Collateral now or thereafter acquired from any Borrower.

       (b)    Each Borrower expressly waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which such Borrower may now or hereafter have against any other Borrower or against any other Person directly or contingently liable for the Obligations until all Obligations have been indefeasibly paid in full as determined by Lender.

       (c)    Each Borrower represents and warrants to Lender that (i) the Borrowers have one or more common or affiliated shareholders, directors and officers, (ii) the businesses and corporate activities of each Borrower are closely related to, and substantially benefit, the business and corporate activities of the other, (iii) each Borrower will receive a substantial economic benefit from entering into this Agreement and will receive a substantial economic benefit from the application of the Loan hereunder, in each case, whether or not such amount is used directly by such Borrower and (iv) the Loans made hereunder are for the exclusive and indivisible benefit of the Borrower as though, for purposes of this Agreement, the Borrowers constituted a single entity.

**BORROWER:**

CROP USA INSURANCE AGENCY, INC.

By:
Name:   R JOHN TAYLOR
Title:   Pres

CROPUSA INSURANCE SERVICES, LLC

By:
Name:   R John Taylor
Title:   Mngr

{00171999.DOC, 1}

12

**EXHIBIT 5**

EXECUTION

## AMENDED AND RESTATED SECURED CONTINUING GUARANTEE

THIS AMENDED AND RESTATED CONTINUING GUARANTEE (this "Guarantee") is executed by RAY JOHNSON TAYLOR, a/k/a R. JOHN TAYLOR, a/k/a R. Johnson Taylor, an individual ("Guarantor"), in favor of GEMCAP LENDING I, LLC (hereinafter called "Lender"), with a principal place of business at 24955 Pacific Coast Highway, Suite A202, Malibu, CA 90265, with respect to the joint and several Indebtedness of CROP USA INSURANCE AGENCY, INC. and CROPUSA INSURANCE SERVICES, LLC (together, "Borrowers").

1.     **Continuing Guarantee.**  For valuable consideration, Guarantor hereby unconditionally guarantees and promises to promptly pay to Lender, at the address indicated above or at such other address as Lender may direct, in lawful money of the United States, all Indebtedness of Borrower to Lender when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter. The liability of Guarantor under this Guaranty is not limited as to the principal amount of the Indebtedness guaranteed and includes, without limitation, liability for all interest, fees, indemnities and other costs and expenses relating to or arising out of the Indebtedness. In giving this Guarantee, Guarantor hereby acknowledges that this Guarantee is a guaranty of payment (and not of collection), and that the liability of Guarantor hereunder is present, absolute, unconditional, continuing, primary, direct and independent of the obligations of Borrower to Lender. Lender shall not be required to pursue any other remedies including, without limitation, its remedies against Borrower under any Loan Documents evidencing Indebtedness of Borrower, before pursuing Lender's rights and remedies against Guarantor under this Guarantee.

2.     **Definitions.**

(a)     "Indebtedness" shall mean: (a) any and all debts, duties, obligations and liabilities of Borrower to Lender, now or hereafter existing, whether voluntary or involuntary and however arising, whether direct or indirect or acquired by Lender by assignment, succession, or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, held or to be held by Lender for its own account or as agent for another or others, whether Borrower may be liable individually or jointly with others, whether recovery upon such debts, liabilities, and obligations may be or hereafter become barred by any statute of limitations, and whether such debts, liabilities, and obligations may be or hereafter become otherwise unenforceable and regardless of whether recovery thereon is discharged in any bankruptcy, insolvency or other proceeding, including without limitation, any of the same that arise from or in connection with Lender's acquisition of a security interest or other interest in any property of Borrower; and (b) any and all attorneys' fees, court costs, and collection charges incurred in endeavoring to collect or enforce any of the foregoing against Borrower, Guarantor, or any other person liable thereon (whether or not suit be brought) and any other expense of, for or incidental to collection thereof. Guarantor hereby acknowledges and agrees that acceptance by Lender of this Guarantee shall not constitute a commitment of any kind by Lender to permit Borrower to incur Indebtedness to Lender.

(c)     "Loan Documents" shall mean loan agreements between Borrower and Lender and promissory notes from Borrower in favor of Lender evidencing or relating to any of the Indebtedness, and deeds of trust, mortgages, security agreements, other agreements, documents, and instruments executed by Borrower in connection with such loan agreements and promissory notes, as such loan agreements, promissory notes, security agreements, other agreements, documents and instruments are now in effect and as hereafter amended, restated, renewed or superseded.

3.     [INTENTIONALLY LEFT BLANK]

4.     **Rights of Lender.**  Guarantor hereby consents and agrees that, without notice to or by Guarantor and without affecting or impairing in any way the obligations or liability of Guarantor hereunder, Lender may, from time to time before or after revocation of this Guarantee, do any one or more of the following in Lender's sole and absolute discretion: (a) renew, compromise, extend, accelerate, or otherwise change the time for payment or

{00171624.DOC; 1}

1

accept partial payments of, compromise or settle, renew, discharge the performance of, refuse to enforce or release all or any parties to, any or all of the Indebtedness, or otherwise change the terms of the Indebtedness or any part thereof, including increase or decrease of the rate of interest thereon; (b) grant any other indulgence to Borrower or any other person in respect of any or all of the Indebtedness or any other matter; (c) accept, release, waive, surrender, enforce, exchange, modify, impair, or extend the time for the performance, discharge, or payment of, any and all property of any kind securing any or all of the Indebtedness, Guarantor's obligations hereunder or any guaranty of any or all of the Indebtedness or on which Lender at any time may have a lien, or refuse to enforce its rights or make any compromise or settlement or agreement therefore in respect of any or all of such property; (d) substitute or add, or take any action or omit to take any action that results in the release of, any one or more endorsers or guarantor of all or part of the Indebtedness, including without limitation one or more parties to this Guarantee, regardless of any destruction or impairment of any right of contribution or other right of Guarantor; (e) amend, alter or change in any respect whatsoever any term or provision of the Loan Documents relating to any or all of the Indebtedness, including the rate of interest thereon; (f) apply to the Indebtedness, any sums received from Borrower, any other guarantor, endorser, or cosigner, or from the disposition of any collateral or security to any indebtedness whatsoever owing from such person or secured by such collateral or security, in such manner and order as Lender determines in its sole discretion, and regardless of whether such indebtedness is part of the Indebtedness, is secured, or is due and payable; and (g) apply any sums received from Guarantor or from the disposition of any collateral or security securing the obligations of Guarantor, to any of the Indebtedness in such manner and order as Lender determines in its sole discretion, regardless of whether or not such Indebtedness is secured or is due and payable. Guarantor consents and agrees that Lender shall be under no obligation to marshal any assets in favor of Guarantor, or against or in payment of any or all of the Indebtedness. Guarantor further consents and agrees that Lender shall have no duties or responsibilities whatsoever with respect to any property securing any or all of the Indebtedness or Guarantor's obligations hereunder. Without limiting the generality of the foregoing, Lender shall have no obligation to monitor, verify audit, examine, or obtain or maintain any insurance with respect to, any property securing any or all of the Indebtedness or Guarantor's obligations hereunder.

5.    **Guaranty to be Absolute.** Guarantor agrees that until the Indebtedness has been indefeasibly paid in full and any commitments of Lender or facilities provided by Lender with respect to the Indebtedness have been terminated, Guarantor shall not be released by or because of the taking, or failure to take, any action that might in any manner or to any extent vary the risks of Guarantor under this Guaranty or that, but for this paragraph, might discharge or otherwise reduce, limit, or modify Guarantor's obligations under this Guaranty. Guarantor waives and surrenders any defense to any liability under this Guaranty based upon any such action, including but not limited to any action of Lender described in the immediately preceding paragraph of this Guaranty. It is the express intent of Guarantor that Guarantor's obligations under this Guaranty are and shall be absolute and unconditional. In the event any payment with respect to any or all of the Indebtedness by any person is repaid or returned by Lender because of any claim that such payment constituted a preferential transfer or fraudulent conveyance or for any other reason whatsoever, the liability of Guarantor hereunder shall not be discharged or reduced by reason of such payment and Guarantor shall be and remain fully liable therefor. Lender shall have full authority in its sole discretion to compromise or settle any such claim, and any amounts received by Lender that are paid, repaid or returned as a part of such compromise or settlement, and the foregoing shall not discharge or reduce the liability of Guarantor hereunder and Guarantor shall be and remain fully liable therefore.

6.    **Waiver of Subrogation.** Until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Lender with respect to the Indebtedness have been terminated, Guarantor waives any right of subrogation, reimbursement, indemnification, and contribution (contractual, statutory, or otherwise) including, without limitation, any claim or right of subrogation under the Bankruptcy Code (Title 11, United States Code) or any successor statute, arising from the existence or performance of this Guaranty, and Guarantor waives any right to enforce any remedy which Lender now has or may hereafter have against Borrower, and waives any benefit of, and any right to participate in, any security now or hereafter held by Lender.

7.    **Waivers.** Guarantor hereby waives:   (a) all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of intent to accelerate, notices of

{00171624.DOC; 1}

2

**EX 5 PG 96**

acceleration, notices of any suit or any other action against Borrower or any other person, any other notices to any party liable on any Loan Document (including Guarantor), notices of acceptance of this Guarantee, and notices of the existence, creation, or incurring of new or additional Indebtedness, and all other notices and demands to which Guarantor might be entitled, including without limitation, all of the following: (i) the amount of the Indebtedness from time to time outstanding; (ii) any foreclosure sale or other disposition of any property which secures any or all of the Indebtedness or which secures the obligations of any other guarantor of any or all of the Indebtedness; (iii) any adverse change in Borrower's financial position; (iv) any other fact that might increase Guarantor's risk; (v) any default, partial payment or non-payment of all or any part of the Indebtedness; (vi) the occurrence of any of the other Events of Default (as hereinafter defined); and (vii) any and all agreements and arrangements between Lender and Borrower and any changes, modifications, or extensions thereof, and any revocation, modification or release of any guaranty of any or all of the Indebtedness by any person; (b) any right to require Lender to institute suit against, or to exhaust its rights and remedies against, Borrower or any other person, or to proceed against any property of any kind that secures all or any part of the Indebtedness, or to exercise any right of offset or other right with respect to any reserves, credits or deposit accounts held by or maintained with Lender or any indebtedness of Lender to Borrower, or to exercise any other right or power, or pursue any other remedy Lender may have; (c) any defense arising by reason of any disability or other defense of Borrower or any other guarantor or any endorser, co-maker or other person, or by reason of the cessation from any cause whatsoever of any liability of Borrower or any other guarantor or any endorser, co-maker or other person, with respect to all or any part of the Indebtedness, or by reason of any act or omission of Lender or others that directly or indirectly results in the discharge or release of Borrower or any other guarantor or any other person or any Indebtedness or any security therefore, whether by operation of law or otherwise; (d) all rights of subrogation, reimbursement, and indemnity whatsoever, and all rights of recourse to or with respect to any assets or property of Borrower or any collateral or security for any or all of the Indebtedness; (e) any defense arising by reason of any failure of Lender to obtain, perfect, maintain or keep in force any security interest in, or lien or encumbrance upon, any property of Borrower or any other person; (f) any defense based upon failure of Lender to give Guarantor notice of any sale or other disposition of any property securing any or all of the Indebtedness or Guarantor's obligations hereunder, or any defects in any such notice that may be given, or failure of Lender to comply with any provision of applicable law in enforcing any security interest in or lien upon any property securing any or all of the Indebtedness or Guarantor's obligations hereunder, including, but not limited to, any failure by Lender to dispose of any property securing any or all of the Indebtedness or Guarantor's obligations hereunder in a commercially reasonable manner; and (g) any defense based upon arising out of any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, liquidation or dissolution proceeding commenced by or against Borrower or any other guarantor or any endorser, co-maker or other person, including without limitation any discharge of, or bar against collecting, any of the Indebtedness (including without limitation any interest thereon), in or as a result of any such proceeding.

8.  **Waiver of Other Rights and Defenses.**

(a)     Guarantor waives any rights and defenses that are or may become available to Guarantor by reason of Sections 2787 to 2855, inclusive, of the California Civil Code.

(b)     Guarantor waives all rights and defenses that Guarantor may have because any of the Indebtedness is secured by real property. This means, among other things: (i) Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower; and (ii) if Lender forecloses on any real property collateral pledged by Borrower: (1) the amount of the Indebtedness may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (2) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because any of the Indebtedness is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

EX 5 PG 97

FOSTER DEC. EX. 1 pg. 102

EXECUTION

(c)     Guarantor waives any right or defense it may have at law or equity, including California Code of Civil Procedure Section 580a, to a fair market value hearing or action to determine a deficiency judgment after a foreclosure.

(d)     Guarantor agrees to withhold the exercise of any and all subrogation and reimbursement rights against Borrower, against any other person, and against any collateral or security for the Indebtedness, including any such rights pursuant to Sections 2847 and 2848 of the California Civil Code, until the Indebtedness has been indefeasibly paid and satisfied in full, all obligations owed to Lender under the Loan Documents have been fully performed, and Lender has released, transferred or disposed of all of its right, title and interest in such collateral or security.

9.     **Acceleration.**  The obligations of the Guarantor hereunder to pay any or all of the Indebtedness shall, at the option of Lender, immediately become due and payable, without notice, and without regard to the expressed maturity of any of the Indebtedness, in the event: (a) a breach by Borrower of any term, covenant, condition, representation or warranty in any of the Loan Documents, or any statement, report, or certificate made or delivered to Lender by Borrower or Guarantor, or any of their respective officers, partners, employees, or agents, is incorrect, false, untrue, or misleading when given in any material respect; or (b) Borrower or Guarantor shall fail to pay when due all or any part of the Indebtedness; or (c) Guarantor shall fail to pay or perform when due any indebtedness or obligation of Guarantor to Lender, whether under this Guarantee or any other instrument, document, or agreement heretofore or hereafter entered into; or (d) any event shall occur which results in the acceleration of the maturity of any indebtedness of Borrower or Guarantor to others; or (e) Borrower or Guarantor shall fail promptly to perform or comply with any term or condition of any agreement with any third party which does or may result in a material adverse effect on the business of Borrower or Guarantor; or (f) there shall be made or exist any levy, assessment, attachment, seizure, lien, or encumbrance for any cause or reason whatsoever upon all or any part of the property of Borrower or Guarantor; or (g) there shall occur the liquidation, dissolution, termination of existence, insolvency, or business failure of Borrower or Guarantor, or the appointment of a receiver, trustee or custodian for Borrower, Guarantor or all or any part of the property of either of them, or the assignment for the benefit of creditors by Borrower or Guarantor, or the commencement of any proceeding by or against Borrower or Guarantor under any reorganization, insolvency, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, now or hereafter in effect; or (h)Borrower or Guarantor shall conceal, remove or permit to be concealed or removed any part of its property, with intent to hinder, delay or defraud its creditors, or make or suffer any transfer of any of its property which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law, or shall make any transfer of its property to or for the benefit of any creditor at a time when other creditors similarly situated have not been paid; or (i) Guarantor shall revoke this Guarantee. All of the foregoing is hereinafter referred to as "Events of Default".

10.     **Right to Attachment Remedy.**  Guarantor agrees that, notwithstanding the existence of any property securing any or all of the Indebtedness or securing Guarantor's obligations under this Guarantee, Lender shall have all of the rights of a creditor of Guarantor, including without limitation the right to obtain a temporary protective order and writ of attachment against Guarantor with respect to any sums due under this Guarantee. Guarantor further agrees that in the event any property secures the obligations of Guarantor under this Guarantee, to the extent that Lender, in its sole and absolute discretion, determines prior to the disposition of such property that the amount to be realized by Lender therefrom may be less than the indebtedness of Guarantor under this Guarantee, Lender shall have all the rights of an unsecured creditor against Guarantor, including without limitation the right of Lender, prior to the disposition of said property, to obtain a temporary protective order and writ of attachment against Guarantor. Guarantor waives the benefit of Section 483.010(b) of the California Code of Civil Procedure and of any and all other statutes and rules of law now or hereafter in effect requiring Lender to first resort to or exhaust all such collateral before seeking or obtaining any attachment remedy against Guarantor. Lender shall have no liability to Guarantor as a result thereof, whether or not the actual deficiency realized by Lender is less than the anticipated deficiency on the basis, which Lender obtains a temporary protective order or writ of attachment.

11.     **Subordination.**  Any and all rights of Guarantor under any and all debts, liabilities and obligations owing

EX 5 PG 98

**FOSTER DEC. EX. 1 pg. 103**

from Borrower to Guarantor, including any security for and guaranties of any such obligations, whether now existing or hereafter arising, are hereby subordinated in right of payment to the prior payment in full of all of the Indebtedness. No payment in respect of any such subordinated obligations shall at any time be made to or accepted by Guarantor if at any time such payment any Indebtedness is outstanding. Borrower and any assignee, trustee in bankruptcy, receiver, or any other person having custody or control over any or all of Borrower's property are hereby authorized and directed to pay to Lender the entire balance of the Indebtedness before making any payments whatsoever to Guarantor, whether as a creditor, shareholder, or otherwise; and insofar as may be necessary for that purpose, Guarantor hereby assigns and transfers to Lender all rights to any and all debts, liabilities and obligations owing from Borrower to Guarantor, including any security for any guaranties of any such obligations, whether now existing or hereafter arising, including without limitation any payments, dividends or distributions out of the business or assets of Borrower. Any amounts received by Guarantor in violation of the foregoing provisions shall be received and held in trust for the benefit of Lender and shall forthwith be paid over to Lender to be applied to the Indebtedness in such order and sequence as Lender shall in its sole discretion determine. Guarantor hereby expressly waives any right to set-off or assert against Lender any counterclaim that Guarantor may have against Borrower.

