Case 2:18-cv-00370-RMP   ECF No. 9-15   filed 09/18/18   PageID.628   Page 1
Case 1:10-cv-00404-DCN-CWD   Document 44-19   Filed 09/17/18   Page 1 of 52
of 52

**EXHIBIT 14**

**TO**

**DECLARATION OF ALYSON A. FOSTER**

FILED

2014 JUL 21 AM 10 23

PATTY O. WEEKS
CLERK OF THE DIST. COURT
KATHY ROGERS
DEPUTY

RODERICK C. BOND, ISB No. 8082
RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiffs

## IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

| | |
|---|---|
| PAUL D. DURANT, an individual; DALE L. MIESEN, an individual; DONNA J. TAYLOR, an individual;<br><br>              Plaintiffs,<br><br>v.<br><br>GEMCAP LENDING I, LLC, a Delaware limited liability company; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC., an Idaho corporation and a 100% wholly owned subsidiary of AIA Services Corporation;<br><br>              Defendants. | Case No.: **CV14-01444**<br><br>**VERIFIED COMPLAINT FOR DECLARATORY RELIEF AND INJUNCTIVE RELIEF**<br><br>Category: A<br>Fee: $221.00 |

Plaintiffs Paul D. Durant, Dale L. Miesen, and Donna J. Taylor (collectively or in the alternative individually "Plaintiffs") submit this Complaint, pursuant to **I.C. § 10-1200**, *et seq.* and other applicable law, alleging as follows and, to the extent necessary, in the alternative as follows:

### I. PARTIES, JURISDICTION AND VENUE

1. Plaintiff Paul D. Durant ("Durant") is a resident of Lewiston, Nez Perce County, Idaho.

2. Plaintiff Dale L. Miesen ("Miesen") is a resident of Colleyville, Texas.

VERIFIED COMPLAINT - 1


Case Assigned to:
JEFF M. BRUDIE

3.      Plaintiff Donna J. Taylor ("Donna Taylor") is a resident of Clarkston, Washington.

4.      Defendant Gemcap Lending I, LLC ("Gemcap") is a Delaware limited liability company and it conducts business throughout the United States, including in Nez Perce County, Idaho with CropUSA Insurance Agency, Inc. and CropUSA Insurance Services, LLC, an Idaho corporation and Idaho limited liability company, respectively, both of which have principal places of business in Lewiston, Nez Perce County, Idaho.

5.      Defendant AIA Services Corporation ("AIA Services") is an Idaho corporation with its principal place of business located in Lewiston, Nez Perce County, Idaho.

6.      Defendant AIA Insurance ("AIA Insurance") is an Idaho corporation with its principal place of business located in Lewiston, Nez Perce County, Idaho. During all relevant times, AIA Insurance is a 100% wholly owned subsidiary of AIA Services.

7.      Defendants AIA Services and AIA Insurance own real property in Lewiston, Idaho. The ownership of AIA Services and AIA Insurance's real property is at issue by and through their purported grant of security interests in all of their assets to Gemcap and/or by and through Gemcap's attempt to collect over the over $8.7 million, plus accrued interest, owed by CropUSA Insurance Agency, Inc. and CropUSA Insurance Services, LLC from AIA Services and AIA Insurance through their purported Guarantee of that indebtedness.

8.      Jurisdiction and venue are appropriate in Nez Perce County District Court. *See e.g.,* I.C. § 5-401; I.C. § 5-404; I.C. § 5-514.

## II.  FACTUAL BACKGROUND

9.      Plaintiff Durant owns 7,360.50 common shares in AIA Services and he has held these shares for over 10 years.

10.     Plaintiff Miesen owns at least 45,000 common shares in AIA Services and he has

VERIFIED COMPLAINT - 2

**FOSTER DEC. EX. 14 pg. 2**

held these shares for over 10 years.

11.    Plaintiff Donna Taylor owns 41,651.25 Series A Preferred Shares in defendant AIA Services (as confirmed by Judge Brudie in a recent partial summary judgment decision), with a principal value of $416,512, plus accrued interest since December 3, 2003. Donna Taylor has held these 41,651.25 Series A Preferred Shares since the shares were issued to her in or about late 1987.

12.    On or about November 23, 2011, Gemcap entered into a Loan and Security Agreement with CropUSA Insurance Agency, Inc. and CropUSA Insurance Services, LLC (collectively "CropUSA"), neither of which were a wholly owned subsidiaries of AIA Services or AIA Insurance from 2011 through the present time, which such Loan and Security Agreement was subsequently amended on April 1, 2012, July 18, 2012, and February 4, 2013 (the original loan and all subsequent amendments are collectively referred to as the "Loan").

13.    On October 1, 2012, Gemcap entered into a "Security Agreement – Guarantee" with AIA Services and AIA Insurance ("Guarantee"). A true and correct copy of the Guarantee is attached as *Exhibit A* and incorporated by reference in this complaint. When Gemcap entered into the Guaranty, it was aware that the Guarantee did not and could not provide any benefit to AIA Services or AIA Insurance. AIA Services and AIA Insurance received no consideration for entry into the Guaranty and most of the Loan's indebtedness was already owed as of October 1, 2012.

14.    The Guarantee was signed by R. John Taylor, as the purported President of AIA Services and the purported President of AIA Insurance. Gemcap was aware, or should have been aware with the exercise of reasonable diligence, that R. John Taylor has no authority to execute the Guarantee on behalf of AIA Services or AIA Insurance.

15.    On December 20, 2012, Gemcap filed a UCC financing statement with the Idaho Secretary of State stating that AIA Services and AIA Insurance had pledged "All of each of

VERIFIED COMPLAINT - 3

Debtor's right, title and interest, whether now existing or hereafter acquired, in and to all assets of such Debtor, wherever located, whether tangible or intangible, and the proceeds and products thereof" ("Financing Statement").

16.     Under the terms of the Loan, CropUSA could borrow up to $10,000,000 and the borrowed funds must be used solely for CropUSA.  Upon information and belief, CropUSA owed Gemcap $8,676,288.39, plus interest, attorneys' fees and costs, as of July 26, 2013.

17.     Under the terms of the Loan, interest accrued at 18.5% per annum and 24% upon a default. Upon information and belief, Gemcap provided CropUSA and other parties a notice of default through a notice dated July 16, 2013. Upon information and belief, Gemcap provided a purported notice of default and demand for payment to AIA Services and AIA Insurance of the $8,676,288.39 owed by CropUSA through a notice dated July 29, 2013.

18.     Upon information and belief, the Loan has a present balance due of over $10,300,000, plus attorneys' fees and costs and Gemcap filed suit in California federal court with no prospects that CropUSA will ever be able to pay the entire indebtedness.

19.     Upon information and belief, prior to entering into the Loan with CropUSA, Gemcap conducted a litigation report on R. John Taylor and others. Gemcap and its counsel knew, or with reasonable diligence should have known, that the rightful owners of at least part of CropUSA Insurance Agency Inc.'s assets were in dispute, as confirmed by the derivative action filed against CropUSA Insurance Agency Inc. in 2010 and now pending in the United States District Court in Idaho (a lawsuit in which R. John Taylor is also a named defendant).

20.     From December 29, 1987 through the present time, AIA Services' amended articles of incorporation provided that AIA Services was barred from guaranteeing any loans for any entity that was not a wholly owned subsidiary of AIA Services.

VERIFIED COMPLAINT - 4

**FOSTER DEC. EX. 14 pg. 4**

21.     Under Idaho law, "All corporate powers shall be exercised by or under the authority

of...its board of directors, subject to any limitation set forth in the articles of incorporation." **I.C.**

**§ 30-1-801(2).** Under Idaho law, "The articles of incorporation may set forth...Provisions not

inconsistent with the law regarding...Managing the business and regulating the affairs of the

corporation, Defining, *limiting and regulating the powers of the corporation, its board of*

*directors, and shareholders...*" **I.C. § 30-1-202(2)(b)(ii)-(iii)** (emphasis added). Under Idaho law,

"Every corporation incorporated under this chapter has the purpose of engaging in any lawful

business *unless a more limited purpose is set forth in the articles of incorporation.*" **I.C. § 30-1-**

**301(1)** (emphasis added). Under Idaho law, "*Unless its articles of incorporation provide*

*otherwise*, every corporation...has the same powers as an individual to do all things necessary...to

make contracts and guarantees..." **I.C. § 30-1-302(7)** (emphasis added).

22.     When Gemcap entered into the Guarantee with AIA Services and AIA Insurance,

it knew, or should have known, that AIA Services' amended articles of incorporation filed on May

8, 1996, which are attached as *Exhibit B* and incorporated by reference into this complaint,

provided that neither AIA Services nor its wholly owned subsidiary AIA Insurance could

Guarantee the Loan for CropUSA (neither CropUSA Insurance Agency, Inc. nor CropUSA

Insurance Services, LLC was a wholly owned subsidiary at the time of the Guarantee):

> [AIA Services] will not, and will not permit any of its Subsidiaries to, directly or
> indirectly, create, incur, assume, guaranty or otherwise become or remain directly
> liable with respect to, any Indebtedness.

(Exhibit B, p. 4, § 4.2.9(c).) The Guarantee separately violated the "Transactions with

Shareholders and Affiliates" covenant of AIA Services' amended articles of incorporation because

the Guarantee because no reasonable director or officer would have authorized the entry into the

Guarantee. AIA Services and AIA Insurance's Guarantee violates and is barred by AIA Services'

VERIFIED COMPLAINT - 5

amended articles of incorporation and thus violated Idaho law, including **I.C. § 30-1-801(2); I.C. § 30-1-202(2)(b)(ii)-(iii); I.C. § 30-1-302(7)**. "An illegal contract is one that rests on illegal consideration consisting of any act or forbearance which is contrary to law or public policy." *Farrell v. Whiteman*, 146 Idaho 604, 609, 200 P.3d 1153, 1158 (2008). As a result, the Guarantee is illegal as a matter of law, as is any document, instrument or agreement executed in furtherance of that illegal Guarantee.

23.     From the time that R. John Taylor executed the Guarantee on October 1, 2012 through the present time, he, Connie Taylor Henderson and James Beck were the purported directors of AIA Services and AIA Insurance (collectively "Boards of Directors"). The Boards of Directors knew that AIA Services and AIA Insurance were barred from entering into the Guarantee and pledging any security or property to Gemcap to secure CropUSA's obligations under the Loan. The Boards of Directors had no authority to authorize R. John Taylor to enter into the Guarantee on behalf of AIA Services or AIA Insurance. Despite demands upon the Boards of Directors to take action against Gemcap to invalidate the Guarantee, they have refused to do so, which further supports the Boards of Directors untenable positions.

24.     Gemcap was aware, or should have been aware upon the exercise of reasonable due diligence, that AIA Services and AIA Insurance could not lawfully enter into the Guarantee. Gemcap did not accept the Guarantee in good faith and it is not entitled to assert any defenses which may normally be available to a good faith lender.

25.     Plaintiffs did not consent to AIA Services and AIA Insurance entering into the Guarantee or the pledge of assets and granting of security interests to Gemcap under the Guarantee nor did they consent to the Loan. The Guarantee was not entered into for normal business purposes.

26.     No authorization was sought or obtained from AIA Services common or preferred

VERIFIED COMPLAINT - 6

shareholders for the Guarantee. Upon information and belief, no authorization was sought or obtained from AIA Insurance's sole shareholder, AIA Services, nor could such authorization have been obtained because AIA Services was barred from doing so.

27.     Under the law, the "directors of a corporation may bind a corporation only when they act at a legal meeting of the board" and a "meeting held without notice to some or any of the directors and in their absence is illegal, and action taken at such a meeting, although by a majority of the directors, is invalid." *Stone v. American Lacquer Solvents Co.*, 345 A.2d 174, 176-77 (Pa. 1975); *Marine Services Unlimited, Inc. v. Rakes*, 918 S.W.2d 132, 134 (Ark. 1996); 14B AM. JUR. 2D CORPORATIONS § 1258; 18B AM. JUR. 2D CORPORATIONS § 1264.

28.     Under AIA Services' amended articles of incorporation, plaintiff Donna Taylor had the sole right to designate one person to the board of directors of AIA Services. Gemcap knew, or should have known, that plaintiff Donna Taylor's designee was required to be a member of the board of directors of AIA Services and that her right was not being honored as reflected by the annual reports filed with the Idaho Secretary of State and the various lawsuits pending in federal and state court in Idaho. Neither Plaintiff Donna Taylor, nor her recent designee to AIA Services' board of directors, plaintiff Durant, has received any notices of any board meetings to authorize the Guarantee or the Loan, any document or instrument pertaining to the Guarantee or the Loan, or any of the security interests or property pledged under the Guarantee.

