Case 2:18-cv-00270-RMP   ECF No. 9-21   filed 09/18/18   PageID.740   Page 1
Case 1:10-cv-00404-MCN-CWD   Document 46-21   Filed 09/17/18   Page 1 of 149
of 149

**EXHIBIT 20**

**TO**

**DECLARATION OF ALYSON A. FOSTER**

1  JOHN H. GUIN, CSB 282725
2  john@guinlaw.com
   LAW OFFICE OF JOHN H. GUIN, PLLC
3  421 W. Riverside Ave., Suite 461
   Spokane, WA 99201
4  Telephone: (509) 747-5250
5  Facsimile: (509) 747-5251

6
   *Attorney for Intervenor*
7  *DONNA J. TAYLOR*

8

9              THE UNITED STATES DISTRICT COURT

10
       FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DISTRICT

11

12 | GEMCAP LENDING I, LLC, a Delaware | Case No.: CV13-5504 SJO (MAN)
   | limited liability company, |
13 | |
14 |             Plaintiff, |
15 |     vs. | **NOTICE AND MOTION TO**
   | | **INTERVENE BY INTERVENOR**
16 | | **DONNA J. TAYLOR**
17 | CROP USA INSURANCE AGENCY, INC., |
   | an Idaho corporation; CROP USA |
18 | INSURANCE SERVICES, LLC, an Idaho | **Date:      February 9, 2015**
   | limited liability company; CROP, LLC, a | **Time:      10:00 a.m.**
19 | limited liability company of unknown origin; | **Ctrm:      1**
   | AIA INSURANCE, INC., an Idaho |
20 | corporation; AIA SERVICES |
21 | CORPORATION, an Idaho corporation; R. | **Hon. S. James Otero**
   | JOHN TAYLOR a/k/a RAY JOHNSON |
22 | TAYLOR a/k/a R. JOHNSON TAYLOR |
   | a/k/a RAYMOND J. TAYLOR, an |
23 | Individual; REINSURANCE PARTNERS, |
24 | LLC, an Idaho limited liability company; |
   | GREEN LEAF REINSURANCE |
25 | PARTNERS, LLC, a Delaware limited |
26 | |

- 1 -

NOTICE AND MOTION TO INTERVENE BY INTERVENOR DONNA J. TAYLOR

**FOSTER DEC. EX. 20 pg. 1**

<table>
<tr><td>

1

2

3

4

5

6

7

8

9

10

11

12

</td><td>

liability company; WESKAN AGENCY, an
Idaho assumed business name; PACIFIC
EMPIRE RADIO CORPORATION, an
Idaho corporation; RANDOLPH
LAMBERJACK, an individual; JOLEE
DUCLOS, an individual; BRYAN
FREEMAN, an individual; HILLCRAFT
AIRCRAFT COMPANY, an Idaho
corporation; CGB DIVERSIFIED
SERVICES, INC. d/b/a DIVERSIFIED
CROP INSURANCE SERVICES, a
Louisiana corporation; and GREENLEAF
REINSURANCE COMPANY,

                   Defendants.

</td></tr>
</table>

**TO ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:**

    **PLEASE TAKE NOTICE** that on February 9, 2015 at 10:00 a.m., or as soon

thereafter as the matter may be heard before the Honorable Judge S. James Otero of the

United States District Court, Central District of California, Courtroom 1, located at 312

North Spring Street, 2nd Floor, Los Angeles, California, 90012, Intervenor DONNA J.

TAYLOR will and hereby moves this Court for an order authorizing DONNA J.

TAYLOR to intervene in this action as a matter of right, or in the alternative, for an order

permitting DONNA J. TAYLOR to intervene in this action, in order to allow DONNA J.

TAYLOR to file Intervenor Donna J. Taylor's: (1) Additional Affirmative Defenses to

the Second Amended Complaint; and (2) Intervenor-Complaint for Declaratory Judgment

and Injunctive Relief, attached hereto.

- 2 -

---

NOTICE AND MOTION TO INTERVENE BY INTERVENOR DONNA J. TAYLOR

This motion is made pursuant to Federal Rule of Civil Procedure 24(a) and (b) on the grounds that:

(a) Defendants AIA INSURANCE, INC. and AIA SERVICES CORPORATION have failed to raise dispositive defenses to the claims alleged by the plaintiff, thereby failing to protect Donna J. Taylor's significant interests as a preferred shareholder of AIA SERVICES CORPORATION and its wholly-owned subsidiary, AIA INSURANCE, INC; and

(b) Defendants AIA INSURANCE, INC. and AIA SERVICES CORPORATION are attempting to compromise and alienate the property and assets of these corporations without authority from a properly-constituted Board of Directors for the corporations, rendering any proposed settlement with Gemcap ultra vires, illegal, and unenforceable.

This Motion is made and is based on: this Notice; the Memorandum of Points and Authorities in Support of the Motion to Intervene; the Declaration of Roderick C. Bond; Intervenor Donna J. Taylor's: (1) Additional Affirmative Defenses to the Second Amended Complaint; and (2) Intervenor-Complaint for Declaratory Judgment and Injunctive Relief; together with all pleadings, files and records filed in this case and upon such oral and documentary evidence as may be allowed at the hearing on this motion.

- 3 -

NOTICE AND MOTION TO INTERVENE BY INTERVENOR DONNA J. TAYLOR

**FOSTER DEC. EX. 20 pg. 3**

Local Rule 7-3: In light of the fact that Intervenor Donna J. Taylor is not yet a party to the lawsuit, it is unclear whether Local Rule 7-3 applies to her Motion to Intervene. If applicable, counsel for the moving party reports the following:

1.     On January 8, 2015, counsel for the moving party was able to confer telephonically with counsel for the plaintiff, Gemcap Lending I, LLC, regarding the motion. Counsel discussed the merits of the motion and any opposition, and counsel were unable to resolve the motion. Plaintiff Gemcap Lending I, LLC opposes the motion to intervene.

2.     On January 8, 2015, counsel for the moving party was able to confer telephonically with counsel for defendants Crop USA Insurance Agency, Crop USA Insurance Services LLC, Crop USA LLC, AIA Insurance, Inc., AIA Services Corporation, Reinsurance Partners, LLC, Green Leaf Reinsurance Partners, LLC, Weskan Agency, LLC, Sound Insurance Agency, Pacific Empire Radio Corporation, and Jolee Duclos. Counsel for these defendants needed to discuss the motion to intervene prior taking a position.

/ /

/ /

- 4 -

NOTICE AND MOTION TO INTERVENE BY INTERVENOR DONNA J. TAYLOR

Case 2:13-cr-00370-RMP   ECF No. 21   filed 09/18/13   PageID.745   Page 6
Case 4:15-cv-09402-DMG-Document 12 filed 09/18/13   Page 18 of   Page ID #:472
of 149

1    3.    On January 8, 2015, counsel for the moving party was able to confer

2  telephonically with counsel for defendant R. John Taylor.  Counsel for defendant Taylor

3  needed to discuss the motion to intervene prior taking a position.

4

5

6  DATED: January 8, 2015                    LAW OFFICE OF JOHN H. GUIN, PLLC

7

8                                           */s/ John H. Guin*

9                                           John H. Guin
                                            *Attorney for Intervenor DONNA J. TAYLOR*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

- 5 -

NOTICE AND MOTION TO INTERVENE BY INTERVENOR DONNA J. TAYLOR

JOHN H. GUIN, CSB 282725
john@guinlaw.com
LAW OFFICE OF JOHN H. GUIN, PLLC
421 W. Riverside Ave., Suite 461
Spokane, WA 99201
Telephone: (509) 747-5250
Facsimile: (509) 747-5251

*Attorney for Intervenor*
*DONNA J. TAYLOR*

# THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DISTRICT

| | |
|---|---|
| GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>CROP USA INSURANCE AGENCY, INC., an Idaho corporation; CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company; CROP, LLC, a limited liability company of unknown origin; AIA INSURANCE, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; R. JOHN TAYLOR a/k/a RAY JOHNSON TAYLOR a/k/a R. JOHNSON TAYLOR a/k/a RAYMOND J. TAYLOR, an Individual; REINSURANCE PARTNERS, LLC, an Idaho limited liability company; GREEN LEAF REINSURANCE PARTNERS, LLC, a | Case No.: CV13-5504 SJO (MAN)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE BY INTERVENOR DONNA J. TAYLOR**<br><br>**Date:      February 9, 2015**<br>**Time:     10:00 a.m.**<br>**Ctrm:     1**<br><br>**Hon. S. James Otero** |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE BY
INTERVENOR DONNA J. TAYLOR

**FOSTER DEC. EX. 20 pg. 6**

Case 2:18-cv-00278-RMG ECF No. 9-21 filed 09/18/18 PageID.747 Page 8
Case 3:1-cv-05969-JCW Document 46 Filed 01/17 Page 24 of 149
of 149

1  Delaware limited liability company;
2  WESKAN AGENCY, an Idaho assumed
   business name; PACIFIC EMPIRE
3  RADIO CORPORATION, an Idaho
4  corporation; RANDOLPH
   LAMBERJACK, an individual; JOLEE
5  DUCLOS, an individual; BRYAN
6  FREEMAN, an individual; HILLCRAFT
   AIRCRAFT COMPANY, an Idaho
7  corporation; CGB DIVERSIFIED
8  SERVICES, INC. d/b/a DIVERSIFIED
   CROP INSURANCE SERVICES, a
9  Louisiana corporation; and GREENLEAF
10 REINSURANCE COMPANY,

11              Defendants.
12

13

| **TABLE OF CONTENTS** | |
|---|---|
| I.  INTRODUCTION………………………………………………... | 1 |
| II.  STATEMENT OF FACTS…………………………………......... | 2 |
|   A.  The Parties………………………………………………… | 2 |
|   B.  The Illegal Transactions under Idaho Law……………………….... | 3 |
|   C.  AIA Companies' Refusal to Assert Illegality Defense……………..... | 10 |
|   D.  Donna Taylor's Idaho Lawsuit Stayed Pending Resolution of Illegality Issue by this Court……………………………………………… | 10 |
| III.  ARGUMENT………………………………………............. | 11 |
|   A.  Donna Taylor, as the Sole Preferred Shareholder of AIA Services, Is Entitled to Intervene as a Matter of Right to Protect Her Interests……….. | 12 |
|     1.  Timeliness of Intervention………………….................................. | 12 |
|     2.  Interest of the Intervening Party………………….................... | 13 |

- ii -

FOSTER DEC. EX. 20 pg. 7

Case 2:18-cv-00370-RMP Document 14-10 Filed 09/18/18 PageID.748 Page 9 of 149
Case 3:17-cv-05049-BHS Document 140-10 Filed 05/17 Page Page 24 of 149
of 149

| | |
|---|---|
| 3. Impact of Proceeding on Intervenor's Interest…………………………… | 14 |
| 4. Inadequacy of Representation by Existing Parties………………….. | 15 |
| 5. Intervention by Shareholders……………………………………….. | 16 |
| B. Alternatively, Donna Taylor Should Be Permitted to Intervene Because Her Claims and Defenses Relating to the Security Agreement – Guarantee Share Common Questions of Law and Fact……………………………… | 18 |
| IV. CONCLUSION……………………………………………………. | 20 |

## <u>TABLE OF AUTHORITIES</u>

| | |
|---|---|
| **<u>Cases</u>** | |
| *Beckman Industries, Inc. v. Int'l Ins. Co.*, 966 F.2d 470 (9th Cir. 1992)…………………………………………….. | 18 |
| *Borkowski v. Fraternal Order of Police, Philadelphia Lodge No. 5*, 155 F.R.D. 105 (1994)…………………………………….. | 17, 19 |
| *California ex rel. Lockyer v. United States*, 450 F.3d 436 (9th Cir.2006)………………………………………………… | 13 |
| *Consolidated Edison, Inc. v. Northeast Utilities*, 2004 WL 35445 (S.D.N.Y. 2004)………………………………………… | 16, 19 |
| *Farrell v. Whiteman*, 146 Idaho 604, 200 P.3d 1153 (2008)............ | 9 |
| *Fowler v. Cheirrett*, 69 Idaho 224, 205 P.2d 502 (1949)………….. | 9 |
| *Golconda Petroleum Corp. v. Petrol Corp.*, 46 F.Supp. 23 (S.D. Cal. 1942)……………………………………………….. | 17, 19 |
| *Marine Services Unlimited, Inc. v. Rakes*, 918 S.W.2d 132 (Ark. 1996)………………………………………………… | 7 |
| *Northwest Forest Resource Council v. Glickman*, 82 F.3d 825 (9th Cir. 1996) …………………………………………… | 11, 12, 13, 15, 18 |
| *Pellegrino v. Nesbit*, 203 F.2d 463 (9th Cir. 1953)……………….. | 12, 14, 16 |
| *Price v. Gurney*, 324 U.S. 100, 65 S.Ct. 513, 89 L.Ed. 776 (1945).. | 14 |

- iii -

| | |
|---|---|
| *SEC v. Everest Management Corp.*, 475 F.2d 1236 (2d Cir. 1972).. | 18 |
| *Shortel v. Evans-Ferguson Corp.*, 277 P. 519 (Ca 1929)………… | 9 |
| *Sierra Club v. EPA*, 995 F.2d 1478 (9th Cir. 2011)……………… | 11 |
| *Spangler v. Pasadena City Bd. of Ed.*, 552 F.2d 1326 (9th Cir. 1977)……………………………………………………….. | 18 |
| *State of California v. Tahoe Regional Planning Agency*, 792 F.2d 775 (9th Cir.1986)…………………………………………………… | 19 |
| *Stone v. American Lacquer Solvents Co.*, 345 A.2d 174 (Pa. 1975). | 7 |
| *Taylor v. AIA Services Corp.*, 151 Idaho 52, 261 P.3d 829 (2011).. | 8, 9 |
| *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972)………………………………… | 15 |
| *United States v. City of Los Angeles*, 288 F.3d 391 (9th Cir. 2002). | 12 |
| *Wilderness Soc. V. United States Forest Service*, 630 F.3d 1173 (9th Cir. 2011)……………………………………………………….. | 11, 12, 13 |
| *Venegas v. Skaggs*, 867 F.2d 527 (9th Cir. 1989)………………… | 18, 19 |
| **Statutes** | |
| Idaho Code § 30-1-202(2)(b)……………………………………… | 3, 6, 8, 9 |
| Idaho Code § 30-1-301(1)………………………………………… | 3, 4, 6, 8, 9 |
| Idaho Code § 30-1-302(7)………………………………………… | 3, 4, 6, 8, 9 |
| Idaho Code § 30-1-801(2)………………………………………… | 3, 6, 7, 8, 9 |
| Idaho Code § 30-1-821…………………………………………… | 6 |
| **Rules** | |
| F.R.Civ.P. 24(a)(2)……………………………………………… | 11, 13, 17 |
| F.R.Civ.P. 24(b)(1)(B)………………………………………….. | 18 |
| F.R.Civ.P. 24(b)(3)……………………………………………… | 18 |
| **Other** | |
| 14B AM. JUR. 2D CORPORATIONS § 1258……………………… | 7 |
| 18B AM. JUR. 2D CORPORATIONS § 1264……………………… | 7 |

- iv -

FOSTER DEC. EX. 20 pg. 9

# I.    **INTRODUCTION**

Donna J. Taylor ("Donna Taylor") is a preferred shareholder of AIA Services Corporation ("AIA Services"), which is the sole shareholder of its subsidiary corporation, AIA Insurance, Inc. ("AIA Insurance").  Donna Taylor has been complaining for years that insiders at AIA Services and AIA Insurance have been violating the law and the corporations' articles of incorporation.  Despite these complaints, AIA Services and AIA Insurance illegally, in violation of AIA Services' amended articles of incorporation, guaranteed a $10 Million loan for CropUSA Insurance Agency and CropUSA Insurance Services.  The plaintiff, Gemcap Lending I, LLC ("Gemcap"), is seeking to enforce the illegal guarantee in this lawsuit, and AIA Services and AIA Insurance have refused to take action to have the guarantee declared illegal.

As the sole preferred shareholder of AIA Services, Donna Taylor has a substantial interest in preventing a multimillion dollar judgment from being entered against AIA Services or its subsidiary, AIA Insurance.  Donna Taylor also has a substantial interest in preventing the insiders of AIA Services and AIA Insurance from continuing to allow the assets of these corporations to be encumbered and alienated to cover debts of other corporations.  Donna Taylor seeks to intervene on behalf of the AIA companies to assert the affirmative defenses associated with the illegality and unenforceability of the guarantee, which the AIA companies have refused to pursue in this litigation.  Donna

- 1 -

**FOSTER DEC. EX. 20 pg. 10**

Case 2:18-cv-00070-BMR  CFC No. 9-31  filed 09/19/18  Page 1 of 1
Case 1:13-cv-09040-CDW-AGW  Document 14  Filed 09/19/18  Page 12 of 97  Page ID
of 549

Taylor also seeks to intervene to prevent the AIA companies—through the insiders—from further damaging the AIA companies and the shareholders by committing the AIA companies to a liability by way of settlement, which should not exist in the first place.

## II.     STATEMENT OF FACTS

### A.    The Parties.

Donna Taylor is the sole Series A Preferred Shareholder of AIA Services and she holds 41,651.25 Series A Preferred Shares. (Bond Decl., Ex. 3-4 and 5)  AIA Insurance is a wholly owned subsidiary of AIA Services.  (Bond Decl., ¶ 4)  From 2012 through the present time, CropUSA Insurance Agency and CropUSA Insurance Services were not subsidiaries of AIA Services. (Bond Decl., Ex. 2)

Under AIA Services' amended articles of incorporation, there are various restrictive covenants that bar it or its wholly owned subsidiary, AIA Insurance, from guaranteeing any loans for any entity that is not a wholly owned subsidiary.  (Bond Decl., Ex. 1, p. 86-92.)  In addition, Donna Taylor had the unqualified right to appoint a director to the board of AIA Services and that right has not been honored from 2009 through the present time.  (Bond Decl., Ex. 5)

On October 1, 2012, Gemcap entered into a "Security Agreement – Guarantee" with AIA Services and AIA Insurance ("Guarantee") for the purpose of guaranteeing a $10 Million loan for CropUSA Insurance Agency and CropUSA Insurance Services. (2nd

FOSTER DEC. EX. 20 pg. 11

Am. Compl., Doc. #102, Ex. 7, p. 117-136)   AIA Services' Series A Preferred Shareholder, Donna Taylor, and AIA Services common shareholders did not consent to the Guarantee or authorize it at a shareholder meeting. (Bond Decl., Ex. 5) When CropUSA Insurance Agency and CropUSA Insurance Services defaulted on the $10 Million loan, Gemcap filed this lawsuit against them, AIA Services, AIA Insurance, John Taylor and others.

**B.**     **The Illegal Transaction under Idaho Law.**

AIA Services and AIA Insurance's Guarantee of the $10 Million loan violates AIA Services' amended articles of incorporation and thus violated Idaho Code § 30-1-801(2), § 30-1-202(2)(b)(ii)-(iii), § 30-1-301(1) and § 30-1-302(7), which govern AIA Services and AIA Insurance (both Idaho corporations).

Under Idaho law, "[a]ll corporate powers shall be exercised by or under the authority of…its board of directors, *subject to any limitation set forth in the articles of incorporation.*" I.C. § 30-1-801(2) (emphasis added).  "The articles of incorporation may set forth…Provisions not inconsistent with the law regarding…Managing the business and regulating the affairs of the corporation, Defining, *limiting and regulating the powers of the corporation, its board of directors, and shareholders…*"  I.C. § 30-1-202(2)(b)(ii)-(iii) (emphasis added).  Under Idaho law, "Every corporation incorporated under this chapter has the purpose of engaging in any lawful business *unless a more limited purpose*

- 3 -

*is set forth in the articles of incorporation.*" I.C. § 30-1-301(1) (emphasis added). Under Idaho law, "*Unless its articles of incorporation provide otherwise, every corporation…*has the same powers as an individual to do all things necessary…to make contracts and guarantees…" I.C. § 30-1-302(7) (emphasis added).

Here, AIA Services' amended articles of incorporation barred AIA Services and its wholly owned subsidiary, AIA Insurance, from guaranteeing the $10 Million loan for CropUSA, as neither CropUSA Insurance Agency nor CropUSA Insurance Services, LLC are wholly owned subsidiaries of AIA Services:

> [AIA Services] will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume, guaranty or otherwise become or remain directly liable with respect to, any Indebtedness, except…[listing a number of exceptions]

(Bond Decl., Ex. 1, p. 86, § 4.2.9(c))  None of the exceptions apply.  (Id. at p. 86-90) Moreover, the financial covenants in the amended articles of incorporation also barred the Guarantee of the $10 Million loan:

> Neither the corporation nor any Subsidiary will incur any new Indebtedness (other than Indebtedness permitted by Section 4.2.9(c)(xi) of this Articles Fourth) if, at the time of incurring such Indebtedness, the ratio of

- 4 -

**FOSTER DEC. EX. 20 pg. 13**

Case 2:18-cv-00070-BMR    ECF No. 9-31    filed 09/19/18    PageID.354    Page 15
Case 1:13-cv-09040-CIN-CWD    Document 44    Filed 06/09/17    Page 15    of 149
of 149

Consolidated Long Term Debt to Consolidated Net Worth exceeds, or such

additional Indebtedness would cause such ratio to exceed 3.6 to 1.0.

(Bond Decl., Ex. 1, p. 90, §4.2.9(j)) The definition of "Indebtedness" as applied to the

above restrictions includes:

(a) all indebtedness for borrowed money…(c) notes payable and drafts

accepted representing extensions of credit whether or not representing

obligations for borrowed money…(e) all indebtedness secured by a Lien…

(Bond Decl., Ex. 1, p. 91) The definition of "Lien" means:

[A]ny lien, mortgage, pledge, security interest, charge or encumbrance of

any kind (including any conditional sale or other title rentention agreement,

any lease in the nature thereof, and any agreement to give a security interest.

(Bond Decl., Ex. 1, p. 91.)  As applied to the restrictions in Section 4.2.9, the definitions

of all applicable terms do not provide an exception for AIA Services and AIA Insurance's

Guarantee to Gemcap. (Id. at 86-90.) Moreover, CropUSA Insurance Agency and

CropUSA Insurance Services were not subsidiaries of AIA Services when the Guarantee

was entered into, so no exception in that regard applies. (Id.)  From 2010 through the

present, AIA Services' financial condition, as defined in the amended articles of

incorporation, barred the Guarantee of the $10 Million loan. (Id.; Bond Decl., Ex. 2)

- 5 -

FOSTER DEC. EX. 20 pg. 14

None of the restrictive covenants in Section 4.2 of AIA Services' amended articles of incorporation could be waived unless Donna Taylor consented and she never provided such consent. (Bond Decl., Ex. 1, p. 93, §4.2.12; Bond Decl., Ex. 5) In fact, AIA Services never bothered to even obtain independent shareholder approval for the Guarantee of the $10 Million loan from AIA Services' common shareholders. (Bond Decl., Ex. 5) There is no way that a sophisticated investor like Gemcap was not aware of these restrictions.

Therefore, AIA Services and AIA Insurance's Guarantee of the $10 Million loan for CropUSA Insurance Agency and CropUSA Insurance Services violated AIA Services' amended articles of incorporation and consequently violated I.C. § 30-1-801(2), I.C. § 30-1-202(2)(b)(ii)-(iii), I.C. § 30-1-301(1) and I.C. § 30-1-302(7).

Even if the Guarantee was authorized by the restrictive lending covenants, the Guarantee is separately illegal because Donna Taylor had the unequivocal right to appoint a director to the board of directors of AIA Services and since her appointment was not honored, all actions taken by the board is unlawful. "All corporate powers shall be exercised by or under the authority of…its board of directors, *subject to any limitation set forth in the articles of incorporation*." I.C. § 30-1-801(2) (emphasis added). Action without a meeting may only be taken by the board with written consent from all directors. I.C. § 30-1-821. The "directors of a corporation may bind a corporation only when they act at a legal meeting of the board" and a "meeting held without notice to some or any of

- 6 -

**FOSTER DEC. EX. 20 pg. 15**

the directors and in their absence is illegal, and action taken at such a meeting, although by a majority of the directors, is invalid." *Stone v. American Lacquer Solvents Co.*, 345 A.2d 174, 176-77 (Pa. 1975); *Marine Services Unlimited, Inc. v. Rakes*, 918 S.W.2d 132, 134 (Ark. 1996); 14B AM. JUR. 2D CORPORATIONS § 1258; 18B AM. JUR. 2D CORPORATIONS § 1264.

Because a properly constituted board of directors of AIA Services did not authorize the Guarantee, AIA Services and AIA Insurance violated I.C. § 30-801(2) and common law by taking action without authorization from AIA Services' board of directors. AIA Services was obligated to honor Donna Taylor's unqualified appointment of a person to the board of directors and it refused to acknowledge her appointment of Paul Durant to the board of directors. (Bond Decl., ¶8 and Ex. 1, p. 86, §4.2.8; Bond Decl., Ex. 5) There is no possible way that the Guarantee could be authorized by the board of directors when Donna Taylor's designee never received notice of any board meetings or consented to any action in lieu of a board meeting. (Bond Decl., Ex. 5) Again, an astute lender such as Gemcap can hardly allege that it didn't review AIA Services' amended articles of incorporation and inquire on the status of Donna Taylor's designee to the board and the sums owed to her for her Series A Preferred Shares. Thus, the Guarantee separately violated Idaho Code and AIA Services' amended articles of

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE BY INTERVENOR DONNA J. TAYLOR

**FOSTER DEC. EX. 20 pg. 16**

incorporation since Donna Taylor's designee did not authorize the Guarantee or receive notice of any meetings to authorize it. (Bond Decl., Ex. 5)

Having established above that AIA Services and AIA Insurance violated I.C. § 30-1-801(2), I.C. § 30-1-202(2)(b)(ii)-(iii), I.C. § 30-1-301(1) and I.C. § 30-1-302(7) when it unlawfully entered into the Guarantee, the Guarantee is illegal and unenforceable, as is any document or agreement in furtherance of the illegal Guarantee, including the UCC Financing Statement that Gemcap filed with the Idaho Secretary of State. Idaho law relating to illegality of contract is clear:

> An illegal contract is one that rests on illegal consideration consisting of any act or forbearance which is contrary to law or public policy. The general rule is that a contract prohibited by law is illegal and unenforceable. A contract which is made for the purpose of furthering any matter or thing prohibited by statute is void.

*Taylor v. AIA Services Corp.*, 151 Idaho 552, 564-65, 261 P.3d 829, 841-42 (2011)

> Idaho has long disallowed judicial aid to either party to an illegal contract…An illegal contract is one that rests on illegal consideration consisting of any act or forbearance which is contrary to law or public policy…In most cases, the court will leave the parties to an illegal contract as it finds them.

- 8 -

FOSTER DEC. EX. 20 pg. 17

Case 2:18-cv-00270-RMP    ECF No. 9-21    filed 09/18/18    PageID.358    Page 19
Case 1:07-cv-00048-BLW    Document 491-4    filed 08/08/13    Page 18 of 148    PageID
of 5485

1    *Farrell v. Whiteman*, 146 Idaho 604, 609, 200 P.3d 1153, 1158 (2008).

2    "A new promise based on an illegal, invalid consideration cannot validate the

3    original transaction or any part of it…[and] [t]he courts cannot lend their aid to

4

5    enforcement of a claimed indebtedness based entirely on an illegal consideration."

6    *Fowler v. Cheirrett*, 69 Idaho 224, 226, 205 P.2d 502 (1949); *see also Shortel v. Evans-*

7

8    *Ferguson Corp.*, 277 P. 519, 521 (Ca 1929) ("Release from or cancelation of an illegal or

9    void contract can never be valid consideration…'Modification or abandonment of an

10

11   illegal contract by mutual agreement cannot be a lawful consideration for a new

12   contract'"). Moreover, "an illegal contract is against public policy, and any release

13

14   promising not to assert illegality is also against public policy and is void as a document in

15   furtherance of the illegal contract." *Taylor*, 261 P.3d at 847.

16   Since Gemcap, AIA Services and AIA Insurance violated I.C. § 30-1-801(2), I.C. §

17   30-1-202(2)(b)(ii)-(iii), I.C. § 30-1-301(1) and I.C. § 30-1-302(7) when they entered into

18

19   the Guaranty for the $10 Million loan, the Guarantee constitutes an illegal and

20   unenforceable contract.  Likewise, the UCC Financing Statement filed by Gemcap is also

21   illegal and unenforceable. Finally, any document or agreement entered into in furtherance

22

23   of, or release of, the illegal Guarantee is also illegal and unenforceable.

24   / /

25   / /

26

- 9 -

**FOSTER DEC. EX. 20 pg. 18**

**C.   AIA Companies' Refusal to Assert Illegality Defense.**

Soon after Gemcap filed this lawsuit, counsel for Donna Taylor repeatedly advised the attorneys for Gemcap and the AIA companies that the Guarantee was an illegal contract and unenforceable.  (Bond Decl., ¶ 5)  Despite these demands, AIA Services and AIA Insurance have failed to take action to have the Guarantee declared illegal and Gemcap has refused to release AIA Services and AIA Insurance from the Guarantee. (Bond Decl., ¶¶5-7, Ex. 5)

**D.   Donna Taylor's Idaho Lawsuit Stayed Pending Resolution of Illegality Issue by this Court.**

In order to protect her interests, Donna Taylor filed suit in Idaho state court against Gemcap and the AIA companies for declaratory judgment and injunctive relief, seeking an order declaring the Guarantee to be an illegal and unenforceable contract.  (Bond Decl., Ex. 4)  Donna Taylor then filed a summary judgment motion on the issue.  (Bond Decl., ¶ 7)  In response to the motion for summary judgment, Gemcap asked the Idaho court to stay the Idaho lawsuit due to this pending action in California federal court. (Bond Decl., ¶ 8)  The Idaho court verbally granted Gemcap's motion to stay on September 18, 2014.  (Bond Decl., ¶ 8, Ex. 6)  As a result of the Idaho court's decision, the only forum in which Donna Taylor can currently raise the illegality defense is by intervention in this lawsuit.  (Bond Decl., ¶ 8)

/ /

- 10 -

FOSTER DEC. EX. 20 pg. 19

# III.   ARGUMENT

## A.   Donna Taylor, as the Sole Preferred Shareholder of AIA Services, Is Entitled to Intervene as a Matter of Right to Protect Her Interests.

