During the calendar year 2011, there were no direct transactions between the Company and CropLLC. The summarized balance sheet of CropLLC as of December 31, 2011 is provided in the supplemental information of this report.

**Weskan Agency, LLC (Weskan)** - As of December 31, 2011, the combined shareholders of the Company owned 70 % of Weskan, which is a retail crop insurance agency based in Weskan, Kansas.

During the calendar year 2011, there were no direct or indirect transactions between the Company and Weskan.

**Pacific Empire Radio Corporation (PERC)** - As of December 31, 2011, the combined shareholders of the Company owned 46.32% of PERC.

During the calendar year 2011, the Company advanced to PERC and paid expenses on its behalf of $51,447, primarily legal expenses and lease payments. The summarized balance sheet of PERC as of December 31, 2011, is provided in the supplemental information of this report.

**Pacific Empire Holdings Corporation (PEHC)** - As of December 31, 2011, the combined shareholders of the Company owned 80.88% of PEHC.

During the calendar year 2011, there were no direct or indirect transactions between the Company and PEHC.

**Radio Leasing II, LLC (Radio Leasing)** - As of December 31, 2011, the combined shareholders of the Company owned 30% of Radio Leasing.

During the calendar year 2011, there were no direct transactions between the Company and Radio Leasing. However, the Company advanced to PERC lease payments due to Radio Leasing of $30,419, which is included in the amounts due to the Company from PERC.

**17 State Street Partners, LLC (17 State Street)** - As of December 31, 2011, the combined shareholders of the Company owned 63% of 17 State Street.

During the calendar year 2011, there were no direct or indirect transactions between the Company and 17 State Street.

## NOTE 4 - INCOME TAXES

As of December 31, 2011, the Company had a deferred tax asset of $37,000. The significant components of the Company's deferred tax assets and liabilities are summarized as follows:

Deferred tax assets:

| | |
|---|---|
| Allowance for doubtful accounts | $ 56,000 |
| Property and equipment | $ (19,000) |

As of December 31, 2011, the Company has $4,074,905 in net operating loss carry forwards (NOL) available to offset future taxable income which expire through 2015. These net operating loss carry forwards relate to the Company's discontinued life insurance operations.

The Company's ability to use its net operating loss carry-forwards to offset future taxable income is subject to annual restrictions contained in the United States Internal Revenue Code of 1986, as amended (the Code). These restrictions act to limit the Company's future use of its net operating losses following certain substantial stock ownership changes as enumerated in the Code. There was such a change in ownership during 1995 and there are substantial annual restrictions limiting the Company's future use of its net operating loss carry forwards unless the Company is able to reach a settlement with the former

**FOSTER DEC. EX. 20 pg. 149**

majority shareholder. Without such settlement, the Company estimates the present value of the future tax savings of the NOL to be $46,020 and $124,610 at December 31, 2011 and December 31, 2010.

## NOTE 5 - SERIES A PREFERRED STOCK

The Company has authorized 200,000 of no par, nonparticipating Series A preferred stock. All of these shares were issued to the ex-wife of the former majority shareholder in 1988. Pursuant to the preferred stock agreement, the holder of the Series A preferred stock had the right to require the Company to redeem the stock any time after September 14, 1993. The right was exercised by giving the Company written notice of demand for redemption effective December 2, 1993.

In 1994, the Company began redeeming the Series A preferred shares at $10 per share over a fifteen-year period with interest at 1-1/2% below prime rate, adjusted quarterly. At December 31, 2011 and 2010, there were 7,590 remaining preferred shares outstanding, plus accrued interest from the date of last payment in 2008.

The amount due to the holder of the Preferred A shares is provided for in the redemption agreement of 1993. Since 1993, the company has made payments of $2,695,202 including interest. The remaining balance due pursuant to the redemption agreement of 1993 is $81,395 at year end, including interest due from the last payment in 2008. This amount due is based on the terms of the 1993 redemption demand without regard to subsequent modifications made incident to the 1995 stock purchase and sale agreement for the benefit of the former majority shareholder.

Based on recent court rulings and the opinion expressed by the counsel of the holders of the Preferred A Stock, the Company believes the 1995 modifications to the redemption agreement are no longer enforceable and the balance due to the holder of the Preferred A shares in accompanying financial statements have be prepared in accordance with the interest rate terms provided for in the original agreement and reflect the shares outstanding, plus accrued interest, after deducting the share redemptions made since 1993..

If the Company dissolves, the Series A preferred stock has liquidating preference over common and Series C stockholders in amounts equal to its redemption value. The holder of the Series A preferred stock has the right, voting separately as a class, to elect one member to the Board of Directors pursuant to the processes established by the Idaho Corporation Act. There is currently no member of the Board that has been elected by the Series A shareholder.

During 2012, the Company intends to directly or indirectly redeem the remaining Preferred A shares, subject to the consent of the holder of the Preferred A shares or upon determination by the 2nd District Court validating the Company's calculation of the remaining number of shares outstanding subject to redemption.

## NOTE 6 - SERIES C PREFERRED STOCK

During 1995, the Company initiated a private placement of preferred stock in which 297,500 shares of the authorized 500,000 shares Series C 10% convertible preferred stock and attendant Series C warrants were sold for $2,975,000. As of December 31, 2011, 92,500 shares of Preferred C shares remain outstanding. The shares are callable and redeemable by the Company for at $10 per share plus accumulated dividends of $12.025 per share, for a total of $2,127,500. The shares are appraised at $7.36 per share at year end 2011.

If the Company dissolves, the Series C preferred stock has liquidating preference over common shares in an amount equal to its redemption value.

**FOSTER DEC. EX. 20 pg. 150**

## NOTE 7 - BONDS POSTED IN COURT

As of December 31, 2011, the Company had $410,000 posted with the Clerk of 2nd District Court of Idaho in the matter of Reed J. Taylor vs. the Company and others.

An Order by the Court, dated May 17, 2012 released the bonds. The Company is in the process of collecting these funds, plus interest.

## NOTE 8 – PREPAID EXPENSES

As of December 31, 2011, the Company had a balance of $34,513 for prepaid expenses. Most of this balance is from a $25,375 lease deposit on the Lewis Clark Plaza.

The remaining prepaid expenses include prepaid insurance premiums and a deposit with the Idaho State Tax Commission on the Company's sales and use tax certificate.

## NOTE 9 – AGENT ADVANCES

As of December 31, 2011, the Company had recorded a net receivable of $36,309, which represents the Company's estimate of the net realizable value of advances paid to agents. Future commissions earned by agents will be offset against these advances.

## NOTE 10 – DUE FROM RELATED PARTIES AND RELATED COMPANIES

As of December 31, 2011, the Company was owed $754,986 from Pacific Empire Radio Corporation. The balance consists of cash advances, administration, payroll and other expenses paid by the Company on behalf of Pacific Empire Radio Corporation. The note carries a 12% interest rate and is collateralized by assets of Pacific Empire Radio Corporation.

As of December 31, 2011, the Company was owed $368,024 from R. John Taylor. The note carries no interest rate, maturity date, or minimum payment, nor is it collateralized by any assets.

## NOTE 11 – DUE TO RELATED PARTIES

As of December 31, 2011, the Company owed R. John Taylor $361,882. The note carries no interest rate, maturity date or minimum payment, nor is it collateralized by any assets of the Company.

As of December 31, 2011 and December 31, 2010, the Company's subsidiary, AIA Insurance, owes CropUSA Insurance Agency, Inc, $297,213 and $287,131, respectively. The balance consists of administration, payroll and other expenses for the Company paid on behalf of AIA Insurance, Inc.

As of December 31, 2011 and December 31, 2010, the Company owed $1,400,590 and $1,316,594, respectively to CropUSA Insurance Agency, Inc, resulting from advances for legal fees, administration, and other expenses paid on behalf of the Company. The note carries no interest rate, maturity date, or minimum payment but is subject to a credit agreement with CropUSA Insurance Agency, Inc.

## NOTE 12 – NOTES PAYABLE

On December 16, 2009, the Company entered into a debt agreement with Syringa Bank for $500,000, which carries an interest rate of 6.5%, is collateralized by the mortgage due on the Lewis Clark Plaza and is personally guaranteed by the majority shareholder of the Company. As of December 31, 2011, the Company owed $225,000. Pursuant to a modification agreement dated April 26, 2012, the Company makes monthly payments of $10,000, with a final payment of all remaining unpaid principal and accrued interest due on October 15, 2012.

- 11 -

**FOSTER DEC. EX. 20 pg. 151**

On December 17, 2009, the Company entered into a purchase agreement with an unrelated third party to purchase the lower portion of the Dahmen Building Condominiums (the Company currently owns the upper portion), located at 200 Main Street, Lewiston, Idaho. The purchase price was $225,000, of which $200,000 was financed by the Company with the seller. The note carries an interest rate of 5.5%, monthly payments of $1,634 beginning on February 20, 2010, a final payment of the entire balance on January 20, 2013, and is secured by the Deed of Trust. As of December 31, 2011, the Company owed $182,880

On March 30, 2011, the Company entered into a note agreement with U.S. Bank to purchase a 2007 Chevrolet Suburban. The purchase price was $24,988, which $21,125 was financed by the Company. The note carries an interest rate of 4.49%, monthly payments of $481.45 beginning April 27, 2011, a final payment of the unpaid principal and accrued interest on March 27, 2015, and is secured by the vehicle.

## NOTE 13 – STOCK PURCHASES

As of December 31, 2011, the majority shareholder agreed to purchase 343,659 outstanding shares of common stock from one of the Board members and other unrelated parties. The parties negotiated a purchase price of $0.10 per share and the purchases were completed in April of 2012. The purchase price included all rights and proceeds, if any, that may accrue as a result of any litigation known and unknown.

## NOTE 14 – EMPLOYEE BENEFIT PLAN

The Company maintains a profit-sharing retirement plan with an Internal Revenue Service Code Section 401(k) feature covering substantially all employees who have completed three months of service or more. Employee elective deferral contributions are fully vested immediately and Company contributions are fully vested after seven years of participation. The Company made no contributions to the plan for the year ended December 31, 2011.

The Company terminated its Employee Stock Ownership Plan on December 31, 2011. Final distribution checks were issued to participants with remaining balances in March of 2012, based on the December 31, 2011 valuation and March 2012 termination letter by Acclaro Valuation Advisors, the Plan's independent appraiser. The shares were appraised by Acclaro for $.01 and $.00 cents per share at December 31, 2011 and December 31, 2010,

## NOTE 15 – LITIGATION

In 2007, the Company was named as a co-defendant with CropUSA Insurance Agency, Inc. and others in a breach of contract lawsuit filed by the former majority shareholder of AIA Services Corporation stemming from a 1995 stock redemption agreement transaction. The majority of the claims were dismissed by the 2nd District Court of Idaho in 2009 in favor of the Company and the other defendants. This decision was later upheld by the Idaho Supreme Court in September 2011. In December 2011, the remaining claims were dismissed, except for some counterclaims by the Company against the former majority shareholder. Although the Company paid to or on the behalf of the former majority shareholder over $9,700,000 from 1995 to 2008, the court ruled that the Company cannot recover any of these amounts from the plaintiff. The Company has a pending counterclaim against the former majority shareholder for damages caused by the litigation and for reimbursement of some of the legal fees paid by the Company.

Two directors of the company, including the majority owner, have been named in a suit by the holder of the Preferred A shares in 2nd District Court of Idaho asking for redemption of her Preferred A shares and other items to be determined by the Court.

The Company has been named as a defendant in Federal Court, along with CropUSA Insurance Agency Inc., its attorneys, directors and others by the ex-wife of the former majority shareholder of AIA Services

- 12 -

**FOSTER DEC. EX. 20 pg. 152**

Corporation, alleging breach of contract and breach of fiduciary duty stemming from the same 1995 stock redemption agreement, as well as other derivative-type claims on behalf of shareholders. The suit has been stayed pending the disposition of all pending claims in the 2nd District Court of Idaho.

In spite of numerous attempts and offers to reach an all party settlement with the former majority shareholder and his ex-wife, none of those attempts were successful. The Company will continue to vigorously defend against any remaining  or future claims.

For financial reporting purposes, the Company does not provide for any further liability to the former majority shareholder;   The Company does provide for a liability to the holder of the Preferred A Shares for the number of shares the Company deems outstanding.  The Company does not provide for any estimate of recovery of legal fees and costs previously expended nor any estimate of future expenses or costs of the remaining litigation.

The company initiated suit in the 2nd District Court of Idaho to foreclose on the property known as the Lewis Clark Plaza.  The suit was filed in September 2011 against Washington Bank Properties (WBP) and seeks to either return the title of the building to the Company or require payment of the note due on the property held by the Company. WBP has sued the Company in King County, Washington, seeking damages from the Company as a guarantor pursuant to a lease of the property between WBP and AIA Insurance, Inc.  The Company expects that this litigation will be concluded in 2012.

- 13 -

## SUPPLEMENTAL INFORMATION

FOSTER DEC. EX. 20 pg. 154

CropUSA Insurance Agency, Inc.
Summarized Balance Sheet
 December 31, 2011


Assets

| | | |
|---|---:|---:|
| Cash and cash equivalents | $ 297,327 | |
| Certificates of deposits | 1,017,097 | |
| Commission receivable, less uneared portion of $4,623,419 | 914,645 | |
| Agent advances | 3,163,759 | |
| Subscription receivable | 100,000 | |
| Prepaid expenses | 567,752 | |
| Due from related companies, net of reserve | 1,215,320 | |
| Due from related parties | 2,173 | |
| Total Current Assets | | $7,278,073 |
| Office equipment, net of depreciation | | 27,725 |
| Total Assets | | $ 7,305,798 |


| | | |
|---|---:|---:|
| Liabilities and Stockholders Equity | | |
| Accounts payable and accrued expenses | $ 90,750 | |
| Commissions payable | 521,626 | |
| Line of credit payable | 4,485,243 | |
| Due from related parties | 102,000 | |
| Total Liabilities | | $ 5,199,619 |
| Subordinated debt | | 810,743 |
| Common stock | 155,442 | |
| Additional paid in capital | 3,360,995 | |
| Retained earnings | (2,221,001) | |
| Total Stockholders Equity | | 1,295,436 |
| Total Liabilities and Stockholders Equity | | $ 7,305,798 |


- 15 -

**FOSTER DEC. EX. 20 pg. 155**

CropUSA Insurance Services, LLC
Summarized Balance Sheet
 December 31, 2011


Assets
 Cash and cash equivalents    $ 7,454
 Agent advances    654,683
 Investment in premium    424,231
 Investment in securities    281,257

   Total Assets      $ 1,367,625


Liabilities and Members Equity
 Unearned commissions    $ 2,699,004
 Due to related companies    17,438
   Total Liabilities     $ 2,716,442

 Member capital    271,257
 Retained earnings    (1,620,074)
   Total members Equity    (1,348,817)

   Total Liabilities and Members Equity    $ 1,367,625

**FOSTER DEC. EX. 20 pg. 156**

Pacific Empire Radio Corporation
Summarized Balance Sheet
 December 31, 2011


Assets
  Cash and cash equivalents                                $   20,271
  Cash and trade receivables                                   215,147
  Due from affiliates, net                                      288,129
  Due from unaffiliated broadcasters                         1,091,162
  Prepaid expenses                                               51,413
               Total Current Assets                                      $ 1,666,122
  Licenses, net of amortization                                            4,201,047
  Office equipment, net of depreciation                                      817,505

               Total Assets                                              $ 6,684,674


Liabilities and Stockholders Equity
  Accounts payable and accrued expenses                    $  770,131
  Line of credit payable                                      1,664,447
               Total Liabilities                                          $ 2,434,578

  Subordinated debt                                                         3,438,219

  Common stock                                                   3,909
  Additional paid in capital                                  1,967,965
  Retained earnings                                          (1,159,998)
               Total Stockholders Equity                                     811,876

               Total Liabilities and Stockholders Equity                  $ 6,684,674


- 17 -

**FOSTER DEC. EX. 20 pg. 157**

Radio Leasing II
Summarized Balance Sheet
December 31, 2011

**Assets**

| | | |
|---|---|---|
| FCC Licenses | | $ 866,960 |
| Intangible assets and deferred charges | | 5,676 |
| Total Assets | | $ 872,636 |

**Liabilities and Stockholders Equity**

| | | |
|---|---|---|
| Accounts payable | $          - | |
| Notes payable | 618,126 | |
| Due to related companies and parties | 340,889 | |
| Total Liabilities | | $ 959,015 |
| | | |
| Common stock | - | |
| Additional paid in capital | 1,302,733 | |
| Retained earnings | (1,389,111) | |
| Total Stockholders Equity | | (86,378) |
| | | |
| Total Liabilities and Stockholders Equity | | $ 872,637 |

**FOSTER DEC. EX. 20 pg. 158**

# AIA SERVICES CORPORATION
# AND SUBSIDIARY

## Consolidated Financial Statements

## December 31, 2012 and December 31, 2011

**FOSTER DEC. EX. 20 pg. 159**

# AIA SERVICES CORPORATION AND SUBSIDIARY

## Consolidated Balance Sheets

|  | December 31, 2012 | December 31, 2011 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $ 250,150 | $ 77,536 |
| Cash bonds posted | - | 410,000 |
| Investment securities available-for-sale | - | - |
| Accounts receivable | 54,216 | 21,869 |
| Agent advances | 31,477 | 36,309 |
| Due from related parties | 409,732 | 413,598 |
| Investment in affiliate | 1,469,880 | 754,987 |
| Prepaid expenses | 72,521 | 34,513 |
| Deferred income taxes | 41,600 | 37,000 |
| Lewis Clark Plaza | 1,381,134 | 1,381,134 |
| Net real estate | 271,572 | 282,069 |
| Net property, equipment and vehicles | 16,787 | 22,174 |
| Total assets | $ 3,999,069 | $ 3,471,190 |
| **Liabilities:** | | |
| Accounts payable and accrued expenses | $ 350,414 | $ 386,388 |
| Accrued wages | 361,882 | 361,882 |
| ULIC settlement payable | 425,904 | 427,656 |
| Due to CropUSA | 2,280,464 | 1,697,803 |
| Income taxes payable | 5,000 | 5,000 |
| Unearned commissions | 19,000 | 24,000 |
| Notes payable | 335,425 | 448,382 |
| Total liabilities | $ 3,778,087 | $ 3,351,111 |
| **Obligation to Former Stockholder:** | $ - | $ - |
| **Series A preferred stock:** | $ 81,395 | $ 81,395 |
| **Stockholders' deficit:** | | |
| Series C convertible preferred stock | $ 92,500 | $ 92,500 |
| Common stock | 16,478 | 17,334 |
| Additional paid-in capital | (15,658) | (15,685) |
| Accumulated deficit | 46,265 | (55,465) |
| Treasury stock - at cost | - | - |
| Total stockholders' equity (deficit) | $ 139,585 | $ 38,684 |
| Total liabilities and stockholders' equity | $ 3,999,069 | $ 3,471,190 |

FOSTER DEC. EX. 20 pg. 160

# AIA SERVICES CORPORATION AND SUBSIDIARY

## Consolidated Statements of Operations

|  | | December 31, 2012 | | December 31, 2011 |
|---|---|---|---|---|
| **Revenues:** | | | | |
| Commissions | $ | 225,823 | $ | 198,735 |
| Administrative fees | | 98,452 | | 82,835 |
| Other income | | 46,310 | | - |
| Investment income | | 381,117 | | 105,545 |
| Total revenues | $ | 751,701 | $ | 387,115 |
| **Expenses:** | | | | |
| General and administrative expense | $ | 323,015 | $ | 211,281 |
| Commission expense | | 40,675 | | 38,589 |
| Building expense | | 111,909 | | - |
| | | - | | |
| Total operating expenses | $ | 475,599 | $ | 249,870 |
| **Operating income:** | $ | 276,102 | $ | 137,245 |
| **Other income (expense):** | | | | |
| Interest expense | $ | 39,916 | $ | 55,132 |
| Legal Fees | | 138,470 | | 43,444 |
| Total other expense | $ | 178,386 | $ | 98,576 |
| **Income (loss) from continuing operations before income tax (expense) benefits:** | $ | 97,716 | $ | 38,669 |
| **Income tax (expense) benefit:** | $ | 586 | $ | 706 |
| **Net income (loss):** | $ | 97,130 | $ | 37,963 |

- 3 -

**FOSTER DEC. EX. 20 pg. 161**

# AIA SERVICES CORPORATION AND SUBSIDIARY

### Consolidated Statements of Stockholders' Equity (Deficit)

| | Series C Convertible Preferred Stock | Common Stock | Additional Paid-in Capital | Treasury Stock | Retained Earnings (Deficit) |
|---|---|---|---|---|---|
| Balance, December 31, 2007 | $ 92,500 | $ 17,360 | $ (14,999) | $ 546 | $ (9,043,667) |
| Net income (loss) | | | | | (65,651) |
| Eliminate obligation to former majority shareholder | | | | | 8,407,188 |
| Treasury Stock retired | | (16) | (411) | (546) | - |
| Balance, December 31, 2008 | $ 92,500 | $ 17,344 | $ (15,410) | $ - | $ (702,130) |
| Net income (loss) | | | | | (96,271) |
| 2009 Tax Provision | | | | - | 164,561 |
| Treasury Stock retired | | (10) | (246) | - | |
| Balance, December 31, 2009 | $ 92,500 | $ 17,334 | $ (15,656) | $ - | $ (633,840) |
| Net income (loss) | | | | | 140,671 |
| Adjust Preferred A Redemption to 1993 Agreement | | | | - | 337,891 |
| Treasury Stock retired | | - | (15) | - | - |
| Balance, December 31, 2010 | $ 92,500 | $ 17,334 | $ (15,670) | $ - | $ (155,278) |
| Net income (loss) | | | | | 99,813 |
| Treasury Stock retired | | - | (15) | - | |
| Balance, December 31, 2011 | $ 92,500 | $ 17,334 | $ (15,685) | $ - | $ (55,465) |
| Net income (loss) | | | | | 97,130 |
| Adjustment for Deferred Taxes | | | | | 4,600 |
| Treasury Stock retired | | (856) | 27 | - | - |
| Balance, December 31, 2012 | $ 92,500 | $ 16,478 | $ (15,658) | $ - | $ 46,264 |

**FOSTER DEC. EX. 20 pg. 162**

# AIA SERVICES CORPORATION

## Statement of Cash Flows

| | December 31, 2012 | December 31, 2011 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ 97,130 | $ 37,963 |
| Adjustments to reconcile net income (loss) to net cash (used in) provided by operating activities: | | |
| Depreciation and amortization | 15,885 | 10,969 |
| Changes in assets and liabilities: | | |
| Accounts receivable and agent advances | (27,515) | 282,932 |
| Prepaid expenses | 371,992 | 7,450 |
| Due from related companies | (132,232) | (27,997) |
| Due from Washington Bank Properties | - | 46,736 |
| Accounts payable and accrued expenses | (37,727) | 33,822 |
| Unearned commissions | (5,000) | - |
| Net cash provided by operating activities | 286,399 | 391,875 |
| **Cash flows from investing activities:** | | |
| Capital expenditures | - | (24,988) |
| Lewis Clark Mortgage | (0) | (105,093) |
| Net cash used in investing activities: | (0) | (130,081) |
| **Cash flows from financing activities:** | | |
| Repayment of mortgages and notes payable | (112,957) | (238,179) |
| Change in Series A preferred stock | 0 | -- |
| Retired Treasury Stock | - | -- |
| Purchase of common stock | (828) | - |
| Elimination of obligation to former majority stockholder | | |
| Net cash (used in) provided by financing activities: | (113,785) | (238,179) |
| Net increase (decrease) in cash | 172,615 | 23,615 |
| **Cash and cash equivalents, beginning of year** | 77,536 | 123,978 |
| **Cash and cash equivalents, end of period** | $ 250,151 | $ 147,594 |

- 5 -

**FOSTER DEC. EX. 20 pg. 163**

# AIA SERVICES CORPORATION
# AND SUBSIDIARY

**Consolidated Financial Statements**

**December 31, 2013 and December 31, 2012**

July 31, 2014

**FOSTER DEC. EX. 20 pg. 164**

# AIA SERVICES CORPORATION
# AND SUBSIDIARY

**Consolidated Financial Statements**


**December 31, 2013 and December 31, 2012**


July 31, 2014

# AIA SERVICES CORPORATION AND SUBSIDIARY

## Consolidated Balance Sheets

|  | December 31, 2013 | | December 31, 2012 |
|---|---:|---|---:|
| **Assets** | | | |
| Cash and cash equivalents |  | 12,294 | $ 250,150 |
| Accounts receivable and agent advances | $ | 596,675 | 85,693 |
| Due from related parties | $ | - | 409,732 |
| Investment in Pacific Empire Radio | $ | 1,631,385 | 1,469,880 |
| Prepaid expenses |  | 82,912 | 72,521 |
| Deferred income taxes |  | 41,600 | 41,600 |
| Lewis Clark Plaza |  | 1,003,132 | 1,381,134 |
| Net real estate |  | 1,058,642 | 271,572 |
| Net property, equipment and vehicles |  | 14,085 | 16,787 |
| Total assets | $ | 4,466,125 | $ 3,999,069 |
| | | | |
| **Liabilities:** | | | |
| Accounts payable and accrued commissions | $ | 472,266 | $ 350,414 |
| Accrued wages |  | 415,563 | 361,882 |
| ULIC settlement payable |  | 425,116 | 425,904 |
| Due to CropUSA |  | 1,635,181 | 2,280,464 |
| Due to related parties |  | 571,018 | |
| Income taxes payable |  | 5,001 | 5,000 |
| Unearned commissions |  | 19,000 | 19,000 |
| Notes payable |  | 651,495 | 335,425 |
| Total liabilities | $ | 4,194,640 | $ 3,778,087 |
| | | | |
| Series A preferred stock: | $ | 419,286 | $ 81,395 |
| | | | |
| Series C convertible preferred stock | $ | 92,500 | $ 92,500 |
| Common stock |  | 16,478 | 16,478 |
| Additional paid-in capital |  | (49,703) | (15,656) |
| Accumulated earnings |  | (232,478) | 46,265 |
| Total stockholders' equity | $ | (173,203) | $ 139,587 |
| | | | |
| Total liabilities and stockholders' equity | $ | 4,440,723 | $ 3,999,069 |

- 2 -

**FOSTER DEC. EX. 20 pg. 166**

# AIA SERVICES CORPORATION AND SUBSIDIARY

## Consolidated Statements of Operations

|  | December 31, 2013 | December 31, 2012 |
|---|---|---|
| **Revenues:** |  |  |
| Commissions | $ 140,081 | $ 225,823 |
| Administrative fees | 116,739 | 98,452 |
| Other Income | (3,629) | 46,310 |
| Investment income | 659,547 | 381,117 |
| Total revenues | $ 912,738 | $ 751,701 |
| **Expenses:** |  |  |
| General and administrative expense | $ 251,830 | $ 323,015 |
| Commission expense | 36,144 | 40,675 |
| Building expense | 386,926 | 111,909 |
| Legal and Professional Fees | 114,184 | 138,470 |
|  | - | - |
| Total operating expenses | $ 789,084 | $ 614,069 |
| **Operating income:** | $ 123,654 | $ 137,632 |
| **Other income (expense):** |  |  |
| Depreciation | 36,300 | - |
| Interest expense | $ 28,193 | $ 39,916 |
|  | $ 64,493 | $ 39,916 |
| **Income (loss) from continuing operations before income tax (expense) benefits:** | $ 59,161 | $ 97,716 |
| **Income tax (expense) benefit:** | $ 12 | 586 |
| **Net income (loss):** | $ 59,149 | $ 97,130 |

- 3 -

**FOSTER DEC. EX. 20 pg. 167**

# AIA SERVICES CORPORATION AND SUBSIDIARY

## Consolidated Statements of Stockholders' Equity (Deficit)

| | Series C Convertible Preferred Stock | Common Stock | Additional Paid-in Capital | Treasury Stock | Retained Earnings (Deficit) |
|---|---|---|---|---|---|
| Balance, December 31, 2007 | $ 92,500 | $ 17,360 | $ (14,999) | $ 546 | $ (9,043,667) |
| Net income (loss) | | | | | (65,651) |
| Eliminate obligation to former majority shareholder | | | | | 8,407,188 |
| Treasury Stock retired | | (16) | (411) | (546) | - |
| Balance, December 31, 2008 | $ 92,500 | $ 17,344 | $ (15,410) | $ - | $ (702,130) |
| Net income (loss) | | | | | (96,271) |
| 2009 Tax Provision | | | | - | 164,561 |
| Treasury Stock retired | | (10) | (246) | - | |
| Balance, December 31, 2009 | $ 92,500 | $ 17,334 | $ (15,656) | $ - | $ (633,840) |
| Net income (loss) | | | | | 140,671 |
| Adjust Preferred A Redemption to 1993 Agreement | | | | - | 337,891 |
| Treasury Stock retired | | - | (15) | - | - |
| Balance, December 31, 2010 | $ 92,500 | $ 17,334 | $ (15,670) | $ - | $ (155,278) |
| Net income (loss) | | | | | 99,813 |
| Treasury Stock retired | | - | (15) | - | - |
| Balance, December 31, 2011 | $ 92,500 | $ 17,334 | $ (15,685) | $ - | $ (55,465) |
| Net income (loss) | | | | | 97,130 |
| Adjustment for Deferred Taxes | | | | | 4,600 |
| Treasury Stock retired | | (856) | 27 | - | |
| Balance, December 31, 2012 | $ 92,500 | $ 16,478 | $ (15,658) | $ - | $ 46,264 |
| Net income (loss) | | | | | 59,149 |
| Adjustment for Termination of options | | | (34,045) | | - |
| Treasury Stock retired | | | | - | |
| Adjustment for Series A adjustment per court | | | | | (337,891) |
| Balance, December 31, 2013 | $ 92,500 | $ 16,478 | $ (49,703) | $ - | $ (232,478) |

- 4 -

**FOSTER DEC. EX. 20 pg. 168**

# AIA Services Corporation, Lewiston, ID 83501

## NOTES TO THE FINANCIAL STATEMENTS

### December 31, 2012 and December 31, 2013

## NOTE 1 - ORGANIZATION

AIA Services Corporation (the Company) was incorporated in December 1983, under the laws of the State of Idaho. The Company is based in Lewiston, Idaho.