**12.**    **Revocation.**   This is a continuing guaranty relating to all of the Indebtedness, including Indebtedness arising under successive transactions that from time to time continue the Indebtedness or renew it after it has been satisfied. The obligations of Guarantor hereunder may be terminated only as to future transactions and only by giving written notice thereof to Lender in accordance with Paragraph 23 herein. No such revocation shall be effective until the third business day following the date of actual receipt thereof by Lender. Notwithstanding such revocation, this Guarantee and all consents, waivers and other provision hereof shall continue in full force and effect as to any and all Indebtedness that is outstanding on the effective date of revocation and all extensions, renewals and modifications of said Indebtedness including without limitation amendments, extensions, renewals and modifications that are evidenced by new or additional instruments, documents or agreements executed after revocation.

**13.**    **Independent Liability.**   Guarantor hereby agrees that one or more successive or concurrent actions may be brought hereon against Guarantor, in the same action in which Borrower may be sued or in separate actions, as often as deemed advisable by Lender. The liability of Guarantor hereunder is exclusive and independent of any other guaranty of any or all of the Indebtedness whether executed by Guarantor or by any other guarantor. The liability of Guarantor hereunder shall not be affected, revoked, impaired, or reduced by any one or more of the following: (a) the fact that the Indebtedness exceeds the maximum amount of Guarantor's liability, if any, specified herein or elsewhere (and no agreement specifying a maximum amount of Guarantor's liability shall be enforceable unless set forth in a writing signed by Lender or set forth in this Guarantee); or (b) any direction as to the application of payment by Borrower or by any other party; or (c) any other continuing or restrictive guaranty or undertaking or any limitation on the liability of any other guarantor (whether under this Guarantee or under any other guaranty agreement); or (d) any payment on or reduction of any other guaranty or undertaking; or (e) any revocation, amendment, modification or release of any such other guaranty or undertaking; or (f) any dissolution or termination of, or increase, decrease, or change in membership or stock ownership of Guarantor. Guarantor hereby expressly represents that it was not induced to give this Guarantee by the fact that there are or may be other guarantors either under this Guarantee or otherwise, and Guarantor agrees that any release of any one or more of such other guarantors shall not release Guarantor from its obligations hereunder either in full or to any lesser extent. If Guarantor is a married person, Guarantor hereby expressly agrees that recourse may be had against his or her separate property for all of his or her obligations hereunder.

**14.**    **Remedies Cumulative; No Waiver.**   Lender shall have the right to seek recourse against Guarantor to the full extent provided for herein or in any other instrument or agreement evidencing obligations of Guarantor to Lender. No election in one form of action or proceeding, or against any party, or on any obligation, shall constitute a waiver of Lender's right to proceed in any other form of action or proceeding or against any other party. The failure of Lender to enforce any of the provisions of this Guarantee at any time or for any period of time shall not be construed to be a waiver of any such provision or the right thereafter to enforce the same. All remedies hereunder shall be cumulative and shall be in addition to all rights, powers and remedies given to Lender by law or under other instrument or agreement.

{00171624.DOC; 1}

5

EXECUTION

**15.** **Financial Condition of Borrower.** Guarantor is fully aware of the financial condition of Borrower and is executing and delivering this Guarantee at Borrower's request and based solely upon its own independent investigation of all matters pertinent hereto and is not relying in any manner upon any representation or statement of Lender with respect thereto. Guarantor represents and warrants that it is in a position to obtain, and Guarantor hereby assumes full responsibility for obtaining, any additional information concerning Borrower's financial condition and any other matter pertinent hereto as Guarantor may desire, and Guarantor is not relying upon or expecting Lender to furnish to him any information now or hereafter in Lender's possession concerning the same or any other matter. By executing this Guarantee, Guarantor knowingly accepts the full range of risks encompassed within a contract of continuing guaranty, which risks Guarantor acknowledges include without limitation the possibility that Borrower will incur additional Indebtedness for which Guarantor will be liable hereunder after Borrower's financial condition or ability to pay such Indebtedness has deteriorated and/or after bankruptcy or insolvency proceedings have been commenced by or against Borrower.

**16.** **Reports and Financial Statements of Guarantor.** Guarantor shall, at its sole cost and expense, at any time and from time to time, prepare or cause to be prepared, and provide to Lender upon Lender's request: (a) such financial statements and reports concerning Guarantor for such periods of time as Lender may designate (which financial statements shall, if requested by Lender, be audited by certified public accountants acceptable to Lender); (b) any other information concerning Guarantor's business, financial condition or affairs as Lender may request; and (c) copies of any and all foreign, federal, state and local tax returns and reports of or relating to Guarantor as Lender may from time to time request. Guarantor hereby intentionally and knowingly waives any and all rights and privileges it may have not to divulge or deliver said tax returns, reports and other information that are requested by Lender hereunder or in any litigation in which Lender may be involved relating directly or indirectly to Borrower or to Guarantor. Guarantor further agrees immediately to give written notice to Lender of any adverse change in Guarantor's financial condition and of any condition or event that constitutes any Events of Default under this Guarantee.

**17.** **Representations and Warranties.** Guarantor hereby represents and warrants that: (a) it is in Guarantor's direct interest to assist Borrower in procuring credit, because Borrower (i) is fully or partially owned by Guarantor, (ii) is an affiliate of Guarantor, furnishes goods or services to Guarantor, (iii) purchases or acquires goods or services from Guarantor, and/or (iv) otherwise has a direct or indirect corporate or business relationship with Guarantor; (b) this Guarantee has been duly and validly authorized, executed and delivered and constitutes the binding obligation of Guarantor, enforceable in accordance with its terms; and (c) the execution and delivery of this Guarantee does not violate or constitute a default under any order, judgment, decree, instrument or agreement to which Guarantor is a party or by which its property is affected or bound.

**18.** **Integration; Amendment and Restatement.** This Guarantee and the Pledge Agreement referred to below, together with the other Loan Documents to which Guarantor is a party, are the only agreements between Guarantor and Lender with respect to the subject matter hereof, and all representations, warranties, agreements, or undertakings heretofore or contemporaneously made, which are not set forth herein or therein, are superseded hereby. This Guarantee (i) is being delivered pursuant to the Amended and Restated Loan Agreement of even date herewith, and (ii) amends and restates in its entirety, and as so amended and restated supersedes, that certain Continuing Guarantee dated November 23, 2011, by Guarantor in favor of Lender.

**19.** **Amendment.** The terms and provisions hereof may not be waived, altered, modified, or amended except in a writing executed by Guarantor and a duly authorized officer of Lender.

**20.** **Costs.** Whether or not suit be instituted, Guarantor agrees to reimburse Lender on demand for all attorneys' fees and all other costs and expenses incurred by Lender in enforcing this Guarantee, or arising out of or relating in any way to this Guarantee, or in enforcing any of the Indebtedness against Borrower, Guarantor, or any other person, or in connection with any property of any kind securing all or any part of the Indebtedness. Without limiting the generality of the foregoing, and in addition thereto, Guarantor shall reimburse Lender on demand for all attorneys' fees and costs Lender incurs in any way relating to Guarantor, Borrower or the Indebtedness, in order to: (i) obtain legal advice; (ii) enforce or seek to enforce any of its rights; (iii) commence,

{00171624.DOC; 1}

6

intervene in, respond to, or defend any action or proceeding; (iv) file, prosecute or defend any claim or cause of action in any action or proceeding (including without limitation any probate claim, bankruptcy claim, third-party claim, secured creditor claim, reclamation complaint, and complaint for relief from any stay under the Bankruptcy Code (Title 11, United States Code) or otherwise); (v) protect, obtain possession of, sell, lease, dispose of or otherwise enforce any security interest in or lien on any property of any kind securing any or all of the Indebtedness or Guarantor's obligations hereunder; or (vi) represent Lender in any litigation with respect to Borrower's or Guarantor's affairs. In the event either Lender or Guarantor files any lawsuit against the other predicated on a breach of this Guarantee, the prevailing party in such action shall be entitled to recover its attorneys' fees and costs of suit from the non-prevailing party.

**21.    Successors and Assigns.** All rights, benefits and privileges hereunder shall inure to the benefit of and be enforceable by Lender and its successors and assigns and shall be binding upon Guarantor and its heirs, executors, administrators, personal representatives, successors and permitted assigns, provided that none of the obligations of Guarantor hereunder shall be assigned without the prior written consent of Lender. Neither the death of Guarantor nor notice thereof to Lender shall terminate this Guarantee as to its estate, and notwithstanding the death of Guarantor or notice thereof to Lender, this Guarantee shall continue in full force and effect with respect to all Indebtedness, including without limitation, Indebtedness incurred or created after the death of Guarantor and notice thereof to Lender.

**22.    Security for Guarantee.** This is the Secured Guarantee referred to, and secured by the Membership Interest Pledge Agreement, of even date herewith, between Guarantor and Lender ("Pledge Agreement"), the terms of which are incorporated herein by reference, and the Lender is entitled to the benefits thereof.

**23.    Notices.** Any notice that a party shall be required or shall desire to give to the other hereunder shall be in writing and either (a) delivered by registered or certified mail, (b) delivered by hand, or (c) delivered by national overnight courier service with next business day delivery, and shall be deemed to have been duly given or made (i) three (3) business days after deposit in the United States Mail, registered or certified mail, return receipt requested, with proper postage prepaid, (ii) one (1) business day after deposit with a national overnight courier with next business day delivery with all charges prepaid, or (iii) when hand-delivered. All notices, requests and demands are to be given or made to the respective parties at the following addresses (or to such other addresses as either party may designate by notice in accordance with the provisions of this paragraph):

| | |
|---|---|
| If to Guarantor: | R. John Taylor<br>2020 Broadview Drive<br>Lewiston, Idaho 83501 |
| With a copy to: | Quarles & Brady LLP<br>300 North LaSalle Street<br>Suite 4000<br>Chicago, IL 60654<br>Attn: James Gatziolis |
| If to Lender: | GemCap Lending I, LLC<br>24955 Pacific Coast Highway<br>Suite A202<br>Malibu, CA 90265<br>Attention: David Ellis |
| With a copy to: | Cohen Tauber Spievack & Wagner P.C.<br>420 Lexington Avenue, Suite 2400<br>New York, NY 10170<br>Attention: Robert A. Boghosian |

**24.    Construction; Severability; Headings.** If more than one person has executed this Guarantee or such

{00171624.DOC; 1}

7

EXECUTION

other person has executed a separate guaranty document in favor of Lender in respect of the Indebtedness, the term "Guarantor" as used herein and in such other guaranty document shall be deemed to refer to all and any one or more of such persons and their obligations hereunder or under such other guaranty document shall be joint and several. Without limiting the generality of the foregoing, if more than one person has executed this Guarantee or such other person has executed a separate guaranty document in favor of Lender, this Guarantee and such other guaranty document shall in all respects be interpreted as though each person signing this Guarantee or such other guaranty document had signed a separate guaranty document, and reference herein to "other guarantors" or words of similar effect shall include without limitation other persons signing this Guarantee or such other guaranty document. As used in this Guarantee, the term "property" is used in its most comprehensive sense and shall mean all property of every kind and nature whatsoever, including without limitation real property, personal property, mixed property, tangible property and intangible property. Words used herein in the masculine gender shall include the neuter and feminine gender, words used herein in the neuter gender shall include the masculine and feminine gender, words used herein in the singular shall include the plural and words used in the plural shall include the singular, wherever the context so reasonably requires. If any provisions of this Guarantee or the application thereof to any party or circumstance are held invalid, void, inoperative or unenforceable, the remainder of this Guarantee and the application of such provision to other parties or circumstances shall not be affected thereby, the provisions of this Guarantee being severable in any such instance. The headings in this Guarantee are inserted for convenience only and shall not be considered for the purpose of determining the meaning or of any provision hereof.

25.    **Additional Lender Rights.**  Lender, in its sole and absolute discretion, may:

    (a)    bring suit against Guarantor;

    (b)    compromise or settle with Guarantor for such consideration as Lender may deem proper;

    (c)    release the party named as a Guarantor in this Guaranty from liability; and

    (d)    otherwise deal with Guarantor in any manner, and no such action shall impair the rights of Lender to collect from Guarantor any amount guaranteed by Guarantor under this Guarantee.

26.    **APPLICABLE LAW.**  THIS GUARANTEE SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, THE LAWS OF WHICH THE GUARANTOR HEREBY EXPRESSLY ELECTS TO APPLY TO THIS GUARANTEE, WITHOUT GIVING EFFECT TO PROVISIONS FOR CHOICE OF LAW THEREUNDER. THE GUARANTOR AGREES THAT ANY ACTION OR PROCEEDING BROUGHT TO ENFORCE OR ARISING OUT OF THIS GUARANTEE SHALL BE COMMENCED IN ACCORDANCE WITH THE PROVISIONS OF THIS GUARANTEE.

27.    **WAIVER OF JURY TRIAL.**  TO THE EXTENT PERMITTED BY APPLICABLE LAW, GUARANTOR HEREBY WAIVES ANY AND ALL RIGHTS THAT THE GUARANTOR MAY NOW OR HEREAFTER HAVE UNDER THE LAWS OF THE UNITED STATES OF AMERICA OR ANY STATE TO A TRIAL BY JURY OF ANY AND ALL ISSUES ARISING EITHER DIRECTLY OR INDIRECTLY IN ANY ACTION OR PROCEEDING BETWEEN GUARANTOR, LENDER OR THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, OUT OF OR IN ANY WAY CONNECTED WITH THIS GUARANTEE. IT IS INTENDED THAT SAID WAIVER SHALL APPLY TO ANY AND ALL DEFENSES, RIGHTS, AND/OR COUNTERCLAIMS IN ANY ACTION OR PROCEEDINGS BETWEEN GUARANTOR AND LENDER. GUARANTOR WAIVES ALL RIGHTS TO INTERPOSE ANY CLAIMS, DEDUCTIONS, SETOFFS OR COUNTERCLAIMS OF ANY KIND, NATURE OR DESCRIPTION IN ANY ACTION OR PROCEEDING INSTITUTED BY LENDER WITH RESPECT TO THIS GUARANTEE OR ANY MATTER ARISING HEREFROM OR RELATING HERETO, EXCEPT COMPULSORY COUNTERCLAIMS.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

{00171624.DOC; 1}

8

**EX 5 PG 102**

CTSW DRAFT 1/23/13

28. **CONSENT TO JURISDICTION.** GUARANTOR HEREBY (a) IRREVOCABLY SUBMITS AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF CALIFORNIA, LOS ANGELES COUNTY WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS GUARANTEE OR ANY MATTER ARISING HEREFROM OR RELATING HERETO, AND (b) WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE OR FORUM NON CONVENIENS WITH RESPECT THERETO. IN ANY SUCH ACTION OR PROCEEDING, GUARANTOR WAIVES PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT OR OTHER PROCESS AND PAPERS THEREIN AND AGREES THAT THE SERVICE THEREOF MAY BE MADE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO GUARANTOR AT ITS ADDRESS SET FORTH HEREIN OR OTHER ADDRESS OF WHICH LENDER HAS RECEIVED NOTICE AS PROVIDED IN THIS GUARANTEE. NOTWITHSTANDING THE FOREGOING, GUARANTOR CONSENTS TO THE COMMENCEMENT BY LENDER OF ANY SUIT, ACTION OR PROCEEDING IN ANY OTHER JURISDICTION IN WHICH BORROWER, GUARANTOR OR ANY PORTION OF THE LENDER'S COLLATERAL IS LOCATED TO ENFORCE LENDER'S RIGHTS, AND GUARANTOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING.

IN WITNESS WHEREOF, the undersigned has executed this Guarantee on February 7, 2013.

GUARANTOR:

RAY JOHNSON TAYLOR A/K/A R. JOHN TAYLOR A/K/A R. JOHNSON TAYLOR

Address: 2020 Broadview Dr

Lewiston ID 83501

SSN: 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

[SIGNATURE PAGE 1 OF 2 – AMENDED AND RESTATED SECURED CONTINUING GUARANTEE]

{00171624.DOC; 1}

**EX 5 PG 103**

CTSW DRAFT 1/23/13

STATE OF IDAHO

COUNTY OF _Nez Perce_

On this _7th_ day of _February_ , in the year _2013_ , before me, _Diane A. Whisner_ , a Notary Public, personally appeared _R. John Taylor_ , known or identified to me (or proved to me on the oath of) to be a the person whose name is subscribed to the within instrument, and acknowledged to me that such person executed the same.