29.     Upon information and belief, Gemcap, AIA Services and AIA Insurance knew, or should have known with the exercise of reasonable due diligence, that no resolution was obtained from the Boards of Directors of AIA Services or AIA Insurance to authorize the Guarantee nor could such authorization be obtained, including, without limitation, because the Guarantee did not and could not be reasonably be believed to benefit AIA Services and AIA Insurance.

VERIFIED COMPLAINT - 7

30.     Even if authorized by the law and organizational documents, the Guarantee could not be approved by the Boards of Directors because they all had irreconcilable conflicts of interest by way of their ownership in CropUSA and other entities unlawfully derived from AIA Services and AIA Insurance and by having participated or acquiesced in unlawful acts and malfeasance.

31.     Gemcap, AIA Services and AIA Insurance knew, or should have known with the exercise of reasonable due diligence, that the Guarantee separately violated AIA Services' Restated Bylaws, including, Section 4.14, Director Conflicts of Interest, Section 6.2, Loans, and Section 14.1, Certain Corporate Loans and Guarantees.

32.     Gemcap, AIA Services and AIA Insurance knew, or should have known with the exercise of reasonable due diligence, that the Guarantee separately violated AIA Insurance's Bylaws, including Section 4.14, Director Conflicts of Interest, Section 6.2, Loans, and Section 14.1, Certain Corporate Loans and Guarantees.

33.     Despite numerous demands by the Plaintiffs and their counsel over ninety days ago, Gemcap has refused to release AIA Services and AIA Insurance from the Guarantee and AIA Services and AIA Insurance have failed to take any action to comply with their amended articles of incorporation and to have the Guarantee declared illegal, void and unenforceable.

34.     If AIA Services and/or AIA Insurance is obligated under the Guarantee, AIA Services and/or AIA Insurance will be irreparably harmed because neither corporation has the funds or assets to satisfy the over $8.7 million, plus accrued interest, owed to Gemcap. If AIA Services and/or AIA Insurance is obligated under the Guarantee, AIA Services and/or AIA Insurance would both likely be forced into bankruptcy protection. The payment of any sums, or the transfer of any real or personal property, by AIA Services or AIA Insurance under the Guarantee would cause them irreparable harm because their respective businesses generate little

VERIFIED COMPLAINT - 8

**FOSTER DEC. EX. 14 pg. 8**

revenues and such revenues continue to decline. The enforcement of the Guarantee will separately
irreparably impact the value of the Plaintiffs' common and preferred shares in AIA Services and
their rights to share equally or preferentially in the assets of AIA Services and its subsidiary.

## III. FIRST CAUSE OF ACTION – DECLARATORY JUDGMENT AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

35.     Plaintiffs re-allege and incorporate each and every allegation contained in other
paragraphs of this Complaint necessary to support this cause of action.

36.     The Guarantee, together with any related agreements and instruments pertaining to
AIA Services and AIA Insurance, violates AIA Services and AIA Insurance's amended articles of
incorporation, bylaws and/or the law, and are thus unlawful, illegal, void and/or unenforceable.

37.     Plaintiffs request a declaratory judgment that: (i) the Guarantee (Exhibit A),
together with any subsequent modifications, instruments, deeds of trust, and agreements relating
thereto, are unlawful, illegal, void and unenforceable; (ii) the Financing Statement, together with
any amendments or subsequent financing statements, filed with the Idaho Secretary of State and
any other state are unlawful, illegal, void and unenforceable; (iii) any security interests, deeds of
trust, mortgages and any other instrument or right granted by AIA Services and AIA Insurance in
favor of Gemcap are unlawful, illegal, void and unenforceable; (iv) any real property, property or
funds paid to Gemcap, directly or indirectly, through funds or assets derived from AIA Services
and AIA Insurance must be returned to AIA Services and AIA Insurance by and through depositing
those funds, deeds and/or instruments with this Court; (v) any forbearance agreements and/or
settlement agreements pertaining to Gemcap and AIA Services and/or AIA Insurance are unlawful,
illegal, void and unenforceable; (vi) Gemcap is barred from seeking, through a court of law or any
other means, recovery and/or payment of any money, assets, property and/or real property directly
or indirectly from AIA Services and AIA Insurance on the Guarantee and any related agreements

VERIFIED COMPLAINT - 9

or instruments; (vii) AIA Services and AIA Insurance must expressly comply with all terms, conditions and restrictions under their respective amended articles of incorporation, bylaws and Idaho Code (including the Idaho Business Corporation Act); and (viii) such other declaratory relief reasonably contemplated by this complaint and/or as Plaintiffs may request at or before trial.

38.     Plaintiffs further request a temporary restraining order, preliminary injunction, and permanent injunction against Gemcap, AIA Services and/or AIA Insurance for any one or more of the declaratory relief items listed above or any part of them, for any such relief reasonably contemplated by this complaint and/or any such relief as may be requested at or before trial.

## IV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.     For a declaratory judgment against Gemcap, AIA Services and AIA Insurance for the declaratory relief requested above and any further declaratory relief requested at or before trial;

2.     For a temporary restraining order, preliminary injunction and permanent injunction consistent with the relief requested above and any further temporary restraining order, preliminary injunction and/or permanent injunction as may be requested before or at trial;

3.     For an award of attorneys' fees and costs incurred in this action pursuant to Idaho Law, including, without limitation, I.C. § 12-120(3) and I.C. § 12-121; and

4.     For such other relief that the Plaintiffs may request at or before trial and/or such relief as the Court deems just and equitable.

DATED this 21ˢᵗ day of July, 2014.

RODERICK BOND LAW OFFICE, PLLC

By:_____
Roderick C. Bond
Attorney for Plaintiffs

VERIFIED COMPLAINT - 10

## VERIFICATION

STATE OF IDAHO )
) ss.
COUNTY OF NEZ PERCE )

I, Paul D. Durant, being first duly sworn on oath, deposes and says:

I am one of the Plaintiffs in the above-entitled action. I have read the contents of this Complaint, know the contents of this Complaint and exhibits attached thereto, and believe that the facts in set forth in this Complaint and exhibits attached thereto are true and accurate to the best of my knowledge and belief.

Paul D. Durant

SUBSCRIBED AND SWORN to before me this 21st day of July, 2014.

Notary Public for Idaho
Residing at: _Culdesac, Idaho_
My commission expires: _7/11/19_

VERIFIED COMPLAINT - 11

## VERIFICATION

STATE OF TEXAS          )
                                  ) ss.

COUNTY OF TARRANT      )

I, Dale L. Miesen, being first duly sworn on oath, deposes and says:

I am one of the Plaintiffs in the above-entitled action. I have read the contents of this Complaint, know the contents of this Complaint and exhibits attached thereto, and believe that the facts in set forth in this Complaint and exhibits attached thereto are true and accurate to the best of my knowledge and belief.

_____
Dale L. Miesen

SUBSCRIBED AND SWORN to before me this 21st day of July, 2014.

Teri C. Hyman
Commission Expires
09-08-15

_____
Notary Public for Texas
Residing at: Hurst, Texas
My commission expires: 9-8-15

VERIFIED COMPLAINT - 12

## VERIFICATION

STATE OF IDAHO          )
                        ) ss.
COUNTY OF NEZ PERCE     )

I, Donna J. Taylor, being first duly sworn on oath, deposes and says:

I am one of the Plaintiffs in the above-entitled action. I have read the contents of this Complaint, know the contents of this Complaint and exhibits attached thereto, and believe that the facts in set forth in this Complaint and exhibits attached thereto are true and accurate to the best of my knowledge and belief.

_Donna J. Taylor_
Donna J. Taylor

SUBSCRIBED AND SWORN to before me this 21st day of July, 2014.

_Debbie Hoisington_
Notary Public for Idaho
Residing at: _Culdesac, Idaho_
My commission expires: _7/11/19_

VERIFIED COMPLAINT - 13

## SECURITY AGREEMENT - GUARANTEE

THIS SECURITY AGREEMENT - GUARANTEE (this "Security Agreement"), made and entered into as of the 1st day of October, 2012 by each of AIA SERVICES CORPORATION, an Idaho corporation having a principal place of business at 111 Main St. Lewiston, Idaho 83501 and AIA INSURANCE, INC., an Idaho corporation having a principal place of business at 111 Main St. Lewiston, Idaho 83501 (each, individually, and collectively, "Debtor"), on a joint and several basis, and GEMCAP LENDING I, LLC, a Delaware limited liability company (the "Secured Party"), having its principal place of business at 24955 Pacific Coast Highway, Suite A202, Malibu, CA 90265.

### WITNESSETH:

WHEREAS, the Secured Party has entered into a certain Loan and Security Agreement, dated November 23, 2011 (as amended through the date hereof, the "Loan Agreement") with CROP USA INSURANCE AGENCY, INC. and CROPUSA INSURANCE SERVICES, LLC, jointly and severally (together, "Borrowers"), pursuant to which the Secured Party has made a loan and extend other financial accommodations to or for the benefit of Borrowers under and subject to the terms of the Loan Agreement;

WHEREAS, an Event of Default has occurred under the Loan Agreement, as set forth in Amendment No. 3 and Forbearance, dated October 1, 2012 ("Amendment No. 3") to the Loan Agreement, and as an inducement to the Secured Party to enter into Amendment No. 3 and forbear from exercising Secured Party's rights and remedies with respect to such Event of Default and as a condition thereto, the Debtor has agreed to execute an Amended and Restated Secured Continuing Guarantee, of even date herewith (the "Secured Guarantee"), for the benefit of Secured Party, pursuant to which Debtor, jointly and severally, guarantees the obligations of Borrowers to Secured Party;

WHEREAS, pursuant to the Secured Guarantee, the Debtor has agreed to enter into this Security Agreement to grant the Secured Party the security interests contemplated in this Security Agreement as security for the prompt and full payment and performance of the indebtedness and obligations of the Debtor under the Secured Guarantee, and such other indebtedness and obligations as more fully set forth herein; and

WHEREAS, the Secured Party is not willing to enter into Amendment No. 3 unless and until the Debtor enters into this Security Agreement upon the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, and intending to be legally bound hereby, the Debtor and the Secured Party hereby covenant and agree as follows:

{00159562.DOC; 3}

- 1 -

## ARTICLE I

## DEFINITIONS

Section 1.01  Definitions.  Unless otherwise defined herein, terms defined in the Loan Agreement are used herein as therein defined, and the following terms shall have the following meanings (such meanings being equally applicable to both the singular and plural forms of the terms defined):

"Accounts" shall mean any "account," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all accounts receivable, book debts and other forms of payment obligations (other than forms of obligations evidenced by Chattel Paper, Documents or Instruments) now owned or hereafter received or acquired by or belonging or owing to the Debtor (whether held in the name of the Debtor or any division thereof or in any applicable trade name or trade style) whether arising out of property that has been or is to be sold, leased, licensed, assigned or otherwise disposed of, or out of services rendered or to be rendered by the Debtor or from any other transaction, whether or not the same involves the sale of goods or services by the Debtor (including, without limitation, any such obligation that might be characterized as an account or contract right under the UCC), and all of the Debtor's rights in, to and under all purchase orders or receipts now owned or hereafter acquired by it for goods or services sold or rendered by the Debtor (or by any Person from whom the Debtor acquired such rights), and all of the Debtor's rights to any goods represented by any of the foregoing (including, without limitation, unpaid seller's rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods) and choses in action and causes of action (whether arising in contract, tort or otherwise and whether or not currently in litigation) and all other debts, obligations and liabilities in whatever form owing to the Debtor, documents of title, warehouse receipts, leases, investment accounts, deposit accounts, Cash, contract rights, insurance policies, dividends, distributions, judgments, covenants, licenses, franchises, warranties, indemnities, partnership and joint venture interests, and other rights, including all rights to the payment of monies due or to become due to the Debtor, under all contracts for the sale, lease, license or assignment of goods or the performance of services or both by the Debtor (whether or not yet earned by performance on the part of the Debtor or in connection with any other transaction), now in existence or hereafter occurring, including, without limitation, the right to receive the proceeds of said purchase orders and contracts, and all collateral security and guarantees of any kind given by any Person with respect to any of the foregoing.

"Cash" shall mean cash or cash equivalents now owned or hereafter acquired by the Debtor.

"Chattel Paper" shall mean any "chattel paper," "Tangible Chattel Paper" and "Electronic Chattel Paper," as such terms are defined in the UCC, now owned or hereafter acquired by the Debtor, or in which the Debtor now has or hereafter acquires any rights.

Exhibit - A
FOSTER DEC. EX. 14 pg. 15

"**Commercial Tort Claims**" shall mean any "commercial tort claim," as such term is defined in the UCC, now owned or hereafter acquired by Debtor, or in which the Debtor now has or hereafter acquires any rights.

"**Contracts**" shall mean all contracts, undertakings, or other agreements (other than rights evidenced by Chattel Paper, Documents or Instruments) in or under which the Debtor may now or hereafter have any right, title or interest, including, without limitation, with respect to an Account and any agreement relating to the terms of payment or the terms of performance of such Account.