A court "must permit" a moving party to intervene, as a matter of right, if the moving party "claims an interest relating to the property or the transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."   F.R.Civ.P. 24(a)(2).   Courts apply a four-part test when analyzing a motion to intervene under Rule 24(a)(2):

> (1) the motion must be timely; (2) the applicant must claim a "significantly protectable" interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action.

*Wilderness Soc. V. United States Forest Service*, 630 F.3d 1173, 1177 (9th Cir. 2011) (quoting *Sierra Club v. EPA*, 995 F.2d 1478, 1481 (9th Cir. 2011); *Northwest Forest Resource Council v. Glickman*, 82 F.3d 825, 836 (9th Cir. 1996).   When applying these requirements, courts usually "follow 'practical and equitable considerations' and construe the Rule 'broadly in favor of proposed intervenors.'"   *Wilderness Soc.*, 630 F.3d at 1179

- 11 -

FOSTER DEC. EX. 20 pg. 20

(quoting *United States v. City of Los Angeles*, 288 F.3d 391, 397 (9th Cir.2002)).  Broad construction exists "because '[a] liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts.'"  *Wilderness Soc.*, 630 F.3d at 1179 (quoting *City of Los Angeles*, 288 F.3d at 397-98).

### 1.    <u>Timeliness of Intervention.</u>

Courts use "three criteria in determining whether a motion to intervene is timely: (1) the stage of the proceedings; (2) whether the parties would be prejudiced; and (3) the reason for any delay in moving to intervene."  *Northwest Forest*, 92 F.3d at 836-37.  "In determining the timeliness of such a motion a court should consider not only the period of time that has passed, but also the circumstances contributing to the delay."  *Pellegrino v. Nesbit*, 203 F.2d 463, 465 (9th Cir. 1953).  "Intervention should be allowed even after a final judgment where it is necessary to preserve some right which cannot otherwise be protected."  *Id*.

In this case, Donna Taylor has diligently attempted to work with Gemcap and the AIA companies to resolve the illegality and enforceability issue.  When it became clear that the issues would not be considered by these parties, Donna Taylor attempted to present the issues in what she believed to be the proper forum—state court in the State of Idaho, where the corporations are formed and reside.  (Bond Decl., ¶ 9)  As a result of the Idaho action being stayed due to the pendency of this action, Donna Taylor is now

- 12 -

seeking to present these issues to this Court before the entry of any judgment against the AIA companies.

Furthermore, there is no prejudice to the parties by allowing the intervention. There has been no trial and there has been no final judgment entered. The issues of illegality and enforceability are issues that can be determined on a summary judgment basis, so allowing these claims and defenses to be presented will not significantly delay the proceedings.

## 2.    Interest of the Intervening Party.

"Rule 24(a)(2) does not require a specific legal or equitable interest." *Wilderness Soc.*, 630 F.3d at 1179. Instead, the "interest" test is a practical guide to resolve of lawsuits by involving as many interested parties as may be compatible with efficiency and due process. *Id*. Generally, the interest at issue need only be protectable under some law and there is a relationship between the protected interest and the claims in the lawsuit. *Id*.; *Northwest Forest*, 82 F.3d at 837. An interest for purposes of intervention is adequate if the intervenor "'will suffer a practical impairment of its interests as a result of the pending litigation.'" *Wilderness Soc.*, 630 F.3d at 1179 (quoting *California ex rel. Lockyer v. United States,* 450 F.3d 436, 441 (9th Cir.2006)).

In this case, Donna Taylor is the sole preferred stockholder in AIA Services. As a result, she has a substantial interest in ensuring that the compelling and dispositive

- 13 -

**FOSTER DEC. EX. 20 pg. 22**

defenses of illegality and enforceability of contract are fully presented.  *See Price v. Gurney*, 324 U.S. 100, 105, 65 S.Ct. 513, 89 L.Ed. 776 (1945) (stating that "if a corporation has a defense to an action against it and is not asserting it, a stockholder may intervene and defend on behalf of the corporation.")  In addition, she has an interest in preventing future ultra vires actions by AIA Services's insiders, in the form of committing to a significant financial obligation by way of settlement, when the board of directors is not properly constituted.  Such action would constitute a further violation of Donna Taylor's rights as a preferred shareholder of AIA Services.

### 3.    Impact of Proceeding on Intervenor's Interest.

A corporation's failure to diligently prosecute a claim or defense which presents substantial and important questions of law can adversely impact a shareholder's interest, justifying intervention by the shareholder.  *Pellegrino*, 203 F.2d at 468.  In this case, the failure by AIA Services and AIA Insurance to raise illegality and unenforceability defenses constitutes a failure to diligently defend against Gemcap's claims.  The failure to raise these defenses exposes the AIA corporations to unnecessary liability and depletes the assets of the companies.  In addition, any negotiated settlement entered into by an improperly constituted board of directors, which commits the AIA companies to future liability based on the illegal Guarantee, causes further injury to Donna Taylor's interest as the sole preferred shareholder.

- 14 -

FOSTER DEC. EX. 20 pg. 23

### 4. __Inadequacy of Representation by Existing Parties.__

Where an individual member of a group or organization establishes doubt about the adequacy of representation by a lawyer for the entire group, intervention as a matter of right is appropriate. *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538-39, 92 S.Ct. 630, 636, 30 L.Ed.2d 686 (1972). To determine whether an intervening party's interest is adequately protected, courts consider "(1) whether the interest of a present party is such that it will undoubtedly make all the intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether the would-be intervenor would offer any necessary elements to the proceedings that other parties would neglect." *Northwest Forest*, 92 F.3d at 838. The intervenor does not have to show that representation "will be" inadequate; rather, the intervenor need only show that representation "may be" inadequate. *Id*.

In this case, the illegality of the Guarantee is a dispositive defense available to AIA Services and AIA Insurance, yet both companies have failed to assert the defense in any fashion. Instead, the corporations are contemplating a settlement which will provide for the entry of judgment against them for obligations that are simply not enforceable, as a matter of law. Again, a corporation's failure to assert a material defense equates to inadequate representation of a shareholder's interest.

/ /

- 15 -

**5.** **Intervention by Shareholders.**

Courts have consistently held that shareholders should be permitted to intervene in actions involving corporations, where the shareholder's interests can be adversely affected or where the corporations are failing to diligently prosecute or defend an action.

In *Pellegrino v. Nesbit*, *supra*, a shareholder who held only two shares of stock was allowed to intervene as a matter of right, after entry of a judgment denying relief against corporate officers for violations of the Securities and Exchange Act of 1934. *Pellegrino*, 203 F.2d at 465. The stockholder asserted his right to intervene in order to appeal the judgment. *Id*. In reversing the district court and sustaining the stockholder's motion to intervene, as a matter of right, the Ninth Circuit stated that the corporation's decision not to appeal the judgment constituted a failure to diligently prosecute the claims against the officers, particularly when the correctness of judgment presented substantial and important questions of law. *Id*. at 467.

In *Consolidated Edison, Inc. v. Northeast Utilities*, 2004 WL 35445 (S.D.N.Y. 2004), the district court allowed a shareholder to intervene, as a matter of right and permissively, in a breach of contract case between a target corporation and acquiring corporation following a failed merger. *Consolidated Edison*, 2004 WL 35445 at *5-7. The court found that the shareholder's interests "could be impaired by any obligations or judgments reached in this litigation." *Id*. at *6. The court allowed the intervention even

- 16 -

**FOSTER DEC. EX. 20 pg. 25**

though litigation had been pending for two years, finding that the relevant issues had only "recently crystalized." *Id*. The court also found no prejudice to the existing parties, as intervention would allow all issues regarding the transaction to be litigated in one forum and would avoid conflicting determinations. *Id*.

In *Golconda Petroleum Corp. v. Petrol Corp.*, 46 F.Supp. 23 (S.D. Cal. 1942), a shareholder of the plaintiff corporation, suiting for oil royalties, was allowed to intervene because the boards of both corporations were controlled by same people, and as a result of this mutual control, the board of directors for the plaintiff corporation planned to dismiss action against defendant corporation. *Golconda*, 46 F.Supp. at 24-25. In this situation, the district court determined the shareholder had "clearly" established a right to intervene in light of the corporation's failure to diligently prosecute the claim. *Id*. at 25-26; *see also Borkowski v. Fraternal Order of Police, Philadelphia Lodge No. 5*, 155 F.R.D. 105, 108 (1994) (50% stockholder allowed to intervene as a matter of right and permissively to dismiss lawsuit, which required his approval before filing, because "he had a vested interest in the property and potential liabilities" of the corporation).

In this case, Donna Taylor has presented the necessary facts to establish that she has a substantially protectable interest, as the sole preferred shareholder of AIA Services, to ensure that the AIA corporations avail themselves of clear defenses which compels her intervention in this action. F.R.Civ.P. 24(a)(2).

- 17 -

<sub>1</sub>
<sub>2</sub>
<sub>3</sub>

**B.**      <u>Alternatively, Donna Taylor Should Be Permitted to Intervene Because Her Claims and Defenses Relating to the Security Agreement – Guarantee Share Common Questions of Law and Fact</u>.

<sub>4</sub>
<sub>5</sub>

     A court "may permit" a moving party to intervene if the moving party "has a claim

<sub>6</sub>

or defense that shares with the main action a common question of law for fact."

<sub>7</sub>
<sub>8</sub>

F.R.Civ.P. 24(b)(1)(B).    On a motion for permissive intervention, "the court must

consider whether the intervention will unduly delay or prejudice the adjudication of the

<sub>9</sub>

original parties' rights" when exercising the court's discretion.   F.R.Civ.P. 24(b)(3).

<sub>10</sub>
<sub>11</sub>

     Whether to grant a motion for permissive intervention is a matter of discretion with

<sub>12</sub>

the court.   *Beckman Industries, Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 472 (9th Cir. 1992);

<sub>13</sub>

*Venegas v. Skaggs*, 867 F.2d 527, 529-30 (9th Cir. 1989); *Spangler v. Pasadena City Bd.*

<sub>14</sub>
<sub>15</sub>

*of Ed.*, 552 F.2d 1326, 1329 (9th Cir. 1977).   Rule 24(b) gives the district court discretion

<sub>16</sub>

"to determine the fairest and most efficient method of handling a case."   *Venegas*, 867

<sub>17</sub>

F.2d at 530 (quoting *SEC v. Everest Management Corp.*, 475 F.2d 1236, 1240 (2d Cir.

<sub>18</sub>
<sub>19</sub>

1972)).

<sub>20</sub>

     A court may grant permissive intervention if three conditions are met: "(1) the

<sub>21</sub>

movant must show an independent ground for jurisdiction; (2) the motion must be timely;

<sub>22</sub>
<sub>23</sub>

and (3) the movant's claim or defense and the main action must have a question of law

<sub>24</sub>

and fact in common."   *Venegas*, 867 F.2d at 529; *Beckman*, 966 F.2d at 473; *Northwest*

<sub>25</sub>

*Forest*, 82 F.3d at 839.   A court "should evaluate whether the movant's 'interests are

<sub>26</sub>

**FOSTER DEC. EX. 20 pg. 27**

adequately represented by existing parties.'" *Venegas*, 867 F.2d at 530 (quoting *State of California v. Tahoe Regional Planning Agency*, 792 F.2d 775, 779 (9th Cir.1986)). Judicial economy is also a relevant consideration on a motion for permissive intervention. *Id*. at 531.  In addition, a court may consider the nature and extent of the intervenor's interest, standing to raise relevant legal issues, the legal position being advanced and its relation to the case, and whether intervention will significantly contribute to the development of the underlying factual issues and to "the just and equitable adjudication of the legal questions presented." *Spangler*, 552 F.2d at 1329.

The reasons previously set forth in support of Donna Taylor's intervention as a matter of right also justify a determination that Donna Taylor should be permitted to intervene.  *See, e.g., Consolidated Edison*, at *7 (stating that permissive intervention by shareholder would be appropriate, even if there were no right to intervention); *Golconda*, 46 F.Supp. at 25-26; *Borkowski*, 155 F.R.D. at 110-11 (finding that shareholder established grounds for permissive intervention in addition to mandatory intervention).

/ /

/ /

/ /

/ /

/ /

- 19 -

FOSTER DEC. EX. 20 pg. 28

# IV.   <u>CONCLUSION</u>

For the foregoing reasons, Intervenor Donna J. Taylor respectfully requests that the Court enter an order authorizing Donna Taylor to intervene in this action as a matter of right, or in the alternative, for an order permitting her to intervene in this action, in order to allow her to file Intervenor Donna J. Taylor's: (1) Additional Affirmative Defenses to the Second Amended Complaint; and (2) Intervenor-Complaint for Declaratory Judgment and Injunctive Relief.

DATED: January 8, 2015                    LAW OFFICE OF JOHN H. GUIN, PLLC

*/s/ John H. Guin*
John H. Guin
*Attorney for Intervenor DONNA J. TAYLOR*

- 20 -

FOSTER DEC. EX. 20 pg. 29

JOHN H. GUIN, CSB 282725
john@guinlaw.com
LAW OFFICE OF JOHN H. GUIN, PLLC
421 W. Riverside Ave., Suite 461
Spokane, WA 99201
Telephone: (509) 747-5250
Facsimile: (509) 747-5251

*Attorney for Intervenor*
*DONNA J. TAYLOR*

# THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DISTRICT

| | |
|---|---|
| GEMCAP LENDING I, LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> CROP USA INSURANCE AGENCY, INC., an Idaho corporation; CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company; CROP, LLC, a limited liability company of unknown origin; AIA INSURANCE, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; R. JOHN TAYLOR a/k/a RAY JOHNSON TAYLOR a/k/a R. JOHNSON TAYLOR a/k/a RAYMOND J. TAYLOR, an Individual; REINSURANCE PARTNERS, LLC, an Idaho limited liability company; GREEN LEAF REINSURANCE PARTNERS, LLC, a | Case No.: CV13-5504 SJO (MAN) <br><br> **DECLARATION OF RODERICK C. BOND IN SUPPORT OF MOTION TO INTERVENE BY INTERVENOR DONNA J. TAYLOR** <br><br> **Date:**   **February 9, 2015** <br> **Time:**   **10:00 a.m.** <br> **Ctrm:**   **1** <br><br> **Hon. S. James Otero** |

Delaware limited liability company;
WESKAN AGENCY, an Idaho assumed
business name; PACIFIC EMPIRE
RADIO CORPORATION, an Idaho
corporation; RANDOLPH
LAMBERJACK, an individual; JOLEE
DUCLOS, an individual; BRYAN
FREEMAN, an individual; HILLCRAFT
AIRCRAFT COMPANY, an Idaho
corporation; CGB DIVERSIFIED
SERVICES, INC. d/b/a DIVERSIFIED
CROP INSURANCE SERVICES, a
Louisiana corporation; and GREENLEAF
REINSURANCE COMPANY,

                    Defendants.

I, Roderick C. Bond, declare:

1.      I am an attorney for Donna J. Taylor in a number of court actions (including

in Idaho state court) involving her status as the sole Series A Preferred shareholder in AIA

Services Corporation ("AIA Services"), over the age of eighteen and am competent to

testify in court, including as to the matters set forth in this declaration.  This declaration is

based on my personal knowledge.  I am familiar with and have personal knowledge of all

of the documents attached to this declaration as they were obtained or produced to me

through my role as an attorney in the various cases.

1.      Attached as ***Exhibit 1*** are true and correct certified copies of AIA Services'

Articles of Incorporation and all Amendments and Restatements thereto that I obtained

from the Idaho Secretary of State for AIA Services from the time of its incorporation through the present time. I have provided copies of the applicable amended articles of incorporation contained in Exhibit 1 to Mr. Munding, counsel for AIA Services and AIA Insurance, and Mr. Bernstein, counsel for Gemcap Lending I, LLC ("Gemcap") and explained to them that the Security Agreement – Guarantee dated October 1, 2012 entered into by AIA Services and AIA Insurance, Inc. ("AIA Insurance"), which is attached as Exhibit 7 to the Second Amended Complaint in this lawsuit (the "Guarantee") violated AIA Services' amended articles of incorporation.

2.    Attached as ***Exhibit 2*** is a true and correct copy of AIA Services' 2011-2010 Consolidated Financial Statements with notes thereto, AIA Services' 2012-2011 Consolidated Financial Statements, and AIA Services' 2013-2012 Consolidated Financial Statements. These documents were produced to me by AIA Services' counsel, Doug Siddoway.

3.    Attached as ***Exhibit 3*** is a true and correct copy of Judge Brudie's Opinion and Order filed in *Donna Taylor v. AIA Services, et al.* consolidated cases in the District Court for the Second Judicial District of the State of Idaho, Nez Perce County (Case Nos. CV-08-01150 and CV-13-01075).  I am the attorney for Donna Taylor in these cases and have personal knowledge of this Opinion and Order.

4.      AIA Insurance is a wholly-owned subsidiary of AIA Services.

5.      I have reached out by email and telephone to the attorneys representing Gemcap, AIA Services and AIA Insurance numerous times demanding that AIA Services and AIA Insurance's Guarantee of the $10 Million be released and that the attorney for AIA Services and AIA Insurance should be seeking to have the Guarantee declared illegal. As indicated in Exhibit 1, the Series A Preferred Shareholder, Donna Taylor, has the exclusive right to be a member of the board of directors of AIA Services. Despite numerous demands to honor Donna Taylor's board designee since 2009, the insiders (including R. John Taylor) and their attorneys at AIA Services have refused to do so. On behalf of Donna J. Taylor and other shareholders, I have consistently objected to AIA Services' board of directors taking any action without Donna J. Taylor's designee being appointed and present at any meetings.  Despite all of my requests and demands that the Guarantee be released, no action has been taken. Neither I nor any of my clients had knowledge of the Guarantee until well after it was allegedly entered into by AIA Services and AIA Insurance and not until after this lawsuit was filed.

6.      Having received no commitment from Gemcap to recognize the defense of illegality and having received no commitment from the attorney representing AIA Services and AIA Insurance in this action to assert the defense of illegality, on July 21, 2014, Donna J. Taylor, together with two common shareholders (Dale Miesen and Paul Durant),

commenced a lawsuit in the Second Judicial District of the State of Idaho, in the County of Nez Perce, seeking to declare the Guarantee illegal and unenforceable before the September 16, 2014 trial date in this action. Attached as ***Exhibit 4*** is a true and correct copy of the Verified Complaint for Declaratory Relief and Injunctive Relief filed in the District Court of Nez Perce County, State of Idaho.

7.     Donna J. Taylor, Dale Miesen and Paul Durant filed a motion for summary judgment in the State of Idaho lawsuit and sought a declaration from the Idaho court on the issue of illegality prior to the scheduled trial date in this lawsuit. Attached as ***Exhibit 5*** is a true and correct copy of the Declaration of Donna J. Taylor in support of her motion for summary judgment in the Idaho action. Since the filing of Exhibit 6, Donna J. Taylor has not been paid a single penny nor has her board designee been appointed, as discussed in paragraph 5 above.

8.     In response to Donna Taylor's motion for summary judgment in the Idaho action, Gemcap asked the Idaho court to refrain from making a decision on the illegality issue and to stay the Idaho action due to this pending lawsuit in California federal court. On September 18, 2014, the Idaho court verbally granted the request to stay the Idaho action due to this lawsuit. Attached as ***Exhibit 6*** is a true and correct copy of the Repository Report from the Idaho action, showing the minute entry of the Idaho court's decision to stay the Idaho action. No written order has been issued by the Idaho court at this time

because I objected to Gemcap's proposed order and the trial court has not further addressed the issue. In light of the Idaho court's decision to stay the Idaho action, the only forum in which Donna Taylor can raise the illegality defense in time to prevent judgment from being entered against AIA Services and AIA Insurance is by intervention in this lawsuit.

9. Without waiving attorney-client privilege, I believed that Idaho was the proper venue to resolve the illegality issue because AIA Services and AIA Insurance are Idaho corporations, their place of business is in Idaho, their real property is located in Idaho, the UCC, Financing Statements filed by Gemcap were filed in Idaho, the corporations do not do business in Idaho, and the consent to California jurisdiction contained within Guarantee was illegal and unenforceable (as is the Guarantee itself). In addition, I am not licensed to practice law in California. Nevertheless, I have continued to monitor this lawsuit by and through reviewing the records contained on PACER. Despite sending various emailed to attorneys for AIA Services, AIA Insurance and Gemcap regarding the Guarantee violating AIA Services' amended articles of incorporation, I have not seen a single pleading, paper or disclosure advising this Court of the illegality of the Guarantee. Without waiving attorney-client privilege, it is safe for this Court to assume that Donna J. Taylor, like most everyday Americans, did not have the financial wherewithal to engage in costly litigation in California. Since I have worked both with and against John Guin in the past (and without waiving any attorney-client privilege), he agreed to represent

Donna J. Taylor in this lawsuit. If intervention is granted, I intend on moving this Court

for permission to appear *pro hac vice*.

    I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE
STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.

January 8, 2015, Bellevue, Washington
Date and City and State Signed          Roderick C. Bond

Case 2:18-cv-00278-RMP ECF No. 9-21 filed 09/18/18 PageID.777 Page 38
Case 3:17-cv-05806-RJB Document 91-4 filed 03/05/17 Page Page 28 of 149
of 559
#:5504

# BOND DECLARATION EXHIBIT 1

# State of Idaho

## Office of the Secretary of State

I, BEN YSURSA, Secretary of State of the State of Idaho, hereby certify that I am the custodian of the corporation records of this State.

I FURTHER CERTIFY That the annexed is a full, true and complete duplicate of articles of incorporation of **AIA SERVICES CORPORATION**, an Idaho corporation, received and filed in this office on December 20, 1983, under file number C 74568 , including all amendments filed thereto, as appears of record in this office as of this date.

Dated:  February 11, 2013



*Ben Ysursa*

SECRETARY OF STATE

By _Cynthia M_

**FOSTER DEC. EX. 20 pg. 38**

Case 2:18-cv-00279-BMR-CSF No. 9-31 filed 09/05/18 PageID.778 Page 40 of 149

# State of Idaho

## Department of State.

### CERTIFICATE OF INCORPORATION
### OF

**AIA INSURANCE CORPORATION**

I, PETE T. CENARRUSA, Secretary of State of the State of Idaho, hereby certify that duplicate originals of Articles of Incorporation for the incorporation of __**AIA INSURANCE**__ __**CORPORATION**__ ,

duly signed pursuant to the provisions of the Idaho Business Corporation Act, have been received in this office and are found to conform to law.

ACCORDINGLY and by virtue of the authority vested in me by law, I issue this Certificate of Incorporation and attach hereto a duplicate original of the Articles of Incorporation.

Dated: **December 20, 1983**

SECRETARY OF STATE

by:_____

CIP 181

**FOSTER DEC. EX. 20 pg. 39**

# ARTICLES OF INCORPORATION

DEC 21  3 45 PM '83

## OF

## AIA INSURANCE CORPORATION

      THE UNDERSIGNED, acting as incorporator of a corporation under the Idaho Business Corporation Act, adopts the following Articles of Incorporation for such corporation:

### FIRST

      The name of the corporation is AIA INSURANCE CORPORATION.

### SECOND

      The period of its duration is perpetual.

### THIRD

      The purpose for which the corporation is organized is for the transaction of any or all lawful business for which the corporation may be incorporated under the Idaho Business Corporation Act.

### FOURTH

      The aggregate number of shares which the corporation shall have authority to issue is 5,000,000 with a par value of $1.00 per share.

### FIFTH

      Shareholders shall not have a preemptive right to acquire unissued or treasury shares or securities convertible into such shares or carrying a right to subscribe to or acquire shares, except as provided in the Idaho Business Corporation Act.

### SIXTH

      The location of the initial registered office of the corporation is One Lewis Clark Plaza, Lewiston, Idaho 83501 and the name of its initial registered agent at such address is R. John Taylor.

### SEVENTH

      The number of directors constituting the initial Board of Directors is four, and the names and addresses of the persons who are to serve until the first annual meeting of the shareholders and until their successors are elected and qualified are:

ARTICLES OF INCORPORATION - P. 1

**FOSTER DEC. EX. 20 pg. 40**

| NAME | ADDRESS |
|------|---------|
| Reed J. Taylor | P.O. Box 538<br>Lewiston, ID 83501 |
| R. John Taylor | P.O. Box 538<br>Lewiston, ID 83501 |
| Raymond R. Heilman | P.O. Box 538<br>Lewiston, ID 83501 |
| Mary K. Frost | P.O. Box 538<br>Lewiston, ID 83501 |

## EIGHTH

The name and address of the incorporator is as follows:

Reed J. Taylor
P.O. Box 538
Lewiston, ID 83501

## NINTH

The Board of Directors is expressly authorized to alter, amend or repeal the By-Laws of the corporation and to adopt new By-Laws, subject to repeal or change by a majority vote of the shareholders.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 20 day of December, 1983.

_Reed J. Taylor_
Reed J. Taylor

ARTICLES OF INCORPORATION - P. 2

FOSTER DEC. EX. 20 pg. 41

Dec 20  3 PM '83

## CONSENT TO USE CORPORTION NAME

A.I.A., Inc., hereby consents to the use of corporate name, "AIA Insurance Corporation", by the incorporated thereof, and by the corporation to be formed using that name as its corporate name.

_Reed J. Taylor_
Reed J. Taylor

12/19/83
Date

State of Idaho

County of Nez Perce

On this 19th day of ____Dec.____, in the year 1983, before me Bobette Ruddell personally appeared Reed J. Taylor known to me as President of A.I.A., Inc., whose name is subscribed to the within instrument, and acknowledged to me that he executed the same.

_Bobette Ruddell_
Notary Public

My commission expires 3/15/84

**FOSTER DEC. EX. 20 pg. 42**

Case 2:18-cv-00278-BMR-CCE No. 9-31 filed 09/05/19 Page D 782 Page 44 ID #5540



# State of Idaho

## Department of State.

### CERTIFICATE OF AMENDMENT
### OF

### AIA INSURANCE CORPORATION

I PETE T. CENARRUSA, Secretary of State of the State of Idaho hereby, certify that duplicate originals of Articles of Amendment to the Articles of Incorporation of _____

~~AIA SERVICES CORPORATION~~

duly signed and verified pursuant to the provisions of the Idaho Business Corporation Act, have been received in this office and are found to conform to law.

ACCORDINGLY and by virtue of the authority vested in me by law, I issue this Certificate of Amendment to the Articles of Incorporation and attach hereto a duplicate original of the Articles of Amendment.

Dated _____ **October 14** _____ , 19 **86** .

SECRETARY OF STATE

Corporation Clerk

CAM 779

ARTICLES OF AMENDMENT
TO THE ARTICLES OF INCORPORATION
OF
AIA INSURANCE CORPORATION

\* \* \* \* \* \* \* \* \* \* \*

Pursuant to the provisions of Section 30-1-61 of the Idaho Business Corporation Act, the undersigned corporation adopts the following Articles of Amendment to its Articles of Incorporation.

FIRST:    The name of the corporation is AIA INSURANCE CORPORATION.

SECOND:    The following amendments to the Articles of Incorporation were adopted by the shareholders of the corporation on the 29th day of August, 1986, in the manner prescribed by the Idaho Business Corporation Act:

"FIRST

The name of the corporation is AIA SERVICES CORPORATION."

THIRD:    The number of shares of the corporation outstanding at the time of such adoption was ___1,000___; and the number of shares entitled to vote thereon was ___1,000___.

FOURTH:    The designation and number of outstanding shares of each class entitled to vote thereon as a class were as follows:

| Class: | Number of Shares: |
|--------|-------------------|
| Common | 1,000 |

FIFTH:    The number of shares voted for such amendment was __1,000__; and the number of shares voted against such amendment was ___0___.

ARTICLES OF AMENDMENT - P. 1

FOSTER DEC. EX. 20 pg. 44

DATED this 13th day of October, 1986.

AIA INSURANCE CORPORATION

By _Reed Taylor_
President

ATTEST:

_R. John Taylor_
Secretary

STATE OF IDAHO    )
                  :ss.
County of Nez-Perce Ada    )

I,   Ma Amrit Savito   , a Notary Public, do hereby certify that on this 13th day of October, 1986, personally appeared before me REED J. TAYLOR, who, being by me first duly sworn, declared that he is the President of AIA INSURANCE CORPORATION, that he signed the foregoing document as President of the corporation, and that the statements contained therein are true.

_Ma Amrit Savito_
Notary Public for Idaho
Residing at:   Boise, Idaho

ARTICLES OF AMENDMENT - P. 2

# State of Idaho

## Department of State.

### CERTIFICATE OF AMENDMENT
### OF

### AIA SERVICES CORPORATION

I PETE T. CENARRUSA, Secretary of State of the State of Idaho hereby, certify that duplicate originals of Articles of Amendment to the Articles of Incorporation of _____

**AIA SERVICES CORPORATION**

duly signed and verified pursuant to the provisions of the Idaho Business Corporation Act, have been received in this office and are found to conform to law.

ACCORDINGLY and by virtue of the authority vested in me by law, I issue this Certificate of Amendment to the Articles of Incorporation and attach hereto a duplicate original of the Articles of Amendment.

Dated _____ **December 29** , 19 **87** .

SECRETARY OF STATE

Corporation Clerk

CAM 779

**FOSTER DEC. EX. 20 pg. 46**

**ORIGINAL**

## ARTICLES OF AMENDMENT
## TO THE ARTICLES OF INCORPORATION
### OF
### AIA SERVICES CORPORATION

DEC 29

SECRETARY OF STATE

Pursuant to the provisions of Section 30-1-59 and 30-1-61 of the Idaho Business Corporation Act, the undersigned corporation adopts the following Articles of Amendment to its Articles of Incorporation, as heretofore amended.

**FIRST:** The name of the corporation is **AIA SERVICES CORPORATION.**

**SECOND:** Effective on December **23**, 1987, the shareholders of the corporation adopted and approved the following Amended and Restated Articles of Incorporation of AIA Services Corporation, pursuant to which Article Fourth was amended by replacing it in its entirety and new Articles Tenth and Eleventh were added to the original Articles of Incorporation of AIA Services Corporation as filed on December 20, 1983 and previously amended on October 14, 1986:

## ˄AMENDED AND RESTATED ARTICLES OF INCORPORATION
### OF
### AIA SERVICES CORPORATION

Except for the amendment of Article Fourth by replacing it in its entirety and the addition of new Article Tenth and new Article Eleventh as contained herein, these Amended and Restated Articles of Incorporation of AIA Services Corporation correctly set forth without change the corresponding provisions of the original Articles of Incorporation as heretofore filed on December 20, 1983 and amended on October 14, 1986; and these Amended and Restated Articles of Incorporation of AIA Services Corporation, including the amendment of Article Fourth and the addition of new Articles Tenth and Eleventh, supersede the original Articles of Amendment and all previous amendments thereto.