The Company's principal business is the administration of policies of insurance issued to farmers who were members of sponsoring associations; managing the distribution of policy reserves for the terminated Group Universal Health policies; and managing its investment and real estate portfolio.

## NOTE 2- SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Principles of consolidation — The consolidated financial statements include the accounts of the Company and its subsidiary, AIA Insurance. All material inter-company transactions have been eliminated.

Income — The Company earns commissions and administrative fees on policies that are sold to farmers. Commissions on policies are paid to the Company when premiums are paid on the policies to the insurer or to the Company. Commission income is recognized ratably over the policy period.

Commissions are primarily received from one insurance company. Any loss of the ability to renew policies with this insurance company may negatively impact the Company's financial results. It is unlikely a replacement insurer can be found.

Commission expense — The Company pays a commission to its third-party agents for policies written to its insureds. The amount of commissions paid to third-party agents is determined by stated agreement between the Company and those agents.

Office equipment — Office equipment, including computer software and related equipment, is stated at cost less accumulated depreciation. Depreciation is computed principally by the straight-line method using estimated useful lives of three to five years.

Income taxes — The Company accounts for income taxes in accordance with the provisions of FASB ASC 740, Income Taxes. Under the asset and liability method prescribed by FASB ASC 740, deferred income taxes are provided for temporary differences between the financial reporting and tax bases of assets and liabilities. Such differences primarily relate to accumulated depreciation of office equipment and the allowance for uncollectible agent advances. In addition, deferred tax assets are reported for the estimated future tax benefit of net operating loss carry-forwards. Deferred taxes are measured using provisions of currently enacted tax laws. A valuation allowance against deferred tax assets is required if it is more likely than not that some or all of the deferred tax assets will not be realized.

Estimates — The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of revenues and expenses during the reporting period. Actual results could differ from those estimates.

5

Intangibles — The cost of intangible assets, including commissions on renewed insurance policies written and agency agreements, are amortized on a straight-line basis over an estimated useful life of five years.

Cash concentrations — The Company maintains accounts with various financial institutions with funds insured by the Federal Deposit Insurance Corporation (FDIC). The Company's accounts at these institutions may exceed the FDIC insured limits at times. The Company has not experienced any losses in such accounts.

Accounting pronouncements — In September 2009, Financial Accounting Standards Board (FASB) issued an Amendment of FASB ASC 740-10 — Income Taxes-Overall. This amendment eliminates disclosures required by paragraph 740-10-50-15(a), improves current accounting by helping to achieve consistent application of accounting for uncertainty in income taxes and is not intended to change practice. For entities that are currently applying the standards for accounting for uncertainty in income taxes, the guidance and disclosure requirements are effective for financial statements issued for interim and annual periods ending after September 15, 2009. For entities, such as the Company, that have deferred the application of accounting for uncertainty in income taxes in accordance with paragraph 740- 10-65-1 (e), the guidance and disclosure amendments are effective upon adoption of those standards. These amendments do not affect the effective date guidance for certain nonpublic entities in paragraph 740-10-65-1.

Effective January 1, 2008, the Company adopted the provisions of FASB ASC 820 - Fair Value Measurements and Disclosures, related to its financial assets and liabilities and non financial assets and liabilities measured at fair value on a recurring basis. In May 2011, FASB issued an Amendment of FASB ASC 820, which updated wording to describe reporting requirements but doesn't change the application of the requirements.

Subsequent events — Management has evaluated subsequent events through the date of the report. This is the date the financial statements were available to be issued. See Notes 3, 7, 13, 14 and 15 for further information.

## NOTE 3- COMMONLY CONTROLLED COMPANIES

### The common Stock of AIA Services Corporation, the Company.

As of December 31, 2013 and December 31, 2012, R John Taylor owned 85.55% and 83.66% of the common stock of the Company. During 2013, Mr. Taylor purchased 36,035 shares from the IRA plan of a former employee at 10 cents per share. In 2012, Mr. Taylor purchased 343,659 shares from a board member and other shareholders at a negotiated price of 10 cents per share. There are 1,647,770 shares outstanding at December 31, 2012 and December 31, 2013.

### The Company has several commonly controlled companies.

**CropUSA Insurance Agency, Inc. (CropUSA)** - As of December 31, 2013, the combined shareholders of the Company owned 54.49% of CropUSA Insurance Agency, Inc.

As of December 31, 2012, the Company owes CropUSA $1,697,803. As of December 31, 2013, the Company owes CropUSA $1,635,181.

During the year, the Company reimbursed CropUSA $80,046 in legal expenses and $78,211 for salary and other items paid on its behalf, net of payments by AIA on behalf of CropUSA. In addition, CropUSA advanced paid rent of $34,800 to the Company. During 2012, the Company reimbursed CropUSA $122,247 in expenses for salary and other items paid on its behalf. In addition, CropUSA advanced $94,078 to the Company for working capital.

**CropUSA Insurance Services LLC (Crop LLC)** - As of December 31, 2013, the combined shareholders of the Company, owned 70% of Crop LLC. Crop LLC owns 18.09% of the outstanding common shares of CropUSA Insurance Agency, Inc.

6

**FOSTER DEC. EX. 20 pg. 170**

During the calendar year 2012, there were no direct transactions between the Company and Crop LLC.

**Weskan Agency, LLC (Weskan) -** As of December 31, 2012, the combined shareholders of the Company owned 70 % of Weskan, which is a retail crop insurance agency based in Weskan, Kansas.

During the calendar year 2013, the company advanced $25,400 to Weskan for monthly expenses of the agency, all of which were reimbursed. During the calendar year 2012, there were no direct or indirect transactions between the Company and Weskan.

**Pacific Empire Radio Corporation (PERC) -** As of December 31, 2012 and 2013, the combined shareholders of the Company owned 64.15% of PERC.

During the calendar year 2013, the Company advanced $161,505 to PERC. During the calendar year 2012, the Company advanced to PERC and paid expenses on its behalf of $51,447.

**Pacific Empire Holdings Corporation (PEHC) -** As of December 31, 2013, the combined shareholders of the Company owned 80.88% of PEHC.

During the calendar year 2013, real estate owned by PECH was transferred to AIA Insurance, at its book value of $322,418, including an assumption of a mortgage due to Banner Bank for $200,352. During the calendar year 2012, there were no direct or indirect transactions between the Company and PEHC.

**Radio Leasing II, LLC (Radio Leasing) -** As of December 31, 2012, the combined shareholders of the Company owned 30% of Radio Leasing.

During the calendar years 2012 and 2013 there were no direct transactions between the Company and Radio Leasing. Radio Leasing was dissolved and liquidated effective December 31, 2012.

**17 State Street Partners, LLC (17 State Street) -** As of December 31, 2012, the combined shareholders of the Company owned 63% of 17 State Street.

During 2013, real estate formerly owned by 17 State Street, was transferred to the company at book value of $418,250, including an assumption of mortgage at Zions Bank of $175,176.

During the calendar year 2012, there were no direct or indirect transactions between the Company and 17 State Street.

## NOTE 4- INCOME TAXES

As of December 31, 2012 and 2013, the Company had a deferred tax asset of $37,000. The significant components of the Company's deferred tax assets and liabilities are summarized as follows:

Deferred tax assets:

| | |
|---|---|
| Allowance for doubtful accounts | $ 56,000 |
| Property and equipment | $(19,000) |

As of December 31, 2012, the Company has $4,074,905 in net operating loss carry forwards (NOL) available to offset future taxable income which expire through 2015. The NOL will be reduced in at year end 2013 by the taxable income of the Company. These net operating loss carry forwards relate to the Company's discontinued life insurance operations.

The Company's ability to use its net operating loss carry-forwards to offset future taxable income is subject to annual restrictions contained in the United States Internal Revenue Code of 1986, as amended (the Code). These restrictions act to limit the Company's future use of its net operating losses following certain substantial stock ownership changes as enumerated in the Code.

7

## NOTE 5- SERIES A PREFERRED STOCK

The Company's authorized capital includes 200,000 shares of no par, nonparticipating Series A preferred stock (the "Series A Stock"). All of these shares were issued to the ex-wife of the Company's former majority shareholder in 1988 in connection with their divorce. Pursuant to the Company's articles of incorporation, the holder of the Series A preferred stock had the right to require the Company to redeem the stock any time after September 14, 1993. She exercised this right in December 1993, and the Company began redeeming the shares in 1994.

The redemption price is $10 per share. In addition, the Company's articles of incorporation obligate the Company to pay interest on the unpaid portion of the redemption price at 1-1/2% below prime rate, adjusted quarterly. The interest rate was later modified by letter agreement to prime plus ¼%. The Company and the holder of the Series A Stock are currently involved in litigation in district court in Nez Perce County, Idaho concerning the number of shares of Series A Stock that remain to be redeemed and the redemption price attributable to those remaining shares. The Company maintains that the letter agreement requiring a higher interest rate is unlawful and that the lower rate of interest set forth in its articles of incorporation is controlling. The holder of the Series A Stock maintains that letter agreement is not unlawful and that the higher interest rate set forth therein is controlling. If the Company's position is upheld, then 7,590 shares of Series A Stock remained to be redeemed at December 31, 2013, at a redemption price of $79,937, inclusive of interest. If the shareholder's position is upheld, then 41,651 shares of Series A Stock remained to be redeemed at such date, at a redemption price of $502,242, inclusive of interest.

The Company increased the outstanding balance of Series A Stock and related interest by $337,891 for the year ended December 31, 2013 in response to the litigation. Total stockholders' equity at such date was a negative $173,203, based on this increase. If the lesser interest rate set forth in the Company's articles of incorporation is ultimately determined by the court to be the applicable rate, then total stockholders' equity at such date would be a positive $139,587.

The Company's articles of incorporation restrict it from redeeming any shares of Series A Stock unless it has "legally available funds" therefore and such redemption is in compliance with applicable provisions of the Idaho Business Corporations Act. The Company does not believe any redemption payments are currently due the holder of its outstanding shares of Series A Stock, principally because it does not have legally available funds to redeem her shares and because any such redemption would therefore violate the limitations set forth in the Idaho Business Corporation Act. If the Company dissolves, the holder of Series A Stock will have a liquidation preference over the holders of the Company's common stock and Series C preferred stock in an amount equal to $10 per share. The holder of Series A Stock has the right, voting separately as a class, to elect one member to the Company's board of directors. As of December 31, 2013, the holder of Series A Stock had not elected anyone to the Company's board of directors.

## NOTE 6- SERIES C PREFERRED STOCK

During 1995, the Company initiated a private placement of preferred stock in which 297,500 shares of the authorized 500,000 shares Series C 10% convertible preferred stock and attendant Series C warrants were sold for $2,975,000. As of December 31, 2012, 92,500 shares of Preferred C shares remain outstanding. The shares are callable and redeemable by the Company for $10 per share plus accumulated dividends of $13.025 per share. The shares are appraised at $7.36 per share at year end 2011. There has not been a more recent appraisal.

## NOTE 7- BONDS POSTED IN COURT

As of December 31, 2013 and December 31, 2012, the Company had no bonds posted with the Clerk of Second District Court of Idaho in the matter of Reed J. Taylor vs. the Company.

**FOSTER DEC. EX. 20 pg. 172**

## NOTE 8- PREPAID EXPENSES

As of December 31, 2013 and December 31, 2012, the Company had a balance of $82,912 and $72,521 for prepaid expenses. These prepaid expenses include prepaid insurance premiums, deposits for professional services, a $25,375 lease deposit with Washington Bank Properties and a deposit with the Idaho State Tax Commission on the Company's sales and use tax certificate.

## NOTE 9- AGENT ADVANCES

As of December 31, 2013 and 2012, the Company had recorded a net receivable of $596,675 and $85,963, which represents the Company's estimate of the net realizable value of advances paid to agents. Future commissions earned by agents will be offset against these advances.

The significant increase consisted of $509,352 advances made by the Company to certain crop insurance agents of CropUSA. Theses advances were funded by the majority shareholder.

## NOTE 10- DUE FROM RELATED PARTIES AND RELATED COMPANIES

As of December 31, 2013 and December 31, 2012, the Company's investment in PERC increased from $1,469,880 to $1,631,385 in the form of notes receivable from PERC. The note carries a 12% interest rate and is collateralized by assets of PERC.

As of December 31, 2012, the majority shareholder owes the Company $368,024. The note carries no interest rate, maturity date, or minimum payment, but is offset by accrued salary due to due to R. John Taylor. At December 31, 2013 there was no balance due from Taylor.

## NOTE 11 - DUE TO RELATED PARTIES

As of December 31, 2013 and December 31, 2012, the Company owes R. John Taylor $415,563 and $361,882 in accrued but unpaid salary.

As of December 31, 2013 and December 31, 2012, the Company's subsidiary, AIA Insurance, owes CropUSA Insurance Agency, Inc. $287,917 and $297,213, respectively. The balance consists of administration, payroll and other expenses for the Company paid on behalf of AIA Insurance, Inc. by CropUSA.

As of December 31, 2013 and December 31, 2012, the Company owed $1,635,181 and $1,469,880 respectively to CropUSA Insurance Agency, Inc, resulting from advances for legal fees, administration, and other expenses allocated to or paid on behalf of the Company. These amounts include the amounts owed by the Company's subsidiary, AIA Insurance.

## NOTE 12- NOTES PAYABLE

On December 16, 2009, the Company entered into a debt agreement with Syringa Bank (now Sunwest Bank) for $500,000, which carries an interest rate of 6.5%, is collateralized by the mortgage due on the Lewis Clark Plaza and is personally guaranteed by the majority shareholder of the Company. As of December 31, 2013 and December 31, 2013, the balance of the note is $69,456 and $225,000 respectively. The current payments are $1500 per month.

On December 17, 2009, the Company entered into a purchase agreement with an unrelated third party to purchase the lower portion of the Dahmen Building Condominiums (the Company currently owns the upper portion), located at 200 Main Street, Lewiston, Idaho. The purchase price was $225,000, of which $200,000 was financed by the Company with the seller. In 2013, the Company paid the mortgage due to the third party and refinanced the unit with a Mortgage of $175,000 with Zions Bank. The monthly payment is $1165.17.

On March 30, 2011, the Company entered into a note agreement with U.S. Bank to purchase a 2007 Chevrolet Suburban. The purchase price was $24,988, of which $21,125 was financed by the Company. The note

9

**FOSTER DEC. EX. 20 pg. 173**

carries an interest rate of 4.49%, monthly payments of $481.45 beginning April 27, 2011, a final payment of the unpaid principal and accrued interest on March 27, 2015, and is secured by the vehicle.

## NOTE 13- STOCK PURCHASES

In 2012, the majority shareholder purchased 343,659 outstanding shares of common stock from one of the Board members and other unrelated parties. The parties negotiated a purchase price of $0.10 per share and the purchases were completed in April of 2012. The purchase price included all rights and proceeds, if any, that may accrue as a result of any litigation known and unknown.

In 2013, the majority shareholder purchased 36,035 shares of common stock from the IRA account of a former employee for a similar amount.

## NOTE 14- EMPLOYEE BENEFIT PLAN

The Company maintains a profit-sharing retirement plan with an Internal Revenue Service Code Section 401(k) feature covering substantially all employees who have completed three months of service or more. Employee elective deferral contributions are fully vested immediately and Company contributions are fully vested after seven years of participation. The Company made no contributions to the plan for the years ended December 31, 2012 and 2013.

The Company terminated its Employee Stock Ownership Plan on December 31, 2011. Final distribution checks were issued to participants with remaining balances in March of 2012, based on the December 31, 2011 valuation and March 2012 termination letter by Acclaro Valuation Advisors, the Plan's independent appraiser. The shares were appraised by Acclaro for $.01 and $.00 cents per share at December 31, 2011 and December 31, 2010.

## NOTE 15- LITIGATION

The company initiated suit in the Second District Court of Idaho to foreclose on the mortgage on the property known as the Lewis Clark Plaza. The suit was filed in September 2011 against Washington Bank Properties (WBP) and seeks to either return the title of the building to the Company or require payment of the note due on the property held by the Company. WBP sued the Company in King County, Washington, seeking damages from the Company as a guarantor pursuant to a lease of the property between WBP and AIA Insurance, Inc. The suit was dismissed. The company received a favorable order from the Second District Court in July, 2013 and a sheriff's sale is pending. The Company also initiated a suit in Nez Perce County in 2012 seeking a declaratory judgment that it has no further liability to WPB as a result of the 1995 lease between AIA Insurance and WBP. The action is pending and the Company has made no accrual for any potential liability.

In 2007, the Company was named as a co-defendant with CropUSA Insurance Agency, Inc. and others in a breach of contract lawsuit filed by the former majority shareholder of AIA Services Corporation stemming from a 1995 stock redemption agreement transaction. The majority of the claims were dismissed by the Second District Court of Idaho in 2009 in favor of the Company and the other defendants. This decision was later upheld by the Idaho Supreme Court in September 2011. In December 2011, the remaining claims were dismissed, except for some counterclaims by the Company against the former majority shareholder. Although the Company paid to or on the behalf of the former majority shareholder over $9,700,000 from 1995 to 2008, the court ruled that the Company cannot recover any of these amounts from the plaintiff. The Company has a pending counterclaim against the former majority shareholder for damages caused by the litigation and for reimbursement of some of the legal fees paid by the Company.

In 2008, two directors of the company, including the majority owner, were named in a suit by the holder of the Preferred A shares in Second District Court of Idaho, asking for redemption of her Preferred A shares and other items to be determined by the Court. In 2009, the Preferred A Shareholder filed suit against the Company, its directors and others, demanding redemption of the Preferred A shares and for other alleged damages. In 2010, the Preferred A Shareholder, the ex-wife of the former majority shareholder, filed a derivative claim in Federal Court, against the Company, its attorneys, directors and others, including CropUSA, alleging breach of contract

10

and breach of fiduciary duty stemming from the same 1995 stock redemption agreement, as well as other derivative-type claims on behalf of shareholders. The federal suit has been stayed pending the disposition of all pending claims in the Second District Court of Idaho.  The suits in the Second District Court of Idaho have been consolidated and a final decision is pending.

In spite of numerous attempts and offers to reach an all-party settlement with the former majority shareholder and his ex-wife, none of those attempts have been successful. The Company will continue to vigorously defend against any remaining or future claims. For financial reporting purposes, the Company does not provide for any further liability to the former majority shareholder.  The Company does provide for a liability to the holder of the Preferred A Shares.  The Company does not provide for any estimate of recovery of legal fees and costs previously expended nor any estimate of future expenses or costs of the remaining litigation.

In 2013, the Company was named a defendant, among others, in a lawsuit brought by GemCap Lending I, alleging breach of contract and other claims, in relation to a financing agreement between GemCap Lending and CropUSA Insurance Agency.  The Company is vigorously defending the claims and has not recorded an estimate for any liability, other than the amounts due to CropUSA indicated in Note 11.

In 2014, the Company, AIA Insurance, Inc. and GemCap Lending I were named as defendants in a lawsuit brought by the ex-wife of the former majority shareholder and two other shareholders in a suit to set aside the GemCap financing arrangement. The Company will seek dismissal of this action on several grounds.

11

**BOND DECLARATION EXHIBIT 3**

FILED

2014 JUL 14 AM 8 07

PATTY O. WEEKS
CLERK OF THE DIST. COURT

DEPUTY

# IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

| | |
|---|---|
| DONNA J. TAYLOR, | ) CASE NO. CV08-01150 and |
| Plaintiff, | ) CV13-01075 (Consolidated cases) |
| v. | ) OPINION AND ORDER ON |
| R. JOHN TAYLOR and CONNIE TAYLOR, | ) PLAINTIFF'S MOTION FOR |
| | ) PARTIAL SUMMARY JUDGMENT; |
| Defendants. | ) DEFENDANTS' MOTION TO STRIKE, |
| | ) MOTION TO DISMISS, AND MOTION |
| and | ) FOR SUMMARY JUDGMENT |
| DONNA J. TAYLOR, | ) |
| Plaintiff, | ) |
| v. | ) |
| AIA SERVICES CORPORATION, an Idaho corporation; R. JOHN TAYLOR; CONNIE TAYLOR HENDERSON; JAMES BECK; and MICHAEL CASHMAN, SR., | ) |
| Defendants. | ) |

1

*Taylor v. Taylor*
Opinion & Order on Motions

FOSTER DEC. EX. 20 pg. 177

This matter is before the Court on Defendants' Motion to Dismiss, Motion for Summary Judgment, Motion to Strike Portions of Peterson Declaration, and on Plaintiff's Motion for Partial Summary Judgment. The Court heard oral arguments on the Motions on May 23, 2014. Plaintiff Donna Taylor was represented by attorney Roderick C. Bond. Defendant AIA Services Corporation was represented by attorney Douglas J. Siddoway. Defendants John Taylor, Connie Taylor Henderson, James Beck, and Michael Cashman were represented by attorney David R. Risley. The Court, having read the Motions, affidavits, and briefs filed by the parties, having reviewed the record, having heard oral arguments of counsel, and being fully advised in the matter, hereby renders its decision.

## BACKGROUND

This Court articulated the material facts in this matter in its Opinion and Order on Defendants' Motion for Partial Summary Judgment entered in July 26, 2013. For efficiency, the Court will only repeat in part the facts as stated in that Order.

In 1995, a stock redemption agreement was entered into between AIA Services Corporation ("AIA"), shareholder Reed Taylor ("Reed"), who owned common shares, and shareholder Donna Taylor ("Donna"), the sole owner of all outstanding Preferred A Shares issued by the corporation[1]. The corporation quickly found it was in default, however, and the parties opted to enter into a new restructured agreement in 1996.[2] Under the 1996 Series A Preferred Shareholder Agreement, AIA was to redeem Donna's shares over a ten year amortization payment schedule.[3] The 1996 restructured agreement provided for Reed Taylor to

---

[1] Donna Taylor became the owner of the Preferred A shares as part of a property settlement when, prior to 1995, Donna Taylor and Reed Taylor divorced.
[2] Exhibit A to the Complaint filed October 1, 2009.
[3] Exhibit A to the Complaint filed October 1, 2009.

2

*Taylor v. Taylor*
Opinion & Order on Motions

FOSTER DEC. EX. 20 pg. 178

receive certain payments over the same ten year period with payment of a $6 million promissory note at the end of the ten years. The restructured agreement further provided that the corporation's debt to Donna was senior to its debt to Reed.[4] In exchange for AIA's agreement to accelerate payment of the principal due on the redemption of the Series A Preferred Shares, Donna agreed to release AIA from any claims of breach or default relative to the 1995 Series A Preferred stock redemption agreement.[5]

AIA Services was incorporated in the mid 1980's and, since that time, John Taylor ("John") has held the position of president of the corporation.[6] Reed Taylor ("Reed") was the founder and majority shareholder of AIA until 1995, when AIA agreed to redeem Reed's common stocks. Upon the redemption of Reed's shares, John Taylor became the majority shareholder. John Taylor continues to be the majority shareholder of AIA and continues to hold the position of president of the corporation.

In a letter dated February 2001, John Taylor informed Donna that AIA was developing an insurance program through a new company named CropUSA and requested AIA be allowed to defer five months of stock redemption payments, with the understanding the amounts would be paid at the end of contract.[7] Donna agreed to defer the payments based on the personal guarantee of payment by John Taylor and Reed Taylor.[8]

By 2006, AIA was in default of its 1996 stock redemption agreements with both Donna Taylor and Reed Taylor.[9] In December 2006, Donna Taylor agreed to subordinate the amounts

---

[4] Exhibit A to the Complaint filed October 1, 2009.
[5] Exhibit A to the Complaint filed October 1, 2009 at ¶ H.
[6] Deposition of John Taylor, attached to the Affidavit of Michael S. Bissell filed October 1, 2009.
[7] Exhibit C to Donna Taylor's Motion for Partial Summary Judgment and Memorandum in Support filed October 1, 2009.
[8] Exhibit 2 to the Affidavit of Connie Taylor filed October 15, 2009.
[9] AIA entered into an agreement in 1996 to redeem Donna Taylor's Preferred A shares and with Reed Taylor to redeem his common shares.

*Taylor v. Taylor*
Opinion & Order on Motions

FOSTER DEC. EX. 20 pg. 179

and obligations owed to her by AIA to those amounts and obligations owed to Reed Taylor by AIA. Donna and Reed reduced their agreement to writing in a subordination agreement dated December 1, 2006.[10] In January 2007, Reed Taylor filed suit against AIA and others, including John Taylor and Connie Taylor, asserting numerous causes of action including breach of contract.[11] That action was stayed pending appeal on the issue of whether the 1995 stock redemption agreement between AIA and Reed Taylor and the 1996 restructured stock redemption agreement were illegal contracts under the applicable statutory stock redemption statute as it existed in 1995 and 1996.

On June 2, 2008, Plaintiff Donna Taylor filed the above-entitled action against Defendant John Taylor. John Taylor timely filed an Answer, Counterclaim and Demand for Jury Trial. On October 27, 2008, by stipulation of the parties, Plaintiff filed an Amended Complaint adding as a defendant Connie Taylor ("Connie").[12] John Taylor timely filed an Answer to Amended Complaint and Counterclaim, as did Connie Taylor.

In October 2009, Plaintiff Donna Taylor filed a Motion for Partial Summary Judgment, Defendant John Taylor filed a Motion for Summary Judgment, and Defendant Connie Taylor filed a Motion to Dismiss. The Court heard oral arguments on the Motions in November 2009. The Court subsequently entered a stay in Donna Taylor's action after finding Donna's matters shared common questions of law with Reed Taylor's action against the same Defendants and, because the issues of law were on appeal, Donna's matter should be stayed pending a ruling on the legal issues. In May 2011, the Idaho Supreme Court in *Reed Taylor v. AIA Services*

---

[10] Exhibit 5 to the Affidavit of Connie Taylor filed October 15, 2009.
[11] Reed Taylor v. AIA Services, AIA Insurance, John Taylor, Connie Taylor, Bryan Freeman, JoLee Duclos, Crop USA Insurance, James Beck and Corrine Beck, Nez Perce County Case No. CV07-00208.
[12] Connie Taylor was added as a defendant when it was determined John Taylor and Connie Taylor continue to own assets as community property. The marriage of John Taylor and Connie Taylor was terminated by an Interlocutory Decree of Divorce in December 2005. However, the parties have not sought, nor has the court entered, a property settlement dividing the community property that comprised the marital estate.

4

*Taylor v. Taylor*
Opinion & Order on Motions

FOSTER DEC. EX. 20 pg. 180

*Corporation*, 151 Idaho 353, 261 P.3d 829 (2011) affirmed this Court's finding that the Stock Redemption Agreement was illegal and unenforceable, having violated the earned and capital surplus limitations in I.C. § 30-1-6 as the statute existed in 1995 and 1996.

Following entry of the Idaho Supreme Court's ruling in Reed Taylor's case, Defendants Taylor filed a Motion for Partial Summary Judgment, seeking to have the Court find as a matter of law that the value of Donna Taylor's unredeemed stocks is $82,000.00, a value that was disputed by Donna. The Court denied Defendant Taylors' Motion, lifted the stay, and informed the parties that, should they desire, they could re-notice their 2009 motions and file additional briefing.

In 2013, Donna Taylor filed a Complaint against AIA Services Corporation, R. John Taylor, Connie Taylor Henderson, James W. Beck, and Michael W. Cashman, Sr. asserting claims against AIA for breach of contract, against R. John Taylor, Connie Taylor Henderson, James Beck, and Michael W. Cashman, Sr. claims for breach of fiduciary duties, aiding and abetting fiduciary duties, and unjust enrichment, and as against all parties a cause of action seeking declaratory relief/specific performance. The 2013 lawsuit (Nez Perce County Case No. CV13-1075) and the 2008 lawsuit (Nez Perce County Case No. CV08-1150) were consolidated by Order of the Court on August 7, 2013. Currently before the Court are motions re-filed by the parties in the 2009 matter and the 2013 matter.