(Seal)

_[signature]_

Notary Public

Printed Name: _Diane R. Whisner_

Commission Expires: _10-4-2013_

_____

[SIGNATURE PAGE 2 OF 2 – AMENDED AND RESTATED SECURED CONTINUING GUARANTEE]

{00171624 DOC; 1}

# CONTINUING GUARANTEE

THIS CONTINUING GUARANTEE (this "Guarantee") is executed by the undersigned (hereinafter called "Guarantor") in favor of GemCap Lending I, LLC (hereinafter called "Lender"), with a principal place of business at 1401 Ocean Avenue, Suite 305, Santa Monica, California 90401, with respect to the joint and several Indebtedness of CROP USA INSURANCE AGENCY, INC. and CROPUSA INSURANCE SERVICES, LLC (together, "Borrower").

1. **Continuing Guarantee.** For valuable consideration, Guarantor hereby unconditionally guarantees and promises to pay on demand to Lender, at the address indicated above, or at such other address as Lender may direct, in lawful money of the United States, and to perform for the benefit of Lender, all Indebtedness of Borrower now or hereafter owing to or held by Lender. As used herein, the term "Indebtedness" is used in its most comprehensive sense and shall mean and include without limitation: (a) any and all debts, duties, obligations, liabilities, representations, warranties and guaranties of Borrower or any one or more of them, heretofore, now, or hereafter made, incurred, or created, whether directly to Lender or acquired by Lender by assignment or otherwise, or held by Lender on behalf of others, however arising, whether voluntary or involuntary, due or not due, absolute or contingent, liquidated or unliquidated, certain or uncertain, determined or undetermined, monetary or non monetary, written or oral, and whether Borrower may be liable thereon individually or jointly with others, and regardless of whether recovery thereon is discharged in any bankruptcy, insolvency or other proceeding, including without limitation any of the same that arise from or in connection with Lender's acquisition of a security interest or other interest in any property of Borrower, or in any other manner; and (b) any and all amendments, modifications, renewals and extensions of any or all of the foregoing, including without limitation amendments, modifications, renewals and extensions that are evidenced by any new or additional instrument, document or agreement; and (c) any and all attorneys' fees, court costs, and collection charges incurred in endeavoring to collect or enforce any of the foregoing against Borrower, Guarantor, or any other person liable thereon (whether or not suit be brought) and any other expense of, for or incidental to collection thereof. As used herein, the term "Borrower" shall include any successor to the business and assets of Borrower, and shall also include Borrower in its capacity as a debtor or debtor in possession under the federal Bankruptcy Code, and any trustee, custodian or receiver for Borrower or any of its assets, should Borrower hereafter become the subject of any bankruptcy or insolvency proceeding, voluntary or involuntary; and all indebtedness, liabilities and obligations incurred by any such person shall be included in the Indebtedness guaranteed hereby. Guarantor hereby acknowledges and agrees that acceptance by Lender of this guaranty shall not constitute a commitment of any kind by Lender to permit Borrower to incur Indebtedness to Lender. All sums due under this Guarantee shall bear interest from the date due until the date paid at the highest rate charged with respect to any of the Indebtedness. In giving this Guarantee, Guarantor hereby acknowledges that this Guarantee is a guarantee of payment (and not of collection), and that the liability of Guarantor hereunder is present, absolute, unconditional, continuing, primary, direct and independent of the obligations of Borrower. Lender shall not be required to pursue any other remedies before invoking the benefits of this Guarantee, including, without limitation, its remedies against Borrower under any agreement or instrument evidencing Indebtedness of Borrower.

2. **Waivers.** Guarantor hereby waives: (a) presentment for payment, notice of dishonor, demand, protest, and notice thereof as to any instrument, and all other notices and demands to which Guarantor might be entitled, including without limitation notice of all of the following: the acceptance hereof; the creation, existence, or acquisition of any Indebtedness; the amount of the Indebtedness from time to time outstanding; any foreclosure sale or other disposition of any property which secures any or all of the Indebtedness or which secures the obligations of any other guarantor of any or all of the Indebtedness; any adverse change in Borrower's financial position; any other fact that might increase Guarantor's risk; any default, partial payment or non-payment of all or any part of the Indebtedness; the occurrence of any other Event of Default (as hereinafter defined); any and all agreements and arrangements between Lender and Borrower and any changes, modifications, or extensions thereof, and any revocation, modification or release of any guaranty of any or all of the Indebtedness by any person; (b) any right to require Lender to institute suit against, or to exhaust its rights and remedies against, Borrower or any other person, or to proceed against any property of any kind that secures all or any part of the

1

EX 5 PG 105

Indebtedness, or to exercise any right of offset or other right with respect to any reserves, credits or deposit accounts held by or maintained with Lender or any indebtedness of Lender to Borrower, or to exercise any other right or power, or pursue any other remedy Lender may have; (c) any defense arising by reason of any disability or other defense of Borrower or any other guarantor or any endorser, co-maker or other person, or by reason of the cessation from any cause whatsoever of any liability of Borrower or any other guarantor or any endorser, co-maker or other person, with respect to all or any part of the Indebtedness, or by reason of any act or omission of Lender or others that directly or indirectly results in the discharge or release of Borrower or Guarantor or any other person or any Indebtedness or any security therefore, whether by operation of law or otherwise, (d) all rights of subrogation, reimbursement, and indemnity whatsoever, and all rights of recourse to or with respect to any assets or property of Borrower or any collateral or security for any or all of the Indebtedness; (e) any defense arising by reason of any failure of Lender to obtain, perfect, maintain or keep in force any security interest in, or lien or encumbrance upon, any property of Borrower or any other person, (f) any defense based upon failure of Lender to give Guarantor notice of any sale or other disposition of any property securing any or all of the Indebtedness, or any defects in any such notice that may be given, or failure of Lender to comply with any provision of applicable law in enforcing any security interest in or lien upon any property securing any or all of the Indebtedness including, but not limited to, any failure by Lender to dispose of any property securing any or all of the Indebtedness in a commercially reasonable manner; and (g) any defense based upon or arising out of any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, liquidation or dissolution proceeding commenced by or against Borrower or Guarantor or any endorser, co-maker or other person, including without limitation any discharge of, or bar against collecting, any of the Indebtedness (including without limitation any interest thereon), in or as a result of any such proceeding. Until all of the Indebtedness has been paid, performed, and discharged in full, nothing shall discharge or satisfy the liability of Guarantor hereunder except the full performance and payment of all of the Indebtedness. In the event any payment with respect to any or all of the Indebtedness by any person is repaid or returned by Lender for any reason whatsoever (including, without limitation, the insolvency, bankruptcy, liquidation or reorganization of any party or because of any claim that such payment constituted a preferential transfer or fraudulent conveyance), the liability of Guarantor hereunder shall not be discharged or reduced by reason of such payment and Guarantor shall be and remain fully liable therefor. Lender shall have full authority in its sole discretion to compromise or settle any such claim, and any amounts received by Lender that are paid, repaid or returned as a part of such compromise or settlement shall not discharge or reduce the liability of Guarantor hereunder and Guarantor shall be and remain fully liable therefore.

3.  **Consents.**  Guarantor hereby consents and agrees that, without notice to or by Guarantor and without affecting or impairing in any way the obligations or liability of Guarantor hereunder, Lender may, from time to time before or after revocation of this Guarantee, do any one or more of the following in Lender's sole and absolute discretion: (a) accelerate, accept partial payments of, compromise or settle, renew, extend the time for the payment, discharge, or performance of, refuse to enforce, and release all or any parties to, any or all of the Indebtedness; (b) grant any other indulgence to Borrower or any other person in respect of any or all of the Indebtedness or any other matter; (c) accept, release, waive, surrender, enforce, exchange, modify, impair, or extend the time for the performance, discharge, or payment of, any and all property of any kind securing any or all of the Indebtedness or any guaranty of any or all of the Indebtedness, or on which Lender at any time may have a lien, or refuse to enforce its rights or make any compromise or settlement or agreement therefor in respect of any or all of such property; (d) substitute or add, or take any action or omit to take any action that results in the release of, any one or more endorsers or guarantor of all or part of the Indebtedness, including without limitation one or more parties to this Guarantee, regardless of any destruction or impairment of any right of contribution or other right of Guarantor; (e) amend, alter or change in any respect whatsoever any term or provision relating to any or all of the Indebtedness, including the rate of interest thereon, (f) apply any sums received from Borrower, any other guarantor, endorser, or cosigner, or from the disposition of any collateral or security, to any indebtedness whatsoever owing from such person or secured by such collateral or security, in such manner and order as Lender determines in its sole discretion, and regardless of whether such indebtedness is part of the Indebtedness, is secured, or is due and payable; (g) apply any sums received from Guarantor or from the disposition of any collateral or security securing the obligations of Guarantor, to any of the Indebtedness in such manner and order as Lender determines in its sole discretion, regardless of whether or not such Indebtedness is secured or is due and payable. Guarantor consents and agrees that Lender shall be under no obligation to marshal any assets in favor of Guarantor, or against or in payment of any or all of the Indebtedness. Guarantor further consents and agrees that

{00128955.DOC; 1}                                                                                                      2

EX 5 PG 106

FOSTER DEC. EX. 1 pg. 111

Lender shall have no duties or responsibilities whatsoever with respect to any property securing any or all of the Indebtedness. Without limiting the generality of the foregoing, Lender shall have no obligation to monitor, verify audit, examine, or obtain or maintain any insurance with respect to, any property securing any or all of the Indebtedness.

4. **Exercise of Rights and Remedies.** Guarantor consents and agrees that, without notice to or by Guarantor and without affecting or impairing in any way the obligations or liability of Guarantor hereunder, Lender may, from time to time before or after revocation of this Guarantee, exercise any right or remedy it may have with respect to any or all of the Indebtedness or any property securing any or all of the Indebtedness or any guaranty therefor, including without limitation judicial foreclosure, non judicial foreclosure, exercise of a power of sale, and taking a deed, assignment or transfer in lieu of foreclosure as to any such property, and Guarantor expressly waives any defense based upon the exercise of any such right or remedy, notwithstanding the effect thereof upon any of Guarantor's rights, including without limitation, any destruction of Guarantor's right of subrogation against Borrower and any destruction of Guarantor's right of contribution or other right against any other guarantor of any or all of the Indebtedness or against any other person, whether by operation of Sections 580d or 726 of the California Code of Civil Procedure, or any similar or comparable provisions of the laws of any other jurisdiction, or any other statutes or rules of law now or hereafter in effect, or otherwise. Without limiting the generality of the foregoing, Guarantor understands and agrees that, in the event Lender in its sole discretion forecloses any trust deed now or hereafter securing any or all of the Indebtedness, by non judicial foreclosure, Guarantor will remain liable to Lender for any deficiency, even though Guarantor will lose his right of subrogation against Borrower, and even though Guarantor will be unable to recover from Borrower the amount of the deficiency for which Guarantor is liable, and even though Guarantor would have retained his right of subrogation against Borrower if Lender had foreclosed said trust deed by judicial foreclosure as opposed to non judicial foreclosure.

5. **Acceleration.** Notwithstanding the terms of all or any part of the Indebtedness, the obligations of the Guarantor hereunder to pay and perform all of the Indebtedness shall, at the option of Lender, immediately become due and payable, without notice, and without regard to the expressed maturity of any of the Indebtedness, in the event: (a) any warranty, representation, statement, report, or certificate made or delivered to Lender by Borrower or Guarantor, or any of their respective officers, partners, employees, or agents, is incorrect, false, untrue, or misleading when given in any material respect; or (b) Borrower or Guarantor shall fail to pay or perform when due all or any part of the Indebtedness; or (c) Guarantor shall fail to pay or perform when due any indebtedness or obligation of Guarantor to Lender, whether under this Guarantee or any other instrument, document, or agreement heretofore or hereafter entered into; or (d) any event shall occur which results in the acceleration of the maturity of any indebtedness of Borrower or Guarantor to others; or (e) Borrower or Guarantor shall fail promptly to perform or comply with any term or condition of any agreement with any third party which does or may result in a material adverse effect on the business of Borrower or Guarantor; or (f) there shall be made or exist any levy, assessment, attachment, seizure, lien, or encumbrance for any cause or reason whatsoever upon all or any part of the property of Borrower or Guarantor (unless discharged by payment, release or bond not more than twenty (20) days after such event has occurred); or (g) there shall occur the liquidation, dissolution, termination of existence, insolvency, or business failure of Borrower or Guarantor, or the appointment of a receiver, trustee or custodian for Borrower, Guarantor or all or any part of the property of either of them, or the assignment for the benefit of creditors by Borrower or Guarantor, or the commencement of any proceeding by or against Borrower or Guarantor under any reorganization, insolvency, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, now or hereafter in effect; or (h) Borrower or Guarantor shall be deceased or declared incompetent by any court or a guardian or conserver shall be appointed for either of them or for the property of either of them; or (i) Borrower or Guarantor shall conceal, remove or permit to be concealed or removed any part of its property, with intent to hinder, delay or defraud its creditors, or make or suffer any transfer of any of its property which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law, or shall make any transfer of its property to or for the benefit of any creditor at a time when other creditors similarly situated have not been paid; or (j) Guarantor shall revoke this Guarantee. Each of the foregoing is hereinafter referred to as an "Event of Default".

6. **Right to Attachment Remedy.** Guarantor agrees that, notwithstanding the existence of any

3

{00128955.DOC; 1}

property securing any or all of the Indebtedness, Lender shall have all of the rights of a creditor of Guarantor, including without limitation the right to obtain a temporary protective order and writ of attachment against Guarantor with respect to any sums due under this Guarantee. Guarantor further agrees that in the event any property secures the obligations of Guarantor under this Guarantee, to the extent that Lender, in its sole and absolute discretion, determines prior to the disposition of such property that the amount to be realized by Lender therefrom may be less than the indebtedness of Guarantor under this Guarantee, Lender shall have all the rights of an unsecured creditor against Guarantor, including without limitation the right of Lender, prior to the disposition of said property, to obtain a temporary protective order and writ of attachment against Guarantor. Guarantor waives the benefit of Section 483.010(b) of the California Code of Civil procedure and of any and all other statutes and rules of law now or hereafter in effect requiring Lender to first resort to or exhaust all such collateral before seeking or obtaining any attachment remedy against Guarantor. Lender shall have no liability to Guarantor as a result thereof, whether or not the actual deficiency realized by Lender is less than the anticipated deficiency on the basis, which Lender obtains a temporary protective order or writ of attachment.

7.    **Subordination.**    Any and all rights of Guarantor under any and all debts, liabilities and obligations owing from Borrower to Guarantor, including any security for and guaranties of any such obligations, whether now existing or hereafter arising, are hereby subordinated in right of payment to the prior payment in full of all of the Indebtedness. No payment in respect of any such subordinated obligations shall at any time be made to or accepted by Guarantor if at any time such payment any Indebtedness is outstanding. If any Event of Default has occurred, Borrower and any assignee, trustee in bankruptcy, receiver, or any other person having custody or control over any or all of Borrower's property are hereby authorized and directed to pay to Lender the entire balance of the Indebtedness before making any payments whatsoever to Guarantor, whether as a creditor, shareholder, or otherwise; and insofar as may be necessary for that purpose, Guarantor hereby assigns and transfers to Lender all rights to any and all debts, liabilities and obligations owing from Borrower to Guarantor, including any security for any guaranties of any such obligations, whether now existing or hereafter arising, including without limitation any payments, dividends or distributions out of the business or assets of Borrower. Any amounts received by Guarantor in violation of the foregoing provisions shall be received and held in trust for the benefit of Lender and shall forthwith be paid over to Lender to be applied to the Indebtedness in such order and sequence as Lender shall in its sole discretion determine. Guarantor hereby expressly waives any right to set-off or assert against Lender any counterclaim that Guarantor may have against Borrower.

8.    **Revocation.**    This is a continuing guaranty relating to all of the Indebtedness, including Indebtedness arising under successive transactions that from time to time continue the Indebtedness or renew it after it has been satisfied. The obligations of Guarantor hereunder may be terminated only as to future transactions and only by giving written notice thereof to Lender at its address above by registered first-class U.S. mail, postage prepaid, return receipt requested. No such revocation shall be effective until the third business day following the date of actual receipt thereof by Lender. Notwithstanding such revocation, this Guarantee and all consents, waivers and other provision hereof shall continue in full force and effect as to any and all Indebtedness that is outstanding on the effective date of revocation and all extensions, renewals and modifications of said Indebtedness including without limitation amendments, extensions, renewals and modifications that are evidenced by new or additional instruments, documents or agreements executed after revocation.

9.    **Independent Liability.**    Guarantor hereby agrees that one or more successive or concurrent actions may be brought hereon against Guarantor, in the same action in which Borrower may be sued or in separate actions, as often as deemed advisable by Lender. The liability of Guarantor hereunder is exclusive and independent of any other guaranty of any or all of the Indebtedness whether executed by Guarantor or by any other guarantor. The liability of Guarantor hereunder shall not be affected, revoked, impaired, or reduced by any one or more of the following: (a) the fact that the Indebtedness exceeds the maximum amount of Guarantor's liability, if any, specified herein or elsewhere (and no agreement specifying a maximum amount of Guarantor's liability shall be enforceable unless set forth in a writing signed by Lender or set forth in this Guarantee); or (b) any direction as to the application of payment by Borrower or by any other party; or (c) any other continuing or restrictive guaranty or undertaking or any limitation on the liability of any other guarantor (whether under this Guarantee or under any other agreement); or (d) any payment on or reduction of any such other guaranty or undertaking; or (e) any revocation, amendment, modification or release of any such other guaranty or

{00128955.DOC; 1}

4

EX 5 PG 108

undertaking; or (f) any dissolution or termination of, or increase, decrease, or change in membership or stock ownership of Guarantor. Guarantor hereby expressly represents that he was not induced to give this Guarantee by the fact that there are or may be other guarantors either under this Guarantee or otherwise, and Guarantor agrees that any release of any one or more of such other guarantors shall not release Guarantor from his obligations hereunder either in full or to any lesser extent. If Guarantor is a married person, Guarantor hereby expressly agrees that recourse may be had against his separate property for all of his obligations hereunder.