"**Copyrights**" shall mean all of the following now or hereafter acquired by the Debtor: (i) all copyrights, registrations and applications therefor; (ii) all renewals and extensions thereof; (iii) all income, royalties, damages and payments now and hereafter due or payable or both with respect thereto, including, without limitation, damages and payments for past or future infringements or misappropriations thereof; (iv) all rights to sue for past, present and future infringements or misappropriations thereof; and (v) all other rights corresponding thereto throughout the world.

"**Deposit Accounts**" shall mean any "deposit account," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor, or in which the Debtor now has or hereafter acquires any rights.

"**Documents**" shall mean any "documents," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor or in which the Debtor now has or hereafter acquires any rights.

"**Equipment**" shall mean any "equipment," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all machinery, equipment, furnishings, fixtures, vehicles and computers and other electronic data processing and other office equipment now owned or hereafter acquired by the Debtor and any and all additions, substitutions and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

"**Fixtures**" shall mean any "fixtures," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor.

"**General Intangibles**" shall mean any "general intangibles," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all right, title and interest that the Debtor may now or hereafter have in or under any Contract, in or to any partnerships, joint ventures and similar entities and rights to distribution of income therefrom, all tax refunds, tax refund claims, customer lists, Payment Intangibles, Copyrights, Trademarks, Trademark licenses, Patents, Patent licenses, rights in intellectual property, permits, Trade Secrets, proprietary or confidential information, inventions (whether patented or patentable or not) and technical information, procedures, designs, knowledge, know-how, software, computer programs, computer records and discs, computer

**Exhibit - A**
**FOSTER DEC. EX. 14 pg. 16**

data, databases, data, skill, expertise, experience, processes, models, drawings, materials and records, now owned or hereafter acquired by the Debtor, and the goodwill and rights of indemnification related thereto and associated therewith.

"Goods" shall mean any "goods," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor, wherever located. .

"Instruments" shall mean any "instrument," as such term is defined the UCC, now owned or hereafter acquired by the Debtor, or in which the Debtor now has or hereafter acquires any rights, including promissory notes, but not including instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"Inventory" shall mean any "inventory," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all inventory, merchandise, goods and other personal property now owned or hereafter acquired by the Debtor that are held for sale or lease, or are furnished or are to be furnished under a contract of service, or that constitute raw materials, work in process or materials used or consumed or to be used or consumed in the Debtor's business, or the processing, packaging, delivery or shipping of the same, and all finished goods.

"Investment Property" shall mean any "investment property," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all securities, securities accounts and security entitlements.

"Letter of Credit Rights" shall mean any "letter of credit right," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor, or in which the Debtor now has or hereafter acquires any rights.

"Lien" means any mortgage, deed of trust, pledge, lien, security interest, charge or other encumbrance or security arrangement of any nature, including, but not limited to, any conditional sale or title retention arrangement, and any assignment, deposit arrangement or lease intended as, or having the effect of, security.

"Patents" shall mean all of the following now or hereafter owned by the Debtor, if any: (i) all patents and patent applications; (ii) all inventions and improvements described and claimed therein; (iii) all reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof; (iv) all income, royalties, damages and payments now and hereafter due and/or payable to the Debtor with respect thereto, including, without limitation, damages and payments for past or future infringements or misappropriations thereof; (v) all rights to sue for past, present and future infringements or misappropriations thereof; and (vi) all other rights corresponding thereto throughout the world.

"Payment Intangible" means any "payment intangible," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor, or in which the Debtor now has or hereafter acquires any rights.

{00159562.DOC; 3}                                    - 4 -

"**Permitted Liens**" shall mean: (i) Liens in favor of the Secured Party; (ii) Liens arising from taxes, assessments, charges, levies or claims that are not yet due or that remain payable without penalty or to the extent permitted to remain unpaid under the Security Agreement; (iii) deposits or pledges to secure workmen's compensation, unemployment insurance, old age benefits or other social security obligations, or in connection with or to secure the performance of bids, tenders, trade contracts or leases, or to secure statutory obligations, or stay, surety or appeal bonds, or other pledges or deposits of like nature and all in the ordinary course of business; (iv) mechanics', carriers', workmen's, repairmen's or similar liens arising in the ordinary course of business in respect of obligations which are not overdue, or deposits made to obtain the release of such mechanics', carriers', workmen's, repairmen's or similar liens which are being contested in good faith by appropriate proceedings and with respect to which the Debtor has created reserves which are determined to be adequate by the application of GAAP consistently applied, and (v) liens in favor of third parties in effect on the date hereof.

"**Person**" shall mean any individual, corporation, joint venture, general or limited partnership, limited liability company, trust, association, unincorporated organization or other business entity.

"**Proceeds**" shall mean "proceeds," as such term is defined in the UCC and, in any event, shall include, without limitation, (i) any and all proceeds of any insurance, indemnity or warranty payable to the Debtor from time to time with respect to any of the Collateral; (ii) any and all payments (in any form whatsoever) made or due and payable to the Debtor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental body, authority, bureau or agency (or any person acting under color of governmental authority); (iii) any claim of the Debtor against third parties (A) for past, present or future infringement of any Patent or Patent license, or (B) for past, present or future infringement or dilution of any Trademark or Trademark license or for injury to the goodwill associated with any Trademark, Trademark registration or Trademark licensed under any Trademark license; and (iv) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"**Promissory Notes**" shall mean any "promissory notes," as such term is defined in the UCC.

"**Secured Obligations**" shall mean all indebtedness and obligations of the Debtor to the Secured Party under the Secured Guarantee and hereunder, now existing or hereafter incurred, and the payment of amounts that would become due from the Debtor to the Secured Party but for the operation of the automatic stay provisions of Section 362 of the Bankruptcy Code, 11 U.S.C. § 362.

"**Securities**" shall mean any "securities," as such term is defined in the UCC (whether certificated or uncertificated).

"**Software**" shall mean any "software," as such term is defined in the UCC.

**Exhibit - A**
**FOSTER DEC. EX. 14 pg. 18**

Exh. 7, Page 121

"Supporting Obligation" means any "supporting obligation," as such term is defined in the UCC.

"Trademarks" shall mean all of the following, now owned or hereafter acquired by the Debtor: (i) all trademarks (including service marks and trade names, whether registered or at common law), registrations and applications therefor, and the entire product lines and goodwill of the Debtor's business connected therewith and symbolized thereby; (ii) all renewals thereof, (iii) all income, royalties, damages and payments now and hereafter due or payable or both with respect thereto, including, without limitation, damages and payments for past or future infringements or misappropriations thereof; (iv) all rights to sue for past, present and future infringements or misappropriations thereof; and (v) all other rights corresponding thereto throughout the world.

"Trade Secrets" shall mean all of the following, now owned or hereafter acquired by the Debtor: (i) trade secrets; (ii) income, royalties, damages and payments now and hereafter due and/or payable to the Debtor with respect to trade secrets, including, without limitation, damages and payments for past or future infringements or misappropriations thereof; (iii) rights to sue for past, present and future infringements or misappropriations of trade secrets; and (iv) all other rights corresponding to trade secrets throughout the world.

"State" shall mean the State of California.

"UCC" shall mean the Uniform Commercial Code presently enacted in the State, *provided, however*, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of the Secured Party's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

## ARTICLE II

### SECURITY INTEREST

Section 2.01   Grant of Security Interest.

(a)   As security for the prompt and full payment and performance of the Secured Obligations, the Debtor hereby assigns and pledges, and hereby creates and grants, to the Secured Party a continuing lien on and security interest in and to all property and assets now owned or hereafter arising or acquired by the Debtor, wheresoever located, and all right, title and interest of the Debtor therein (collectively, the "Collateral"), including, without limitation, the following:

{00159562.DOC; 3}                                  - 6 -

Case 2:18-cv-00074-RMG-MGB Document 44 Filed 09/18/18 Page 2 of 21
Case 2:18-cv-00074-RMGN-CWD Document 45 Filed 09/18/18 PageID #648 21 of 52
Case 2:13-cv-05504-SJO-MAN   Document 102-2   Filed 10/31/13   Page 27 of 88   Page ID #:1320

    (i)     All Accounts, Chattel Paper (including Tangible Chattel Paper and Electronic Chattel Paper), Documents, Instruments, Promissory Notes, Commercial Tort Claims and Contracts;

    (ii)    All Inventory;

    (iii)    All Equipment and all Fixtures;

    (iv)    All General Intangibles (including Payment Intangibles), Software, Trademarks, Patents, Copyrights and Trade Secrets;

    (v)    All Cash, Deposit Accounts, Letter of Credit Rights, Supporting Obligations, Securities and Investment Property;

    (vi)    All other Goods and personal property of the Debtor, whether tangible or intangible, now owned or hereafter acquired by the Debtor, wheresoever located; and

    (vii)    All Proceeds and products relating to each of the foregoing.

    (b)    The Collateral includes all of the items described above in paragraph (a), whether now owned or hereafter at any time arising or acquired by the Debtor and wherever located, and includes all replacements, additions, accessions, substitutions, repairs, guaranties and securities therefor, Proceeds and products relating thereto or therefrom, and all documents, records (including, but not limited to, manual records, computer runs, print-outs, tapes, disks, software, programs, source codes and other computer prepared information and equipment of any kind), ledger sheets and files of the Debtor relating thereto. Proceeds hereunder include any insurance now or hereafter payable by reason of loss or damage to any item of Collateral or any proceeds thereof, and all unearned refund premiums and dividends which may become payable under such policies of insurance and loss payments under such policies, which shall reduce the unearned premiums.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

    **Section 3.01   Debtor's Representations.**   The Debtor represents and warrants to the Secured Party as follows:

    (a)    The Debtor is (or to the extent that this Security Agreement states that the Collateral is to be acquired after the date hereof, will be) the sole owner of its Collateral, and the liens and security interests granted hereby to the Secured Party in the Collateral which can be perfected by the filing of UCC financing statements will be perfected liens and security interests upon the filing of such financing statements;

**Exhibit - A**
**FOSTER DEC. EX. 14 pg. 20**

Exh. 7, Page 123

(b)    Schedule 1 attached hereto (the "Disclosure Schedule") contains a complete list of, among other items, (i) the current and former corporate and fictitious names utilized by Debtor, (ii) the chief executive offices of the Debtor, (iii) the office where Debtor keeps its records concerning the Collateral, (iv) each place of business of the Debtor, (v) as to Inventory, a complete list of each location where Inventory is located, and (vi) as to Equipment, a complete list of each location where Equipment is located. All information contained in the Disclosure Schedule is true, complete and correct and the Debtor hereby acknowledges and agrees that the Secured Party and its legal counsel may fully rely upon the information contained therein as representations and warranties of the Debtor, the falsity of which may constitute a Default (as hereinafter defined);

(c)    Except as otherwise disclosed to the Secured Party, the Debtor has exclusive possession and control of all its Inventory and Equipment, and the Debtor has not and will not allow any of its contractors, processors or suppliers to have possession or control of any Inventory and Equipment;

(d)    No consent, authorization, approval or other action by, and no notice to or filing with, any governmental authority is required for (i) the grant by the Debtor of the Liens granted hereby or for the execution, delivery or performance of this Security Agreement by the Debtor; (ii) the perfection or maintenance of the Liens created hereby which may be perfected by the filing of financing statements; or (iii) the exercise by the Secured Party of any of its rights and remedies hereunder, except for the filing of financing statements necessary to perfect or continue the perfection of the security interests granted by this Security Agreement;

(e)    This Security Agreement creates a valid security interest in the Collateral, and the filing of the financing statements in the jurisdictions listed in the Disclosure Schedule perfects those security interests in such Collateral which can be perfected by the filing of financing statements; and

(f)    Neither the execution and delivery of this Security Agreement by the Debtor, the consummation of the transactions herein contemplated or the fulfillment of the terms hereof will (i) result in a breach of any of the terms or provisions of, or constitute a default under, or constitute an event which, with notice or lapse of time or both, will result in a breach of, or constitute a default under, the organizational documents of Debtor, any agreement, indenture, mortgage, deed of trust, equipment lease, instrument or other document to which the Debtor is a party; or (ii) conflict with any law, except to the extent that any such breach, default, event or conflict would not have a material adverse effect on the business, operations or financial condition of the Debtor.

(g)    Debtor is organized and incorporated under the laws of the State of Idaho.

(h)    The execution, delivery and performance of this Security Agreement and the Secured Guarantee have been duly authorized by Debtor, each of which are and shall be binding on and enforceable against Debtor in accordance with their terms, and do not and shall not contravene any other instrument or agreement binding on Debtor.