### FIRST

The name of the corporation is **AIA SERVICES CORPORATION.**

### SECOND

The period of its duration is perpetual.

ARTICLES OF AMENDMENT - 1

## THIRD

The purpose for which the corporation is organized is for the transaction of any or all lawful business for which the corporation may be incorporated under the Idaho Business Corporation Act.

## FOURTH

**4.1** **Authorized Capital**. This corporation is authorized to issue two classes of stock to be designated, respectively, "Stated Value Preferred Stock" and "Common Stock". The total number of shares which this corporation is authorized to issue is 5,200,000 shares, of which 200,000 shares shall be Stated Value Preferred Stock, without par value, and 5,000,000 shares shall be common stock, $1.00 par value. The Stated Value Preferred Stock shall be issued in a single series; and each share of Stated Value Preferred Stock shall have the rights and preferences conferred in this Article Fourth. Holders of Stated Value Preferred Stock shall have no rights to share in any distribution of the profits or assets of the corporation, whether in the form of cash or stock or dividends or otherwise, except to the extent specifically provided herein.

**4.2** **No Dividends**. The Stated Value Preferred Stock shall not pay or accrue any dividends.

**4.3** **Demand for Redemption**. (a) The holder of Stated Value Preferred Stock shall have the right to require the corporation to redeem such stock from any legally available funds upon breach of any covenant of the corporation set forth in this Article Fourth, but only to the extent such redemption shall not violate the Idaho Business Corporation Act restrictions on the corporation's redemption of its own shares. This right may be exercised by giving the corporation written notice of demand for redemption specifying the default and a redemption date not less than ninety (90) days from the date such notice delivered to the corporation; provided however that, if the corporation cures such specified default within sixty (60) days after receipt of such notice by corporation, the right to redeem Stated Value Preferred Stock on account of such specified default shall be extinguished.

(b) The holder of Stated Value Preferred Stock shall have the right to require the corporation to redeem such stock from any legally available funds at any time after September 14, 1993, but only to the extent such redemption shall not violate the Idaho Business Corporation Act restrictions on the corporation's redemption of its own shares. This right may be exercised by giving the corporation written notice of demand for redemption specifying a redemption date after September 14, 1993 and not less than ninety (90) days or more than one hundred eighty (180) days from the date such notice is delivered to the corporation.

**4.4** **Call for Redemption**. The Stated Value Preferred Stock may be called for redemption by the corporation, in whole or in part, upon payment of the redemption price from legally available funds at any time prior to demand for redemption by the holder of Stated Value Preferred Stock. Notice of such call for redemption, specifying the redemption date not less than thirty (30) days from the date such notice is mailed, shall be mailed to each record holder of

ARTICLES OF AMENDMENT - 2

Stated Value Preferred Stock. If fewer than all shares of Stated Value Preferred Stock are to be redeemed, the shares shall be redeemed prorata from the holders thereof.

**4.5   Redemption Price;.**   If Stated Value Preferred Stock is redeemed on or before September 14, 1990, the redemption price is $8.00 per share if paid in a lump sum.   If Stated Value Preferred Stock is redeemed any time during the three-year period beginning September 15, 1990 and ending on September 14, 1993, the redemption price is $8.50 per share if paid in a lump sum.   If not paid in a lump sum on or before September 14, 1993, the redemption price for Stated Value Preferred Stock is $10.00 per share, provided that the redemption price may be paid, at the corporation's sole option, in monthly installments on a fifteen (15) year amortization schedule beginning on the day after the redemption date and accruing interest at a rate one-and one-half (1-1/2) points under The First Interstate Bank of Idaho, N.A., prime lending rate, adjusted quarterly.

**4.6   Redemption Procedure and Effect.**

(a)   _Lump Sum Payment._   If the redemption price is to be paid in a lump sum, the corporation shall deposit, or shall cause its nominee to deposit, on or before the redemption date specified in the notice of redemption, the aggregate redemption price of the shares of Stated Value Preferred Stock to be redeemed with a bank or trust company specified in the notice, payable on the redemption date in the amounts and to the respective orders of the holders of the shares of Stated Value Preferred Stock to be redeemed, on endorsement to the corporation or its nominee as may be required and upon surrender of the certificates for such shares.   Unless the corporation or its nominee fails to pay the lump sum redemption price on or before the redemption date, the shares of Stated Value Preferred Stock subject to such redemption shall be deemed to have been redeemed, and shall be deemed no longer to be outstanding, from and after the redemption date set forth in the notice of redemption.   On or after the redemption date, subject only to payment of the redemption price, Stated Value Preferred Stock so called for redemption shall cease to be entitled to any interest or right in the corporation; and holders of such Stated Value Preferred Stock shall thereafter cease to be shareholders and shall be entitled only to payment of the amount of the redemption price, without interest, upon surrender of the certificates evidencing such stock.   If the lump sum redemption price shall be paid by a nominee of the corporation, such nominee shall upon such payment become the owner of the shares with respect to which such payment was made; and certificates of stock may be issued to such nominee in evidence of such ownership.

(b)   _Installment Payment._   If the corporation elects to pay the redemption price in installments, the number of shares of Stated Value Preferred Stock equal to the principal portion of each installment divided by $10.00 per share shall be deemed to have been redeemed and to be no longer outstanding from and after the date of payment of such installment.   On and after such payment date, such number of shares of Stated Value Preferred Stock shall cease to be entitled to any interest or right in the corporation; and holders of such shares shall thereafter cease to be shareholders of the corporation with respect to such shares, whether or not the certificates evidencing such shares have been surrendered.   Upon request of the corporation from time to time, certificates

ARTICLES OF AMENDMENT - 3

**FOSTER DEC. EX. 20 pg. 49**

evidencing shares of Stated Value Preferred Stock including redeemed shares shall be surrendered to and reissued by the corporation in reduced amount to reflect any and all installment redemptions of shares prior to such request.

**4.7    Liquidation Preference.**   In case of the voluntary liquidation or dissolution of the corporation, the holder of Stated Value Preferred Stock shall have the right to be paid in full, before any amount shall be paid to the owners of the common stock, as follows:

> $8.00 per share if the liquidation price is paid on or before September 14, 1990.

> $8.50 per share if the liquidation price is paid after September 14, 1990 and on or before September 14, 1993.

> $10.00 per share if the liquidation price is paid after September 14, 1993.

In case of the involuntary liquidation or dissolution of the corporation, the holder of Stated Value Preferred Stock shall have the right to be paid $10.00 per share, in full, before any amount shall be paid to the owners of the common stock.   After payment to the holders of the Stated Value Preferred Stock of the full preferential amounts hereinabove provided, the holders of the Stated Value Preferred Stock as such shall have no right or claim to any of the remaining assets of the corporation either upon any distribution of such assets or upon dissolution, liquidation or winding up; and the remaining assets to be distributed, if any, upon a distribution of such assets or upon dissolution, liquidation or winding up, may be distributed among the holders of the common stock.

**4.8    Limited Voting Rights.**   The Stated Value Preferred Stock shall have no right (except as required by law or as provided by Section 4.11 of this Article Fourth) to receive notice of or to vote at any regular or special meeting of stockholders, except that the holders of a majority of the shares of Stated Value Preferred Stock shall have the right, voting separately as a class, to elect one director to the board of directors of the corporation.

**4.9    Covenants.**   So long as any shares of Stated Value Preferred Stock are outstanding, and except with the consent of the holders of a majority of the outstanding shares of Stated Value Preferred Stock:

(a)    Common Stock.   The corporation shall not issue any common stock for less than book value (determined as of the end of the immediately preceding fiscal year), except for common stock issued to pay a dividend payable solely in shares of common stock or issued to employees or agents pursuant to incentive stock option or bonus plan.

(b)    Preferred Stock.   The corporation shall issue no preferred stock other than the Stated Value Preferred Stock, nor any securities convertible into such stock.

(c)    Indebtedness.   The corporation will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume, guaranty or

ARTICLES OF AMENDMENT - 4

otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

(1) The corporation may remain liable in respect of Indebtedness outstanding on the date of adoption of this Article Fourth by the corporation's shareholders.

(2) The corporation and its Subsidiaries may become and remain liable with respect to Indebtedness that is not secured by a Lien on any of the assets of the corporation or its Subsidiaries, provided that the aggregate principal amount of such unsecured Indebtedness shall not exceed Consolidated Net Worth less goodwill of the corporation at any time; and

(3) The corporation and its Subsidiaries may become and remain liable in respect of Indebtedness secured by any of the following Liens:

(i) Liens for taxes, assessments or governmental charges or claims the payment of which is not yet delinquent or is being contested in good faith, if such reserve or other provision, if any, as shall be required by generally accepted accounting principles, consistently applied, shall have been made therefor;

(ii) Statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen and other liens imposed by law incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by generally accepted accounting principles, consistently applied, shall have been made therefor;

(iii) Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(iv) Any attachment or judgment Lien; provided that if the judgment it secures exceeds $250,000 (alone or when aggregated with all other judgments secured by Liens permitted by this clause (iv)), such judgment shall, within 45 days after the entry thereof, have been discharged or execution thereof stayed pending appeal, or shall have been discharged within 45 days after the expiration of any such stay;

(v) Easements, rights-of-way, restrictions and other similar charges or encumbrances not interfering with the ordinary conduct of the business of the corporation or any of its Subsidiaries;

(vi) Any interest or title of a lessor under any lease;

ARTICLES OF AMENDMENT - 5

(vii)   Any Lien existing on any asset of any corporation at the time such corporation becomes a Subsidiary if such Lien was not created in contemplation of such event;

(viii)   Any Lien on any asset securing Indebtedness incurred or assumed for the purpose of financing not more than eighty-five percent (85%) of the cost of acquiring such asset; provided that such Lien attaches to such asset concurrently with or within 90 days after the acquisition thereof;

(ix)   Any Lien on any asset of any corporation existing at the time such corporation is merged into or consolidated with the corporation or a Subsidiary, if such Lien was not created in contemplation of such event;

(x)   Any Lien existing on any asset prior to the acquisition thereof by the corporation or a Subsidiary, if such Lien was not created in contemplation of such acquisition;

(xi)   Any Lien arising out of the refinancing, extension, renewal or refunding of any Indebtedness secured by any Lien permitted by any of the foregoing clauses of this Section 4.9(c); provided that the amount of such Indebtedness is not increased and that such Indebtedness is not secured by any additional assets; and

(xii)   Liens not otherwise permitted by the foregoing clauses of this Section 4.9(c) (including, without limitation, Liens on stock of Subsidiaries, whether consolidated or unconsolidated) securing Indebtedness in an aggregate principal amount at any time outstanding not to exceed 10% of the difference between Consolidated Net Worth and the amount of the goodwill of the corporation.

(d)   Corporate Existence.   The corporation will maintain its corporate existence and will not liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or enter into any transaction of merger or consolidation with any Person (including any Subsidiary) unless (i) this corporation is the surviving corporation following any such merger or consolidation, and (ii) the Consolidated Net Worth of the surviving corporation immediately following such merger or consolidation equals or exceeds the Consolidated Net Worth of this corporation immediately prior to such merger or consolidation.

(e)   Sale of Assets.   The corporation will not, and will not permit any of its Subsidiaries to, convey, sell, lease, transfer or otherwise dispose of all or any material part of its business, property or assets, whether now owned or hereafter acquired, except:

(1)   The corporation and its Subsidiaries may convey, sell, lease, transfer or otherwise dispose of investment assets in the ordinary course of business;

ARTICLES OF AMENDMENT - 6

(2)    The corporation and its Subsidiaries may sell or otherwise dispose of Capital Assets or real property if the asset so disposed of is concurrently replaced by a substantially equivalent asset having a value equal to or greater than the asset disposed of;

(3)    The corporation and its Subsidiaries may sell or otherwise dispose of obsolete or worn out property in the ordinary course of business;

(4)    The corporation and its Subsidiaries may sell and lease back any newly acquired asset for the purpose of financing the acquisition of such asset and securing the repayment of Indebtedness, provided that such Indebtedness shall not exceed eighty-five percent (85%) of the cost of such asset and is otherwise permitted by the covenants contained in this Article Fourth; and

(5)    The corporation and its Subsidiaries may sell or otherwise dispose of any of their other assets; <u>provided</u> that any such sale or other disposition is made for the fair market value of such assets.

(f)    <u>Acquisitions</u>.    The corporation will not, and will not permit any of its Subsidiaries to, acquire by purchase or otherwise all or substantially all the business, property or fixed assets, or the stock or other evidence of beneficial ownership, of any Person unless, immediately prior to and after giving effect to such transaction, no violation of any of the covenants or other provisions contained in this Article Fourth shall have occurred and be continuing or would be caused by such acquisition.

(g)    <u>Transactions with Shareholders and Affiliates</u>.    The corporation will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease, loan or exchange of any property or the rendering of any service) with any director or officer or any holder of equity securities of the corporation, or with any Affiliate of the corporation or of such director, officer or holder, on terms that are less favorable to the corporation or that Subsidiary, as the case may be, than those which might be obtained at the time from Persons who are not such a director, officer, holder or Affiliate; <u>provided</u> that the forgoing restriction shall not apply to (1) any transaction in effect at the date of adoption of this Article Fourth by the corporation's shareholders; (2) any transaction between the corporation and any of its wholly-owned Subsidiaries or between any of its wholly-owned Subsidiaries; (3) compensation (net of amounts contributed or repaid to the corporation or any Subsidiary or to Lewiston Land Company and contributed or repaid to the corporation or any Subsidiary), by way of salary or bonus, paid to directors or officers of the corporation in an amount, as to any one individual, not greater than the greater of $400,000 or the total compensation paid in calendar year 1986; (4) compensation paid to any director or officer of the corporation in amounts equal to income tax liability of such director or officer attributable to transactions involving the corporation, A.I.A., Inc., AIA Travel Services, Inc., AIA Travel, Inc., Lewiston Land Company, AIA Bancard Services Corporation or Taylor Brothers Aircraft on or before January 1, 1988 or to other personal income tax liability of such director or officer for tax years ended before January 1, 1988;

ARTICLES OF AMENDMENT - 7

FOSTER DEC. EX. 20 pg. 53

or (5) any loan to or account receivable from an officer, director or shareholder which is repaid in full at least annually on or before the last day of the fiscal year.

(h) <u>Consolidated Net Worth</u>. The corporation will not permit Consolidated Net Worth any date to be less than the number of shares of Stated Value Preferred Stock outstanding at such date multiplied by $10.00 per share.

(i) <u>Dividend Restriction</u>. The corporation will not, directly or indirectly, declare, order, make or set apart any sum for payment of any dividend in respect of its common stock (other than a dividend payable solely in shares of common stock), except that the corporation may declare and pay common stock dividends in an aggregate amount not exceeding the Dividend Availability Amount.

(j) <u>Debt/Equity Ratio</u>. Neither the corporation nor any Subsidiary will incur any new Indebtedness (other than Indebtedness permitted by Section 4.9(c)(xi) of this Article Fourth) if, at the time of incurring such Indebtedness, the ratio of Consolidated Long Term Debt to Consolidated Net Worth exceeds, or such additional Indebtedness would cause such ratio to exceed, 3.6 to 1.0.

(k) <u>Debt Service Coverage</u>. Neither the corporation nor any Subsidiary will incur any new Indebtedness (other than Indebtedness permitted by Section 4.9(c)(xi) of this Article Fourth) if, at the time of incurring such Indebtedness, the ratio of (i) Consolidated Net Income plus depreciation and amortization expenses plus compensation contributed or repaid to the corporation, any Subsidiary, Lewiston Land Company or AIA Travel Services, Inc. during the immediately preceding fiscal year of the corporation, divided by (ii) current maturities of Long Term Debt is, or such additional Indebtedness would cause such ratio to be, less than .8 to 1.0.

4.10 <u>Definitions</u>. For the purpose of Section 4.9 of this Article Fourth, the following terms shall have the following meanings:

"**Affiliate**", as applied to any Person, shall mean any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"**Capital Asset**" shall mean, as at any date of determination, those assets of a Person that would, in conformity with generally accepted accounting principles, consistently applied, be classified as plant, property or equipment on the balance sheet of that Person.

"**Consolidated Long Term Debt**" shall mean, as at any date of determination, the total of all Long Term Debt of the corporation and its Subsidiaries on a consolidated basis determined in accordance with generally accepted (or, in the

ARTICLES OF AMENDMENT - 8

case of an insurance company for which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

"**Consolidated Net Worth**" shall mean, as at any date of determination, the sum of (a) the capital stock and additional paid-in capital, (b) plus retained earnings (or minus accumulated deficit) of the corporation and its Subsidiaries on a consolidated basis, determined in conformity with generally accepted (or, in the case of an insurance company for which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

"**Consolidated Net Income**" for any period, shall mean the net income (or loss) of the corporation and its Subsidiaries on a consolidated basis determined in conformity with generally accepted (or, in the case of an insurance company for which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

"**Dividend Availability Amount**" shall mean, as at any date of determination, an amount equal to 50% of Consolidated Net Income for the period (taken as single accounting period) commencing January 31, 1987 and ending on the last day of the fiscal quarter immediately preceding such date of determination.

"**Indebtedness**" as applied to any person, means (a) all indebtedness for borrowed money, (b) that portion of obligations with respect to finance leases which is capitalized on a balance sheet in conformity with generally accepted accounting principles, consistently applied, (c) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money, (d) any obligation owed for all or any part of the deferred purchase price of property or services which purchase price is (i) due more than six month from the date of incurrence of the obligation in respect thereof, or (ii) evidenced by a note or similar written instrument, and (e) all indebtedness secured by any Lien or vendor's interest under any conditional sale or other title retention agreement existing on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is non-recourse to the credit of that Person; provided, however, that "Indebtedness" shall not include policy claims, policy reserves or mandatory securities valuation reserves of a regulated insurance company; and further provided that "Indebtedness" shall not include indebtedness of the corporation to any Subsidiary.

"**Lien**" shall mean any lien, mortgage, pledge, security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give a security interest).

"**Long Term Debt**", as applied to any Person, shall mean all Indebtedness of that Person which by its terms or by the terms of any instrument or agreement relating thereto matures more than one year, or is directly renewable or extendable at the option of the debtor to a date more than one year (including an option of the debtor under a revolving credit or similar agreement obligating the lenders to extend credit over a period of one year or more), from the date of creation thereof, but excluding any payments due under the terms thereof within 12 months of any date of determination.

ARTICLES OF AMENDMENT - 9

**FOSTER DEC. EX. 20 pg. 55**

"**Person**" shall mean an individual, corporation, partnership, joint venture, trust, unincorporated organization or any other jurisdictional entity, or a foreign state or any agency or political subdivision thereof.

"**Subsidiary**" shall mean any corporation of which at least a majority of the outstanding stock having by the terms thereof ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether or not at the time stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by the corporation or one or more of its Subsidiaries or by the corporation and one or more of its Subsidiaries.

**4.11**    **Conversion Right**. The holders of the Stated Value Preferred Stock shall have the following conversion right ("Conversion Right"):

(a)    Right to Convert.  Each share of Stated Value Preferred Stock shall be convertible, at the option of the holder thereof, at any time prior to the date on which notice of redemption is given under Section 4.3 or Section 4.4, at the office of the corporation or any transfer agent for the Stated Value Preferred Stock or Common Stock, into one fully paid and nonassessable share of Common Stock.

(b)    Mechanics of Conversion.   Before any holder of Stated Value Preferred Stock shall be entitled to convert such stock into shares of Common Stock, he shall surrender the certificate or certificates for such Preferred Stock, duly endorsed, at the office of the corporation or of any transfer agent for the Common Stock, and shall give written notice to the corporation at such office that he elects to convert such Preferred Stock and shall state therein the number of shares of Stated Value Preferred Stock being converted.   Thereupon the corporation shall promptly issue and deliver at such office to such holder of Stated Value Preferred Stock a certificate or certificates for the number of shares of Common Stock to which he shall be entitled.

Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the shares of Stated Value Preferred Stock to be converted (the "Conversion Date"); and the person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date.

(c)    Fractional Shares.   No fractional share of Common Stock shall be issued upon conversion of Stated Value Preferred Stock.   In lieu of any fractional shares to which the holder would otherwise be entitled, the corporation shall pay cash equal to the product of such fraction multiplied by the fair market value of one share of the corporation's Common Stock on the Conversion Date, such value to be determined in good faith by the Board of Directors.

(d)    Reservation of Stock Issuable Upon Conversion.   The corporation shall at all times reserve and keep available out of its authorized but unissued

ARTICLES OF AMENDMENT - 10

**FOSTER DEC. EX. 20 pg. 56**

shares of Common Stock, solely for the purpose of effecting the conversion of the shares of the Stated Value Preferred Stock, such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding shares of the Stated Value Preferred Stock; and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Stated Value Preferred Stock, the corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose.

(e)  Termination of Redemption Right.  Upon exercise of the Conversion Right under this Section 4.11, all rights of a holder of Stated Value Preferred Stock to require redemption of such stock under Section 4.3 shall automatically terminated; and no holder of Common Stock acquired upon conversion of Stated Value Preferred Stock shall have any right of redemption.

4.12 **Modification of Rights and Preferences**.  The rights and preferences hereby conferred on the Stated Value Preferred Stock shall not be changed, altered or revoked without the consent of the holders of the majority of the Stated Value Preferred Stock outstanding at the time.

### FIFTH

Shareholders shall not have a preemptive right to acquire unissued or treasury shares or securities convertible into such shares or carrying a right to subscribe to or acquire shares, except as provided in the Idaho Business Corporation Act.

### SIXTH

The location of the initial registered office of the corporation is One Lewis Clark Plaza, Lewiston, Idaho 83501; and the name of its initial registered agent at such address is R. John Taylor.

### SEVENTH

The number of directors constituting the initial Board of Directors is four, and the names and addresses of the persons who are to serve until the first annual meeting of the shareholders and until their successors are elected and qualified are:

| NAME | ADDRESS |
|---|---|
| Reed J. Taylor | P.O. Box 538 Lewiston, ID 83501 |
| R. John Taylor | P.O. Box 538 Lewiston, ID 83501 |
| Raymond R. Heilman | P.O. Box 538 Lewiston, ID 83501 |

ARTICLES OF AMENDMENT - 11

Mary K. Frost

P.O. Box 538
Lewiston, ID 83501

## EIGHTH

The name and address of the incorporator is as follows:

Reed J. Taylor
P.O. Box 538
Lewiston, ID 83501

## NINTH

The Board of Directors is expressly authorized to alter, amend or repeal the Bylaws of the corporation and to adopt new Bylaws, subject to repeal or change by a majority vote of the shareholders.

## TENTH

At each meeting of shareholders, every shareholder of record of the corporation shall be entitled to one vote for each share of common stock registered in his name on the books of the corporation. Shareholders shall not be entitled to vote their shares cumulatively in the election of directors of the corporation.

## ELEVENTH

A director of this corporation shall not be personally liable to this corporation or its shareholders for monetary damages for breach of fiduciary duty as a director, except for liability (a) for any breach of the director's duty of loyalty to this corporation or its shareholders, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (c) under Section 30-1-48, Idaho Code, or (d) for any transaction from which the director derived an improper personal benefit. If the Idaho Business Corporation Act is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of this corporation shall be eliminated or limited to the fullest extent permitted by the Idaho Business Corporation Act, as so amended. Any repeal or modification of this Article Eleventh by the shareholders of the corporation shall not adversely affect any right or protection of a director of the corporation existing at the time of such repeal or modification."

**THIRD:** The number of shares of the corporation outstanding at the time of such adoption was 801,000; and the number of shares entitled to vote thereon was 801,000.

**FOURTH:** The designation and number of outstanding shares of each class entitled to vote thereon as a class were a follows:

ARTICLES OF AMENDMENT - 12

| Class: | Number of Shares: |
|--------|-------------------|
| Common | 801,000 |

**FIFTH:** The number of shares voted for such amendment was 801,000; and the number of shares voted against such amendment was 0.

**DATED** this 23d day of December, 1987.

AIA SERVICES CORPORATION

By _Reed J. Taylor_
Reed J. Taylor, President

ATTEST:
_R. John Taylor_
R. John Taylor, Secretary

**VERIFICATION**

STATE OF ~~ARIZONA~~ IDAHO )
                            :ss.
County of Nez Perce )

I, Babette Ruddell, a Notary Public, do hereby certify that on the 23 day of December, 1987, personally appeared before me REED J. TAYLOR, who, being by me first duly sworn, declared that he is the President of AIA SERVICES CORPORATION, that he signed the foregoing document as President of the coporation, and that the statements contained therein are true.

_Babette Ruddell_
Notary Public for Arizona
Residing at: Newton
My Commission Expires: 3/5/88

ARTICLES OF AMENDMENT - 13



## Department of State.

### CERTIFICATE OF EXCHANGE

I, PETE T. CENARRUSA, Secretary of State of the State of
Idaho hereby certify that duplicate originals of Articles
of Exchange of AIA SERVICES CORPORATION, an Idaho corporation,
and A.I.A., INC., an Idaho corporation, duly signed and
verified pursuant to the provisions of the Idaho Business
Corporation Act, have been received in this office and are
found to conform to law.

ACCORDINGLY and by virtue of the authority vested in me by
law, I issue this certificate of exchange and attach hereto
a duplicate original of the Articles of Exchange.

Dated:   January 5, 1988

_____
SECRETARY OF STATE

_____
Corporations Clerk

**FOSTER DEC. EX. 20 pg. 60**

Case 2:18-cv-00270-BMP ECF No. 9-21 filed 09/10/19 Page 1 of 1 PageID
Case 2:12-cv-00584-EJL-CWD Document 216-25 Filed 05/17/14 Page 220 of 249 Page ID
#:528

# ARTICLES OF EXCHANGE

## OF

## AIA SERVICES CORPORATION
(an Idaho corporation)

## AND

## A.I.A., INC.
(an Idaho corporation)

Pursuant to Section 30-1-74 of the Idaho Business Corporation Act, the undersigned corporations adopt the following Articles of Exchange:

1.   The Plan of Exchange of Stock for Stock and Other Property dated December 11, 1987 (the "Plan") approved and entered into by said corporations is attached hereto and by this reference is incorporated herein.

2.   The number of shares of A.I.A., Inc. common stock outstanding at the time of the adoption of the Plan was 3500, and the number of shares entitled by law to vote thereon was 3500.   The number of shares voted in favor of such adoption was 3395; and the number of shares voted against such adoption was 0.

3.   The Board of Directors of AIA Services Corporation, the acquiring corporation, approved the adoption of the Plan and the performance of its terms, and took all other action required by its Articles of Incorporation or Bylaws necessary to put the Plan into effect.   The number of shares of AIA Services Corporation's common stock outstanding at the time of adoption of the Plan was 801,000.   By virtue of Idaho Code Section 30-1-73, no vote of the acquiring corporation's stockholders was required.

AIA SERVICES CORPORATION

By _____
Reed J. Taylor, President

ATTEST:

By _____
R. John Taylor, Secretary

A.I.A., INC.

By _____
Reed J. Taylor, President

ATTEST:

By _____
R. John Taylor, Secretary

ARTICLES OF EXCHANGE/A.I.A., INC. - P. 1

## VERIFICATION

STATE OF IDAHO )
                 :ss.
County of Nez Perce )

    I, _Roberta Ruddell_ a Notary Public, do hereby certify that on this ~~4th~~ day of ~~December, 1985,~~ personally appeared before me **REED J. TAYLOR,** who, being by me first duly sworn, declared that he is the President of the corporations A1A SERVICES CORPORATION and A.I.A., INC., that he signed the foregoing document as President of these corporations, and that the statements contained therein are true.

_[signature]_

Notary Public for Idaho
Residing at _Lewiston,_
My Commission Expires: _3/15/88_

ARTICLES OF EXCHANGE/A.I.A., INC. - P. 2

**FOSTER DEC. EX. 20 pg. 62**

## PLAN OF EXCHANGE OF STOCK FOR STOCK AND OTHER PROPERTY

**THIS AGREEMENT,** providing for a plan of exchange of stock for stock and other property ("Plan"), is made as of December 11, 1987, at Lewiston, Idaho, by **AIA SERVICES CORPORATION,** an Idaho corporation ("Services"), **A.I.A., INC.,** an Idaho corporation ("AIA"), **AIA BANCARD SERVICES CORPORATION,** an Idaho corporation ("Bancard"), **AIA TRAVEL, INC.,** an Idaho corporation ("Travel"), and **REED J. TAYLOR** (acting on behalf of himself and his spouse, Donna J. Taylor, pursuant to the community property laws of the State of Idaho) and **R. JOHN TAYLOR,** doing business as **TAYLOR BROTHERS AIRCRAFT,** a joint venture ("TBA").

Services desires to exchange, with the holders of the common stock of AIA, Bancard and Travel, and with the holders of the interests in TBA, shares of its common stock ($1.00 par value) and its stated value preferred stock (without par value) in exchange for all of the 3,500 issued and outstanding shares of common stock ($1.00 par value) of AIA, the 1,200 issued and outstanding shares of common stock ($1.00 par value) of Bancard, the 1,000 issued and outstanding shares of common stock ($.01 par value) of Travel, and the entire interests of Reed J. Taylor, Donna J. Taylor and R. John Taylor in the TBA joint venture; and the other parties desire that the exchanges contemplated by this Plan be consummated.

The Idaho Business Corporation Act provides a procedure for adoption of a plan of exchange by the corporation and a majority of its shareholders; and the parties desire to comply with such procedure.

In consideration of the mutual covenants and agreements contained in this Plan, the parties agree as follows:

PLAN OF EXCHANGE OF STOCK - P. 1

**FOSTER DEC. EX. 20 pg. 63**

1.   Services, AIA, Bancard, Travel, TBA and Reed J. Taylor and R. John Taylor adopt this Plan, which they intend to qualify as a non-taxable (or, as to TBA, a partially non-taxable) exchange under Section 351 of the Internal Revenue Code of 1986, and as a plan of exchange under Idaho Code Section 30-1-72A.