## STANDARD OF REVIEW

Under Rule 56(c) of the Idaho Rules of Civil Procedure, summary judgment is proper if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Summary judgment should be granted if the evidence reveals no

5

*Taylor v. Taylor*
Opinion & Order on Motions

disputed issues of material fact. In making this determination, all disputed facts are liberally construed in favor of the non-moving party. Circumstantial evidence can create a genuine issue of material fact. *De Groot v. Standley Trenching, Inc.*, 2014 WL 1266104 (2014). Inferences that can reasonably be made from the record are made in favor of the non-moving party. *Id.* However, the non-moving party may not rest on a mere scintilla of evidence. If the record raises neither a question of witness credibility nor requires weighing the evidence, then summary judgment should be granted. *Id.* The moving party is entitled to judgment when the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case. *ParkWest Homes, LLC v. Barnson,* 154 Idaho 678, 682, 302 P.3d 18, 22 (2013) (internal citations and quotations omitted).

## ANALYSIS

### A. DEFENDANTS' MOTION TO STRIKE PORTIONS OF PEDERSON DECLARATION

Defendants seek to have the Court strike portions of the declaration filed by Plaintiff's expert, Paul Pederson. In particular, Defendants seek to strike Pederson's adoption and incorporation of his affidavit filed in Reed Taylor's case, arguing it is not part of this record. Defendants further assert portions of statements are conclusory, opinions of law, or based on facts for which Pederson has no direct knowledge. The Court, without striking the declaration, will determine what is relevant and proper and will consider only those statements that are admissible expert statements.

### B. DEFENDANTS MOTION TO DISMISS

Defendants seek dismissal of Plaintiff's claims for fraud, constructive fraud, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty. Defendants contend the tort claims are barred by the economic loss rule. The Court agrees.

6

*Taylor v. Taylor*
Opinion & Order on Motions

Idaho's Appellate Courts have consistently held that, unless an exception applies, the economic loss rule precludes recovery of purely economic losses in negligence actions, stating there is no duty to prevent economic loss to another. *Stapleton v. Cushman Drilling and Pump Co.*, 153 Idaho 735, 742, 291 P.3d 418 (2012). "[A]s a general rule, a plaintiff is prohibited from recovery in tort for purely economic losses absent an accompanying physical injury to persons or property, unique circumstances, or a special relationship. *Duffin v. Idaho Crop Improvement Ass'n,* 126 Idaho 1002, 1007–08, 895 P.2d 1195, 1200–01 (1995)." In the instant matter, Donna Taylor's loss is purely economic. Therefore, her claims in tort will only survive if they fall within one of the exceptions to the economic loss rule.

The first exception occurs when economic loss accompanies, or is parasitic to, physical injury to persons or property. This exception is clearly not applicable to the instant matter, as Donna Taylor asserts no injury to her person or property. The second exception occurs when unique circumstances require re-allocation of the risks. Donna Taylor has presented the Court with no facts that would place her economic loss into this second exception. The third exception occurs when there is a special relationship between the parties. Defendants contend the relationship of shareholder with the corporation or its corporate officers is not a special relationship as defined by Idaho case law. Plaintiff counters by arguing the economic loss rule bars only tort claims for negligent acts or omissions, not intentional torts as asserted by Donna. Addressing the type of special relationship that must exist to trigger the third exception to the economic loss rule, Idaho's Appellate Courts have stated,

> The 'special relationship' exception generally pertains to claims for personal services provided by professionals, such as physicians, attorneys, architects, engineers and insurance agents. *Eliopulos v. Knox*, 123 Idaho 400, 408, 848 P.2d 984, 992 (Ct.App.1992). A special relationship may exist where a party holds itself out to the public as performing a specialized function and induces reliance on superior knowledge and skill. *Duffin,* 126 Idaho at 1008, 895 P.2d at 1201.

7

*Taylor v. Taylor*
Opinion & Order on Motions

**FOSTER DEC. EX. 20 pg. 183**

In *Duffin,* the Idaho Supreme Court held that a special relationship existed between an entity which certified seed potatoes and a farmer who bought seed which was certified but defective. The seed certification entity was the only such entity in the state. The entity held itself out to the public as having expertise in seed certification and induced reliance on that expertise. Furthermore, the farmer was obligated to utilize the entity. Due to this specialization and induced reliance on the seed certification entity's expertise, the Supreme Court gave the farmer the ability to recover for pure economic loss based upon a special relationship. However, the Supreme Court explained in its holding that this principle only applies to an "extremely limited group of cases" in which it is equitable to impose a duty to exercise due care to avoid the pure economic loss of another. *Id.* at 1008, 895 P.2d at 1201.

*Nelson v. Anderson Lumber Co.,* 140 Idaho 702, 710, 99 P.2d 1092 (Ct.App.2004).

The issue of whether the economic loss rule bars intentional torts where damages are purely economic has not been addressed by Idaho's Appellate Courts. Other jurisdictions have, however, addressed the issue.

Recognizing the shortcomings of the economic loss rule, the *Eastwood* court held that the more appropriate inquiry when determining if tort remedies are recoverable when a contractual relationship also exists is whether an independent legal duty exists, outside the parties' contractual relationship, imposing a duty on the tortfeasor. 170 Wash.2d at 389, 241 P.3d 1256. Thus, the court held, "An injury is remediable in tort if it traces back to the breach of a tort duty arising independently of the terms of the contract." The court named this inquiry the "independent duty doctrine." *Eastwood,* 170 Wash.2d at 398, 241 P.3d 1256.

Although it reframed the appropriate inquiry and renamed the rule, the court noted that when determining how a court can distinguish between claims where a plaintiff is limited to contract remedies and cases where recovery in tort may be available[, a] review of our cases, on the economic loss rule shows that ordinary tort principles have always resolved this question.... The court determines whether there is an independent tort duty of care, and "[t]he existence of a duty is a question of law and depends on mixed considerations of logic, common sense, justice, policy, and precedent." *Eastwood,* 170 Wash.2d at 389, 241 P.3d 1256 (internal quotation marks omitted) (third alteration in original) (quoting *Snyder v. Med. Serv. Corp. of E. Wash.,* 145 Wash.2d 233, 243, 35 P.3d 1158 (2001)).

*Hendrickson v. Tender Care Animal Hosp. Corp.,* 312 P.3d 52, 58, 176 Wash.App. 757, 768 (Wash.Ct.App.2013).

8

*Taylor v. Taylor*
Opinion & Order on Motions

In *McCann v. McCann*, 152 Idaho 809, 815, 275 P.3d 824, 829 (2012), the Supreme Court reiterated the legal standard that a corporation and its directors owe fiduciary duties to shareholders. "This Court held that in a closely-held corporation, the corporate directors owe a fiduciary duty to one another, to the corporation and to the shareholders, including the minority shareholders." *McCann*, 152 Idaho at 815. Donna Taylor, as a shareholder, was owed fiduciary duties by the Defendant corporate directors, duties that are independent of any contractual duties she was owed. However, Idaho's Appellate Courts have not extended the definition of 'special relationships' beyond those relationships involving personal services provided by professionals who hold themselves out to the public as performing specialized functions. Any expansion of the definition must be left to Idaho's Appellate Courts. Therefore, the Court does not find the relationship between Plaintiff Donna Taylor and the Defendants to be one for personal services performed by professionals. As a result, Donna's claims for fraud, constructive fraud, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty, do not fall within the third exception to the economic loss rule.

The Court finds none of the exceptions to the economic loss rule applicable to Plaintiff Donna Taylor's claims for fraud, constructive fraud, breach of fiduciary duty, or aiding and abetting breach of fiduciary duty. Therefore, because Donna's claims are for purely economic loss, the economic loss rule bars her claims in tort as a matter of law.

## (C) PLAINTIFF'S UNJUST ENRICHMENT CLAIM

Plaintiff Donna Taylor asserts in her Second Amended Complaint filed November 6, 2009 and in her 2013 Complaint, that the named individual Defendants were unjustly enriched when, after obtaining her approval in 2001 to defer her stock redemption payments for five months, Defendants transferred substantial amounts of AIA's assets to CropUSA, Defendants

9

*Taylor v. Taylor*
Opinion & Order on Motions

looted AIA to their benefit, Defendants then informed Donna AIA had insufficient funds to continue making the promised redemption payments, and by their conduct Defendants have been unjustly enriched to the detriment of Donna Taylor. Defendants contend Donna has failed to make out a *prima facie* case for unjust enrichment.

Unjust enrichment occurs when a defendant receives a benefit that would be inequitable to retain without compensating the plaintiff to the extent that retention is unjust. *Beco Constr. Co. v. Bannock Paving Co.*, 118 Idaho 463, 466, 797 P.2d 863, 866 (1990). In order to set out a *prima facie* case for unjust enrichment, a plaintiff must present facts on three elements: (1) there was a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance of the benefit under circumstances that would be inequitable for the defendant to retain the benefit without payment to the plaintiff for the value thereof. *Aberdeen–Springfield Canal Co. v. Peiper*, 133 Idaho 82, 88, 982 P.2d 917, 923 (1999). "However, the alleged recipient must also be the intended beneficiary. *Hettinga v. Sybrandy*, 126 Idaho 467, 471, 886 P.2d 772, 776 (1994). Accordingly, '[r]ecovery for unjust enrichment is unavailable if the benefits [to the recipient] were created incidentally by [the claimant] in pursuit of his own financial advantage.' *Id.*" *Cuevas v. Barraza*, 152 Idaho 890, 897, 277 P.3d 337 (2012). The party who has conferred the benefit and who is seeking the return of the full amount thereof has the burden of proving it would be unjust for the recipient to retain any part of the benefit. *Toews v. Funk*, 129 Idaho 316, 323, 924 P.2d 217, 224 (Ct.App.1994).

Donna Taylor, by agreeing to allow AIA to defer five months of stock redemption payments in order to allow AIA to develop CropUSA, conferred a benefit on AIA, not on the named individual Defendants, nor is there any evidence Donna intended the individual Defendants to benefit. Any benefit enjoyed by the individual Defendants was incidentally

10

*Taylor v. Taylor*
Opinion & Order on Motions

created as a result of Donna's pursuit of her own financial advantage. Therefore, recovery for unjust enrichment against the individual Defendant's in unavailable to Donna. Rather, recovery is available through breach of contract claims against AIA, and against John Taylor and Reed Taylor as guarantors.

## (D)   DONNA'S CLAIM UNDER THE GUARANTY AGREEMENT

In February 2001, Donna Taylor received a letter signed by John Taylor and Reed Taylor seeking to defer payment on Donna's stock redemption for five months in order to facilitate the startup of CropUSA.[13] The letter ends with, "Reed and John will guarantee the deferred payments." Donna subsequently agreed to defer redemption payments for five months. However, in breach of the agreement between the parties, the deferred payments have never been made to Donna, who now seeks to recover the five deferred payments plus interest from John Taylor only. Defendants contend Reed Taylor is an indispensable party and must be joined by Donna or, in the alternative, the Court should find Donna relieved Reed of his guaranty obligation, thus rendering John Taylor's guaranty void.

Rule 19(a)(1) of the Idaho Rules of Civil Procedures reads:

> *Persons to Be Joined if Feasible.* A person who is subject to service of process shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff.

---

[13] Exhibit C to Donna Taylor's Motion for Partial Summary Judgment and Memorandum in Support Thereof, filed October 1, 2009.

11

*Taylor v. Taylor*
Opinion & Order on Motions

I.R.C.P. 19(a)(1).

John Taylor and Reed Taylor became co-guarantors under the terms of the deferred payment agreement. Donna Taylor, as the creditor, may seek recovery from either or both guarantors. However, if one guarantor pays more than his equal share of the debt, recovery for payment of more than his propositional share may be sought from the other guarantor.

> If a principal obligation is guaranteed by two or more persons, each must pay the proportional share of the liability, and a guarantor who has paid more than his or her share is entitled to contribution from the others and may sue to enforce that right. While an action for contribution may not be maintained unless the guarantor has paid more than his or her share of the obligation, or satisfied a judgment against that guarantor, it is not necessary that the guarantor have paid the entire debt. A guarantor may be entitled to interest on the contribution due, payable from the date of payment by the guarantor.

> The right to contribution among coguarantors arises from their implicit agreement that each would contribute his or her just proportion of any liability and, thus, is based on an implied contract. That right is governed by equitable principles and is subject to equitable defenses.

> A guarantor is entitled to contribution regardless of whether the guarantors signed a single or separate documents, or the creditor released the coguarantors after the default on the underlying loan.

38 Am.Jur.2d Guaranty § 100.

The Court found no Idaho case law instructive on this issue. However, the Court rejects Donna's argument that Reed was somehow relieved of his liability as co-guarantor. Reed Taylor signed the letter that create the guaranty and has offered no evidence to the contrary. The Court also rejects John Taylor's theory that Donna Taylor, by executing a subordination agreement with Reed Taylor in 2006, relieved Reed of his obligation under the guaranty without John Taylor's consent, and as a result John Taylor is relieved of his obligation. Defendant offers the Court no legal authority in support of his theory, nor has the Court found any such authority. The Court finds the 2001 guaranty event and the 2006 subordination agreement event to be two

12

*Taylor v. Taylor*
Opinion & Order on Motions

FOSTER DEC. EX. 20 pg. 188

distinct and unrelated events that have no effect on the other. Based on the general principals of guaranty law and I.R.C.P. 19(a)(1), the Court finds Reed Taylor is not an indispensable party, as Donna Taylor may obtain complete relief from only one of the guarantors. If full recovery is obtained from John Taylor, he may then bring an action against Reed Taylor, as the co-guarantor, to recover Reed's portion of the liability.

## (E) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants contend the Series A Preferred Shareholder Agreement was illegal, thus making void any obligation to redeem Donna's shares. Plaintiff Donna Taylor argues that, even if the 1995 and 1996 redemption agreements are void, there was a prior lawful agreement between Donna and AIA regarding redemption of her Series A shares, that agreement was memorialized in three letters that preceded the 1995 and 1996 agreements, and the 'letter' agreement is enforceable, as it could not be superseded by an illegal agreement. Defendants contend the 1995 redemption agreement evidenced by the letters cannot be resurrected by the Court, as the intent of the parties in entering the 1995 and 1996 agreements would be thwarted and Donna Taylor would be allowed to receive the benefit of a higher interest rate and amortization schedule.

In the instant matter, the parties agree the 1995 and 1996 Series A Shareholder Agreements between Donna Taylor and AIA are illegal for the same reasons Reed Taylor's Promissory Note for redemption of his shares was illegal.[14] The parties also agree there was an earlier 1995 agreement memorialized in three letters[15] that lawfully provided for the redemption of Donna Taylor's Series A shares. However, while Donna Taylor argues the 'letters' agreement is enforceable, Defendants argue it was superseded by the illegal agreements and, if enforced

---

[14] *See Taylor v. AIA,* 151 Idaho 552, 261 P.3d 829 (2011).
[15] See Exhibits C, D, and E to the Affidavit of Donna Taylor filed May 23, 2013.

13

*Taylor v. Taylor*
Opinion & Order on Motions

now, would be contrary to the intent of the parties 1995 and 1996 agreements, would reward

Donna for her 'misconduct'[16], and would give Donna the benefit of a higher interest rate and

amortization schedule.

The Court, while unable to find any instructive Idaho case law, finds the majority of

jurisdictions adhere to the rule that a legal and valid contract is not made void by a subsequent

illegal contract regarding the same subject matter.

> A subsequent illegal agreement by the parties cannot affect a previous fair and
> lawful contract between them in relation to the same subject. The change is
> regarded as a mere nullity, and as such cannot scathe the original contract.
> Wilcoxon v. Logan, 91 N.C. 449; Britt v. Aylett, 11 Ark. 475, 52 Am.Dec. 282;
> McCurdy v. Dillon, 135 Mich. 678, 98 N.W. 746; Cain v. Bonner, 108 Tex. 399,
> 194 S.W. 1098, 3 A.L.R. 874; 15 A. & E.Ency.Law 932; Tearney v. Marmiom,
> 103 W.Va. 394, 137 S.E. 543; 17 C.J.S., Contracts, s 287; Page on Contracts, sec.
> 2469. See also: In re Port Publishing Co., 231 N.C. 395, 57 S.E.2d 366, 14
> A.L.R.2d 842.

Tillman v. Talbert, 93 S.E.2d 101, 103, 244 N.C. 270, 272 (N.C.1956).

The Court finds the "no taint" holding by other jurisdictions persuasive. The Court also

agrees that under Idaho law, "If a contract is illegal and void, the court will leave the parties as it

finds them and refuse to enforce the contract." Wernecke v. St. Maries Joint School Dist. # 401,

147 Idaho 277, 287, 207 P.3d 1008, 1018 (2009). Where the Court finds the parties in the instant

matter is in the position they were just prior to the illegal agreements being entered into. The

parties do not dispute that, prior to entering into the illegal agreements, the parties entered into an

agreement with Donna Taylor for the redemption of her Series A shares, and that the agreement

was memorialized in a series of three letters, with two of the letters being signed by the

necessary parties. That agreement was a lawful and enforceable agreement establishing the

---

[16] Defendants argue Donna Taylor committed 'misconduct' in 2006 when she entered into a subordination
agreement with Reed Taylor giving Reed priority over Donna relative to redemption payments. It was within
Donna's right to relinquish priority and to do so without the consent of AIA, who neither benefitted nor was harmed
by the payment priority issue.

14

FOSTER DEC. EX. 20 pg. 190

terms for redemption of Donna Taylor's Series A shares and, therefore, the Court finds the 'letters' agreement remains valid, enforceable, and unscathed by the subsequent illegal agreements. Contrary to the arguments put forth by the Defendants, AIA's amended articles are not applicable to redemption of Donna's Series A shares, as the amendments became effective well after AIA entered into the 'letters' agreement with Donna. Redemption of Donna's share must be in conformance with the lawful and enforceable 'letters' agreement.

## (F) PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff seeks summary judgment on the following issues: (a) the 1995 'letters' agreement is legal and enforceable; (b) 41,509.69 of Donna Taylor's Series A shares have yet to be redeemed; (c) Donna Taylor is owed $415,096.86 for unredeemed Series A shares plus accrued interest; (d) the controlling shareholders breached fiduciary duties to Donna Taylor; and (e) dismissal of AIA's counterclaim asserting Donna Taylor breached the 1995 and 1996 Series A shareholder agreement. The Court, in addressing the Motions of the Defendants, has already determined the 1995 'letters' agreement is legal and enforceable. Therefore, the Court will not re-address that issue. In regard to the number of Series A shares that are outstanding and the value of those shares, the Court has already determined the shares must be redeemed in conformance with the 1995 'letters' agreement. In addition, the Court finds the number of unredeemed shares still held by Donna Taylor is the amount shown by AIA's records on the date of the last payment made to Donna Taylor.

Next, the Court finds summary judgment on the issue of whether the majority shareholders breached fiduciary duties to Donna Taylor as a minority shareholder must be denied. Defendants have consistently maintained the legality of the business dealings involving AIA, CropUSA, and other entities. The parties dispute nearly every fact asserted by the other on

15

*Taylor v. Taylor*
Opinion & Order on Motions

**FOSTER DEC. EX. 20 pg. 191**

this issue, leaving the Court with genuine issues of material fact in dispute that prevent a grant of summary judgment.

Lastly, the Court finds there can be no breach of the 1995 and 1996 Series A Shareholder Agreements by Donna Taylor, as one cannot breach an illegal agreement. Defendants have asserted the illegality of those Agreements throughout this proceeding and Idaho's Supreme Court held the Agreements illegal in *Taylor v. AIA*, 151 Idaho 552, 261 P.3d 829 (2011). Therefore, Donna Taylor cannot be held to have breached an illegal agreement by entering into a subordination agreement with Reed Taylor. In addition, the Court finds no breach of the 1995 'letters' agreement based on the subordination agreement between Donna Taylor and Reed Taylor. The only beneficiary to the priority of payment was Donna Taylor and, as the only beneficiary, it was her right to waive and to do so without legal obligation to first obtain the consent of AIA.

## (G) COSTS AND ATTORNEY FEES

Both parties seeks costs and attorney fees based on I.C. § 12-121 and I.R.C.P. 54(e)(1). The Court denies an award of costs and attorney fees to either party, as the Court finds there is no prevailing party and that none of the motions were brought, pursued, or defended frivolously, unreasonably, or without foundation.

### ORDER

Plaintiff's Motion for Partial Summary Judgment is hereby GRANTED in part and DENIED in part.

Defendants' Motion to Strike is hereby DENIED.

Defendants' Motion for Summary Judgment is hereby GRANTED only as to Plaintiff's claim for unjust enrichment. Defendants' Motion is DENIED as to all other issues.

16

*Taylor v. Taylor*
Opinion & Order on Motions

Defendants' Motion to Dismiss is hereby GRANTED as to Plaintiff's claims for fraud, constructive fraud, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty.


Dated this ___//___ day of July 2014.


JEFF M. BRUDIE, District Judge


17

**FOSTER DEC. EX. 20 pg. 193**

CERTIFICATE OF MAILING

I hereby certify that a true copy of the foregoing OPINION & ORDER was:

_____ hand delivered via court basket, or faxed

___✓___ mailed, postage prepaid, by the undersigned at Lewiston, Idaho, this _14th_ day of July, 2014, to:


Roderick Bond
Roderick C. Bond Law Office, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004


David R. Risley
Risley Law Office, PLLC
PO Box 1247
Lewiston, ID 83501

*Messenger Service*


Douglas J. Siddoway
Randall Danskin PS
601 West Riverside Ave, Suite 1500
Spokane, WA 99201


PATTY O. WEEKS, CLERK

By: _____
          Deputy


Taylor v. Taylor
Opinion & Order on Motions                    18

FOSTER DEC. EX. 20 pg. 194

# BOND DECLARATION EXHIBIT 4

RODERICK C. BOND, ISB No. 8082
RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA 98004
Tel: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiffs

FILED

2014 JUL 21 AM 10 23

PATTY O. WEEKS
CLERK OF THE DIST. COURT

KATHY ROGERS
DEPUTY

IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE STATE OF
IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

| | |
|---|---|
| PAUL D. DURANT, an individual; DALE L. MIESEN, an individual; DONNA J. TAYLOR, an individual;<br><br>Plaintiffs,<br><br>v.<br><br>GEMCAP LENDING I, LLC, a Delaware limited liability company; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC., an Idaho corporation and a 100% wholly owned subsidiary of AIA Services Corporation;<br><br>Defendants. | Case No.:  **CV 14-01444**<br><br>VERIFIED COMPLAINT FOR DECLARATORY RELIEF AND INJUNCTIVE RELIEF<br><br>Category: A<br>Fee: $221.00 |

Plaintiffs Paul D. Durant, Dale L. Miesen, and Donna J. Taylor (collectively or in the alternative individually "Plaintiffs") submit this Complaint, pursuant to **I.C. § 10-1200**, *et seq*. and other applicable law, alleging as follows and, to the extent necessary, in the alternative as follows:

## I.  PARTIES, JURISDICTION AND VENUE

1.  Plaintiff Paul D. Durant ("Durant") is a resident of Lewiston, Nez Perce County, Idaho.

2.  Plaintiff Dale L. Miesen ("Miesen") is a resident of Colleyville, Texas.

VERIFIED COMPLAINT - 1



3. Plaintiff Donna J. Taylor ("Donna Taylor") is a resident of Clarkston, Washington.

4. Defendant Gemcap Lending I, LLC ("Gemcap") is a Delaware limited liability company and it conducts business throughout the United States, including in Nez Perce County, Idaho with CropUSA Insurance Agency, Inc. and CropUSA Insurance Services, LLC, an Idaho corporation and Idaho limited liability company, respectively, both of which have principal places of business in Lewiston, Nez Perce County, Idaho.

5. Defendant AIA Services Corporation ("AIA Services") is an Idaho corporation with its principal place of business located in Lewiston, Nez Perce County, Idaho.

6. Defendant AIA Insurance ("AIA Insurance") is an Idaho corporation with its principal place of business located in Lewiston, Nez Perce County, Idaho. During all relevant times, AIA Insurance is a 100% wholly owned subsidiary of AIA Services.

7. Defendants AIA Services and AIA Insurance own real property in Lewiston, Idaho. The ownership of AIA Services and AIA Insurance's real property is at issue by and through their purported grant of security interests in all of their assets to Gemcap and/or by and through Gemcap's attempt to collect over the over $8.7 million, plus accrued interest, owed by CropUSA Insurance Agency, Inc. and CropUSA Insurance Services, LLC from AIA Services and AIA Insurance through their purported Guarantee of that indebtedness.

8. Jurisdiction and venue are appropriate in Nez Perce County District Court. *See e.g.,* **I.C. § 5-401; I.C. § 5-404; I.C. § 5-514**.

## II. FACTUAL BACKGROUND

9. Plaintiff Durant owns 7,360.50 common shares in AIA Services and he has held these shares for over 10 years.

10. Plaintiff Miesen owns at least 45,000 common shares in AIA Services and he has

VERIFIED COMPLAINT - 2

**FOSTER DEC. EX. 20 pg. 197**

held these shares for over 10 years.

11.     Plaintiff Donna Taylor owns 41,651.25 Series A Preferred Shares in defendant AIA Services (as confirmed by Judge Brudie in a recent partial summary judgment decision), with a principal value of $416,512, plus accrued interest since December 3, 2003. Donna Taylor has held these 41,651.25 Series A Preferred Shares since the shares were issued to her in or about late 1987.

12.     On or about November 23, 2011, Gemcap entered into a Loan and Security Agreement with CropUSA Insurance Agency, Inc. and CropUSA Insurance Services, LLC (collectively "CropUSA"), neither of which were a wholly owned subsidiaries of AIA Services or AIA Insurance from 2011 through the present time, which such Loan and Security Agreement was subsequently amended on April 1, 2012, July 18, 2012, and February 4, 2013 (the original loan and all subsequent amendments are collectively referred to as the "Loan").

13.     On October 1, 2012, Gemcap entered into a "Security Agreement – Guarantee" with AIA Services and AIA Insurance ("Guarantee"). A true and correct copy of the Guarantee is attached as ***Exhibit A*** and incorporated by reference in this complaint. When Gemcap entered into the Guaranty, it was aware that the Guarantee did not and could not provide any benefit to AIA Services or AIA Insurance. AIA Services and AIA Insurance received no consideration for entry into the Guaranty and most of the Loan's indebtedness was already owed as of October 1, 2012.

14.     The Guarantee was signed by R. John Taylor, as the purported President of AIA Services and the purported President of AIA Insurance. Gemcap was aware, or should have been aware with the exercise of reasonable diligence, that R. John Taylor has no authority to execute the Guarantee on behalf of AIA Services or AIA Insurance.

15.     On December 20, 2012, Gemcap filed a UCC financing statement with the Idaho Secretary of State stating that AIA Services and AIA Insurance had pledged "All of each of

VERIFIED COMPLAINT - 3

**FOSTER DEC. EX. 20 pg. 198**

Debtor's right, title and interest, whether now existing or hereafter acquired, in and to all assets of such Debtor, wherever located, whether tangible or intangible, and the proceeds and products thereof" ("Financing Statement").

16.     Under the terms of the Loan, CropUSA could borrow up to $10,000,000 and the borrowed funds must be used solely for CropUSA. Upon information and belief, CropUSA owed Gemcap $8,676,288.39, plus interest, attorneys' fees and costs, as of July 26, 2013.

17.     Under the terms of the Loan, interest accrued at 18.5% per annum and 24% upon a default. Upon information and belief, Gemcap provided CropUSA and other parties a notice of default through a notice dated July 16, 2013. Upon information and belief, Gemcap provided a purported notice of default and demand for payment to AIA Services and AIA Insurance of the $8,676,288.39 owed by CropUSA through a notice dated July 29, 2013.

18.     Upon information and belief, the Loan has a present balance due of over $10,300,000, plus attorneys' fees and costs and Gemcap filed suit in California federal court with no prospects that CropUSA will ever be able to pay the entire indebtedness.

19.     Upon information and belief, prior to entering into the Loan with CropUSA, Gemcap conducted a litigation report on R. John Taylor and others. Gemcap and its counsel knew, or with reasonable diligence should have known, that the rightful owners of at least part of CropUSA Insurance Agency Inc.'s assets were in dispute, as confirmed by the derivative action filed against CropUSA Insurance Agency Inc. in 2010 and now pending in the United States District Court in Idaho (a lawsuit in which R. John Taylor is also a named defendant).

20.     From December 29, 1987 through the present time, AIA Services' amended articles of incorporation provided that AIA Services was barred from guaranteeing any loans for any entity that was not a wholly owned subsidiary of AIA Services.