10.    **Remedies Cumulative; No Waiver.**    Lender shall have the right to seek recourse against Guarantor to the full extent provided for herein or in any other instrument or agreement evidencing obligations of Guarantor to Lender. No election in one form of action or proceeding, or against any party, or on any obligation, shall constitute a waiver of Lender's right to proceed in any other form of action or proceeding or against any other party. The failure of Lender to enforce any of the provisions of this Guarantee at any time or for any period of time shall not be construed to be a waiver of any such provision or the right thereafter to enforce the same. All remedies hereunder shall be cumulative and shall be in addition to all rights, powers and remedies given to Lender by law or under other instrument or agreement.

11.    **Financial Condition of Borrower.**    Guarantor is fully aware of the financial condition of Borrower and is executing and delivering this Guarantee at Borrower's request and based solely upon his own independent investigation of all matters pertinent hereto and is not relying in any manner upon any representation or statement of Lender with respect thereto. Guarantor represents and warrants that he is in a position to obtain, and Guarantor hereby assumes full responsibility for obtaining, any additional information concerning Borrower's financial condition and any other matter pertinent hereto as Guarantor may desire, and Guarantor is not relying upon or expecting Lender to furnish to him any information now or hereafter in Lender's possession concerning the same or any other matter. By executing this Guarantee, Guarantor knowingly accepts the full range of risks encompassed within a contract of continuing guaranty, which risks Guarantor acknowledges include without limitation the possibility that Borrower will incur additional Indebtedness for which Guarantor will be liable hereunder after Borrower's financial condition or ability to pay such Indebtedness has deteriorated and/or after bankruptcy or insolvency proceedings have been commenced by or against Borrower.

12.    **Reports and Financial Statements of Guarantor.**    Guarantor shall, at his sole cost and expense, at any time and from time to time, prepare or cause to be prepared, and provide to Lender upon Lender's request: (a) such financial statements and reports concerning Guarantor for such periods of time as Lender may designate (which financial statements shall, if requested by Lender, be audited by certified public accountants acceptable to Lender); (b) any other information concerning Guarantor's business, financial condition or affairs as Lender may request; and (c) copies of any and all foreign, federal, state and local tax returns and reports of or relating to Guarantor as Lender may from time to time request. Guarantor hereby intentionally and knowingly waives any and all rights and privileges he may have not to divulge or deliver said tax returns, reports and other information that are requested by Lender hereunder or in any litigation in which Lender may be involved relating directly or indirectly to Borrower or to Guarantor. Guarantor further agrees immediately to give written notice to Lender of any adverse change in Guarantor's financial condition and of any condition or event that constitutes an Event of Default under this Guarantee.

13.    **Representations and Warranties.**    Guarantor hereby represents and warrants that: (a) it is in Guarantor's direct interest to assist Borrower in procuring credit, because Borrower is an affiliate of Guarantor, furnishes goods or services to Guarantor, purchases or acquires goods or services from Guarantor, and/or otherwise has a direct or indirect corporate or business relationship with Guarantor; (b) this Guarantee has been duly and validly authorized, executed and delivered and constitutes the binding obligation of Guarantor, enforceable in accordance with its terms; (c) the execution and delivery of this Guarantee does not violate or constitute a default under any order, judgment, decree, instrument or agreement to which Guarantor is a party or by which he or his property are affected or bound; and (d) Guarantor has been represented by the law firm of Quarles & Brady LLP in connection with the negotiation, execution and delivery of this Guarantee.

14.    **Entire Agreement.**    This Guarantee is the entire and only agreement between Guarantor and Lender with respect to the guaranty of the Indebtedness of Borrower by Guarantor, and all representations, warranties,

{00128955.DOC: 1}

5

agreements, or undertakings heretofore or contemporaneously made, which are not set forth herein, are superseded hereby.

15.    **Amendment.**  The terms and provisions hereof may not be waived, altered, modified, or amended except in a writing executed by Guarantor and a duly authorized officer of Lender.

16.    **Costs.**  Whether or not suit be instituted, Guarantor agrees to reimburse Lender on demand for all attorneys' fees and all other costs and expenses incurred by Lender in enforcing this Guarantee, or arising out of or relating in any way to this Guarantee, or in enforcing any of the Indebtedness against Borrower, Guarantor, or any other person, or in connection with any property of any kind securing all or any part of the Indebtedness. Without limiting the generality of the foregoing, and in addition thereto, Guarantor shall reimburse Lender on demand for all attorneys' fees and costs Lender incurs in any way relating to Guarantor, Borrower or the Indebtedness, in order to: obtain legal advice; enforce or seek to enforce any of its rights; commence, intervene in, respond to, or defend any action or proceeding; file, prosecute or defend any claim or cause of action in any action or proceeding (including without limitation any probate claim, bankruptcy claim, third-party claim, secured creditor claim, reclamation complaint, and complaint for relief from any stay under the Bankruptcy Code or otherwise); protect, obtain possession of, sell, lease, dispose of or otherwise enforce any security interest in or lien on any property of any kind securing any or all of the Indebtedness; or represent Lender in any litigation with respect to Borrower's or Guarantor's affairs.  In the event either Lender or Guarantor files any lawsuit against the other predicated on a breach of this Guarantee, the prevailing party in such action shall be entitled to recover its attorneys' fees and costs of suit from the non-prevailing party.

17.    **Successors and Assigns.**    All rights, benefits and privileges hereunder shall inure to the benefit of and be enforceable by Lender and its successors and assigns and shall be binding upon Guarantor and his heirs, executors, administrators, personal representatives, successors and permitted assigns, provided that none of the obligations of Guarantor hereunder shall be assigned without the prior written consent of Lender.  Neither the death of Guarantor nor notice thereof to Lender shall terminate this Guarantee as to his estate, and notwithstanding the death of Guarantor or notice thereof to Lender, this Guarantee shall continue in full force and effect with respect to all Indebtedness, including without limitation, Indebtedness incurred or created after the death of Guarantor and notice thereof to Lender.

18.    **Notices.**    Any notice that a party shall be required or shall desire to give to the other hereunder (except for notice of revocation, which shall be governed by Paragraph 8 of this Guarantee) shall be given by personal delivery or by depositing the same in the United States mail, first class postage pre-paid, addressed to Lender at its addresses set forth in the heading of this Guarantee and to Guarantor at his address set forth next to his signature hereon, and such notices shall be deemed duly given on the date of personal delivery or three days after the date of mailing as aforesaid.  Lender and Guarantor may change their address for purposes of receiving notices hereunder by giving written notice thereof to the other party in accordance herewith.  Guarantor shall give Lender immediate written notice of any change in his address.

19.    **Construction; Severability.**    If more than one person has executed this Guarantee, the term "Guarantor" as used herein shall be deemed to refer to all and any one or more of such persons and their obligations hereunder shall be joint and several.  Without limiting the generality of the foregoing, if more than one person has executed this Guarantee, this Guarantee shall in all respects be interpreted as though each person signing this Guarantee had signed a separate Guarantee, and reference herein to "other guarantors" or words of similar effect shall include without limitation other persons signing this Guarantee.  As used in this Guarantee, the term "property" is used in its most comprehensive sense and shall mean all property of every kind and nature whatsoever, including without limitation real property, personal property, mixed property, tangible property and intangible property.  Words used herein in the masculine gender shall include the neuter and feminine gender, words used herein in the neuter gender shall include the masculine and feminine gender, words used herein in the singular shall include the plural and words used in the plural shall include the singular, wherever the context so reasonably requires.  If any provisions of this Guarantee or the application thereof to any party or circumstance are held invalid, void, inoperative or unenforceable, the remainder of this Guarantee and the application of such provision to other parties or circumstances shall not be affected thereby, the provisions of this Guarantee being

{00128955.DOC; 1}                                                                                                    6

**EX 5 PG 110**

**FOSTER DEC. EX. 1 pg. 115**

severable in any such instance.

20.  **APPLICABLE LAW.**  THIS GUARANTEE SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, THE LAWS OF WHICH THE GUARANTOR HEREBY EXPRESSLY ELECTS TO APPLY TO THIS GUARANTEE, WITHOUT GIVING EFFECT TO PROVISIONS FOR CHOICE OF LAW THEREUNDER.  THE GUARANTOR AGREES THAT ANY ACTION OR PROCEEDING BROUGHT TO ENFORCE OR ARISING OUT OF THIS GUARANTEE SHALL BE COMMENCED IN ACCORDANCE WITH THE PROVISIONS OF THIS GUARANTEE.

21.  **WAIVER OF JURY TRIAL.**  GUARANTOR HEREBY WAIVES ANY AND ALL RIGHTS THAT IT MAY NOW OR HEREAFTER HAVE UNDER THE LAWS OF THE UNITED STATES OF AMERICA OR ANY STATE TO A TRIAL BY JURY OF ANY AND ALL ISSUES ARISING EITHER DIRECTLY OR INDIRECTLY IN ANY ACTION OR PROCEEDING BETWEEN GUARANTOR, LENDER OR THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, OUT OF OR IN ANY WAY CONNECTED WITH THIS GUARANTEE.  IT IS INTENDED THAT SAID WAIVER SHALL APPLY TO ANY AND ALL DEFENSES, RIGHTS, AND/OR COUNTERCLAIMS IN ANY ACTION OR PROCEEDINGS BETWEEN GUARANTOR AND LENDER.  GUARANTOR WAIVES ALL RIGHTS TO INTERPOSE ANY CLAIMS, DEDUCTIONS, SETOFFS OR COUNTERCLAIMS OF ANY KIND, NATURE OR DESCRIPTION IN ANY ACTION OR PROCEEDING INSTITUTED BY LENDER WITH RESPECT TO THIS GUARANTEE OR ANY MATTER ARISING HEREFROM OR RELATING HERETO, EXCEPT COMPULSORY COUNTERCLAIMS.

22.  **CONSENT TO JURISDICTION.**  GUARANTOR HEREBY (a) IRREVOCABLY SUBMITS AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF CALIFORNIA, LOS ANGELES COUNTY WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF THIS GUARANTEE OR ANY MATTER ARISING HEREFROM OR RELATING HERETO, AND (b) WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE OR FORUM NON CONVENIENS WITH RESPECT THERETO.  IN ANY SUCH ACTION OR PROCEEDING, GUARANTOR WAIVES PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT OR OTHER PROCESS AND PAPERS THEREIN AND AGREES THAT THE SERVICE THEREOF MAY BE MADE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO GUARANTOR AT ITS OFFICES SET FORTH HEREIN OR OTHER ADDRESS OF WHICH LENDER HAS RECEIVED NOTICE AS PROVIDED IN THIS GUARANTEE. NOTWITHSTANDING THE FOREGOING, GUARANTOR CONSENTS TO THE COMMENCEMENT BY LENDER OF ANY SUIT, ACTION OR PROCEEDING IN ANY OTHER JURISDICTION TO ENFORCE ITS RIGHTS AND GUARANTOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING.

[SIGNATURE PAGE FOLLOWS]

{00128955.DOC. 1}

**EX 5 PG 111**

IN WITNESS WHEREOF, the undersigned have executed this Continuing Guarantee on November 22, 2011.

GUARANTOR:

R/ JOHN TAYLOR
Address: 2020 8100 Ollew W
Lewistn Io 8501
SSN: 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

. . . . . . . . . . . . . . . . . . . . . . . . .

STATE OF _Idaho_ )
                                            )ss.
COUNTY OF _Nez Perce_ )

On this 22nd day of _November_ 2011, before me, the subscriber, a Notary Public in and for said State and County, personally appeared _R John Taylor_, the _President_ _Manager_ of _CropUSA Insurance Agency Inc._, _CropUSA Insurance Services Inc._, known or identified to me to be the person whose name is subscribed to the within instrument, and in due form of law acknowledged that he/she is authorized on behalf of said company to execute all documents pertaining hereto and acknowledged to me that he/she executed the same as his/her voluntary act and deed on behalf of said company.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my seal in said State and County on the day and year last above written.

| Notary Seal | |
| --- | --- |
| DIANE R. WHISNER NOTARY PUBLIC STATE OF IDAHO | (Signature of Notary)<br><br>Residing at: _Lewiston_<br><br>My Commission Expires: _10.4.2013_ |

{00128955.DOC; 1}

**EXHIBIT 6**

## SECURITY AGREEMENT - GUARANTEE

**THIS SECURITY AGREEMENT - GUARANTEE** (this "**Security Agreement**"), made and entered into as of the 1st day of October, 2012 by each of **AIA SERVICES CORPORATION**, an Idaho corporation having a principal place of business at 111 Main St. Lewiston, Idaho 83501 and **AIA INSURANCE, INC.**, an Idaho corporation having a principal place of business at 111 Main St. Lewiston, Idaho 83501 (each, individually, and collectively, "**Debtor**"), on a joint and several basis, and **GEMCAP LENDING I, LLC**, a Delaware limited liability company (the "**Secured Party**"), having its principal place of business at 24955 Pacific Coast Highway, Suite A202, Malibu, CA 90265.

### WITNESSETH:

**WHEREAS,** the Secured Party has entered into a certain Loan and Security Agreement, dated November 23, 2011 (as amended through the date hereof, the "**Loan Agreement**"), with CROP USA INSURANCE AGENCY, INC. and CROPUSA INSURANCE SERVICES, LLC, jointly and severally (together, "**Borrowers**"), pursuant to which the Secured Party has made a loan and extend other financial accommodations to or for the benefit of Borrowers under and subject to the terms of the Loan Agreement;

**WHEREAS,** an Event of Default has occurred under the Loan Agreement, as set forth in Amendment No. 3 and Forbearance, dated October 1, 2012 ("**Amendment No. 3**") to the Loan Agreement, and as an inducement to the Secured Party to enter into Amendment No. 3 and forbear from exercising Secured Party's rights and remedies with respect to such Event of Default and as a condition thereto, the Debtor has agreed to execute an Amended and Restated Secured Continuing Guarantee, of even date herewith (the "**Secured Guarantee**"), for the benefit of Secured Party, pursuant to which Debtor, jointly and severally, guarantees the obligations of Borrowers to Secured Party;

**WHEREAS,** pursuant to the Secured Guarantee, the Debtor has agreed to enter into this Security Agreement to grant the Secured Party the security interests contemplated in this Security Agreement as security for the prompt and full payment and performance of the indebtedness and obligations of the Debtor under the Secured Guarantee, and such other indebtedness and obligations as more fully set forth herein; and

**WHEREAS,** the Secured Party is not willing to enter into Amendment No. 3 unless and until the Debtor enters into this Security Agreement upon the terms and conditions hereinafter set forth;

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants contained herein, and intending to be legally bound hereby, the Debtor and the Secured Party hereby covenant and agree as follows:

{00159562.DOC; 3}

- 1 -

**EX 6 PG 113**

**FOSTER DEC. EX. 1 pg. 119**

# ARTICLE I

## DEFINITIONS

**Section 1.01 Definitions.** Unless otherwise defined herein, terms defined in the Loan Agreement are used herein as therein defined, and the following terms shall have the following meanings (such meanings being equally applicable to both the singular and plural forms of the terms defined):

**"Accounts"** shall mean any "account," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all accounts receivable, book debts and other forms of payment obligations (other than forms of obligations evidenced by Chattel Paper, Documents or Instruments) now owned or hereafter received or acquired by or belonging or owing to the Debtor (whether held in the name of the Debtor or any division thereof or in any applicable trade name or trade style) whether arising out of property that has been or is to be sold, leased, licensed, assigned or otherwise disposed of, or out of services rendered or to be rendered by the Debtor or from any other transaction, whether or not the same involves the sale of goods or services by the Debtor (including, without limitation, any such obligation that might be characterized as an account or contract right under the UCC), and all of the Debtor's rights in, to and under all purchase orders or receipts now owned or hereafter acquired by it for goods or services sold or rendered by the Debtor (or by any Person from whom the Debtor acquired such rights), and all of the Debtor's rights to any goods represented by any of the foregoing (including, without limitation, unpaid seller's rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods) and choses in action and causes of action (whether arising in contract, tort or otherwise and whether or not currently in litigation) and all other debts, obligations and liabilities in whatever form owing to the Debtor, documents of title, warehouse receipts, leases, investment accounts, deposit accounts, Cash, contract rights, insurance policies, dividends, distributions, judgments, covenants, licenses, franchises, warranties, indemnities, partnership and joint venture interests, and other rights, including all rights to the payment of monies due or to become due to the Debtor, under all contracts for the sale, lease, license or assignment of goods or the performance of services or both by the Debtor (whether or not yet earned by performance on the part of the Debtor or in connection with any other transaction), now in existence or hereafter occurring, including, without limitation, the right to receive the proceeds of said purchase orders and contracts, and all collateral security and guarantees of any kind given by any Person with respect to any of the foregoing.