Case 2:18-cv-00374-DCN-CWD No. 8-15 filed 09/18/18 PageID.650 23 of 52
Case 1:10-cv-03040-RMC-CWD Document 15 filed 09/18/18 Page 23 of 23

Case 2:13-cv-05504-SJO-MAN   Document 102-2   Filed 10/31/13   Page 29 of 88   Page ID
#:1322

## ARTICLE IV

### COVENANTS OF THE DEBTOR

Section 4.01  Debtor's Covenants.  The Debtor covenants and agrees to perform each of the covenants set forth below in this Article IV:

(a)    The Debtor will defend the Collateral against all claims and demands of all Persons at any time claiming the same or any interest therein;

(b)    The Debtor will not change the location of its chief executive offices or the offices where it keeps records concerning Accounts from the locations set forth in the Disclosure Schedule, except with thirty (30) days' prior written notice to the Secured Party, nor will the Debtor move, or permit to be moved, the Collateral or any portion thereof to any location other than those set forth in the Disclosure Schedule;

(c)    The Debtor will not voluntarily or involuntarily change its name, identity or corporate structure without the prior written consent of the Secured Party;

(d)    The Debtor will, promptly upon request by the Secured Party, procure or execute and deliver any document (including, without limitation, mortgagee or landlord waivers with respect to any and all Inventory which is a part of the Collateral), give any notices, execute and file any financing statements, mortgages or other documents, all in form and substance satisfactory to the Secured Party, mark any Chattel Paper, deliver any Chattel Paper or Instruments to the Secured Party and take any other actions which are necessary or, in the reasonable judgment of the Secured Party, desirable to perfect or continue the perfection and priority of the Secured Party's liens on and security interests in the Collateral, to protect the Collateral against the rights, claims or interests of any Person other than the Secured Party or to effect the purposes of this Security Agreement, and will pay all reasonable costs and expenses incurred in connection therewith;

(e)    The Debtor will not, without the prior written consent of the Secured Party, in any way hypothecate or create or permit to exist any Lien on or other interest in the Collateral except Permitted Liens and those created by this Security Agreement;

(f)    The Debtor will pay and discharge all taxes, assessments and governmental charges or levies against the Collateral prior to delinquency thereof, except taxes, assessments or charges subject to good faith dispute for which the Debtor has created adequate reserves on its books, and will keep the Collateral free of all unpaid charges whatsoever where the failure to make any of such payments could result in a material adverse effect on the business, operations or financial condition of the Debtor;

(g)    The Debtor will at all times be in compliance with all laws pertaining to the use or ownership of the Collateral; at the Debtor's own expense, the Debtor will keep the Collateral in good condition and maintain same in accordance with industry specifications and requirements;

Exh. 7, Page 125

Exhibit - A
FOSTER DEC. EX. 14 pg. 22

    (h)   The Debtor will cause the Collateral to be kept insured at its own expense under one or more policies with such companies, in such amounts and against such risks and liabilities as is ordinarily maintained by companies engaged in the same or similar businesses and similarly situated and as are satisfactory to the Secured Party in its sole discretion. Such policies shall include loss payable endorsements or such other mortgagee indemnity clauses in favor of the Secured Party as the Secured Party shall direct and shall name the Secured Party as an additional insured. No such policy shall be subject to reduction or cancellation without thirty (30) days' prior written notice to the Secured Party and an original of such policy shall be delivered to the Secured Party.

    (i)   The Debtor will, upon the Secured Party's request, deliver to the Secured Party records and schedules which show the status, condition and location of all its Inventory and Equipment. The Secured Party shall have the right to review and verify such records, schedules, notices and financial information, and the Debtor will reimburse the Secured Party for all costs incurred thereby;

    (j)   The Debtor authorizes the Secured Party to file UCC financing statements, in form and substance satisfactory to the Secured Party, to assure the protection, perfection and enforcement of the Liens in the Collateral in favor of the Secured Party, and the Debtor will pay all filing fees and taxes related thereto. The Debtor hereby irrevocably appoints the Secured Party, its agents and employees, as attorney-in-fact for the Debtor to execute, deliver, file and record any such financing statements in the name of the Debtor at any time and, as applicable, under the rules of the UCC;

    (k)   The Debtor will permit the Secured Party to enter into and upon any premises where any of the Collateral or records with respect thereto are located for the purpose of inspecting the same, making copies of records, observing the use of any part of the Collateral or otherwise protecting its security interest in the Collateral; and

    (l)   The Secured Party shall have the right at any time to make any payments and do any other acts the Secured Party may deem reasonably necessary to protect its security interest in the Collateral, including, without limitation, the right to pay, purchase, contest or compromise any Lien which is prior to or superior to the liens and security interests granted hereunder, except Permitted Liens, and appear in and defend any action or proceeding purporting to affect its security interest in the Collateral, and in exercising any such powers or authority, the right to pay all reasonable costs and expenses incurred in connection therewith, including reasonable attorneys' fees. The Debtor will reimburse the Secured Party for all such payments made and expenses incurred, which amounts shall be secured under this Security Agreement, and agree that the Debtor shall be bound by any payment made or act taken by the Secured Party hereunder. The Secured Party shall have no obligation to make any of the foregoing payments or perform any of the foregoing acts.

## ARTICLE V

## AUTHORITY OF SECURED PARTY

**Section 5.01  Attorney-In-Fact.**   The Debtor hereby irrevocably constitutes and appoints the Secured Party, and any agent thereof, with full power of substitution, as its true and lawful attorney-in-fact, with full irrevocable power and authority in the name of the Debtor or in its own name to take any and all action and to execute any and all documents and instruments which the Secured Party, at any time and from time to time, deems necessary or desirable to accomplish the purposes of this Security Agreement and, without limiting the generality of the foregoing, the Debtor hereby gives the Secured Party the power and right on behalf of the Debtor and in its own name to do any of the following, at any time and from time to time, without notice to or the consent of the Debtor:

(a)     to demand, sue for, collect, or receive in the name of the Debtor or in its own name, any money or property at any time payable or receivable on account of or in exchange for any of the Collateral and, in connection therewith, endorse checks, notes, drafts, acceptances, money orders, documents of title or any other instruments for the payment of money under the Collateral or any policy of insurance;

(b)     to pay or discharge taxes, Liens, security interests, or other encumbrances levied or placed on or threatened against the Collateral;

(c)     to send requests for verification to account debtors and other obligors;

(d)     (i) to direct the account debtors and any other parties liable for any payment under any of the Collateral to make payment of any and all monies due and to become due thereunder directly to the Secured Party or as the Secured Party shall direct; (ii) to receive payment of and receipt for any and all monies, claims and other amounts due and to become due at any time in respect of or arising out of any Collateral; (iii) to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against the Debtor, assignments, proxies, stock powers, verifications and notices in connection with an account and other documents relating to the Collateral; (iv) to commence and prosecute any suit, action or proceeding at law or in equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral; (v) to defend any suit, action or proceeding brought against the Debtor with respect to any Collateral; (vi) to settle, compromise or adjust any suit, action or proceeding described above and, in connection therewith, to give such discharges or releases as the Secured Party may deem appropriate; (vii) to exchange any of the Collateral for other property upon any merger, consolidation, reorganization, recapitalization or other readjustment of the issue thereof and, in connection therewith, deposit any of the Collateral with any committee, depositary, transfer agent, registrar or other designated agency upon such terms as the Secured Party may determine; (viii) to add or release any guarantor, endorser, surety or other party to any of the Collateral; (ix) to renew, extend or otherwise change the terms and conditions of any of the Collateral; (x) to insure and to make, settle, compromise or adjust claims

{00159562.DOC; 3}

- 11 -

**Exhibit - A**
FOSTER DEC. EX. 14 pg. 24

Exh. 7, Page 127

under any insurance policy covering any of the Collateral; and (xi) to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Secured Party were the absolute owner thereof for all purposes, and to do, at the Secured Party's option and the Debtor's' expense, at any time or from time to time, all acts and things which the Secured Party deems necessary to protect, preserve or realize upon the Collateral and the Secured Party's security interest therein.

This power of attorney is a power coupled with an interest and shall be irrevocable. The Secured Party shall be under no duty to exercise or withhold the exercise of any of the rights, power, privileges and options expressly or implicitly granted to the Secured Party in this Security Agreement, and shall not be liable for any failure to do so or any delay in doing so. The Secured Party shall not be liable for any act or omission or error of judgment or any notice of act or law in its individual capacity, or in its capacity as attorney-in-fact, except acts or omissions resulting from its willful misconduct or gross negligence. This power of attorney is conferred on the Secured Party to protect, preserve and realize upon its lien and security interest in the Collateral. The Secured Party shall not be responsible for any decline in the value of the Collateral and shall not be required to take any steps to preserve rights against prior parties or to protect, preserve or maintain any security interest given to secure the Collateral.

## ARTICLE VI

## [INTENTIONALLY OMITTED]

## ARTICLE VII

## DEFAULTS AND REMEDIES

Section 7.01   Defaults.   The occurrence of any one or more of the following events or conditions shall constitute a default under this Security Agreement (a "Default"):

(a)     The occurrence of an Event of Default under the Secured Guarantee or the Loan Agreement.

(b)     The Debtor fails to make any payment or perform any obligation or covenant required to be performed by Debtor in accordance with the terms and conditions of this Security Agreement.

(c)     The Debtor makes or has made or furnishes or has furnished any warranty, representation or statement to the Secured Party in connection with this Security Agreement, or any other agreement to which the Debtor and the Secured Party are parties, which is or was false or misleading in any material respect when made or furnished.

**Exhibit - A**
FOSTER DEC. EX. 14 pg. 25                               **Exh. 7, Page 128**

Section 7.02 **Remedies.** Upon the occurrence of a Default, the Secured Party may, at its option, without notice to or demand upon the Debtor, do any one or more of the following:

(a) Declare all of the Secured Obligations immediately due and payable.

(b) Exercise any or all of the rights and remedies provided for by the UCC of the state or states having jurisdiction with respect to all or any portion of the Collateral from time to time, specifically including, without limitation, the right to recover reasonable attorneys' fees and other expenses incurred by the Secured Party in the enforcement of this Security Agreement or in connection with the Debtor's redemption of the Collateral.

(c) Require the Debtor to assemble the Collateral or any part thereof and make it available at one or more places as the Secured Party may designate, and to deliver possession of the Collateral or any part thereof to the Secured Party, who shall have full right to enter upon any or all of the Debtor's premises and property to exercise the Secured Party's rights hereunder.

(d) Use, manage, operate and control the Collateral and the Debtor's business and property to preserve the Collateral or its value, including, without limitation, the right to take possession of all of the Debtor's premises and property, to exclude the Debtor and any third parties, whether or not claiming under the Debtor, from such premises and property, to make repairs, replacements, alterations, additions and improvements to the Collateral and to dispose of all or any portion of the Collateral in the ordinary course of the Debtor's business.

(e) Use, in connection with any assembly, use or disposition of the Collateral, any Trademark, Trade Secret, trade name, trade style, copyright, Patent or technical knowledge or process used or utilized by the Debtor.

(f) Enforce one or more remedies hereunder, successively or concurrently, and such action shall not operate to estop or prevent the Secured Party from pursuing any other or further remedy which it may have, and any repossession or retaking or sale of the Collateral pursuant to the terms hereof shall not operate to release the Debtor until full and final payment of any deficiency has been made in cash. The Debtor shall reimburse the Secured Party upon demand for, or the Secured Party may apply any proceeds of the Collateral to, the costs and expenses (including reasonable attorneys' fees, transfer taxes and any other charges) incurred by the Secured Party in connection with any sale, disposition or retention of any Collateral hereunder.

(g) In connection with any public or private sale under the applicable UCC, the Secured Party shall give the Debtor at least ten (10) days' prior written notice of the time and place of any public sale of the Collateral or of the time after which any private sale or other intended disposition thereof is to be made, which shall be deemed to be reasonable notice of such sale or other disposition. Such notice may be mailed to the Debtor at the address set forth in this Security Agreement for delivery of notices.

{00159562.DOC; 3}                                    - 13 -

(h)    Proceed by an action or actions at law or in equity to recover the Secured Obligations or to foreclose under this Security Agreement and sell the Collateral, or any portion thereof, pursuant to a judgment or decree of a court or courts of competent jurisdiction.

(i)    In the event the Secured Party recovers possession of all or any part of the Collateral pursuant to a writ of possession or other judicial process, whether prejudgment or otherwise, the Secured Party may thereafter retain, sell or otherwise dispose of such collateral in accordance with this Security Agreement or the applicable UCC, and following such retention, sale or other disposition, the Secured Party may voluntarily dismiss without prejudice the judicial action in which such writ of possession or other judicial process was issued. The Debtor hereby consents to the voluntary dismissal by the Secured Party of such judicial action, and the Debtor further consents to the exoneration of any bond which the Secured Party filed in such action.

## ARTICLE VIII

### MISCELLANEOUS PROVISIONS

**Section 8.01  Notices.** Any notice or consent required or permitted by this Security Agreement shall be in writing and shall be delivered in the manner and to the addresses specified in the first paragraph hereof. All notices shall be deemed effective upon receipt.