2.   The exchange shall be effective, pursuant to Idaho Code Section 30-1-76, on the later of the filing of Articles of Exchange or the opening of business on January 4, 1988. Upon the effective date of the exchange, each outstanding share of common stock of AIA, Bancard and Travel, and the community property interest of Reed J. Taylor and Donna J. Taylor and and the interest of R. John Taylor in TBA, shall be deemed to be exchanged into the number of shares of Services' common and preferred stock detailed on the attached Exhibit "A". Thereafter, the holders of certificates representing shares of common stock of AIA, Bancard and Travel and the holders of interests in TBA shall be entitled only to receive the shares of Services' common or preferred stock into which such shares or interests have been converted.   The shares of Services' common or preferred stock shall be issued in accordance with Exhibit "A" upon surrender to the Secretary of Services of those certificates representing shares of common stock of AIA, Bancard and Travel and upon delivery to the Secretary of Services of an assignment by Reed J. Taylor, Donna J. Taylor and R. John Taylor of their interests in TBA.

3.   The consummation of the exchanges is conditioned upon (i) purchase by Travel of all of the assets and assumption by Travel of certain of the liabilities of AIA Travel Services, Inc., a related Idaho corporation, and (ii) approval of the proposed exchanges of stock by the shareholders of AIA, Bancard and Travel, and authorization of a new class of preferred stock by the shareholders of

PLAN OF EXCHANGE OF STOCK - P. 2

Services, as required by applicable Idaho law. Services agrees to call a special meeting for the purpose of considering, voting upon and authorizing a new class of preferred stock; and Services agrees to recommend to its shareholders that the new class of stock be approved and authorized at such meeting. AIA, Bancard and Travel agree to call special meetings of their respective shareholders to be held on January 2, 1988 for the purpose of considering, voting upon and approving this Plan; and those corporations agree to recommend to their respective shareholders that such shareholders approve and adopt the Plan at such meetings.

PLAN OF EXCHANGE OF STOCK - P. 3

FOSTER DEC. EX. 20 pg. 65

DATED this 11th day of December, 1987.

AIA SERVICES CORPORATION

By _____
Reed J. Taylor, President

A.I.A., INC.

By _____
Reed J. Taylor, President

AIA BANCARD SERVICES CORPORATION

By _____
Reed J. Taylor, President

AIA TRAVEL, INC.

By _____
Reed J. Taylor, President

TAYLOR BROTHERS AIRCRAFT

By _____
Reed J. Taylor, for the community
comprised of himself and his spouse,
Donna J. Taylor

By _____
R. John Taylor

PLAN OF EXCHANGE OF STOCK - P. 4

P.02                                                    AIA-LEWISTON ID

## EXHIBIT "A"

| | Stock or Other Interest Surrendered | Common Shares Issued | Preferred Shares Issued |
|---|---|---|---|
| Reed J. Taylor and Donna J. Taylor | {3395 shares of AIA} { 200 shares of Bancard} { 75% interest in TBA} | 5,963 | 200,000 |
| R. John Taylor | { 200 shares of Bancard} { 25% interest in TBA} | 2,289 | |
| Jud R. Taylor | { 35 shares of AIA} { 60 shares o Travel} | 6,197-2/3 | |
| Jay R. Taylor | { 35 shares of AIA} { 60 shares of Travel} | 6,197-2/3 | |
| Sara J. Taylor | { 35 shares of AIA} { 60 shares of Travel} | 6,197-2/3 | |
| Raymond R. Heilman | {820 shares of Travel} {200 shares of Bancard} | 10,793-1/2 | |
| Paul D. Durant II | 200 shares of Bancard | 453-1/2 | |
| Mary K. Frost | 200 shares of Bancard | 453-1/2 | |
| Theodore Hartshorn | 200 shares of Bancard | 453-1/2 | |
| | | 38,999 | 200,000 |

EXHIBIT "A" TO PLAN OF EXCHANGE - P. 1



## CERTIFICATE OF EXCHANGE

I, PETE T. CENARRUSA, Secretary of State of the State of
Idaho, hereby certify that duplicate originals of Articles
of Exchange of AIA SERVICES CORPORATION, an Idaho corporation,
and AIA TRAVEL, INC., an Idaho corporation, duly signed and
verified pursuant to the provisions of the Idaho Business
Corporation Act, have been received in this office and are
found to conform to law.

ACCORDINGLY and by virtue of the authority vested in me by
law, I issue this certificate of exchange and attach hereto
a duplicate original of the Articles of Exchange.

Dated:   January 5, 1988

```
                          _____
                              SECRETARY OF STATE


                          _____
                              Corporations Clerk
```

# ARTICLES OF EXCHANGE

## OF

## AIA SERVICES CORPORATION
(an Idaho corporation)

## AND

## AIA TRAVEL, INC.
(an Idaho corporation)

Pursuant to Section 30-1-74 of the Idaho Business Corporation Act, the undersigned corporations adopt the following Articles of Exchange:

1. The Plan of Exchange of Stock for Stock and Other Property dated December 11, 1987 (the "Plan") approved and entered into by said corporations is attached hereto and by this reference is incorporated herein.

2. The number of shares of AIA Travel, Inc. common stock outstanding at the time of the adoption of the Plan was 1000, and the number of shares entitled by law to vote thereon was 1000. The number of shares voted in favor of such adoption was 820; and the number of shares voted against such adoption was 0.

3. The Board of Directors of AIA Services Corporation, the acquiring corporation, approved the adoption of the Plan and the performance of its terms, and took all other action required by its Articles of Incorporation or Bylaws necessary to put the Plan into effect. The number of shares of AIA Services Corporation's common stock outstanding at the time of adoption of the Plan was 801,000. By virtue of Idaho Code Section 30-1-73, no vote of the acquiring corporation's stockholders was required.

AIA SERVICES CORPORATION

By _____
Reed J. Taylor, President

ATTEST:

By _____
R. John Taylor, Secretary

AIA TRAVEL, INC.

By _____
Reed J. Taylor, President

ATTEST:

By _____
R. John Taylor, Secretary

ARTICLES OF EXCHANGE/AIA TRAVEL, INC. - P. 1

FOSTER DEC. EX. 20 pg. 69

## VERIFICATION

STATE OF IDAHO )
                :ss.
County of Nez Perce )

    I, ~~Roberta~~ Ruddell, a Notary Public, do hereby certify that on this 4 day of ~~December~~, 1988, personally appeared before me **REED J. TAYLOR**, who, being by me first duly sworn, declared that he is the President of the corporations AIA SERVICES CORPORATION and AIA TRAVEL, INC., that he signed the foregoing document as President of these corporations, and that the statements contained therein are true.

                             _Roberta Ruddell_
                             Notary Public for Idaho
                             Residing at: _Lewiston_
                             My Commission Expires: _3/15/88_

ARTICLES OF EXCHANGE/AIA TRAVEL, INC. - P. 2

**FOSTER DEC. EX. 20 pg. 70**

## PLAN OF EXCHANGE OF STOCK FOR STOCK AND OTHER PROPERTY

**THIS AGREEMENT,** providing for a plan of exchange of stock for stock and other property ("Plan"), is made as of December 11, 1987, at Lewiston, Idaho, by **AIA SERVICES CORPORATION**, an Idaho corporation ("Services"), **A.I.A., INC.,** an Idaho corporation ("AIA"), **AIA BANCARD SERVICES CORPORATION,** an Idaho corporation ("Bancard"), **AIA TRAVEL, INC.,** an Idaho corporation ("Travel"), and **REED J. TAYLOR** (acting on behalf of himself and his spouse, Donna J. Taylor, pursuant to the community property laws of the State of Idaho) and **R. JOHN TAYLOR**, doing business as **TAYLOR BROTHERS AIRCRAFT**, a joint venture ("TBA").

Services desires to exchange, with the holders of the common stock of AIA, Bancard and Travel, and with the holders of the interests in TBA, shares of its common stock ($1.00 par value) and its stated value preferred stock (without par value) in exchange for all of the 3,500 issued and outstanding shares of common stock ($1.00 par value) of AIA, the 1,200 issued and outstanding shares of common stock ($1.00 par value) of Bancard, the 1,000 issued and outstanding shares of common stock ($.01 par value) of Travel, and the entire interests of Reed J. Taylor, Donna J. Taylor and R. John Taylor in the TBA joint venture; and the other parties desire that the exchanges contemplated by this Plan be consummated.

The Idaho Business Corporation Act provides a procedure for adoption of a plan of exchange by the corporation and a majority of its shareholders; and the parties desire to comply with such procedure.

In consideration of the mutual covenants and agreements contained in this Plan, the parties agree as follows:

PLAN OF EXCHANGE OF STOCK - P. 1

**FOSTER DEC. EX. 20 pg. 71**

1. Services, AIA, Bancard, Travel, TBA and Reed J. Taylor and R. John Taylor adopt this Plan, which they intend to qualify as a non-taxable (or, as to TBA, a partially non-taxable) exchange under Section 351 of the Internal Revenue Code of 1986, and as a plan of exchange under Idaho Code Section 30-1-72A.

2. The exchange shall be effective, pursuant to Idaho Code Section 30-1-76, on the later of the filing of Articles of Exchange or the opening of business on January 4, 1988. Upon the effective date of the exchange, each outstanding share of common stock of AIA, Bancard and Travel, and the community property interest of Reed J. Taylor and Donna J. Taylor and and the interest of R. John Taylor in TBA, shall be deemed to be exchanged into the number of shares of Services' common and preferred stock detailed on the attached Exhibit "A". Thereafter, the holders of certificates representing shares of common stock of AIA, Bancard and Travel and the holders of interests in TBA shall be entitled only to receive the shares of Services' common or preferred stock into which such shares or interests have been converted. The shares of Services' common or preferred stock shall be issued in accordance with Exhibit "A" upon surrender to the Secretary of Services of those certificates representing shares of common stock of AIA, Bancard and Travel and upon delivery to the Secretary of Services of an assignment by Reed J. Taylor, Donna J. Taylor and R. John Taylor of their interests in TBA.

3. The consummation of the exchanges is conditioned upon (i) purchase by Travel of all of the assets and assumption by Travel of certain of the liabilities of AIA Travel Services, Inc., a related Idaho corporation, and (ii) approval of the proposed exchanges of stock by the shareholders of AIA, Bancard and Travel, and authorization of a new class of preferred stock by the shareholders of

PLAN OF EXCHANGE OF STOCK - P. 2

FOSTER DEC. EX. 20 pg. 72

Services, as required by applicable Idaho law. Services agrees to call a special meeting for the purpose of considering, voting upon and authorizing a new class of preferred stock; and Services agrees to recommend to its shareholders that the new class of stock be approved and authorized at such meeting. AIA, Bancard and Travel agree to call special meetings of their respective shareholders to be held on January 2, 1988 for the purpose of considering, voting upon and approving this Plan; and those corporations agree to recommend to their respective shareholders that such shareholders approve and adopt the Plan at such meetings.

PLAN OF EXCHANGE OF STOCK - P. 3

DATED this 11th day of December, 1987.

AIA SERVICES CORPORATION

By _Reed J. Taylor_
Reed J. Taylor, President

A.I.A., INC.

By _Reed J. Taylor_
Reed J. Taylor, President

AIA BANCARD SERVICES CORPORATION

By _Reed J. Taylor_
Reed J. Taylor, President

AIA TRAVEL, INC.

By _Reed J. Taylor_
Reed J. Taylor, President

TAYLOR BROTHERS AIRCRAFT

By _Reed J. Taylor_
Reed J. Taylor, for the community
comprised of himself and his spouse,
Donna J. Taylor

By _R. John Taylor_
R. John Taylor

PLAN OF EXCHANGE OF STOCK - P. 4

AIA-LEWISTON ID

## EXHIBIT "A"

| | Stock or Other Interest Surrendered | Common Shares Issued | Preferred Shares Issued |
|---|---|---|---|
| Reed J. Taylor and Donna J. Taylor | {3395 shares of AIA} { 200 shares of Bancard} { 75% interest in TBA} | 5,963 | 200,000 |
| R. John Taylor | { 200 shares of Bancard} { 25% interest in TBA} | 2,289 | |
| Jud R. Taylor | { 35 shares of AIA} { 60 shares o Travel} | 6,197-2/3 | |
| Jay R. Taylor | { 35 shares of AIA} { 60 shares of Travel} | 6,197-2/3 | |
| Sara J. Taylor | { 35 shares of AIA} { 60 shares of Travel} | 6,197-2/3 | |
| Raymond R. Heilman | {820 shares of Travel} {200 shares of Bancard} | 10,793-1/2 | |
| Paul D. Durant II | 200 shares of Bancard | 453-1/2 | |
| Mary K. Frost | 200 shares of Bancard | 453-1/2 | |
| Theodore Hartshorn | 200 shares of Bancard | 453-1/2 | |
| | | 38,999 | 200,000 |

EXHIBIT "A" TO PLAN OF EXCHANGE - P. 1

# State of Idaho

## Department of State.

### CERTIFICATE OF AMENDMENT
### OF

AIA SERVICES CORPORATION

I PETE T. CENARRUSA, Secretary of State of the State of Idaho hereby, certify that duplicate originals of Articles of Amendment to the Articles of Incorporation of _____

AIA SERVICES CORPORATION

duly signed and verified pursuant to the provisions of the Idaho Business Corporation Act, have been received in this office and are found to conform to law.

ACCORDINGLY and by virtue of the authority vested in me by law, I issue this Certificate of Amendment to the Articles of Incorporation and attach hereto a duplicate original of the Articles of Amendment.

Dated _____ **March 8** _____ , 19 __89__ .

SECRETARY OF STATE

Corporation Clerk

CAM 779

FOSTER DEC. EX. 20 pg. 76

## ARTICLES OF AMENDMENT
### TO THE
### ARTICLES OF INCORPORATION
### OF
### AIA SERVICES CORPORATION

AIA Services Corporation ("Corporation") hereby adopts the following Articles of Amendment to the Articles of Incorporation under the provisions of the Idaho Business Corporation Act:

(a)  The name of the corporation is **AIA SERVICES CORPORATION.**

(b)  The amendments adopted by the shareholders of the Corporation are as follows:

(i)  The current Article ELEVENTH has been deleted in its entirety and is replaced by the following new Article ELEVENTH:

### ELEVENTH

No director or officer of the Corporation shall be personally liable to the Corporation or any of its stockholders for damages for breach of fiduciary duty as a director or officer, except that this provision will not eliminate or limit the liability of a director or officer for any act or omission which involves intentional misconduct, fraud or knowing violation of law, or for any act or omission specified in the Idaho Business Corporation Act as an act or omission for which a director or officer shall have liability to the Corporation or its shareholders. Any repeal or modification of this Article ELEVENTH by the shareholders of the Corporation shall not adversely affect any right or protection of a director or officer of the Corporation existing at the time of such repeal or modification with respect to an act or omission which occurred prior to such repeal or modification.

- 1 -

The following new Article <u>TWELFTH</u>, <u>THIRTEENTH</u>, AND <u>FOURTEENTH</u> are being added to the Articles of Incorporation:

## TWELFTH

The Corporation shall have the right to purchase its own shares, whether direct or indirect, to the extent of unreserved and unrestricted earned surplus available therefor and to the extent of unreserved and unrestricted capital surplus available therefor. To the extent that earned surplus or capital surplus is used as the measure of the Corporation's right to purchase its own shares, such surplus shall be restricted so long as such shares are held as treasury shares, and upon the disposition or cancellation of any of such shares, the restriction shall be removed pro tanto. The foregoing limitations shall not apply to purchases or other acquisitions by the Corporation of its own shares for the purpose of (i) eliminating fractional shares, (ii) collecting or compromising indebtedness to the Corporation, (iii) paying dissenting shareholders entitled to payment for their shares under the provisions of the Idaho Business Corporation Act, or (iv) effecting, subject to other provisions of such Act, the retirement of the Corporation's redeemable shares by redemption or by purchase at not to exceed the redemption price. The Corporation may not purchase or pay for its own shares at a time when the Corporation is insolvent or when such purchase or payment would make it solvent.

## THIRTEENTH

The Board of Directors of the Corporation may, from time to time, distribute to the Corporation's shareholders out of capital surplus of the Corporation a portion of the Corporation's assets, in cash or property, if such distribution is not made at a time when the Corporation is insolvent or when such distribution would render the Corporation insolvent, if such distribution is made at a time when the Corporation has paid in full all cumulative dividends accrued on all classes of shares entitled to preferential dividends, if such

- 2 -

distribution would not reduce the remaining net assets of the Corporation below the aggregate preferential amount payable in the event of involuntary liquidation of the Corporation to the holders of shares having preferential rights to the assets of the Corporation in the event of liquidation, and if such distribution, when made, is identified as a distribution from capital surplus and the amount thereof per share is disclosed to the shareholders receiving such distribution concurrently with the distribution thereof.

**FOURTEENTH**

The officers and directors of this Corporation shall be subject to the doctrine or corporate opportunities only insofar as it applies to business opportunities in which this Corporation has expressed an interest as determined from time to time by the Corporation's Board of Directors as evidenced by resolutions appearing in the Corporation's Minutes. When such areas of interest are delineated, all such business opportunities within such areas of interest which come to the attention of the officers and directors of this Corporation shall be disclosed promptly to this Corporation and made available to it. The Board of Directors may reject any business opportunity presented to it for any valid business reason and thereafter any officer or director may avail himself (herself) of such opportunity. This provision shall not be construed to release any employee of the Corporation from any duties which he (she) may have to the Corporation.

(c) These Articles of Amendment were adopted by the shareholders of the Corporation on February 15, 1989.

(d) The number of shares of the Corporation outstanding entitled to vote on this Amendment of the Articles of Incorporation of the Corporation was 973,749 shares of $1.00 par value common stock.

(e) This Amendment to the Articles of Incorporation was approved by a vote of shareholders of the Corporation holding 930,900 1/6 shares of $1.00

**FOSTER DEC. EX. 20 pg. 79**

par value common stock.  Holders of zero shares of common stock of the
Corporation voted against this Amendment.

(f)  The Amendment to the Articles of Incorporation does not provide
for an exchange, reclassification or cancellation of issued shares.

(g)  The Amendment to the Articles of Incorporation does not effect a
change in the amount of stated capital of the Corporation.

Dated:  February 17, 1989

**AIA SERVICES CORPORATION**

By: _____
Reed J. Taylor, President

**ATTEST:**

_____
R. John Taylor, Secretary

- 4 -

**FOSTER DEC. EX. 20 pg. 80**

## VERIFICATION

STATE OF IDAHO )
                ) ss.
COUNTY OF _Nez Perce_ )

    I, _Shelle Maddell_ , a Notary Public, do hereby certify that on February 17, 1989, personally appeared before me Reed J. Taylor, who, being by me first duly sworn, declared that he is the President of AIA Services Corporation, that he signed the foregoing document as President of such Corporation, and that the statements contained herein are true.

    Witness my hand and official seal.

    My Commission expires: _3/13/94_

S E A L

                    _Shelle Maddux_
                    Notary Public
                    _P.O. Box 536_
                    Address
                    _Lewiston, ID 83501_

- 5 -

FOSTER DEC. EX. 20 pg. 81

# State of Idaho

## Department of State

CERTIFICATE OF AMENDMENT
OF

AIA SERVICES CORPORATION
File Number C 74568

I, PETE T. CENARRUSA, Secretary of State of the State of Idaho, hereby certify that duplicate originals of Articles of Amendment to the Articles of Incorporation of AIA SERVICES CORPORATION duly signed and verified pursuant to the provisions of the Idaho Business Corporation Act, have been received in this office and are found to conform to law.

ACCORDINGLY and by virtue of the authority vested in me by law, I issue this Certificate of Amendment to the Articles of Incorporation and attach hereto a duplicate original of the Articles of Amendment.

Dated: April 11, 1995

*Pete T. Cenarrusa*

**SECRETARY OF STATE**

By _____

# ARTICLES OF AMENDMENT
## TO THE ARTICLES OF INCORPORATION
### OF
### AIA SERVICES CORPORATION

ORIGINAL

Pursuant to the provisions of §30-1-58, §30-1-59 and §30-1-61 of the Idaho Business Corporation Act, the undersigned corporation adopts the following Articles of Amendment to its Articles of Incorporation, as filed on December 20, 1983 and previously amended on October 14, 1986 and December 29, 1987.

**FIRST:** The name of the corporation is **AIA SERVICES CORPORATION**.

**SECOND:** On March 7, 1995, the shareholders of the corporation adopted and approved the following Amended and Restated Articles of Incorporation of AIA Services Corporation, pursuant to which Article Fourth, Article Fifth and Article Tenth were amended by replacing them in their entirety.

### "AMENDED AND RESTATED ARTICLES OF INCORPORATION
### OF
### AIA SERVICES CORPORATION

Except for the amendment of Articles Fourth, Fifth and Tenth by replacing them in their entirety, these Amended and Restated Articles of Incorporation of AIA Services Corporation correctly set forth without change the corresponding provisions of the original Articles of Incorporation as hereinbefore filed on December 20, 1983 and amended on October 14, 1986 and December 29, 1987; and these Amended and Restated Articles of Incorporation, including the amended Articles Fourth, Fifth and Tenth, supersede the original Articles of Amendment and all previous amendments thereto.

### FIRST

The name of the corporation is **AIA SERVICES CORPORATION**.

### SECOND

The period of its duration is perpetual.

```
IDAHO SECRETARY OF STATE
19950411  0900      79540   2
CK #: 58727    CUST# 20168
         CORP
1@      30.00=      30.00
```

ARTICLES OF AMENDMENT - Page 1
03/13/95 10:46am/s

#: C

## THIRD

The purpose for which the corporation is organized is for the transaction of any or all lawful business for which the corporation may be incorporated under the Idaho Business Corporation Act.

## FOURTH

**4.1     Authorized Capital.** The aggregate number of shares which this corporation shall have authority to issue is 6,085,000 shares, of which 1,085,000 shares shall be Preferred Stock and 5,000,000 shares shall be Common Stock ($1 par value). The corporation is authorized to issue the Preferred Stock in three series designated as "Series A", consisting of 200,000 shares of Stated Value Preferred Stock (without par value); "Series B", consisting of 735,000 shares of 10% Preferred Stock ($1 par value); and "Series C", consisting of 150,000 shares of 10% Preferred Stock ($1 par value). The respective preferences, limitations and relative rights of each of the three series of Preferred Stock and the Common Stock of the corporation are set forth in the following provisions of Article Fourth:

**4.2     Series A Preferred Stock.**

**4.2.1   General.** Each share of Series A Preferred Stock shall have the rights and preferences conferred in this Section 4.2 of Article Fourth. Holders of Series A Preferred Stock shall have no rights to share in any distribution of the profits or assets of the corporation, whether in the form of cash or stock or dividends or otherwise, except to the extent specifically provided herein.

**4.2.2   No Dividends.** The Series A Preferred Stock shall not pay or accrue any dividends.

**4.2.3   Demand for Redemption.** (a) The holder of Series A Preferred Stock shall have the right to require the corporation to redeem such stock from any legally available funds upon breach of any covenant of the corporation set forth in this Article Fourth, but only to the extent such redemption shall not violate the Idaho Business Corporation Act restrictions on the corporation's redemption of its own shares. This right may be exercised by giving the corporation written notice of demand for redemption specifying the default and a redemption date not less than ninety (90) days from the date such notice delivered to the corporation; provided however that, if the corporation cures such specified default within sixty (60) days after receipt of such notice by corporation, the right to redeem Series A Preferred Stock on account of such specified default shall be extinguished.

(b)     The holder of Series A Preferred Stock shall have the right to require the corporation to redeem such stock from any legally available funds at any time after September 14, 1993, but only to the extent such redemption shall not violate the Idaho Business Corporation Act restrictions on the corporation's redemption of its own shares. This right may be exercised by giving the corporation written notice of demand for redemption specifying a redemption date after September 14, 1993 and not less than ninety (90) days or more than one hundred eighty (180) days from the date such notice is delivered to the corporation.

ARTICLES OF AMENDMENT - Page 2
03/13/95 10:46am/s

**FOSTER DEC. EX. 20 pg. 84**

**4.2.4 Call for Redemption.** The Series A Preferred Stock may be called for redemption by the corporation, in whole or in part, upon payment of the redemption price from legally available funds at any time prior to the demand for redemption by the holder of Series A Preferred Stock. Notice of such call for redemption, specifying the redemption date not less than thirty (30) days from the date such notice is mailed, shall be mailed to each record holder of Series A Preferred Stock. If fewer than all shares of Series A Preferred Stock are to be redeemed, the shares shall be redeemed prorata from the holders thereof.

**4.2.5 Redemption Price** If Series A Preferred Stock is redeemed on or before September 14, 1990, the redemption price is $8.00 per share if paid in a lump sum. If Series A Preferred Stock is redeemed any time during the three-year period beginning September 15, 1990 and ending on September 14, 1993, the redemption price is $8.50 per share if paid in a lump sum. If not paid in a lump sum on or before September 14, 1993, the redemption price for Series A Preferred Stock is $10.00 per share, provided that the redemption price may be paid, at the corporation's sole option, in monthly installments on a fifteen (15) year amortization schedule beginning on the day after the redemption date and accruing interest at a rate of one-and one-half (1½) points under the First Interstate Bank of Idaho, N.A., prime lending rate, adjusted quarterly.

### 4.2.6 Redemption Procedure and Effect.

(a)    **Lump Sum Payment.** If the redemption price is to be paid in a lump sum, the corporation shall deposit, or shall cause its nominee to deposit, on or before the redemption date specified in the notice of redemption, the aggregate redemption price of the shares of Series A Preferred Stock to be redeemed with a bank or trust company specified in the notice, payable on the redemption date in the amounts and to the respective orders of the holders of the shares of Series A Preferred Stock to be redeemed, on endorsement to the corporation or its nominee as may be required and upon surrender of the certificates for such shares. Unless the corporation or its nominee fails to pay the lump sum redemption price on or before the redemption date, the shares of Series A Preferred Stock subject to such redemption shall be deemed to have been redeemed, and shall be deemed no longer to be outstanding, from and after the redemption date set forth in the notice of redemption. On or after the redemption date, subject only to payment of the redemption price, Series A Preferred Stock so called for redemption shall cease to be entitled to any interest or right in the corporation; and holders of such Series A Preferred Stock shall thereafter cease to be shareholders and shall be entitled only to payment of the amount of the redemption price, without interest, upon surrender of the certificates evidencing such stock. If the lump sum redemption price shall be paid by a nominee of the corporation, such nominee shall upon such payment become the owner of the shares with respect to which such payment was made; and certificates of stock may be issued to such nominee in evidence of such ownership.

(b)    **Installment Payment.** If the corporation elects to pay the redemption price in installments, the number of shares of Series A Preferred Stock equal to the principal portion of each installment divided by $10.00 per share shall be deemed to have been redeemed and to be no longer outstanding from and after the date of such installment. On and after such payment date, such number of shares of Series A Preferred Stock shall cease to be entitled to any interest or right in the corporation; and holders of such shares shall thereafter cease to be shareholders

ARTICLES OF AMENDMENT - Page 3
03/13/95 10:46am/s

of the corporation with respect to such shares, whether or not the certificates evidencing such shares have been surrendered. Upon request of the corporation from time to time, certificates evidencing shares of Series A Preferred Stock including redeemed shares shall be surrendered to and reissued by the corporation in reduced amount to reflect any and all installment redemptions of shares prior to such request.

**4.2.7 Liquidation Preference.** In case of the voluntary liquidation or dissolution of the corporation, the holder of Series A Preferred Stock shall have the right to be paid in full, before any amount shall be paid to the owners of the Common Stock or to the owners of the Series B or Series C Preferred Stock, as follows:

> $8.00 per share if the liquidation price is paid on or before September 14, 1990.

> $8.50 per share if the liquidation price is paid after September 14, 1990 and on or before September 14, 1993.

> $10.00 per share if the liquidation price is paid after September 14, 1993.

In case of the involuntary liquidation or dissolution of the corporation, the holder of Series A Preferred Stock shall have the right to be paid $10.00 per share, in full, before any amount shall be paid to the owners of the Common Stock or to the owners of the Series B or Series C Preferred Stock. After payment to the holders of the Series A Preferred Stock of the full preferential amounts hereinabove provided, the holders of the Series A Preferred Stock as such shall have no right or claim to any of the remaining assets of the corporation either upon any distribution of such assets or upon dissolution, liquidation or winding up; and the remaining assets to be distributed, if any, upon a distribution of such assets or upon dissolution, liquidation or winding up, may be distributed among the holders of the Series B Preferred Stock, the Series C Preferred Stock and the Common Stock in accordance with the provisions of this Article Fourth.

**4.2.8 Limited Voting Rights.** The Series A Preferred Stock shall have no right (except as required by law or as provided by Section 4.2.12 of this Article Fourth) to receive notice of or to vote at any regular or special meeting of stockholders, except that the holders of a majority of the shares of Series A Preferred Stock shall have the right, voting separately as a class, to elect one director to the board of directors of the corporation.

**4.2.9 Covenants.** So long as any shares of Series A Preferred Stock are outstanding, and except with the consent of the holders of a majority of the outstanding shares of Series A Preferred Stock.

(a) Common Stock. The corporation shall not issue any Common Stock for less than book value (determined as of the end of the immediately preceding fiscal year), except for Common Stock issued to pay a dividend payable solely in shares of Common Stock or issued to employees or agents pursuant to incentive stock option or bonus plan.

ARTICLES OF AMENDMENT - Page 4
03/13/95 10:46am/s

FOSTER DEC. EX. 20 pg. 86

(b)     Preferred Stock.  The corporation shall issue no Preferred Stock or securities convertible into such stock, other than the Series A, Series B and Series C Preferred Stock.

(c)     Indebtedness.  The corporation will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume, guaranty or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

(1)     The corporation may remain liable in respect of Indebtedness outstanding on the date of adoption of this Article Fourth by the corporation's shareholders.