VERIFIED COMPLAINT - 4

**FOSTER DEC. EX. 20 pg. 199**

21.     Under Idaho law, "All corporate powers shall be exercised by or under the authority of…its board of directors, subject to any limitation set forth in the articles of incorporation." **I.C. § 30-1-801(2)**. Under Idaho law, "The articles of incorporation may set forth…Provisions not inconsistent with the law regarding…Managing the business and regulating the affairs of the corporation, Defining, *limiting and regulating the powers of the corporation, its board of directors, and shareholders*…" **I.C. § 30-1-202(2)(b)(ii)-(iii)** (emphasis added). Under Idaho law, "Every corporation incorporated under this chapter has the purpose of engaging in any lawful business *unless a more limited purpose is set forth in the articles of incorporation*." **I.C. § 30-1-301(1)** (emphasis added). Under Idaho law, "*Unless its articles of incorporation provide otherwise*, every corporation…has the same powers as an individual to do all things necessary…to make contracts and guarantees…" **I.C. § 30-1-302(7)** (emphasis added).

22.     When Gemcap entered into the Guarantee with AIA Services and AIA Insurance, it knew, or should have known, that AIA Services' amended articles of incorporation filed on May 8, 1996, which are attached as ***Exhibit B*** and incorporated by reference into this complaint, provided that neither AIA Services nor its wholly owned subsidiary AIA Insurance could Guarantee the Loan for CropUSA (neither CropUSA Insurance Agency, Inc. nor CropUSA Insurance Services, LLC was a wholly owned subsidiary at the time of the Guarantee):

> [AIA Services] will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume, guaranty or otherwise become or remain directly liable with respect to, any Indebtedness.

(Exhibit B, p. 4, § 4.2.9(c).) The Guarantee separately violated the "Transactions with Shareholders and Affiliates" covenant of AIA Services' amended articles of incorporation because the Guarantee because no reasonable director or officer would have authorized the entry into the Guarantee. AIA Services and AIA Insurance's Guarantee violates and is barred by AIA Services'

VERIFIED COMPLAINT - 5

FOSTER DEC. EX. 20 pg. 200

amended articles of incorporation and thus violated Idaho law, including **I.C. § 30-1-801(2)**; **I.C. § 30-1-202(2)(b)(ii)-(iii)**; **I.C. § 30-1-302(7)**. "An illegal contract is one that rests on illegal consideration consisting of any act or forbearance which is contrary to law or public policy." *Farrell v. Whiteman*, 146 Idaho 604, 609, 200 P.3d 1153, 1158 (2008). As a result, the Guarantee is illegal as a matter of law, as is any document, instrument or agreement executed in furtherance of that illegal Guarantee.

23. From the time that R. John Taylor executed the Guarantee on October 1, 2012 through the present time, he, Connie Taylor Henderson and James Beck were the purported directors of AIA Services and AIA Insurance (collectively "Boards of Directors"). The Boards of Directors knew that AIA Services and AIA Insurance were barred from entering into the Guarantee and pledging any security or property to Gemcap to secure CropUSA's obligations under the Loan. The Boards of Directors had no authority to authorize R. John Taylor to enter into the Guarantee on behalf of AIA Services or AIA Insurance. Despite demands upon the Boards of Directors to take action against Gemcap to invalidate the Guarantee, they have refused to do so, which further supports the Boards of Directors untenable positions.

24. Gemcap was aware, or should have been aware upon the exercise of reasonable due diligence, that AIA Services and AIA Insurance could not lawfully enter into the Guarantee. Gemcap did not accept the Guarantee in good faith and it is not entitled to assert any defenses which may normally be available to a good faith lender.

25. Plaintiffs did not consent to AIA Services and AIA Insurance entering into the Guarantee or the pledge of assets and granting of security interests to Gemcap under the Guarantee nor did they consent to the Loan. The Guarantee was not entered into for normal business purposes.

26. No authorization was sought or obtained from AIA Services common or preferred

VERIFIED COMPLAINT - 6

**FOSTER DEC. EX. 20 pg. 201**

shareholders for the Guarantee. Upon information and belief, no authorization was sought or obtained from AIA Insurance's sole shareholder, AIA Services, nor could such authorization have been obtained because AIA Services was barred from doing so.

27.     Under the law, the "directors of a corporation may bind a corporation only when they act at a legal meeting of the board" and a "meeting held without notice to some or any of the directors and in their absence is illegal, and action taken at such a meeting, although by a majority of the directors, is invalid." *Stone v. American Lacquer Solvents Co.*, 345 A.2d 174, 176-77 (Pa. 1975); *Marine Services Unlimited, Inc. v. Rakes*, 918 S.W.2d 132, 134 (Ark. 1996); **14B AM. JUR. 2D CORPORATIONS § 1258; 18B AM. JUR. 2D CORPORATIONS § 1264**.

28.     Under AIA Services' amended articles of incorporation, plaintiff Donna Taylor had the sole right to designate one person to the board of directors of AIA Services. Gemcap knew, or should have known, that plaintiff Donna Taylor's designee was required to be a member of the board of directors of AIA Services and that her right was not being honored as reflected by the annual reports filed with the Idaho Secretary of State and the various lawsuits pending in federal and state court in Idaho. Neither Plaintiff Donna Taylor, nor her recent designee to AIA Services' board of directors, plaintiff Durant, has received any notices of any board meetings to authorize the Guarantee or the Loan, any document or instrument pertaining to the Guarantee or the Loan, or any of the security interests or property pledged under the Guarantee.

29.     Upon information and belief, Gemcap, AIA Services and AIA Insurance knew, or should have known with the exercise of reasonable due diligence, that no resolution was obtained from the Boards of Directors of AIA Services or AIA Insurance to authorize the Guarantee nor could such authorization be obtained, including, without limitation, because the Guarantee did not and could not be reasonably be believed to benefit AIA Services and AIA Insurance.

VERIFIED COMPLAINT - 7

**FOSTER DEC. EX. 20 pg. 202**

30.     Even if authorized by the law and organizational documents, the Guarantee could not be approved by the Boards of Directors because they all had irreconcilable conflicts of interest by way of their ownership in CropUSA and other entities unlawfully derived from AIA Services and AIA Insurance and by having participated or acquiesced in unlawful acts and malfeasance.

31.     Gemcap, AIA Services and AIA Insurance knew, or should have known with the exercise of reasonable due diligence, that the Guarantee separately violated AIA Services' Restated Bylaws, including, Section 4.14, Director Conflicts of Interest, Section 6.2, Loans, and Section 14.1, Certain Corporate Loans and Guarantees.

32.     Gemcap, AIA Services and AIA Insurance knew, or should have known with the exercise of reasonable due diligence, that the Guarantee separately violated AIA Insurance's Bylaws, including Section 4.14, Director Conflicts of Interest, Section 6.2, Loans, and Section 14.1, Certain Corporate Loans and Guarantees.

33.     Despite numerous demands by the Plaintiffs and their counsel over ninety days ago, Gemcap has refused to release AIA Services and AIA Insurance from the Guarantee and AIA Services and AIA Insurance have failed to take any action to comply with their amended articles of incorporation and to have the Guarantee declared illegal, void and unenforceable.

34.     If AIA Services and/or AIA Insurance is obligated under the Guarantee, AIA Services and/or AIA Insurance will be irreparably harmed because neither corporation has the funds or assets to satisfy the over $8.7 million, plus accrued interest, owed to Gemcap. If AIA Services and/or AIA Insurance is obligated under the Guarantee, AIA Services and/or AIA Insurance would both likely be forced into bankruptcy protection. The payment of any sums, or the transfer of any real or personal property, by AIA Services or AIA Insurance under the Guarantee would cause them irreparable harm because their respective businesses generate little

VERIFIED COMPLAINT - 8

**FOSTER DEC. EX. 20 pg. 203**

revenues and such revenues continue to decline. The enforcement of the Guarantee will separately irreparably impact the value of the Plaintiffs' common and preferred shares in AIA Services and their rights to share equally or preferentially in the assets of AIA Services and its subsidiary.

### III. FIRST CAUSE OF ACTION – DECLARATORY JUDGMENT AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

35.     Plaintiffs re-allege and incorporate each and every allegation contained in other paragraphs of this Complaint necessary to support this cause of action.

36.     The Guarantee, together with any related agreements and instruments pertaining to AIA Services and AIA Insurance, violates AIA Services and AIA Insurance's amended articles of incorporation, bylaws and/or the law, and are thus unlawful, illegal, void and/or unenforceable.

37.     Plaintiffs request a declaratory judgment that: (i) the Guarantee (Exhibit A), together with any subsequent modifications, instruments, deeds of trust, and agreements relating thereto, are unlawful, illegal, void and unenforceable; (ii) the Financing Statement, together with any amendments or subsequent financing statements, filed with the Idaho Secretary of State and any other state are unlawful, illegal, void and unenforceable; (iii) any security interests, deeds of trust, mortgages and any other instrument or right granted by AIA Services and AIA Insurance in favor of Gemcap are unlawful, illegal, void and unenforceable; (iv) any real property, property or funds paid to Gemcap, directly or indirectly, through funds or assets derived from AIA Services and AIA Insurance must be returned to AIA Services and AIA Insurance by and through depositing those funds, deeds and/or instruments with this Court; (v) any forbearance agreements and/or settlement agreements pertaining to Gemcap and AIA Services and/or AIA Insurance are unlawful, illegal, void and unenforceable; (vi) Gemcap is barred from seeking, through a court of law or any other means, recovery and/or payment of any money, assets, property and/or real property directly or indirectly from AIA Services and AIA Insurance on the Guarantee and any related agreements

VERIFIED COMPLAINT - 9

**FOSTER DEC. EX. 20 pg. 204**

or instruments; (vii) AIA Services and AIA Insurance must expressly comply with all terms, conditions and restrictions under their respective amended articles of incorporation, bylaws and Idaho Code (including the Idaho Business Corporation Act); and (viii) such other declaratory relief reasonably contemplated by this complaint and/or as Plaintiffs may request at or before trial.

38.     Plaintiffs further request a temporary restraining order, preliminary injunction, and permanent injunction against Gemcap, AIA Services and/or AIA Insurance for any one or more of the declaratory relief items listed above or any part of them, for any such relief reasonably contemplated by this complaint and/or any such relief as may be requested at or before trial.

## IV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.     For a declaratory judgment against Gemcap, AIA Services and AIA Insurance for the declaratory relief requested above and any further declaratory relief requested at or before trial;

2.     For a temporary restraining order, preliminary injunction and permanent injunction consistent with the relief requested above and any further temporary restraining order, preliminary injunction and/or permanent injunction as may be requested before or at trial;

3.     For an award of attorneys' fees and costs incurred in this action pursuant to Idaho Law, including, without limitation, I.C. § 12-120(3) and I.C. § 12-121; and

4.     For such other relief that the Plaintiffs may request at or before trial and/or such relief as the Court deems just and equitable.

DATED this 21st day of July, 2014.

RODERICK BOND LAW OFFICE, PLLC

By: _____
Roderick C. Bond
Attorney for Plaintiffs

VERIFIED COMPLAINT - 10

## VERIFICATION

STATE OF IDAHO      )
                      ) ss.

COUNTY OF NEZ PERCE    )

I, Paul D. Durant, being first duly sworn on oath, deposes and says:

I am one of the Plaintiffs in the above-entitled action. I have read the contents of this Complaint, know the contents of this Complaint and exhibits attached thereto, and believe that the facts in set forth in this Complaint and exhibits attached thereto are true and accurate to the best of my knowledge and belief.

Paul D. Durant

SUBSCRIBED AND SWORN to before me this 21st day of July, 2014.

Notary Public for Idaho
Residing at: _Culdesac, Idaho_
My commission expires: _7/11/19_

VERIFIED COMPLAINT - 11

**FOSTER DEC. EX. 20 pg. 206**

## VERIFICATION

STATE OF TEXAS        )
                           ) ss.
COUNTY OF TARRANT    )

I, Dale L. Miesen, being first duly sworn on oath, deposes and says:

I am one of the Plaintiffs in the above-entitled action. I have read the contents of this Complaint, know the contents of this Complaint and exhibits attached thereto, and believe that the facts in set forth in this Complaint and exhibits attached thereto are true and accurate to the best of my knowledge and belief.

_____
Dale L. Miesen

SUBSCRIBED AND SWORN to before me this 21st day of July, 2014.

Teri C. Hyman
Commission Expires
09-08-15

_____
Notary Public for Texas
Residing at: Hurst, Texas
My commission expires: 9-8-15

VERIFIED COMPLAINT - 12

## VERIFICATION

STATE OF IDAHO        )
                           ) ss.
COUNTY OF NEZ PERCE    )

I, Donna J. Taylor, being first duly sworn on oath, deposes and says:

I am one of the Plaintiffs in the above-entitled action. I have read the contents of this Complaint, know the contents of this Complaint and exhibits attached thereto, and believe that the facts in set forth in this Complaint and exhibits attached thereto are true and accurate to the best of my knowledge and belief.

_Donna J. Taylor_
Donna J. Taylor

SUBSCRIBED AND SWORN to before me this 21ˢᵗ day of July, 2014.

Notary Public for Idaho
Residing at: _Culdesac, Idaho_
My commission expires: _7/11/19_

VERIFIED COMPLAINT - 13

# SECURITY AGREEMENT - GUARANTEE

**THIS SECURITY AGREEMENT - GUARANTEE** (this "**Security Agreement**"), made and entered into as of the 1st day of October, 2012 by each of **AIA SERVICES CORPORATION**, an Idaho corporation having a principal place of business at 111 Main St. Lewiston, Idaho 83501 and **AIA INSURANCE, INC.**, an Idaho corporation having a principal place of business at 111 Main St. Lewiston, Idaho 83501 (each, individually, and collectively, "**Debtor**"), on a joint and several basis, and **GEMCAP LENDING I, LLC**, a Delaware limited liability company (the "**Secured Party**"), having its principal place of business at 24955 Pacific Coast Highway, Suite A202, Malibu, CA 90265.

## WITNESSETH:

**WHEREAS,** the Secured Party has entered into a certain Loan and Security Agreement, dated November 23, 2011 (as amended through the date hereof, the "**Loan Agreement**"), with CROP USA INSURANCE AGENCY, INC. and CROPUSA INSURANCE SERVICES, LLC, jointly and severally (together, "**Borrowers**"), pursuant to which the Secured Party has made a loan and extend other financial accommodations to or for the benefit of Borrowers under and subject to the terms of the Loan Agreement;

**WHEREAS,** an Event of Default has occurred under the Loan Agreement, as set forth in Amendment No. 3 and Forbearance, dated October 1, 2012 ("**Amendment No. 3**") to the Loan Agreement, and as an inducement to the Secured Party to enter into Amendment No. 3 and forbear from exercising Secured Party's rights and remedies with respect to such Event of Default and as a condition thereto, the Debtor has agreed to execute an Amended and Restated Secured Continuing Guarantee, of even date herewith (the "**Secured Guarantee**"), for the benefit of Secured Party, pursuant to which Debtor, jointly and severally, guarantees the obligations of Borrowers to Secured Party;

**WHEREAS,** pursuant to the Secured Guarantee, the Debtor has agreed to enter into this Security Agreement to grant the Secured Party the security interests contemplated in this Security Agreement as security for the prompt and full payment and performance of the indebtedness and obligations of the Debtor under the Secured Guarantee, and such other indebtedness and obligations as more fully set forth herein; and

**WHEREAS,** the Secured Party is not willing to enter into Amendment No. 3 unless and until the Debtor enters into this Security Agreement upon the terms and conditions hereinafter set forth;

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants contained herein, and intending to be legally bound hereby, the Debtor and the Secured Party hereby covenant and agree as follows:

{00159562.DOC; 3}

- 1 -

# ARTICLE I

## DEFINITIONS

**Section 1.01  Definitions.**  Unless otherwise defined herein, terms defined in the Loan Agreement are used herein as therein defined, and the following terms shall have the following meanings (such meanings being equally applicable to both the singular and plural forms of the terms defined):

"**Accounts**" shall mean any "account," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all accounts receivable, book debts and other forms of payment obligations (other than forms of obligations evidenced by Chattel Paper, Documents or Instruments) now owned or hereafter received or acquired by or belonging or owing to the Debtor (whether held in the name of the Debtor or any division thereof or in any applicable trade name or trade style) whether arising out of property that has been or is to be sold, leased, licensed, assigned or otherwise disposed of, or out of services rendered or to be rendered by the Debtor or from any other transaction, whether or not the same involves the sale of goods or services by the Debtor (including, without limitation, any such obligation that might be characterized as an account or contract right under the UCC), and all of the Debtor's rights in, to and under all purchase orders or receipts now owned or hereafter acquired by it for goods or services sold or rendered by the Debtor (or by any Person from whom the Debtor acquired such rights), and all of the Debtor's rights to any goods represented by any of the foregoing (including, without limitation, unpaid seller's rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods) and choses in action and causes of action (whether arising in contract, tort or otherwise and whether or not currently in litigation) and all other debts, obligations and liabilities in whatever form owing to the Debtor, documents of title, warehouse receipts, leases, investment accounts, deposit accounts, Cash, contract rights, insurance policies, dividends, distributions, judgments, covenants, licenses, franchises, warranties, indemnities, partnership and joint venture interests, and other rights, including all rights to the payment of monies due or to become due to the Debtor, under all contracts for the sale, lease, license or assignment of goods or the performance of services or both by the Debtor (whether or not yet earned by performance on the part of the Debtor or in connection with any other transaction), now in existence or hereafter occurring, including, without limitation, the right to receive the proceeds of said purchase orders and contracts, and all collateral security and guarantees of any kind given by any Person with respect to any of the foregoing.

"**Cash**" shall mean cash or cash equivalents now owned or hereafter acquired by the Debtor.

"**Chattel Paper**" shall mean any "chattel paper," "Tangible Chattel Paper" and "Electronic Chattel Paper," as such terms are defined in the UCC, now owned or hereafter acquired by the Debtor, or in which the Debtor now has or hereafter acquires any rights.

Exhibit A
FOSTER DEC. EX. 20 pg. 210
Exh. 7, Page 118

"**Commercial Tort Claims**" shall mean any "commercial tort claim," as such term is defined in the UCC, now owned or hereafter acquired by Debtor, or in which the Debtor now has or hereafter acquires any rights.

"**Contracts**" shall mean all contracts, undertakings, or other agreements (other than rights evidenced by Chattel Paper, Documents or Instruments) in or under which the Debtor may now or hereafter have any right, title or interest, including, without limitation, with respect to an Account and any agreement relating to the terms of payment or the terms of performance of such Account.

"**Copyrights**" shall mean all of the following now or hereafter acquired by the Debtor: (i) all copyrights, registrations and applications therefor; (ii) all renewals and extensions thereof; (iii) all income, royalties, damages and payments now and hereafter due or payable or both with respect thereto, including, without limitation, damages and payments for past or future infringements or misappropriations thereof; (iv) all rights to sue for past, present and future infringements or misappropriations thereof; and (v) all other rights corresponding thereto throughout the world.

"**Deposit Accounts**" shall mean any "deposit account," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor, or in which the Debtor now has or hereafter acquires any rights.

"**Documents**" shall mean any "documents," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor or in which the Debtor now has or hereafter acquires any rights.

"**Equipment**" shall mean any "equipment," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all machinery, equipment, furnishings, fixtures, vehicles and computers and other electronic data processing and other office equipment now owned or hereafter acquired by the Debtor and any and all additions, substitutions and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

"**Fixtures**" shall mean any "fixtures," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor.

"**General Intangibles**" shall mean any "general intangibles," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all right, title and interest that the Debtor may now or hereafter have in or under any Contract, in or to any partnerships, joint ventures and similar entities and rights to distribution of income therefrom, all tax refunds, tax refund claims, customer lists, Payment Intangibles, Copyrights, Trademarks, Trademark licenses, Patents, Patent licenses, rights in intellectual property, permits, Trade Secrets, proprietary or confidential information, inventions (whether patented or patentable or not) and technical information, procedures, designs, knowledge, know-how, software, computer programs, computer records and discs, computer

{00159562.DOC; 3}

- 3.-

**Exhibit A**

FOSTER DEC. EX. 20 Pg. 211

data, databases, data, skill, expertise, experience, processes, models, drawings, materials and records, now owned or hereafter acquired by the Debtor, and the goodwill and rights of indemnification related thereto and associated therewith.

"**Goods**" shall mean any "goods," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor, wherever located.

"**Instruments**" shall mean any "instrument," as such term is defined the UCC, now owned or hereafter acquired by the Debtor, or in which the Debtor now has or hereafter acquires any rights, including promissory notes, but not including instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"**Inventory**" shall mean any "inventory," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all inventory, merchandise, goods and other personal property now owned or hereafter acquired by the Debtor that are held for sale or lease, or are furnished or are to be furnished under a contract of service, or that constitute raw materials, work in process or materials used or consumed or to be used or consumed in the Debtor's business, or the processing, packaging, delivery or shipping of the same, and all finished goods.

"**Investment Property**" shall mean any "investment property," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all securities, securities accounts and security entitlements.

"**Letter of Credit Rights**" shall mean any "letter of credit right," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor, or in which the Debtor now has or hereafter acquires any rights.

"**Lien**" means any mortgage, deed of trust, pledge, lien, security interest, charge or other encumbrance or security arrangement of any nature, including, but not limited to, any conditional sale or title retention arrangement, and any assignment, deposit arrangement or lease intended as, or having the effect of, security.

"**Patents**" shall mean all of the following now or hereafter owned by the Debtor, if any: (i) all patents and patent applications; (ii) all inventions and improvements described and claimed therein; (iii) all reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof; (iv) all income, royalties, damages and payments now and hereafter due and/or payable to the Debtor with respect thereto, including, without limitation, damages and payments for past or future infringements or misappropriations thereof; (v) all rights to sue for past, present and future infringements or misappropriations thereof; and (vi) all other rights corresponding thereto throughout the world.

"**Payment Intangible**" means any "payment intangible," as such term is defined in the UCC, now owned or hereafter acquired by the Debtor, or in which the Debtor now has or hereafter acquires any rights.

- 4 -

**Exhibit A**
FOSTER DEC. EX. 20, pg. 212

Exh. 7, Page 120

**"Permitted Liens"** shall mean: (i) Liens in favor of the Secured Party; (ii) Liens arising from taxes, assessments, charges, levies or claims that are not yet due or that remain payable without penalty or to the extent permitted to remain unpaid under the Security Agreement; (iii) deposits or pledges to secure workmen's compensation, unemployment insurance, old age benefits or other social security obligations, or in connection with or to secure the performance of bids, tenders, trade contracts or leases, or to secure statutory obligations, or stay, surety or appeal bonds, or other pledges or deposits of like nature and all in the ordinary course of business; (iv) mechanics', carriers', workmen's, repairmen's or similar liens arising in the ordinary course of business in respect of obligations which are not overdue, or deposits made to obtain the release of such mechanics', carriers', workmen's, repairmen's or similar liens which are being contested in good faith by appropriate proceedings and with respect to which the Debtor has created reserves which are determined to be adequate by the application of GAAP consistently applied, and (v) liens in favor of third parties in effect on the date hereof.

**"Person"** shall mean any individual, corporation, joint venture, general or limited partnership, limited liability company, trust, association, unincorporated organization or other business entity.

**"Proceeds"** shall mean "proceeds," as such term is defined in the UCC and, in any event, shall include, without limitation, (i) any and all proceeds of any insurance, indemnity or warranty payable to the Debtor from time to time with respect to any of the Collateral; (ii) any and all payments (in any form whatsoever) made or due and payable to the Debtor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental body, authority, bureau or agency (or any person acting under color of governmental authority); (iii) any claim of the Debtor against third parties (A) for past, present or future infringement of any Patent or Patent license, or (B) for past, present or future infringement or dilution of any Trademark or Trademark license or for injury to the goodwill associated with any Trademark, Trademark registration or Trademark licensed under any Trademark license; and (iv) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

**"Promissory Notes"** shall mean any "promissory notes," as such term is defined in the UCC.

**"Secured Obligations"** shall mean all indebtedness and obligations of the Debtor to the Secured Party under the Secured Guarantee and hereunder, now existing or hereafter incurred, and the payment of amounts that would become due from the Debtor to the Secured Party but for the operation of the automatic stay provisions of Section 362 of the Bankruptcy Code, 11 U.S.C. § 362.

**"Securities"** shall mean any "securities," as such term is defined in the UCC (whether certificated or uncertificated).

**"Software"** shall mean any "software," as such term is defined in the UCC.

**Exhibit A**
**FOSTER DEC. EX. 20 pg. 213**

**Exh. 7, Page 121**

"**Supporting Obligation**" means any "supporting obligation," as such term is defined in the UCC.

"**Trademarks**" shall mean all of the following, now owned or hereafter acquired by the Debtor: (i) all trademarks (including service marks and trade names, whether registered or at common law), registrations and applications therefor, and the entire product lines and goodwill of the Debtor's business connected therewith and symbolized thereby; (ii) all renewals thereof, (iii) all income, royalties, damages and payments now and hereafter due or payable or both with respect thereto, including, without limitation, damages and payments for past or future infringements or misappropriations thereof; (iv) all rights to sue for past, present and future infringements or misappropriations thereof; and (v) all other rights corresponding thereto throughout the world.

"**Trade Secrets**" shall mean all of the following, now owned or hereafter acquired by the Debtor: (i) trade secrets; (ii) income, royalties, damages and payments now and hereafter due and/or payable to the Debtor with respect to trade secrets, including, without limitation, damages and payments for past or future infringements or misappropriations thereof; (iii) rights to sue for past, present and future infringements or misappropriations of trade secrets; and (iv) all other rights corresponding to trade secrets throughout the world.

"**State**" shall mean the State of California.

"**UCC**" shall mean the Uniform Commercial Code presently enacted in the State, *provided, however*, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of the Secured Party's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

## ARTICLE II

### SECURITY INTEREST

**Section 2.01  Grant of Security Interest.**

(a)  As security for the prompt and full payment and performance of the Secured Obligations, the Debtor hereby assigns and pledges, and hereby creates and grants, to the Secured Party a continuing lien on and security interest in and to all property and assets now owned or hereafter arising or acquired by the Debtor, wheresoever located, and all right, title and interest of the Debtor therein (collectively, the "**Collateral**"), including, without limitation, the following:

Exhibit A
FOSTER DEC. EX. 20 pg. 214

Exh. 7, Page 122

(i)    All Accounts, Chattel Paper (including Tangible Chattel Paper and Electronic Chattel Paper), Documents, Instruments, Promissory Notes, Commercial Tort Claims and Contracts;

(ii)    All Inventory;

(iii)    All Equipment and all Fixtures;

(iv)    All General Intangibles (including Payment Intangibles), Software, Trademarks, Patents, Copyrights and Trade Secrets;

(v)    All Cash, Deposit Accounts, Letter of Credit Rights, Supporting Obligations, Securities and Investment Property;

(vi)    All other Goods and personal property of the Debtor, whether tangible or intangible, now owned or hereafter acquired by the Debtor, wheresoever located; and

(vii)    All Proceeds and products relating to each of the foregoing.

(b)    The Collateral includes all of the items described above in paragraph (a), whether now owned or hereafter at any time arising or acquired by the Debtor and wherever located, and includes all replacements, additions, accessions, substitutions, repairs, guaranties and securities therefor, Proceeds and products relating thereto or therefrom, and all documents, records (including, but not limited to, manual records, computer runs, print-outs, tapes, disks, software, programs, source codes and other computer prepared information and equipment of any kind), ledger sheets and files of the Debtor relating thereto. Proceeds hereunder include any insurance now or hereafter payable by reason of loss or damage to any item of Collateral or any proceeds thereof, and all unearned refund premiums and dividends which may become payable under such policies of insurance and loss payments under such policies, which shall reduce the unearned premiums.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

**Section 3.01  Debtor's Representations.**  The Debtor represents and warrants to the Secured Party as follows:

(a)    The Debtor is (or to the extent that this Security Agreement states that the Collateral is to be acquired after the date hereof, will be) the sole owner of its Collateral, and the liens and security interests granted hereby to the Secured Party in the Collateral which can be perfected by the filing of UCC financing statements will be perfected liens and security interests upon the filing of such financing statements;

{00159562.DOC; 3}

- 7 -

(b)     Schedule 1 attached hereto (the **"Disclosure Schedule"**) contains a complete list of, among other items, (i) the current and former corporate and fictitious names utilized by Debtor, (ii) the chief executive offices of the Debtor, (iii) the office where Debtor keeps its records concerning the Collateral, (iv) each place of business of the Debtor, (v) as to Inventory, a complete list of each location where Inventory is located, and (vi) as to Equipment, a complete list of each location where Equipment is located. All information contained in the Disclosure Schedule is true, complete and correct and the Debtor hereby acknowledges and agrees that the Secured Party and its legal counsel may fully rely upon the information contained therein as representations and warranties of the Debtor, the falsity of which may constitute a Default (as hereinafter defined);

(c)     Except as otherwise disclosed to the Secured Party, the Debtor has exclusive possession and control of all its Inventory and Equipment, and the Debtor has not and will not allow any of its contractors, processors or suppliers to have possession or control of any Inventory and Equipment;

(d)     No consent, authorization, approval or other action by, and no notice to or filing with, any governmental authority is required for (i) the grant by the Debtor of the Liens granted hereby or for the execution, delivery or performance of this Security Agreement by the Debtor; (ii) the perfection or maintenance of the Liens created hereby which may be perfected by the filing of financing statements; or (iii) the exercise by the Secured Party of any of its rights and remedies hereunder, except for the filing of financing statements necessary to perfect or continue the perfection of the security interests granted by this Security Agreement;

(e)     This Security Agreement creates a valid security interest in the Collateral, and the filing of the financing statements in the jurisdictions listed in the Disclosure Schedule perfects those security interests in such Collateral which can be perfected by the filing of financing statements; and

(f)     Neither the execution and delivery of this Security Agreement by the Debtor, the consummation of the transactions herein contemplated or the fulfillment of the terms hereof will (i) result in a breach of any of the terms or provisions of, or constitute a default under, or constitute an event which, with notice or lapse of time or both, will result in a breach of, or constitute a default under, the organizational documents of Debtor, any agreement, indenture, mortgage, deed of trust, equipment lease, instrument or other document to which the Debtor is a party; or (ii) conflict with any law, except to the extent that any such breach, default, event or conflict would not have a material adverse effect on the business, operations or financial condition of the Debtor.