**"Cash"** shall mean cash or cash equivalents now owned or hereafter acquired by the Debtor.

**"Chattel Paper"** shall mean any "chattel paper," "Tangible Chattel Paper" and "Electronic Chattel Paper," as such terms are defined in the UCC, now owned or hereafter acquired by the Debtor, or in which the Debtor now has or hereafter acquires any rights.

**EX 6 PG 114**

**FOSTER DEC. EX. 1 pg. 120**

**"Commercial Tort Claims"** shall mean any "commercial tort claim," as such term is defined in the UCC, now owned or hereafter acquired by Debtor, or in which the Debtor now has or hereafter acquires any rights.

**"Contracts"** shall mean all contracts, undertakings, or other agreements (other than rights evidenced by Chattel Paper, Documents or Instruments) in or under which the Debtor may now or hereafter have any right, title or interest, including, without limitation, with respect to an Account and any agreement relating to the terms of payment or the terms of performance of such Account.

**"Copyrights"** shall mean all of the following now or hereafter acquired by the Debtor: (i) all copyrights, registrations and applications therefor; (ii) all renewals and extensions thereof; (iii) all income, royalties, damages and payments now and hereafter due or payable or both with respect thereto, including, without limitation, damages and payments for past or future infringements or misappropriations thereof; (iv) all rights to sue for past, present and future infringements or misappropriations thereof; and (v) all other rights corresponding thereto throughout the world.

**"Deposit Accounts"** shall mean any "deposit account," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor, or in which the Debtor now has or hereafter acquires any rights.

**"Documents"** shall mean any "documents," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor or in which the Debtor now has or hereafter acquires any rights.

**"Equipment"** shall mean any "equipment," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all machinery, equipment, furnishings, fixtures, vehicles and computers and other electronic data processing and other office equipment now owned or hereafter acquired by the Debtor and any and all additions, substitutions and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

**"Fixtures"** shall mean any "fixtures," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor.

**"General Intangibles"** shall mean any "general intangibles," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all right, title and interest that the Debtor may now or hereafter have in or under any Contract, in or to any partnerships, joint ventures and similar entities and rights to distribution of income therefrom, all tax refunds, tax refund claims, customer lists, Payment Intangibles, Copyrights, Trademarks, Trademark licenses, Patents, Patent licenses, rights in intellectual property, permits, Trade Secrets, proprietary or confidential information, inventions (whether patented or patentable or not) and technical information, procedures, designs, knowledge, know-how, software, computer programs, computer records and discs, computer

{00159562.DOC; 3}

- 3.-

data, databases, data, skill, expertise, experience, processes, models, drawings, materials and records, now owned or hereafter acquired by the Debtor, and the goodwill and rights of indemnification related thereto and associated therewith.

"**Goods**" shall mean any "goods," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor, wherever located.

"**Instruments**" shall mean any "instrument," as such term is defined the UCC, now owned or hereafter acquired by the Debtor, or in which the Debtor now has or hereafter acquires any rights, including promissory notes, but not including instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"**Inventory**" shall mean any "inventory," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all inventory, merchandise, goods and other personal property now owned or hereafter acquired by the Debtor that are held for sale or lease, or are furnished or are to be furnished under a contract of service, or that constitute raw materials, work in process or materials used or consumed or to be used or consumed in the Debtor's business, or the processing, packaging, delivery or shipping of the same, and all finished goods.

"**Investment Property**" shall mean any "investment property," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all securities, securities accounts and security entitlements.

"**Letter of Credit Rights**" shall mean any "letter of credit right," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor, or in which the Debtor now has or hereafter acquires any rights.

"**Lien**" means any mortgage, deed of trust, pledge, lien, security interest, charge or other encumbrance or security arrangement of any nature, including, but not limited to, any conditional sale or title retention arrangement, and any assignment, deposit arrangement or lease intended as, or having the effect of, security.

"**Patents**" shall mean all of the following now or hereafter owned by the Debtor, if any: (i) all patents and patent applications; (ii) all inventions and improvements described and claimed therein; (iii) all reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof; (iv) all income, royalties, damages and payments now and hereafter due and/or payable to the Debtor with respect thereto, including, without limitation, damages and payments for past or future infringements or misappropriations thereof; (v) all rights to sue for past, present and future infringements or misappropriations thereof; and (vi) all other rights corresponding thereto throughout the world.

"**Payment Intangible**" means any "payment intangible," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor, or in which the Debtor now has or hereafter acquires any rights.

{00159562.DOC; 3}                                  - 4 -

**EX 6 PG 116**

**FOSTER DEC. EX. 1 pg. 122**

"**Permitted Liens**" shall mean: (i) Liens in favor of the Secured Party; (ii) Liens arising from taxes, assessments, charges, levies or claims that are not yet due or that remain payable without penalty or to the extent permitted to remain unpaid under the Security Agreement; (iii) deposits or pledges to secure workmen's compensation, unemployment insurance, old age benefits or other social security obligations, or in connection with or to secure the performance of bids, tenders, trade contracts or leases, or to secure statutory obligations, or stay, surety or appeal bonds, or other pledges or deposits of like nature and all in the ordinary course of business; (iv) mechanics', carriers', workmen's, repairmen's or similar liens arising in the ordinary course of business in respect of obligations which are not overdue, or deposits made to obtain the release of such mechanics', carriers', workmen's, repairmen's or similar liens which are being contested in good faith by appropriate proceedings and with respect to which the Debtor has created reserves which are determined to be adequate by the application of GAAP consistently applied, and (v) liens in favor of third parties in effect on the date hereof.

"**Person**" shall mean any individual, corporation, joint venture, general or limited partnership, limited liability company, trust, association, unincorporated organization or other business entity.

"**Proceeds**" shall mean "proceeds," as such term is defined in the UCC and, in any event, shall include, without limitation, (i) any and all proceeds of any insurance, indemnity or warranty payable to the Debtor from time to time with respect to any of the Collateral; (ii) any and all payments (in any form whatsoever) made or due and payable to the Debtor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental body, authority, bureau or agency (or any person acting under color of governmental authority); (iii) any claim of the Debtor against third parties (A) for past, present or future infringement of any Patent or Patent license, or (B) for past, present or future infringement or dilution of any Trademark or Trademark license or for injury to the goodwill associated with any Trademark, Trademark registration or Trademark licensed under any Trademark license; and (iv) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"**Promissory Notes**" shall mean any "promissory notes," as such term is defined in the UCC.

"**Secured Obligations**" shall mean all indebtedness and obligations of the Debtor to the Secured Party under the Secured Guarantee and hereunder, now existing or hereafter incurred, and the payment of amounts that would become due from the Debtor to the Secured Party but for the operation of the automatic stay provisions of Section 362 of the Bankruptcy Code, 11 U.S.C. § 362.

"**Securities**" shall mean any "securities," as such term is defined in the UCC (whether certificated or uncertificated).

"**Software**" shall mean any "software," as such term is defined in the UCC.

EX 6 PG 117

FOSTER DEC. EX. 1 pg. 123

"**Supporting Obligation**" means any "supporting obligation," as such term is defined in the UCC.

"**Trademarks**" shall mean all of the following, now owned or hereafter acquired by the Debtor: (i) all trademarks (including service marks and trade names, whether registered or at common law), registrations and applications therefor, and the entire product lines and goodwill of the Debtor's business connected therewith and symbolized thereby; (ii) all renewals thereof, (iii) all income, royalties, damages and payments now and hereafter due or payable to or both with respect thereto, including, without limitation, damages and payments for past or future infringements or misappropriations thereof; (iv) all rights to sue for past, present and future infringements or misappropriations thereof; and (v) all other rights corresponding thereto throughout the world.

"**Trade Secrets**" shall mean all of the following, now owned or hereafter acquired by the Debtor: (i) trade secrets; (ii) income, royalties, damages and payments now and hereafter due and/or payable to the Debtor with respect to trade secrets, including, without limitation, damages and payments for past or future infringements or misappropriations thereof; (iii) rights to sue for past, present and future infringements or misappropriations of trade secrets; and (iv) all other rights corresponding to trade secrets throughout the world.

"**State**" shall mean the State of California.

"**UCC**" shall mean the Uniform Commercial Code presently enacted in the State, *provided, however*, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of the Secured Party's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

## ARTICLE II

### SECURITY INTEREST

**Section 2.01   Grant of Security Interest.**

(a)     As security for the prompt and full payment and performance of the Secured Obligations, the Debtor hereby assigns and pledges, and hereby creates and grants, to the Secured Party a continuing lien on and security interest in and to all property and assets now owned or hereafter arising or acquired by the Debtor, wheresoever located, and all right, title and interest of the Debtor therein (collectively, the "**Collateral**"), including, without limitation, the following:

**EX 6 PG 118**

**FOSTER DEC. EX. 1 pg. 124**

(i)     All Accounts, Chattel Paper (including Tangible Chattel Paper and Electronic Chattel Paper), Documents, Instruments, Promissory Notes, Commercial Tort Claims and Contracts;

(ii)     All Inventory;

(iii)     All Equipment and all Fixtures;

(iv)     All General Intangibles (including Payment Intangibles), Software, Trademarks, Patents, Copyrights and Trade Secrets;

(v)     All Cash, Deposit Accounts, Letter of Credit Rights, Supporting Obligations, Securities and Investment Property;

(vi)     All other Goods and personal property of the Debtor, whether tangible or intangible, now owned or hereafter acquired by the Debtor, wheresoever located; and

(vii)     All Proceeds and products relating to each of the foregoing.

(b)     The Collateral includes all of the items described above in paragraph (a), whether now owned or hereafter at any time arising or acquired by the Debtor and wherever located, and includes all replacements, additions, accessions, substitutions, repairs, guaranties and securities therefor, Proceeds and products relating thereto or therefrom, and all documents, records (including, but not limited to, manual records, computer runs, print-outs, tapes, disks, software, programs, source codes and other computer prepared information and equipment of any kind), ledger sheets and files of the Debtor relating thereto. Proceeds hereunder include any insurance now or hereafter payable by reason of loss or damage to any item of Collateral or any proceeds thereof, and all unearned refund premiums and dividends which may become payable under such policies of insurance and loss payments under such policies, which shall reduce the unearned premiums.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

**Section 3.01 Debtor's Representations.** The Debtor represents and warrants to the Secured Party as follows:

(a)     The Debtor is (or to the extent that this Security Agreement states that the Collateral is to be acquired after the date hereof, will be) the sole owner of its Collateral, and the liens and security interests granted hereby to the Secured Party in the Collateral which can be perfected by the filing of UCC financing statements will be perfected liens and security interests upon the filing of such financing statements;

EX 6 PG 119

FOSTER DEC. EX. 1 pg. 125

(b)     Schedule 1 attached hereto (the "**Disclosure Schedule**") contains a complete list of, among other items, (i) the current and former corporate and fictitious names utilized by Debtor, (ii) the chief executive offices of the Debtor, (iii) the office where Debtor keeps its records concerning the Collateral, (iv) each place of business of the Debtor, (v) as to Inventory, a complete list of each location where Inventory is located, and (vi) as to Equipment, a complete list of each location where Equipment is located. All information contained in the Disclosure Schedule is true, complete and correct and the Debtor hereby acknowledges and agrees that the Secured Party and its legal counsel may fully rely upon the information contained therein as representations and warranties of the Debtor, the falsity of which may constitute a Default (as hereinafter defined);

(c)     Except as otherwise disclosed to the Secured Party, the Debtor has exclusive possession and control of all its Inventory and Equipment, and the Debtor has not and will not allow any of its contractors, processors or suppliers to have possession or control of any Inventory and Equipment;

(d)     No consent, authorization, approval or other action by, and no notice to or filing with, any governmental authority is required for (i) the grant by the Debtor of the Liens granted hereby or for the execution, delivery or performance of this Security Agreement by the Debtor; (ii) the perfection or maintenance of the Liens created hereby which may be perfected by the filing of financing statements; or (iii) the exercise by the Secured Party of any of its rights and remedies hereunder, except for the filing of financing statements necessary to perfect or continue the perfection of the security interests granted by this Security Agreement;

(e)     This Security Agreement creates a valid security interest in the Collateral, and the filing of the financing statements in the jurisdictions listed in the Disclosure Schedule perfects those security interests in such Collateral which can be perfected by the filing of financing statements; and

(f)     Neither the execution and delivery of this Security Agreement by the Debtor, the consummation of the transactions herein contemplated or the fulfillment of the terms hereof will (i) result in a breach of any of the terms or provisions of, or constitute a default under, or constitute an event which, with notice or lapse of time or both, will result in a breach of, or constitute a default under, the organizational documents of Debtor, any agreement, indenture, mortgage, deed of trust, equipment lease, instrument or other document to which the Debtor is a party; or (ii) conflict with any law, except to the extent that any such breach, default, event or conflict would not have a material adverse effect on the business, operations or financial condition of the Debtor.

(g)     Debtor is organized and incorporated under the laws of the State of Idaho.

(h)     The execution, delivery and performance of this Security Agreement and the Secured Guarantee have been duly authorized by Debtor, each of which are and shall be binding on and enforceable against Debtor in accordance with their terms, and do not and shall not contravene any other instrument or agreement binding on Debtor.

EX 6 PG 120

FOSTER DEC. EX. 1 pg. 126

## ARTICLE IV

## COVENANTS OF THE DEBTOR

**Section 4.01  Debtor's Covenants.**  The Debtor covenants and agrees to perform each of the covenants set forth below in this Article IV:

(a)  The Debtor will defend the Collateral against all claims and demands of all Persons at any time claiming the same or any interest therein;

(b)  The Debtor will not change the location of its chief executive offices or the offices where it keeps records concerning Accounts from the locations set forth in the Disclosure Schedule, except with thirty (30) days' prior written notice to the Secured Party, nor will the Debtor move, or permit to be moved, the Collateral or any portion thereof to any location other than those set forth in the Disclosure Schedule;

(c)  The Debtor will not voluntarily or involuntarily change its name, identity or corporate structure without the prior written consent of the Secured Party;

(d)  The Debtor will, promptly upon request by the Secured Party, procure or execute and deliver any document (including, without limitation, mortgagee or landlord waivers with respect to any and all Inventory which is a part of the Collateral), give any notices, execute and file any financing statements, mortgages or other documents, all in form and substance satisfactory to the Secured Party, mark any Chattel Paper, deliver any Chattel Paper or Instruments to the Secured Party and take any other actions which are necessary or, in the reasonable judgment of the Secured Party, desirable to perfect or continue the perfection and priority of the Secured Party's liens on and security interests in the Collateral, to protect the Collateral against the rights, claims or interests of any Person other than the Secured Party or to effect the purposes of this Security Agreement, and will pay all reasonable costs and expenses incurred in connection therewith;

(e)  The Debtor will not, without the prior written consent of the Secured Party, in any way hypothecate or create or permit to exist any Lien on or other interest in the Collateral except Permitted Liens and those created by this Security Agreement;

(f)  The Debtor will pay and discharge all taxes, assessments and governmental charges or levies against the Collateral prior to delinquency thereof, except taxes, assessments or charges subject to good faith dispute for which the Debtor has created adequate reserves on its books, and will keep the Collateral free of all unpaid charges whatsoever where the failure to make any of such payments could result in a material adverse effect on the business, operations or financial condition of the Debtor;

(g)  The Debtor will at all times be in compliance with all laws pertaining to the use or ownership of the Collateral; at the Debtor's own expense, the Debtor will keep the Collateral in good condition and maintain same in accordance with industry specifications and requirements;

**EX 6 PG 121**

**FOSTER DEC. EX. 1 pg. 127**

(h)     The Debtor will cause the Collateral to be kept insured at its own expense under one or more policies with such companies, in such amounts and against such risks and liabilities as is ordinarily maintained by companies engaged in the same or similar businesses and similarly situated and as are satisfactory to the Secured Party in its sole discretion. Such policies shall include loss payable endorsements or such other mortgagee indemnity clauses in favor of the Secured Party as the Secured Party shall direct and shall name the Secured Party as an additional insured. No such policy shall be subject to reduction or cancellation without thirty (30) days' prior written notice to the Secured Party and an original of such policy shall be delivered to the Secured Party.

(i)     The Debtor will, upon the Secured Party's request, deliver to the Secured Party records and schedules which show the status, condition and location of all its Inventory and Equipment. The Secured Party shall have the right to review and verify such records, schedules, notices and financial information, and the Debtor will reimburse the Secured Party for all costs incurred thereby;

(j)     The Debtor authorizes the Secured Party to file UCC financing statements, in form and substance satisfactory to the Secured Party, to assure the protection, perfection and enforcement of the Liens in the Collateral in favor of the Secured Party, and the Debtor will pay all filing fees and taxes related thereto. The Debtor hereby irrevocably appoints the Secured Party, its agents and employees, as attorney-in-fact for the Debtor to execute, deliver, file and record any such financing statements in the name of the Debtor at any time and, as applicable, under the rules of the UCC;

(k)     The Debtor will permit the Secured Party to enter into and upon any premises where any of the Collateral or records with respect thereto are located for the purpose of inspecting the same, making copies of records, observing the use of any part of the Collateral or otherwise protecting its security interest in the Collateral; and

(l)     The Secured Party shall have the right at any time to make any payments and do any other acts the Secured Party may deem reasonably necessary to protect its security interest in the Collateral, including, without limitation, the right to pay, purchase, contest or compromise any Lien which is prior to or superior to the liens and security interests granted hereunder, except Permitted Liens, and appear in and defend any action or proceeding purporting to affect its security interest in the Collateral, and in exercising any such powers or authority, the right to pay all reasonable costs and expenses incurred in connection therewith, including reasonable attorneys' fees. The Debtor will reimburse the Secured Party for all such payments made and expenses incurred, which amounts shall be secured under this Security Agreement, and agree that the Debtor shall be bound by any payment made or act taken by the Secured Party hereunder. The Secured Party shall have no obligation to make any of the foregoing payments or perform any of the foregoing acts.