**Section 8.02  Headings.** The various headings in this Security Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Security Agreement or any provision hereof.

**Section 8.03  Amendments.** This Security Agreement or any provision hereof may be changed, waived or terminated only by a statement in writing signed by the party against which such change, waiver or termination is sought to be enforced.

**Section 8.04  No Waiver.** No delay in enforcing or failure to enforce any right under this Security Agreement shall constitute a waiver by the Secured Party of such right. No waiver by the Secured Party of any default hereunder shall be effective unless in writing, nor shall any waiver operate as a waiver of any other default or of the same default on a future occasion.

**Section 8.05  TIME OF THE ESSENCE. TIME IS OF THE ESSENCE IN EACH PROVISION OF THIS SECURITY AGREEMENT OF WHICH TIME IS AN ELEMENT.**

**Section 8.06  Binding Agreement.** All rights of the Secured Party hereunder shall inure to the benefit of its successors and assigns. The Debtor shall not assign any of its interest under this Security Agreement without the prior written consent of the Secured Party. Any purported

{00159562.DOC; 3}        - 14 -

assignment inconsistent with this provision shall, at the option of the Secured Party, be null and void.

Section 8.07   Entire Security Agreement. This Security Agreement and the Secured Guarantee are intended by the parties as a final expression of their agreement and are intended as a complete and exclusive statement of the terms and conditions thereof. Acceptance of or acquiescence in a course of performance rendered under this Security Agreement shall not be relevant to determine the meaning of this Security Agreement even though the accepting or acquiescing party had knowledge of the nature of the performance and opportunity for objection.

Section 8.08   Attorneys' Fees. In any action or proceeding brought to enforce any provision of this Security Agreement, or to seek damages for a breach of any provision hereof, or where any provision hereof is asserted as a defense, the Debtor shall pay the Secured Party's reasonable attorneys' fees in addition to any other remedy available under this Security Agreement.

Section 8.09   Severability. If any provision of this Security Agreement should be found to be invalid or unenforceable, all of the other provisions shall nonetheless remain in full force and effect to the maximum extent permitted by law.

Section 8.10   Survival of Provisions. All representations, warranties and covenants of the Debtor contained herein shall survive the execution and delivery of this Security Agreement, and terminate only upon full and final payment and performance of the Secured Obligations.

Section 8.11.   Setoff. The Secured Party shall have the right, at any time after the occurrence of a Default, to set off any indebtedness or obligation of the Debtor to the Secured Party against any indebtedness or obligation of the Secured Party to the Debtor, without notice to or demand upon the Debtor and whether or not any such indebtedness or obligations are liquidated or mature at the time of such offset. The Secured Party's right of offset hereunder shall be in addition to and not in limitation of any other rights or remedies which may exist in favor of the Secured Party.

Section 8.12   Authority of the Secured Party. The Secured Party shall have and be entitled to exercise all powers hereunder which are specifically delegated to the Secured Party by the terms hereof, together with such powers as are reasonably incident thereto. The Secured Party may perform any of its duties hereunder or in connection with the Collateral by or through agents or employees and shall be entitled to retain counsel to act in reliance upon the advice of counsel concerning all such matters. Neither the Secured Party nor any director, officer, employee, attorney or agent of the Secured Party shall be liable to the Debtor for any action taken or omitted to be taken by it or them hereunder, except for its or their own gross negligence or willful misconduct; nor shall the Secured Party be responsible for the validity, effectiveness or sufficiency hereof or of any document or security furnished pursuant hereto. The Secured Party shall be entitled to rely on any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper person or persons. The Debtor agrees to indemnify and hold harmless the Secured Party and/or any such other person from and against any and all costs, expenses (including reasonable attorneys' fees), claims or liability

incurred by the Secured Party or such other persons hereunder unless such claim or liability shall be due to willful misconduct or gross negligence on the part of the Secured Party or such other person.

Section 8.13  Termination of Security Agreement.  This Security Agreement shall continue in force so long as any portion of the Secured Obligations remains unpaid and until the Secured Guarantee is terminated.  If the Secured Party receives any payment or payments on account of the Secured Obligations, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, as amended, or any other state or federal law, common law or equitable doctrine, then, to the extent of any sum not finally retained by the Secured Party, the Debtor's obligations to the Secured Party shall be reinstated and this Security Agreement, and any security therefor, shall remain in full force and effect (or be reinstated) until payment shall have been made to the Secured Party, notwithstanding termination of this Security Agreement or the cancellation of any note, instrument or agreement evidencing the Secured Obligations, and such payment shall be due on demand by the Secured Party.  If any proceeding seeking such repayment is pending or, in the Secured Party's sole judgment, threatened, this Security Agreement and any security therefor shall remain in full force and effect, notwithstanding that the Debtor may not otherwise be obligated to the Secured Party.

Section 8.14  Counterparts.  This Security Agreement may be executed by fax or other electronic signature and in one or more counterparts, each of which shall be deemed an original but all of which shall together constitute one and the same agreement.

Section 8.15  Joint and Several Liability.  The obligations of Debtor (and each party named as a Debtor in this Security Agreement) shall be joint and several. Each reference to "Debtor" herein shall be deemed a reference to each of AIA Insurance, Inc. and AIA Services Corporation.  Lender, in its sole and absolute discretion, may:

    (a)    bring suit against Debtor, or any one or more of the parties named as a Debtor in this Security Agreement, jointly and severally, or against any one or more of them;

    (b)    compromise or settle with Debtor, or any one or more of the parties named as a Debtor in this Security Agreement, for such consideration as Lender may deem proper;

    (c)    release one or more of the parties named as a Debtor in this Security Agreement from liability; and

    (d)    otherwise deal with Debtor or any one or more of the parties named as Debtor in this Security Agreement, in any manner, and no such action shall impair the rights of Lender in this Security Agreement to collect from Debtor, or any one or more of the parties named as a Debtor in this Security Agreement, any amount

guaranteed by a Debtor, or any one or more of the parties named as a Debtor, in the Secured Guarantee.

Section 8.16.   APPLICABLE LAW; WAIVER OF JURY TRIAL; CONSENT TO, JURISDICTION

(a)   APPLICABLE LAW.  THIS SECURITY AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, THE LAWS OF WHICH DEBTOR HEREBY EXPRESSLY ELECTS TO APPLY TO THIS SECURITY AGREEMENT, WITHOUT GIVING EFFECT TO PROVISIONS FOR CHOICE OF LAW THEREUNDER.   DEBTOR AGREES THAT ANY ACTION OR PROCEEDING BROUGHT TO ENFORCE OR ARISING OUT OF THIS SECURITY AGREEMENT SHALL BE COMMENCED IN ACCORDANCE WITH THE PROVISIONS OF THIS SECURITY AGREEMENT.

(b)   WAIVER OF JURY TRIAL. TO THE EXTENT PERMITTED BY APPLICABLE LAW, DEBTOR HEREBY WAIVES ANY AND ALL RIGHTS THAT IT MAY NOW OR HEREAFTER HAVE UNDER THE LAWS OF THE UNITED STATES OF AMERICA OR ANY STATE TO A TRIAL BY JURY OF ANY AND ALL ISSUES ARISING EITHER DIRECTLY OR INDIRECTLY IN ANY ACTION OR PROCEEDING BETWEEN DEBTOR, SECURED PARTY, OR THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, OUT OF OR IN ANY WAY CONNECTED WITH THIS SECURITY AGREEMENT, THE OTHER FACTORING DOCUMENTS, THE OBLIGATIONS AND/OR THE COLLATERAL.  IT IS INTENDED THAT SAID WAIVER SHALL APPLY TO ANY AND ALL DEFENSES, RIGHTS, AND/OR COUNTERCLAIMS IN ANY ACTION OR PROCEEDINGS BETWEEN DEBTOR AND SECURED PARTY. DEBTOR WAIVES ALL RIGHTS TO INTERPOSE ANY CLAIMS, DEDUCTIONS, SETOFFS OR COUNTERCLAIMS OF ANY KIND, NATURE OR DESCRIPTION IN ANY ACTION OR PROCEEDING INSTITUTED BY SECURED PARTY WITH RESPECT TO THIS SECURITY AGREEMENT, THE OTHER FACTORING DOCUMENTS, THE OBLIGATIONS, THE COLLATERAL OR ANY MATTER ARISING THEREFROM OR RELATING THERETO, EXCEPT COMPULSORY COUNTERCLAIMS.

(c)   CONSENT TO JURISDICTION. DEBTOR HEREBY (i) IRREVOCABLY SUBMITS AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF CALIFORNIA, LOS ANGELES COUNTY WITH RESPECT TO ANY ACTION OR PROCEEDING ARISING OUT OF THIS SECURITY AGREEMENT, THE OTHER FACTORING DOCUMENTS, THE OBLIGATIONS AND/OR THE COLLATERAL OR ANY MATTER ARISING THEREFROM OR RELATING THERETO, AND (ii) WAIVES ANY OBJECTION BASED ON VENUE OR FORUM NON CONVENIENS WITH RESPECT THERETO. IN ANY SUCH ACTION OR PROCEEDING, DEBTOR WAIVES PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT OR OTHER PROCESS AND PAPERS THEREIN AND AGREES THAT THE SERVICE THEREOF MAY BE MADE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO DEBTOR

Exhibit - A
FOSTER DEC. EX. 14 pg. 30

AT ITS OFFICES SET FORTH HEREIN OR OTHER ADDRESS THEREOF OF
WHICH SECURED PARTY HAS RECEIVED NOTICE AS PROVIDED IN THIS
SECURITY AGREEMENT.   NOTWITHSTANDING THE FOREGOING, DEBTOR
CONSENTS TO THE COMMENCEMENT BY LENDER OF ANY SUIT, ACTION OR
PROCEEDING IN ANY OTHER JURISDICTION TO ENFORCE ITS RIGHTS IN AND
TO THE COLLATERAL AND DEBTOR WAIVES ANY OBJECTIONS WHICH IT
MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON
CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING.

[SIGNATURE PAGE FOLLOWS]

Exhibit - A
FOSTER DEC. EX. 14 pg. 31                        Exh. 7, Page 134

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement - Guarantee to be executed by their duly authorized officers as of the day and year first above written.

AIA SERVICES CORPORATION

By: _____

Name: R. John Taylor
Title:  President


AIA INSURANCE INC.

By: _____

Name: R. John Taylor
Title:  President


AGREED:

GEMCAP LENDING I, LLC

By: _____
Name: _____
Title: _____

{00159562.DOC; 3}

- 19 -

## SCHEDULE 1 TO SECURITY AGREEMENT

**Current Names Used By Debtor:**

AIA Services Corporation

AIA Insurance, Inc.

**Any Assumed or Fictitious Names Debtor Has Used in Past Five (5) Years or Any Other Corporate Name Used in Past Five (5) Years:**

No fictitious or other corporate names used in past five (5) years.

**Location of Chief Executive Offices of Debtor:**

111 Main Street, Lewiston, ID  83501

**Offices Where Debtor Keeps Records Concerning Inventory, Accounts, Contracts and Other Property:**

111 Main Street, Lewiston, ID  83501

**Places of Business of Debtor:**

111 Main Street, Lewiston, ID  83501

**Exhibit A**

FOSTER DEC. EX. 14 pg. 33

# *State of Idaho*

## Office of the Secretary of State

I, BEN YSURSA, Secretary of State of the State of Idaho, hereby certify that I am the custodian of the corporation records of this State.

I FURTHER CERTIFY That the annexed is a full, true and complete duplicate of articles of incorporation of **AIA SERVICES CORPORATION**, an Idaho corporation, received and filed in this office on December 20, 1983, under file number C 74568 , including all amendments filed thereto, as appears of record in this office as of this date.

Dated: February 11, 2013



*Ben Ysursa*

SECRETARY OF STATE

By _Contrie Jr_

## **Exhibit - B**

**FOSTER DEC. EX. 14 pg. 34**

# *State of Idaho*

## Department of State

CERTIFICATE OF AMENDMENT
OF

AIA SERVICES CORPORATION
File Number C 74568

I, PETE T. CENARRUSA, Secretary of State of the State of Idaho, hereby certify that duplicate originals of Articles of Amendment to the Articles of Incorporation of AIA SERVICES CORPORATION duly executed pursuant to the provisions of the Idaho Business Corporation Act, have been received in this office and are found to conform to law.

ACCORDINGLY and by virtue of the authority vested in me by law, I issue this Certificate of Amendment to the Articles of Incorporation and attach hereto a duplicate original of the Articles of Amendment.

Dated: May 8, 1996

SECRETARY OF STATE

By

# Exhibit - B

**FOSTER DEC. EX. 14 pg. 35**

ORIGINAL

MAY 8  10 59 AM '96

SECRETARY OF THE
STATE OF ...