(2)     The corporation and its Subsidiaries may become and remain liable with respect to Indebtedness that  is not secured by a Lien on any of the assets of the corporation or its Subsidiaries, provided that the aggregate principal amount of such unsecured Indebtedness shall not exceed Consolidated Net Worth less goodwill of the corporation at any time; and

(3)     The corporation and its Subsidiaries may become and remain liable in respect of Indebtedness secured by any of the following Liens:

(i)     Liens for taxes, assessments or governmental charges or claims the payment of which is not yet delinquent or is being contested in good faith, if such reserve or other provision, if any, as shall be required by generally accepted accounting principles, consistently applied, shall have been made therefor;

(ii)     Statutory Liens of landlords and lines of carriers, warehousemen, mechanics, materialmen and other liens imposed by law incurred in the ordinary courses of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by generally accepted accounting principles, consistently applied shall have been made therefor;

(iii)     Liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, governmental contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(iv)     Any attachment or judgment Lien; provided that if the judgment it secures exceeds $250,000 (alone or when aggregated with all other judgments secured by Liens permitted by this clause (vi)), such judgment shall, within forty-five (45) days after the entry thereof, have been discharged or execution thereof stayed pending appeal, or shall have been discharged within forty-five (45) days after the expiration of any such stay;

ARTICLES OF AMENDMENT - Page 5
03/13/95 10:46am/s

(v)     Easements, rights-of-way, restrictions and other similar charges or encumbrances not interfering with the ordinary conduct of the business of the corporation or any of its Subsidiaries;

(vi)     Any interest or title of a lessor under any lease;

(vii)     Any Lien existing on any asset of any corporation at the time such corporation becomes a subsidiary if such Lien was not created in contemplation of such event;

(viii)     Any Lien on any asset securing Indebtedness incurred or assume for the purpose of financing not more than Eighty-five percent (85%) of the cost of acquiring such assets; provided that such line attaches to such asset concurrently with or within ninety (90) days after the acquisition thereof;

(ix)     Any Lien on any asset of any corporation existing at the time such corporation is merged into or consolidated with the corporation or a subsidiary, if such Lien was not created in contemplation of such event;

(x)     Any Lien existing on any asset prior to the acquisition thereof by the corporation or a Subsidiary, if such Lien was not created in contemplation of such acquisition;

(xi)     Any Lien arising out of the refinancing, extension, renewal or refunding of any Indebtedness secured by any Lien permitted by any of the foregoing clauses of this Section 4.2.9(c); provided that the amount of such Indebtedness is not increased and that such Indebtedness is not secured by any additional assets; and

(xii)     Liens not otherwise permitted by the foregoing clauses of this Section 4.2.9(c) (including, without limitation, Liens on stock of Subsidiaries, whether consolidated or unconsolidated) securing Indebtedness in an aggregate principal amount of any time outstanding not to exceed ten percent (10%) of the difference between Consolidated Net Worth and the amount of the goodwill of the corporation.

(d)     Corporate Existence. The corporation will maintain its corporate existence and will not liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or enter into any transaction of merger or consolidation with any Person (including any Subsidiary) unless (i) this corporation is the surviving corporation following any such merger or consolidation, and (ii) the Consolidated Net Worth of the surviving corporation immediately following such merger or consolidation equals or exceeds the Consolidated Net Worth of this corporation immediately prior to such merger or consolidation.

(e)     Sale of Assets. The corporation will not, and will not permit any of its Subsidiaries to, convey, sell, lease, transfer or otherwise dispose of all or any material part of its business, property or assets, whether now owned or hereafter acquired, except:

ARTICLES OF AMENDMENT - Page 6
03/13/95 10:46am/s

FOSTER DEC. EX. 20 pg. 88

(1)     The corporation and its Subsidiaries may convey, sell, lease, transfer or otherwise dispose of investment assets in the ordinary course of business;

(2)     The corporation and its Subsidiaries may sell or otherwise dispose of Capital Assets or real property if the asset so disposed of is concurrently replaced by a substantially equivalent asset having a value equal to or greater than the assets disposed of:

(3)     The corporation and is Subsidiaries may sell or otherwise dispose of obsolete or worn out property in the ordinary course of business;

(4)     The corporation and its Subsidiaries may sell and lease back any newly acquired asset for the purpose of financing the acquisition of such asset and securing the repayment of Indebtedness, provided that such Indebtedness shall not exceed eighty-five percent (85%) of the cost of such asset and is otherwise permitted by the covenants contained in this Article Fourth; and

(5)     The corporation and its Subsidiaries may sell or otherwise dispose of any of their other assets; provided that any such sale or other disposition is made for the fair market value of such assets.

(f)     Acquisitions.  The corporation will not, and will not permit any of its Subsidiaries to, acquire by purchase or otherwise all or substantially all the business, property or fixed assets, or the stock or other evidence of beneficial ownership, of any Person unless, immediately prior to and after giving effect to such transaction, no violation of any of the covenants or other provisions contained in this Article Fourth shall have occurred and be continuing or would be caused by such acquisition.

(g)     Transactions with Shareholders and Affiliates.  The corporation will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease, loan or exchange of any property or the rendering of any service) with any director or officer or any holder of equity securities of the corporation, or with any Affiliate of the corporation or of such director, officer or holder, on terms that are less favorable to the corporation or that Subsidiary, as the case may be, than those which might be obtained at the time from Persons who are not such a director, officer, holder or Affiliate; provided that the foregoing restriction shall not apply to (i) any transaction in effect at the date of adoption of this Article Fourth by the corporation's shareholders; (ii) any transaction between the corporation and any of its wholly-owned Subsidiaries or between any of its wholly-owned Subsidiaries; (iii) compensation (net of amounts contributed or repaid to the corporation or any Subsidiary or to Lewiston Land Company and contributed or repaid to the corporation or any Subsidiary), by way of salary or bonus, paid to director or officers of the corporation in an amount, as to any one individual, not greater than the greater of $400,000 or the total compensation paid in calendar year 1986; (iv) compensation paid to any director or officer of the corporation in amounts equal to income tax liability of such director or officer attributable to transactions involving the corporation, A.I.A., Inc., AIA Travel Services, Inc., AIA Travel, Inc., Lewiston Land Company, AIA Bancard Services Corporation or Taylor Brothers Aircraft on or before January 1, 1988 or to other personal

FOSTER DEC. EX. 20 pg. 89

income tax liability of such director or officer for tax years ended before January 1, 1988; or (v) any loan to or account receivable from an officer, director or stockholder which is repaid in full at least annually on or before the last day of the fiscal year.

(h)     Consolidated Net Worth.  The corporation will not permit Consolidated Net Worth at any date to be less than the number of shares of Series A Preferred Stock outstanding at such date multiplied by $10.00 per share.

(i)     Dividend Restriction.  The corporation will not, directly or indirectly, declare, order, make or set apart any sum for payment of any dividend in respect of its Common Stock (other than a dividend payable solely in shares of Common Stock), except that the corporation may declare and pay Common Stock dividends in an aggregate amount not exceeding the Dividend Availability Amount.

(j)     Debt/Equity Ratio.  Neither the corporation nor any Subsidiary will incur any new Indebtedness (other than Indebtedness permitted by Section 4.2.9(c)(xi) of this Article Fourth) if, at the time of incurring such Indebtedness, the ratio of Consolidated Long Term Debt to Consolidated Net Worth exceeds, or such additional Indebtedness would cause such ratio to exceed, 3.6 to 1.0.

(k)     Debt Service Coverage.  Neither the corporation nor any Subsidiary will incur any new Indebtedness (other than Indebtedness permitted by Section 4.2.9(c)(xi) of this Article Fourth) if, at the time of incurring such Indebtedness, the ratio of (i) Consolidated Net Income plus depreciation and amortization expenses plus compensation contributed or repaid to the corporation, any Subsidiary, Lewiston Land Company or AIA Travel Services, Inc. during the immediately preceding fiscal year of the corporation, divided by (ii) current maturities of Long Term Debt is, or such additional Indebtedness would cause such ratio to be, less than .8 to 1.0.

**4.2.10  Definitions.**  For the purpose of Section 4.2.9 of this Article Fourth, the following terms shall have the following meanings:

**"Affiliate"**, as applied to any Person, shall mean any other Person directly or indirectly controlling, controlled by, or under common control with, that Person.  For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

**"Capital Asset"** shall mean, as at any date of determination, those assets of a Person that would, in conformity with generally accepted accounting principles, *consistently* applied, be classified as plant, property or equipment on the balance sheet of that Person.

**"Consolidated Long Term Debt"** shall mean, as at any date of determination, the total of all Long Term Debt of the corporation and its Subsidiaries on a consolidated basis determined in accordance with generally accepted (or, in the case of an insurance company for

ARTICLES OF AMENDMENT - Page 8
03/13/95 10:46am/s

**FOSTER DEC. EX. 20 pg. 90**

which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

"**Consolidated Net Worth**" shall mean, as at any date of determination, the sum of (a) the capital stock and additional paid-in capital, (b) plus retained earnings (or minus accumulated deficit) of the corporation and its Subsidiaries on a consolidated basis, determined in conformity with generally accepted (or, in the case of an insurance company for which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

"**Consolidated Net Income**" for any period, shall mean the net income (or loss) of the corporation and its Subsidiaries on a consolidated basis determined in conformity with generally accepted (or, in the case of an insurance company for which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

"**Dividend Availability Amount**" shall mean, as at any date of determination, an amount equal to fifty percent (50%) of Consolidated Net Income for the period (taken as single accounting period) commencing January 31, 1987 and ending on the last day of the fiscal quarter immediately preceding such date of determination.

"**Indebtedness**" as applied to any person, means (a) all indebtedness for borrowed money, (b) that portion of obligations with respect to finance leases which is capitalized on a balance sheet in conformity with generally accepted accounting principles, consistently applied, (c) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money, (d) any obligation owed for all or any part of the deferred purchase price of property or services which purchase price is (i) due more than six (6) months from the date of incurrence of the obligation in respect thereof, or (ii) evidenced by a note or similar written instrument, and (e) all indebtedness secured by any Lien or vendor's interest under any conditional sale or other title retention agreement existing on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is non-recourse to the credit of that Person; provided, however, that "Indebtedness" shall not include policy claims, policy reserves or mandatory securities valuation reserves of a regulated insurance company; and further provided that "Indebtedness" shall not include indebtedness of the corporation to any Subsidiary.

"**Lien**" shall mean any lien, mortgage, pledge, security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give a security interest).

"**Long Term Debt**", as applied to any Person, shall mean all Indebtedness of that Person which by its terms or by the terms of any instrument or agreement relating thereto matures more than one year, or is directly renewable or extendable at the option of the debtor to a date more than one year (including an option of the debtor under a revolving credit or similar agreement obligating the lenders to extend credit over a period of one year or more), from the date of creation thereof, but excluding any payments due under the terms thereof within twelve (12) months of any date of determination.

ARTICLES OF AMENDMENT - Page 9
03/13/95 10:46am/s

**FOSTER DEC. EX. 20 pg. 91**

"**Person**" shall mean an individual, corporation, partnership, joint venture, trust, unincorporated organization or any other jurisdictional entity, or a foreign state or any agency or political subdivision thereof.

"**Subsidiary**" shall mean any corporation of which at least a majority of the outstanding stock having by the terms thereof ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether or not at the time stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by the corporation or one or more of its Subsidiaries or by the corporation and one or more of its Subsidiaries.

**4.2.11 Conversion Right.** The holders of the Series A Preferred Stock shall have the following conversion right ("Conversion Right"):

(a)   Right to Convert.   Each share of Series A Preferred Stock shall be convertible, at the option of the holder thereof, at any time prior to the date on which notice of redemption is given under Section 4.2.3 or Section 4.2.4, at the office of the corporation or any transfer agent for the Series A Preferred Stock or Common Stock, into one fully paid and nonassessable share of Common Stock.

(b)   Mechanics of Conversion.   Before any holder of Series A Preferred Stock shall be entitled to convert such stock into shares of Common Stock, he shall surrender the certificate or certificates for such Preferred Stock, duly endorsed, at the office of the corporation or any transfer agent for the Common Stock, and shall give written notice to the corporation at such office that he elects to convert such Preferred Stock and shall state therein the number of shares of Series A Preferred Stock being converted. Thereupon the corporation shall promptly issue and deliver at such office to such holder of a certificate or certificates for the number of shares of Common Stock to which he shall be entitled.

Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the shares of Series A Stock to be converted (the "Conversion Date"); and the person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date.

(c)   Fractional Shares.   No fractional share of Common Stock shall be issued upon conversion of Series A Stock. In lieu of any fractional shares to which the holder would otherwise be entitled, the corporation shall pay cash equal to the product of such fraction multiplied by the fair market value of one share of the corporation's Common Stock on the Conversion Date, such value to be determined in good faith by the Board of Directors.

(d)   Reservation of Stock Issuable Upon Conversion.   The corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock, solely for the purpose of effecting the conversion of the shares of the Series A Stock, such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding shares of the Series A Preferred Stock; and if at any time the

ARTICLES OF AMENDMENT - Page 10
03/13/95 10:46am/s

number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Series A Preferred Stock, the corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose.

     (e)    Termination of Redemption Right. Upon exercise of the Conversion Right under this Section 4.2.11, all rights of a holder of Series A Stock to require redemption of such stock under Section 4.2.3 shall automatically be terminated; and no holder of Common Stock acquired upon conversion of Series A Preferred Stock shall have any right of redemption.

     **4.2.12 Modification of Rights and Preferences.** The rights and preferences hereby conferred on the Series A Preferred Stock shall not be changed, altered or revoked without the consent of the holders of the majority of the Series A Preferred Stock outstanding at the time.

     **4.3**    **Series B and Series C Preferred Stock.**

     **4.3.1 General.** Each share of Series B Preferred Stock and each share of Series C Preferred Stock shall have the relative rights, preferences and limitations set forth in this Section 4.3 of Article Fourth. The rights, preferences and limitations of the Series B Preferred Stock shall be identical to the rights, preferences and limitations of the Series C Preferred Stock, except that the holders of Series C Preferred Stock shall have certain voting and conversion rights not shared by the holders of Series B Preferred Stock; and the Series B Preferred Stock shall participate pro rata with the Series C Preferred Stock in any and all dividends declared and paid on the Preferred Stock, in distributions upon liquidation, dissolution or winding up of corporation's affairs, and in redemption.

     **4.3.2 Restricted Voting Rights.** The holders of the Series B and the Series C Preferred Stock shall have no right (except as required by law) to receive notice of or to vote on any matter (including, without limitation, the election of directors of the corporation) at any regular or special meeting of stockholders of the corporation, except that the holders of a majority of the shares of Series C Preferred Stock shall have the right, voting separately as a class, to elect one director to the Board of Directors of the corporation.

     **4.3.3 Cumulative Dividend Preference**

     The Series B Preferred Stock and the Series C Preferred Stock shall be entitled to receive, when and as declared by the corporation's Board of Directors, cash dividends at the per annum rate of 10% of the Liquidation Rate (as defined in Section 4.3.4), cumulative, payable annually at December 31 of each calendar year out of any funds legally available for the payment of dividends, and in preference to any dividends upon the Common Stock. The dividends on the Series B and Series C Preferred Stock shall be cumulative, whether or not declared, so that, if for any period such dividend shall not be paid, the right to such dividend shall accumulate as against the Common Stock; and all arrears so accumulated shall be paid before any dividends shall be declared or paid upon the Common Stock. No dividends shall be declared or paid on the Series B or Series C Preferred Stock if the redemption payments due to

ARTICLES OF AMENDMENT - Page 11
03/13/95 10:46am/s

**FOSTER DEC. EX. 20 pg. 93**

the holders of the Series A Preferred Stock under Section 4.2. of this Article Fourth are in arrears. No dividend shall be declared or paid upon the Common Stock nor shall any Common Stock be purchased or otherwise acquired by the corporation for value (other than payment of amounts due to Reed J. Taylor for redemption of his Common Stock), unless all dividends on the Series B and Series C Preferred Stock for all past period shall have been paid or shall have been declared and a sum sufficient for the payment thereof set apart for payment.

### 4.3.4 Liquidation Preference.

In the event of any liquidation, dissolution or winding-up of the corporation, whether voluntary or involuntary, before any other distribution or payment is made to the holders of Common Stock or any other series of Preferred Stock (except the corporation's Series A Preferred Stock), the holders of Series B Preferred Stock and the holders of the Series C Preferred Stock shall be entitled to receive, out of the assets of the corporation legally available therefor, a liquidation payment in the amount of $10.00 cash per share of Series B or Series C Preferred Stock ("Liquidation Rate"), plus a further amount equal to the dividends accumulated and unpaid thereon to the date of such liquidation payment. If, upon any liquidation, dissolution or winding up of the corporation, the assets available for distribution are insufficient to pay to the holders of all outstanding Series B and Series C Preferred Stock the full amount of the Liquidation Rate and all accumulated but unpaid dividends, the holders of the Series B and Series C Preferred Stock shall share pro rata in any such distribution of assets. Such rights of the holders of the Series B and Series C Preferred Stock shall be subordinate only to the right of the holder of the Series A Preferred Stock to be paid the redemption price of such stock in full, together with accrued interest, in accordance with Section 4.2 of this Article Fourth. After payment to the holders of the Series B and Series C Preferred Stock of the full preferential amounts hereinabove provided, the holders of the Series B and Series C Preferred Stock as such shall have no right or claim to any of the remaining assets of the corporation either upon any distribution of such assets or upon dissolution, liquidation or winding up; and the remaining assets to be distributed, if any, upon a distribution of such assets or upon dissolution, liquidation or winding up, may be distributed among the holders of the Common Stock.

### 4.3.5 Redemption.

(a) Mandatory Redemption by Corporation. The Series B Preferred Stock and, subject to the conversion rights provided in Section 4.3.6 of Article Fourth, the Series C Preferred Stock shall be called for redemption by the corporation upon payment of the aggregate Redemption Rate from legally available funds upon the closing of the earliest of the following events ("Equity Offering"):

(i) an offering of the corporation's securities conducted pursuant to the registration requirements of the Securities Act of 1933 ("1933 Act") in which gross proceeds of at least $5,000,000 are raised;

(ii) an offering of the corporation's securities pursuant to exemptions from registration under the 1933 Act in which gross proceeds of at least $5,000,000 are raised; or

ARTICLES OF AMENDMENT - Page 12
03/13/95 10:46am/s

**FOSTER DEC. EX. 20 pg. 94**

(iii)    an offering of any securities convertible into corporation's Common Stock that are sold in an offering that conforms to the parameters of subparagraph (i) or (ii) above.

The redemption price for each share of Series B and Series C Preferred Stock shall be the "Redemption Rate" equal to 100% of the Liquidation Rate if such redemption occurs within two (2) years from the issuance of the first shares of Series B or Series C Preferred Stock. After such two year period, an amount equal to 5% of the Liquidation Rate will be added to the Redemption Rate immediately and each 180 days thereafter until all outstanding shares of the Series B and Series C Preferred Stock are fully redeemed, viz:

| Time from Original Issuance | Percentage of Liquidation Rate |
|---|---|
| Within two years | 100% |
| After two years but before two years plus 181 days | 105% |
| After two years plus 180 days but before two years plus 361 days | 110% |
| After two years plus 360 days but before two years plus 541 days | 115% |
| . . . | . . . |

Notice of such call for redemption, specifying the anticipated date of closing of the Equity Offering, shall be mailed to each record holder of Series B or Series C Preferred Stock as soon as practicable before such closing date. The redemption date for mandatory redemption of the Series B and Series C Preferred Stock shall be the actual closing date of the Equity Offering. Mandatory redemption of the Series B and Series C Preferred Stock under this Section 4.3.5 of Article Fourth shall automatically be cancelled upon determination by corporation's board of directors that the Equity Offering will not be consummated for any reason.

(b) Voluntary Redemption by Corporation. The Series B and Series C Preferred Stock may be called for redemption by the corporation, in whole or in part, upon payment of the Redemption Price from legally available funds at any time prior to the closing of an Equity Offering. Notice of such call for redemption, specifying the redemption date not less than thirty days from the date such notice is mailed and the number or percentage of outstanding shares of Series B and Series C Preferred Stock to be redeemed, shall be mailed to each record holder of Series B and Series C Preferred Stock. If fewer than all shares of Series B and Series C Preferred Stock are to be redeemed, the shares shall be redeemed prorata from the holders

ARTICLES OF AMENDMENT - Page 13
03/13/95 10:46am/s

FOSTER DEC. EX. 20 pg. 95

thereof; and, upon request of the corporation, certificates evidencing shares of Series B and Series C Preferred Stock including redeemed shares shall be surrendered to and reissued by the corporation in reduced amount to reflect any and all partial redemptions of such shares prior to such request.

(c)  <u>Redemption Procedure and Effect</u>.  The corporation shall deposit, on or before the redemption date specified in the notice of redemption, the aggregate redemption price of the shares of Series B and Series C Preferred Stock to be redeemed with a bank or trust company specified in the notice, payable on the redemption date in the amounts and to the respective orders of the holders of the shares of Series B and Series C Preferred Stock to be redeemed, on endorsement to the corporation as may be required and upon surrender of the certificates for such shares.  Unless the corporation fails to pay the Redemption Price on or before the redemption date, the shares of Series B and Series C Preferred Stock subject to such redemption shall be deemed to have been redeemed, and shall be deemed no longer to be outstanding, from and after the redemption date set forth in the notice of redemption.  On or after the redemption date, subject only to payment of the redemption price, Series B and Series C Preferred Stock so called for redemption shall cease to be entitled to any interest or right in the corporation; and holders of such Series B or Series C Preferred Stock shall thereafter cease to be shareholders and shall be entitled only to payment of the amount of the redemption price, without interest, upon surrender of the certificates evidencing such stock.

**4.3.6  <u>Conversion of Series C Preferred Stock</u>.**  Each holder of Series C Preferred Stock shall have the right, exercisable beginning at the earlier of the date of receipt of notice of mandatory redemption of the Series C Preferred Stock pursuant to Section 4.3.5(a) or two years after the first issuance of Series B or Series C Preferred Stock and ending on the closing date of an Equity Offering, to convert Series C Preferred Stock into Common Stock at the Conversion Rate determined as follows:  Each share of Series C Preferred Stock shall be convertible into that number of shares of Common Stock which equals 10.4% of the Common Stock on a fully diluted basis divided by 150,000.

This conversion right shall be exercisable by any holder of Series C Preferred Stock as to all or any number of the shares of Series C Preferred Stock owned of record by such holder and shall be exercised by giving the corporation written notice of the exercise of such right, specifying the number of shares of Series C Preferred Stock to be converted and the effective date of such conversion, provided that the effective date of the conversion shall not be later than the closing date of an Equity Offering.

**4.4  <u>Common Stock</u>.**  Holders of the Common Stock are entitled to one vote per share on all matters to be voted on by stockholders, including the election of directors.  Common Stockholders are not entitled to vote their shares cumulatively in the election of directors.  Holders of Common Stock of the corporation shall be entitled to elect all of the directors of the corporation other than the director appointed by the holders of the Series A Preferred Stock and the director elected by the holders of Series C Preferred Stock.  The holders of any series of Preferred Stock of the corporation have a preference over the holders of Common Stock of the corporation on the assets of the corporation legally available for distribution to stockholders in the event of any liquidation, dissolution, or winding up of the affairs of the corporation.  In the event of any liquidation, dissolution or winding up of the affairs of the corporation, holders of

ARTICLES OF AMENDMENT - Page 14
03/13/95 10:46am/s

**FOSTER DEC. EX. 20 pg. 96**

the Common Stock will share ratably in any assets of the corporation legally available for distribution to holders of Common Stock after satisfying the liquidation preferences of the Series A, Series B and Series C Preferred Stock. Holders of Series B and Series C Preferred Stock have a preference over the holders of Common Stock as to the payment of dividends. Holders of Common Stock have rights, share for share, to receive dividends if and when declared by the Board of Directors out of funds legally available therefor, after paying preferred dividends to the holders of Series B and Series C Preferred Stock.

## FIFTH

Holders of any class or series of corporation's stock shall not have a preemptive right to acquire unissued or treasury shares of any class or series or securities convertible into such shares or carrying a right to subscribe to or acquire such shares, except as provided in the Idaho Business Corporation Act.

## SIXTH

The location of the initial registered office of the corporation is One Lewis Clark Plaza, Lewiston, Idaho 83501; and the name of its initial registered agent at such address is R. John Taylor.

## SEVENTH

The number of directors constituting the initial Board of Directors is four, and the names and addresses of the persons who are to serve until the first annual meeting of the shareholders and until their successors are elected and qualified are:

| Name | Address |
| --- | --- |
| Reed J. Taylor | P.O. Box 538<br>Lewiston ID 83501 |
| R. John Taylor | P.O. Box 538<br>Lewiston ID 83501 |
| Raymond R. Heilman | P.O. Box 538<br>Lewiston ID 83501 |
| Mary K. Frost | P.O. Box 538<br>Lewiston ID 83501 |

ARTICLES OF AMENDMENT - Page 15
03/13/95 10:53am/s

**FOSTER DEC. EX. 20 pg. 97**

## EIGHTH

The name and address of the incorporator is as follows:

Reed J. Taylor
P.O. Box 538
Lewiston ID 83501

## NINTH

The Board of Directors is expressly authorized to alter, amend or repeal the Bylaws of the corporation and to adopt new Bylaws, subject to repeal or change by a majority vote of the shareholders.

## TENTH

Shareholders entitled under Article Fourth to vote in the election of directors of the corporation shall not be entitled to vote their shares cumulatively in the election of directors of the corporation.

## ELEVENTH

A director of this corporation shall not be personally liable to this corporation or its shareholders for monetary damages for breach of fiduciary duty as a director, except for liability (a) for any breach of the director's duty of loyalty to this corporation or its shareholders, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (c) under Idaho Code §30-1-48, or (d) for any transaction from which the director derived an improper personal benefit. If the Idaho Business Corporation Act is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of this corporation shall be eliminated or limited to the fullest extent permitted by the Idaho Business Corporation Act, as so amended. Any repeal or modification of this Article Eleventh by the shareholders of the corporation shall not adversely affect any right or protection of a director of the corporation existing at the time of such repeal or modification."

**THIRD:** The number of shares of the corporation outstanding at the time of such adoption was 973,333.5 shares of Common Stock and 188,065 shares of Stated Value Preferred Stock; and the number of shares entitled to vote thereon was 973,333.5 shares of Common Stock.

**FOURTH:** The designation and number of outstanding shares of each class entitled to vote thereon as a class were as follows:

ARTICLES OF AMENDMENT - Page 16
03/13/95 10:53am/s

**FOSTER DEC. EX. 20 pg. 98**

| Class | Number of Shares |
|-------|------------------|
| Common | 973,333.5 |

**FIFTH:** The number of shares of Common Stock voted for such amendment was 926,698; and the number of shares of Common Stock voted against such amendment was 6,688.

DATED this __7th__ day of March 1995.

AIA SERVICES CORPORATION

By _____
R. John Taylor, President

ATTEST:

_____
Daniel L. Spickler, Secretary

## VERIFICATION

STATE OF IDAHO      )
                    :ss.
County of Nez Perce )

I, Sherry L. Roberts a Notary Public, do hereby certify that on the 7th day of March 1995, personally appeared before me R. JOHN TAYLOR, who, being by me first duly sworn, declared that he is the President of AIA SERVICES CORPORATION, that he signed the foregoing document as President of the corporation, and that the statements contained therein are true.

_____
Notary Public for Idaho
Residing at: Lewiston
My Commission Expires: 10/20/97

ARTICLES OF AMENDMENT - Page 17
03/13/95 10:53am/s

**FOSTER DEC. EX. 20 pg. 99**

# State of Idaho

## Department of State

CERTIFICATE OF AMENDMENT

OF

AIA SERVICES CORPORATION

File Number C 74568

I, PETE T. CENARRUSA, Secretary of State of the State of Idaho, hereby certify that duplicate originals of Articles of Amendment to the Articles of Incorporation of AIA SERVICES CORPORATION duly executed pursuant to the provisions of the Idaho Business Corporation Act, have been received in this office and are found to conform to law.

ACCORDINGLY and by virtue of the authority vested in me by law, I issue this Certificate of Amendment to the Articles of Incorporation and attach hereto a duplicate original of the Articles of Amendment.

Dated: August 3, 1995

*Pete T. Cenarrusa*

**SECRETARY OF STATE**

By *Sally J. Clark*

ORIGINAL

Aug 3  3 16 PM '95

SECRETARY OF STATE
STATE OF IDAHO

**ARTICLES OF AMENDMENT
TO THE ARTICLES OF INCORPORATION
OF
AIA SERVICES CORPORATION**

Pursuant to the provisions of §30-1-58, §30-1-59 and §30-1-61 of the Idaho Business Corporation Act, the undersigned corporation adopts the following Articles of Amendment to its Articles of Incorporation, as filed on December 20, 1983 and previously amended on October 14, 1986, December 29, 1987 and April 11, 1995.

**FIRST:** The name of the corporation is **AIA SERVICES CORPORATION.**

**SECOND:** On July 18, 1995, the shareholders of the corporation adopted and approved the following Amended and Restated Articles of Incorporation of AIA Services Corporation, pursuant to which Article Fourth was amended by replacing it in its entirety.

**"AMENDED AND RESTATED ARTICLES OF INCORPORATION
OF
AIA SERVICES CORPORATION**

Except for the amendment of Article Fourth by replacing it in its entirety, these Amended and Restated Articles of Incorporation of AIA Services Corporation correctly set forth without change the corresponding provisions of the original Articles of Incorporation as hereinbefore filed on December 20, 1983 and amended on October 14, 1986, December 29, 1987 and April 11, 1995; and these Amended and Restated Articles of Incorporation, including the amended Article Fourth supersede the original Articles of Amendment and all previous amendments thereto.

**FIRST**

The name of the corporation is **AIA SERVICES CORPORATION.**

**SECOND**

The period of its duration is perpetual.

IDAHO SECRETARY OF STATE

7/21/95      9:00:00 AM
Customer # 20168
IVC960003788  16384
CORPORATION PROFIT AMENDMENT

1 @ 30.00 =  30.00

ARTICLES OF AMENDMENT - Page 1

## THIRD

The purpose for which the corporation is organized is for the transaction of any or all lawful business for which the corporation may be incorporated under the Idaho Business Corporation Act.

## FOURTH

**4.1 Authorized Capital.** The aggregate number of shares which this corporation shall have authority to issue is 11,700,000 shares, of which 700,000 shares shall be Preferred Stock and 11,000,000 shares shall be Common Stock ($0.01 par value). The corporation is authorized to issue the Preferred Stock in two classes designated as "Series A", consisting of 200,000 shares of Stated Value Preferred Stock (without par value); and "Series C", consisting of 500,000 shares of 10% Preferred Stock ($1 par value). The respective preferences, limitations and relative rights of each of the two classes of Preferred Stock and the Common Stock of the corporation are set forth in the following provisions of Article Fourth:

**4.2 Series A Preferred Stock.**

**4.2.1 General.** Each share of Series A Preferred Stock shall have the rights and preferences conferred in this Section 4.2 of Article Fourth. Holders of Series A Preferred Stock shall have no rights to share in any distribution of the profits or assets of the corporation, whether in the form of cash or stock or dividends or otherwise, except to the extent specifically provided herein.