(g)     Debtor is organized and incorporated under the laws of the State of Idaho.

(h)     The execution, delivery and performance of this Security Agreement and the Secured Guarantee have been duly authorized by Debtor, each of which are and shall be binding on and enforceable against Debtor in accordance with their terms, and do not and shall not contravene any other instrument or agreement binding on Debtor.

## ARTICLE IV

## COVENANTS OF THE DEBTOR

**Section 4.01   Debtor's Covenants.** The Debtor covenants and agrees to perform each of the covenants set forth below in this Article IV:

(a)      The Debtor will defend the Collateral against all claims and demands of all Persons at any time claiming the same or any interest therein;

(b)      The Debtor will not change the location of its chief executive offices or the offices where it keeps records concerning Accounts from the locations set forth in the Disclosure Schedule, except with thirty (30) days' prior written notice to the Secured Party, nor will the Debtor move, or permit to be moved, the Collateral or any portion thereof to any location other than those set forth in the Disclosure Schedule;

(c)      The Debtor will not voluntarily or involuntarily change its name, identity or corporate structure without the prior written consent of the Secured Party;

(d)      The Debtor will, promptly upon request by the Secured Party, procure or execute and deliver any document (including, without limitation, mortgagee or landlord waivers with respect to any and all Inventory which is a part of the Collateral), give any notices, execute and file any financing statements, mortgages or other documents, all in form and substance satisfactory to the Secured Party, mark any Chattel Paper, deliver any Chattel Paper or Instruments to the Secured Party and take any other actions which are necessary or, in the reasonable judgment of the Secured Party, desirable to perfect or continue the perfection and priority of the Secured Party's liens on and security interests in the Collateral, to protect the Collateral against the rights, claims or interests of any Person other than the Secured Party or to effect the purposes of this Security Agreement, and will pay all reasonable costs and expenses incurred in connection therewith;

(e)      The Debtor will not, without the prior written consent of the Secured Party, in any way hypothecate or create or permit to exist any Lien on or other interest in the Collateral except Permitted Liens and those created by this Security Agreement;

(f)      The Debtor will pay and discharge all taxes, assessments and governmental charges or levies against the Collateral prior to delinquency thereof, except taxes, assessments and charges subject to good faith dispute for which the Debtor has created adequate reserves on its books, and will keep the Collateral free of all unpaid charges whatsoever where the failure to make any of such payments could result in a material adverse effect on the business, operations or financial condition of the Debtor;

(g)      The Debtor will at all times be in compliance with all laws pertaining to the use or ownership of the Collateral; at the Debtor's own expense, the Debtor will keep the Collateral in good condition and maintain same in accordance with industry specifications and requirements;

{00159562.DOC; 3}

- 9 -

(h)     The Debtor will cause the Collateral to be kept insured at its own expense under one or more policies with such companies, in such amounts and against such risks and liabilities as is ordinarily maintained by companies engaged in the same or similar businesses and similarly situated and as are satisfactory to the Secured Party in its sole discretion. Such policies shall include loss payable endorsements or such other mortgagee indemnity clauses in favor of the Secured Party as the Secured Party may direct and shall name the Secured Party as an additional insured. No such policy shall be subject to reduction or cancellation without thirty (30) days' prior written notice to the Secured Party and an original of such policy shall be delivered to the Secured Party.

(i)     The Debtor will, upon the Secured Party's request, deliver to the Secured Party records and schedules which show the status, condition and location of all its Inventory and Equipment. The Secured Party shall have the right to review and verify such records, schedules, notices and financial information, and the Debtor will reimburse the Secured Party for all costs incurred thereby;

(j)     The Debtor authorizes the Secured Party to file UCC financing statements, in form and substance satisfactory to the Secured Party, to assure the protection, perfection and enforcement of the Liens in the Collateral in favor of the Secured Party, and the Debtor will pay all filing fees and taxes related thereto. The Debtor hereby irrevocably appoints the Secured Party, its agents and employees, as attorney-in-fact for the Debtor to execute, deliver, file and record any such financing statements in the name of the Debtor at any time and, as applicable, under the rules of the UCC;

(k)     The Debtor will permit the Secured Party to enter into and upon any premises where any of the Collateral or records with respect thereto are located for the purpose of inspecting the same, making copies of records, observing the use of any part of the Collateral or otherwise protecting its security interest in the Collateral; and

(l)     The Secured Party shall have the right at any time to make any payments and do any other acts the Secured Party may deem reasonably necessary to protect its security interest in the Collateral, including, without limitation, the right to pay, purchase, contest or compromise any Lien which is prior to or superior to the liens and security interests granted hereunder, except Permitted Liens, and appear in and defend any action or proceeding purporting to affect its security interest in the Collateral, and in exercising any such powers or authority, the right to pay all reasonable costs and expenses incurred in connection therewith, including reasonable attorneys' fees. The Debtor will reimburse the Secured Party for all such payments made and expenses incurred, which amounts shall be secured under this Security Agreement, and agree that the Debtor shall be bound by any payment made or act taken by the Secured Party hereunder. The Secured Party shall have no obligation to make any of the foregoing payments or perform any of the foregoing acts.

Exhibit A
FOSTER DECL. EX. 20 Pg. 218

Exh. 7, Page 126

## ARTICLE V

## AUTHORITY OF SECURED PARTY

**Section 5.01  Attorney-In-Fact.**    The Debtor hereby irrevocably constitutes and appoints the Secured Party, and any agent thereof, with full power of substitution, as its true and lawful attorney-in-fact, with full irrevocable power and authority in the name of the Debtor or in its own name to take any and all action and to execute any and all documents and instruments which the Secured Party, at any time and from time to time, deems necessary or desirable to accomplish the purposes of this Security Agreement and, without limiting the generality of the foregoing, the Debtor hereby gives the Secured Party the power and right on behalf of the Debtor and in its own name to do any of the following, at any time and from time to time, without notice to or the consent of the Debtor:

(a)    to demand, sue for, collect, or receive in the name of the Debtor or in its own name, any money or property at any time payable or receivable on account of or in exchange for any of the Collateral and, in connection therewith, endorse checks, notes, drafts, acceptances, money orders, documents of title or any other instruments for the payment of money under the Collateral or any policy of insurance;

(b)    to pay or discharge taxes, Liens, security interests, or other encumbrances levied or placed on or threatened against the Collateral;

(c)    to send requests for verification to account debtors and other obligors;

(d)    (i) to direct the account debtors and any other parties liable for any payment under any of the Collateral to make payment of any and all monies due and to become due thereunder directly to the Secured Party or as the Secured Party shall direct; (ii) to receive payment of and receipt for any and all monies, claims and other amounts due and to become due at any time in respect of or arising out of any Collateral; (iii) to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against the Debtor, assignments, proxies, stock powers, verifications and notices in connection with an account and other documents relating to the Collateral; (iv) to commence and prosecute any suit, action or proceeding at law or in equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral; (v) to defend any suit, action or proceeding brought against the Debtor with respect to any Collateral; (vi) to settle, compromise or adjust any suit, action or proceeding described above and, in connection therewith, to give such discharges or releases as the Secured Party may deem appropriate; (vii) to exchange any of the Collateral for other property upon any merger, consolidation, reorganization, recapitalization or other readjustment of the issue thereof and, in connection therewith, deposit any of the Collateral with any committee, depositary, transfer agent, registrar or other designated agency upon such terms as the Secured Party may determine; (viii) to add or release any guarantor, endorser, surety or other party to any of the Collateral; (ix) to renew, extend or otherwise change the terms and conditions of any of the Collateral; (x) to insure and to make, settle, compromise or adjust claims

{00159562.DOC; 3}

- 11 -

Exhibit A
FOSTER DECL. EX. 20 Pg. 219

under any insurance policy covering any of the Collateral; and (xi) to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Secured Party were the absolute owner thereof for all purposes, and to do, at the Secured Party's option and the Debtor's' expense, at any time or from time to time, all acts and things which the Secured Party deems necessary to protect, preserve or realize upon the Collateral and the Secured Party's security interest therein.

This power of attorney is a power coupled with an interest and shall be irrevocable. The Secured Party shall be under no duty to exercise or withhold the exercise of any of the rights, power, privileges and options expressly or implicitly granted to the Secured Party in this Security Agreement, and shall not be liable for any failure to do so or any delay in doing so. The Secured Party shall not be liable for any act or omission or error of judgment or any notice of act or law in its individual capacity, or in its capacity as attorney-in-fact, except acts or omissions resulting from its willful misconduct or gross negligence. This power of attorney is conferred on the Secured Party to protect, preserve and realize upon its lien and security interest in the Collateral. The Secured Party shall not be responsible for any decline in the value of the Collateral and shall not be required to take any steps to preserve rights against prior parties or to protect, preserve or maintain any security interest given to secure the Collateral.

## ARTICLE VI

## [INTENTIONALLY OMITTED]

## ARTICLE VII

## DEFAULTS AND REMEDIES

**Section 7.01  Defaults.**  The occurrence of any one or more of the following events or conditions shall constitute a default under this Security Agreement (a "**Default**"):

(a)  The occurrence of an Event of Default under the Secured Guarantee or the Loan Agreement.

(b)  The Debtor fails to make any payment or perform any obligation or covenant required to be performed by Debtor in accordance with the terms and conditions of this Security Agreement.

(c)  The Debtor makes or has made or furnishes or has furnished any warranty, representation or statement to the Secured Party in connection with this Security Agreement, or any other agreement to which the Debtor and the Secured Party are parties, which is or was false or misleading in any material respect when made or furnished.

Exhibit A
FOSTER DECL. EXT. 20 Pg. 220                    Exh. 7, Page 128

Case 2:13-cv-05504-SJO-MAN   Document 9-22   Filed 08/14/15   Page 106 of 132   Page ID
#:1326
Case 2:13-cv-05504-SJO-MAN   Document 9-22   Filed 10/31/13   Page 33 of 88   Page ID
#:1326

**Section 7.02   Remedies.** Upon the occurrence of a Default, the Secured Party may, at its option, without notice to or demand upon the Debtor, do any one or more of the following:

(a)   Declare all of the Secured Obligations immediately due and payable.

(b)   Exercise any or all of the rights and remedies provided for by the UCC of the state or states having jurisdiction with respect to all or any portion of the Collateral from time to time, specifically including, without limitation, the right to recover reasonable attorneys' fees and other expenses incurred by the Secured Party in the enforcement of this Security Agreement or in connection with the Debtor's redemption of the Collateral.

(c)   Require the Debtor to assemble the Collateral or any part thereof and make it available at one or more places as the Secured Party may designate, and to deliver possession of the Collateral or any part thereof to the Secured Party, who shall have full right to enter upon any or all of the Debtor's premises and property to exercise the Secured Party's rights hereunder.

(d)   Use, manage, operate and control the Collateral and the Debtor's business and property to preserve the Collateral or its value, including, without limitation, the right to take possession of all of the Debtor's premises and property, to exclude the Debtor and any third parties, whether or not claiming under the Debtor, from such premises and property, to make repairs, replacements, alterations, additions and improvements to the Collateral and to dispose of all or any portion of the Collateral in the ordinary course of the Debtor's business.

(e)   Use, in connection with any assembly, use or disposition of the Collateral, any Trademark, Trade Secret, trade name, trade style, copyright, Patent or technical knowledge or process used or utilized by the Debtor.

(f)   Enforce one or more remedies hereunder, successively or concurrently, and such action shall not operate to estop or prevent the Secured Party from pursuing any other or further remedy which it may have, and any repossession or retaking or sale of the Collateral pursuant to the terms hereof shall not operate to release the Debtor until full and final payment of any deficiency has been made in cash. The Debtor shall reimburse the Secured Party upon demand for, or the Secured Party may apply any proceeds of the Collateral to, the costs and expenses (including reasonable attorneys' fees, transfer taxes and any other charges) incurred by the Secured Party in connection with any sale, disposition or retention of any Collateral hereunder.

(g)   In connection with any public or private sale under the applicable UCC, the Secured Party shall give the Debtor at least ten (10) days' prior written notice of the time and place of any public sale of the Collateral or of the time after which any private sale or other intended disposition thereof is to be made, which shall be deemed to be reasonable notice of such sale or other disposition. Such notice may be mailed to the Debtor at the address set forth in this Security Agreement for delivery of notices.

**Exhibit A**
FOSTER DEC. EX. 20 pg. 221                    Exh. 7, Page 129

(h)   Proceed by an action or actions at law or in equity to recover the Secured Obligations or to foreclose under this Security Agreement and sell the Collateral, or any portion thereof, pursuant to a judgment or decree of a court or courts of competent jurisdiction.

(i)   In the event the Secured Party recovers possession of all or any part of the Collateral pursuant to a writ of possession or other judicial process, whether prejudgment or otherwise, the Secured Party may thereafter retain, sell or otherwise dispose of such collateral in accordance with this Security Agreement or the applicable UCC, and following such retention, sale or other disposition, the Secured Party may voluntarily dismiss without prejudice the judicial action in which such writ of possession or other judicial process was issued. The Debtor hereby consents to the voluntary dismissal by the Secured Party of such judicial action, and the Debtor further consents to the exoneration of any bond which the Secured Party filed in such action.

## ARTICLE VIII

## MISCELLANEOUS PROVISIONS

**Section 8.01   Notices.**  Any notice or consent required or permitted by this Security Agreement shall be in writing and shall be delivered in the manner and to the addresses specified in the first paragraph hereof.  All notices shall be deemed effective upon receipt.

**Section 8.02   Headings.**  The various headings in this Security Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Security Agreement or any provision hereof.

**Section 8.03   Amendments.**  This Security Agreement or any provision hereof may be changed, waived or terminated only by a statement in writing signed by the party against which such change, waiver or termination is sought to be enforced.

**Section 8.04   No Waiver.**  No delay in enforcing or failure to enforce any right under this Security Agreement shall constitute a waiver by the Secured Party of such right.  No waiver by the Secured Party of any default hereunder shall be effective unless in writing, nor shall any waiver operate as a waiver of any other default or of the same default on a future occasion.

**Section 8.05   TIME OF THE ESSENCE. TIME IS OF THE ESSENCE IN EACH PROVISION OF THIS SECURITY AGREEMENT OF WHICH TIME IS AN ELEMENT.**

**Section 8.06   Binding Agreement.**  All rights of the Secured Party hereunder shall inure to the benefit of its successors and assigns.  The Debtor shall not assign any of its interest under this Security Agreement without the prior written consent of the Secured Party.  Any purported

{00159562.DOC; 3}                                  - 14 -

assignment inconsistent with this provision shall, at the option of the Secured Party, be null and void.

Section 8.07  **Entire Security Agreement.**  This Security Agreement and the Secured Guarantee are intended by the parties as a final expression of their agreement and are intended as a complete and exclusive statement of the terms and conditions thereof.  Acceptance of or acquiescence in a course of performance rendered under this Security Agreement shall not be relevant to determine the meaning of this Security Agreement even though the accepting or acquiescing party had knowledge of the nature of the performance and opportunity for objection.

Section 8.08  **Attorneys' Fees.**  In any action or proceeding brought to enforce any provision of this Security Agreement, or to seek damages for a breach of any provision hereof, or where any provision hereof is asserted as a defense, the Debtor shall pay the Secured Party's reasonable attorneys' fees in addition to any other remedy available under this Security Agreement.

Section 8.09  **Severability.**  If any provision of this Security Agreement should be found to be invalid or unenforceable, all of the other provisions shall nonetheless remain in full force and effect to the maximum extent permitted by law.

Section 8.10  **Survival of Provisions.**  All representations, warranties and covenants of the Debtor contained herein shall survive the execution and delivery of this Security Agreement, and terminate only upon full and final payment and performance of the Secured Obligations.

Section 8.11.  **Setoff.**  The Secured Party shall have the right, at any time after the occurrence of a Default, to set off any indebtedness or obligation of the Debtor to the Secured Party against any indebtedness or obligation of the Secured Party to the Debtor, without notice to or demand upon the Debtor and whether or not any such indebtedness or obligations are liquidated or mature at the time of such offset.  The Secured Party's right of offset hereunder shall be in addition to and not in limitation of any other rights or remedies which may exist in favor of the Secured Party.

Section 8.12  **Authority of the Secured Party.**  The Secured Party shall have and be entitled to exercise all powers hereunder which are specifically delegated to the Secured Party by the terms hereof, together with such powers as are reasonably incident thereto.  The Secured Party may perform any of its duties hereunder or in connection with the Collateral by or through agents or employees and shall be entitled to retain counsel to act in reliance upon the advice of counsel concerning all such matters.  Neither the Secured Party nor any director, officer, employee, attorney or agent of the Secured Party shall be liable to the Debtor for any action taken or omitted to be taken by it or them hereunder, except for its or their own gross negligence or willful misconduct; nor shall the Secured Party be responsible for the validity, effectiveness or sufficiency hereof or of any document or security furnished pursuant hereto.  The Secured Party shall be entitled to rely on any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper person or persons.  The Debtor agrees to indemnify and hold harmless the Secured Party and/or any such other person from and against any and all costs, expenses (including reasonable attorneys' fees), claims or liability

**Exhibit  A**
FOSTER DECL.  pg. 223
Exh. 7, Page 131

incurred by the Secured Party or such other persons hereunder unless such claim or liability shall be due to willful misconduct or gross negligence on the part of the Secured Party or such other person.

**Section 8.13 Termination of Security Agreement.** This Security Agreement shall continue in force so long as any portion of the Secured Obligations remains unpaid and until the Secured Guarantee is terminated. If the Secured Party receives any payment or payments on account of the Secured Obligations, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, as amended, or any other state or federal law, common law or equitable doctrine, then, to the extent of any sum not finally retained by the Secured Party, the Debtor's obligations to the Secured Party shall be reinstated and this Security Agreement, and any security therefor, shall remain in full force and effect (or be reinstated) until payment shall have been made to the Secured Party, notwithstanding termination of this Security Agreement or the cancellation of any note, instrument or agreement evidencing the Secured Obligations, and such payment shall be due on demand by the Secured Party. If any proceeding seeking such repayment is pending or, in the Secured Party's sole judgment, threatened, this Security Agreement and any security therefor shall remain in full force and effect, notwithstanding that the Debtor may not otherwise be obligated to the Secured Party.

**Section 8.14 Counterparts.** This Security Agreement may be executed by fax or other electronic signature and in one or more counterparts, each of which shall be deemed an original but all of which shall together constitute one and the same agreement.

**Section 8.15 Joint and Several Liability.** The obligations of Debtor (and each party named as a Debtor in this Security Agreement) shall be joint and several. Each reference to "Debtor" herein shall be deemed a reference to each of AIA Insurance, Inc. and AIA Services Corporation. Lender, in its sole and absolute discretion, may:

(a) bring suit against Debtor, or any one or more of the parties named as a Debtor in this Security Agreement, jointly and severally, or against any one or more of them;

(b) compromise or settle with Debtor, or any one or more of the parties named as a Debtor in this Security Agreement, for such consideration as Lender may deem proper;

(c) release one or more of the parties named as a Debtor in this Security Agreement from liability; and

(d) otherwise deal with Debtor or any one or more of the parties named as Debtor in this Security Agreement, in any manner, and no such action shall impair the rights of Lender in this Security Agreement to collect from Debtor, or any one or more of the parties named as a Debtor in this Security Agreement, any amount

**Exhibit A**
FOSTER DECL. EX. 20 Pg. 224

Exh. 7, Page 132

guaranteed by a Debtor, or any one or more of the parties named as a Debtor, in the Secured Guarantee.

**Section 8.16. APPLICABLE LAW; WAIVER OF JURY TRIAL; CONSENT TO, JURISDICTION**

(a) <u>APPLICABLE LAW.</u> THIS SECURITY AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, THE LAWS OF WHICH DEBTOR HEREBY EXPRESSLY ELECTS TO APPLY TO THIS SECURITY AGREEMENT, WITHOUT GIVING EFFECT TO PROVISIONS FOR CHOICE OF LAW THEREUNDER. DEBTOR AGREES THAT ANY ACTION OR PROCEEDING BROUGHT TO ENFORCE OR ARISING OUT OF THIS SECURITY AGREEMENT SHALL BE COMMENCED IN ACCORDANCE WITH THE PROVISIONS OF THIS SECURITY AGREEMENT.

(b) <u>WAIVER OF JURY TRIAL.</u> TO THE EXTENT PERMITTED BY APPLICABLE LAW, DEBTOR HEREBY WAIVES ANY AND ALL RIGHTS THAT IT MAY NOW OR HEREAFTER HAVE UNDER THE LAWS OF THE UNITED STATES OF AMERICA OR ANY STATE TO A TRIAL BY JURY OF ANY AND ALL ISSUES ARISING EITHER DIRECTLY OR INDIRECTLY IN ANY ACTION OR PROCEEDING BETWEEN DEBTOR, SECURED PARTY, OR THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, OUT OF OR IN ANY WAY CONNECTED WITH THIS SECURITY AGREEMENT, THE OTHER FACTORING DOCUMENTS, THE OBLIGATIONS AND/OR THE COLLATERAL. IT IS INTENDED THAT SAID WAIVER SHALL APPLY TO ANY AND ALL DEFENSES, RIGHTS, AND/OR COUNTERCLAIMS IN ANY ACTION OR PROCEEDINGS BETWEEN DEBTOR AND SECURED PARTY. DEBTOR WAIVES ALL RIGHTS TO INTERPOSE ANY CLAIMS, DEDUCTIONS, SETOFFS OR COUNTERCLAIMS OF ANY KIND, NATURE OR DESCRIPTION IN ANY ACTION OR PROCEEDING INSTITUTED BY SECURED PARTY WITH RESPECT TO THIS SECURITY AGREEMENT, THE OTHER FACTORING DOCUMENTS, THE OBLIGATIONS, THE COLLATERAL OR ANY MATTER ARISING THEREFROM OR RELATING THERETO, EXCEPT COMPULSORY COUNTERCLAIMS.

(c) <u>CONSENT TO JURISDICTION.</u> DEBTOR HEREBY (i) IRREVOCABLY SUBMITS AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF CALIFORNIA, LOS ANGELES COUNTY WITH RESPECT TO ANY ACTION OR PROCEEDING ARISING OUT OF THIS SECURITY AGREEMENT, THE OTHER FACTORING DOCUMENTS, THE OBLIGATIONS AND/OR THE COLLATERAL OR ANY MATTER ARISING THEREFROM OR RELATING THERETO, AND (ii) WAIVES ANY OBJECTION BASED ON VENUE OR <u>FORUM NON CONVENIENS</u> WITH RESPECT THERETO. IN ANY SUCH ACTION OR PROCEEDING, DEBTOR WAIVES PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT OR OTHER PROCESS AND PAPERS THEREIN AND AGREES THAT THE SERVICE THEREOF MAY BE MADE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO DEBTOR

{00159562.DOC; 3}                                    - 17 -

Case 2:13-cv-05504-SJO-MAN Document 24-3 Filed 08/18/15 Page 066 of 132 Page 78
Case 2:13-cv-05504-SJO-MAN Document 24-3 Filed 10/31/13 Page 38 of 88 Page ID
#:1331

AT ITS OFFICES SET FORTH HEREIN OR OTHER ADDRESS THEREOF OF WHICH SECURED PARTY HAS RECEIVED NOTICE AS PROVIDED IN THIS SECURITY AGREEMENT. NOTWITHSTANDING THE FOREGOING, DEBTOR CONSENTS TO THE COMMENCEMENT BY LENDER OF ANY SUIT, ACTION OR PROCEEDING IN ANY OTHER JURISDICTION TO ENFORCE ITS RIGHTS IN AND TO THE COLLATERAL AND DEBTOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR <u>FORUM NON CONVENIENS</u> OF ANY SUCH SUIT, ACTION OR PROCEEDING.

[SIGNATURE PAGE FOLLOWS]

Exhibit A
FOSTER DECL. EX. 20 pg. 226

Exh. 7, Page 134

Case 2:18-cv-00070-DMF Document 106 Filed 09/18/19 Page 967 of 939 Page ID
Case 2:13-cv-05504-SJO-MAN Document 106-24 Filed 10/31/13 Page 39 of 88 Page ID
#:1332

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement - Guarantee to be executed by their duly authorized officers as of the day and year first above written.

AIA SERVICES CORPORATION

By: _____
Name: R. John Taylor
Title: President


AIA INSURANCE INC.

By: _____
Name: R. John Taylor
Title: President


AGREED:

GEMCAP LENDING I, LLC

By: _____
Name: _____ _PHILLIP ELLIS_
Title: _____ _MANAGER_

FOSTER DECL. EX. 20 pg. 227

Exhibit A

Case 2:18-cv-00230-BMM   ECF No. 9-23   filed 09/18/19   PageID.868   Page 80 of
Case 2:13-cv-05504-SJO-MAN   Document 52   Filed 10/31/13   Page 40 of 88   Page ID
#:1333

## SCHEDULE 1 TO SECURITY AGREEMENT

Current Names Used By Debtor:

    AIA Services Corporation

    AIA Insurance, Inc.

Any Assumed or Fictitious Names Debtor Has Used in Past Five (5) Years or Any Other Corporate Name Used in Past Five (5) Years:

    No fictitious or other corporate names used in past five (5) years.

Location of Chief Executive Offices of Debtor:

    111 Main Street, Lewiston, ID  83501

Offices Where Debtor Keeps Records Concerning Inventory, Accounts, Contracts and Other Property:

    111 Main Street, Lewiston, ID  83501

Places of Business of Debtor:

    111 Main Street, Lewiston, ID  83501

Exhibit A
FOSTER DECL. EX. 20 pg. 228

Exh. 7, Page 136

# State of Idaho

## Office of the Secretary of State

I, BEN YSURSA, Secretary of State of the State of Idaho, hereby certify that I am the custodian of the corporation records of this State.

I FURTHER CERTIFY That the annexed is a full, true and complete duplicate of articles of incorporation of **AIA SERVICES CORPORATION**, an Idaho corporation, received and filed in this office on December 20, 1983, under file number C 74568 , including all amendments filed thereto, as appears of record in this office as of this date.

Dated: February 11, 2013



*Ben Ysursa*

SECRETARY OF STATE

By _Cynthia ___

## Exhibit - B

# State of Idaho

## Department of State

CERTIFICATE OF AMENDMENT

OF

AIA SERVICES CORPORATION

File Number C 74568

I, PETE T. CENARRUSA, Secretary of State of the State of Idaho, hereby certify that duplicate originals of Articles of Amendment to the Articles of Incorporation of AIA SERVICES CORPORATION duly executed pursuant to the provisions of the Idaho Business Corporation Act, have been received in this office and are found to conform to law.

ACCORDINGLY and by virtue of the authority vested in me by law, I issue this Certificate of Amendment to the Articles of Incorporation and attach hereto a duplicate original of the Articles of Amendment.

Dated: May 8, 1996

*Pete T. Cenarrusa*

SECRETARY OF STATE

By *Sally J. Clark*

## Exhibit - B

FOSTER DEC. EX. 20 pg. 230

Case 2:18-cv-00370-DMR-NC Document 2-21 filed 09/18/19 Page 1 of 1 Page ID #:838

ORIGINAL

MAY 8 10 59 AM '96

SECRETARY OF THE
STATE OF IDAHO

## ARTICLES OF AMENDMENT
### TO THE ARTICLES OF INCORPORATION
### OF
### AIA SERVICES CORPORATION

Pursuant to the provisions of §30-1-58, §30-1-59 and §30-1-61 of the Idaho Business Corporation Act, the undersigned corporation adopts the following Articles of Amendment to its Articles of Incorporation, as filed on December 20, 1983 and previously amended on October 14, 1986, December 29, 1987, April 11, 1995 and August 3, 1995.

**FIRST:** The name of the corporation is **AIA SERVICES CORPORATION**.

**SECOND:** On December 14, 1995, the shareholders of the corporation adopted and approved the following Amended and Restated Articles of Incorporation of AIA Services Corporation, pursuant to which Section 4.3.3 of Article Fourth was amended by replacing it in its entirety.