EX 6 PG 122

FOSTER DEC. EX. 1 pg. 128

# ARTICLE V

## AUTHORITY OF SECURED PARTY

**Section 5.01  Attorney-In-Fact.**  The Debtor hereby irrevocably constitutes and appoints the Secured Party, and any agent thereof, with full power of substitution, as its true and lawful attorney-in-fact, with full irrevocable power and authority in the name of the Debtor or in its own name to take any and all action and to execute any and all documents and instruments which the Secured Party, at any time and from time to time, deems necessary or desirable to accomplish the purposes of this Security Agreement and, without limiting the generality of the foregoing, the Debtor hereby gives the Secured Party the power and right on behalf of the Debtor and in its own name to do any of the following, at any time and from time to time, without notice to or the consent of the Debtor:

(a)  to demand, sue for, collect, or receive in the name of the Debtor or in its own name, any money or property at any time payable or receivable on account of or in exchange for any of the Collateral and, in connection therewith, endorse checks, notes, drafts, acceptances, money orders, documents of title or any other instruments for the payment of money under the Collateral or any policy of insurance;

(b)  to pay or discharge taxes, Liens, security interests, or other encumbrances levied or placed on or threatened against the Collateral;

(c)  to send requests for verification to account debtors and other obligors;

(d)  (i) to direct the account debtors and any other parties liable for any payment under any of the Collateral to make payment of any and all monies due and to become due thereunder directly to the Secured Party or as the Secured Party shall direct; (ii) to receive payment of and receipt for any and all monies, claims and other amounts due and to become due at any time in respect of or arising out of any Collateral; (iii) to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against the Debtor, assignments, proxies, stock powers, verifications and notices in connection with an account and other documents relating to the Collateral; (iv) to commence and prosecute any suit, action or proceeding at law or in equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral; (v) to defend any suit, action or proceeding brought against the Debtor with respect to any Collateral; (vi) to settle, compromise or adjust any suit, action or proceeding described above and, in connection therewith, to give such discharges or releases as the Secured Party may deem appropriate; (vii) to exchange any of the Collateral for other property upon any merger, consolidation, reorganization, recapitalization or other readjustment of the issue thereof and, in connection therewith, deposit any of the Collateral with any committee, depositary, transfer agent, registrar or other designated agency upon such terms as the Secured Party may determine; (viii) to add or release any guarantor, endorser, surety or other party to any of the Collateral; (ix) to renew, extend or otherwise change the terms and conditions of any of the Collateral; (x) to insure and to make, settle, compromise or adjust claims

**EX 6 PG 123**

**FOSTER DEC. EX. 1 pg. 129**

under any insurance policy covering any of the Collateral; and (xi) to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Secured Party were the absolute owner thereof for all purposes, and to do, at the Secured Party's option and the Debtor's' expense, at any time or from time to time, all acts and things which the Secured Party deems necessary to protect, preserve or realize upon the Collateral and the Secured Party's security interest therein.

This power of attorney is a power coupled with an interest and shall be irrevocable. The Secured Party shall be under no duty to exercise or withhold the exercise of any of the rights, power, privileges and options expressly or implicitly granted to the Secured Party in this Security Agreement, and shall not be liable for any failure to do so or any delay in doing so. The Secured Party shall not be liable for any act or omission or error of judgment or any notice of act or law in its individual capacity, or in its capacity as attorney-in-fact, except acts or omissions resulting from its willful misconduct or gross negligence. This power of attorney is conferred on the Secured Party to protect, preserve and realize upon its lien and security interest in the Collateral. The Secured Party shall not be responsible for any decline in the value of the Collateral and shall not be required to take any steps to preserve rights against prior parties or to protect, preserve or maintain any security interest given to secure the Collateral.

## ARTICLE VI

## [INTENTIONALLY OMITTED]

## ARTICLE VII

## DEFAULTS AND REMEDIES

**Section 7.01  Defaults.** The occurrence of any one or more of the following events or conditions shall constitute a default under this Security Agreement (a "**Default**"):

(a)    The occurrence of an Event of Default under the Secured Guarantee or the Loan Agreement.

(b)    The Debtor fails to make any payment or perform any obligation or covenant required to be performed by Debtor in accordance with the terms and conditions of this Security Agreement.

(c)    The Debtor makes or has made or furnishes or has furnished any warranty, representation or statement to the Secured Party in connection with this Security Agreement, or any other agreement to which the Debtor and the Secured Party are parties, which is or was false or misleading in any material respect when made or furnished.

EX 6 PG 124

**FOSTER DEC. EX. 1 pg. 130**

**Section 7.02  Remedies.**  Upon the occurrence of a Default, the Secured Party may, at its option, without notice to or demand upon the Debtor, do any one or more of the following:

     (a)    Declare all of the Secured Obligations immediately due and payable.

     (b)    Exercise any or all of the rights and remedies provided for by the UCC of the state or states having jurisdiction with respect to all or any portion of the Collateral from time to time, specifically including, without limitation, the right to recover reasonable attorneys' fees and other expenses incurred by the Secured Party in the enforcement of this Security Agreement or in connection with the Debtor's redemption of the Collateral.

     (c)    Require the Debtor to assemble the Collateral or any part thereof and make it available at one or more places as the Secured Party may designate, and to deliver possession of the Collateral or any part thereof to the Secured Party, who shall have full right to enter upon any or all of the Debtor's premises and property to exercise the Secured Party's rights hereunder.

     (d)    Use, manage, operate and control the Collateral and the Debtor's business and property to preserve the Collateral or its value, including, without limitation, the right to take possession of all of the Debtor's premises and property, to exclude the Debtor and any third parties, whether or not claiming under the Debtor, from such premises and property, to make repairs, replacements, alterations, additions and improvements to the Collateral and to dispose of all or any portion of the Collateral in the ordinary course of the Debtor's business.

     (e)    Use, in connection with any assembly, use or disposition of the Collateral, any Trademark, Trade Secret, trade name, trade style, copyright, Patent or technical knowledge or process used or utilized by the Debtor.

     (f)    Enforce one or more remedies hereunder, successively or concurrently, and such action shall not operate to estop or prevent the Secured Party from pursuing any other or further remedy which it may have, and any repossession or retaking or sale of the Collateral pursuant to the terms hereof shall not operate to release the Debtor until full and final payment of any deficiency has been made in cash.  The Debtor shall reimburse the Secured Party upon demand for, or the Secured Party may apply any proceeds of the Collateral to, the costs and expenses (including reasonable attorneys' fees, transfer taxes and any other charges) incurred by the Secured Party in connection with any sale, disposition or retention of any Collateral hereunder.

     (g)    In connection with any public or private sale under the applicable UCC, the Secured Party shall give the Debtor at least ten (10) days' prior written notice of the time and place of any public sale of the Collateral or of the time after which any private sale or other intended disposition thereof is to be made, which shall be deemed to be reasonable notice of such sale or other disposition.  Such notice may be mailed to the Debtor at the address set forth in this Security Agreement for delivery of notices.

**EX 6 PG 125**

**FOSTER DEC. EX. 1 pg. 131**

     (h)     Proceed by an action or actions at law or in equity to recover the Secured Obligations or to foreclose under this Security Agreement and sell the Collateral, or any portion thereof, pursuant to a judgment or decree of a court or courts of competent jurisdiction.

     (i)     In the event the Secured Party recovers possession of all or any part of the Collateral pursuant to a writ of possession or other judicial process, whether prejudgment or otherwise, the Secured Party may thereafter retain, sell or otherwise dispose of such collateral in accordance with this Security Agreement or the applicable UCC, and following such retention, sale or other disposition, the Secured Party may voluntarily dismiss without prejudice the judicial action in which such writ of possession or other judicial process was issued. The Debtor hereby consents to the voluntary dismissal by the Secured Party of such judicial action, and the Debtor further consents to the exoneration of any bond which the Secured Party filed in such action.

## ARTICLE VIII

### MISCELLANEOUS PROVISIONS

**Section 8.01  Notices.** Any notice or consent required or permitted by this Security Agreement shall be in writing and shall be delivered in the manner and to the addresses specified in the first paragraph hereof. All notices shall be deemed effective upon receipt.

**Section 8.02  Headings.** The various headings in this Security Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Security Agreement or any provision hereof.

**Section 8.03  Amendments.** This Security Agreement or any provision hereof may be changed, waived or terminated only by a statement in writing signed by the party against which such change, waiver or termination is sought to be enforced.

**Section 8.04  No Waiver.** No delay in enforcing or failure to enforce any right under this Security Agreement shall constitute a waiver by the Secured Party of such right. No waiver by the Secured Party of any default hereunder shall be effective unless in writing, nor shall any waiver operate as a waiver of any other default or of the same default on a future occasion.

**Section 8.05  TIME OF THE ESSENCE. TIME IS OF THE ESSENCE IN EACH PROVISION OF THIS SECURITY AGREEMENT OF WHICH TIME IS AN ELEMENT.**

**Section 8.06  Binding Agreement.** All rights of the Secured Party hereunder shall inure to the benefit of its successors and assigns. The Debtor shall not assign any of its interest under this Security Agreement without the prior written consent of the Secured Party. Any purported

**EX 6 PG 126**

**FOSTER DEC. EX. 1 pg. 132**

assignment inconsistent with this provision shall, at the option of the Secured Party, be null and void.

**Section 8.07    Entire Security Agreement.** This Security Agreement and the Secured Guarantee are intended by the parties as a final expression of their agreement and are intended as a complete and exclusive statement of the terms and conditions thereof. Acceptance of or acquiescence in a course of performance rendered under this Security Agreement shall not be relevant to determine the meaning of this Security Agreement even though the accepting or acquiescing party had knowledge of the nature of the performance and opportunity for objection.

**Section 8.08    Attorneys' Fees.** In any action or proceeding brought to enforce any provision of this Security Agreement, or to seek damages for a breach of any provision hereof, or where any provision hereof is asserted as a defense, the Debtor shall pay the Secured Party's reasonable attorneys' fees in addition to any other remedy available under this Security Agreement.

**Section 8.09    Severability.** If any provision of this Security Agreement should be found to be invalid or unenforceable, all of the other provisions shall nonetheless remain in full force and effect to the maximum extent permitted by law.

**Section 8.10    Survival of Provisions.** All representations, warranties and covenants of the Debtor contained herein shall survive the execution and delivery of this Security Agreement, and terminate only upon full and final payment and performance of the Secured Obligations.

**Section 8.11.    Setoff.** The Secured Party shall have the right, at any time after the occurrence of a Default, to set off any indebtedness or obligation of the Debtor to the Secured Party against any indebtedness or obligation of the Secured Party to the Debtor, without notice to or demand upon the Debtor and whether or not any such indebtedness or obligations are liquidated or mature at the time of such offset. The Secured Party's right of offset hereunder shall be in addition to and not in limitation of any other rights or remedies which may exist in favor of the Secured Party.

**Section 8.12    Authority of the Secured Party.** The Secured Party shall have and be entitled to exercise all powers hereunder which are specifically delegated to the Secured Party by the terms hereof, together with such powers as are reasonably incident thereto. The Secured Party may perform any of its duties hereunder or in connection with the Collateral by or through agents or employees and shall be entitled to retain counsel to act in reliance upon the advice of counsel concerning all such matters. Neither the Secured Party nor any director, officer, employee, attorney or agent of the Secured Party shall be liable to the Debtor for any action taken or omitted to be taken by it or them hereunder, except for its or their own gross negligence or willful misconduct; nor shall the Secured Party be responsible for the validity, effectiveness or sufficiency hereof or of any document or security furnished pursuant hereto. The Secured Party shall be entitled to rely on any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper person or persons. The Debtor agrees to indemnify and hold harmless the Secured Party and/or any such other person from and against any and all costs, expenses (including reasonable attorneys' fees), claims or liability

**EX 6 PG 127**

**FOSTER DEC. EX. 1 pg. 133**

incurred by the Secured Party or such other persons hereunder unless such claim or liability shall be due to willful misconduct or gross negligence on the part of the Secured Party or such other person.

**Section 8.13   Termination of Security Agreement.**   This Security Agreement shall continue in force so long as any portion of the Secured Obligations remains unpaid and until the Secured Guarantee is terminated.   If the Secured Party receives any payment or payments on account of the Secured Obligations, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, as amended, or any other state or federal law, common law or equitable doctrine, then, to the extent of any sum not finally retained by the Secured Party, the Debtor's obligations to the Secured Party shall be reinstated and this Security Agreement, and any security therefor, shall remain in full force and effect (or be reinstated) until payment shall have been made to the Secured Party, notwithstanding termination of this Security Agreement or the cancellation of any note, instrument or agreement evidencing the Secured Obligations, and such payment shall be due on demand by the Secured Party.   If any proceeding seeking such repayment is pending or, in the Secured Party's sole judgment, threatened, this Security Agreement and any security therefor shall remain in full force and effect, notwithstanding that the Debtor may not otherwise be obligated to the Secured Party.

**Section 8.14   Counterparts.**   This Security Agreement may be executed by fax or other electronic signature and in one or more counterparts, each of which shall be deemed an original but all of which shall together constitute one and the same agreement.

**Section 8.15   Joint and Several Liability.**   The obligations of Debtor (and each party named as a Debtor in this Security Agreement) shall be joint and several.   Each reference to "Debtor" herein shall be deemed a reference to each of AIA Insurance, Inc. and AIA Services Corporation.   Lender, in its sole and absolute discretion, may:

(a)   bring suit against Debtor, or any one or more of the parties named as a Debtor in this Security Agreement, jointly and severally, or against any one or more of them;

(b)   compromise or settle with Debtor, or any one or more of the parties named as a Debtor in this Security Agreement, for such consideration as Lender may deem proper;

(c)   release one or more of the parties named as a Debtor in this Security Agreement from liability; and

(d)   otherwise deal with Debtor or any one or more of the parties named as Debtor in this Security Agreement, in any manner, and no such action shall impair the rights of Lender in this Security Agreement to collect from Debtor, or any one or more of the parties named as a Debtor in this Security Agreement, any amount

**EX 6 PG 128**

**FOSTER DEC. EX. 1 pg. 134**

guaranteed by a Debtor, or any one or more of the parties named as a Debtor, in the Secured Guarantee.

**Section 8.16. APPLICABLE LAW; WAIVER OF JURY TRIAL; CONSENT TO, JURISDICTION**

(a)   **APPLICABLE LAW.** THIS SECURITY AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, THE LAWS OF WHICH DEBTOR HEREBY EXPRESSLY ELECTS TO APPLY TO THIS SECURITY AGREEMENT, WITHOUT GIVING EFFECT TO PROVISIONS FOR CHOICE OF LAW THEREUNDER. DEBTOR AGREES THAT ANY ACTION OR PROCEEDING BROUGHT TO ENFORCE OR ARISING OUT OF THIS SECURITY AGREEMENT SHALL BE COMMENCED IN ACCORDANCE WITH THE PROVISIONS OF THIS SECURITY AGREEMENT.

(b)   **WAIVER OF JURY TRIAL.** TO THE EXTENT PERMITTED BY APPLICABLE LAW, DEBTOR HEREBY WAIVES ANY AND ALL RIGHTS THAT IT MAY NOW OR HEREAFTER HAVE UNDER THE LAWS OF THE UNITED STATES OF AMERICA OR ANY STATE TO A TRIAL BY JURY OF ANY AND ALL ISSUES ARISING EITHER DIRECTLY OR INDIRECTLY IN ANY ACTION OR PROCEEDING BETWEEN DEBTOR, SECURED PARTY, OR THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, OUT OF OR IN ANY WAY CONNECTED WITH THIS SECURITY AGREEMENT, THE OTHER FACTORING DOCUMENTS, THE OBLIGATIONS AND/OR THE COLLATERAL. IT IS INTENDED THAT SAID WAIVER SHALL APPLY TO ANY AND ALL DEFENSES, RIGHTS, AND/OR COUNTERCLAIMS IN ANY ACTION OR PROCEEDINGS BETWEEN DEBTOR AND SECURED PARTY. DEBTOR WAIVES ALL RIGHTS TO INTERPOSE ANY CLAIMS, DEDUCTIONS, SETOFFS OR COUNTERCLAIMS OF ANY KIND, NATURE OR DESCRIPTION IN ANY ACTION OR PROCEEDING INSTITUTED BY SECURED PARTY WITH RESPECT TO THIS SECURITY AGREEMENT, THE OTHER FACTORING DOCUMENTS, THE OBLIGATIONS, THE COLLATERAL OR ANY MATTER ARISING THEREFROM OR RELATING THERETO, EXCEPT COMPULSORY COUNTERCLAIMS.