**ARTICLES OF AMENDMENT
TO THE ARTICLES OF INCORPORATION
OF
AIA SERVICES CORPORATION**

Pursuant to the provisions of §30-1-58, §30-1-59 and §30-1-61 of the Idaho Business Corporation Act, the undersigned corporation adopts the following Articles of Amendment to its Articles of Incorporation, as filed on December 20, 1983 and previously amended on October 14, 1986, December 29, 1987, April 11, 1995 and August 3, 1995.

**FIRST:** The name of the corporation is AIA SERVICES CORPORATION.

**SECOND:** On December 14, 1995, the shareholders of the corporation adopted and approved the following Amended and Restated Articles of Incorporation of AIA Services Corporation, pursuant to which Section 4.3.3 of Article Fourth was amended by replacing it in its entirety.

**"AMENDED AND RESTATED ARTICLES OF INCORPORATION
OF
AIA SERVICES CORPORATION**

Except for the amendment of Section 4.3.3 of Article Fourth by replacing it in its entirety, these Amended and Restated Articles of Incorporation of AIA Services Corporation correctly set forth without change the corresponding provisions of the original Articles of Incorporation as hereinbefore filed on December 20, 1983 and amended on October 14, 1986, December 29, 1987, April 11, 1995 and August 3, 1995; and these Amended and Restated Articles of Incorporation, including the amended Article Fourth, supersede the original Articles of Amendment and all previous amendments thereto.

<u>**FIRST**</u>

The name of the corporation is AIA SERVICES CORPORATION.

<u>**SECOND**</u>

The period of its duration is perpetual.

IDAHO SECRETARY OF STATE
DATE 05/08/1996  0900    60950

2

CK #: 6364    CUST# 20168
                AMEND PROF
10    30.00=    30.00

ARTICLES OF AMENDMENT - Page 1

**Exhibit - B**

**FOSTER DEC. EX. 14 pg. 36**

## THIRD

The purpose for which the corporation is organized is for the transaction of any or all lawful business for which the corporation may be incorporated under the Idaho Business Corporation Act.

## FOURTH

**4.1    Authorized Capital.** The aggregate number of shares which this corporation shall have authority to issue is 11,700,000 shares, of which 700,000 shares shall be Preferred Stock and 11,000,000 shares shall be Common Stock ($0.01 par value). The corporation is authorized to issue the Preferred Stock in two classes designated as "Series A", consisting of 200,000 shares of Stated Value Preferred Stock (without par value); and "Series C", consisting of 500,000 shares of 10% Preferred Stock ($1 par value). The respective preferences, limitations and relative rights of each of the two classes of Preferred Stock and the Common Stock of the corporation are set forth in the following provisions of Article Fourth:

**4.2    Series A Preferred Stock.**

**4.2.1   General.** Each share of Series A Preferred Stock shall have the rights and preferences conferred in this Section 4.2 of Article Fourth. Holders of Series A Preferred Stock shall have no rights to share in any distribution of the profits or assets of the corporation, whether in the form of cash or stock or dividends or otherwise, except to the extent specifically provided herein.

**4.2.2   No Dividends.** The Series A Preferred Stock shall not pay or accrue any dividends.

**4.2.3   Demand for Redemption.** (a) The holder of Series A Preferred Stock shall have the right to require the corporation to redeem such stock from any legally available funds upon breach of any covenant of the corporation set forth in this Article Fourth, but only to the extent such redemption shall not violate the Idaho Business Corporation Act restrictions on the corporation's redemption of its own shares. This right may be exercised by giving the corporation written notice of demand for redemption specifying the default and a redemption date not less than ninety (90) days from the date such notice delivered to the corporation; provided however that, if the corporation cures such specified default within sixty (60) days after receipt of such notice by corporation, the right to redeem Series A Preferred Stock on account of such specified default shall be extinguished.

(b)    The holder of Series A Preferred Stock shall have the right to require the corporation to redeem such stock from any legally available funds at any time after September 14, 1993, but only to the extent such redemption shall not violate the Idaho Business Corporation Act restrictions on the corporation's redemption of its own shares. This right may be exercised by giving the corporation written notice of demand for redemption specifying a redemption date after September 14, 1993 and not less than ninety (90) days or more than one hundred eighty (180) days from the date such notice is delivered to the corporation.

**4.2.4   Call for Redemption.** The Series A Preferred Stock may be called for redemption by the corporation, in whole or in part, upon payment of the redemption price from legally available funds at any time prior to the demand for redemption by the holder of Series A

ARTICLES OF AMENDMENT - Page 2

# Exhibit - B

**FOSTER DEC. EX. 14 pg. 37**

Preferred Stock. Notice of such call for redemption, specifying the redemption date not less than thirty (30) days from the date such notice is mailed, shall be mailed to each record holder of Series A Preferred Stock. If fewer than all shares of Series A Preferred Stock are to be redeemed, the shares shall be redeemed prorata from the holders thereof.

4.2.5 <u>Redemption Price</u>  If Series A Preferred Stock is redeemed on or before September 14, 1990, the redemption price is $8.00 per share if paid in a lump sum. If Series A Preferred Stock is redeemed any time during the three-year period beginning September 15, 1990 and ending on September 14, 1993, the redemption price is $8.50 per share if paid in a lump sum. If not paid in a lump sum on or before September 14, 1993, the redemption price for Series A Preferred Stock is $10.00 per share, provided that the redemption price may be paid, at the corporation's sole option, in monthly installments on a fifteen (15) year amortization schedule beginning on the day after the redemption date and accruing interest at a rate of one-and one-half (1½) points under the First Interstate Bank of Idaho, N.A., prime lending rate, adjusted quarterly.

4.2.6 <u>Redemption Procedure and Effect.</u>

(a)  <u>Lump Sum Payment.</u>  If the redemption price is to be paid in a lump sum, the corporation shall deposit, or shall cause its nominee to deposit, on or before the redemption date specified in the notice of redemption, the aggregate redemption price of the shares of Series A Preferred Stock to be redeemed with a bank or trust company specified in the notice, payable on the redemption date in the amounts and to the respective orders of the holders of the shares of Series A Preferred Stock to be redeemed, on endorsement to the corporation or its nominee as may be required and upon surrender of the certificates for such shares. Unless the corporation or its nominee fails to pay the lump sum redemption price on or before the redemption date, the shares of Series A Preferred Stock subject to such redemption shall be deemed to have been redeemed, and shall be deemed no longer to be outstanding, from and after the redemption date set forth in the notice of redemption. On or after the redemption date, subject only to payment of the redemption price, Series A Preferred Stock so called for redemption shall cease to be entitled to any interest or right in the corporation; and holders of such Series A Preferred Stock shall thereafter cease to be shareholders and shall be entitled only to payment of the amount of the redemption price, without interest, upon surrender of the certificates evidencing such stock. If the lump sum redemption price shall be paid by a nominee of the corporation, such nominee shall upon such payment become the owner of the shares with respect to which such payment was made; and certificates of stock may be issued to such nominee in evidence of such ownership.

(b)  <u>Installment Payment.</u>  If the corporation elects to pay the redemption price in installments, the number of shares of Series A Preferred Stock equal to the principal portion of each installment divided by $10.00 per share shall be deemed to have been redeemed and to be no longer outstanding from and after the date of such installment. On and after such payment date, such number of shares of Series A Preferred Stock shall cease to be entitled to any interest or right in the corporation; and holders of such shares shall thereafter cease to be shareholders of the corporation with respect to such shares, whether or not the certificates evidencing such shares have been surrendered. Upon request of the corporation from time to time, certificates evidencing shares of Series A Preferred Stock including redeemed shares shall be surrendered to and reissued by the corporation in reduced amount to reflect any and all installment redemptions of shares prior to such request.

ARTICLES OF AMENDMENT - Page 3

# Exhibit - B

**4.2.7 Liquidation Preference.** In case of the voluntary liquidation or dissolution of the corporation, the holder of Series A Preferred Stock shall have the right to be paid in full, before any amount shall be paid to the owners of the Common Stock or to the owners of the Series C Preferred Stock, as follows:

$8.00 per share if the liquidation price is paid on or before September 14, 1990.

$8.50 per share if the liquidation price is paid after September 14, 1990 and on or before September 14, 1993.

$10.00 per share if the liquidation price is paid after September 14, 1993.

In case of the involuntary liquidation or dissolution of the corporation, the holder of Series A Preferred Stock shall have the right to be paid $10.00 per share, in full, before any amount shall be paid to the owners of the Common Stock or to the owners of the Series C Preferred Stock. After payment to the holders of the Series A Preferred Stock of the full preferential amounts hereinabove provided, the holders of the Series A Preferred Stock as such shall have no right or claim to any of the remaining assets of the corporation either upon any distribution of such assets or upon dissolution, liquidation or winding up; and the remaining assets to be distributed, if any, upon a distribution of such assets or upon dissolution, liquidation or winding up, may be distributed among the holders of the Series C Preferred Stock and the Common Stock in accordance with the provisions of this Article Fourth.

**4.2.8 Limited Voting Rights.** The Series A Preferred Stock shall have no right (except as required by law or as provided by Section 4.2.12 of this Article Fourth) to receive notice of or to vote at any regular or special meeting of stockholders, except that the holders of a majority of the shares of Series A Preferred Stock shall have the right, voting separately as a class, to elect one director to the board of directors of the corporation.

**4.2.9 Covenants.** So long as any shares of Series A Preferred Stock are outstanding, and except with the consent of the holders of a majority of the outstanding shares of Series A Preferred Stock.

(a)     Common Stock. The corporation shall not issue any Common Stock for less than book value (determined as of the end of the immediately preceding fiscal year), except for Common Stock issued to pay a dividend payable solely in shares of Common Stock or issued to employees or agents pursuant to incentive stock option or bonus plan.

(b)     Preferred Stock. The corporation shall issue no Preferred Stock or securities convertible into such stock, other than the Series A and Series C Preferred Stock.

(c)     Indebtedness. The corporation will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume, guaranty or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

# Exhibit - B

**FOSTER DEC. EX. 14 pg. 39**

(1) The corporation may remain liable in respect of Indebtedness outstanding on the date of adoption of this Article Fourth by the corporation's shareholders.

(2) The corporation and its Subsidiaries may become and remain liable with respect to Indebtedness that is not secured by a Lien on any of the assets of the corporation or its Subsidiaries, provided that the aggregate principal amount of such unsecured Indebtedness shall not exceed Consolidated Net Worth less goodwill of the corporation at any time; and

(3) The corporation and its Subsidiaries may become and remain liable in respect of Indebtedness secured by any of the following Liens:

(i) Liens for taxes, assessments or governmental charges or claims the payment of which is not yet delinquent or is being contested in good faith, if such reserve or other provision, if any, as shall be required by generally accepted accounting principles, consistently applied, shall have been made therefor;

(ii) Statutory Liens of landlords and lines of carriers, warehousemen, mechanics, materialmen and other liens imposed by law incurred in the ordinary courses of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by generally accepted accounting principles, consistently applied shall have been made therefor;

(iii) Liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, governmental contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(iv) Any attachment or judgment Lien; provided that if the judgment it secures exceeds $250,000 (alone or when aggregated with all other judgments secured by Liens permitted by this clause (vi)), such judgment shall, within forty-five (45) days after the entry thereof, have been discharged or execution thereof stayed pending appeal, or shall have been discharged within forty-five (45) days after the expiration of any such stay;

(v) Easements, rights-of-way, restrictions and other similar charges or encumbrances not interfering with the ordinary conduct of the business of the corporation or any of its Subsidiaries;

(vi) Any interest or title of a lessor under any lease;

(vii) Any Lien existing on any asset of any corporation at the time such corporation becomes a subsidiary if such Lien was not created in contemplation of such event;

ARTICLES OF AMENDMENT - Page 5

# Exhibit - B

(viii)     Any Lien on any asset securing Indebtedness incurred or assume for the purpose of financing not more than Eighty-five percent (85%) of the cost of acquiring such assets; provided that such line attaches to such asset concurrently with or within ninety (90) days after the acquisition thereof;

(ix)     Any Lien on any asset of any corporation existing at the time such corporation is merged into or consolidated with the corporation or a subsidiary, if such Lien was not created in contemplation of such event;

(x)     Any Lien existing on any asset prior to the acquisition thereof by the corporation or a Subsidiary, if such Lien was not created in contemplation of such acquisition;

(xi)     Any Lien arising out of the refinancing, extension, renewal or refunding of any Indebtedness secured by any Lien permitted by any of the foregoing clauses of this Section 4.2.9(c); provided that the amount of such Indebtedness is not increased and that such Indebtedness is not secured by any additional assets; and

(xii)     Liens not otherwise permitted by the foregoing clauses of this Section 4.2.9(c) (including, without limitation, Liens on stock of Subsidiaries, whether consolidated or unconsolidated) securing Indebtedness in an aggregate principal amount of any time outstanding not to exceed ten percent (10%) of the difference between Consolidated Net Worth and the amount of the goodwill of the corporation.