**4.2.2 No Dividends.** The Series A Preferred Stock shall not pay or accrue any dividends.

**4.2.3 Demand for Redemption.** (a) The holder of Series A Preferred Stock shall have the right to require the corporation to redeem such stock from any legally available funds upon breach of any covenant of the corporation set forth in this Article Fourth, but only to the extent such redemption shall not violate the Idaho Business Corporation Act restrictions on the corporation's redemption of its own shares. This right may be exercised by giving the corporation written notice of demand for redemption specifying the default and a redemption date not less than ninety (90) days from the date such notice delivered to the corporation; provided however that, if the corporation cures such specified default within sixty (60) days after receipt of such notice by corporation, the right to redeem Series A Preferred Stock on account of such specified default shall be extinguished.

(b) The holder of Series A Preferred Stock shall have the right to require the corporation to redeem such stock from any legally available funds at any time after September 14, 1993, but only to the extent such redemption shall not violate the Idaho Business Corporation Act restrictions on the corporation's redemption of its own shares. This right may be exercised by giving the corporation written notice of demand for redemption specifying a redemption date after September 14, 1993 and not less than ninety (90) days or more than one hundred eighty (180) days from the date such notice is delivered to the corporation.

ARTICLES OF AMENDMENT - Page 2

**4.2.4 Call for Redemption.** The Series A Preferred Stock may be called for redemption by the corporation, in whole or in part, upon payment of the redemption price from legally available funds at any time prior to the demand for redemption by the holder of Series A Preferred Stock. Notice of such call for redemption, specifying the redemption date not less than thirty (30) days from the date such notice is mailed, shall be mailed to each record holder of Series A Preferred Stock. If fewer than all shares of Series A Preferred Stock are to be redeemed, the shares shall be redeemed prorata from the holders thereof.

**4.2.5 Redemption Price** If Series A Preferred Stock is redeemed on or before September 14, 1990, the redemption price is $8.00 per share if paid in a lump sum. If Series A Preferred Stock is redeemed any time during the three-year period beginning September 15, 1990 and ending on September 14, 1993, the redemption price is $8.50 per share if paid in a lump sum. If not paid in a lump sum on or before September 14, 1993, the redemption price for Series A Preferred Stock is $10.00 per share, provided that the redemption price may be paid, at the corporation's sole option, in monthly installments on a fifteen (15) year amortization schedule beginning on the day after the redemption date and accruing interest at a rate of one-and one-half (1½) points under the First Interstate Bank of Idaho, N.A., prime lending rate, adjusted quarterly.

## 4.2.6 Redemption Procedure and Effect.

(a)     **Lump Sum Payment.** If the redemption price is to be paid in a lump sum, the corporation shall deposit, or shall cause its nominee to deposit, on or before the redemption date specified in the notice of redemption, the aggregate redemption price of the shares of Series A Preferred Stock to be redeemed with a bank or trust company specified in the notice, payable on the redemption date in the amounts and to the respective orders of the holders of the shares of Series A Preferred Stock to be redeemed, on endorsement to the corporation or its nominee as may be required and upon surrender of the certificates for such shares. Unless the corporation or its nominee fails to pay the lump sum redemption price on or before the redemption date, the shares of Series A Preferred Stock subject to such redemption shall be deemed to have been redeemed, and shall be deemed no longer to be outstanding, from and after the redemption date set forth in the notice of redemption. On or after the redemption date, subject only to payment of the redemption price, Series A Preferred Stock so called for redemption shall cease to be entitled to any interest or right in the corporation; and holders of such Series A Preferred Stock shall thereafter cease to be shareholders and shall be entitled only to payment of the amount of the redemption price, without interest, upon surrender of the certificates evidencing such stock. If the lump sum redemption price shall be paid by a nominee of the corporation, such nominee shall upon such payment become the owner of the shares with respect to which such payment was made; and certificates of stock may be issued to such nominee in evidence of such ownership.

(b)     **Installment Payment.** If the corporation elects to pay the redemption price in installments, the number of shares of Series A Preferred Stock equal to the principal portion of each installment divided by $10.00 per share shall be deemed to have been redeemed and to be no longer outstanding from and after the date of such installment. On and after such payment date, such number of shares of Series A Preferred Stock shall cease to be entitled to any interest or right in the corporation; and holders of such shares shall thereafter cease to be shareholders

ARTICLES OF AMENDMENT - Page 3

**FOSTER DEC. EX. 20 pg. 103**

of the corporation with respect to such shares, whether or not the certificates evidencing such shares have been surrendered. Upon request of the corporation from time to time, certificates evidencing shares of Series A Preferred Stock including redeemed shares shall be surrendered to and reissued by the corporation in reduced amount to reflect any and all installment redemptions of shares prior to such request.

**4.2.7 Liquidation Preference.** In case of the voluntary liquidation or dissolution of the corporation, the holder of Series A Preferred Stock shall have the right to be paid in full, before any amount shall be paid to the owners of the Common Stock or to the owners of the Series C Preferred Stock, as follows:

> $8.00 per share if the liquidation price is paid on or before September 14, 1990.

> $8.50 per share if the liquidation price is paid after September 14, 1990 and on or before September 14, 1993.

> $10.00 per share if the liquidation price is paid after September 14, 1993.

In case of the involuntary liquidation or dissolution of the corporation, the holder of Series A Preferred Stock shall have the right to be paid $10.00 per share, in full, before any amount shall be paid to the owners of the Common Stock or to the owners of the Series C Preferred Stock. After payment to the holders of the Series A Preferred Stock of the full preferential amounts hereinabove provided, the holders of the Series A Preferred Stock as such shall have no right or claim to any of the remaining assets of the corporation either upon any distribution of such assets or upon dissolution, liquidation or winding up; and the remaining assets to be distributed, if any, upon a distribution of such assets or upon dissolution, liquidation or winding up, may be distributed among the holders of the Series C Preferred Stock and the Common Stock in accordance with the provisions of this Article Fourth.

**4.2.8 Limited Voting Rights.** The Series A Preferred Stock shall have no right (except as required by law or as provided by Section 4.2.12 of this Article Fourth) to receive notice of or to vote at any regular or special meeting of stockholders, except that the holders of a majority of the shares of Series A Preferred Stock shall have the right, voting separately as a class, to elect one director to the board of directors of the corporation.

**4.2.9 Covenants.** So long as any shares of Series A Preferred Stock are outstanding, and except with the consent of the holders of a majority of the outstanding shares of Series A Preferred Stock.

(a) _Common Stock_. The corporation shall not issue any Common Stock for less than book value (determined as of the end of the immediately preceding fiscal year), except for Common Stock issued to pay a dividend payable solely in shares of Common Stock or issued to employees or agents pursuant to incentive stock option or bonus plan.

(b) _Preferred Stock_. The corporation shall issue no Preferred Stock or

ARTICLES OF AMENDMENT - Page 4

securities convertible into such stock, other than the Series A and Series C Preferred Stock.

(c) **Indebtedness**. The corporation will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume, guaranty or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

(1) The corporation may remain liable in respect of Indebtedness outstanding on the date of adoption of this Article Fourth by the corporation's shareholders.

(2) The corporation and its Subsidiaries may become and remain liable with respect to Indebtedness that is not secured by a Lien on any of the assets of the corporation or its Subsidiaries, provided that the aggregate principal amount of such unsecured Indebtedness shall not exceed Consolidated Net Worth less goodwill of the corporation at any time; and

(3) The corporation and its Subsidiaries may become and remain liable in respect of Indebtedness secured by any of the following Liens:

(i) Liens for taxes, assessments or governmental charges or claims the payment of which is not yet delinquent or is being contested in good faith, if such reserve or other provision, if any, as shall be required by generally accepted accounting principles, consistently applied, shall have been made therefor;

(ii) Statutory Liens of landlords and lines of carriers, warehousemen, mechanics, materialmen and other liens imposed by law incurred in the ordinary courses of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by generally accepted accounting principles, consistently applied shall have been made therefor;

(iii) Liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, governmental contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(iv) Any attachment or judgment Lien; __provided__ that if the judgment it secures exceeds $250,000 (alone or when aggregated with all other judgments secured by Liens permitted by this clause (vi)), such judgment shall, within forty-five (45) days after the entry thereof, have been discharged or execution thereof stayed pending appeal, or shall have been discharged within forty-five (45) days after the expiration of any such stay;

(v) Easements, rights-of-way, restrictions and other similar

ARTICLES OF AMENDMENT - Page 5

charges or encumbrances not interfering with the ordinary conduct of the business of the corporation or any of its Subsidiaries;

(vi)    Any interest or title of a lessor under any lease;

(vii)    Any Lien existing on any asset of any corporation at the time such corporation becomes a subsidiary if such Lien was not created in contemplation of such event;

(viii)    Any Lien on any asset securing Indebtedness incurred or assume for the purpose of financing not more than Eighty-five percent (85%) of the cost of acquiring such assets; provided that such line attaches to such asset concurrently with or within ninety (90) days after the acquisition thereof;

(ix)    Any Lien on any asset of any corporation existing at the time such corporation is merged into or consolidated with the corporation or a subsidiary, if such Lien was not created in contemplation of such event;

(x)    Any Lien existing on any asset prior to the acquisition thereof by the corporation or a Subsidiary, if such Lien was not created in contemplation of such acquisition;

(xi)    Any Lien arising out of the refinancing, extension, renewal or refunding of any Indebtedness secured by any Lien permitted by any of the foregoing clauses of this Section 4.2.9(c); provided that the amount of such Indebtedness is not increased and that such Indebtedness is not secured by any additional assets; and

(xii)    Liens not otherwise permitted by the foregoing clauses of this Section 4.2.9(c) (including, without limitation, Liens on stock of Subsidiaries, whether consolidated or unconsolidated) securing Indebtedness in an aggregate principal amount of any time outstanding not to exceed ten percent (10%) of the difference between Consolidated Net Worth and the amount of the goodwill of the corporation.

(d)    Corporate Existence.  The corporation will maintain its corporate existence and will not liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or enter into any transaction of merger or consolidation with any Person (including any Subsidiary) unless (i) this corporation is the surviving corporation following any such merger or consolidation, and (ii) the Consolidated Net Worth of the surviving corporation immediately following such merger or consolidation equals or exceeds the Consolidated Net Worth of this corporation immediately prior to such merger or consolidation.

(e)    Sale of Assets.  The corporation will not, and will not permit any of its Subsidiaries to, convey, sell, lease, transfer or otherwise dispose of all or any material part of its business, property or assets, whether now owned or hereafter acquired, except:

ARTICLES OF AMENDMENT - Page 6

(1)    The corporation and its Subsidiaries may convey, sell, lease, transfer or otherwise dispose of investment assets in the ordinary course of business;

(2)    The corporation and its Subsidiaries may sell or otherwise dispose of Capital Assets or real property if the asset so disposed of is concurrently replaced by a substantially equivalent asset having a value equal to or greater than the assets disposed of;

(3)    The corporation and is Subsidiaries may sell or otherwise dispose of obsolete or worn out property in the ordinary course of business;

(4)    The corporation and its Subsidiaries may sell and lease back any newly acquired asset for the purpose of financing the acquisition of such asset and securing the repayment of Indebtedness, provided that such Indebtedness shall not exceed eighty-five percent (85%) of the cost of such asset and is otherwise permitted by the covenants contained in this Article Fourth; and

(5)    The corporation and its Subsidiaries may sell or otherwise dispose of any of their other assets; <u>provided</u> that any such sale or other disposition is made for the fair market value of such assets.

(f)    <u>Acquisitions</u>. The corporation will not, and will not permit any of its Subsidiaries to, acquire by purchase or otherwise all or substantially all the business, property or fixed assets, or the stock or other evidence of beneficial ownership, of any Person unless, immediately prior to and after giving effect to such transaction, no violation of any of the covenants or other provisions contained in this Article Fourth shall have occurred and be continuing or would be caused by such acquisition.

(g)    <u>Transactions with Shareholders and Affiliates</u>. The corporation will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease, loan or exchange of any property or the rendering of any service) with any director or officer or any holder of equity securities of the corporation, or with any Affiliate of the corporation or of such director, officer or holder, on terms that are less favorable to the corporation or that Subsidiary, as the case may be, than those which might be obtained at the time from Persons who are not such a director, officer, holder or Affiliate; <u>provided</u> that the foregoing restriction shall not apply to (i) any transaction in effect at the date of adoption of this Article Fourth by the corporation's shareholders; (ii) any transaction between the corporation and any of its wholly-owned Subsidiaries or between any of its wholly-owned Subsidiaries; (iii) compensation (net of amounts contributed or repaid to the corporation or any Subsidiary or to Lewiston Land Company and contributed or repaid to the corporation or any Subsidiary), by way of salary or bonus, paid to director or officers of the corporation in an amount, as to any one individual, not greater than the greater of $400,000 or the total compensation paid in calendar year 1986; (iv) compensation paid to any director or officer of the corporation in amounts equal to income tax liability of such director or officer attributable to transactions involving the corporation, A.I.A., Inc., AIA Travel Services, Inc., AIA Travel, Inc., Lewiston Land Company, AIA Bancard Services Corporation or Taylor Brothers Aircraft on or before January 1, 1988 or to other personal

ARTICLES OF AMENDMENT - Page 7

income tax liability of such director or officer for tax years ended before January 1, 1988; or (v) any loan to or account receivable from an officer, director or stockholder which is repaid in full at least annually on or before the last day of the fiscal year.

(h) **Consolidated Net Worth**. The corporation will not permit Consolidated Net Worth at any date to be less than the number of shares of Series A Preferred Stock outstanding at such date multiplied by $10.00 per share.

(i) **Dividend Restriction**. The corporation will not, directly or indirectly, declare, order, make or set apart any sum for payment of any dividend in respect of its Common Stock (other than a dividend payable solely in shares of Common Stock), except that the corporation may declare and pay Common Stock dividends in an aggregate amount not exceeding the Dividend Availability Amount.

(j) **Debt/Equity Ratio**. Neither the corporation nor any Subsidiary will incur any new Indebtedness (other than Indebtedness permitted by Section 4.2.9(c)(xi) of this Article Fourth) if, at the time of incurring such Indebtedness, the ratio of Consolidated Long Term Debt to Consolidated Net Worth exceeds, or such additional Indebtedness would cause such ratio to exceed, 3.6 to 1.0.

(k) **Debt Service Coverage**. Neither the corporation nor any Subsidiary will incur any new Indebtedness (other than Indebtedness permitted by Section 4.2.9(c)(xi) of this Article Fourth) if, at the time of incurring such Indebtedness, the ratio of (i) Consolidated Net Income plus depreciation and amortization expenses plus compensation contributed or repaid to the corporation, any Subsidiary, Lewiston Land Company or AIA Travel Services, Inc. during the immediately preceding fiscal year of the corporation, divided by (ii) current maturities of Long Term Debt is, or such additional Indebtedness would cause such ratio to be, less than .8 to 1.0.

**4.2.10 Definitions**. For the purpose of Section 4.2.9 of this Article Fourth, the following terms shall have the following meanings:

"**Affiliate**", as applied to any Person, shall mean any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"**Capital Asset**" shall mean, as at any date of determination, those assets of a Person that would, in conformity with generally accepted accounting principles, consistently applied, be classified as plant, property or equipment on the balance sheet of that Person.

"**Consolidated Long Term Debt**" shall mean, as at any date of determination, the total of all Long Term Debt of the corporation and its Subsidiaries on a consolidated basis determined in accordance with generally accepted (or, in the case of an insurance company for

ARTICLES OF AMENDMENT - Page 8

**FOSTER DEC. EX. 20 pg. 108**

which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

**"Consolidated Net Worth"** shall mean, as at any date of determination, the sum of (a) the capital stock and additional paid-in capital, (b) plus retained earnings (or minus accumulated deficit) of the corporation and its Subsidiaries on a consolidated basis, determined in conformity with generally accepted (or, in the case of an insurance company for which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

**"Consolidated Net Income"** for any period, shall mean the net income (or loss) of the corporation and its Subsidiaries on a consolidated basis determined in conformity with generally accepted (or, in the case of an insurance company for which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

**"Dividend Availability Amount"** shall mean, as at any date of determination, an amount equal to fifty percent (50%) of Consolidated Net Income for the period (taken as single accounting period) commencing January 31, 1987 and ending on the last day of the fiscal quarter immediately preceding such date of determination.

**"Indebtedness"** as applied to any person, means (a) all indebtedness for borrowed money, (b) that portion of obligations with respect to finance leases which is capitalized on a balance sheet in conformity with generally accepted accounting principles, consistently applied, (c) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money, (d) any obligation owed for all or any part of the deferred purchase price of property or services which purchase price is (i) due more than six (6) months from the date of incurrence of the obligation in respect thereof, or (ii) evidenced by a note or similar written instrument, and (e) all indebtedness secured by any Lien or vendor's interest under any conditional sale or other title retention agreement existing on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is non-recourse to the credit of that Person; provided, however, that "Indebtedness" shall not include policy claims, policy reserves or mandatory securities valuation reserves of a regulated insurance company; and further provided that "Indebtedness" shall not include indebtedness of the corporation to any Subsidiary.

**"Lien"** shall mean any lien, mortgage, pledge, security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give a security interest).

**"Long Term Debt"**, as applied to any Person, shall mean all Indebtedness of that Person which by its terms or by the terms of any instrument or agreement relating thereto matures more than one year, or is directly renewable or extendable at the option of the debtor to a date more than one year (including an option of the debtor under a revolving credit or similar agreement obligating the lenders to extend credit over a period of one year or more), from the date of creation thereof, but excluding any payments due under the terms thereof within twelve (12) months of any date of determination.

ARTICLES OF AMENDMENT - Page 9

"**Person**" shall mean an individual, corporation, partnership, joint venture, trust, unincorporated organization or any other jurisdictional entity, or a foreign state or any agency or political subdivision thereof.

"**Subsidiary**" shall mean any corporation of which at least a majority of the outstanding stock having by the terms thereof ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether or not at the time stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by the corporation or one or more of its Subsidiaries or by the corporation and one or more of its Subsidiaries.

**4.2.11** <u>Conversion Right</u>. The holders of the Series A Preferred Stock shall have the following conversion right ("Conversion Right"):

(a) <u>Right to Convert</u>. Each share of Series A Preferred Stock shall be convertible, at the option of the holder thereof, at any time prior to the date on which notice of redemption is given under Section 4.2.3 or Section 4.2.4, at the office of the corporation or any transfer agent for the Series A Preferred Stock or Common Stock, into one fully paid and nonassessable share of Common Stock.

(b) <u>Mechanics of Conversion</u>. Before any holder of Series A Preferred Stock shall be entitled to convert such stock into shares of Common Stock, he shall surrender the certificate or certificates for such Preferred Stock, duly endorsed, at the office of the corporation or any transfer agent for the Common Stock, and shall give written notice to the corporation at such office that he elects to convert such Preferred Stock and shall state therein the number of shares of Series A Preferred Stock being converted. Thereupon the corporation shall promptly issue and deliver at such office to such holder of a certificate or certificates for the number of shares of Common Stock to which he shall be entitled.

Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the shares of Series A Stock to be converted (the "Conversion Date"); and the person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date.

(c) <u>Fractional Shares</u>. No fractional share of Common Stock shall be issued upon conversion of Series A Stock. In lieu of any fractional shares to which the holder would otherwise be entitled, the corporation shall pay cash equal to the product of such fraction multiplied by the fair market value of one share of the corporation's Common Stock on the Conversion Date, such value to be determined in good faith by the Board of Directors.

(d) <u>Reservation of Stock Issuable Upon Conversion</u>. The corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock, solely for the purpose of effecting the conversion of the shares of the Series A Stock, such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding shares of the Series A Preferred Stock; and if at any time the

ARTICLES OF AMENDMENT - Page 10

**FOSTER DEC. EX. 20 pg. 110**

number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Series A Preferred Stock, the corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose.

(e)  Termination of Redemption Right.  Upon exercise of the Conversion Right under this Section 4.2.11, all rights of a holder of Series A Stock to require redemption of such stock under Section 4.2.3 shall automatically be terminated; and no holder of Common Stock acquired upon conversion of Series A Preferred Stock shall have any right of redemption.

4.2.12  **Modification of Rights and Preferences.**  The rights and preferences hereby conferred on the Series A Preferred Stock shall not be changed, altered or revoked without the consent of the holders of the majority of the Series A Preferred Stock outstanding at the time.

4.3  Series C Preferred Stock.

4.3.1  **General.**  Each share of Series C Preferred Stock shall have the relative rights, preferences and limitations set forth in this Section 4.3 of Article Fourth.

4.3.2  **Restricted Voting Rights.**  The holders of the Series C Preferred Stock shall have no right (except as required by law) to receive notice of or to vote on any matter (including, without limitation, the election of directors of the corporation) at any regular or special meeting of stockholders of the corporation, except that the holders of a majority of the shares of Series C Preferred Stock shall have the right, voting separately as a class, to elect one director to the Board of Directors of the corporation.

4.3.3  **Cumulative Dividend Preference**  The Series C Preferred Stock shall be entitled to receive, when and as declared by the corporation's Board of Directors, cash dividends at the per annum rate of 10% of the Liquidation Rate (as defined in Section 4.3.4), cumulative, payable annually at December 31 of each calendar year out of any funds legally available for the payment of dividends, and in preference to any dividends upon the Common Stock.  The dividends on the Series C Preferred Stock shall be cumulative, whether or not declared, so that, if for any period such dividend shall not be paid, the right to such dividend shall accumulate as against the Common Stock; and all arrears so accumulated shall be paid before any dividends shall be declared or paid upon the Common Stock.  No dividends shall be declared or paid on the Series C Preferred Stock if the redemption payments due to the holders of the Series A Preferred Stock under Section 4.2. of this Article Fourth are in arrears.  No dividend shall be declared or paid upon the Common Stock nor shall any Common Stock be purchased or otherwise acquired by the corporation for value (other than payment of amounts due to Reed J. Taylor for redemption of his Common Stock), unless all dividends on the Series C Preferred Stock for all past period shall have been paid or shall have been declared and a sum sufficient for the payment thereof set apart for payment.

4.3.4  **Liquidation Preference.**  In the event of any liquidation, dissolution or winding-up of the corporation, whether voluntary or involuntary, before any other distribution

ARTICLES OF AMENDMENT - Page 11

or payment is made to the holders of Common Stock or any other series of Preferred Stock (except the corporation's Series A Preferred Stock), the holders of the Series C Preferred Stock shall be entitled to receive, out of the assets of the corporation legally available therefor, a liquidation payment in the amount of $10.00 cash per share of Series C Preferred Stock ("Liquidation Rate"), plus a further amount equal to the dividends accumulated and unpaid thereon to the date of such liquidation payment. If, upon any liquidation, dissolution or winding up of the corporation, the assets available for distribution are insufficient to pay to the holders of all outstanding Series C Preferred Stock the full amount of the Liquidation Rate and all accumulated but unpaid dividends, the holders of the Series C Preferred Stock shall share pro rata in any such distribution of assets. Such rights of the holders of the Series C Preferred Stock shall be subordinate only to the right of the holder of the Series A Preferred Stock to be paid the redemption price of such stock in full, together with accrued interest, in accordance with Section 4.2 of this Article Fourth. After payment to the holders of the Series C Preferred Stock of the full preferential amounts hereinabove provided, the holders of the Series C Preferred Stock as such shall have no right or claim to any of the remaining assets of the corporation either upon any distribution of such assets or upon dissolution, liquidation or winding up; and the remaining assets to be distributed, if any, upon a distribution of such assets or upon dissolution, liquidation or winding up, may be distributed among the holders of the Common Stock.

### 4.3.5 Redemption.

(a) Mandatory Redemption by Corporation. Subject to the conversion rights provided in Section 4.3.6 of Article Fourth, the Series C Preferred Stock shall be called for redemption by the corporation upon payment of the aggregate Redemption Rate from legally available funds upon the closing of the earliest of the following events ("Equity Offering"):

(i) an offering of the corporation's securities conducted pursuant to the registration requirements of the Securities Act of 1933 ("1933 Act") in which gross proceeds of at least $5,000,000 are raised;

(ii) an offering of the corporation's securities pursuant to exemptions from registration under the 1933 Act in which gross proceeds of at least $5,000,000 are raised; or

(iii) an offering of any securities convertible into corporation's Common Stock that are sold in an offering that conforms to the parameters of subparagraph (i) or (ii) above.

The redemption price for each share of Series C Preferred Stock ("Redemption Price") shall be the "Redemption Rate" equal to 100% of the Liquidation Rate if such redemption occurs within two (2) years from the issuance of the first shares of Series C Preferred Stock. After such two year period, an amount equal to 5% of the Liquidation Rate will be added to the Redemption Rate immediately and each 180 days thereafter until all outstanding shares of the Series C Preferred Stock are fully redeemed, viz:

FOSTER DEC. EX. 20 pg. 112

| Time from Original Issuance | Percentage of Liquidation Rate |
|---|---|
| Within two years | 100% |
| After two years<br>but<br>before two years plus 181 days | 105% |
| After two years plus 180 days but<br>before two years plus 361 days | 110% |
| After two years plus 360 days<br>but<br>before two years plus 541 days | 115% |
| . . . | . . . |

Notice of such call for redemption, specifying the anticipated date of closing of the Equity Offering, shall be mailed to each record holder of Series C Preferred Stock as soon as practicable before such closing date. The redemption date for mandatory redemption of the Series C Preferred Stock shall be the actual closing date of the Equity Offering. Mandatory redemption of the Series C Preferred Stock under this Section 4.3.5 of Article Fourth shall automatically be cancelled upon determination by corporation's board of directors that the Equity Offering will not be consummated for any reason.

(b) Voluntary Redemption by Corporation. The Series C Preferred Stock may be called for redemption by the corporation, in whole or in part, upon payment of the Redemption Price from legally available funds at any time prior to the closing of an Equity Offering. Notice of such call for redemption, specifying the redemption date not less than thirty days from the date such notice is mailed and the number or percentage of outstanding shares of Series C Preferred Stock to be redeemed, shall be mailed to each record holder of Series C Preferred Stock. If fewer than all shares of Series C Preferred Stock are to be redeemed, the shares shall be redeemed prorata from the holders thereof; and, upon request of the corporation, certificates evidencing shares of Series C Preferred Stock including redeemed shares shall be surrendered to and reissued by the corporation in reduced amount to reflect any and all partial redemptions of such shares prior to such request.

(c) Redemption Procedure and Effect. The corporation shall deposit, on or before the redemption date specified in the notice of redemption, the aggregate Redemption Price of the shares of Series C Preferred Stock to be redeemed with a bank or trust company specified in the notice, payable on the redemption date in the amounts and to the respective orders of the holders of the shares of Series C Preferred Stock to be redeemed, on endorsement to the corporation as may be required and upon surrender of the certificates for such shares. Unless the corporation fails to pay the Redemption Price on or before the redemption date, the shares

ARTICLES OF AMENDMENT - Page 13

of Series C Preferred Stock subject to such redemption shall be deemed to have been redeemed, and shall be deemed no longer to be outstanding, from and after the redemption date set forth in the notice of redemption. On or after the redemption date, subject only to payment of the redemption price, Series C Preferred Stock so called for redemption shall cease to be entitled to any interest or right in the corporation; and holders of such Series C Preferred Stock shall thereafter cease to be shareholders and shall be entitled only to payment of the amount of the redemption price, without interest, upon surrender of the certificates evidencing such stock.

**4.3.6 Conversion of Series C Preferred Stock.** Subject to the provisions of Section 4.3.7, each holder of Series C Preferred Stock shall have the right, exercisable beginning at the earlier of the date of receipt of notice of mandatory redemption of the Series C Preferred Stock pursuant to Section 4.3.5(a) or two years after the first issuance of Series C Preferred Stock and ending on the closing date of an Equity Offering, to convert Series C Preferred Stock into Common Stock at the Conversion Rate determined as follows: Each share of Series C Preferred Stock shall be convertible into that number of shares of Common Stock which equals .0000693% of the Common Stock on a fully diluted basis at the effective date of exercise, including by way of inclusion and without limiting the foregoing, any conversion or exercise rights contained in any Preferred Stock, options, warrants, or other rights to Common Stock, granted by the corporation in any form or manner, as if fully exercised at the effective date of exercise. Any holder of Series C Preferred Stock who exercises this conversion right prior to the closing date of an Equity Offering shall be protected against dilution in the event of any Common Stock issuance or other transaction which occurs prior to an Equity Offering and increases the number of outstanding shares of Common Stock on a fully diluted basis: For each share of Series C Preferred Stock converted prior to an Equity Offering, the Company shall issue to the holder thereof such number of additional shares of Common Stock as necessary to maintain, at all times prior to an Equity Offering, such holder's 0.0000693% interest in Company's outstanding Common Stock on a fully diluted basis.

Subject to the provisions of Section 4.3.7, this conversion right shall be exercisable by any holder of Series C Preferred Stock as to all or any number of the shares of Series C Preferred Stock owned of record by such holder and shall be exercised by giving the corporation written notice of the exercise of such right, specifying the number of shares of Series C Preferred Stock to be converted and the effective date of such conversion, provided that the effective date of the conversion shall not be later than the closing date of an Equity Offering.

**4.3.7 Regulatory Limitation on Conversion Right.** Notwithstanding any other provision of Section 4.3.6, the right to convert the Series C Preferred Stock into Common Stock of the Company shall be subject to receipt of prior approval by all regulatory authorities with jurisdiction over the acquisition of such Common Stock. Without limiting the generality of the foregoing limitation, the Holder shall not be permitted to convert Series C Preferred Stock into Common Stock if and to the extent that, after such exercise, the Holder would, directly or indirectly (or by exercise of any unrestricted right to convert into or to acquire Company's voting securities or otherwise) be in "control" of an insurer within the meaning of any applicable state insurance holding company act, unless and until such change of "control" has been approved by all applicable state insurance regulators under their respective insurance holding company acts. If the time for exercise of any conversion rights shall expire or be scheduled to expire within two weeks of any final regulatory approval, then the applicable time periods to

ARTICLES OF AMENDMENT - Page 14

exercise any such conversion rights shall be extended for such a period of time equal to the period of time from delivery of notice of exercise of any rights until the corporation notifies such rights holders of all applicable regulatory approvals.