### "AMENDED AND RESTATED ARTICLES OF INCORPORATION
### OF
### AIA SERVICES CORPORATION

Except for the amendment of Section 4.3.3 of Article Fourth by replacing it in its entirety, these Amended and Restated Articles of Incorporation of AIA Services Corporation correctly set forth without change the corresponding provisions of the original Articles of Incorporation as hereinbefore filed on December 20, 1983 and amended on October 14, 1986, December 29, 1987, April 11, 1995 and August 3, 1995; and these Amended and Restated Articles of Incorporation, including the amended Article Fourth, supersede the original Articles of Amendment and all previous amendments thereto.

### FIRST

The name of the corporation is **AIA SERVICES CORPORATION**.

### SECOND

The period of its duration is perpetual.

IDAHO SECRETARY OF STATE
DATE 05/08/1996  0900    60950

2

CK #: 63564     CUST# 20168
                AMEND  PROF
1#    30.00=    30.00

ARTICLES OF AMENDMENT - Page 1

# Exhibit - B

**FOSTER DEC. EX. 20 pg. 231**

## THIRD

The purpose for which the corporation is organized is for the transaction of any or all lawful business for which the corporation may be incorporated under the Idaho Business Corporation Act.

## FOURTH

**4.1    Authorized Capital.**  The aggregate number of shares which this corporation shall have authority to issue is 11,700,000 shares, of which 700,000 shares shall be Preferred Stock and 11,000,000 shares shall be Common Stock ($0.01 par value).  The corporation is authorized to issue the Preferred Stock in two classes designated as "Series A", consisting of 200,000 shares of Stated Value Preferred Stock (without par value); and "Series C", consisting of 500,000 shares of 10% Preferred Stock ($1 par value).  The respective preferences, limitations and relative rights of each of the two classes of Preferred Stock and the Common Stock of the corporation are set forth in the following provisions of Article Fourth:

**4.2    Series A Preferred Stock.**

**4.2.1    General.**  Each share of Series A Preferred Stock shall have the rights and preferences conferred in this Section 4.2 of Article Fourth.  Holders of Series A Preferred Stock shall have no rights to share in any distribution of the profits or assets of the corporation, whether in the form of cash or stock or dividends or otherwise, except to the extent specifically provided herein.

**4.2.2    No Dividends.**  The Series A Preferred Stock shall not pay or accrue any dividends.

**4.2.3    Demand for Redemption.**  (a)  The holder of Series A Preferred Stock shall have the right to require the corporation to redeem such stock from any legally available funds upon breach of any covenant of the corporation set forth in this Article Fourth, but only to the extent such redemption shall not violate the Idaho Business Corporation Act restrictions on the corporation's redemption of its own shares.  This right may be exercised by giving the corporation written notice of demand for redemption specifying the default and a redemption date not less than ninety (90) days from the date such notice delivered to the corporation; provided however that, if the corporation cures such specified default within sixty (60) days after receipt of such notice by corporation, the right to redeem Series A Preferred Stock on account of such specified default shall be extinguished.

(b)    The holder of Series A Preferred Stock shall have the right to require the corporation to redeem such stock from any legally available funds at any time after September 14, 1993, but only to the extent such redemption shall not violate the Idaho Business Corporation Act restrictions on the corporation's redemption of its own shares.  This right may be exercised by giving the corporation written notice of demand for redemption specifying a redemption date after September 14, 1993 and not less than ninety (90) days or more than one hundred eighty (180) days from the date such notice is delivered to the corporation.

**4.2.4    Call for Redemption.**  The Series A Preferred Stock may be called for redemption by the corporation, in whole or in part, upon payment of the redemption price from legally available funds at any time prior to the demand for redemption by the holder of Series A

ARTICLES OF AMENDMENT - Page 2

## Exhibit - B

**FOSTER DEC. EX. 20 pg. 232**

Preferred Stock. Notice of such call for redemption, specifying the redemption date not less than thirty (30) days from the date such notice is mailed, shall be mailed to each record holder of Series A Preferred Stock. If fewer than all shares of Series A Preferred Stock are to be redeemed, the shares shall be redeemed prorata from the holders thereof.

### 4.2.5  Redemption Price

If Series A Preferred Stock is redeemed on or before September 14, 1990, the redemption price is $8.00 per share if paid in a lump sum. If Series A Preferred Stock is redeemed any time during the three-year period beginning September 15, 1990 and ending on September 14, 1993, the redemption price is $8.50 per share if paid in a lump sum. If not paid in a lump sum on or before September 14, 1993, the redemption price for Series A Preferred Stock is $10.00 per share, provided that the redemption price may be paid, at the corporation's sole option, in monthly installments on a fifteen (15) year amortization schedule beginning on the day after the redemption date and accruing interest at a rate of one-and one-half (1½) points under the First Interstate Bank of Idaho, N.A., prime lending rate, adjusted quarterly.

### 4.2.6  Redemption Procedure and Effect.

(a)  Lump Sum Payment.  If the redemption price is to be paid in a lump sum, the corporation shall deposit, or shall cause its nominee to deposit, on or before the redemption date specified in the notice of redemption, the aggregate redemption price of the shares of Series A Preferred Stock to be redeemed with a bank or trust company specified in the notice, payable on the redemption date in the amounts and to the respective orders of the holders of the shares of Series A Preferred Stock to be redeemed, on endorsement to the corporation or its nominee as may be required and upon surrender of the certificates for such shares. Unless the corporation or its nominee fails to pay the lump sum redemption price on or before the redemption date, the shares of Series A Preferred Stock subject to such redemption shall be deemed to have been redeemed, and shall be deemed no longer to be outstanding, from and after the redemption date set forth in the notice of redemption. On or after the redemption date, subject only to payment of the redemption price, Series A Preferred Stock so called for redemption shall cease to be entitled to any interest or right in the corporation; and holders of such Series A Preferred Stock shall thereafter cease to be shareholders and shall be entitled only to payment of the amount of the redemption price, without interest, upon surrender of the certificates evidencing such stock. If the lump sum redemption price shall be paid by a nominee of the corporation, such nominee shall upon such payment become the owner of the shares with respect to which such payment was made; and certificates of stock may be issued to such nominee in evidence of such ownership.

(b)  Installment Payment.  If the corporation elects to pay the redemption price in installments, the number of shares of Series A Preferred Stock equal to the principal portion of each installment divided by $10.00 per share shall be deemed to have been redeemed and to be no longer outstanding from and after the date of such installment. On and after such payment date, such number of shares of Series A Preferred Stock shall cease to be entitled to any interest or right in the corporation; and holders of such shares shall thereafter cease to be shareholders of the corporation with respect to such shares, whether or not the certificates evidencing such shares have been surrendered. Upon request of the corporation from time to time, certificates evidencing shares of Series A Preferred Stock including redeemed shares shall be surrendered to and reissued by the corporation in reduced amount to reflect any and all installment redemptions of shares prior to such request.

ARTICLES OF AMENDMENT - Page 3

# Exhibit - B

**FOSTER DEC. EX. 20 pg. 233**

**4.2.7 Liquidation Preference.** In case of the voluntary liquidation or dissolution of the corporation, the holder of Series A Preferred Stock shall have the right to be paid in full, before any amount shall be paid to the owners of the Common Stock or to the owners of the Series C Preferred Stock, as follows:

$8.00 per share if the liquidation price is paid on or before September 14, 1990.

$8.50 per share if the liquidation price is paid after September 14, 1990 and on or before September 14, 1993.

$10.00 per share if the liquidation price is paid after September 14, 1993.

In case of the involuntary liquidation or dissolution of the corporation, the holder of Series A Preferred Stock shall have the right to be paid $10.00 per share, in full, before any amount shall be paid to the owners of the Common Stock or to the owners of the Series C Preferred Stock. After payment to the holders of the Series A Preferred Stock of the full preferential amounts hereinabove provided, the holders of the Series A Preferred Stock as such shall have no right or claim to any of the remaining assets of the corporation either upon any distribution of such assets or upon dissolution, liquidation or winding up; and the remaining assets to be distributed, if any, upon a distribution of such assets or upon dissolution, liquidation or winding up, may be distributed among the holders of the Series C Preferred Stock and the Common Stock in accordance with the provisions of this Article Fourth.

**4.2.8 Limited Voting Rights.** The Series A Preferred Stock shall have no right (except as required by law or as provided by Section 4.2.12 of this Article Fourth) to receive notice of or to vote at any regular or special meeting of stockholders, except that the holders of a majority of the shares of Series A Preferred Stock shall have the right, voting separately as a class, to elect one director to the board of directors of the corporation.

**4.2.9 Covenants.** So long as any shares of Series A Preferred Stock are outstanding, and except with the consent of the holders of a majority of the outstanding shares of Series A Preferred Stock.

(a)     Common Stock. The corporation shall not issue any Common Stock for less than book value (determined as of the end of the immediately preceding fiscal year), except for Common Stock issued to pay a dividend payable solely in shares of Common Stock or issued to employees or agents pursuant to incentive stock option or bonus plan.

(b)     Preferred Stock. The corporation shall issue no Preferred Stock or securities convertible into such stock, other than the Series A and Series C Preferred Stock.

(c)     Indebtedness. The corporation will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume, guaranty or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

ARTICLES OF AMENDMENT - Page 4

# Exhibit - B

**FOSTER DEC. EX. 20 pg. 234**

(1)  The corporation may remain liable in respect of Indebtedness outstanding on the date of adoption of this Article Fourth by the corporation's shareholders.

(2)  The corporation and its Subsidiaries may become and remain liable with respect to Indebtedness that  is not secured by a Lien on any of the assets of the corporation or its Subsidiaries, provided that the aggregate principal amount of such unsecured Indebtedness shall not exceed Consolidated Net Worth less goodwill of the corporation at any time; and

(3)  The corporation and its Subsidiaries may become and remain liable in respect of Indebtedness secured by any of the following Liens:

(i)  Liens for taxes, assessments or governmental charges or claims the payment of which is not yet delinquent or is being contested in good faith, if such reserve or other provision, if any, as shall be required by generally accepted accounting principles, consistently applied, shall have been made therefor;

(ii)  Statutory Liens of landlords and lines of carriers, warehousemen, mechanics, materialmen and other liens imposed by law incurred in the ordinary courses of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by generally accepted accounting principles, consistently applied shall have been made therefor;

(iii)  Liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, governmental contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(iv)  Any attachment or judgment Lien; _provided_ that if the judgment it secures exceeds $250,000 (alone or when aggregated with all other judgments secured by Liens permitted by this clause (vi)), such judgment shall, within forty-five (45) days after the entry thereof, have been discharged or execution thereof stayed pending appeal, or shall have been discharged within forty-five (45) days after the expiration of any such stay;

(v)  Easements, rights-of-way, restrictions and other similar charges or encumbrances not interfering with the ordinary conduct of the business of the corporation or any of its Subsidiaries;

(vi)  Any interest or title of a lessor under any lease;

(vii)  Any Lien existing on any asset of any corporation at the time such corporation becomes a subsidiary if such Lien was not created in contemplation of such event;

ARTICLES OF AMENDMENT - Page 5

# Exhibit - B

**FOSTER DEC. EX. 20 pg. 235**

(viii)    Any Lien on any asset securing Indebtedness incurred or assume for the purpose of financing not more than Eighty-five percent (85%) of the cost of acquiring such assets; provided that such line attaches to such asset concurrently with or within ninety (90) days after the acquisition thereof;

(ix)    Any Lien on any asset of any corporation existing at the time such corporation is merged into or consolidated with the corporation or a subsidiary, if such Lien was not created in contemplation of such event;

(x)    Any Lien existing on any asset prior to the acquisition thereof by the corporation or a Subsidiary, if such Lien was not created in contemplation of such acquisition;

(xi)    Any Lien arising out of the refinancing, extension, renewal or refunding of any Indebtedness secured by any Lien permitted by any of the foregoing clauses of this Section 4.2.9(c); provided that the amount of such Indebtedness is not increased and that such Indebtedness is not secured by any additional assets; and

(xii)    Liens not otherwise permitted by the foregoing clauses of this Section 4.2.9(c) (including, without limitation, Liens on stock of Subsidiaries, whether consolidated or unconsolidated) securing Indebtedness in an aggregate principal amount of any time outstanding not to exceed ten percent (10%) of the difference between Consolidated Net Worth and the amount of the goodwill of the corporation.

(d)    Corporate Existence.  The corporation will maintain its corporate existence and will not liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or enter into any transaction of merger or consolidation with any Person (including any Subsidiary) unless (i) this corporation is the surviving corporation following any such merger or consolidation, and (ii) the Consolidated Net Worth of the surviving corporation immediately following such merger or consolidation equals or exceeds the Consolidated Net Worth of this corporation immediately prior to such merger or consolidation.

(e)    Sale of Assets.  The corporation will not, and will not permit any of its Subsidiaries to, convey, sell, lease, transfer or otherwise dispose of all or any material part of its business, property or assets, whether now owned or hereafter acquired, except:

(1)    The corporation and its Subsidiaries may convey, sell, lease, transfer or otherwise dispose of investment assets in the ordinary course of business;

(2)    The corporation and its Subsidiaries may sell or otherwise dispose of Capital Assets or real property if the asset so disposed of is concurrently replaced by a substantially equivalent asset having a value equal to or greater than the assets disposed of;

(3)    The corporation and is Subsidiaries may sell or otherwise dispose of obsolete or worn out property in the ordinary course of business;

ARTICLES OF AMENDMENT - Page 6

# Exhibit - B

**FOSTER DEC. EX. 20 pg. 236**

(4)     The corporation and its Subsidiaries may sell and lease back any newly acquired asset for the purpose of financing the acquisition of such asset and securing the repayment of Indebtedness, provided that such Indebtedness shall not exceed eighty-five percent (85%) of the cost of such asset and is otherwise permitted by the covenants contained in this Article Fourth; and

(5)     The corporation and its Subsidiaries may sell or otherwise dispose of any of their other assets; provided that any such sale or other disposition is made for the fair market value of such assets.

(f)     Acquisitions.   The corporation will not, and will not permit any of its Subsidiaries to, acquire by purchase or otherwise all or substantially all the business, property or fixed assets, or the stock or other evidence of beneficial ownership, of any Person unless, immediately prior to and after giving effect to such transaction, no violation of any of the covenants or other provisions contained in this Article Fourth shall have occurred and be continuing or would be caused by such acquisition.

(g)     Transactions with Shareholders and Affiliates.   The corporation will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease, loan or exchange of any property or the rendering of any service) with any director or officer or any holder of equity securities of the corporation, or with any Affiliate of the corporation or of such director, officer or holder, on terms that are less favorable to the corporation or that Subsidiary, as the case may be, than those which might be obtained at the time from Persons who are not such a director, officer, holder or Affiliate; provided that the foregoing restriction shall not apply to (i) any transaction in effect at the date of adoption of this Article Fourth by the corporation's shareholders; (ii) any transaction between the corporation and any of its wholly-owned Subsidiaries or between any of its wholly-owned Subsidiaries; (iii) compensation (net of amounts contributed or repaid to the corporation or any Subsidiary or to Lewiston Land Company and contributed or repaid to the corporation or any Subsidiary), by way of salary or bonus, paid to director or officers of the corporation in an amount, as to any one individual, not greater than the greater of $400,000 or the total compensation paid in calendar year 1986; (iv) compensation paid to any director or officer of the corporation in amounts equal to income tax liability of such director or officer attributable to transactions involving the corporation, A.I.A., Inc., AIA Travel Services, Inc., AIA Travel, Inc., Lewiston Land Company, AIA Bancard Services Corporation or Taylor Brothers Aircraft on or before January 1, 1988 or to other personal income tax liability of such director or officer for tax years ended before January 1, 1988; or (v) any loan to or account receivable from an officer, director or stockholder which is repaid in full at least annually on or before the last day of the fiscal year.

(h)     Consolidated Net Worth.   The corporation will not permit Consolidated Net Worth at any date to be less than the number of shares of Series A Preferred Stock outstanding at such date multiplied by $10.00 per share.

(i)     Dividend Restriction.   The corporation will not, directly or indirectly, declare, order, make or set apart any sum for payment of any dividend in respect of its Common Stock (other than a dividend payable solely in shares of Common Stock), except that the corporation may declare and pay Common Stock dividends in an aggregate amount not exceeding the Dividend Availability

ARTICLES OF AMENDMENT - Page 7

# Exhibit - B

**FOSTER DEC. EX. 20 pg. 237**

Amount.

      (j)    Debt/Equity Ratio. Neither the corporation nor any Subsidiary will incur any new Indebtedness (other than Indebtedness permitted by Section 4.2.9(c)(xi) of this Article Fourth) if, at the time of incurring such Indebtedness, the ratio of Consolidated Long Term Debt to Consolidated Net Worth exceeds, or such additional Indebtedness would cause such ratio to exceed, 3.6 to 1.0.

      (k)    Debt Service Coverage. Neither the corporation nor any Subsidiary will incur any new Indebtedness (other than Indebtedness permitted by Section 4.2.9(c)(xi) of this Article Fourth) if, at the time of incurring such Indebtedness, the ratio of (i) Consolidated Net Income plus depreciation and amortization expenses plus compensation contributed or repaid to the corporation, any Subsidiary, Lewiston Land Company or AIA Travel Services, Inc. during the immediately preceding fiscal year of the corporation, divided by (ii) current maturities of Long Term Debt is, or such additional Indebtedness would cause such ratio to be, less than .8 to 1.0.

      **4.2.10**  **Definitions.** For the purpose of Section 4.2.9 of this Article Fourth, the following terms shall have the following meanings:

      **"Affiliate"**, as applied to any Person, shall mean any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

      **"Capital Asset"** shall mean, as at any date of determination, those assets of a Person that would, in conformity with generally accepted accounting principles, consistently applied, be classified as plant, property or equipment on the balance sheet of that Person.

      **"Consolidated Long Term Debt"** shall mean, as at any date of determination, the total of all Long Term Debt of the corporation and its Subsidiaries on a consolidated basis determined in accordance with generally accepted (or, in the case of an insurance company for which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

      **"Consolidated Net Worth"** shall mean, as at any date of determination, the sum of (a) the capital stock and additional paid-in capital, (b) plus retained earnings (or minus accumulated deficit) of the corporation and its Subsidiaries on a consolidated basis, determined in conformity with generally accepted (or, in the case of an insurance company for which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

      **"Consolidated Net Income"** for any period, shall mean the net income (or loss) of the corporation and its Subsidiaries on a consolidated basis determined in conformity with generally accepted (or, in the case of an insurance company for which GAAP financial statements are not prepared, statutory) accounting principles consistently applied.

ARTICLES OF AMENDMENT - Page 8

# Exhibit - B

**FOSTER DEC. EX. 20 pg. 238**

**"Dividend Availability Amount"** shall mean, as at any date of determination, an amount equal to fifty percent (50%) of Consolidated Net Income for the period (taken as single accounting period) commencing January 31, 1987 and ending on the last day of the fiscal quarter immediately preceding such date of determination.

**"Indebtedness"** as applied to any person, means (a) all indebtedness for borrowed money, (b) that portion of obligations with respect to finance leases which is capitalized on a balance sheet in conformity with generally accepted accounting principles, consistently applied, (c) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money, (d) any obligation owed for all or any part of the deferred purchase price of property or services which purchase price is (i) due more than six (6) months from the date of incurrence of the obligation in respect thereof, or (ii) evidenced by a note or similar written instrument, and (e) all indebtedness secured by any Lien or vendor's interest under any conditional sale or other title retention agreement existing on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is non-recourse to the credit of that Person; provided, however, that "Indebtedness" shall not include policy claims, policy reserves or mandatory securities valuation reserves of a regulated insurance company; and further provided that "Indebtedness" shall not include indebtedness of the corporation to any Subsidiary.

**"Lien"** shall mean any lien, mortgage, pledge, security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give a security interest).

**"Long Term Debt"**, as applied to any Person, shall mean all Indebtedness of that Person which by its terms or by the terms of any instrument or agreement relating thereto matures more than one year, or is directly renewable or extendable at the option of the debtor to a date more than one year (including an option of the debtor under a revolving credit or similar agreement obligating the lenders to extend credit over a period of one year or more), from the date of creation thereof, but excluding any payments due under the terms thereof within twelve (12) months of any date of determination.

**"Person"** shall mean an individual, corporation, partnership, joint venture, trust, unincorporated organization or any other jurisdictional entity, or a foreign state or any agency or political subdivision thereof.

**"Subsidiary"** shall mean any corporation of which at least a majority of the outstanding stock having by the terms thereof ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether or not at the time stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by the corporation or one or more of its Subsidiaries or by the corporation and one or more of its Subsidiaries.

4.2.11 <u>Conversion Right.</u> The holders of the Series A Preferred Stock shall have the following conversion right ("Conversion Right"):

(a) <u>Right to Convert</u>. Each share of Series A Preferred Stock shall be convertible,

ARTICLES OF AMENDMENT - Page 9

# Exhibit - B

**FOSTER DEC. EX. 20 pg. 239**

at the option of the holder thereof, at any time prior to the date on which notice of redemption is given under Section 4.2.3 or Section 4.2.4, at the office of the corporation or any transfer agent for the Series A Preferred Stock or Common Stock, into one fully paid and nonassessable share of Common Stock.

        (b)   <u>Mechanics of Conversion</u>.  Before any holder of Series A Preferred Stock shall be entitled to convert such stock into shares of Common Stock, he shall surrender the certificate or certificates for such Preferred Stock, duly endorsed, at the office of the corporation or any transfer agent for the Common Stock, and shall give written notice to the corporation at such office that he elects to convert such Preferred Stock and shall state therein the number of shares of Series A Preferred Stock being converted.  Thereupon the corporation shall promptly issue and deliver at such office to such holder of a certificate or certificates for the number of shares of Common Stock to which he shall be entitled.

        Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the shares of Series A  Stock to be converted (the "Conversion Date"); and the person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date.

        (c)   <u>Fractional Shares</u>.  No fractional share of Common Stock shall be issued upon conversion of Series A Stock.  In lieu of any fractional shares to which the holder would otherwise be entitled, the corporation shall pay cash equal to the product of such fraction multiplied by the fair market value of one share of the corporation's Common Stock on the Conversion Date, such value to be determined in good faith by the Board of Directors.

        (d)   <u>Reservation of Stock Issuable Upon Conversion</u>.  The corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock, solely for the purpose of effecting the conversion of the shares of the Series A  Stock, such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding shares of the Series A Preferred Stock; and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Series A Preferred Stock, the corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose.

        (e)   <u>Termination of Redemption Right</u>.  Upon exercise of the Conversion Right under this Section 4.2.11, all rights of a holder of Series A  Stock to require redemption of such stock under Section 4.2.3 shall automatically be terminated; and no holder of Common Stock acquired upon conversion of Series A Preferred Stock shall have any right of redemption.

        4.2.12  <u>Modification of Rights and Preferences</u>.  The rights and preferences hereby conferred on the Series A Preferred Stock shall not be changed, altered or revoked without the consent of the holders of the majority of the Series A Preferred Stock outstanding at the time.

        4.3    <u>Series C Preferred Stock</u>.

ARTICLES OF AMENDMENT - Page 10

# Exhibit - B

**FOSTER DEC. EX. 20 pg. 240**

**4.3.1   General.**  Each share of Series C Preferred Stock shall have the relative rights, preferences and limitations set forth in this Section 4.3 of Article Fourth.

**4.3.2   Restricted Voting Rights.**  The holders of the Series C Preferred Stock shall have no right (except as required by law) to receive notice of or to vote on any matter (including, without limitation, the election of directors of the corporation) at any regular or special meeting of stockholders of the corporation, except that the holders of a majority of the shares of Series C Preferred Stock shall have the right, voting separately as a class, to elect one director to the Board of Directors of the corporation.

**4.3.3   Cumulative Dividend Preference**  The Series C Preferred Stock shall be entitled to receive, when and as declared by the corporation's Board of Directors, cash dividends at the per annum rate of 10% of the Liquidation Rate (as defined in Section 4.3.4), cumulative, payable quarterly at March 31, June 30, September 30 and December 31 of each calendar year out of any funds legally available for the payment of dividends, and in preference to any dividends upon the Common Stock.  The dividends on the Series C Preferred Stock shall be cumulative, whether or not declared, so that, if for any period such dividend shall not be paid, the right to such dividend shall accumulate as against the Common Stock; and all arrears so accumulated shall be paid before any dividends shall be declared or paid upon the Common Stock.  No dividends shall be declared or paid on the Series C Preferred Stock if the redemption payments due to the holders of the Series A Preferred Stock under Section 4.2. of this Article Fourth are in arrears.  No dividend shall be declared or paid upon the Common Stock nor shall any Common Stock be purchased or otherwise acquired by the corporation for value (other than payment of amounts due to Reed J. Taylor for redemption of his Common Stock), unless all dividends on the Series C Preferred Stock for all past period shall have been paid or shall have been declared and a sum sufficient for the payment thereof set apart for payment.

**4.3.4   Liquidation Preference.**  In the event of any liquidation, dissolution or winding-up of the corporation, whether voluntary or involuntary, before any other distribution or payment is made to the holders of Common Stock or any other series of Preferred Stock (except the corporation's Series A Preferred Stock), the holders of the Series C Preferred Stock shall be entitled to receive, out of the assets of the corporation legally available therefor, a liquidation payment in the amount of $10.00 cash per share of Series C Preferred Stock ("Liquidation Rate"), plus a further amount equal to the dividends accumulated and unpaid thereon to the date of such liquidation payment.  If, upon any liquidation, dissolution or winding up of the corporation, the assets available for distribution are insufficient to pay to the holders of all outstanding Series C Preferred Stock the full amount of the Liquidation Rate and all accumulated but unpaid dividends, the holders of the Series C Preferred Stock shall share pro rata in any such distribution of assets.  Such rights of the holders of the Series C Preferred Stock shall be subordinate only to the right of the holder of the Series A Preferred Stock to be paid the redemption price of such stock in full, together with accrued interest, in accordance with Section 4.2 of this Article Fourth.  After payment to the holders of the Series C Preferred Stock of the full preferential amounts hereinabove provided, the holders of the Series C Preferred Stock as such shall have no right or claim to any of the remaining assets of the corporation either upon any distribution of such assets or upon dissolution, liquidation or winding up; and the remaining assets to be distributed, if any, upon a distribution of such assets or upon dissolution, liquidation or winding up, may be distributed among the holders of the Common Stock.

ARTICLES OF AMENDMENT - Page 11

# Exhibit - B

**FOSTER DEC. EX. 20 pg. 241**

### 4.3.5 Redemption.

(a) **Mandatory Redemption by Corporation.** Subject to the conversion rights provided in Section 4.3.6 of Article Fourth, the Series C Preferred Stock shall be called for redemption by the corporation upon payment of the aggregate Redemption Rate from legally available funds upon the closing of the earliest of the following events ("Equity Offering"):

(i) an offering of the corporation's securities conducted pursuant to the registration requirements of the Securities Act of 1933 ("1933 Act") in which gross proceeds of at least $5,000,000 are raised;

(ii) an offering of the corporation's securities pursuant to exemptions from registration under the 1933 Act in which gross proceeds of at least $5,000,000 are raised; or

(iii) an offering of any securities convertible into corporation's Common Stock that are sold in an offering that conforms to the parameters of subparagraph (i) or (ii) above.

The redemption price for each share of Series C Preferred Stock ("Redemption Price") shall be the "Redemption Rate" equal to 100% of the Liquidation Rate if such redemption occurs within two (2) years from the issuance of the first shares of Series C Preferred Stock. After such two year period, an amount equal to 5% of the Liquidation Rate will be added to the Redemption Rate immediately and each 180 days thereafter until all outstanding shares of the Series C Preferred Stock are fully redeemed, viz:

| Time from Original Issuance | Percentage of Liquidation Rate |
|---|---|
| Within two years | 100% |
| After two years but before two years plus 181 days | 105% |
| After two years plus 180 days but before two years plus 361 days | 110% |
| After two years plus 360 days but before two years plus 541 days | 115% |
| . . . | . . . |

Notice of such call for redemption, specifying the anticipated date of closing of the Equity Offering, shall be mailed to each record holder of Series C Preferred Stock as soon as practicable before such closing date. The redemption date for mandatory redemption of the Series C Preferred Stock shall be the actual closing date of the Equity Offering. Mandatory redemption of the Series C Preferred

ARTICLES OF AMENDMENT - Page 12

## Exhibit - B

Stock under this Section 4.3.5 of Article Fourth shall automatically be cancelled upon determination by corporation's board of directors that the Equity Offering will not be consummated for any reason.

(b) <u>Voluntary Redemption by Corporation</u>. The Series C Preferred Stock may be called for redemption by the corporation, in whole or in part, upon payment of the Redemption Price from legally available funds at any time prior to the closing of an Equity Offering. Notice of such call for redemption, specifying the redemption date not less than thirty days from the date such notice is mailed and the number or percentage of outstanding shares of Series C Preferred Stock to be redeemed, shall be mailed to each record holder of Series C Preferred Stock. If fewer than all shares of Series C Preferred Stock are to be redeemed, the shares shall be redeemed prorata from the holders thereof; and, upon request of the corporation, certificates evidencing shares of Series C Preferred Stock including redeemed shares shall be surrendered to and reissued by the corporation in reduced amount to reflect any and all partial redemptions of such shares prior to such request.