(c)   **CONSENT TO JURISDICTION.** DEBTOR HEREBY (i) IRREVOCABLY SUBMITS AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF CALIFORNIA, LOS ANGELES COUNTY WITH RESPECT TO ANY ACTION OR PROCEEDING ARISING OUT OF THIS SECURITY AGREEMENT, THE OTHER FACTORING DOCUMENTS, THE OBLIGATIONS AND/OR THE COLLATERAL OR ANY MATTER ARISING THEREFROM OR RELATING THERETO, AND (ii) WAIVES ANY OBJECTION BASED ON VENUE OR FORUM NON CONVENIENS WITH RESPECT THERETO. IN ANY SUCH ACTION OR PROCEEDING, DEBTOR WAIVES PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT OR OTHER PROCESS AND PAPERS THEREIN AND AGREES THAT THE SERVICE THEREOF MAY BE MADE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO DEBTOR

**FOSTER DEC. EX. 1 pg. 135**

AT ITS OFFICES SET FORTH HEREIN OR OTHER ADDRESS THEREOF OF WHICH SECURED PARTY HAS RECEIVED NOTICE AS PROVIDED IN THIS SECURITY AGREEMENT. NOTWITHSTANDING THE FOREGOING, DEBTOR CONSENTS TO THE COMMENCEMENT BY LENDER OF ANY SUIT, ACTION OR PROCEEDING IN ANY OTHER JURISDICTION TO ENFORCE ITS RIGHTS IN AND TO THE COLLATERAL AND DEBTOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING.

[SIGNATURE PAGE FOLLOWS]

EX 6 PG 130

FOSTER DEC. EX. 1 pg. 136

**IN WITNESS WHEREOF,** the parties hereto have caused this Security Agreement - Guarantee to be executed by their duly authorized officers as of the day and year first above written.

AIA SERVICES CORPORATION

By: _____

Name: R. John Taylor

Title: President


AIA INSURANCE, INC.

By: _____

Name: R. John Taylor

Title: President


AGREED:

**GEMCAP LENDING I, LLC**

By: _____

Name:

Title:

{00159562.DOC; 3}                          - 19 -

**EX 6 PG 131**

**FOSTER DEC. EX. 1 pg. 137**

## SCHEDULE 1 TO SECURITY AGREEMENT

Current Names Used By Debtor:

   AIA Services Corporation

   AIA Insurance, Inc.

Any Assumed or Fictitious Names Debtor Has Used in Past Five (5) Years or Any Other Corporate Name Used in Past Five (5) Years:

   No fictitious or other corporate names used in past five (5) years.

Location of Chief Executive Offices of Debtor:

   111 Main Street, Lewiston, ID 83501

Offices Where Debtor Keeps Records Concerning Inventory, Accounts, Contracts and Other Property:

   111 Main Street, Lewiston, ID 83501

Places of Business of Debtor:

   111 Main Street, Lewiston, ID 83501

**EXHIBIT 7**

FOSTER DEC. EX. 1 pg. 139

EXECUTION

# THIRD AMENDED AND RESTATED SECURED REVOLVING NOTE

Up to $10,000,000

Original Date: November 23, 2011
Amended and Restated as of April 1, 2012
Further Amended and Restated as of July 18, 2012,
Further Amended and Restated as of February 4, 2013

FOR VALUE RECEIVED, **CROP USA INSURANCE AGENCY, INC.**, an Idaho corporation, and **CROPUSA INSURANCE SERVICES, LLC**, an Idaho limited liability company, each with its principal place of business located at 111 Main Street, Lewiston, ID 83501 (each, individually, and collectively, **"Borrower"**), jointly and severally promise to pay to the order of **GEMCAP LENDING I, LLC**, a Delaware limited liability company with offices at 24955 Pacific Coast Highway, Suite A202, Malibu, CA 90265 (together with its successors and assigns, **"Lender"**), on or before November 23, 2014, the principal sum of up to Ten Million Dollars ($10,000,000) in accordance with this Third Amended and Restated Secured Revolving Note (this **"Note"**) and the Amended and Restated Loan and Security Agreement, of even date herewith, entered into by and between Borrower and Lender (as amended from time to time, the **"Agreement"**). Capitalized terms used herein and not defined herein have the meanings given to them in the Agreement.

INTEREST; AMORTIZATION; DUE DATE: Interest on the unpaid principal balance of Revolving Loans, including interest charges for Collection Days, shall be computed on the basis of the actual number of days elapsed and a year of 360 days and shall accrue on the unpaid principal balance of Advances at the rate of Eighteen and One Half Percent (18.5%) per annum (the **"Revolving Loan Interest Rate"**).

All accrued interest on the Loans, including interest charges for Collection Days, shall be payable by Borrower in arrears (x) prior to the Maturity Date, on the first Business Day of each calendar month, commencing January 1, 2012, (y) in full on the Maturity Date and (z) on demand after the Maturity Date. Following and during the continuation of an Event of Default, interest on the unpaid principal balance hereunder shall accrue at a rate per annum equal to Twenty Four Percent (24%).

Subject to the prepayment provisions hereof, Borrower may borrow, repay and reborrow Loans, as set forth in the Agreement.

The entire principal balance of this Note then outstanding, plus any accrued and unpaid interest thereon, together with all penalties and late payment fees, if any, shall be due and payable on the Maturity Date pursuant to the terms of the Agreement. Borrower may voluntarily prepay the entire unpaid principal sum of the Revolving Loans without premium or penalty, provided, however, that, (i) such prepayment is no less than the amount of the then-outstanding aggregate principal sum of all Revolving Loans and all accrued and unpaid interest thereon, (ii) as part of such prepayment, Borrower shall pay Lender all other amounts due to Lender pursuant to this Note, the Agreement and other Loan Documents, including, without limitation, any Minimum Draw Fee, and (iii) in the event Borrower makes such prepayment on or before November 23, 2014, then Borrower shall pay to Lender an amount equal to the Revolving Loan Prepayment Fee. The Revolving Loan

{00171623.DOC; 1}

Prepayment Fee is intended to compensate Lender for committing and deploying funds for Borrower's Loans pursuant to the Agreement and for Lender's loss of investment of such funds in connection with such early termination, and is not intended as a penalty. The Revolving Loan Prepayment and the Minimum Draw Fee also shall be due and payable by Borrower to Lender if Lender accelerates the payment of the Obligations on or before November 23, 2014 due to the occurrence of an Event of Default.

PAYMENT AND COLLECTION: In order to satisfy Borrower's payment of amounts due under the Loans and all fees, expenses and charges with respect thereto that are due and payable under this Note, the Agreement or any other Loan Document, Borrower hereby irrevocably authorizes Lender to initiate manual and automatic electronic (debit and credit) entries through the Automated Clearing House or other appropriate electronic payment system ("ACH") to all deposit accounts maintained by Borrower, wherever located. At the request of Lender, Borrower shall complete, execute and deliver to the institution set forth below (with a copy to the Lender) an ACH agreement, voided check, information and/or direction letter reasonably necessary to so instruct Borrower's depository institution. Borrower (i) shall maintain in all respects this ACH arrangement; (ii) shall not change depository institutions without Lender's prior written consent, and if consent is received, shall immediately execute similar ACH instruction(s), and (iii) waive any and all claims for loss or damage arising out of debits or credits to/from the depository institution, whether made properly or in error. Borrower has communicated with and instructed the institution set forth below:

| | |
|---|---|
| Bank Name: | US Bank |
| Address: | 615 6th Street |
| | Clarkston, WA 99403 |
| ABA#: | 125000105 |
| Account # | 1535 9134 9136 |
| Phone: | 208 762 0247 |
| Fax: | _____ |
| Reference: | _____ |
| Contact Person: Marian Pelsma | |

MAXIMUM RATE OF INTEREST: It is intended that the rates of interest herein shall never exceed the maximum rate, if any, which may be legally charged on the Loans evidenced by this Note (the "Maximum Rate"), and if the provisions for interest contained in this Note would result in a rate higher than the Maximum Rate, interest shall nevertheless be limited to the Maximum Rate and any amounts which may be paid toward interest in excess of the Maximum Rate shall be applied to the reduction of principal, or, at the option of Lender, returned to Borrower.

PLACE OF PAYMENT: All payments hereon shall be made, and all notices to the Lender required or authorized hereby shall be given, at the office of Lender at the address designated in the Agreement, or to such other place as Lender may from time to time direct by written notice to Borrower.

APPLICATION OF PAYMENTS: All payments received hereunder shall be applied in accordance with the provisions of the Agreement.

2

{00171623.DOC; 1}

EX 7 PG 134

FOSTER DEC. EX. 1 pg. 141

**PAYMENT AND COLLECTION**: All amounts payable hereunder are payable by check or wire transfer in immediately available funds to the account number specified by Lender, in lawful money of the United States. At Lender's option, Lender may charge the Borrower's account for the interest accrued hereunder. Borrower agrees to perform and comply with each of the covenants, conditions, provisions and agreements contained in every instrument now evidencing or securing the indebtedness evidenced hereby.

**SECURITY**: This Note is issued pursuant to the Agreement and is secured by a pledge of the Collateral as described in the Loan Documents. Borrower hereby acknowledges, admits and agrees that Borrower's obligations under this Note are full recourse obligations of Borrower to which Borrower pledges its full faith and credit.

**DEFAULTS; REMEDIES**: Upon the happening of an Event of Default, the Lender shall have all of the rights and remedies set forth in the Agreement.

The failure to exercise any of the rights and remedies set forth in the Agreement shall not constitute a waiver of the right to exercise the same or any other option at any subsequent time in respect of the same event or any other event. The acceptance by Lender of any payment which is less than payment in full of all amounts due and payable at the time of such payment shall not constitute a waiver of the right to exercise any of the foregoing rights and remedies at that time or at any subsequent time or nullify any prior exercise of any such rights and remedies without the express consent of Lender, except as and to the extent otherwise provided by law.

**WAIVERS**: Borrower waives diligence, presentment, protest and demand and also notice of protest, demand, dishonor and nonpayment of this Note.

**TERMINOLOGY**: Any reference herein to Lender shall be deemed to include and apply to every subsequent holder of this Note.

**AGREEMENT**: Reference is made to the Agreement for provisions as to the Loans, rates of interest, Collateral, acceleration and release matters. If there is any conflict between the terms of this Note and the terms of the Agreement, the terms of the Agreement shall control.

**APPLICABLE LAW**: **THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, THE LAWS OF WHICH BORROWER HEREBY EXPRESSLY ELECTS TO APPLY TO THIS NOTE, WITHOUT GIVING EFFECT TO PROVISIONS FOR CHOICE OF LAW THEREUNDER. BORROWER AGREES THAT ANY ACTION OR PROCEEDING BROUGHT TO ENFORCE OR ARISING OUT OF THIS NOTE SHALL BE COMMENCED IN ACCORDANCE WITH THE PROVISIONS OF THIS NOTE.**

**WAIVER OF JURY TRIAL**. **TO THE EXTENT PERMITTED BY APPLICABLE LAW, BORROWER HEREBY WAIVES ANY AND ALL RIGHTS THAT IT MAY NOW OR HEREAFTER HAVE UNDER THE LAWS OF THE UNITED STATES OF AMERICA OR ANY STATE TO A TRIAL BY JURY OF ANY AND ALL ISSUES**

3

{00171623.DOC; 1}

ARISING EITHER DIRECTLY OR INDIRECTLY IN ANY ACTION OR PROCEEDING BETWEEN BORROWER AND LENDER OR THEIR SUCCESSORS AND ASSIGNS, OUT OF OR IN ANY WAY CONNECTED WITH THIS NOTE, THE OTHER LOAN DOCUMENTS, THE OBLIGATIONS AND/OR THE COLLATERAL. IT IS INTENDED THAT SAID WAIVER SHALL APPLY TO ANY AND ALL DEFENSES, RIGHTS, AND/OR COUNTERCLAIMS IN ANY ACTION OR PROCEEDINGS BETWEEN BORROWER AND LENDER. BORROWER WAIVES ALL RIGHTS TO INTERPOSE ANY CLAIMS, DEDUCTIONS, SETOFFS OR COUNTERCLAIMS OF ANY KIND, NATURE OR DESCRIPTION IN ANY ACTION OR PROCEEDING INSTITUTED BY LENDER WITH RESPECT TO THIS NOTE, THE OTHER LOAN DOCUMENTS, THE OBLIGATIONS, THE COLLATERAL OR ANY MATTER ARISING THEREFROM OR RELATING THERETO, EXCEPT COMPULSORY COUNTERCLAIMS.

CONSENT TO JURISDICTION. BORROWER HEREBY (a) IRREVOCABLY SUBMITS AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF CALIFORNIA, LOS ANGELES COUNTY, WITH RESPECT TO ANY ACTION OR PROCEEDING ARISING OUT OF THIS NOTE, THE OTHER LOAN DOCUMENTS, THE OBLIGATIONS AND/OR THE COLLATERAL OR ANY MATTER ARISING THEREFROM OR RELATING THERETO, AND (b) WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS WITH RESPECT THERETO. IN ANY SUCH ACTION OR PROCEEDING, BORROWER WAIVES PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT OR OTHER PROCESS AND PAPERS THEREIN AND AGREES THAT THE SERVICE THEREOF MAY BE MADE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO BORROWER AT ITS OFFICES SET FORTH IN THE AGREEMENT OR OTHER ADDRESS THEREOF OF WHICH LENDER HAS RECEIVED NOTICE AS PROVIDED IN THE AGREEMENT. NOTWITHSTANDING THE FOREGOING, BORROWER CONSENTS TO THE COMMENCEMENT BY LENDER OF ANY ACTION OR PROCEEDING IN ANY OTHER JURISDICTION TO ENFORCE ITS RIGHTS AND WAIVES ANY OBJECTION WHICH BORROWER MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH ACTION OR PROCEEDING.

ASSIGNMENT: Lender reserves the right to sell, assign, transfer, negotiate, or grant participation interests in all or any part of this Note, or any interest in Lender's rights and benefits hereunder.

LOST NOTE: In the event of the loss, theft, destruction or mutilation of this Note, upon request of Lender and submission of evidence reasonably satisfactory to the Borrower of such loss, theft, destruction or mutilation, and, in the case of any such loss, theft, or destruction, upon delivery of a bond or indemnity reasonably satisfactory to Borrower, or in the case of any such mutilation, upon surrender and cancellation of this Note, Borrower will issue a new Note of like tenor as the lost, stolen, destroyed or mutilated Note.

{00171623.DOC; 1}

4

**EXHIBIT 8**



24955 PCH
Suite A202
Malibu, California
90265

310.593.9073

July 16, 2013

<u>VIA EMAIL AND OVERNIGHT DELIVERY SERVICE</u>

Crop USA Insurance Agency, Inc., and
CropUSA Insurance Services, LLC
111 Main St. Lewiston, ID 83051
Attn: R. John Taylor

AIA Services Corporation and
AIA Insurance, Inc.
111 Main St. Lewiston, ID 83051
Attn: R. John Taylor

R. John Taylor
2020 Broadview Drive
Lewiston, ID 83501

*Re: Notice of Default Under (i) Amended And Restated Loan and Security Agreement by and between GemCap Lending I, LLC, as lender, and Crop USA Insurance Agency, Inc., and CropUSA Insurance Services, LLC, as joint as several borrowers, dated February 4, 2013, (ii) Amended And Restated Loan Agreement Schedule by Crop USA Insurance Agency, Inc. and CropUSA Insurance Services, LLC, and (iii) Third Amended And Restated Secured Revolving Note by Crop USA Insurance Agency, Inc. and CropUSA Insurance Services, LLC, dated February 4, 2013*

Gentlemen:

This letter constitutes a formal notice of default (the "Notice of Default") under and in accordance with the loan documents identified above, and a reservation of the rights of GemCap Lending I, LLC ("GemCap") in connection with the exercise of all rights and remedies GemCap, as lender, maintains under any and all of the Loan Documents. This Notice of Default relates to the breaches and defaults of Crop USA Insurance Agency, Inc. and CropUSA Insurance Services, LLC as joint and several borrowers (collectively "Crop") under: (1) that certain Loan and Security Agreement by and between GemCap and Crop dated November 23, 2011, and as amended and restated by that certain Amended and Restated Loan and Security Agreement dated February 4, 2013 (collectively the "Agreement"); (2) that certain Loan Agreement Schedule, as modified by that certain Amended and Restated Loan Agreement Schedule (the "Schedule"); and (3) that certain Secured Revolving Note dated November 23, 2011, as modified by that certain Amended and

{00189519.DOCX; 1}1

EX 8 PG 137

FOSTER DEC. EX. 1 pg. 145

Restated Revolving Note dated April 1, 2012, as further modified by that
certain Further Amended and Restated Revolving Note dated July 18,
2012, and as finally modified by that certain Third Amended and Restated
Secured Revolving Note dated February 4, 2013 (the "Note" and together
with the Schedule and the Agreement, collectively, the "Loan
Documents"). Crop, as the borrower under the Loan Documents, is
obligated to comply with the terms and conditions prescribed by the Loan
Documents. In addition, AIA Services Corporation, AIA Insurance, Inc., and
R. John Taylor, (collectively, the "Guarantors") each of which have signed
guaranty documents and are the guarantors of the obligations of Crop to
GemCap under the Loan Documents, are liable and obligated to GemCap
for repayment and performance of Crop's obligations to GemCap under
the terms of, and in the time demanded in, the Loan Documents.