(d)     Corporate Existence.  The corporation will maintain its corporate existence and will not liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or enter into any transaction of merger or consolidation with any Person (including any Subsidiary) unless (i) this corporation is the surviving corporation following any such merger or consolidation, and (ii) the Consolidated Net Worth of the surviving corporation immediately following such merger or consolidation equals or exceeds the Consolidated Net Worth of this corporation immediately prior to such merger or consolidation.

(e)     Sale of Assets.  The corporation will not, and will not permit any of its Subsidiaries to, convey, sell, lease, transfer or otherwise dispose of all or any material part of its business, property or assets, whether now owned or hereafter acquired, except:

(1)     The corporation and its Subsidiaries may convey, sell, lease, transfer or otherwise dispose of investment assets in the ordinary course of business;

(2)     The corporation and its Subsidiaries may sell or otherwise *dispose of* Capital Assets or real property if the asset so disposed of is concurrently replaced by a substantially equivalent asset having a value equal to or greater than the assets disposed of;

(3)     The corporation and is Subsidiaries may sell or otherwise dispose of obsolete or worn out property in the ordinary course of business;

ARTICLES OF AMENDMENT - Page 6

# Exhibit - B

**FOSTER DEC. EX. 14 pg. 41**

(4)   The corporation and its Subsidiaries may sell and lease back any newly acquired asset for the purpose of financing the acquisition of such asset and securing the repayment of Indebtedness, provided that such Indebtedness shall not exceed eighty-five percent (85%) of the cost of such asset and is otherwise permitted by the covenants contained in this Article Fourth; and

(5)   The corporation and its Subsidiaries may sell or otherwise dispose of any of their other assets; provided that any such sale or other disposition is made for the fair market value of such assets.

(f)   Acquisitions.   The corporation will not, and will not permit any of its Subsidiaries to, acquire by purchase or otherwise all or substantially all the business, property or fixed assets, or the stock or other evidence of beneficial ownership, of any Person unless, immediately prior to and after giving effect to such transaction, no violation of any of the covenants or other provisions contained in this Article Fourth shall have occurred and be continuing or would be caused by such acquisition.

(g)   Transactions with Shareholders and Affiliates.   The corporation will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease, loan or exchange of any property or the rendering of any service) with any director or officer or any holder of equity securities of the corporation, or with any Affiliate of the corporation or of such director, officer or holder, on terms that are less favorable to the corporation or that Subsidiary, as the case may be, than those which might be obtained at the time from Persons who are not such a director, officer, holder or Affiliate; provided that the foregoing restriction shall not apply to (i) any transaction in effect at the date of adoption of this Article Fourth by the corporation's shareholders; (ii) any transaction between the corporation and any of its wholly-owned Subsidiaries or between any of its wholly-owned Subsidiaries; (iii) compensation (net of amounts contributed or repaid to the corporation or any Subsidiary or to Lewiston Land Company and contributed or repaid to the corporation or any Subsidiary), by way of salary or bonus, paid to director or officers of the corporation in an amount, as to any one individual, not greater than the greater of $400,000 or the total compensation paid in calendar year 1986; (iv) compensation paid to any director or officer of the corporation in amounts equal to income tax liability of such director or officer attributable to transactions involving the corporation, A.I.A., Inc., AIA Travel Services, Inc., AIA Travel, Inc., Lewiston Land Company, AIA Bancard Services Corporation or Taylor Brothers Aircraft on or before January 1, 1988 or to other personal income tax liability of such director or officer for tax years ended before January 1, 1988;  or (v) any loan to or account receivable from an officer, director or stockholder which is repaid in full at least annually on or before the last day of the fiscal year.

(h)   Consolidated Net Worth.   The corporation will not permit Consolidated Net Worth at any date to be less than the number of shares of Series A Preferred Stock outstanding at such date multiplied by $10.00 per share.

(i)   Dividend Restriction.   The corporation will not, directly or indirectly, declare, order, make or set apart any sum for payment of any dividend in respect of its Common Stock (other than a dividend payable solely in shares of Common Stock), except that the corporation may declare and pay Common Stock dividends in an aggregate amount not exceeding the Dividend Availability

ARTICLES OF AMENDMENT - Page 7

# Exhibit - B

Amount.

        (j)    Debt/Equity Ratio. Neither the corporation nor any Subsidiary will incur any new Indebtedness (other than Indebtedness permitted by Section 4.2.9(c)(xi) of this Article Fourth) if, at the time of incurring such Indebtedness, the ratio of Consolidated Long Term Debt to Consolidated Net Worth exceeds, or such additional Indebtedness would cause such ratio to exceed, 3.6 to 1.0.

        (k)    Debt Service Coverage. Neither the corporation nor any Subsidiary will incur any new Indebtedness (other than Indebtedness permitted by Section 4.2.9(c)(xi) of this Article Fourth) if, at the time of incurring such Indebtedness, the ratio of (i) Consolidated Net Income plus depreciation and amortization expenses plus compensation contributed or repaid to the corporation, any Subsidiary, Lewiston Land Company or AIA Travel Services, Inc. during the immediately preceding fiscal year of the corporation, divided by (ii) current maturities of Long Term Debt is, or such additional Indebtedness would cause such ratio to be, less than .8 to 1.0.

        4.2.10   Definitions. For the purpose of Section 4.2.9 of this Article Fourth, the following terms shall have the following meanings:

        "Affiliate", as applied to any Person, shall mean any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

        "Capital Asset" shall mean, as at any date of determination, those assets of a Person that would, in conformity with generally accepted accounting principles, consistently applied, be classified as plant, property or equipment on the balance sheet of that Person.

        "Consolidated Long Term Debt" shall mean, as at any date of determination, the total of all Long Term Debt of the corporation and its Subsidiaries on a consolidated basis determined in accordance with generally accepted (or, in the case of an insurance company for which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

        "Consolidated Net Worth" shall mean, as at any date of determination, the sum of (a) the capital stock and additional paid-in capital, (b) plus retained earnings (or minus accumulated deficit) of the corporation and its Subsidiaries on a consolidated basis, determined in conformity with generally accepted (or, in the case of an insurance company for which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

        "Consolidated Net Income" for any period, shall mean the net income (or loss) of the corporation and its Subsidiaries on a consolidated basis determined in conformity with generally accepted (or, in the case of an insurance company for which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

ARTICLES OF AMENDMENT - Page 8

# Exhibit - B

**"Dividend Availability Amount"** shall mean, as at any date of determination, an amount equal to fifty percent (50%) of Consolidated Net Income for the period (taken as single accounting period) commencing January 31, 1987 and ending on the last day of the fiscal quarter immediately preceding such date of determination.

**"Indebtedness"** as applied to any person, means (a) all indebtedness for borrowed money, (b) that portion of obligations with respect to finance leases which is capitalized on a balance sheet in conformity with generally accepted accounting principles, consistently applied, (c) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money, (d) any obligation owed for all or any part of the deferred purchase price of property or services which purchase price is (i) due more than six (6) months from the date of incurrence of the obligation in respect thereof, or (ii) evidenced by a note or similar written instrument, and (e) all indebtedness secured by any Lien or vendor's interest under any conditional sale or other title retention agreement existing on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is non-recourse to the credit of that Person; provided, however, that "Indebtedness" shall not include policy claims, policy reserves or mandatory securities valuation reserves of a regulated insurance company; and further provided that "Indebtedness" shall not include indebtedness of the corporation to any Subsidiary.

**"Lien"** shall mean any lien, mortgage, pledge, security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give a security interest).

**"Long Term Debt"**, as applied to any Person, shall mean all Indebtedness of that Person which by its terms or by the terms of any instrument or agreement relating thereto matures more than one year, or is directly renewable or extendable at the option of the debtor to a date more than one year (including an option of the debtor under a revolving credit or similar agreement obligating the lenders to extend credit over a period of one year or more), from the date of creation thereof, but excluding any payments due under the terms thereof within twelve (12) months of any date of determination.

**"Person"** shall mean an individual, corporation, partnership, joint venture, trust, unincorporated organization or any other jurisdictional entity, or a foreign state or any agency or political subdivision thereof.

**"Subsidiary"** shall mean any corporation of which at least a majority of the outstanding stock having by the terms thereof ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether or not at the time stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by the corporation or one or more of its Subsidiaries or by the corporation and one or more of its Subsidiaries.

**4.2.11** <u>Conversion Right</u>. The holders of the Series A Preferred Stock shall have the following conversion right ("Conversion Right"):

(a) <u>Right to Convert</u>. Each share of Series A Preferred Stock shall be convertible,

ARTICLES OF AMENDMENT - Page 9

# Exhibit - B

**FOSTER DEC. EX. 14 pg. 44**

at the option of the holder thereof, at any time prior to the date on which notice of redemption is given under Section 4.2.3 or Section 4.2.4, at the office of the corporation or any transfer agent for the Series A Preferred Stock or Common Stock, into one fully paid and nonassessable share of Common Stock.

(b)     Mechanics of Conversion.  Before any holder of Series A Preferred Stock shall be entitled to convert such stock into shares of Common Stock, he shall surrender the certificate or certificates for such Preferred Stock, duly endorsed, at the office of the corporation or any transfer agent for the Common Stock, and shall give written notice to the corporation at such office that he elects to convert such Preferred Stock and shall state therein the number of shares of Series A Preferred Stock being converted.  Thereupon the corporation shall promptly issue and deliver at such office to such holder of a certificate or certificates for the number of shares of Common Stock to which he shall be entitled.

Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the shares of Series A Stock to be converted (the "Conversion Date"); and the person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date.

(c)     Fractional Shares.  No fractional share of Common Stock shall be issued upon conversion of Series A Stock.  In lieu of any fractional shares to which the holder would otherwise be entitled, the corporation shall pay cash equal to the product of such fraction multiplied by the fair market value of one share of the corporation's Common Stock on the Conversion Date, such value to be determined in good faith by the Board of Directors.

(d)     Reservation of Stock Issuable Upon Conversion.  The corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock, solely for the purpose of effecting the conversion of the shares of the Series A Stock, such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding shares of the Series A Preferred Stock; and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Series A Preferred Stock, the corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose.

(e)     Termination of Redemption Right.  Upon exercise of the Conversion Right under this Section 4.2.11, all rights of a holder of Series A Stock to require redemption of such stock under Section 4.2.3 shall automatically be terminated; and no holder of Common Stock acquired upon conversion of Series A Preferred Stock shall have any right of redemption.

4.2.12  Modification of Rights and Preferences.  The rights and preferences hereby conferred on the Series A Preferred Stock shall not be changed, altered or revoked without the consent of the holders of the majority of the Series A Preferred Stock outstanding at the time.

4.3     Series C Preferred Stock.

ARTICLES OF AMENDMENT - Page 10

# Exhibit - B

**FOSTER DEC. EX. 14 pg. 45**

**4.3.1   General.**  Each share of Series C Preferred Stock shall have the relative rights, preferences and limitations set forth in this Section 4.3 of Article Fourth.

**4.3.2   Restricted Voting Rights.**  The holders of the Series C Preferred Stock shall have no right (except as required by law) to receive notice of or to vote on any matter (including, without limitation, the election of directors of the corporation) at any regular or special meeting of stockholders of the corporation, except that the holders of a majority of the shares of Series C Preferred Stock shall have the right, voting separately as a class, to elect one director to the Board of Directors of the corporation.

**4.3.3   Cumulative Dividend Preference**  The Series C Preferred Stock shall be entitled to receive, when and as declared by the corporation's Board of Directors, cash dividends at the per annum rate of 10% of the Liquidation Rate (as defined in Section 4.3.4), cumulative, payable quarterly at March 31, June 30, September 30 and December 31 of each calendar year out of any funds legally available for the payment of dividends, and in preference to any dividends upon the Common Stock.  The dividends on the Series C Preferred Stock shall be cumulative, whether or not declared, so that, if for any period such dividend shall not be paid, the right to such dividend shall accumulate as against the Common Stock; and all arrears so accumulated shall be paid before any dividends shall be declared or paid upon the Common Stock.  No dividends shall be declared or paid on the Series C Preferred Stock if the redemption payments due to the holders of the Series A Preferred Stock under Section 4.2. of this Article Fourth are in arrears.  No dividend shall be declared or paid upon the Common Stock nor shall any Common Stock be purchased or otherwise acquired by the corporation for value (other than payment of amounts due to Reed J. Taylor for redemption of his Common Stock), unless all dividends on the Series C Preferred Stock for all past period shall have been paid or shall have been declared and a sum sufficient for the payment thereof set apart for payment.