**4.4    Common Stock.** Holders of the Common Stock are entitled to one vote per share on all matters to be voted on by stockholders, including the election of directors.  Common Stockholders are not entitled to vote their shares cumulatively in the election of directors. Holders of Common Stock of the corporation shall be entitled to elect all of the directors of the corporation other than the director appointed by the holders of the Series A Preferred Stock and the director elected by the holders of Series C Preferred Stock.  The holders of any series of Preferred Stock of the corporation have a preference over the holders of Common Stock of the corporation on the assets of the corporation legally available for distribution to stockholders in the event of any liquidation, dissolution, or winding up of the affairs of the corporation.  In the event of any liquidation, dissolution or winding up of the affairs of the corporation, holders of the Common Stock will share ratably in any assets of the corporation legally available for distribution to holders of Common Stock after satisfying the liquidation preferences of the Series A and Series C Preferred Stock.  Holders of Series C Preferred Stock have a preference over the holders of Common Stock as to the payment of dividends.  Holders of Common Stock have rights, share for share, to receive dividends if and when declared by the Board of Directors out of funds legally available therefor, after paying preferred dividends to the holders of Series C Preferred Stock.

## FIFTH

Holders of any class or series of corporation's stock shall not have a preemptive right to acquire unissued or treasury shares of any class or series or securities convertible into such shares or carrying a right to subscribe to or acquire such shares, except as provided in the Idaho Business Corporation Act.

## SIXTH

The location of the initial registered office of the corporation is One Lewis Clark Plaza, Lewiston, Idaho 83501; and the name of its initial registered agent at such address is R. John Taylor.

## SEVENTH

The number of directors constituting the initial Board of Directors is four, and the names and addresses of the persons who are to serve until the first annual meeting of the shareholders and until their successors are elected and qualified are:

ARTICLES OF AMENDMENT - Page 15

Case 2:18-cv-06278-RMP ECF No. 9-22-1 filed 09/18/18 PageID 856 Page 147
of 149
Case 3:10-cv-00494-DMC-CLW Document 291-44 filed 04/08/2011 Page Page 116 of Page ID
#558

| Name | Address |
|------|---------|
| Reed J. Taylor | P.O. Box 538 <br> Lewiston ID 83501 |
| R. John Taylor | P.O. Box 538 <br> Lewiston ID 83501 |
| Raymond R. Heilman | P.O. Box 538 <br> Lewiston ID 83501 |
| Mary K. Frost | P.O. Box 538 <br> Lewiston ID 83501 |

## EIGHTH

The name and address of the incorporator is as follows:

Reed J. Taylor
P.O. Box 538
Lewiston ID 83501

## NINTH

The Board of Directors is expressly authorized to alter, amend or repeal the Bylaws of the corporation and to adopt new Bylaws, subject to repeal or change by a majority vote of the shareholders.

## TENTH

Shareholders entitled under Article Fourth to vote in the election of directors of the corporation shall not be entitled to vote their shares cumulatively in the election of directors of the corporation.

ARTICLES OF AMENDMENT - Page 16

## ELEVENTH

A director of this corporation shall not be personally liable to this corporation or its shareholders for monetary damages for breach of fiduciary duty as a director, except for liability (a) for any breach of the director's duty of loyalty to this corporation or its shareholders, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (c) under Idaho Code §30-1-48, or (d) for any transaction from which the director derived an improper personal benefit. If the Idaho Business Corporation Act is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of this corporation shall be eliminated or limited to the fullest extent permitted by the Idaho Business Corporation Act, as so amended. Any repeal or modification of this Article Eleventh by the shareholders of the corporation shall not adversely affect any right or protection of a director of the corporation existing at the time of such repeal or modification."

**THIRD:** The number of shares of the corporation outstanding at the time of such adoption was 973,333.5 shares of Common Stock and 182,792 shares of Stated Value Preferred Stock; and the number of shares entitled to vote thereon was 973,333.5 shares of Common Stock.

**FOURTH:** The designation and number of outstanding shares of each class entitled to vote thereon as a class were as follows:

ARTICLES OF AMENDMENT - Page 17

**FOSTER DEC. EX. 20 pg. 117**

| Class | Number of Shares |
|-------|------------------|
| Common | 973,333.5 |

**FIFTH:** The number of shares of Common Stock voted for such amendment was 804,658.5; and the number of shares of Common Stock voted against such amendment was 0.

**SIXTH:** The amendment reduces the par value of the outstanding Common Stock from $1.00 per share to $.01 per share and therefore reduces the corporation's stated capital from $973,333.50 to $9,733.34.

DATED this 20th day of July 1995.

AIA SERVICES CORPORATION

By _____

R. John Taylor, President

ARTICLES OF AMENDMENT - Page 1⅓

# State of Idaho

## Department of State

CERTIFICATE OF AMENDMENT

OF

AIA SERVICES CORPORATION

File Number C 74568

I, PETE T. CENARRUSA, Secretary of State of the State of Idaho, hereby certify that duplicate originals of Articles of Amendment to the Articles of Incorporation of AIA SERVICES CORPORATION duly executed pursuant to the provisions of the Idaho Business Corporation Act, have been received in this office and are found to conform to law.

ACCORDINGLY and by virtue of the authority vested in me by law, I issue this Certificate of Amendment to the Articles of Incorporation and attach hereto a duplicate original of the Articles of Amendment.

Dated: May 8, 1996

*Pete T. Cenarrusa*

**SECRETARY OF STATE**

By *Sally J. Clark*

ORIGINAL

MAY 8  10 59 AM '96

SECRETARY TO THE
STATE OF IDAHO

**ARTICLES OF AMENDMENT**
**TO THE ARTICLES OF INCORPORATION**
**OF**
**AIA SERVICES CORPORATION**

Pursuant to the provisions of §30-1-58, §30-1-59 and §30-1-61 of the Idaho Business Corporation Act, the undersigned corporation adopts the following Articles of Amendment to its Articles of Incorporation, as filed on December 20, 1983 and previously amended on October 14, 1986, December 29, 1987, April 11, 1995 and August 3, 1995.

**FIRST:** The name of the corporation is **AIA SERVICES CORPORATION**.

**SECOND:** On December 14, 1995, the shareholders of the corporation adopted and approved the following Amended and Restated Articles of Incorporation of AIA Services Corporation, pursuant to which Section 4.3.3 of Article Fourth was amended by replacing it in its entirety.

**"AMENDED AND RESTATED ARTICLES OF INCORPORATION**
**OF**
**AIA SERVICES CORPORATION**

Except for the amendment of Section 4.3.3 of Article Fourth by replacing it in its entirety, these Amended and Restated Articles of Incorporation of AIA Services Corporation correctly set forth without change the corresponding provisions of the original Articles of Incorporation as hereinbefore filed on December 20, 1983 and amended on October 14, 1986, December 29, 1987, April 11, 1995 and August 3, 1995; and these Amended and Restated Articles of Incorporation, including the amended Article Fourth, supersede the original Articles of Amendment and all previous amendments thereto.

**FIRST**

The name of the corporation is **AIA SERVICES CORPORATION**.

**SECOND**

The period of its duration is perpetual.

IDAHO SECRETARY OF STATE
DATE 05/08/1996  0900    60950

CK #: 63564    CUST# 20168
AMEND PROF
1 @    30.00=    30.00

2

# :

ARTICLES OF AMENDMENT - Page 1

## THIRD

The purpose for which the corporation is organized is for the transaction of any or all lawful business for which the corporation may be incorporated under the Idaho Business Corporation Act.

## FOURTH

**4.1** **Authorized Capital.** The aggregate number of shares which this corporation shall have authority to issue is 11,700,000 shares, of which 700,000 shares shall be Preferred Stock and 11,000,000 shares shall be Common Stock ($0.01 par value). The corporation is authorized to issue the Preferred Stock in two classes designated as "Series A", consisting of 200,000 shares of Stated Value Preferred Stock (without par value); and "Series C", consisting of 500,000 shares of 10% Preferred Stock ($1 par value). The respective preferences, limitations and relative rights of each of the two classes of Preferred Stock and the Common Stock of the corporation are set forth in the following provisions of Article Fourth:

**4.2** **Series A Preferred Stock.**

**4.2.1** **General.** Each share of Series A Preferred Stock shall have the rights and preferences conferred in this Section 4.2 of Article Fourth. Holders of Series A Preferred Stock shall have no rights to share in any distribution of the profits or assets of the corporation, whether in the form of cash or stock or dividends or otherwise, except to the extent specifically provided herein.

**4.2.2** **No Dividends.** The Series A Preferred Stock shall not pay or accrue any dividends.

**4.2.3** **Demand for Redemption.** (a) The holder of Series A Preferred Stock shall have the right to require the corporation to redeem such stock from any legally available funds upon breach of any covenant of the corporation set forth in this Article Fourth, but only to the extent such redemption shall not violate the Idaho Business Corporation Act restrictions on the corporation's redemption of its own shares. This right may be exercised by giving the corporation written notice of demand for redemption specifying the default and a redemption date not less than ninety (90) days from the date such notice delivered to the corporation; provided however that, if the corporation cures such specified default within sixty (60) days after receipt of such notice by corporation, the right to redeem Series A Preferred Stock on account of such specified default shall be extinguished.

(b) The holder of Series A Preferred Stock shall have the right to require the corporation to redeem such stock from any legally available funds at any time after September 14, 1993, but only to the extent such redemption shall not violate the Idaho Business Corporation Act restrictions on the corporation's redemption of its own shares. This right may be exercised by giving the corporation written notice of demand for redemption specifying a redemption date after September 14, 1993 and not less than ninety (90) days or more than one hundred eighty (180) days from the date such notice is delivered to the corporation.

**4.2.4** **Call for Redemption.** The Series A Preferred Stock may be called for redemption by the corporation, in whole or in part, upon payment of the redemption price from legally available funds at any time prior to the demand for redemption by the holder of Series A

ARTICLES OF AMENDMENT - Page 2

Preferred Stock. Notice of such call for redemption, specifying the redemption date not less than thirty (30) days from the date such notice is mailed, shall be mailed to each record holder of Series A Preferred Stock. If fewer than all shares of Series A Preferred Stock are to be redeemed, the shares shall be redeemed prorata from the holders thereof.

**4.2.5  Redemption Price**  If Series A Preferred Stock is redeemed on or before September 14, 1990, the redemption price is $8.00 per share if paid in a lump sum. If Series A Preferred Stock is redeemed any time during the three-year period beginning September 15, 1990 and ending on September 14, 1993, the redemption price is $8.50 per share if paid in a lump sum. If not paid in a lump sum on or before September 14, 1993, the redemption price for Series A Preferred Stock is $10.00 per share, provided that the redemption price may be paid, at the corporation's sole option, in monthly installments on a fifteen (15) year amortization schedule beginning on the day after the redemption date and accruing interest at a rate of one-and one-half (1½) points under the First Interstate Bank of Idaho, N.A., prime lending rate, adjusted quarterly.

### 4.2.6 Redemption Procedure and Effect.

(a)  _Lump Sum Payment_.  If the redemption price is to be paid in a lump sum, the corporation shall deposit, or shall cause its nominee to deposit, on or before the redemption date specified in the notice of redemption, the aggregate redemption price of the shares of Series A Preferred Stock to be redeemed with a bank or trust company specified in the notice, payable on the redemption date in the amounts and to the respective orders of the holders of the shares of Series A Preferred Stock to be redeemed, on endorsement to the corporation or its nominee as may be required and upon surrender of the certificates for such shares. Unless the corporation or its nominee fails to pay the lump sum redemption price on or before the redemption date, the shares of Series A Preferred Stock subject to such redemption shall be deemed to have been redeemed, and shall be deemed no longer to be outstanding, from and after the redemption date set forth in the notice of redemption. On or after the redemption date, subject only to payment of the redemption price, Series A Preferred Stock so called for redemption shall cease to be entitled to any interest or right in the corporation; and holders of such Series A Preferred Stock shall thereafter cease to be shareholders and shall be entitled only to payment of the amount of the redemption price, without interest, upon surrender of the certificates evidencing such stock. If the lump sum redemption price shall be paid by a nominee of the corporation, such nominee shall upon such payment become the owner of the shares with respect to which such payment was made; and certificates of stock may be issued to such nominee in evidence of such ownership.

(b)  _Installment Payment_.  If the corporation elects to pay the redemption price in installments, the number of shares of Series A Preferred Stock equal to the principal portion of each installment divided by $10.00 per share shall be deemed to have been redeemed and to be no longer outstanding from and after the date of such installment. On and after such payment date, such number of shares of Series A Preferred Stock shall cease to be entitled to any interest or right in the corporation; and holders of such shares shall thereafter cease to be shareholders of the corporation with respect to such shares, whether or not the certificates evidencing such shares have been surrendered. Upon request of the corporation from time to time, certificates evidencing shares of Series A Preferred Stock including redeemed shares shall be surrendered to and reissued by the corporation in reduced amount to reflect any and all installment redemptions of shares prior to such request.

ARTICLES OF AMENDMENT - Page 3

**4.2.7  Liquidation Preference.**  In case of the voluntary liquidation or dissolution of the corporation, the holder of Series A Preferred Stock shall have the right to be paid in full, before any amount shall be paid to the owners of the Common Stock or to the owners of the Series C Preferred Stock, as follows:

$8.00 per share if the liquidation price is paid on or before September 14, 1990.

$8.50 per share if the liquidation price is paid after September 14, 1990 and on or before September 14, 1993.

$10.00 per share if the liquidation price is paid after September 14, 1993.

In case of the involuntary liquidation or dissolution of the corporation, the holder of Series A Preferred Stock shall have the right to be paid $10.00 per share, in full, before any amount shall be paid to the owners of the Common Stock or to the owners of the Series C Preferred Stock.  After payment to the holders of the Series A Preferred Stock of the full preferential amounts hereinabove provided, the holders of the Series A Preferred Stock as such shall have no right or claim to any of the remaining assets of the corporation either upon any distribution of such assets or upon dissolution, liquidation or winding up; and the remaining assets to be distributed, if any, upon a distribution of such assets or upon dissolution, liquidation or winding up, may be distributed among the holders of the Series C Preferred Stock and the Common Stock in accordance with the provisions of this Article Fourth.

**4.2.8  Limited Voting Rights.**  The Series A Preferred Stock shall have no right (except as required by law or as provided by Section 4.2.12 of this Article Fourth) to receive notice of or to vote at any regular or special meeting of stockholders, except that the holders of a majority of the shares of Series A Preferred Stock shall have the right, voting separately as a class, to elect one director to the board of directors of the corporation.

**4.2.9  Covenants.**  So long as any shares of Series A Preferred Stock are outstanding, and except with the consent of the holders of a majority of the outstanding shares of Series A Preferred Stock.

(a)  Common Stock.  The corporation shall not issue any Common Stock for less than book value (determined as of the end of the immediately preceding fiscal year), except for Common Stock issued to pay a dividend payable solely in shares of Common Stock or issued to employees or agents pursuant to incentive stock option or bonus plan.

(b)  Preferred Stock.  The corporation shall issue no Preferred Stock or securities convertible into such stock, other than the Series A and Series C Preferred Stock.

(c)  Indebtedness.  The corporation will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume, guaranty or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

ARTICLES OF AMENDMENT - Page 4

(1)     The corporation may remain liable in respect of Indebtedness outstanding on the date of adoption of this Article Fourth by the corporation's shareholders.

(2)     The corporation and its Subsidiaries may become and remain liable with respect to Indebtedness that is not secured by a Lien on any of the assets of the corporation or its Subsidiaries, provided that the aggregate principal amount of such unsecured Indebtedness shall not exceed Consolidated Net Worth less goodwill of the corporation at any time; and

(3)     The corporation and its Subsidiaries may become and remain liable in respect of Indebtedness secured by any of the following Liens:

(i)     Liens for taxes, assessments or governmental charges or claims the payment of which is not yet delinquent or is being contested in good faith, if such reserve or other provision, if any, as shall be required by generally accepted accounting principles, consistently applied, shall have been made therefor;

(ii)     Statutory Liens of landlords and lines of carriers, warehousemen, mechanics, materialmen and other liens imposed by law incurred in the ordinary courses of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by generally accepted accounting principles, consistently applied shall have been made therefor;

(iii)     Liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, governmental contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(iv)     Any attachment or judgment Lien; provided that if the judgment it secures exceeds $250,000 (alone or when aggregated with all other judgments secured by Liens permitted by this clause (vi)), such judgment shall, within forty-five (45) days after the entry thereof, have been discharged or execution thereof stayed pending appeal, or shall have been discharged within forty-five (45) days after the expiration of any such stay;

(v)     Easements, rights-of-way, restrictions and other similar charges or encumbrances not interfering with the ordinary conduct of the business of the corporation or any of its Subsidiaries;

(vi)     Any interest or title of a lessor under any lease;

(vii)     Any Lien existing on any asset of any corporation at the time such corporation becomes a subsidiary if such Lien was not created in contemplation of such event;

ARTICLES OF AMENDMENT - Page 5

FOSTER DEC. EX. 20 pg. 124

(viii)    Any Lien on any asset securing Indebtedness incurred or assume for the purpose of financing not more than Eighty-five percent (85%) of the cost of acquiring such assets; provided that such line attaches to such asset concurrently with or within ninety (90) days after the acquisition thereof;

(ix)    Any Lien on any asset of any corporation existing at the time such corporation is merged into or consolidated with the corporation or a subsidiary, if such Lien was not created in contemplation of such event;

(x)    Any Lien existing on any asset prior to the acquisition thereof by the corporation or a Subsidiary, if such Lien was not created in contemplation of such acquisition;

(xi)    Any Lien arising out of the refinancing, extension, renewal or refunding of any Indebtedness secured by any Lien permitted by any of the foregoing clauses of this Section 4.2.9(c); provided that the amount of such Indebtedness is not increased and that such Indebtedness is not secured by any additional assets; and

(xii)    Liens not otherwise permitted by the foregoing clauses of this Section 4.2.9(c) (including, without limitation, Liens on stock of Subsidiaries, whether consolidated or unconsolidated) securing Indebtedness in an aggregate principal amount of any time outstanding not to exceed ten percent (10%) of the difference between Consolidated Net Worth and the amount of the goodwill of the corporation.

(d)    Corporate Existence.  The corporation will maintain its corporate existence and will not liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or enter into any transaction of merger or consolidation with any Person (including any Subsidiary) unless (i) this corporation is the surviving corporation following any such merger or consolidation, and (ii) the Consolidated Net Worth of the surviving corporation immediately following such merger or consolidation equals or exceeds the Consolidated Net Worth of this corporation immediately prior to such merger or consolidation.

(e)    Sale of Assets.  The corporation will not, and will not permit any of its Subsidiaries to, convey, sell, lease, transfer or otherwise dispose of all or any material part of its business, property or assets, whether now owned or hereafter acquired, except:

(1)    The corporation and its Subsidiaries may convey, sell, lease, transfer or otherwise dispose of investment assets in the ordinary course of business;

(2)    The corporation and its Subsidiaries may sell or otherwise dispose of Capital Assets or real property if the asset so disposed of is concurrently replaced by a substantially equivalent asset having a value equal to or greater than the assets disposed of;

(3)    The corporation and is Subsidiaries may sell or otherwise dispose of obsolete or worn out property in the ordinary course of business;

ARTICLES OF AMENDMENT - Page 6

FOSTER DEC. EX. 20 pg. 125

(4)     The corporation and its Subsidiaries may sell and lease back any newly acquired asset for the purpose of financing the acquisition of such asset and securing the repayment of Indebtedness, provided that such Indebtedness shall not exceed eighty-five percent (85%) of the cost of such asset and is otherwise permitted by the covenants contained in this Article Fourth; and

(5)     The corporation and its Subsidiaries may sell or otherwise dispose of any of their other assets; provided that any such sale or other disposition is made for the fair market value of such assets.

(f)     Acquisitions.  The corporation will not, and will not permit any of its Subsidiaries to, acquire by purchase or otherwise all or substantially all the business, property or fixed assets, or the stock or other evidence of beneficial ownership, of any Person unless, immediately prior to and after giving effect to such transaction, no violation of any of the covenants or other provisions contained in this Article Fourth shall have occurred and be continuing or would be caused by such acquisition.

(g)     Transactions with Shareholders and Affiliates.  The corporation will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease, loan or exchange of any property or the rendering of any service) with any director or officer or any holder of equity securities of the corporation, or with any Affiliate of the corporation or of such director, officer or holder, on terms that are less favorable to the corporation or that Subsidiary, as the case may be, than those which might be obtained at the time from Persons who are not such a director, officer, holder or Affiliate; provided that the foregoing restriction shall not apply to (i) any transaction in effect at the date of adoption of this Article Fourth by the corporation's shareholders; (ii) any transaction between the corporation and any of its wholly-owned Subsidiaries or between any of its wholly-owned Subsidiaries; (iii) compensation (net of amounts contributed or repaid to the corporation or any Subsidiary or to Lewiston Land Company and contributed or repaid to the corporation or any Subsidiary), by way of salary or bonus, paid to director or officers of the corporation in an amount, as to any one individual, not greater than the greater of $400,000 or the total compensation paid in calendar year 1986; (iv) compensation paid to any director or officer of the corporation in amounts equal to income tax liability of such director or officer attributable to transactions involving the corporation, A.I.A., Inc., AIA Travel Services, Inc., AIA Travel, Inc., Lewiston Land Company, AIA Bancard Services Corporation or Taylor Brothers Aircraft on or before January 1, 1988 or to other personal income tax liability of such director or officer for tax years ended before January 1, 1988;  or (v) any loan to or account receivable from an officer, director or stockholder which is repaid in full at least annually on or before the last day of the fiscal year.

(h)     Consolidated Net Worth.  The corporation will not permit Consolidated Net Worth at any date to be less than the number of shares of Series A Preferred Stock outstanding at such date multiplied by $10.00 per share.

(i)     Dividend Restriction.  The corporation will not, directly or indirectly, declare, order, make or set apart any sum for payment of any dividend in respect of its Common Stock (other than a dividend payable solely in shares of Common Stock), except that the corporation may declare and pay Common Stock dividends in an aggregate amount not exceeding the Dividend Availability

ARTICLES OF AMENDMENT - Page 7

Amount.

      (j)    <u>Debt/Equity Ratio</u>. Neither the corporation nor any Subsidiary will incur any new Indebtedness (other than Indebtedness permitted by Section 4.2.9(c)(xi) of this Article Fourth) if, at the time of incurring such Indebtedness, the ratio of Consolidated Long Term Debt to Consolidated Net Worth exceeds, or such additional Indebtedness would cause such ratio to exceed, 3.6 to 1.0.

      (k)    <u>Debt Service Coverage</u>. Neither the corporation nor any Subsidiary will incur any new Indebtedness (other than Indebtedness permitted by Section 4.2.9(c)(xi) of this Article Fourth) if, at the time of incurring such Indebtedness, the ratio of (i) Consolidated Net Income plus depreciation and amortization expenses plus compensation contributed or repaid to the corporation, any Subsidiary, Lewiston Land Company or AIA Travel Services, Inc. during the immediately preceding fiscal year of the corporation, divided by (ii) current maturities of Long Term Debt is, or such additional Indebtedness would cause such ratio to be, less than .8 to 1.0.

      **4.2.10**   **Definitions.** For the purpose of Section 4.2.9 of this Article Fourth, the following terms shall have the following meanings:

      **"Affiliate"**, as applied to any Person, shall mean any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

      **"Capital Asset"** shall mean, as at any date of determination, those assets of a Person that would, in conformity with generally accepted accounting principles, consistently applied, be classified as plant, property or equipment on the balance sheet of that Person.

      **"Consolidated Long Term Debt"** shall mean, as at any date of determination, the total of all Long Term Debt of the corporation and its Subsidiaries on a consolidated basis determined in accordance with generally accepted (or, in the case of an insurance company for which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

      **"Consolidated Net Worth"** shall mean, as at any date of determination, the sum of (a) the capital stock and additional paid-in capital, (b) plus retained earnings (or minus accumulated deficit) of the corporation and its Subsidiaries on a consolidated basis, determined in conformity with generally accepted (or, in the case of an insurance company for which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

      **"Consolidated Net Income"** for any period, shall mean the net income (or loss) of the corporation and its Subsidiaries on a consolidated basis determined in conformity with generally accepted (or, in the case of an insurance company for which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

ARTICLES OF AMENDMENT - Page 8

"**Dividend Availability Amount**" shall mean, as at any date of determination, an amount equal to fifty percent (50%) of Consolidated Net Income for the period (taken as single accounting period) commencing January 31, 1987 and ending on the last day of the fiscal quarter immediately preceding such date of determination.

"**Indebtedness**" as applied to any person, means (a) all indebtedness for borrowed money, (b) that portion of obligations with respect to finance leases which is capitalized on a balance sheet in conformity with generally accepted accounting principles, consistently applied, (c) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money, (d) any obligation owed for all or any part of the deferred purchase price of property or services which purchase price is (i) due more than six (6) months from the date of incurrence of the obligation in respect thereof, or (ii) evidenced by a note or similar written instrument, and (e) all indebtedness secured by any Lien or vendor's interest under any conditional sale or other title retention agreement existing on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is non-recourse to the credit of that Person; provided, however, that "Indebtedness" shall not include policy claims, policy reserves or mandatory securities valuation reserves of a regulated insurance company; and further provided that "Indebtedness" shall not include indebtedness of the corporation to any Subsidiary.

"**Lien**" shall mean any lien, mortgage, pledge, security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give a security interest).

"**Long Term Debt**", as applied to any Person, shall mean all Indebtedness of that Person which by its terms or by the terms of any instrument or agreement relating thereto matures more than one year, or is directly renewable or extendable at the option of the debtor to a date more than one year (including an option of the debtor under a revolving credit or similar agreement obligating the lenders to extend credit over a period of one year or more), from the date of creation thereof, but excluding any payments due under the terms thereof within twelve (12) months of any date of determination.

"**Person**" shall mean an individual, corporation, partnership, joint venture, trust, unincorporated organization or any other jurisdictional entity, or a foreign state or any agency or political subdivision thereof.

"**Subsidiary**" shall mean any corporation of which at least a majority of the outstanding stock having by the terms thereof ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether or not at the time stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by the corporation or one or more of its Subsidiaries or by the corporation and one or more of its Subsidiaries.

**4.2.11  Conversion Right.** The holders of the Series A Preferred Stock shall have the following conversion right ("Conversion Right"):

(a)     Right to Convert. Each share of Series A Preferred Stock shall be convertible,

ARTICLES OF AMENDMENT - Page 9

at the option of the holder thereof, at any time prior to the date on which notice of redemption is given under Section 4.2.3 or Section 4.2.4, at the office of the corporation or any transfer agent for the Series A Preferred Stock or Common Stock, into one fully paid and nonassessable share of Common Stock.

(b)  <u>Mechanics of Conversion</u>.  Before any holder of Series A Preferred Stock shall be entitled to convert such stock into shares of Common Stock, he shall surrender the certificate or certificates for such Preferred Stock, duly endorsed, at the office of the corporation or any transfer agent for the Common Stock, and shall give written notice to the corporation at such office that he elects to convert such Preferred Stock and shall state therein the number of shares of Series A Preferred Stock being converted.  Thereupon the corporation shall promptly issue and deliver at such office to such holder of a certificate or certificates for the number of shares of Common Stock to which he shall be entitled.

Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the shares of Series A  Stock to be converted (the "Conversion Date"); and the person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date.

(c)  <u>Fractional Shares</u>.  No fractional share of Common Stock shall be issued upon conversion of Series A  Stock.  In lieu of any fractional shares to which the holder would otherwise be entitled, the corporation shall pay cash equal to the product of such fraction multiplied by the fair market value of one share of the corporation's Common Stock on the Conversion Date, such value to be determined in good faith by the Board of Directors.

(d)  <u>Reservation of Stock Issuable Upon Conversion</u>.  The corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock, solely for the purpose of effecting the conversion of the shares of the Series A  Stock, such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding shares of the Series A Preferred Stock; and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Series A Preferred Stock, the corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose.

(e)  <u>Termination of Redemption Right</u>.  Upon exercise of the Conversion Right under this Section 4.2.11, all rights of a holder of Series A  Stock to require redemption of such stock under Section 4.2.3 shall automatically be terminated; and no holder of Common Stock acquired upon conversion of Series A Preferred Stock shall have any right of redemption.

**4.2.12  <u>Modification of Rights and Preferences</u>.**  The rights and preferences hereby conferred on the Series A Preferred Stock shall not be changed, altered or revoked without the consent of the holders of the majority of the Series A Preferred Stock outstanding at the time.

**4.3**    <u>Series C Preferred Stock</u>.

ARTICLES OF AMENDMENT - Page 10

**4.3.1** **General.** Each share of Series C Preferred Stock shall have the relative rights, preferences and limitations set forth in this Section 4.3 of Article Fourth.

**4.3.2** **Restricted Voting Rights.** The holders of the Series C Preferred Stock shall have no right (except as required by law) to receive notice of or to vote on any matter (including, without limitation, the election of directors of the corporation) at any regular or special meeting of stockholders of the corporation, except that the holders of a majority of the shares of Series C Preferred Stock shall have the right, voting separately as a class, to elect one director to the Board of Directors of the corporation.

**4.3.3** **Cumulative Dividend Preference** The Series C Preferred Stock shall be entitled to receive, when and as declared by the corporation's Board of Directors, cash dividends at the per annum rate of 10% of the Liquidation Rate (as defined in Section 4.3.4), cumulative, payable quarterly at March 31, June 30, September 30 and December 31 of each calendar year out of any funds legally available for the payment of dividends, and in preference to any dividends upon the Common Stock. The dividends on the Series C Preferred Stock shall be cumulative, whether or not declared, so that, if for any period such dividend shall not be paid, the right to such dividend shall accumulate as against the Common Stock; and all arrears so accumulated shall be paid before any dividends shall be declared or paid upon the Common Stock. No dividends shall be declared or paid on the Series C Preferred Stock if the redemption payments due to the holders of the Series A Preferred Stock under Section 4.2. of this Article Fourth are in arrears. No dividend shall be declared or paid upon the Common Stock nor shall any Common Stock be purchased or otherwise acquired by the corporation for value (other than payment of amounts due to Reed J. Taylor for redemption of his Common Stock), unless all dividends on the Series C Preferred Stock for all past period shall have been paid or shall have been declared and a sum sufficient for the payment thereof set apart for payment.