(c) <u>Redemption Procedure and Effect</u>.
The corporation shall deposit, on or before the redemption date specified in the notice of redemption, the aggregate Redemption Price of the shares of Series C Preferred Stock to be redeemed with a bank or trust company specified in the notice, payable on the redemption date in the amounts and to the respective orders of the holders of the shares of Series C Preferred Stock to be redeemed, on endorsement to the corporation as may be required and upon surrender of the certificates for such shares. Unless the corporation fails to pay the Redemption Price on or before the redemption date, the shares of Series C Preferred Stock subject to such redemption shall be deemed to have been redeemed, and shall be deemed no longer to be outstanding, from and after the redemption date set forth in the notice of redemption. On or after the redemption date, subject only to payment of the redemption price, Series C Preferred Stock so called for redemption shall cease to be entitled to any interest or right in the corporation; and holders of such Series C Preferred Stock shall thereafter cease to be shareholders and shall be entitled only to payment of the amount of the redemption price, without interest, upon surrender of the certificates evidencing such stock.

4.3.6 <u>Conversion of Series C Preferred Stock</u>. Subject to the provisions of Section 4.3.7, each holder of Series C Preferred Stock shall have the right, exercisable beginning at the earlier of the date of receipt of notice of mandatory redemption of the Series C Preferred Stock pursuant to Section 4.3.5(a) or two years after the first issuance of Series C Preferred Stock and ending on the closing date of an Equity Offering, to convert Series C Preferred Stock into Common Stock at the Conversion Rate determined as follows: Each share of Series C Preferred Stock shall be convertible into that number of shares of Common Stock which equals .0000693% of the Common Stock on a fully diluted basis at the effective date of exercise, including by way of inclusion and without limiting the foregoing, any conversion or exercise rights contained in any Preferred Stock, options, warrants, or other rights to Common Stock, granted by the corporation in any form or manner, as if fully exercised at the effective date of exercise. Any holder of Series C Preferred Stock who exercises this conversion right prior to the closing date of an Equity Offering shall be protected against dilution in the event of any Common Stock issuance or other transaction which occurs prior to an Equity Offering and increases the number of outstanding shares of Common Stock on a fully diluted basis: For each share of Series C Preferred Stock converted prior to an Equity Offering, the Company shall issue to the holder thereof such number of additional

ARTICLES OF AMENDMENT - Page 13

# Exhibit - B

**FOSTER DEC. EX. 20 pg. 243**

shares of Common Stock as necessary to maintain, at all times prior to an Equity Offering, such holder's 0.0000693% interest in Company's outstanding Common Stock on a fully diluted basis.

Subject to the provisions of Section 4.3.7, this conversion right shall be exercisable by any holder of Series C Preferred Stock as to all or any number of the shares of Series C Preferred Stock owned of record by such holder and shall be exercised by giving the corporation written notice of the exercise of such right, specifying the number of shares of Series C Preferred Stock to be converted and the effective date of such conversion, provided that the effective date of the conversion shall not be later than the closing date of an Equity Offering.

4.3.7  **Regulatory Limitation on Conversion Right.**  Notwithstanding any other provision of Section 4.3.6, the right to convert the Series C Preferred Stock into Common Stock of the Company shall be subject to receipt of prior approval by all regulatory authorities with jurisdiction over the acquisition of such Common Stock.  Without limiting the generality of the foregoing limitation, the Holder shall not be permitted to convert Series C Preferred Stock into Common Stock if and to the extent that, after such exercise, the Holder would, directly or indirectly (or by exercise of any unrestricted right to convert into or to acquire Company's voting securities or otherwise) be in "control" of an insurer within the meaning of any applicable state insurance holding company act, unless and until such change of "control" has been approved by all applicable state insurance regulators under their respective insurance holding company acts.  If the time for exercise of any conversion rights shall expire or be scheduled to expire within two weeks of any final regulatory approval, then the applicable time periods to exercise any such conversion rights shall be extended for such a period of time equal to the period of time from delivery of notice of exercise of any rights until the corporation notifies such rights holders of all applicable regulatory approvals.

4.4  **Common Stock.**  Holders of the Common Stock are entitled to one vote per share on all matters to be voted on by stockholders, including the election of directors.  Common Stockholders are not entitled to vote their shares cumulatively in the election of directors.  Holders of Common Stock of the corporation shall be entitled to elect all of the directors of the corporation other than the director appointed by the holders of the Series A Preferred Stock and the director elected by the holders of Series C Preferred Stock.  The holders of any series of Preferred Stock of the corporation have a preference over the holders of Common Stock of the corporation on the assets of the corporation legally available for distribution to stockholders in the event of any liquidation, dissolution, or winding up of the affairs of the corporation.  In the event of any liquidation, dissolution or winding up of the affairs of the corporation, holders of the Common Stock will share ratably in any assets of the corporation legally available for distribution to holders of Common Stock after satisfying the liquidation preferences of the Series A and Series C Preferred Stock.  Holders of Series C Preferred Stock have a preference over the holders of Common Stock as to the payment of dividends.  Holders of Common Stock have rights, share for share, to receive dividends if and when declared by the Board of Directors out of funds legally available therefor, after paying preferred dividends to the holders of Series C Preferred Stock.

## FIFTH

Holders of any class or series of corporation's stock shall not have a preemptive right to acquire unissued or treasury shares of any class or series or securities convertible into such shares

ARTICLES OF AMENDMENT - Page 14

# Exhibit - B

**FOSTER DEC. EX. 20 pg. 244**

or carrying a right to subscribe to or acquire such shares, except as provided in the Idaho Business Corporation Act.

### SIXTH

The location of the initial registered office of the corporation is One Lewis Clark Plaza, Lewiston, Idaho 83501; and the name of its initial registered agent at such address is R. John Taylor.

### SEVENTH

The number of directors constituting the initial Board of Directors is four, and the names and addresses of the persons who are to serve until the first annual meeting of the shareholders and until their successors are elected and qualified are:

| Name | Address |
|------|---------|
| Reed J. Taylor | P.O. Box 538 Lewiston ID 83501 |
| R. John Taylor | P.O. Box 538 Lewiston ID 83501 |
| Raymond R. Heilman | P.O. Box 538 Lewiston ID 83501 |
| Mary K. Frost | P.O. Box 538 Lewiston ID 83501 |

### EIGHTH

The name and address of the incorporator is as follows:

Reed J. Taylor
P.O. Box 538
Lewiston ID 83501

### NINTH

The Board of Directors is expressly authorized to alter, amend or repeal the Bylaws of the corporation and to adopt new Bylaws, subject to repeal or change by a majority vote of the shareholders.

### TENTH

Shareholders entitled under Article Fourth to vote in the election of directors of the corporation shall not be entitled to vote their shares cumulatively in the election of directors of the corporation.

ARTICLES OF AMENDMENT - Page 15

# Exhibit - B

**FOSTER DEC. EX. 20 pg. 245**

## ELEVENTH

A director of this corporation shall not be personally liable to this corporation or its shareholders for monetary damages for breach of fiduciary duty as a director, except for liability (a) for any breach of the director's duty of loyalty to this corporation or its shareholders, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (c) under Idaho Code §30-1-48, or (d) for any transaction from which the director derived an improper personal benefit. If the Idaho Business Corporation Act is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of this corporation shall be eliminated or limited to the fullest extent permitted by the Idaho Business Corporation Act, as so amended. Any repeal or modification of this Article Eleventh by the shareholders of the corporation shall not adversely affect any right or protection of a director of the corporation existing at the time of such repeal or modification."

**THIRD:** The number of shares of the corporation outstanding at the time of such adoption was 1,079,520 shares of Common Stock, 170,562 shares of Series A Stated Value Preferred Stock, and 185,000 shares of Series C Preferred Stock; and the number of shares entitled to vote thereon was 1,079,520 shares of Common Stock and 185,000 shares of Series C Preferred Stock.

**FOURTH:** The designation and number of outstanding shares of each class entitled to vote thereon as a class were as follows:

| Class | Number of Shares |
|---|---|
| Common | 1,079,520 |
| Series C Preferred | 185,000 |

**FIFTH:** The following table sets forth the number of shares of Common Stock and the number of shares of Series C Preferred Stock voted for and against such amendment:

| | Number of Shares | |
|---|---|---|
| Class | For | Against |
| Common | 865,093.5 | 48,153.5 |
| Series C Preferred | 165,000 | -0- |

DATED this 1st day of May, 1996.

AIA SERVICES CORPORATION

By _Daniel L. Spickler_

Daniel L. Spickler, Secretary

ARTICLES OF AMENDMENT - Page 17

# Exhibit - B

**FOSTER DEC. EX. 20 pg. 246**



# BOND DECLARATION EXHIBIT 5

RODERICK C. BOND, ISB No. 8082
RODERICK BOND LAW OFFICE, PLLC
800 Bellevue Way NE, Suite 400
Bellevue, WA  98004
Tel: (425) 591-6903
Fax: (425) 321-0343
Email: rod@roderickbond.com
Attorney for Plaintiffs

IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE STATE OF
IDAHO, IN AND FOR THE COUNTY OF NEZ PERCE

| | |
|---|---|
| PAUL D. DURANT, an individual; DALE L. MIESEN, an individual; DONNA J. TAYLOR, an individual; | Case No.: CV-14-01444 |
| Plaintiffs, | DECLARATION OF DONNA J. TAYLOR |
| v. | |
| GEMCAP LENDING I, LLC, a Delaware limited liability company; AIA SERVICES CORPORATION, an Idaho corporation; AIA INSURANCE, INC., an Idaho corporation and a 100% wholly owned subsidiary of AIA Services Corporation; | |
| Defendants. | |

I, Donna J. Taylor, declare:

1.      I am one of the plaintiffs in this action, over the age of eighteen and am competent

to testify in court, including as to the matters set forth in this declaration. This declaration is based

on my personal knowledge.

2.      I am the owner of 41,651.25 Series A Preferred Shares in AIA Services Corporation

("AIA Services").  I have not received a single payment on my Series A Preferred Shares since

May 30, 2008. The principal amount owed on my Series A Preferred Shares is over $416,512, plus

accrued interest since May 30, 2008. I am also the holder of my deceased daughter, Sara Taylor's, 18,593 common shares in AIA Services by and through being the Personal Representative of her estate.

3.      On December 28, 2009, I appointed attorney Patrick Moran to be my designee on the board of directors of AIA Services. My appointment of Mr. Moran was never honored, despite the clear and unequivocal terms of my right under AIA Services' amended articles of incorporation. On July 15, 2012, I appointed Paul D. Durant as my designee to the board of directors of AIA Services. Attached as **_Exhibit A_** is a true and correct copy of the Appointment of Director and Consent in Lue of Meeting Vote dated July 15, 2012. I was with my attorney when Exhibit A was hand delivered to AIA Services. Despite repeated demands upon attorneys representing AIA Services to honor my appointment to the board of AIA Services, Mr. Durant's appointment to the board of directors has never been honored.  Despite John Taylor, Connie Taylor Henderson and the other insiders' refusal to honor my appointments to the board of AIA Services, I maintain that Mr. Durant is a director and that no meetings or director action can be taken without his consent.

4.      The provisions and restrictions under Article Fourth of AIA Services' amended articles of incorporation may not be modified or altered without my consent. I have never been asked to consent to AIA Services and AIA Insurance's Guarantee of the $10 Million loan for CropUSA Insurance and CropUSA Insurance Services. I have not consented nor would I ever consent to allow AIA Services and AIA Insurance's Guarantee of the debt that CropUSA Insurance Agency and CropUSA Insurance Services owes to Gemcap Lending I, LLC by and through the "Security Agreement – Guarantee" dated October 1, 2012 ("Guarantee"). From the time that the Guarantee was entered into the present time, CropUSA Insurance Agency and CropUSA Insurance

CropUSA Insurance Services have not been subsidiaries of AIA Services or AIA Insurance.

5.      I never received any notice of a shareholder meeting to approve AIA Services or AIA Insurance's guarantee of any loans for CropUSA Insurance Agency, Inc. or CropUSA Insurance Services LLC. I never consented or approved any guarantees, including and specifically the Guarantee that is the subject of this lawsuit (a copy of which is attached to the complaint) nor would I consent. My attorney has demanded that AIA Services' board and attorneys take action to invalidate the Guarantee between AIA Services and AIA Insurance in favor of Gemcap Lending I, LLC, but no action has been taken. The enforcement of this guarantee will irreparably injure me in that the value of my Series A Preferred Shares will be worth nothing because there is no way AIA Services or AIA Insurance can pay the over $8,700,000 allegedly owed to Gemcap Lending I, LLC. I respectfully request that this Court have that guarantee declared illegal and unenforceable and take action through an injunction to protect AIA Services and AIA Insurance.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF IDAHO THAT THE FOREGOING IS TRUE AND CORRECT.

8/21/14 Lewiston, Id.

Date and City and State Signed

Donna J. Taylor

DECLARATION OF DONNA J. TAYLOR - 3

## CERTIFICATE OF SERVICE

    I, Roderick C. Bond, declare that, on the date indicated below, I served a true and correct copy of the forgoing on the following person(s) via the methods indicated below:

| | |
|---|---|
| R. John Taylor | **Via:** |
| AIA Services Corporation | ( ) U.S. Mail, Postage Prepaid |
| AIA Insurance, Inc. | (**X**) Hand Delivered |
| 111 Main St. | ( ) Overnight Mail |
| P.O. Box 538 | ( ) Facsimile – 208-799-9172 |
| Lewiston, ID 83501 | ( ) Messenger |
| [Attorney for AIA Services and AIA Insurance] | |

| | |
|---|---|
| Alyson A. Foster | **Via:** |
| Thomas A. Banducci | ( ) U.S. Mail, Postage Prepaid |
| Zachary S. Zollinger | ( ) Hand Delivered |
| Andersen Banducci PLLC | ( ) Overnight Mail |
| 101 S. Capitol Boulevard, Suite 1600 | ( ) Facsimile – 208-342-4455 |
| Boise, ID 83702 | (**X**) Email (by Agreement) |
| [Attorneys for Gemcap Lending I, LLC] | |

    Signed this 21st day of August, 2014, at Bellevue, Washington.

_____
Roderick C. Bond

DECLARATION OF DONNA J. TAYLOR - 4

## APPOINTMENT OF DIRECTOR AND CONSENT IN LIEU OF MEETING VOTE

**To:**   **AIA Services Corporation for inclusion in the minutes and filing with the corporate records.**

The undersigned, Donna J. Taylor, the sole shareholder of all outstanding Series A Preferred shares of AIA Services Corporation ("Company"), takes the following actions:

Pursuant to Article 4.2.8 of the Articles of Amendment to the Articles of Incorporation of AIA Services Corporation ("Amended Articles of Incorporation") and effective immediately, Donna J. Taylor hereby nominates and votes all of her Series A Preferred Shares in Company and appoints Paul D. Durant as a Director of the Board of Directors of the Company. Donna J. Taylor certifies that she has not assigned or encumbered her Series A Preferred Shares nor has she granted any other person or entity the right to vote such shares. Prior notice of any meetings of the Board of Directors, or action by the Directors, must be made to Paul D. Durant as follows:

> Paul D. Durant
> 3440 Selway Dr.
> Lewiston, ID 83501
> Tel: (208) 743-0930

This consent also constitutes a vote by Donna J. Taylor, without a meeting, nominating and voting all of her Series A Preferred Shares in favor of the election and appointment of Paul D. Durant to Company's Board of Directors as provided under I.C. § 30-1-704. Although Donna Taylor disputes the number of Series A Preferred Shares indicated on recently provided Company financial statements, the dispute is irrelevant for purposes of this vote and the appointment of Paul D. Durant as a Director because she is the sole Series A Preferred Shareholder of the Company and has voted all of her shares to appoint Paul D. Durant.

Dated this _15_ day of July, 2012, at Clarkston, WA.

_Donna J. Taylor_
Donna J. Taylor

SUBSCRIBED AND SWORN BEFORE ME THIS _5_ DAY OF JULY, 2012.

_____
Roderick C. Bond
Notary Public for the State of Washington
Residing at Bellevue, WA.

1

# BOND DECLARATION EXHIBIT 6

Case 2:18-cv-00370-BMP    ECF No. 9-22    filed 09/19/19    Page 294    Page 106
Case 3:13-cv-05804-BHS    Document 1-4    filed 11/06/13    Page 22 of 132    Page ID
of 132
of 5721

## Case History

### Cases for:  Taylor, Donna Jean
Nez Perce

**11  Cases Found.**

---

**Paul D Durant, etal. vs. GemCap Lending I LLC, etal.**

| | |
|---|---|
| **Case:** CV-2014-0001444 | **District** Filed: 07/21/2014  **Subtype:** Other Claims  **Judge:** Jeff M. Brudie  **Status:** Pending |
| **Defendants:** | AIA Insurance Inc  AIA Services Corporation An Idaho Corporation  GemCap Lending I LLC |
| **Plaintiffs:** | Durant, Paul D  Miesen, Dale L  Taylor, Donna Jean |

**Register Date of actions:**

| Date | Action |
|---|---|
| 07/21/2014 | New Case Filed-Other Claims |
| 07/21/2014 | Plaintiff: Taylor, Donna Jean Attorney Retained Roderick C Bond |
| 07/21/2014 | Plaintiff: Durant, Paul D Attorney Retained Roderick C Bond |
| 07/21/2014 | Plaintiff: Miesen, Dale L Attorney Retained Roderick C Bond |
| 07/21/2014 | Verified Complaint for Declaratory Relief and Injunctive Relief Filed |
| 07/21/2014 | Summons Filed/AIA Services Corp |
| 07/21/2014 | Summons Filed/Gemcap Lending LLC |
| 07/21/2014 | Summons Filed/AIA Insurance Inc. |
| 07/21/2014 | Filing: AA- All initial civil case filings in District Court of any type not listed in categories E, F and H(1) Paid by: Taylor, Donna Jean (plaintiff) Receipt number: 0011825 Dated: 07/21/2014 Amount: $221.00 (Check) For: Durant, Paul D (plaintiff) |
| 07/28/2014 | Miscellaneous Payment: For Making Copy Of Any File Or Record By The Clerk, Per Page Paid by: GS law Receipt number: 0012155 Dated: 07/28/2014 Amount: $52.00 (Credit card) |
| 07/28/2014 | Miscellaneous Payment: Technology Cost - CC Paid by: GS law Receipt number: 0012155 Dated: 07/28/2014 Amount: $3.00 (Credit card) |
| 07/30/2014 | Miscellaneous Payment: For Making Copy Of Any File Or Record By The Clerk, Per Page Paid by: Elam & Burke Receipt number: 0012248 Dated: 7/30/2014 Amount: $52.00 (Check) |
| 08/07/2014 | Notice Of Appearance |
| 08/07/2014 | Defendant: AIA Services Corporation An Idaho Corporation Attorney Retained R John Taylor |
| 08/07/2014 | Defendant: Aia Insurance Inc Attorney Retained R John Taylor |
| 08/07/2014 | Filing: I1 - Initial Appearance by persons other than the plaintiff or petitioner Paid by: R. John Taylor Receipt number: 0013191 Dated: 8/18/2014 Amount: $136.00 (Check) For: AIA Insurance Inc (defendant) and AIA Services Corporation An Idaho Corporation (defendant) |
| 08/12/2014 | Declaration of Roderick C. Bond |
| 08/12/2014 | Plaintiffs' Motion for Default Against Defendant Gemcap Lending, LLC |
| 08/12/2014 | Affidavit of Process Server ~ Served Gemcap Lending LLC: 7-22-14 |
| 08/13/2014 | |

Case 2:18-cv-00270-BMF ECF No. 9-22 filed 09/19/19 PageID.985 Page 107
Case 2:13-cv-05569-SAB Document 246-22 Filed 05/17/19 Page 28 of 120 Page ID
of 132
of 572

| 08/13/2014 | Filing: I1 - Initial Appearance by persons other than the plaintiff or petitioner Paid by: ANDERSON BANDUCCI Receipt number: 0013028 Dated: 8/13/2014 Amount: $136.00 (Credit card) For: Gemcap Lending I LLC (defendant) |
| 08/13/2014 | Filing: Technology Cost - CC Paid by: ANDERSON BANDUCCI Receipt number: 0013028 Dated: 8/13/2014 Amount: $3.00 (Credit card) For: Gemcap Lending I LLC (defendant) |
| 08/13/2014 | Notice Of Appearance ~ Defendant GemCap Lending 1, LLC |
| 08/13/2014 | Defendant: Gemcap Lending I LLC Attorney Retained Thomas A. Banducci |
| 08/13/2014 | Plaintiffs' Notice of Intent to Obtain an Order of Default and Default Judgment Against Defendants AIA Services Corporation and AIA Insurance, Inc. |
| 08/14/2014 | Plaintiffs' Notice of Intent to Obtain an Order of Default & Default Judgment Against Defendant GemCap Lending LLC |
| 08/18/2014 | Answer of Defendants AIA Services Corporation and AIA Insurance, Inc. |
| 08/20/2014 | GemCap Lending I LLC's Answer to Complaint |
| 08/21/2014 | Plaintiffs' Motion for Partial Summary Judgment Against the Defendants |
| 08/21/2014 | Declaration of Donna J. Taylor |
| 08/21/2014 | Declaration of Dale L. Miesen |
| 08/21/2014 | Declaration of Paul D. Durant |
| 08/21/2014 | Plaintiffs' Motion to Shorten Time |
| 08/21/2014 | Notice Of Hearing ~ 9-11-14 @ 9:00am or in alternative 9-18-14 @ 9:00am (if Court doesn't shorten time for hearing) |
| 08/21/2014 | Declaration of Roderick C. Bond |
| 08/21/2014 | Hearing Scheduled (Motion for Partial Summary Judgment 09/11/2014 09:00 AM) Plaintiffs |
| 08/21/2014 | Hearing Scheduled (Motion for Partial Summary Judgment 09/18/2014 09:00 AM) Plaintiffs |
| 08/21/2014 | Hearing Scheduled (Hearing 09/11/2014 09:00 AM) Plaintiffs' Motion to Shorten Time |
| 08/25/2014 | Plaintiffs' Notice Regarding Hearing Scheduled for Motion to Shorten Time and Proposed Order for Shortening Time |
| 09/02/2014 | **VOLUME 2 STARTS** |
| 09/03/2014 | AIA Services Corporation and AIA Insurance, Inc. Opposition to Motion to Shorten Time and Motion for Continuance Pursuant to IRCP 56(F) |
| 09/03/2014 | Affidavit of Counsel in Support of AIA Services Corporation and AIA Insurance, Inc. Opposition to Motion to Shorten Time and Motion for Continuance Pursuant to IRCP 56(F) |
| 09/04/2014 | GemCap Lending I LLC's Motion to Strike Exhibits 2 and 4 to the Declaration of Roderick C. Bond |
| 09/04/2014 | Memorandum in Support of GemCap Lending I, LLC's Motion to Strike Exhibits 2 and 4 to the Declaration of Roderick C. Bond |
| 09/04/2014 | GemCap Lending I, LLC's Opposition to Plaintiffs' Motion for Partial Summary Judgment Against the Defendants |
| 09/04/2014 | |

FOSTER DEC, EX. 20 pg. 255

|  | Declaration of Thomas A. Banducci Re Gemcap Lending I, LLC's Opposition to Plaintiffs' Motion for Partial Summary Judgment |
|---|---|
| 09/04/2014 | GemCap Lending I, LLC's Opposition to Plaintiffs' Motion to Shorten Time |
| 09/04/2014 | GemCap Lending I, LLC's Motion to Dismiss or, Alternatively, to Stay Pending Outcome of Related Litigation |
| 09/04/2014 | Brief in Support of GemCap Lending I, LLC's Motion to Dismiss or, Alternatively, to Stay Pending Outcome of Related Litigation |
| 09/04/2014 | Declaration of Richard Ellis in Support of GemCap Lending I, LLC's Opposition to Plaintiffs' Motion for Partial Summary Judgment |
| 09/04/2014 | Request for Judicial Notice - Defendant GemCap Lending 1, LLC |
| 09/04/2014 | **Plaintiffs' Motion to Shorten Time NOT Granted - Hearing will be on 9-18-14 @ 9:00am** |
| 09/04/2014 | Hearing result for Hearing scheduled on 09/11/2014 09:00 AM: Motion Denied Plaintiffs' Motion to Shorten Time |
| 09/04/2014 | Hearing result for Hearing scheduled on 09/11/2014 09:00 AM: Hearing Vacated Plaintiffs' Motion to Shorten Time |
| 09/04/2014 | Hearing result for Motion for Partial Summary Judgment scheduled on 09/11/2014 09:00 AM: Hearing Vacated Plaintiffs |
| 09/12/2014 | Plaintiffs' (1) Reply in Support of Plaintiffs' Motion for Partial Summary Judgment Against the Defendants; (2) Response in Opposition to Defendants' Motions for Rule 56(f) Continuances; (3) Response in Opposition to GemCap's Motions to Strike; and (4) Preliminary Response in Opposition to GemCap's Motion to Dismiss and Motion to Stay |
| 09/12/2014 | Notice Of Hearing ~ 9-18-14 @ 9:00am PDT(Defendant GemCap's (1)Motion to Dismiss or Alternatively Stay Proceedings, (2)Motion to Strike Exhibits 2 and 4 to the Bond Declaration and (3) Request for Judicial Notice |
| 09/12/2014 | Hearing Scheduled (Hearing on Motions 09/18/2014 09:00 AM) Defendant GemCap's Motion to Dismiss or Stay, Motion to Strike and Request for Judicial Notice |
| 09/14/2014 | **VOLUME 3 STARTS** |
| 09/15/2014 | Plaintiff's Amended (1) Reply in Support of Plaintiffs' Motion for Partial Summary Judgment Against the Defendants; (2) Response in Opposition to Defendants' Motions for Rule 56(f) Continuances; (3) Response in Opposition to GemCap's Motions to Strike; and (4) Prelilminary Response in Opposition to GemCap's Motion to Dismiss and Motion to Stay |
| 09/15/2014 | Supplemental Declaration of Roderick C. Bond |
| 09/17/2014 | GemCap Lending I LLC's Response to Plaintiffs' Request for Attorney's Fees Under Rule 56(g) |
| 09/17/2014 | Reply in Support of GemCap Lending I LLC's Motion to Strike Exhibits 2 and 4 to the Declaration of Roderick C. Bond |
| 09/17/2014 | Reply in Support of GemCap Lending 1 LLC's Motion ot Dismiss or, Alternatively, to Stay Pending Outcome of Related Litigation |
| 09/18/2014 | Hearing result for Hearing on Motions scheduled on 09/18/2014 09:00 AM: Hearing Held Defendant |

FOSTER DEC, EX. 20 pg. 256

Case 2:18-cv-00370-BMF    ECF No. 9-23    filed 09/18/18    Page ID.297    Page 109
Case 3:13-cv-05804-BHS    Document 246-4    Filed 06/05/17    Page 228 of 250    Page ID #:5724
of 132

| | GemCap's Motion to Dismiss or Stay, Motion to Strike and Request for Judicial Notice |
|---|---|
| 09/18/2014 | Hearing result for Hearing on Motions scheduled on 09/18/2014 09:00 AM: District Court Hearing Held Court Reporter: Linda Carlton Number of Transcript Pages for this hearing estimated: Less than 100 pages Defendant GemCap's Motion to Dismiss or Stay, Motion to Strike and Request for Judicial Notice |
| 09/18/2014 | Hearing result for Motion for Partial Summary Judgment scheduled on 09/18/2014 09:00 AM: Hearing Vacated Plaintiffs |
| 09/18/2014 | Defendant GemCap Lending 1 LLC's Motion to Stay is Granted |
| 09/18/2014 | Minute Entry Hearing type: Hearing on Motions Hearing date: 9/18/2014 Time: 9:05 am Courtroom: Court reporter: Linda Carlton Minutes Clerk: PAM Tape Number: Crtrm #1 Plaintiffs: Roderick C. Bond Defendant GemCap Lending 1 LLC: Thomas A. Banducci Defendant AIA Insurance & AIA Services |
| 09/26/2014 | Notice of Unavailability ~ Plaintiffs' Counsel 9-30-14 ~ 10-25-14 |
| 09/29/2014 | Declaration of Roderick C. Bond and Objection to GemCap's Proposed Order ~ Plaintiffs |
| 10/27/2014 | Notice Of Service-defendant GemCap Lending I, LLC |

JOHN H. GUIN, CSB 282725
john@guinlaw.com
LAW OFFICE OF JOHN H. GUIN, PLLC
421 W. Riverside Ave., Suite 461
Spokane, WA 99201
Telephone: (509) 747-5250
Facsimile: (509) 747-5251

*Attorney for Intervenor*
*DONNA J. TAYLOR*

THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DISTRICT

| | |
|---|---|
| GEMCAP LENDING I, LLC, a Delaware limited liability company,<br><br>    Plaintiff,<br><br>  vs.<br><br>CROP USA INSURANCE AGENCY, INC., an Idaho corporation; CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company; CROP, LLC, a limited liability company of unknown origin; AIA INSURANCE, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; R. JOHN TAYLOR a/k/a RAY JOHNSON TAYLOR a/k/a R. JOHNSON TAYLOR a/k/a RAYMOND J. TAYLOR, an Individual; REINSURANCE PARTNERS, LLC, an Idaho limited liability company; GREEN LEAF REINSURANCE | Case No.: CV13-5504 SJO (MAN)<br><br>Hon. S. James Otero<br><br>**[proposed]**<br>**INTERVENOR DONNA J. TAYLOR'S:**<br><br>**(1) ADDITIONAL AFFIRMATIVE DEFENSES TO SECOND AMENDED COMPLAINT; AND**<br><br>**(2) INTERVENOR-COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

- 1 -

[proposed] INTERVENOR DONNA J. TAYLOR'S: (1) ADDITIONAL AFFIRMATIVE DEFENSES TO SECOND AMENDED COMPLAINT; AND (2) INTERVENOR-COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

PARTNERS, LLC, a Delaware limited
liability company; WESKAN AGENCY,
an Idaho assumed business name; PACIFIC
EMPIRE RADIO CORPORATION, an
Idaho corporation; RANDOLPH
LAMBERJACK, an individual; JOLEE
DUCLOS, an individual; BRYAN
FREEMAN, an individual; HILLCRAFT
AIRCRAFT COMPANY, an Idaho
corporation; CGB DIVERSIFIED
SERVICES, INC. d/b/a DIVERSIFIED
CROP INSURANCE SERVICES, a
Louisiana corporation; and GREENLEAF
REINSURANCE COMPANY,

                      Defendants.