GemCap is actively investigating Crop's conduct concerning the
loan, and it has yet to complete that investigation. While GemCap
continues its investigation into the matter, GemCap has discovered facts
plainly demonstrating that Crop is in violation of, and has breached its
obligations under, the Loan Documents and thus is in default. GemCap is
aware of, among other things and without limitation, several events of
default, including the following:

- GemCap discovered several weeks ago that, due to
erroneous information in borrowing certificates that Crop presented to
GemCap, and on the strength of which GemCap funded requested
advances in accordance with the Agreement, GemCap over-advanced
Crop approximately $5,735,126.75. Paragraph 1 (c)(iv) of the Schedule
requires Crop to repay GemCap any over-advanced amounts immediately.
GemCap has repeatedly demanded that this over-advance be immediately
repaid, and in accord with Crop's contractual obligations. Crop has not
denied its obligation to repay these amounts immediately, and has
repeatedly suggested ways in which it could or would raise the funds
necessary to do so. However, Crop has failed to do so, in contravention of
its obligations, and GemCap's rights, under the Loan Documents.

- Crop has failed to make other payments required under the
Loan Documents; and

- GemCap has recently discovered that Crop has extensively
used funds advanced under the Loan Documents for purposes that are not
permitted under Paragraph 1(d) of the Schedule.

- Crop has misrepresented material facts, before, during and
after the consummation of the initial loan, on which GemCap

{00189519.DOCX; 1}2

detrimentally relied in making the loan, and Crop has otherwise engaged in conduct in violation of the Loan Documents.

Since the discovery of the over-advance and the other breaches of the Loan Documents, GemCap and Crop have engaged in ongoing discourse regarding the situation. We have, as noted, consistently demanded throughout these discussions repayment of the over-advance and amelioration of the other breaches. Crop has, in response, (i) acknowledged its repayment obligations to GemCap, (ii) acknowledged that Crop must come into compliance with the Loan Documents as to all breaches, and (iii) repeatedly asked for GemCap's indulgence as Crop attempts to raise the funds necessary to do so. Despite that, the over-advance remains wholly outstanding and the other breaches continue without resolution. Accordingly, GemCap has no alternative but to issue this Notice of Default to Crop and each of the guarantors, which we do by way of this letter.

The information provided above should not be considered, and is not, exhaustive, and GemCap's investigation is ongoing. Additionally, GemCap hereby reserves all its rights in connection with the Loan Agreements, including without limitation its right to accelerate and demand immediate repayment of all outstanding amounts due and owing under the Loan Agreements, GemCap's security interest rights to pledged collateral, and to pursue all rights and remedies against Crop and each of the Guarantors. Nothing in this letter should be considered a waiver of those rights.

We look forward to discussing the situation in person in California on July 19, 2013 with Mr. Taylor and Mr. Gatziolis.

Very truly yours,

GEMCAP LENDING I, LLC

By: _____
Name: Richard Ellis
Title: Co-President

cc: via email   Robert A. Boghosian, Esq. at rboghosian@ctswlaw.com
cc: James Gatziolis, Esq. at james.gatziolis@quarles.com

{00189519.DOCX; 1}3

**EX 8 PG 139**

**FOSTER DEC. EX. 1 pg. 147**

EXHIBIT 9

July 29, 2013



24955 PCH
Suite A202
Malibu, California
90265

310.593.9073

**VIA EMAIL AND OVERNIGHT COURIER – jtaylor@cropusainsurance.com**
Crop USA Insurance Agency, Inc. and
CropUSA Insurance Services, LLC
111 Main Street
Lewiston, ID 83501
Attn: R. John Taylor

Re:  Amended and Restated Loan and Security Agreement dated as of
February 4, 2013 (as may be amended from time to time, the
"Loan Agreement"), between Crop USA Insurance Agency, Inc. and
CropUSA Insurance Services, LLC (jointly and severally the
"Borrower") and GEMCAP LENDING I, LLC (the "Lender")

Dear Mr. Taylor:

This letter is issued in connection with the Loan Agreement referenced
above.  All capitalized terms used herein and not otherwise defined shall
have the meanings set forth in the Loan Agreement.

As you are aware, the Borrower has failed to comply with and is in breach
of certain representations, warranties, covenants and conditions set forth
in the Loan Agreement, including, but not limited to, the following: (i)
Section 2.3; (ii) Section 2.4; (iii) Section 5.4(i); (iv) Section 6.2; (v) Section
8.8; (vi) Section 8.10; (vii) Section 8.17; (viii) Section 8.24; (ix) Section 9.1;
(x) Section 9.4; (xi) Section 9.10; and (xii) Section 10.10.  The foregoing
breaches arise from Borrower's (i) false representations and warranties
and misleading statements inducing the Lender to make Loans, (ii)
creating inaccurate Borrowing Certificates, (iii) failure to direct Collections
to the Collection Account, (iv) use of Loan proceeds in violation of the
Loan Documents, and (v) failure to pay Lender.  In addition, Events of
Default as described in Sections 11.1, 11.3, 11.5, and 11.9 of the Loan
Agreement have occurred (such Events of Default are referred to as the
"Specified Events of Default").

The enumeration of the foregoing Specified Events of Default is not in any
way intended and shall not under any circumstances be construed to be
an exclusive listing of Events of Default that have occurred and remain
currently outstanding and unwaived as of the date hereof.

1

**EX 9 PG 140**

**FOSTER DEC. EX. 1 pg. 149**

This is notice that the Specified Events of Default exist and remain outstanding. Borrower is hereby further notified that Lender has elected to and hereby does exercise certain of Lender's rights and remedies under Section 12.1(a) of the Loan Agreement as follows: (i) accelerate the payment of all Obligations and demand immediate payment thereof to Lender; and (ii) require Borrower, at Borrower's expense, to assemble and make available to Lender all of the Collateral at any place and time designated by Lender.   Demand is hereby made that all outstanding Obligations owed by Borrower to Lender be paid in full to Lender no later than 5:00 p.m. Pacific on July 29, 2013.  As of July 26, 2013, the amount due to Lender is $8,676,288.39 plus interest accruing from and after July 26, 2013 at a per diem rate of $5,784.19, plus fees, costs and expenses (including attorneys' fees), plus any other amounts chargeable under the Loan Documents.

Furthermore, please be advised that, on account of the foregoing Specified Events of Default, effective as of July 16, 2013, interest on the unpaid principal balance of the Loans shall accrue at the Default Interest Rate of twenty-four percent (24%) per annum.

Lender hereby expressly reserves and preserves all other rights and/or remedies available to Lender under the Loan Agreement and the other Loan Documents and otherwise available to Lender at law and in equity as a consequence of the occurrence and continuance of the Specified Events of Default.  Lender may choose to exercise any or all of such rights and remedies at any time in the future, in any order and without first exercising any one or another particular such right or remedy, all its sole, complete and absolute direction without any further written notice to Borrower or any Guarantor (except to the extent any such notice is expressly required under the Loan Agreement), and nothing contained in this letter is in any way intended nor shall under any circumstances be construed to be a waiver of or agreement to be obligated to forbear with respect to any of the Specified Events of Default.

Neither this letter, nor any delay or inaction by Lender in the exercise of such rights and remedies, nor any discussions by Lender with Borrower regarding the status or resolution of the Specified Events of Default shall constitute (i) a modification or an alteration of the terms, conditions or covenants of the Loan Agreement or any of the other Loan Documents, all

2

EX 9 PG 141

FOSTER DEC. EX. 1 pg. 150

of which remain in full force and effect, or (ii) a waiver of or agreement to be obligated to forbear with respect to the Specified Events of Default or a waiver or release of or limitation upon any of the rights and remedies available to Lender under the Loan Agreement and the other Loan Documents or otherwise available to Lender at law or in equity arising and/or exercisable as a result of the occurrence and continuance of the Specified Events of Default, or (iii) any course of conduct or dealing relating to the foregoing.

Very truly yours,

GEMCAP LENDING I, LLC

By: _____

Name: Richard Ellis

Title: Co-President

cc: via e-mail and overnight courier  James Gatziolis, Esq. at Quarles & Brady LLP, 300 North LaSalle Street – Suite 4000, Chicago, IL 60654 and james.gatziolis@quarles.com

via email   Robert A. Boghosian, Esq. at rboghosian@ctswlaw.com

3



24955 PCH
Suite A202
Malibu, California 90265

310.593.9041

July 29, 2013

**VIA EMAIL AND OVERNIGHT COURIER – jtaylor@cropusainsurance.com**

AIA Services Corporation and
AIA Insurance, Inc.
111 Main Street
Lewiston, ID 83501
Attn: R. John Taylor

RE:    Demand for Payment – Amended and Restated Secured Continuing
       Guarantee dated October 5, 2012

Mr. Taylor:

Reference is made to the Amended and Restated Secured Continuing Guarantee dated October 5, 2012 (the "Guarantee") executed and delivered by AIA Services Corporation and AIA Insurance, Inc., as joint and several guarantors (collectively, the "Guarantor"), in favor of GemCap Lending I, LLC (the "Lender"). Capitalized terms used but not defined herein have the meanings given to them in the Guarantee.

Enclosed herewith for your reference is a copy of the letter dated July 29, 2013 (the "Default and Acceleration Letter") from Lender to Crop USA Insurance Agency, Inc., an Idaho corporation, and CropUSA Insurance Services, LLC, an Idaho limited liability company (jointly and severally the "Borrower"), pursuant to the Amended and Restated Loan and Security Agreement, dated as of February 4, 2013, between Lender and Borrower (the "Loan Agreement").

This letter together with the attached Default and Acceleration Letter shall constitute notice under the Guarantee that Guarantor must pay $8,676,288.39, plus interest accruing from and after July 26, 2013 at a per diem rate of $5,784.19, plus fees, costs and expenses (including attorneys' fees), plus any other amounts chargeable under the Loan Documents by the close of business on July 29, 2013.

The foregoing is without prejudice to Lender's rights under the Loan Agreement and the other Loan Documents, including, without limitation, the Guarantee, and applicable law, all of which rights are hereby expressly reserved.

In furtherance and not in limitation of the foregoing, no delay on the part of Lender in exercising any right, remedy, power or privilege under any of the Loan Documents (including, without limitation the Guarantee) or provided by statute or at law or in equity or otherwise against the Borrower or the Guarantor shall impair, prejudice or constitute a waiver of any such right, remedy, power or privilege, or be construed as a waiver of any Event of Default or as an acquiescence therein.

Very truly yours,

GEMCAP LENDING I, LLC

By: _____

Name: Richard Ellis

Title: Co-President

cc: via e-mail and overnight courier    James Gatziolis, Esq. at
Quarles & Brady LLP, 300 North LaSalle Street – Suite 4000, Chicago, IL
60654 and james.gatziolis@quarles.com

via email    Robert A. Boghosian, Esq. at rboghosian@ctswlaw.com

Enclosure

EX 9 PG 144

FOSTER DEC. EX. 1 pg. 153



24955 PCH
Suite A202
Malibu, California 90265

310.593.9041

July 29, 2013

**VIA EMAIL AND OVERNIGHT COURIER – jtaylor@cropusainsurance.com**

R. John Taylor
2020 Broadview Drive
Lewiston, ID 83501

RE:     Demand for Payment – Amended and Restated Secured Continuing
        Guarantee dated February 7, 2013

Mr. Taylor:

Reference is made to the Amended and Restated Secured Continuing Guarantee dated February 7, 2013 (the "Guarantee") executed and delivered by you (the "Guarantor"), in favor of GemCap Lending I, LLC (the "Lender"). Capitalized terms used but not defined herein have the meanings given to them in the Guarantee.

Enclosed herewith for your reference is a copy of the letter dated July 29, 2013, (the "Default and Acceleration Letter") from Lender to Crop USA Insurance Agency, Inc., an Idaho corporation, and CropUSA Insurance Services, LLC, an Idaho limited liability company (jointly and severally the "Borrower"), pursuant to the Amended and Restated Loan and Security Agreement, dated as of February 4, 2013, between Lender and Borrower (the "Loan Agreement").

This letter together with the attached Default and Acceleration Letter shall constitute notice under the Guarantee that Guarantor must pay $8,676,288.39, plus interest accruing from and after July 26, 2013 at a per diem rate of $5,784.19, plus fees, costs and expenses (including attorneys' fees), plus any other amounts chargeable under the Loan Documents by the close of business on July 29, 2013.

The foregoing is without prejudice to Lender's rights under the Loan Agreement and the other Loan Documents, including, without limitation, the Guarantee, and applicable law, all of which rights are hereby expressly reserved.

In furtherance and not in limitation of the foregoing, no delay on the part of Lender in exercising any right, remedy, power or privilege under any of the

EX 9 PG 145

FOSTER DEC. EX. 1 pg. 154

Loan Documents (including, without limitation the Guarantee) or provided by statute or at law or in equity or otherwise against the Borrower or the Guarantor shall impair, prejudice or constitute a waiver of any such right, remedy, power or privilege, or be construed as a waiver of any Event of Default or as an acquiescence therein.

Very truly yours,

GEMCAP LENDING I, LLC

By: _____
Name: Richard Ellis
Title: Co-President

cc: via e-mail and overnight courier     James Gatziolis, Esq. at
     Quarles & Brady LLP, 300 North LaSalle Street – Suite 4000, Chicago, IL
     60654 and james.gatziolis@quarles.com

   via email     Robert A. Boghosian, Esq. at rboghosian@ctswlaw.com

Enclosure

EX 9 PG 146

FOSTER DEC. EX. 1 pg. 155

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge S. James Otero and the assigned discovery Magistrate Judge is Margaret A. Nagle.

The case number on all documents filed with the Court should read as follows:

## CV13- 5504 SJO (MANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| ☑ **Western Division** | ☐ **Southern Division** | ☐ **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)    NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

**FOSTER DEC. EX. 1 pg. 156**

**CIVIL COVER SHEET**

| | |
|---|---|
| **I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )<br>GEMCAP LENDING I, LLC | **DEFENDANTS** ( Check box if you are representing yourself ☐ )<br>CROP USA INSURANCE AGENCY, INC.; CROPUSA INSURANCE SERVICES, LLC; CROP USA, LLC; AIA INSURANCE, INC.; AIA SERVICES CORPORATION; R. JOHN TAYLOR a/k/a RAY JOHNSON TAYLOR a/k/a R. JOHNSON TAYLOR a/k/a RAYMOND J. TAYLOR; REINSURANCE PARTNERS, LLC; GREEN LEAF REINSURANCE PARTNERS, LLC; WESKAN AGENCY, LLC; SOUND INSURANCE AGENCY; PACIFIC EMPIRE RADIO CORPORATION; RANDOLPH LAMBERJACK; JOLEE DUCLOS; BRYAN FREEMAN; LINDA JONES; FRANCIS WILSON; HILLCREST AIRCRAFT COMPANY; CGB DIVERSIFIED SERVICES, INC. dba DIVERSIFIED CROP INSURANCE SERVICES |
| **(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>Todd M. Lander (Bar No. 173031<br>Tracy R. Daub (Bar No. 239013)<br>FREEMAN FREEMAN & SMILEY, LLP<br>1888 Century Park East, Suite 1900, Los Angeles CA 90067<br>(310) 255-6100 | **(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi- District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No ☒ **MONEY DEMANDED IN COMPLAINT: $** t,t12.70

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
(1) Breach of Loan Agreement; (2) Breach of Implied Covenant of Good Faith and Fair Dealing; (3) Fraud; (4) Money Had and Received; (5) Breach of Contract; (6) Fraud; (7) Conversion; (8) Declaratory Relief; (9) Unfair Business Practices

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| | | | | | |

CV13- 5504

**FOSTER DEC. EX. 1 pg. 157**

- [ ] 375 False Claims Act
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce/ICC Rates/Etc.
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced & Corrupt Org.
- [ ] 480 Consumer Credit
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Info. Act
- [ ] 896 Arbitration
- [ ] 899 Admin. Procedures Act/Review of Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loan (Excl. Vet.)
- [ ] 153 Recovery of Overpayment of Vet. Benefits
- [ ] 160 Stockholders' Suits
- [x] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**
**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Fed. Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury-Med Malpratice
- [ ] 365 Personal Injury-Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accomodations
- [ ] 445 American with Disabilities-Employment
- [ ] 446 American with Disabilities-Other
- [ ] 448 Education

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 463 Habeas Corpus-Alien Detainee
- [ ] 465 Other Immigration Actions

**TORTS**
**PRISONER PETITIONS**
**Habeas Corpus:**
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

**Other:**
- [ ] 540 Mandamus/Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Mgmt. Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Ret. Inc. Security Act

- [ ] 830 Patent
- [ ] 840 Trademark

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405 (g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405 (g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS-Third Party 26 USC 7609

FOR OFFICE USE ONLY:  Case Number: _____

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

**FOSTER DEC. EX. 1 pg. 158**

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ NO  ☐ YES

If yes, list case number(s):

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☒ NO  ☐ YES

If yes, list case number(s):

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Nez Perce County, Idaho; Asotin County, Washington; Boone County, Indiana; Morgan County, Illinois |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** Todd M. Lander          DATE: July 30, 2013

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

American LegalNet, Inc.
www.FormsWorkFlow.com

**FOSTER DEC. EX. 1 pg. 159**