**4.3.4   Liquidation Preference.**  In the event of any liquidation, dissolution or winding-up of the corporation, whether voluntary or involuntary, before any other distribution or payment is made to the holders of Common Stock or any other series of Preferred Stock (except the corporation's Series A Preferred Stock), the holders of the Series C Preferred Stock shall be entitled to receive, out of the assets of the corporation legally available therefor, a liquidation payment in the amount of $10.00 cash per share of Series C Preferred Stock ("Liquidation Rate"), plus a further amount equal to the dividends accumulated and unpaid thereon to the date of such liquidation payment.  If, upon any liquidation, dissolution or winding up of the corporation, the assets available for distribution are insufficient to pay to the holders of all outstanding Series C Preferred Stock the full amount of the Liquidation Rate and all accumulated but unpaid dividends, the holders of the Series C Preferred Stock shall share pro rata in any such distribution of assets.  Such rights of the holders of the Series C Preferred Stock shall be subordinate only to the right of the holder of the Series A Preferred Stock to be paid the redemption price of such stock in full, together with accrued interest, in accordance with Section 4.2 of this Article Fourth.  After payment to the holders of the Series C Preferred Stock of the full preferential amounts hereinabove provided, the holders of the Series C Preferred Stock as such shall have no right or claim to any of the remaining assets of the corporation either upon any distribution of such assets or upon dissolution, liquidation or winding up; and the remaining assets to be distributed, if any, upon a distribution of such assets or upon dissolution, liquidation, winding up, may be distributed among the holders of the Common Stock.

# Exhibit - B

FOSTER DEC. EX. 14 pg. 46

### 4.3.5  Redemption.

(a)  Mandatory Redemption by Corporation.  Subject to the conversion rights provided in Section 4.3.6 of Article Fourth, the Series C Preferred Stock shall be called for redemption by the corporation upon payment of the aggregate Redemption Rate from legally available funds upon the closing of the earliest of the following events ("Equity Offering"):

(i)  an offering of the corporation's securities conducted pursuant to the registration requirements of the Securities Act of 1933 ("1933 Act") in which gross proceeds of at least $5,000,000 are raised;

(ii)  an offering of the corporation's securities pursuant to exemptions from registration under the 1933 Act in which gross proceeds of at least $5,000,000 are raised; or

(iii)  an offering of any securities convertible into corporation's Common Stock that are sold in an offering that conforms to the parameters of subparagraph (i) or (ii) above.

The redemption price for each share of Series C Preferred Stock ("Redemption Price") shall be the "Redemption Rate" equal to 100% of the Liquidation Rate if such redemption occurs within two (2) years from the issuance of the first shares of Series C Preferred Stock. After such two year period, an amount equal to 5% of the Liquidation Rate will be added to the Redemption Rate immediately and each 180 days thereafter until all outstanding shares of the Series C Preferred Stock are fully redeemed, viz:

| Time from Original Issuance | Percentage of Liquidation Rate |
|---|---|
| Within two years | 100% |
| After two years but before two years plus 181 days | 105% |
| After two years plus 180 days but before two years plus 361 days | 110% |
| After two years plus 360 days but before two years plus 541 days | 115% |
| . . . | . . . |

Notice of such call for redemption, specifying the anticipated date of closing of the Equity Offering, shall be mailed to each record holder of Series C Preferred Stock as soon as practicable before such closing date.  The redemption date for mandatory redemption of the Series C Preferred Stock shall be the actual closing date of the Equity Offering.  Mandatory redemption of the Series C Preferred

ARTICLES OF AMENDMENT - Page 12

# Exhibit - B

Stock under this Section 4.3.5 of Article Fourth shall automatically be cancelled upon determination by corporation's board of directors that the Equity Offering will not be consummated for any reason.

(b) <u>Voluntary Redemption by Corporation</u>. The Series C Preferred Stock may be called for redemption by the corporation, in whole or in part, upon payment of the Redemption Price from legally available funds at any time prior to the closing of an Equity Offering. Notice of such call for redemption, specifying the redemption date not less than thirty days from the date such notice is mailed and the number or percentage of outstanding shares of Series C Preferred Stock to be redeemed, shall be mailed to each record holder of Series C Preferred Stock. If fewer than all shares of Series C Preferred Stock are to be redeemed, the shares shall be redeemed prorata from the holders thereof; and, upon request of the corporation, certificates evidencing shares of Series C Preferred Stock including redeemed shares shall be surrendered to and reissued by the corporation in reduced amount to reflect any and all partial redemptions of such shares prior to such request.

(c) <u>Redemption Procedure and Effect</u>.
The corporation shall deposit, on or before the redemption date specified in the notice of redemption, the aggregate Redemption Price of the shares of Series C Preferred Stock to be redeemed with a bank or trust company specified in the notice, payable on the redemption date in the amounts and to the respective orders of the holders of the shares of Series C Preferred Stock to be redeemed, on endorsement to the corporation as may be required and upon surrender of the certificates for such shares. Unless the corporation fails to pay the Redemption Price on or before the redemption date, the shares of Series C Preferred Stock subject to such redemption shall be deemed to have been redeemed, and shall be deemed no longer to be outstanding, from and after the redemption date set forth in the notice of redemption. On or after the redemption date, subject only to payment of the redemption price, Series C Preferred Stock so called for redemption shall cease to be entitled to any interest or right in the corporation; and holders of such Series C Preferred Stock shall thereafter cease to be shareholders and shall be entitled only to payment of the amount of the redemption price, without interest, upon surrender of the certificates evidencing such stock.

4.3.6 <u>Conversion of Series C Preferred Stock</u>. Subject to the provisions of Section 4.3.7, each holder of Series C Preferred Stock shall have the right, exercisable beginning at the earlier of the date of receipt of notice of mandatory redemption of the Series C Preferred Stock pursuant to Section 4.3.5(a) or two years after the first issuance of Series C Preferred Stock and ending on the closing date of an Equity Offering, to convert Series C Preferred Stock into Common Stock at the Conversion Rate determined as follows: Each share of Series C Preferred Stock shall be convertible into that number of shares of Common Stock which equals .0000693% of the Common Stock on a fully diluted basis at the effective date of exercise, including by way of inclusion and without limiting the foregoing, any conversion or exercise rights contained in any Preferred Stock, options, warrants, or other rights to Common Stock, granted by the corporation in any form or manner, as if fully exercised at the effective date of exercise. Any holder of Series C Preferred Stock who exercises this conversion right prior to the closing date of an Equity Offering shall be protected against dilution in the event of any Common Stock issuance or other transaction which occurs prior to an Equity Offering and increases the number of outstanding shares of Common Stock on a fully diluted basis. For each share of Series C Preferred Stock converted prior to an Equity Offering, the Company shall issue to the holder thereof such number of additional

ARTICLES OF AMENDMENT - Page 13

# Exhibit - B

**FOSTER DEC. EX. 14 pg. 48**

shares of Common Stock as necessary to maintain, at all times prior to an Equity Offering, such holder's 0.0000693% interest in Company's outstanding Common Stock on a fully diluted basis.

Subject to the provisions of Section 4.3.7, this conversion right shall be exercisable by any holder of Series C Preferred Stock as to all or any number of the shares of Series C Preferred Stock owned of record by such holder and shall be exercised by giving the corporation written notice of the exercise of such right, specifying the number of shares of Series C Preferred Stock to be converted and the effective date of such conversion, provided that the effective date of the conversion shall not be later than the closing date of an Equity Offering.

**4.3.7 Regulatory Limitation on Conversion Right.** Notwithstanding any other provision of Section 4.3.6, the right to convert the Series C Preferred Stock into Common Stock of the Company shall be subject to receipt of prior approval by all regulatory authorities with jurisdiction over the acquisition of such Common Stock. Without limiting the generality of the foregoing limitation, the Holder shall not be permitted to convert Series C Preferred Stock into Common Stock if and to the extent that, after such exercise, the Holder would, directly or indirectly (or by exercise of any unrestricted right to convert into or to acquire Company's voting securities or otherwise) be in "control" of an insurer within the meaning of any applicable state insurance holding company act, unless and until such change of "control" has been approved by all applicable state insurance regulators under their respective insurance holding company acts. If the time for exercise of any conversion rights shall expire or be scheduled to expire within two weeks of any final regulatory approval, then the applicable time periods to exercise any such conversion rights shall be extended for such a period of time equal to the period of time from delivery of notice of exercise of any rights until the corporation notifies such rights holders of all applicable regulatory approvals.

**4.4 Common Stock.** Holders of the Common Stock are entitled to one vote per share on all matters to be voted on by stockholders, including the election of directors. Common Stockholders are not entitled to vote their shares cumulatively in the election of directors. Holders of Common Stock of the corporation shall be entitled to elect all of the directors of the corporation other than the director appointed by the holders of the Series A Preferred Stock and the director elected by the holders of Series C Preferred Stock. The holders of any series of Preferred Stock of the corporation have a preference over the holders of Common Stock of the corporation on the assets of the corporation legally available for distribution to stockholders in the event of any liquidation, dissolution, or winding up of the affairs of the corporation. In the event of any liquidation, dissolution or winding up of the affairs of the corporation, holders of the Common Stock will share ratably in any assets of the corporation legally available for distribution to holders of Common Stock after satisfying the liquidation preferences of the Series A and Series C Preferred Stock. Holders of Series C Preferred Stock have a preference over the holders of Common Stock as to the payment of dividends. Holders of Common Stock have rights, share for share, to receive dividends if and when declared by the Board of Directors out of funds legally available therefor, after paying preferred dividends to the holders of Series C Preferred Stock.

## FIFTH

Holders of any class or series of corporation's stock shall not have a preemptive right to acquire unissued or treasury shares of any class or series or securities convertible into such shares

ARTICLES OF AMENDMENT - Page 14

# Exhibit - B

or carrying a right to subscribe to or acquire such shares, except as provided in the Idaho Business Corporation Act.

### SIXTH

The location of the initial registered office of the corporation is One Lewis Clark Plaza, Lewiston, Idaho 83501; and the name of its initial registered agent at such address is R. John Taylor.

### SEVENTH

The number of directors constituting the initial Board of Directors is four, and the names and addresses of the persons who are to serve until the first annual meeting of the shareholders and until their successors are elected and qualified are:

| Name | Address |
|------|---------|
| Reed J. Taylor | P.O. Box 538<br>Lewiston ID 83501 |
| R. John Taylor | P.O. Box 538<br>Lewiston ID 83501 |
| Raymond R. Heilman | P.O. Box 538<br>Lewiston ID 83501 |
| Mary K. Frost | P.O. Box 538<br>Lewiston ID 83501 |

### EIGHTH

The name and address of the incorporator is as follows:

Reed J. Taylor
P.O. Box 538
Lewiston ID 83501

### NINTH

The Board of Directors is expressly authorized to alter, amend or repeal the Bylaws of the corporation and to adopt new Bylaws, subject to repeal or change by a majority vote of the shareholders.

### TENTH

Shareholders entitled under Article Fourth to vote in the election of directors of the corporation shall not be entitled to vote their shares cumulatively in the election of directors of the corporation.

ARTICLES OF AMENDMENT - Page 15

# Exhibit - B

## FOSTER DEC. EX. 14 pg. 50

### ELEVENTH

A director of this corporation shall not be personally liable to this corporation or its shareholders for monetary damages for breach of fiduciary duty as a director, except for liability (a) for any breach of the director's duty of loyalty to this corporation or its shareholders, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (c) under Idaho Code §30-1-48, or (d) for any transaction from which the director derived an improper personal benefit. If the Idaho Business Corporation Act is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of this corporation shall be eliminated or limited to the fullest extent permitted by the Idaho Business Corporation Act, as so amended. Any repeal or modification of this Article Eleventh by the shareholders of the corporation shall not adversely affect any right or protection of a director of the corporation existing at the time of such repeal or modification."

**THIRD:** The number of shares of the corporation outstanding at the time of such adoption was 1,079,520 shares of Common Stock, 170,562 shares of Series A Stated Value Preferred Stock, and 185,000 shares of Series C Preferred Stock; and the number of shares entitled to vote thereon was 1,079,520 shares of Common Stock and 185,000 shares of Series C Preferred Stock.

**FOURTH:** The designation and number of outstanding shares of each class entitled to vote thereon as a class were as follows:

| Class | Number of Shares |
|---|---|
| Common | 1,079,520 |
| Series C Preferred | 185,000 |

**FIFTH:** The following table sets forth the number of shares of Common Stock and the number of shares of Series C Preferred Stock voted for and against such amendment:

| | Number of Shares | |
|---|---|---|
| Class | For | Against |
| Common | 865,093.5 | 48,153.5 |
| Series C Preferred | 165,000 | -0- |

DATED this 1st day of May, 1996.

AIA SERVICES CORPORATION

By _Daniel L. Spickler_

Daniel L. Spickler, Secretary

ARTICLES OF AMENDMENT - Page 17

# Exhibit - B

## FOSTER DEC. EX. 14 pg. 51