**4.3.4** **Liquidation Preference.** In the event of any liquidation, dissolution or winding-up of the corporation, whether voluntary or involuntary, before any other distribution or payment is made to the holders of Common Stock or any other series of Preferred Stock (except the corporation's Series A Preferred Stock), the holders of the Series C Preferred Stock shall be entitled to receive, out of the assets of the corporation legally available therefor, a liquidation payment in the amount of $10.00 cash per share of Series C Preferred Stock ("Liquidation Rate"), plus a further amount equal to the dividends accumulated and unpaid thereon to the date of such liquidation payment. If, upon any liquidation, dissolution or winding up of the corporation, the assets available for distribution are insufficient to pay to the holders of all outstanding Series C Preferred Stock the full amount of the Liquidation Rate and all accumulated but unpaid dividends, the holders of the Series C Preferred Stock shall share pro rata in any such distribution of assets. Such rights of the holders of the Series C Preferred Stock shall be subordinate only to the right of the holder of the Series A Preferred Stock to be paid the redemption price of such stock in full, together with accrued interest, in accordance with Section 4.2 of this Article Fourth. After payment to the holders of the Series C Preferred Stock of the full preferential amounts hereinabove provided, the holders of the Series C Preferred Stock as such shall have no right or claim to any of the remaining assets of the corporation either upon any distribution of such assets or upon dissolution, liquidation or winding up; and the remaining assets to be distributed, if any, upon a distribution of such assets or upon dissolution, liquidation or winding up, may be distributed among the holders of the Common Stock.

ARTICLES OF AMENDMENT - Page 11

### 4.3.5  Redemption.

(a)  Mandatory Redemption by Corporation.  Subject to the conversion rights provided in Section 4.3.6 of Article Fourth, the Series C Preferred Stock shall be called for redemption by the corporation upon payment of the aggregate Redemption Rate from legally available funds upon the closing of the earliest of the following events ("Equity Offering"):

(i)  an offering of the corporation's securities conducted pursuant to the registration requirements of the Securities Act of 1933 ("1933 Act") in which gross proceeds of at least $5,000,000 are raised;

(ii)  an offering of the corporation's securities pursuant to exemptions from registration under the 1933 Act in which gross proceeds of at least $5,000,000 are raised; or

(iii)  an offering of any securities convertible into corporation's Common Stock that are sold in an offering that conforms to the parameters of subparagraph (i) or (ii) above.

The redemption price for each share of Series C Preferred Stock ("Redemption Price") shall be the "Redemption Rate" equal to 100% of the Liquidation Rate if such redemption occurs within two (2) years from the issuance of the first shares of Series C Preferred Stock. After such two year period, an amount equal to 5% of the Liquidation Rate will be added to the Redemption Rate immediately and each 180 days thereafter until all outstanding shares of the Series C Preferred Stock are fully redeemed, viz:

| Time from Original Issuance | Percentage of Liquidation Rate |
|---|---|
| Within two years | 100% |
| After two years but before two years plus 181 days | 105% |
| After two years plus 180 days but before two years plus 361 days | 110% |
| After two years plus 360 days but before two years plus 541 days | 115% |
| . . . | . . . |

Notice of such call for redemption, specifying the anticipated date of closing of the Equity Offering, shall be mailed to each record holder of Series C Preferred Stock as soon as practicable before such closing date.  The redemption date for mandatory redemption of the Series C Preferred Stock shall be the actual closing date of the Equity Offering.  Mandatory redemption of the Series C Preferred

ARTICLES OF AMENDMENT - Page 12

Stock under this Section 4.3.5 of Article Fourth shall automatically be cancelled upon determination by corporation's board of directors that the Equity Offering will not be consummated for any reason.

(b) <u>Voluntary Redemption by Corporation</u>. The Series C Preferred Stock may be called for redemption by the corporation, in whole or in part, upon payment of the Redemption Price from legally available funds at any time prior to the closing of an Equity Offering. Notice of such call for redemption, specifying the redemption date not less than thirty days from the date such notice is mailed and the number or percentage of outstanding shares of Series C Preferred Stock to be redeemed, shall be mailed to each record holder of Series C Preferred Stock. If fewer than all shares of Series C Preferred Stock are to be redeemed, the shares shall be redeemed prorata from the holders thereof; and, upon request of the corporation, certificates evidencing shares of Series C Preferred Stock including redeemed shares shall be surrendered to and reissued by the corporation in reduced amount to reflect any and all partial redemptions of such shares prior to such request.

(c) <u>Redemption Procedure and Effect</u>.

The corporation shall deposit, on or before the redemption date specified in the notice of redemption, the aggregate Redemption Price of the shares of Series C Preferred Stock to be redeemed with a bank or trust company specified in the notice, payable on the redemption date in the amounts and to the respective orders of the holders of the shares of Series C Preferred Stock to be redeemed, on endorsement to the corporation as may be required and upon surrender of the certificates for such shares. Unless the corporation fails to pay the Redemption Price on or before the redemption date, the shares of Series C Preferred Stock subject to such redemption shall be deemed to have been redeemed, and shall be deemed no longer to be outstanding, from and after the redemption date set forth in the notice of redemption. On or after the redemption date, subject only to payment of the redemption price, Series C Preferred Stock so called for redemption shall cease to be entitled to any interest or right in the corporation; and holders of such Series C Preferred Stock shall thereafter cease to be shareholders and shall be entitled only to payment of the amount of the redemption price, without interest, upon surrender of the certificates evidencing such stock.

**4.3.6** <u>Conversion of Series C Preferred Stock</u>. Subject to the provisions of Section 4.3.7, each holder of Series C Preferred Stock shall have the right, exercisable beginning at the earlier of the date of receipt of notice of mandatory redemption of the Series C Preferred Stock pursuant to Section 4.3.5(a) or two years after the first issuance of Series C Preferred Stock and ending on the closing date of an Equity Offering, to convert Series C Preferred Stock into Common Stock at the Conversion Rate determined as follows: Each share of Series C Preferred Stock shall be convertible into that number of shares of Common Stock which equals .0000693% of the Common Stock on a fully diluted basis at the effective date of exercise, including by way of inclusion and without limiting the foregoing, any conversion or exercise rights contained in any Preferred Stock, options, warrants, or other rights to Common Stock, granted by the corporation in any form or manner, as if fully exercised at the effective date of exercise. Any holder of Series C Preferred Stock who exercises this conversion right prior to the closing date of an Equity Offering shall be protected against dilution in the event of any Common Stock issuance or other transaction which occurs prior to an Equity Offering and increases the number of outstanding shares of Common Stock on a fully diluted basis: For each share of Series C Preferred Stock converted prior to an Equity Offering, the Company shall issue to the holder thereof such number of additional

ARTICLES OF AMENDMENT - Page 13

shares of Common Stock as necessary to maintain, at all times prior to an Equity Offering, such holder's 0.0000693% interest in Company's outstanding Common Stock on a fully diluted basis.

Subject to the provisions of Section 4.3.7, this conversion right shall be exercisable by any holder of Series C Preferred Stock as to all or any number of the shares of Series C Preferred Stock owned of record by such holder and shall be exercised by giving the corporation written notice of the exercise of such right, specifying the number of shares of Series C Preferred Stock to be converted and the effective date of such conversion, provided that the effective date of the conversion shall not be later than the closing date of an Equity Offering.

**4.3.7 Regulatory Limitation on Conversion Right.** Notwithstanding any other provision of Section 4.3.6, the right to convert the Series C Preferred Stock into Common Stock of the Company shall be subject to receipt of prior approval by all regulatory authorities with jurisdiction over the acquisition of such Common Stock. Without limiting the generality of the foregoing limitation, the Holder shall not be permitted to convert Series C Preferred Stock into Common Stock if and to the extent that, after such exercise, the Holder would, directly or indirectly (or by exercise of any unrestricted right to convert into or to acquire Company's voting securities or otherwise) be in "control" of an insurer within the meaning of any applicable state insurance holding company act, unless and until such change of "control" has been approved by all applicable state insurance regulators under their respective insurance holding company acts. If the time for exercise of any conversion rights shall expire or be scheduled to expire within two weeks of any final regulatory approval, then the applicable time periods to exercise any such conversion rights shall be extended for such a period of time equal to the period of time from delivery of notice of exercise of any rights until the corporation notifies such rights holders of all applicable regulatory approvals.

**4.4 Common Stock.** Holders of the Common Stock are entitled to one vote per share on all matters to be voted on by stockholders, including the election of directors. Common Stockholders are not entitled to vote their shares cumulatively in the election of directors. Holders of Common Stock of the corporation shall be entitled to elect all of the directors of the corporation other than the director appointed by the holders of the Series A Preferred Stock and the director elected by the holders of Series C Preferred Stock. The holders of any series of Preferred Stock of the corporation have a preference over the holders of Common Stock of the corporation on the assets of the corporation legally available for distribution to stockholders in the event of any liquidation, dissolution, or winding up of the affairs of the corporation. In the event of any liquidation, dissolution or winding up of the affairs of the corporation, holders of the Common Stock will share ratably in any assets of the corporation legally available for distribution to holders of Common Stock after satisfying the liquidation preferences of the Series A and Series C Preferred Stock. Holders of Series C Preferred Stock have a preference over the holders of Common Stock as to the payment of dividends. Holders of Common Stock have rights, share for share, to receive dividends if and when declared by the Board of Directors out of funds legally available therefor, after paying preferred dividends to the holders of Series C Preferred Stock.

## FIFTH

Holders of any class or series of corporation's stock shall not have a preemptive right to acquire unissued or treasury shares of any class or series or securities convertible into such shares

ARTICLES OF AMENDMENT - Page 14

**FOSTER DEC. EX. 20 pg. 133**

or carrying a right to subscribe to or acquire such shares, except as provided in the Idaho Business Corporation Act.

## SIXTH

The location of the initial registered office of the corporation is One Lewis Clark Plaza, Lewiston, Idaho 83501; and the name of its initial registered agent at such address is R. John Taylor.

## SEVENTH

The number of directors constituting the initial Board of Directors is four, and the names and addresses of the persons who are to serve until the first annual meeting of the shareholders and until their successors are elected and qualified are:

| Name | Address |
|------|---------|
| Reed J. Taylor | P.O. Box 538 Lewiston ID 83501 |
| R. John Taylor | P.O. Box 538 Lewiston ID 83501 |
| Raymond R. Heilman | P.O. Box 538 Lewiston ID 83501 |
| Mary K. Frost | P.O. Box 538 Lewiston ID 83501 |

## EIGHTH

The name and address of the incorporator is as follows:

Reed J. Taylor
P.O. Box 538
Lewiston ID 83501

## NINTH

The Board of Directors is expressly authorized to alter, amend or repeal the Bylaws of the corporation and to adopt new Bylaws, subject to repeal or change by a majority vote of the shareholders.

## TENTH

Shareholders entitled under Article Fourth to vote in the election of directors of the corporation shall not be entitled to vote their shares cumulatively in the election of directors of the corporation.

ARTICLES OF AMENDMENT - Page 15

## ELEVENTH

A director of this corporation shall not be personally liable to this corporation or its shareholders for monetary damages for breach of fiduciary duty as a director, except for liability (a) for any breach of the director's duty of loyalty to this corporation or its shareholders, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (c) under Idaho Code §30-1-48, or (d) for any transaction from which the director derived an improper personal benefit. If the Idaho Business Corporation Act is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of this corporation shall be eliminated or limited to the fullest extent permitted by the Idaho Business Corporation Act, as so amended. Any repeal or modification of this Article Eleventh by the shareholders of the corporation shall not adversely affect any right or protection of a director of the corporation existing at the time of such repeal or modification."

**THIRD:** The number of shares of the corporation outstanding at the time of such adoption was 1,079,520 shares of Common Stock, 170,562 shares of Series A Stated Value Preferred Stock, and 185,000 shares of Series C Preferred Stock; and the number of shares entitled to vote thereon was 1,079,520 shares of Common Stock and 185,000 shares of Series C Preferred Stock.

**FOURTH:** The designation and number of outstanding shares of each class entitled to vote thereon as a class were as follows:

| Class | Number of Shares |
|-------|------------------|
| Common | 1,079,520 |
| Series C Preferred | 185,000 |

**FIFTH:** The following table sets forth the number of shares of Common Stock and the number of shares of Series C Preferred Stock voted for and against such amendment:

| | Number of Shares | |
|-------|------|---------|
| Class | For | Against |
| Common | 865,093.5 | 48,153.5 |
| Series C Preferred | 165,000 | -0- |

DATED this 1st day of May, 1996.

AIA SERVICES CORPORATION

By _Daniel L. Spickler_

Daniel L. Spickler, Secretary

ARTICLES OF AMENDMENT - Page 17

# *State of Idaho*

## Office of the Secretary of State

**CORPORATION REINSTATEMENT CERTIFICATE**

I, PETE T. CENARRUSA, Secretary of State of the State of Idaho, do hereby certify that **AIA SERVICES CORPORATION**, file number C 74568 , a corporation organized under the laws of the State of Idaho, was administratively dissolved on March 8, 2001, for failure to file the required annual report form by the date due.

I FURTHER CERTIFY That the corporation has on March 29, 2001, been reinstated on the records of this office, and that its corporate powers or its right to do business in the State of Idaho are hereby restored.

Dated: March 29, 2001



Pat T Cenarrusa
SECRETARY OF STATE

By

# APPLICATION FOR REINSTATEMENT

## To the SECRETARY OF STATE, STATE OF IDAHO

1. The name of the Idaho corporation / limited liability company applying for reinstatement following administrative dissolution or forfeiture is:_____

   **AIA SERVICES CORPORATION**

2. The date of its incorporation / organization was:_____ December 20, 1983 _____

3. The corporation / limited liability company hereby applies for reinstatement.

4. This application is accompanied by a current annual report, appointment of registered agent, or articles of amendment extending existence, as appropriate, and a filing fee of $30.00.

Signature: _____

Capacity/Title: ___Secretary___

Date: ___3-26-01___

*(must be signed by a chairman of the board of directors or officer of the corporation/LLC)*

g:\corp\annual reports\reinstatement_new.p65
Rev 05/2000

**IDAHO SECRETARY OF STATE**

Secretary of State use only

03/30/2001   09:00
CK: 14771  CT: 97941  BH: 388146

1 @ 30.00 = 30.00  CORP REINS # 2

C74568

**FILED EFFECTIVE**

ARTICLES OF AMENDMENT
TO THE ARTICLES OF INCORPORATION
OF
AIA SERVICES CORPORATION

2012 JUL 17 PM 3: 53

SECRETARY OF STATE
STATE OF IDAHO

Pursuant to the provisions of Sections 30-1-58, 30-1-59 and 30-1-61 of the Idaho Business Corporation Act, the undersigned corporation adopts the following Articles of Amendment to its Articles of Incorporation as filed on December 20, 1983, and previously amended on October 14, 1986; December 29, 1987; April 11, 1995; August 3, 1995; and March 8, 1996.

1.    The name of the corporation is AIA Services Corporation.

2.    The Articles of Amendment provide for an exchange, reclassification, or cancellation of issued shares.

3.    The existing Articles of Incorporation are revised pursuant to the following amendment:

Article 4.4 of the Articles of Incorporation is hereby amended by reference to the existing provisions as (a) and adding the following paragraph as (b):

(b) Without regard to any other provision of these Articles of Incorporation, each 53,000 shares of common stock, either issued and outstanding or held by the Corporation as treasury stock, immediately prior to the time this amendment becomes effective, shall be and is hereby automatically reclassified and changed (without any further act) to one fully paid and non-assessable share of common stock with a par value of $0.01 per share, without increasing or decreasing the amount of stated capital or paid-in surplus of the Corporation, provided that no fractional shares of common stock shall be issued to any holder of fewer than 53,000 shares of common stock immediately prior to the time this amendment becomes effective. Instead of issuing such fractional shares, the Corporation shall pay, in cash at the time this amendment becomes effective, Ten Cents ($0.10) for each share held by any holder of fewer than 53,000 shares of common stock immediately before the time when this amendment becomes effective.

4.    These Articles of Amendment were duly approved at an annual meeting of shareholders held on July 16, 2012. The Articles of Amendment were approved by the shareholders as follows:

a.    On the day of adoption, there were 1,647,768 shares outstanding. On such date, there were 1,479,491.28 shares (89.79 %) represented at the meeting in person or by proxy, and entitled to vote on the Articles of Amendment.

b.    Of the 1,479,491.28 total common shares represented at the meeting, 1,379,693.5 shares (89.79 %) were voted in favor of the Articles of Amendment, 99,797.78 shares (6.75 %) were voted against the Articles of Amendment, and zero shares (0%) abstained.

c.    The number of shares cast in favor of the Articles of Amendment was sufficient for approval.

IDAHO SECRETARY OF STATE
07/17/2012   05:00
CX: 1066065  CT: 172099  BH: 1332378
1 @ 30.00 =   30.00  AMEND PROF # 2
1 @ 20.00 =   20.00  EXPEDITE C # 3

C 74568

5.     The terms and provisions of these Articles of Amendment shall become effective immediately upon filing with the Idaho Secretary of State.

By:

R. John Taylor,
President and Chief Executive Officer



# BOND DECLARATION EXHIBIT 2

# AIA SERVICES CORPORATION
# AND SUBSIDIARY

## Consolidated Financial Statements

## December 31, 2011 and 2010

7/2/2012

# Note to Readers of the Financial Statements

Shareholders
AIA Services Corporation
Lewiston, Idaho

The accompanying consolidated balance sheet of AIA Services Corporation (an Idaho Corporation) as of December 31, 2011 and December 31, 2010, and the related statements of operations, statement of stockholders' equity (deficit) and statement of cash flows for the years then ended are un-audited. These financial statements are the responsibility of the Company's management.  The statements have been prepared in accordance to Idaho Code 30-1-1620, *Financial Statements for Shareholders.*

The financial statements were prepared by management in accordance with accounting principles generally accepted in the United States of America, which requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of revenues and expenses during the reporting period. Actual results could differ materially from those estimates.

DATED
July 2, 2012

**FOSTER DEC. EX. 20 pg. 142**

# AIA SERVICES CORPORATION AND SUBSIDIARY

## Consolidated Balance Sheets

| Assets | | December 31, 2011 | | December 31, 2010 |
|---|---|---:|---|---:|
| Cash and cash equivalents | $ | 77,536 | $ | 123,978 |
| Cash bonds posted | | 410,000 | | 410,000 |
| Accounts receivable | | 21,869 | | 304,000 |
| Agent advances | | 36,309 | | 42,052 |
| Due from related parties | | 413,598 | | 413,304 |
| Due from PERC | | 754,987 | | 703,539 |
| Due from trusts | | - | | 4,245 |
| Prepaid expenses | | 34,513 | | 45,508 |
| Deferred income taxes | | 37,000 | | 37,000 |
| Lewis Clark Mortgage | | 1,381,134 | | 1,241,010 |
| Net real estate | | 282,069 | | 292,739 |
| Net property, equipment and vehicles | | 22,174 | | 1,507 |
| Total assets | $ | 3,471,190 | $ | 3,618,883 |
| | | | | |
| **Liabilities:** | | | | |
| Accounts payable and accrued expenses | $ | 386,388 | $ | 414,777 |
| Accrued wages | | 361,882 | | 361,882 |
| ULIC settlement payable | | 427,656 | | 428,178 |
| Due to CropUSA | | 1,697,803 | | 1,603,725 |
| Due to Washington Bank Properties | | - | | 40,889 |
| Income taxes payable | | 5,000 | | 5,000 |
| Unearned commissions | | 24,000 | | 30,000 |
| Notes payable | | 448,382 | | 715,539 |
| Total liabilities | $ | 3,351,111 | $ | 3,599,990 |
| | | | | |
| **Obligation to Former Stockholder:** | $ | - | $ | - |
| | | | | |
| **Series A preferred stock:** | $ | 81,395 | $ | 80,008 |
| | | | | |
| **Stockholders' deficit:** | | | | |
| Series C convertible preferred stock | $ | 92,500 | $ | 92,500 |
| Common stock | | 17,334 | | 17,334 |
| Additional paid-in capital | | (15,685) | | (15,670) |
| Accumulated deficit | | (55,465) | | (155,278) |
| Treasury stock - at cost | | - | | |
| Total stockholders' equity (deficit) | $ | 38,684 | $ | (61,114) |
| | | | | |
| Total liabilities and stockholders' equity | $ | 3,471,190 | $ | 3,618,883 |

**FOSTER DEC. EX. 20 pg. 143**

## AIA SERVICES CORPORATION AND SUBSIDIARY

### Consolidated Statements of Operations

|  | December 31, 2011 |  | December 31, 2010 |  |
|---|---|---|---|---|
| **Revenues:** |  |  |  |  |
| Commissions | $ | 267,343 | $ | 333,270 |
| Administrative fees |  | 108,697 |  | 134,032 |
| Investment income |  | 205,902 |  | 147,824 |
| Total revenues | $ | 581,942 | $ | 615,126 |
| **Expenses:** |  |  |  |  |
| General and administrative expense | $ | 293,270 | $ | 267,574 |
| Commission expense |  | 56,427 |  | 70,634 |
| Total operating expenses | $ | 349,697 | $ | 338,208 |
| **Operating income:** | $ | 232,245 | $ | 276,918 |
| **Other income (expense):** |  |  |  |  |
| Interest expense | $ | 72,384 | $ | 57,063 |
| Legal Fees |  | 59,343 |  | 78,269 |
| Total other expense | $ | 131,727 | $ | 135,332 |
| **Income (loss) from continuing operations before income tax (expense) benefits:** | $ | 100,518 | $ | 141,586 |
| **Income tax (expense) benefit:** | $ | 706 | $ | 915 |
| **Net income (loss):** | $ | 99,813 | $ | 140,671 |

**FOSTER DEC. EX. 20 pg. 144**

**AIA SERVICES CORPORATION AND SUBSIDIARY**

**Consolidated Statements of Stockholders' Equity (Deficit)**

| | Series C Convertible Preferred Stock | Common Stock | Additional Paid-in Capital | Treasury Stock | Retained Earnings (Deficit) |
|---|---|---|---|---|---|
| Balance, December 31, 2007 | $ 92,500 | $ 17,360 | $ (14,999) | $ 546 | $ (9,043,667) |
| Net income (loss) | | | | | (65,651) |
| Eliminate obligation to former majority shareholder | | | | | 8,407,188 |
| Treasury Stock retired | | (16) | (411) | (546) | - |
| Balance, December 31, 2008 | $ 92,500 | $ 17,344 | $ (15,410) | $ - | $ (702,130) |
| Net income (loss) | | | | | (96,271) |
| 2009 Tax Provision | | | | - | 164,561 |
| Treasury Stock retired | | (10) | (246) | - | |
| Balance, December 31, 2009 | $ 92,500 | $ 17,334 | $ (15,656) | $ - | $ (633,840) |
| Net income (loss) | | | | | 140,671 |
| Adjust Preferred A Redemption to 1993 Agreement | | | | | 337,891 |
| Treasury Stock retired | | - | (15) | - | |
| Balance, December 31, 2010 | $ 92,500 | $ 17,334 | $ (15,670) | $ - | $ (155,278) |
| Net income (loss) | | | | | 99,813 |
| Treasury Stock retired | | - | (15) | - | |
| Balance, December 31, 2011 | $ 92,500 | $ 17,334 | $ (15,685) | $ - | $ (55,465) |

**FOSTER DEC. EX. 20 pg. 145**

# AIA SERVICES CORPORATION

## Statement of Cash Flows

|  | December 31, 2011 | December 31, 2010 |
|---|---|---|
| **Cash flows from operating activities:** |  |  |
| Net income (loss) | $ 99,813 | $ 141,913 |
| Adjustments to reconcile net income (loss) to net cash |  |  |
| (used in) provided by operating activities: |  |  |
| Depreciation and amortization | 14,990 | 19,471 |
| Changes in assets and liabilities: |  |  |
| Accounts receivable and agent advances | 287,874 | (296,416) |
| Prepaid expenses | 10,995 | (784) |
| Due from related companies | 46,875 | (143,216) |
| Due from related parties | (294) | 10,318 |
| Due from Washington Bank Properties | (40,889) | 54,712 |
| Accounts payable and accrued expenses | (28,911) | (27,377) |
| Unearned commissions | (6,000) | (12,000) |
| Net cash provided by operating activities | 384,453 | (253,379) |
| **Cash flows from investing activities:** |  |  |
| Capital expenditures | (24,988) | (225,000) |
| Lewis Clark Mortgage | (140,124) | 66,876 |
| Net cash used in investing activities: | (165,112) | (158,124) |
| **Cash flows from financing activities:** |  |  |
| Repayment of mortgages and notes payable | (267,157) | 387,020 |
| Change in Series A preferred stock | 1,387 | - |
| Retired Treasury Stock | (15) | (15) |
| Purchase of common stock | - | - |
| Elimination of obligation to former majority stockholder |  |  |
| Net cash (used in) provided by financing activities: | (265,785) | 387,005 |
| Net increase (decrease) in cash | (46,444) | (24,498) |
| **Cash and cash equivalents, beginning of year** | 123,978 | 148,477 |
| **Cash and cash equivalents, end of period** | $ 77,536 | $ 123,978 |

**FOSTER DEC. EX. 20 pg. 146**

**AIA Services Corporation**
Lewiston, ID 83501

## NOTES TO THE FINANCIAL STATEMENTS
December 31, 2011

---

### NOTE 1 - ORGANIZATION

AIA Services Corporation (the Company) was incorporated in December 1983, under the laws of the State of Idaho. The Company is based in Lewiston, Idaho.

The Company's principal business is the administration of policies of insurance issued to farmers who are members of sponsoring associations; managing the distribution of policy reserves for the terminated Group Universal Health policies; and managing its investment portfolio.

### NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Principles of consolidation** - The consolidated financial statements include the accounts of the Company and its subsidiary, AIA Insurance. All material inter-company transactions have been eliminated.

**Income** — The Company earns commissions and administrative fees on policies that are sold to farmers. Commissions on policies are paid to the Company when premiums are paid on the policies to the insurer or to the Company. Commission income is recognized ratably over the policy period.

Commissions are primarily received from one insurance company. Any loss of the ability to renew policies with this insurance company may negatively impact the Company's financial results. It is unlikely a replacement insurer can be found.

**Commission expense** — The Company pays a commission to its third-party agents for policies written to its insureds. The amount of commissions paid to third-party agents is determined by stated agreement between the Company and those agents.

**Office equipment** – Office equipment, including computer software and related equipment, is stated at cost less accumulated depreciation. Depreciation is computed principally by the straight-line method using estimated useful lives of three to five years.

**Income taxes** – The Company accounts for income taxes in accordance with the provisions of FASB ASC 740, *Income Taxes*. Under the asset and liability method prescribed by FASB ASC 740, deferred income taxes are provided for temporary differences between the financial reporting and tax bases of assets and liabilities. Such differences primarily relate to accumulated depreciation of office equipment and the allowance for uncollectible agent advances. In addition, deferred tax assets are reported for the estimated future tax benefit of net operating loss carry-forwards. Deferred taxes are measured using provisions of currently enacted tax laws. A valuation allowance against deferred tax assets is required if it is more likely than not that some or all of the deferred tax assets will not be realized.

**Estimates** – The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of revenues and expenses during the reporting period. Actual results could differ from those estimates.

- 7 -

**Intangibles** – The cost of intangible assets, including commissions on renewed insurance policies written and agency agreements, are amortized on a straight-line basis over an estimated useful life of five years.

**Cash concentrations** – The Company maintains accounts with various financial institutions with funds insured by the Federal Deposit Insurance Corporation (FDIC). The Company's accounts at these institutions may exceed the FDIC insured limits at times. The Company has not experienced any losses in such accounts.

**Accounting pronouncements** – In September 2009, Financial Accounting Standards Board (FASB) issued an Amendment of FASB ASC 740-10 – *Income Taxes-Overall*. This amendment eliminates disclosures required by paragraph 740-10-50-15(a), improves current accounting by helping to achieve consistent application of accounting for uncertainty in income taxes and is not intended to change practice. For entities that are currently applying the standards for accounting for uncertainty in income taxes, the guidance and disclosure requirements are effective for financial statements issued for interim and annual periods ending after September 15, 2009. For entities, such as the Company, that have deferred the application of accounting for uncertainty in income taxes in accordance with paragraph 740-10-65-1 (e), the guidance and disclosure amendments are effective upon adoption of those standards. These amendments do not affect the effective date guidance for certain nonpublic entities in paragraph 740-10-65-1.

Effective January 1, 2008, the Company adopted the provisions of FASB ASC 820 - *Fair Value Measurements and Disclosures*, related to its financial assets and liabilities and nonfinancial assets and liabilities measured at fair value on a recurring basis. In May 2011, FASB issued an Amendment of FASB ASC 820, which updated wording to describe reporting requirements but doesn't change the application of the requirements. For public entities, the amendments are effective during interim and annual periods beginning after December 15, 2011, which early application not permitted. This doesn't materially affect the Company's financial statements.

**Subsequent events** – Management has evaluated subsequent events through the date of the report. This is the date the financial statements were available to be issued. See Notes 3, 7, 13, 14 and 15 for further information.

## NOTE 3 - COMMONLY CONTROLLED COMPANIES

The common Stock of AIA Services Corporation, the Company, as of December 31, 2011 and December 31, 2010, was 59.7% owned by R. John Taylor. In 2012, Mr. Taylor purchased 343,659 shares from a board member and other shareholders at a negotiated price of 10 cents per share. As of June 1, 2012, R. John Taylor is the owner of record of 83.66% of the common stock of the Company

The Company has several commonly controlled companies.

**CropUSA Insurance Agency, Inc. (CropUSA)** - As of December 31, 2011, the combined shareholders of the Company (including those shareholders who sold shares to Mr. Taylor in 2012) owned 92.5% of CropUSA Insurance Agency, Inc. As of December 31, 2011, the Company owes CropUSA $1,697,803. This includes $297,213 owed by AIA Insurance, Inc.

During the year, the Company reimbursed CropUSA $122,247 in expenses for salary and other items paid on its behalf. In addition, CropUSA advanced $94,078 to the Company. The summarized balance sheet of CropUSA, as of December 31, 2011, is provided in the supplemental information of this report.

**CropUSA Insurance Services LLC (CropLLC)** – As of December 31, 2011, the combined shareholders of the Company, owned 70% of CropLLC. CropLLC owns 18.09% of the outstanding common shares of CropUSA Insurance Agency, Inc.

- 8 -