DONNA J. TAYLOR, an individual
resident of the State of Washington,

                      Intervenor-Plaintiff

vs.

GEMCAP LENDING I, LLC, a Delaware
limited liability company; AIA
INSURANCE, INC., an Idaho corporation;
and AIA SERVICES CORPORATION, an
Idaho corporation,

                      Intervenor-Defendants

/ /

/ /

- 2 -

[proposed] INTERVENOR DONNA J. TAYLOR'S: (1) ADDITIONAL AFFIRMATIVE DEFENSES TO
SECOND AMENDED COMPLAINT; AND (2) INTERVENOR-COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

FOSTER DEC. EX. 20 pg. 259

## I.   ADDITIONAL AFFIRMATIVE DEFENSES

COMES NOW intervenor DONNA J. TAYLOR, on behalf of defendants AIA INSURANCE, INC. and AIA SERVICES CORPORATION (collectively "AIA Companies"), and by way of further Answer to the Second Amended Complaint (Doc. #102, filed 10/31/13) of GEMCAP LENDING I, LLC, alleges the following affirmative defenses in addition to those affirmative defenses previously alleged by the AIA Companies in their Answer to Second Amended Complaint and Affirmative Defenses (Doc. #114, filed 11/14/13):

### Twelfth Affirmative Defense

The Security Agreement – Guarantee upon which Plaintiff's claims against defendants AIA INSURANCE, INC. and AIA SERVICES CORPORATION are based is an illegal contract and is null, void, and unenforceable.

### Thirteenth Affirmative Defense

When purporting to execute the Security Agreement – Guarantee upon which Plaintiff's claims are based, the officers and/or directors of defendants AIA INSURANCE, INC. and AIA SERVICES CORPORATION did not act with express, actual, or apparent authority and the act of execution of the Guarantee was ultra vires, rendering the Security Agreement – Guarantee null, void, and unenforceable.

- 3 -

[proposed] INTERVENOR DONNA J. TAYLOR'S: (1) ADDITIONAL AFFIRMATIVE DEFENSES TO SECOND AMENDED COMPLAINT; AND (2) INTERVENOR-COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

FOSTER DEC. EX. 20 pg. 260

Case 3:18-cv-00279-BMR CF No. 8-21 filed 08/18/18 PageID 1001 Page
113 of 132
Case 1:16-cv-00403-DCN-CWD Document 14-30 Filed 04/03/17 Page 4 of 113 Page ID
#, 5723

**Fourteenth Affirmative Defense**

The Security Agreement – Guarantee upon which Plaintiff's claims against defendants AIA INSURANCE, INC. and AIA SERVICES CORPORATION are based is unenforceable due to lack of consideration.

## II.  INTERVENOR-COMPLAINT

Intervenor DONNA J. TAYLOR ("Donna Taylor") submits the following Intervenor-Complaint, pursuant to 28 U.S.C. § 2201 and other applicable law, alleging as follows and, to the extent necessary, in the alternative as follows:

### A.  Parties and Jurisdiction

1.  Intervenor-Plaintiff Donna Taylor is a resident of Clarkston, Washington.

2.  Intervenor-Defendant Gemcap Lending I, LLC ("Gemcap") is a Delaware limited liability company and it conducts business throughout the United States, including in Nez Perce County, Idaho with CropUSA Insurance Agency, Inc. and CropUSA Insurance Services, LLC, an Idaho corporation and Idaho limited liability company, respectively, both of which have principal places of business in Lewiston, Nez Perce County, Idaho.

3.  Intervenor-Defendant AIA Services Corporation ("AIA Services") is an Idaho corporation with its principal place of business located in Lewiston, Nez Perce County, Idaho.

- 4 -

FOSTER DEC. EX. 20 pg. 261

4.     Intervenor-Defendant AIA Insurance ("AIA Insurance") is an Idaho corporation with its principal place of business located in Lewiston, Nez Perce County, Idaho. During all relevant times, AIA Insurance is a 100% wholly owned subsidiary of AIA Services.

5.     Intervenor-Defendants AIA Services and AIA Insurance own real property in Lewiston, Idaho. The ownership of AIA Services and AIA Insurance's real property is at issue by and through their purported grant of security interests in all of their assets to Gemcap and/or by and through Gemcap's attempt to collect over the over $8.7 million, plus accrued interest, owed by CropUSA Insurance Agency, Inc. and CropUSA Insurance Services, LLC from AIA Services and AIA Insurance through their purported Guarantee of that indebtedness.

6.     Intervenor-Defendant Gemcap is a citizen of Delaware.   Intervenor-Defendants AIA Services and AIA Insurance are citizens of Idaho.   Intervenor-Plaintiff Donna Taylor is a citizen of Washington.   The matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.00.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) and (c)(1) because there is diversity between the plaintiff, Gemcap, and all defendants, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest or costs.

- 5 -

---

[proposed] INTERVENOR DONNA J. TAYLOR'S: (1) ADDITIONAL AFFIRMATIVE DEFENSES TO SECOND AMENDED COMPLAINT; AND (2) INTERVENOR-COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

### B.   Factual Background

7.   Donna Taylor owns 41,651.25 Series A Preferred Shares in defendant AIA
Services, with a principal value of $416,512, plus accrued interest since December 3,
2003.  Donna Taylor has held these 41,651.25 Series A Preferred Shares since the shares
were issued to her in or about late 1987.

8.   On or about November 23, 2011, Gemcap entered into a Loan and Security
Agreement with CropUSA Insurance Agency, Inc. and CropUSA Insurance Services,
LLC (collectively "CropUSA"), neither of which were a wholly owned subsidiaries of
AIA Services or AIA Insurance from 2011 through the present time, which such Loan
and Security Agreement was subsequently amended on April 1, 2012, July 18, 2012, and
February 4, 2013 (the original loan and all subsequent amendments are collectively
referred to as the "Loan").

9.   On October 1, 2012, Gemcap entered into a "Security Agreement –
Guarantee" with AIA Services and AIA Insurance ("Guarantee").  A true and correct
copy of the Guarantee is attached as Exhibit A and incorporated by reference in this
complaint.  When Gemcap entered into the Guarantee, it was aware that the Guarantee
did not and could not provide any benefit to AIA Services or AIA Insurance.  AIA
Services and AIA Insurance received no consideration for entry into the Guarantee and
most of the Loan's indebtedness was already owed as of October 1, 2012.

- 6 -

FOSTER DEC. EX. 20 pg. 263

10.    The Guarantee was signed by R. John Taylor, as the purported President of AIA Services and the purported President of AIA Insurance.  Gemcap was aware, or should have been aware with the exercise of reasonable diligence, that R. John Taylor has no authority to execute the Guarantee on behalf of AIA Services or AIA Insurance.

11.    On December 20, 2012, Gemcap filed a UCC financing statement with the Idaho Secretary of State stating that AIA Services and AIA Insurance had pledged "All of each of Debtor's right, title and interest, whether now existing or hereafter acquired, in and to all assets of such Debtor, wherever located, whether tangible or intangible, and the proceeds and products thereof" ("Financing Statement").

12.    Under the terms of the Loan, CropUSA could borrow up to $10,000,000 and the borrowed funds must be used solely for CropUSA.  Upon information and belief, CropUSA owed Gemcap $8,676,288.39, plus interest, attorneys' fees and costs, as of July 26, 2013.

13.    Under the terms of the Loan, interest accrued at 18.5% per annum and 24% upon a default.  Upon information and belief, Gemcap provided CropUSA and other parties a notice of default through a notice dated July 16, 2013.  Upon information and belief, Gemcap provided a purported notice of default and demand for payment to AIA Services and AIA Insurance of the $8,676,288.39 owed by CropUSA through a notice dated July 29, 2013.

- 7 -

FOSTER DEC. EX. 20 pg. 264

14.     Upon information and belief, the Loan has a present balance due of over $10,300,000, plus attorneys' fees and costs and Gemcap filed the preswent lawsuit with no prospects that CropUSA will ever be able to pay the entire indebtedness.

15.     Upon information and belief, prior to entering into the Loan with CropUSA, Gemcap conducted a litigation report on R. John Taylor and others. Gemcap and its counsel knew, or with reasonable diligence should have known, that the rightful owners of at least part of CropUSA Insurance Agency Inc.'s assets were in dispute, as confirmed by the derivative action filed against CropUSA Insurance Agency Inc. in 2010 and now pending in the United States District Court in Idaho (a lawsuit in which R. John Taylor is also a named defendant).

16.     From December 29, 1987 through the present time, AIA Services' amended articles of incorporation provided that AIA Services was barred from guaranteeing any loans for any entity that was not a wholly owned subsidiary of AIA Services.

17.     Under Idaho law, "All corporate powers shall be exercised by or under the authority of…its board of directors, subject to any limitation set forth in the articles of incorporation." I.C. § 30-1-801(2). Under Idaho law, "The articles of incorporation may set forth…Provisions not inconsistent with the law regarding…Managing the business and regulating the affairs of the corporation, Defining, limiting and regulating the powers of the corporation, its board of directors, and shareholders…" I.C. § 30-1-202(2)(b)(ii)-

- 8 -

FOSTER DEC. EX. 20 pg. 265

(iii) (emphasis added). Under Idaho law, "Every corporation incorporated under this chapter has the purpose of engaging in any lawful business unless a more limited purpose is set forth in the articles of incorporation." I.C. § 30-1-301(1) (emphasis added). Under Idaho law, "Unless its articles of incorporation provide otherwise, every corporation…has the same powers as an individual to do all things necessary…to make contracts and guarantees…" I.C. § 30-1-302(7) (emphasis added).

18.   When Gemcap entered into the Guarantee with AIA Services and AIA Insurance, it knew, or should have known, that AIA Services amended articles of incorporation filed on May 8, 1996, which are attached as Exhibit B and incorporated by reference, provided that neither AIA Services nor its wholly owned subsidiary, AIA Insurance, could guarantee the Loan for CropUSA (neither CropUSA Insurance Agency, Inc. nor CropUSA Insurance Services, LLC was a wholly owned subsidiaries at the time of the Guarantee):

> [AIA Services] will not, and will not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume, guaranty or otherwise become or remain directly liable with respect to, any Indebtedness.

(Exhibit B, p. 4, § 4.2.9(c).)  The Guarantee separately violated the "Transactions with Shareholders and Affiliates" covenant of AIA Services' amended articles of incorporation because no reasonable director or officer would have authorized the entry

- 9 -

FOSTER DEC. EX. 20 pg. 266

into the Guarantee. AIA Services and AIA Insurance's Guarantee violates and is barred by AIA Services' amended articles of incorporation and thus violated Idaho law, including I.C. § 30-1-801(2); I.C. § 30-1-202(2)(b)(ii)-(iii); I.C. § 30-1-302(7). "An illegal contract is one that rests on illegal consideration consisting of any act or forbearance which is contrary to law or public policy." *Farrell v. Whiteman*, 146 Idaho 604, 609, 200 P.3d 1153, 1158 (2008). As a result, the Guarantee is illegal as a matter of law, as is any document, instrument or agreement executed in furtherance of that illegal Guarantee.

19. From the time that R. John Taylor executed the Guarantee on October 1, 2012 through the present time, he, Connie Taylor Henderson and James Beck were the purported directors of AIA Services and AIA Insurance (collectively "Boards of Directors"). The Boards of Directors knew that AIA Services and AIA Insurance were barred from entering into the Guarantee and pledging any security or property to Gemcap to secure CropUSA's obligations under the Loan. The Boards of Directors had no authority to authorize R. John Taylor to enter into the Guarantee on behalf of AIA Services or AIA Insurance. Despite demands upon the Boards of Directors to take action against Gemcap to invalidate the Guarantee, they have refused to do so, which further supports the Boards of Directors untenable positions.

- 10 -

FOSTER DEC. EX. 20 pg. 267

20.    Gemcap was aware, or should have been aware upon the exercise of reasonable due diligence, that AIA Services and AIA Insurance could not lawfully enter into the Guarantee. Gemcap did not accept the Guarantee in good faith and it is not entitled to assert any defenses which may normally be available to a good faith lender.

21.    Donna Taylor did not consent to AIA Services and AIA Insurance entering into the Guarantee or the pledge of assets and granting of security interests to Gemcap under the Guarantee nor did she consent to the Loan.  The Guarantee was not entered into for normal business purposes.

22.    No authorization was sought or obtained from AIA Services common or preferred shareholders for the Guarantee. Upon information and belief, no authorization was sought or obtained from AIA Insurance's sole shareholder, AIA Services, nor could such authorization have been obtained because AIA Services was barred from doing so.

23.    Under the law, the "directors of a corporation may bind a corporation only when they act at a legal meeting of the board" and a "meeting held without notice to some or any of the directors and in their absence is illegal, and action taken at such a meeting, although by a majority of the directors, is invalid." *Stone v. American Lacquer Solvents Co.*, 345 A.2d 174, 176-77 (Pa. 1975); *Marine Services Unlimited, Inc. v. Rakes*, 918 S.W.2d 132, 134 (Ark. 1996); 14B AM. JUR. 2D CORPORATIONS § 1258; 18B AM. JUR. 2D CORPORATIONS § 1264.

- 11 -

[proposed] INTERVENOR DONNA J. TAYLOR'S: (1) ADDITIONAL AFFIRMATIVE DEFENSES TO SECOND AMENDED COMPLAINT; AND (2) INTERVENOR-COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

24.     Under AIA Services' amended articles of incorporation, Donna Taylor had the sole right to designate one person to the board of directors of AIA Services.  Gemcap knew, or should have known, that Donna Taylor's designee was required to be a member of the board of directors of AIA Services and that her right was not being honored as reflected by the annual reports filed with the Idaho Secretary of State and the various lawsuits pending in federal and state court in Idaho.  Neither Donna Taylor nor her recent designee to AIA Services' board of directors has received any notices of any board meetings to authorize the Guarantee or the Loan, any document or instrument pertaining to the Guarantee or the Loan, or any of the security interests or property pledged under the Guarantee.

25.     Upon information and belief, Gemcap, AIA Services and AIA Insurance knew, or should have known with the exercise of reasonable due diligence, that no resolution was obtained from the Boards of Directors of AIA Services or AIA Insurance to authorize the Guarantee nor could such authorization be obtained, including, without limitation, because the Guarantee did not and could not be reasonably be believed to benefit AIA Services and AIA Insurance.

26.     Even if authorized by the law and organizational documents, the Guarantee could not be approved by the Boards of Directors because they all had irreconcilable conflicts of interest by way of their ownership in CropUSA and other entities unlawfully

- 12 -

FOSTER DEC. EX. 20 pg. 269

derived from AIA Services and AIA Insurance and by having participated or acquiesced in unlawful acts and malfeasance.

27.     Gemcap, AIA Services and AIA Insurance knew, or should have known with the exercise of reasonable due diligence, that the Guarantee separately violated AIA Services' Restated Bylaws, including, Section 4.14, Director Conflicts of Interest, Section 6.2, Loans, and Section 14.1, Certain Corporate Loans and Guarantees.

28.     Gemcap, AIA Services and AIA Insurance knew, or should have known with the exercise of reasonable due diligence, that the Guarantee separately violated AIA Insurance's Bylaws, including Section 4.14, Director Conflicts of Interest, Section 6.2, Loans, and Section 14.1, Certain Corporate Loans and Guarantees.

29.     Despite numerous demands by Donna Taylor and her counsel over the last year, Gemcap has refused to release AIA Services and AIA Insurance from the Guarantee and AIA Services and AIA Insurance have failed to take any action to comply with their amended articles of incorporation and to have the Guarantee declared illegal, void and unenforceable.

30.     If AIA Services and/or AIA Insurance is obligated under the Guarantee, AIA Services and/or AIA Insurance will be irreparably harmed because neither corporation has the funds or assets to satisfy the over $8.7 million, plus accrued interest, owed to Gemcap.  If AIA Services and/or AIA Insurance is obligated under the Guarantee, AIA

- 13 -

FOSTER DEC. EX. 20 pg. 270

Services and/or AIA Insurance would both likely be forced into bankruptcy protection. The payment of any sums, or the transfer of any real or personal property, by AIA Services or AIA Insurance under the Guarantee would cause them irreparable harm because their respective businesses generate little revenues and such revenues continue to decline. The enforcement of the Guarantee will separately irreparably impact the value of Donna Taylor's preferred shares in AIA Services and her right to share preferentially in the assets of AIA Services and its subsidiary.

### C. First Cause of Action – Declaratory Judgment and Preliminary and Permanent Injunctive Relief

31. Donna Taylor re-alleges and incorporates each and every allegation contained in other paragraphs of the Intervenor-Complaint necessary to support this cause of action.

32. The Guarantee, together with any related agreements and instruments pertaining to AIA Services and AIA Insurance, violates AIA Services and AIA Insurance's amended articles of incorporation, bylaws and/or the law, and are thus unlawful, illegal, void and/or unenforceable.

33. Donna Taylor requests a declaratory judgment that: (i) the Guarantee (Exhibit A), together with any subsequent modifications, instruments, deeds of trust, and agreements relating thereto, are unlawful, illegal, void and unenforceable; (ii) the

- 14 -

FOSTER DEC. EX. 20 pg. 271

Financing Statement, together with any amendments or subsequent financing statements, filed with the Idaho Secretary of State and any other state are unlawful, illegal, void and unenforceable; (iii) any security interests, deeds of trust, mortgages and any other instrument or right granted by AIA Services and AIA Insurance in favor of Gemcap are unlawful, illegal, void and unenforceable; (iv) any real property, property or funds paid to Gemcap, directly or indirectly, through funds or assets derived from AIA Services and AIA Insurance must be returned to AIA Services and AIA Insurance by and through depositing those funds, deeds and/or instruments with this Court; (v) any forbearance agreements and/or settlement agreements pertaining to Gemcap and AIA Services and/or AIA Insurance are unlawful, illegal, void and unenforceable; (vi) Gemcap is barred from seeking, through a court of law or any other means, recovery and/or payment of any money, assets, property and/or real property directly or indirectly from AIA Services and AIA Insurance on the Guarantee and any related agreements or instruments; (vii) AIA Services and AIA Insurance must expressly comply with all terms, conditions and restrictions under their respective amended articles of incorporation, bylaws and Idaho Code (including the Idaho Business Corporation Act); and (viii) such other declaratory relief reasonably contemplated by this complaint and/or as Donna Taylor may request at or before trial.

- 15 -

[proposed] INTERVENOR DONNA J. TAYLOR'S: (1) ADDITIONAL AFFIRMATIVE DEFENSES TO SECOND AMENDED COMPLAINT; AND (2) INTERVENOR-COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

34.     Donna Taylor further requests a temporary restraining order, preliminary injunction, and permanent injunction against Gemcap, AIA Services and/or AIA Insurance for any one or more of the declaratory relief items listed above or any part of them, for any such relief reasonably contemplated by this complaint and/or any such relief as may be requested at or before trial.

### D.    Prayer for Relief

WHEREFORE, Donna Taylor prays for the following relief:

1.     That plaintiff Gemcap take nothing by way of its Second Amended Complaint against defendants AIA Services and AIA Insurance and for dismissal of Gemcap's Second Amended Complaint, with prejudice, against defendants AIA Services and AIA Insurance;

2.     For a declaratory judgment against Gemcap, AIA Services and AIA Insurance for the declaratory relief requested above and any further declaratory relief requested at or before trial;

3.     For a temporary restraining order, preliminary injunction and permanent injunction consistent with the relief requested above and any further temporary restraining order, preliminary injunction and/or permanent injunction as may be requested before or at trial;

- 16 -

FOSTER DEC. EX. 20 pg. 273

4.      For an award of attorney's fees and costs incurred in this action pursuant to Idaho Law, including, without limitation, I.C. § 12-120(3) and I.C. § 12-121; and

5.      For such other relief that Donna Taylor may request at or before trial and/or such relief as the Court deems just and equitable.

DATED: January 8, 2015                          LAW OFFICE OF JOHN H. GUIN, PLLC


                                                */s/ John H. Guin*
                                                John H. Guin
                                                *Attorney for Intervenor DONNA J. TAYLOR*

- 17 -

[proposed] INTERVENOR DONNA J. TAYLOR'S: (1) ADDITIONAL AFFIRMATIVE DEFENSES TO
SECOND AMENDED COMPLAINT; AND (2) INTERVENOR-COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF

FOSTER DEC. EX. 20 pg. 274

THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DISTRICT

| | |
|---|---|
| GEMCAP LENDING I, LLC, a Delaware limited liability company, | Case No.: CV13-5504 SJO (MAN) |
| Plaintiff, | |
| vs. | [PROPOSED] **ORDER GRANTING INTERVENOR DONNA J. TAYLOR'S MOTION TO INTERVENE** |
| CROP USA INSURANCE AGENCY, INC., an Idaho corporation; CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company; CROP, LLC, a limited liability company of unknown origin; AIA INSURANCE, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; R. JOHN TAYLOR a/k/a RAY JOHNSON TAYLOR a/k/a R. JOHNSON TAYLOR a/k/a RAYMOND J. TAYLOR, an Individual; REINSURANCE PARTNERS, LLC, an Idaho limited liability company; GREEN LEAF REINSURANCE PARTNERS, LLC, a Delaware limited liability company; WESKAN AGENCY, an Idaho assumed business name; PACIFIC EMPIRE RADIO CORPORATION, an | |

- 1 -

[PROPOSED] ORDER GRANTING INTERVENOR DONNA J. TAYLOR'S MOTION TO INTERVENE

**FOSTER DEC. EX. 20 pg. 275**

Idaho corporation; RANDOLPH
LAMBERJACK, an individual; JOLEE
DUCLOS, an individual; BRYAN
FREEMAN, an individual; HILLCRAFT
AIRCRAFT COMPANY, an Idaho
corporation; CGB DIVERSIFIED
SERVICES, INC. d/b/a DIVERSIFIED
CROP INSURANCE SERVICES, a
Louisiana corporation; and GREENLEAF
REINSURANCE COMPANY,

               Defendants.

      Intervenor Donna J. Taylor's Motion to Intervene came on regularly for hearing before the Court on February 9, 2015, the Honorable Judge S. James Otero presiding, with the parties having appeared through their counsel of record, and the Court having read and considered the Motion to Intervene, together with supporting memorandum, declarations and all other pleadings and papers filed in this case.

      Good cause appearing therefor, the Motion to Intervene is hereby **GRANTED**.

      As the sole Series A Preferred shareholder of defendant AIA Services Corporation, Intervenor Donna J. Taylor has established that she has a significantly protectable interest in challenging the legality or enforceability of the Security Agreement – Guarantee executed between the plaintiff, Gemcap Lending I, LLC, and defendants AIA Services Corporation and AIA Insurance, Inc., which Guarantee is the subject of the action. Donna Taylor has also established that an adverse judgment based on the Guarantee or a settlement which assumes liability under the Guarantee will impair or impede her ability

- 2 -

[PROPOSED] ORDER GRANTING INTERVENOR DONNA J. TAYLOR'S MOTION TO INTERVENE

to protect her interest and that AIA Services Corporation and AIA Insurance, Inc. have inadequately represented her interest in the subject matter of the action.  Finally, Donna Taylor has established that the motion to intervene is timely.  Therefore, pursuant to Federal Rule of Civil Procedure 24(a)(2), Donna Taylor shall intervene in this action as a matter of right.

Alternatively, Intervenor Donna Taylor has established that diversity jurisdiction exists in relation to her asserted claims and defenses, that the motion is timely, and that issues regarding the legality and enforceability of the Guarantee share common questions of fact and law with the pending litigation.  Therefore, pursuant to Federal Rule of Civil Procedure 24(b), Donna Taylor is permitted to intervene in this action.

Within fourteen (14) days of entry of this Order, Donna Taylor shall file Intervenor Donna J. Taylor's: (1) Additional Affirmative Defenses to the Second Amended Complaint; and (2) Intervenor-Complaint for Declaratory Judgment and Injunctive Relief.

SO ORDERED

DATED: _____         By: _____
                                      Hon. S. James Otero
                                      United States District Judge

- 3 -

[PROPOSED] ORDER GRANTING INTERVENOR DONNA J. TAYLOR'S MOTION TO INTERVENE

Case 2:18-cv-00272-BMP-CWD Document 9-22 Filed 09/18/18 Page 131 of 132
Case 2:16-cv-08604-SDW-LDW Document 9-22 Filed 09/18/17 PageID.1043 Page 130 of 132
PageID.5745

JOHN H. GUIN, CSB 282725
john@guinlaw.com
LAW OFFICE OF JOHN H. GUIN, PLLC
421 W. Riverside Ave., Suite 461
Spokane, WA 99201
Telephone: (509) 747-5250
Facsimile: (509) 747-5251

*Attorney for Intervenor*
*DONNA J. TAYLOR*

THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DISTRICT

| | |
|---|---|
| GEMCAP LENDING I, LLC, a Delaware limited liability company, | Case No.: CV13-5504 SJO (MAN) |
| Plaintiff, | |
| vs. | **PROOF OF SERVICE** |
| CROP USA INSURANCE AGENCY, INC., an Idaho corporation; CROP USA INSURANCE SERVICES, LLC, an Idaho limited liability company; CROP, LLC, a limited liability company of unknown origin; AIA INSURANCE, INC., an Idaho corporation; AIA SERVICES CORPORATION, an Idaho corporation; R. JOHN TAYLOR a/k/a RAY JOHNSON TAYLOR a/k/a R. JOHNSON TAYLOR a/k/a RAYMOND J. TAYLOR, an Individual; REINSURANCE PARTNERS, LLC, an Idaho limited liability company; GREEN LEAF REINSURANCE PARTNERS, LLC, a Delaware limited liability company; WESKAN AGENCY, an | |

- 1 -

Proof of Service

Idaho assumed business name; PACIFIC EMPIRE RADIO CORPORATION, an Idaho corporation; RANDOLPH LAMBERJACK, an individual; JOLEE DUCLOS, an individual; BRYAN FREEMAN, an individual; HILLCRAFT AIRCRAFT COMPANY, an Idaho corporation; CGB DIVERSIFIED SERVICES, INC. d/b/a DIVERSIFIED CROP INSURANCE SERVICES, a Louisiana corporation; and GREENLEAF REINSURANCE COMPANY,

Defendants.

I am a resident of the State of Washington, over the age of eighteen years, and not a party to this action.  My business address is: Law Office of John H. Guin, PLLC, 421 W. Riverside, Suite 461, Spokane, WA 99201.   On January 8, 2015, I served the following documents:

1.      Notice and Motion to Intervene by Intervenor Donna J. Taylor;

2.      Declaration of Roderick C. Bond in Support of Motion to Intervene by Intervenor Donna J. Taylor;

3.      Memorandum of Points and Authorities in Support of Motion to Intervene by Intervenor Donna J. Taylor;

4.      [proposed] Order Granting Intervenor Donna J. Taylor's Motion to Intervene;

- 2 -

Proof of Service

**FOSTER DEC. EX. 20 pg. 279**

5.     [proposed] Intervenor Donna J. Taylor's: (1) Additional Affirmative Defenses to Second Amended Complaint; and (2) Intervenor-Complaint for Declaratory Judgment and Injunctive Relief.

  X    By Electronic Filing.  I hereby certify that on January 8, 2015, a copy of the foregoing documents were filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's electronic filing system.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: January 8, 2015                    _____
                                          John L. Guin
                                          *Attorney for Intervenor DONNA J. TAYLOR*

- 3 -

**FOSTER DEC. EX. 20 pg. 280**